**Docket No. 15-56452**

*In the*

# United States Court of Appeals

*for the*

# Ninth Circuit

E.F., a Minor, By and Through His Parents Eric Fulsang and Aneida Fulsang,
ERIC FULSANG and ANEIDA FULSANG,

*Plaintiffs-Appellants,*

v.

NEWPORT MESA UNIFIED SCHOOL DISTRICT,

*Defendant-Appellee.*

*Appeal from a Decision of the United States District Court for the Central District of California,
No. 8:14-cv-00455-CJC-RNB · Honorable Cormac J. Carney*

## BRIEF OF APPELLEE

S. DANIEL HARBOTTLE, ESQ.
SYDNEY BLAAUW, ESQ.
HARBOTTLE LAW GROUP
18401 Von Karman Avenue, Suite 200
Irvine, California 92612
(949) 428-8780 Telephone
(949) 428-8779 Facsimile
dharbottle@harbottlelaw.com
sblaauw@harbottlelaw.com

*Attorneys for Appellee,
Newport Mesa Unified School District*



COUNSEL PRESS · (800) 3-APPEAL

PRINTED ON RECYCLED PAPER



# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................iii

I.    BRIEF INTRODUCTION AND SUMMARY OF ARGUMENT .............1

II.   RESPONSE TO APPELLANTS' STATEMENT OF THE ISSUES .........4

III.  STATEMENT OF THE CASE ...................................................................5

      A.    PROCEDURAL HISTORY AND BACKGROUND FACTS .........5

      B.    SUMMARY OF RELEVANT FACTUAL EVIDENCE ...............11

            1.    2009-2010 School Year: Harper Preschool .........................11

            2.    2010-2011 School Year: Mariners Preschool......................12

            3.    2011-2012 School Year: Kindergarten .................................16

            4.    2012-2013 School Year: First Grade ....................................18

IV.   ARGUMENT ON APPEAL OF OAH DECISION ON
      IDEA CLAIMS.........................................................................................24

      A.    General Standard Of Review In IDEA Appeals .............................24

      B.    Both OAH And the District Court Applied The Correct
            Legal Standards Under the IDEA....................................................26

      C.    The Court Should Uphold The District Court's Affirmation of
            the OAH Decision ...........................................................................28

            1.    The District Court Properly Afforded The OAH Decision
                  Substantial Deference As Should This Court .......................29

            2.    The Challenged Elements Of The District's Assessment
                  And Educational Program Elements Were Properly
                  Found Appropriate. .............................................................30

V.    ARGUMENT ON NON-IDEA CLAIMS:  THE DISTRICT
      COURT'S GRANTING OF APPELLEE'S MOTION FOR
      SUMMARY JUDGMENT WAS PROPER...............................................41

      A.    Non-IDEA Claims Subject To Summary Judgment.......................41

      B.    Legal Standards Governing A Motion For Summary Judgment ....44

      C.     The District Was Entitled To Summary Judgment On
           Appellants' Section 504 And ADA Causes Of Action....................45

VI.    CONCLUSION.............................................................................62

CERTIFICATE OF COMPLIANCE...................................................63

STATEMENT OF RELATED CASES ...............................................64

CERTIFICATE OF SERVICE ...........................................................65

# TABLE OF AUTHORITIES

## CASES

*Adams v. State of Oregon,*
195 F.3d 1141 (9th Cir. 1999) ................................................................38, 39

*Amanda J. ex rel. Annette J. v. Clark Cty. Sch. Dist.,*
267 F.3d 877 (9th Cir. 2001) ................................................................24, 26

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986)...............................................................................44

*Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley,*
458 U.S. 176 (1982).......................................................................25, 27, 37

*Blake C. v. ex rel. Tina F. v. Dep't of Educ. State of Hawaii,*
593 F.Supp.2d 1199 (D. Haw. 2009)...........................................................27

*Burlington N., Inc. v. Weyerhaeuser Co.,*
719 F.2d 304 (9th Cir. 1983) ....................................................................28

*City of Canton v. Harris,*
489 U.S. 378 (1988)...............................................................................51

*Duvall v. County of Kitsap,*
260 F.3d 1124 (9th Cir.2001) ...............................................................49, 51

*G.D. ex rel. Dien Do v. Torrance Unified Sch. Dist.,*
857 F. Supp. 2d 953 (C.D. Cal. 2012).........................................................25

*Grant-Burton v. Covenant Care, Inc.,*
122 Cal. Rptr. 2d 204 (Cal. Ct. App. 2002),
*as modified on denial of reh'g* (July 30, 2002)..............................................9

*J.L. v. Mercer Island School Dist.,*
592 F.3d 938 (9th Cir. 2010) ....................................................................27

*J.W. ex rel. J.E.W. v. Fresno Unified Sch. Dist.,*
570 F. Supp. 2d 1212 (E.D. Cal. 2008) ..............................................49, 50, 51

*K.M. v. Tustin Unified School District/D.H. v. Poway Unified School District,*
725 F.3d 1088 (9th Cir. 2013) ...................................................2, 10, 43, 47

*K.S. v. Fremont Unified School Dist.,*
679 F.Supp.2d 1046 (N.D. Cal. 2009)........................................................38

*La Asociacion De Trabajadores De Lake v. City of Lake Forest*,
    624 F.3d 1083 (9th Cir. 2010.) ....................................................................11

*Lenn v. Portland Sch. Comm.*,
    998 F.2d 1083 (1st Cir. 1993)......................................................................28

*Meiner v. Ford Motor Co.*,
    94 Cal. Rptr. 702 (Cal. Ct. App. 1971).......................................................26

*Ojai Unified Sch. Dist. v. Jackson*,
    4 F.3d 1467 (9th Cir. 1993) ....................................................................9, 25

*Park v. Anaheim Union Sch. Dist.*,
    464 F.3d 1025 (9th Cir. 2006) .....................................................................25

*R.B., ex rel. F.B. v. Napa Valley Unified Sch. Dist.*,
    496 F.3d 932 (9th Cir. 2007) .......................................................................25

*R.P. v. Prescott Unified School Dist.*,
    631 F.3d 1117 (9th Cir. 2011) .....................................................................38

*Schaffer v. Weast*,
    546 U.S. 49 (2005)......................................................................................24

*T.B. ex rel. Brenneise v. San Diego Unified Sch. Dist.*,
    2012 WL 1611021 (S.D. Cal. May 8, 2012) .........................................*passim*

*Vinson v. Thomas*,
    288 F.3d 1145 (9th Cir.2002) .....................................................................47

*Wilson v. State Personnel Bd.*,
    130 Cal. Rptr. 292 (Cal. Ct. App. 1976).....................................................26

*Wong v. Regents of the Univ. of Cal.*, 192 F.3d 807, 816 n. 26 (9th Cir.
    1999) ...........................................................................................................59

## REGULATIONS

California Code of Regulations, Title 5 § 3030.....................................................14

## STATUTES AND RULES

20 U.S.C. § 1400 *et seq*...........................................................................................1

20 U.S.C. § 1414(a)(2)(A) .....................................................................................13

20 U.S.C. § 1414(a)(2)(B) .....................................................................................53

20 U.S.C. § 1415(b)(6)(B) ...................................................................11

20 U.S.C. § 1415(i)(2)(C) ...................................................................24

28 U.S.C. § 2111 .................................................................................28

29 U.S.C. § 794 ...........................................................................*passim*

29 U.S.C. § 794(a) ..............................................................................45

42 U.S.C. § 12132 ........................................................................45, 46

Cal. Ed. Code § 56381(a)(1),(2) .........................................................13

Cal. Ed. Code § 56505(l) .....................................................................11

Fed. R. Civ. P. § 56(a).........................................................................44

## I.    BRIEF INTRODUCTION AND SUMMARY OF ARGUMENT.

This case began as a California Office of Administrative Hearings ("OAH") adjudication by Appellant E.F. and his parents, Appellants Eric and Aneida Fulsang, against Appellee Newport-Mesa Unified School District.  Appellants challenged the appropriateness of several special education Individualized Educational Programs ("IEPs") the District had developed for E.F.  The matter was heard initially by OAH (the "OAH Action") pursuant to the Individuals with Disabilities Education Act ("IDEA").  20 U.S.C. § 1400 *et seq*.

Appellants appealed the outcome of the OAH Action to the federal district court, and added claims that went beyond the jurisdiction of OAH.  (USDC Case No. 10-cv-00455, ECF 1.)[1]  Those additional claims were later narrowed to claims under Section 504 of the Rehabilitation Action of 1978 ("Section 504) and the Americans With Disabilities Act ("ADA"), and various state statutes.  (Order Granting Defendant's Motion for Summary Judgment, Excerpts of Records "ER" 0049:8-19, "MSJ Order.")

The district court bifurcated its consideration of the overall matter into a first phase to consider the IDEA appeal, and a second phase to address the Non-IDEA claims.  (ECF 17 and 20.)  Bifurcation was appropriate because adjudication of the

---

[1] References to "ECF" herein are to the Electronic Court Filing numbers on the district court's docket in Case No. 10-cv-00455.

IDEA appeal provided dispositive facts as to the non-IDEA portion of the case. *See, K.M. v. Tustin Unified School District/D.H. v. Poway Unified School District*, 725 F.3d 1088, 1101 (9th Cir. 2013), noting that adjudication of IDEA claims may also "functionally adjudicate" non-IDEA claims such as those here under Section 504 and the ADA. In phase one, the district court affirmed the decision in the OAH Action ("OAH Decision," ER 0117-0177; Memorandum of Decision, ER 0089-0112.) In phase two, the district court then granted the District's Motion for Summary Judgment. ("MSJ Order," ER 0047-0060.)

Appellants have appealed to this Court the outcome of both phases of the district court matter, and this Court should affirm the lower court's determinations in their entirety. Regarding the IDEA claims, the OAH administrative law judge ("ALJ") Darrell Lepkowsky issued a thorough and careful decision, following a seven-day administrative trial and her review of a voluminous administrative record ("AR"). The OAH Decision was therefore entitled to substantial deference under the applicable legal standard, and was properly given such deference by the district court. (ER 0102.)

Appellants' central argument on the IDEA claims is that the OAH Decision was in error for failing to recognize the "complexities" of E.F.'s disabilities, and consequently to properly analyze his educational needs. In pursuing this argument in this Court, Appellants again urge that E.F. had more fully developed

2

communicative intent, at an earlier age, than recognized by either OAH, or the district court. However, using far more evidence than they have presented to this Court in their ER, Appellants succeeded in persuading OAH and the lower court *only* that the District ought to have tested E.F. with a high-tech device about a year before it did. Prior to that time, the evidence is clear that E.F. was not operating at a high enough cognitive and functional level to appropriately utilize such a device. The District did not appeal the ALJ's determination that the District ought to have tested E.F. in this domain sooner, but there simply are no grounds for modifying the ALJ's well-reasoned and balanced determinations in this regard.

On the non-IDEA claims, the district court exercised its authority to order a summary judgment motion to be filed, and properly granted summary judgment in favor of the District. (ER 0047-0060.) There were, as the court found, no genuine issues of material fact that would justify a denial of summary judgment. Appellants complain that they ought to have been permitted to conduct further discovery than they did, but this argument is without merit. First, as of the filing of the summary judgment motion, the case had been pending for approximately 18 months (March 2014-August 2015), and Appellants therefore had more than sufficient time to conduct any discovery they wished to conduct. Second, the substantial record developed in the OAH Action was more than sufficient to permit the district court's proper grant of summary judgment. In short, any disputes that

remained between the parties were not material to the court's legal analysis of the non-IDEA, Section 504 and ADA claims.

Appellants have failed to meet their burden before this Court to present sufficient grounds for reversal of any of the district court's factual or legal determinations. They have submitted a disjointed and unfocused Opening Brief, and a fragmented and deficient ER consisting of the challenged orders, and a little over 200 pages of documents from an AR of more than 2,700 pages. The District contends that this Court may affirm the district court decision simply on the basis of Appellants' failure to present a coherent argument or sufficient record of the evidence below. However, rather than rely upon Appellants' truncated ER, the District deems it appropriate to present the matter more fully for the Court's consideration, and submits its Supplemental Excerpts of Record ("SER") in support of its Answering Brief.

## II.    RESPONSE TO APPELLANTS' STATEMENT OF THE ISSUES.

Appellants' Opening Brief fails to clearly and concisely recite the issues before this Court, as required, on both their appeal of the IDEA administrative decision and their appeal of the Summary Judgment Order. However, Appellants appear to assert the following as their issues on appeal: (1) that based upon various findings of the ALJ with which Appellants disagree (e.g., E.F.'s cognition), the OAH Decision was not "thorough and careful" and thus not entitled to substantial

4

deference as afforded by the district court; (2) that the district court should not have ordered, nor ruled upon, the motion for summary judgment without permitting further discovery; and (3) that there were disputed issues of material fact presented to the district court that precluded summary judgment. In light of Appellants' failure to clearly articulate the issues under review, the District will address the determinations made by the ALJ and district court that could reasonably fall within these areas of review.

## III. STATEMENT OF THE CASE

### A. PROCEDURAL HISTORY AND BACKGROUND FACTS.

Appellants filed their initial administrative Request for Due Process with OAH on May 17, 2012. (SER 210-240.) After several continuances, Appellants amended their Request on May 9, 2013, nearly a year after their first filing. (SER 241-281.) The case was heard during the course of a seven-day administrative trial in October 2013. ALJ Darrell Lepkowsky adjudicated the following expressly delineated issues, which later came before the district court on the IDEA appeal:

1. Since May 16, 2010, did the District deprive Student of a free and appropriate public education (FAPE) when it failed to appropriately assess Student in all areas of suspected disability, specifically in the areas of cognitive ability, functional communications, assistive technology, social integration, and behavioral analysis?

2. Did the District fail to provide Student a FAPE at the IEP meetings of May 21, 2010; June 21, 2010; November 23, 2010; February 4, 2011; March 8, 2011; February 29, 2010; January 23, 2013; and May 2, 2013, by:

    a. Failing to address all of Student's unique needs;

    b. Failing to adopt appropriate goals; and

    c. Failing to provide appropriate placement and services in the areas of behavioral support, speech and language, parental training, occupational therapy, and assistive technology?

3. Since May 16, 2010, did the District deprive Student of a FAPE when it failed to have "highly qualified" staff to assess and provide services to Student in the areas of behavior intervention, inclusion, assistive technology, and individual aide support?

4. Did the District fail to conduct an appropriate Functional Behavior Analysis (FBA) and Sensory Diet Development Evaluation in May 2013 to determine Student's need for aide assistance, which resulted in the IEP team adopting a less than adequate Behavior Support Plan, Behavior Intervention Plan, and inappropriate aide support?

(OAH Decision, ER 0117-0177, at 0119.) At hearing, approximately 50 documentary exhibits were entered into evidence and the testimony of 16 witnesses

was received.  (MSJ Order, at ER 0100.)  On December 26, 2013, ALJ Lepkowsky issued a 61 page decision, finding that the District prevailed on all issues except a "small portion of Issues 1 and 2."  (OAH Decision at ER 0177.)  Specifically, the ALJ's only adverse determination against the District was that E.F. "should have been provided with assistive technology and corresponding speech services to support his use of the technology almost a year before the District implemented its use." (*Id.* at 0176, ¶90.)  Accordingly, the ALJ awarded Student 20 sessions of 20 minute, individual, assistive technology services, to assist him with using the iTouch for purposes of functional communication, but denied all other relief sought by Student.  (*Id.* at 0177.)  The District did not appeal this narrow adverse finding.

Appellants appealed to the district court on March 24, 2014 (ECF 1.)   As noted, the matter was bifurcated by Judge Carney (ECF 17 and 20), and heard in two phases.   The IDEA appeal was argued in June 2015, with the court's Memorandum of Decision affirming the OAH Decision issuing on June 23, 2015. (ER 89-112.)  The same day, via a separate order, the court directed the District to file its motion for summary judgment.  (ER 0062.)  The summary judgment motion was briefed and argued, and the court issued its decision granting the motion on August 25, 2015.  (ER 0047-0060.)

Appellants base their appeal to this Court on a stream of disconnected and unfocused assertions, attempting to undermine the prior adjudications on both the IDEA and non-IDEA phases of the case. Many of their assertions are not supported by citation to the underlying record, and are often, in fact, directly refuted by the evidence and testimony before the ALJ. For example, they argue that E.F. was making insufficient progress on his educational goals, which are an integral part of each special education student's IEP. In fact, there is ample evidence in the record that E.F. made meaningful progress. (*See e.g.* SER at 744-747, 750-756, 801-804, 862, 870, 884, 885-886, 955, 962-963, 972-973, and 983.)

This evidence was fully evaluated first by the ALJ, who stated, for instance, that, "Contrary to IABA's conclusions, Student was generally making good progress in school, as evidenced by the testimony of his teachers and Ms. Anderson. He had consistently met most of his goals and had made progress on those had had not met." (ER at 0152, ¶161.) As to the manner in which the District tracked E.F.'s progress on goals, the ALJ stated that, "[t]he form used by the District to review and describe a student's present levels of performance on goals and to describe new goals, is a *model of clarity*." (ER at 0148, ¶143; emphasis added.)

Appellants failed at the administrative level to meet their burden to prove that E.F. did not receive meaningful educational benefit. They failed again, before

the district court, to substantiate their claims of error by the ALJ.  Significantly, "[i]t is the duty of a party to support the arguments in its briefs by appropriate reference to the record, which includes providing exact page citations…[and] an appellate court may disregard any factual contention not supported by a proper citation to the record."  *Grant-Burton v. Covenant Care, Inc.*, 122 Cal. Rptr. 2d 204, 219 (Cal. Ct. App. 2002), *as modified on denial of reh'g* (July 30, 2002) (internal citations and original emphasis omitted).

Contrary to Appellants' assertions, the OAH Decision was thorough, careful, impartial, and sensitive to the complexities presented.  Thus, in accordance with the Ninth Circuit's standard of review for IDEA cases, it was proper for the lower court to give the ALJ's decision substantial weight.  *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1476 (9th Cir. 1993).  The fact that ALJ Lepkowsky did not find Appellants' key witness, Dr. Elizabeth Hughes, to be credible, and similarly found Dr. Hughes' functional behavior assessment ("FBA") report to be flawed, does not, as Appellants claim, provide evidence that the ALJ was incapable of understanding the complexity of the issues presented.

Instead, as an objective reading of the extensive OAH Decision demonstrates, ALJ Lepkowsky carefully and comprehensively analyzed all of the evidence placed before her.  Then, based upon that evidence, she made appropriate factual findings, and credibility determinations, and rendered correct conclusions

of law. The district court's determination that her decision was due substantial deference was correct, and this Court should likewise uphold both that decision and the district court's affirmation of it.

As for the summary judgment motion, the close relations between the various statutory schemes, and the overlap of material facts relevant to each such scheme, made this an appropriate case for summary adjudication of the non-IDEA claims. As the district court found, for instance, "a school district's provision of a FAPE under the IDEA meets Section 504 FAPE requirements." (ER 51:23-24, *quoting, K.M. v. Tustin, supra*, at 1099.) Here, as detailed below, Appellants' entire Section 504 claim was premised on a claimed violation of FAPE. (*See, e.g.,* ER 51:19-21, accurately characterizing Appellants' Section 504 claim.)

Similarly, under the ADA cause of action, Appellants articulation of their claims subjected those claims to summary judgment. Specifically, as the district court recognized, "Plaintiffs note that as, 'there is no significant difference between the substantive standards of the ADA and the Rehabilitation Act, the claims are therefore analyzed together.' "(ER 57:150-17, quoting Appellants' Complaint ¶ 217.) Thus, as the district court held, based on Appellants' pleading, the factual determinations for the IDEA phase of the case were also directly material to the non-IDEA elements of the case.

Appellants attempted to escape the clear language in their own Complaint by altering their theory of the case, but as the district court properly held, "[i]t is now too late in the day for Plaintiffs to change course and pick a different theory of liability under the ADA. A party 'may not effectively amend its Complaint by raising a new theory . . . in its response to a motion for summary judgment.'" (ER 58:1-5, *quoting*, *La Asociacion De Trabajadores De Lake v. City of Lake Forest*, 624 F.3d 1083, 1089 (9th Cir. 2010.)

**B.    SUMMARY OF RELEVANT FACTUAL EVIDENCE.**

**1.    2009-2010 School Year: Harper Preschool.**

On May 17, 2010, the start of the two-year statutory period in this case, Student was at the end of his first year in a preschool program. 20 U.S.C. § 1415(b)(6)(B); Cal. Ed. Code § 56505(l). (SER 210-240.) At that time, Student was receiving a FAPE via an annual IEP developed on February 9, 2010. (SER 296-328.) On April 15, 2010, an IEP Addendum was sent home for Parent's consideration. (SER 329.) The sole purpose of the April 15, 2010, IEP Addendum was to delete one IEP goal (sorting items by size) because Student had already met that goal, evidencing educational progress in this area. (Id.) On May 21, 2010, E.F.'s IEP team met to discuss Parents' concerns related to speech and language ("S/L") therapy, among other things. (SER 709.) As a result, the IEP team proposed changing one of Student's 30 minute group S/L sessions to two 15 minute

11

individual sessions.  (Id.)

### 2.    2010-2011 School Year: Mariners Preschool

### a.    November 23, 2010 Progress IEP Meeting

On November 23, 2010, the District convened an addendum IEP meeting to discuss Student's progress.  (SER 399, 986-987.)  Student's IEP team noted that he was making slower progress than the prior reporting period, though he was still making progress.  (SER 399, 744.)  While he could perform many tasks, he required significant adult support and prompting to do so.  (Id.)

As a result of Student's rate of progress, the IEP team identified several goals for modification.  (SER 399.)  Student's behavior goal for calming strategies was revised.  (*Id.*)  In the area of speech/language "S/L", two goals targeting the use of a Picture Exchange Communication System ("PECS") and a sentence strip were removed, as Student was not consistently demonstrating the foundational skills needed to use either form of basic augmentative communication.  (SER 399, 945-952.)  These goals were replaced with two foundational skills goals: consistent use of five communicative gestures, and matching 2-D pictures with 3-D objects. (SER 399.)  Parents provided full consent to the modifications in Student's goals. (SER 434.)

After discussing goal modifications, the school team also recommended a full early triennial reevaluation of E.F.'s educational needs. (SER 399, 435-482.)[2] The reevaluation would address underlying reasons for Student's rate of progress, and evaluate his difficulty demonstrating and retaining learned skills across settings. The District prepared an appropriate assessment plan on December 6, 2010, and Parents consented to it on December 31, 2010. (SER 748.) Parents did not request additional areas of assessment, nor did the IEP team believe any additional assessment areas were necessary. (SER 748, 953-954, 992.)

### b. Comprehensive Assessment and Annual IEP Meeting

E.F.'s comprehensive triennial assessment was conducted and discussed at Student's annual IEP meeting on February 4, 2011. (SER 435-451.) At the time of assessment, Student was 4 years, 10 months old. (*Id.*) The District's assessment was thorough, addressing each of E.F.'s suspected areas of need. (SER 435-482.)

E.F.'s cognitive functioning was assessed using two separate measures: the Mullen and the DAYC-Cognitive (used by both E.F.'s private provider and the District in years past). (SER 437-438, 1047-1048.) The Mullen revealed a T-score of 49, which is in the "very low range," with visual and receptive language skills at the 16-17 month range, expressive language skills at the 5 month range, and fine

---

[2]     Reevaluation must occur no less than every three years, but here the District proposed moving up this schedule as a proactive step. 20 U.S.C. § 1414(a)(2)(A); Cal. Ed. Code § 56381(a)(1),(2).

motor skills scattered as high as the 26 month range. (SER 444-445.) On the DAYC-Cognitive, Student received a standard score of "<50." (*Id.*)

District psychologist Ms. Eby Kent, a highly qualified school psychologist (SER at 0826-0828), credibly testified that these measures are reputable and valid for Student's age and profile, and that she believed the reported scores and age equivalencies were an accurate and reliable measurement of E.F.'s abilities.[3] While his cognitive scores continued to fall in the very low range, E.F. had shown personal growth, reflected by the increase in his raw score on the DAYC-Cognitive from its initial administration in 2009. (SER 1048-1049.) Student's adaptive behavior, social emotional functioning, S/L communication skills, fine motor and sensory processing needs were also all appropriately addressed. (SER 437.) Based on the comprehensive assessment results, the IEP team recommended that Student be found eligible for special education under the primary category of Autistic-Like Behaviors[4], with secondary disabilities of Intellectual Disability ("ID") and Speech/Language Impairment ("SLI"). (SER 483.)

---

[3] Appellants make vague challenge to the "expertise" of District staff (*see e.g.,* Opening Brief at 17), so the District has included in the SER the resumes of the various witnesses, including that of Ms. Kent noted above. (*See,* SER 0806-839.)

[4] Effective July 1, 2014, the terminology "Autistic-Like Behaviors" was replaced in the California Code of Regulations with "Autism." California Code of Regulations, Title 5 § 3030.

The IEP team reviewed Student's progress on his IEP goals for the prior year. (SER 514.) Student had fully met 7 of his 16 annual goals as written, and had made significant progress on all remaining goals. (SER 487-504.) Student's teacher noted that Student had shown increased independence since the IEP team met in November, and was able to demonstrate improved self-control. (SER 514.) He also increased his ability to communicate regarding non-preferred activities. (*Id.*) Parents noted that they had seen significant progress over the past year in the areas of fine and gross motor abilities, but were disappointed by the rate of progress in Student's communication skills. (*Id*.)

Based on the assessment of Student's abilities and behaviors and his progress on current goals, the IEP team developed and recommended 14 goals to address Student's unique educational needs in the areas of behavior, self-help, social/emotional development, readiness skills, visual attention, visual motor coordination, functional communication, and appropriate play skills. (SER 487-504, 993, 1031-1034, and 1036-1037.)

The offer of FAPE included continued placement in an intensive applied behavior analysis ("ABA") special day class ("SDC") for 5 hours and 15 minutes daily; group S/L therapy 1x30 minutes per week ("mpw"); individual S/L therapy 2x15 mpw; group occupational therapy ("OT") 1x30 mpw; and OT consultation 1x30 minutes monthly. (SER 483, 997-998, 1031-1034, and 1037.)

### c. Kindergarten Transition IEP Meeting

On April 19, 2011, the District convened Student's transition to kindergarten IEP meeting. (SER 555-556.) E.F.'s highly qualified kindergarten teacher, Ms. Burns (SER 814), and his highly qualified preschool teacher, Ms. DeNisi (SER 839), were both present at this IEP meeting and led a discussion of the similarities (many) and differences (few) between their respective classrooms. (SER 999-1000.) After a discussion of Student's progress and unique needs, the IEP team made the following offer of FAPE for Student's kindergarten year: placement in an intensive ABA SDC for 6.5 hours daily; group OT 1x30 mpw; and OT consultation 1x30 minutes monthly. (SER 556.) The offer of S/L services was again changed back to 2x15 mpw of individual services; however, group services were increased for E.F.'s kindergarten school year to 2x30 mpw, thereby maintaining a total of 1x90 mpw of S/L therapy. (SER 961-962.) The offer of FAPE again included appropriate mainstreaming opportunities. (SER 556.) Parents noted their disagreement with the level of individual S/L services, but consented to the offer of FAPE for kindergarten in its entirety. (SER 589-590.)

### 3. 2011-2012 School Year: Kindergarten

### a. Annual IEP Meeting

On February 29, 2012, the District convened Student's annual IEP meeting. The IEP team reviewed Student's progress, noting that Student had fully met 11 of

his 14 IEP goals and had made significant progress on his remaining three goals. (SER 598-615.) The IEP team then developed 16 new goals in areas of school readiness, self help, behavior, social emotional development, functional expressive and receptive communication, fine motor, mathematics, and language arts. (SER 598-618.)

During the discussion of S/L goals, Parents noted that Student had begun using an iPad in the home environment. (*Id.* at 625.) Dr. Kathleen Murphy, an exceptionally well-qualified District speech language pathologist (*Id.* at 830), agreed to use the iPad as one mechanism by which to implement the team's proposed "face discrimination" goal. (SER 964-966, 969-970.) Parents did not request that the District provide an alternative augmentative communication ("AAC") assessment or device, nor did the team believe that such an assessment or device was indicated because Student was still working on mastery of foundational skills such as an understanding of symbolic communication, visual scanning, and visual discrimination. (SER 625, 970-971.)

Next, the IEP team made an offer of FAPE that was reasonably calculated to provide Student with educational benefit and to enable him to continue making progress on his IEP goals. (SER 625, 968.) The offer of FAPE included: continued placement in an intensive ABA SDC kindergarten for 6.5 hours daily and group OT 1x30 mpw. (SER 625.) Dr. Murphy again proposed group S/L

therapy 2x30 mpw and individual S/L therapy 2x15 mpw, as E.F. had met each of his S/L IEP goals with this level of service. (SER 968.) However, Dr. Murphy also proposed individual S/L consultation 1x30 minutes per month, specifically for the purpose of consulting with a District AT specialist to ensure that she was doing everything she could to prepare E.F. for future use of a high tech AT device. (*Id.* at 968-971.) Parents consented to the February 2012 Annual IEP in its entirety. (*Id.* at 627.)

### 4.    2012-2013 School Year: First Grade

#### a.    Interim Agreement and Private AT Assessment

In response to Student's request, through his May 2012 due process complaint, for various independent educational evaluations ("IEE"), Parents and the District entered into an Interim Agreement ("Agreement") that was fully executed on November 29, 2012. (SER 633-634.) Through the Agreement, the District agreed to retain Dr. Lauren Franke to conduct a comprehensive records review IEE for Student. The Parties also agreed that, if recommended by Dr. Franke, the District would collect additional data or conduct additional assessments.

Around the same time that the Parties entered into the Agreement, Parents provided the District with a private Assistive Technology ("AT") assessment report by Cindy Cottier dated July 18, 2012. (ER 292-296.) The District had not been

informed that Parents were obtaining an AT evaluation, which Parent had never requested be conducted by the District. (SER 929, 971.) Ms. Cottier's assessment did not include classroom observations, any information about how Student functionally used communication in the educational setting, nor any information from Student's current speech language pathologist or teacher. (ER 292-296.) Consequently, the District proposed conducting an AT consultation by its own personnel to determine Student's AT/AAC needs in the educational setting.

### b. Annual IEP Meeting.

On January 23, 2013, Student's IEP team convened to develop his annual IEP. The team first discussed Dr. Franke's IEE records review and recommendations. (SER 645-682) Based upon her review of Student's records, Dr. Franke recommended a Functional Behavior Analysis ("FBA")[5], and that AT be used with Student. (SER 677.) However, low-tech AT was already being used with Student in the form of visual icons and a PECS system. (SER 856, 984-985, 1052-1053.)

The IEP team next discussed the AT evaluation by Ms. Seldin, a District AT specialist (SER 635-644), which included consideration of Ms. Cottier's report. Ms. Seldin evaluated multiple devices with Student, and ultimately recommended

---

[5] The team agreed to conduct the FBA per Dr. Franke's recommendation, despite its view that Student was not, at that time, exhibiting any serious behaviors that necessarily warranted an FBA. (SER 859-860, 867-869, 1025-1026.)

that Student use an iPod Touch with Proloquo2Go software and speech generation capabilities. (SER 643.)

The IEP team next reviewed Student's progress on his current goals, and noted that he had fully met 10 of his IEP goals and made measurable progress on each of his 6 remaining goals. (SER 649-669.) Upon review of Student's progress and ongoing educational needs, the IEP team developed 15 appropriate goals in the areas of behavior, social emotional development, speech and language, fine motor skills, mathematics and language arts. (*Id.*)

After a discussion of Student's progress and goals, the IEP team made an offer of FAPE that included: continued placement in an intensive ABA SDC; individual S/L therapy 1x30 mpw; small group S/L therapy 1x30 mpw; individual S/L consultation 1x30 mpw; and group OT 1x30 mpw. (SER 645) In addition to these services, the IEP team discussed and offered an intensive training regimen for the trial implementation of Student's new AAC device for the first two months of the annual period. (*Id.*) The services specific to the AAC implementation period included: individual S/L therapy 3x20 mpw; and AT consultation 1x30 mpw. (*Id.*) Ms. Seldin also provided training to E.F.'s school team and Parents. (SER 804.)

In further consideration of Parents' input, the IEP team also agreed to develop a sensory diet[6] and conduct an FBA and an Independence Facilitator ("IF") assessment (SER 697-707), to formally assess whether an IF (one-on-one aide) was necessary for Student to continue to make educational progress. Given the team's view that E.F. was not exhibiting serious maladaptive behaviors, the team discussed which lower level behaviors would be assessed in the FBA. The team, with parental input, decided upon the following: 1) pressing palm to chin, 2) tapping fingers, and 3) minor aggression (squeeze and twist another's hand/wrist). (SER 859-860, 1026-1027.)

### c. Supplemental Assessments and Addendum IEP Meeting

An addendum IEP meeting was convened on May 2, 2013 to discuss the results of each of the District's supplemental assessments. (SER 759.) The IEP team discussed the antecedents and consequences of the three behaviors the IEP team had agreed upon. The FBA assessor, Dr. DelPizzo, determined that none of the targeted behaviors occurred at a level that was disruptive to learning. (*Id.* at SER 686-696; 8590860.) No Behavior Support Plan ("BSP") was recommended as a result of the FBA because Student's low level of behaviors was observed to be

---

[6] The ALJ explained the concept of a sensory diet in the OAH Decision: "A sensory diet is a way of facilitating self-regulation skills using sensory activities incorporated into the child's daily activities." (AR Vol. 0153: ¶165.)

appropriately managed by the classroom's ABA-based behavior management structure. (SER 851, 863-864, 878-881.) Importantly, the FBA contained all required elements: identification of target behaviors; data collection, hypothesis of function of the behaviors, and finally, recommendations. (SER 1061-1062.) Specifically, the District's FBA included teacher interview and descriptive assessment tools (use of antecedent/behavior/consequence ["ABC"] data to draw conclusions), in addition to direct observation. (SER 686-696.)

The IEP team next discussed the District's proposed sensory diet. (SER 760.) To support the classroom teacher in implementing the sensory diet, the IEP team also recommended additional services of OT consultation, 1x30 minutes monthly. (*Id.*) In reviewing the proposed sensory diet, Student's teacher Ms. Burns credibly testified that she was already using the majority of recommended components in E.F.'s sensory diet in her classroom. (SER 683-685, 872-877.)

The IEP team next discussed the IF Assistance Report. (SER 697-707, 760.) As part of the evaluation, Student was observed six times over a period of three weeks in a variety of educational settings, including individual and small group instruction, recess, and during P.E. (SER 1001, 1003-1004, 1007-1008, 1014-1016.) Student was noted to be making progress on his IEP goals, and to accept redirection as needed from a variety of staff members. The adult:student ratio in Student's highly specialized ABA SDC varied between 3:6 or 5:8. (SER 852.)

Based on the evaluation, the IEP team noted that additional adult monitoring or support in the form of an IF was not necessary in order to ensure Student's safety, access to his educational program, or progress on his IEP goals. (SER 760-761, 884-885, 1014-1017.)

Finally, the IEP team discussed the trial of Student's iPod Touch AAC device. (SER 760-761.) All relevant staff members had participated in the training sessions and the AT consultation. (*Id.*) At the time of the May 2013 IEP meeting, Student was able to use his AAC device to make functional requests, rejections (no thanks), cessations (all done), recurrence (more), and labeling (bathroom). (*Id.*) The IEP team agreed to continue the AT consultation services at a rate of 1x30 minutes monthly. (SER 762.)

Still dissatisfied, Appellants amended their administrative due process request on May 9, 2013, nearly a year after their first filing. (SER 241-281.)

### d.  Receipt of IABA's "FBA"

Over the summer of 2013, Parents obtained a private "FBA" from the Institute for Applied Behavior Analysis ("IABA") headed by Dr. Elizabeth Hughes. Parents provided a copy of the assessment to the District in late September, 2013. (ER 300-344.) IABA's FBA targeted one specific behavior: "Inconsistent Responding Behaviors" and was based largely upon video observations of Student in his home environment. (SER 312.) IABA did not

discuss Student's behaviors with his classroom teacher, and conducted only 1 hour and 45 minutes of observation in the school setting, during which no data was collected as to any behaviors in the school setting. (SER 1019-1025.)

The administrative due process trial occurred in October 2013 before ALJ Lepkowsky, and the OAH Decision issued on December 26, 2013. (ER 117-177.)

## IV. ARGUMENT ON APPEAL OF OAH DECISION ON IDEA CLAIMS.

### A. General Standard Of Review In IDEA Appeals.

Appellants, as the parties challenging the district court's ruling, bear the burden of proof in persuading this Court that the district court's rulings were in error. *Schaffer v. Weast*, 546 U.S. 49, 57-58 (2005). A district court's judgment is reviewed *de novo* on conclusions of law and for clear error as to findings of fact. *Amanda J. ex rel. Annette J. v. Clark Cty. Sch. Dist.,* 267 F.3d 877, 887 (9th Cir. 2001). The IDEA itself provides the standard by which courts are to review administrative proceedings conducted under the IDEA. The statute provides that a court reviewing an administrative decision under the IDEA shall review the records of the administrative proceedings, and any additional evidence submitted at the request of a party, and shall base its decision on the preponderance of the evidence. 20 U.S.C. §1415(i)(2)(C).

However, the U.S. Supreme Court has explained that the preponderance of the evidence standard, "is by no means an invitation to the courts to substitute their

own notions of sound educational policy for those of the school authorities which they review." *Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206 (1982) (hereinafter "*Rowley*"). Rather, "[t]his modified *de novo* standard requires that 'due weight' be given to the administrative proceedings." *G.D. ex rel. Dien Do v. Torrance Unified Sch. Dist.*, 857 F. Supp. 2d 953, 962 (C.D. Cal. 2012) (citing *Rowley*).

In determining how much deference to extend to the hearing officer's decision, the Ninth Circuit has explained that substantial weight should be given to the hearing officer's decision if the Court finds that the decision was careful, impartial, and sensitive to the complexities presented. *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1476 (9th Cir. 1993). Specifically, a hearing officer's findings are "thorough and careful" where the officer "participates in the questioning of witnesses and writes a decision containing a complete factual background as well as a discrete analysis supporting the ultimate conclusions." *R.B., ex rel. F.B. v. Napa Valley Unified Sch. Dist.*, 496 F.3d 932, 942 (9th Cir. 2007) (citing *Park v. Anaheim Union Sch. Dist.*, 464 F.3d 1025, 1031 (9th Cir. 2006)). In such cases, the Ninth Circuit has explained, the hearing officer's findings "deserve particular deference." *Napa,* 496 F.3d at 942.

Finally, with regard to credibility determinations, this Court should "give deference to the unique knowledge and experience of state agencies" and recognize

"that [an ALJ] who receives live testimony is in the best position to determine issues of credibility." *Amanda J.*, 267 F.3d at 889. In addition, the demeanor of a witness is one factor to consider when assessing their credibility, a factor not readily established in subsequent judicial review. "On the cold record a witness may be clear, concise, direct, unimpeached, uncontradicted—but on a face to face evaluation, so exude insincerity as to render his credibility factor nil. Another witness may fumble, bumble, be unsure, uncertain, contradict himself, and on the basis of a written transcript be hardly worthy of belief. But one who sees, hears and observes him may be convinced of his honesty, his integrity, his reliability." *Wilson v. State Personnel Bd.*, 130 Cal. Rptr. 292, 301 (Cal. Ct. App. 1976), quoting *Meiner v. Ford Motor Co.*, 94 Cal. Rptr. 702, 711 (Cal. Ct. App. 1971).

## B.   Both OAH And the District Court Applied The Correct Legal Standards Under the IDEA.

In her OAH Decision, ALJ Lepkowsky delineated with great precision the standards applicable under the IDEA in determining whether a school district has provided a FAPE to a special education student. (OAH Decision, ER 157-176.) In particular, ALJ Lepkowsky incorporated the "meaningful benefit" standard claimed to be absent by Appellants here. Specifically, the OAH Decision (1) accurately articulates the variety of standards defining the intent of the IDEA (ER 157, ¶ 1), (2) properly defines FAPE under the relevant law (ER 157, ¶ 2), and, most importantly, (3) incorporates the *Rowley* standard, including discussion of the

"meaningful benefit" standard accepting that this is the proper standard in the Ninth Circuit, citing, *J.L. v. Mercer Island School Dist.* 592 F.3d 938, 950 (9th Cir. 2010). (OAH Decision, ER 158, ¶3.) Notably, *J.L.* post-dates the district court decision in *Blake C. v. ex rel. Tina F. v. Dep't of Educ. State of Hawaii*, 593 F.Supp.2d 1199 (D. Haw. 2009) upon which Appellants so heavily rely.

Appellants' use of *Blake* does nothing to undermine the propriety of the legal analysis conducted by OAH or the district court. Indeed, *Blake* itself (as quoted by Appellants) utilizes the very analytic tool applied by the ALJ here. For instance, Appellants provide a long quotation from *Blake* (Opening Brief at 24-25) the upshot of which is that analysis of educational benefit under *Rowley* is based upon the capabilities of the student him or herself, and not on an abstract standard. Appellants then cite the ALJ's precisely appropriate delineation of this very analysis as inappropriate. (Opening Brief at 25, quoting the ALJ's proper analysis that "the crux of the case" was based upon an analysis of E.F.'s capabilities. (ER 119, ¶6.)

This is precisely what the IDEA requires, and it was entirely proper for the ALJ to approach her analysis in this way, which is entirely consistent with *Rowley*, which, as is well-established, "rejected an interpretation of the IDEA that would require a school district to 'maximize the potential' of each special needs child . . . ." (OAH Decision, ER 158, ¶3.) The district court likewise applied

appropriate legal standards in its review and affirmation of the OAH Decision. (ER 90-91 and, 101-102.)

### C. The Court Should Uphold The District Court's Affirmation of the OAH Decision.

In the Ninth Circuit findings of fact may only be overturned if they are "clearly erroneous." *Burlington N., Inc. v. Weyerhaeuser Co.*, 719 F.2d 304, 307 (9th Cir. 1983). Additionally, "[a] finding of fact is deemed clearly erroneous when although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been committed." Id. Similarly, "the law does not require district courts to be precise to the point of pedantry. Consequently, an appellate court must not hesitate to excuse an awkward locution and give a busy trial judge a bit of breathing room. If using the wrong word or phrase constituted grounds for reversal in every case, much too high a premium would be placed on sheer literalism." *Lenn v. Portland Sch. Comm.*, 998 F.2d 1083, 1088 (1st Cir. 1993). Indeed, on appeal the court shall make a judgment "without regard to errors or defects which do not affect the substantial rights of the parties." 28 U.S.C. § 2111.

Appellants assert that the ALJ committed several "errors," (affirmed by the district court) the combination of which, they claim, demonstrate the ALJ's lack of thoroughness and/or carefulness, bias, and/or an inability to understand the complexities of this case. Consequently, Appellants challenge the district court's

affording substantial deference to the ALJ, and its affirmation of the ALJ's findings of fact.

### 1.    The District Court Properly Afforded The OAH Decision Substantial Deference As Should This Court.

Appellants claim that the OAH Decision was not entitled to substantial deference.  (Opening Brief, at 22-26.)  In the underlying OAH proceeding, ALJ Lepkowsky oversaw a seven day trial, which included her questioning of witnesses and her analysis of more than 50 pieces of documentary evidence, ultimately resulting in a well-written and well-reasoned 61 page decision that showed significant sensitivity to the complexities of the factual and legal issues presented. ALJ Lepkowsky's thorough and careful determinations of credibility, fact, and law were entitled to substantial deference from the district court, which it rightly accorded them, and are likewise entitled to such deference by this Court. According to the district court, "The 61-page OAH Decision contains 185 very thorough factual findings and provides complete, well-reasoned, and thoughtful evaluations of each party's contentions.  Therefore, the Court affords substantial deference to the OAH Decision."  (ER 102:15-18.)  Appellants' challenge to the OAH Decision being afforded substantial deference appears to be based simply on disagreements with the ALJ's findings of fact, rather than any demonstrable errors.

2. **The Challenged Elements Of The District's Assessment And Educational Program Elements Were Properly Found Appropriate.**

a. **E.F.'s Cognitive Disability Was Well-Documented.**

Appellants challenge the ALJ's and district court's acceptance of the District's determinations as to E.F.'s cognitive abilities rather than Appellant's own representations. (*See e.g.*, Opening Brief, at 15-16, 22.) Appellants simply did not meet their burden of proof in this regard. Ms. Kent, the District's school psychologist performed a thorough assessment of Student's cognitive and adaptive behavior functioning in 2011 that included several validly administered standardized assessments indicating an intellectual disability. (SER 1040, 1045-1051.) These results were corroborated by previous testing conducted by both the District (in 2009), and also by Student's private ABA agency. (SER 443.)

In challenging the validity of Ms. Kent's testimony, the District's 2011 multi-disciplinary assessment report *and* the IEP team's finding that Student is eligible under the category of intellectual disability, Appellants relied upon following statements by Dr. Hughes:

> And, you know, many children on the autism spectrum are considered not testable by standardized measures because there is this failure to respond consistently. And, you know, those of us in the field need to be very aware of not falling into a cognitive expectation based on skill presentation. (SER

899.) [7]

On their face, these sweeping statements are not specific to Student and *his* testability. In fact, as the ALJ noted, though Dr. Hughes attended a doctoral program in clinical psychology (and thus was presumably qualified to testify about a psychological assessment), she made no attempt to review Ms. Kent's assessment report, and she also did not conduct any cognitive testing to dispute Ms. Kent's assessment results. (ER 130-131.) Other than Dr. Hughes' broad generalization that autistic students in general are "not testable," Student presented *no* evidence to contradict Ms. Kent's assessment scores and the IEP team's decision that Student met eligibility criteria as a student with an intellectual disability.

Moreover, Appellants' witness, Ms. Cynthia Cottier, is quoted by Appellants in their Opening Brief on a relevant point in this analysis and that quote actually supports the District's (and therefore OAH's and the district court's) conclusions regarding E.F.'s cognitive abilities and resulting frustration potential. Ms. Cottier states as follows:

---

[7] It bears noting that at the start of Dr. Hughes' testimony, counsel for Student specifically indicated that Dr. Hughes was *not* being called as an expert witness. (SER 890.) Student had previously noted that Dr. Hughes was not an expert witness and specifically limited the scope of her testimony to the following: her agency's "assessment, student's unique needs, functional behavioral and support plan recommendations." (SER 287-289, listing Dr. Hughes and indicating no expert witnesses would be called.) Thus, Dr. Hughes' broad generalizations regarding "children on the autism spectrum" were given little weight by the ALJ.

It should be remembered that the most basic underlying principle when selecting and developing an effective augmentative communication or assistive technology system is that the effort to utilize a system needs to be minimized and that the motivation and desire to use the system needs to be equal to, or greater than, this effort. Since Augmentative communication systems by nature require more steps and effort to communicate than speech, this concept was very important to remember considering [E.F.'s] limited tolerance for frustration. *Ultimately, this could decrease the feasibility of E.F. using an augmentative communication system functionally.*

(ER 294, cited in Opening Brief at 15; emphasis added.)

The highlighted portion was left out of Appellants' quotation of Ms. Cottier's report (Opening Brief at 15), and while the entire passage supports the District's then current doubts about E.F.'s use of a high-tech device, the highlighted passage confirms that such doubts, even at the time of Ms. Cottier's report, were rational, though she did recommend an AT device at that time.

Appellants' argument as to claimed error in the OAH Decision on this point is flawed by their failure to clarify for the Court the timing of events. For instance, Appellants rely heavily upon testimony of Ms. Lila Seldin, a District speech pathologist, who tested E.F. for a high-tech AT devise following Ms. Cottier's July

2012 AT evaluation.  Ms.  Seldin presented her report at the January 2013 IEP.
(SER 635-644).  At that time, Ms. Seldin herself proposed a high-tech AT device
for E.F.  (SER 643.)

It was this timing for which the ALJ faulted the District (ER 0120), a point
on which Appellants have already obviously prevailed.   The ALJ found that the
District ought to have tested E.F. in this area, "approximately a year" before it did
so.   Appellants' attempt at the district court, and before this Court, to move that
timeline even further back fails for the reasons it failed in the prior two
adjudications.  As noted above, even Ms. Cottier, in July 2012, expressed doubts
about E.F.'s ability to utilize the recommended advice.  (ER 294.)   Based upon
this, and all of the evidence presented, it was perfectly rational for the ALJ to make
the determinations she did regarding the timing of an AT device for E.F.

**b.** **Dr. Hughes' Testimony Was Rightly Given Less Weight Than The District's Witnesses And Other Evidence.**

Appellants also took issue below with the ALJ's finding that Dr. Hughes
was less credible than District witnesses, and do so again here.  (*See e.g.,* Opening
Brief, pp. 26-28.)   Like previous attempts to validate Dr. Hughes' opinion,
Appellants' argument in this regard presents the IABA report and Dr. Hughes'
testimony regarding it, in a vacuum, without discussing the testimony by the
District's expert witness, Ms. Hinton, who testified about the inappropriateness of

the IABA FBA report and its recommendations. Ms. Hinton is a Board Certified Behavioral Analyst ("BCBA"), with a Master's Degree in special education. (SER 819.) She was at the relevant times an autism specialist in the District, and has been trained by a leading ABA agency, Autism Partnership. (SER 1057-1060.) With respect to testimony about an FBA, Ms. Hinton is equally or more qualified than Dr. Hughes, given her BCBA. (SER 1057-1060; 90; Dr. Hughes testified that she does not have an AT certificate, and neither a special education, nor any teaching degree).)[8]

Dr. Hughes' testimony focused primarily on the District's alleged failure to identify and respond to Student's "inconsistent responding behaviors." Though Dr. Hughes deflected the question when posed to her, "inconsistent responding behaviors," as described in IABA's report is essentially inattention. (SER 921, (Dr. Hughes testifies, "[H]e's demonstrating inconsistent responding. It's converse to say he's not attentive. So if he is inconsistently responding in 70 percent of opportunities, he is attentive in roughly 30 percent…").)

As Dr. Hughes herself testified, inattention or "inconsistent responding" is a common characteristic of a very large proportion of students with autism.

---

[8] Appellants improperly submit as part of the ER, and rely upon, Dr. Hughes' resume despite the fact that Dr. Hughes was not presented as an expert witness, and despite the fact that her resume was not admitted into evidence via the sustaining of an objection to its introduction. (SER 293, noting it was not admitted, and withdrawn from evidence.)

Specifically, Dr. Hughes testified that "one of the hallmark issues with children with autism spectrum disorder is that they do not respond consistently" and that "noncapitalized inconsistent responding as a general feature of children on the autism spectrum is widely…published in most educational publications." (SER 906-907.) This is a clear acknowledgement that "inconsistent responding" is an inherent part of autism itself—not a specific *behavior*. For this reason, categorizing Student's inattention or "inconsistent responding" as a serious "behavior" for which an FBA was warranted was neither appropriate nor necessary. (SER 1066-1067.)

Additionally, Appellants bristled at the ALJ's concern over the fact that Dr. Hughes required an entire team of eight individuals to identify the fact that E.F. consistently exhibited "one of the hallmark issues with children with autism spectrum disorder." (ER 155, ¶179) This, however, was another perfectly legitimate reason not to find Dr. Hughes or the IABA team's report credible. Beyond that reasonable inference though, the ALJ also explicitly found "many flaws in the IABA report" each of which are described in the OAH Decision. (ER 156, ¶180.)

The ALJ gives three very specific reasons why she found Dr. Hughes unpersuasive: 1) that there was no evidence that the individual who had initially recommended the FBA, Dr. Franke, believed that the behaviors that were

ultimately targeted in the FBA were inappropriate or insufficient; 2) that Dr. Hughes' testimony about the "real" problematic behavior for Student was basically just inattention, which the District's IEP goals and programming were addressing; and 3) that Dr. Hughes, by testifying that Student had not received "appropriate" ABA therapy was not only indicting the District's programming, but also three private non-public agencies and the non-public agency that had trained District staff (Autism Partnership), and thus, her testimony was simply not credible. (*Id.* at 162, ¶¶20-22.) The ALJ who heard all of the testimony and reviewed all of the documents, properly and thoroughly explained why she found Dr. Hughes unpersuasive, and those findings were reviewed and upheld by the district court, as they should be by this Court.

### c.      <u>Appellants' Other Specific IDEA Claim Also Fail.</u>

Appellants also challenge various specific elements of the underlying determination of OAH, affirmed by the district court, that the District's IEPs for E.F. were overall appropriate for him with the sole (and unappealed) exception noted previously regarding the timing of the provision of a high-tech AT device. (*See e.g.,* Opening Brief at 17, 32-33.) All of the elements of E.F.'s educational program were the subject of substantial documentary and testimonial evidence during the administrative trial before OAH. Appellants' arguments are much less extensive before this Court than they were below, though they are scattered

throughout their Opening Brief.

For instance, Appellants claim a "violation" of E.F.'s IEP because certain elements of his educational program were provided on a "push in" model. (Opening Brief at 17.) "Push in" simply means the therapist comes to the student's classroom, and contrasts with "pull out" services during which the student goes to the therapist. First, Appellants' argument is without citation to any evidence that supports the claim, and without any citation to law that would support the claim even if evidence were cited. Second, Appellants claim that the "push in" model was inconsistent with the "individual and group" therapy notes in the IEP, but fail to explain this claimed inconsistency, as the therapist could obviously work individually with a student even if other students are in the same proximity.

Appellants also continue with their challenge to E.F.'s progress during the relevant time. (Opening Brief at 14-15, 17-18) However, as noted, there is ample evidence in the record that he made meaningful progress, based upon his abilities, during the entire period under review. (*See e.g.* SER at 744-747, 750-756, 801-804, 862, 870, 884, 885-886, 955, 962-963,972-973, 983.) Appellants simply failed to meet their burden of proof that the *Rowley* standard of meaningful educational benefit was not met. All parties would have preferred more rapid progress but as the ALJ ultimately concluded, and the district court affirmed,

Student is a child who is very impacted by his autism. . . . Student's rate of progress is limited by his disabilities. Where a child has significant deficits such as Student's the law accepts that the child's progress in school may be slow, and that he might need to repeat certain goals.

(ER 168: ¶48, citing, *R.P. v. Prescott Unified School Dist.* 631 F.3d 1117, 1122 (9th Cir. 2011); *K.S. v. Fremont Unified School Dist.* 679 F.Supp.2d 1046, 1057-1058 (N.D. Cal. 2009).)

To the extent there was conflicting testimony or evidence, the ALJ carefully weighed the credibility of each witness and made appropriate findings of fact and conclusions of law.

Appellants also seek to incorporate information not available or shared in the OAH Action to impugn the OAH Decision. (Opening Brief, at 18, noting several declarations submitted to the district court in the motion for summary judgment context.) This violates one of the fundamental principles of IDEA adjudication. The appropriateness of a District's offer of FAPE must be measured by the information available to the IEP team at the time that the team prepares the FAPE offer. In the 9th Circuit, this concept is referenced as the "snapshot rule" in that an IEP is evaluated in light of information available at the time it was developed, and is not to be evaluated in hindsight. *Adams v. State of Oregon,* 195 F.3d 1141, 1149

(9th Cir. 1999).

The *Adams* Court further stated that an IEP must be evaluated in terms of what was objectively reasonable when it was developed. *Id.* In any event, the various declarations upon which Appellants now rely, were rightly unpersuasive to the district court. Importantly, the progress they report cannot be logically separated analytically from the progress E.F. made following the January 2013 provision of a high-tech AT device *by the District*. The OAH Decision expresses this point perfectly:

> By the time of this [May 2, 2013] meeting, Student had been using the iTouch for approximately three months. He was using it in school and at home with appropriate prompting. Student was functionally using the iTouch. Importantly, Student was responding to questions about personal needs and wants, and to location questions about where he was. The District had provided training on using, programming and customizing Student's iTouch to Ms. Burns, Father, Student's in-home ABA supervisor, the speech therapist and Mother.
>
> (ER 155, ¶177.)

Therefore, Appellants' argument regarding E.F.'s post-OAH Action progress, not only violates the "snapshot rule" but also ignores the three months of progress E.F. made with the iTouch high-tech AT device while he was still

enrolled with the District. The various declarations submitted to the district court, and relied upon here, are insufficient to render any judgment whatsoever on the merits of the IEPs under review in the IDEA phase of the case.

Appellants also assert that they met their burden of proof that Student's IEP goals were deficient, focusing before this Court on so-called "high tech" device goals. However, in support of their overall argument regarding goals, they rely most heavily upon the testimony of Dr. Hughes (SER 900-905). In her testimony, Dr. Hughes attempts to discredit the District's measurement of Student's IEP goals by testifying that Student's "report card" grading standards do not measure the IEP goals properly. This testimony was severely discredited during cross examination, when Dr. Hughes admitted that rather than compare the *IEP progress report* with the IEP goals, she had compared the District's general education report card with the IEP goals—two documents that have little to do with each other. She further admitted that though she was confused by this, she failed to seek clarification from the District prior to reporting, in the IABA FBA, that he had failed to make progress in the District's programming. (SER 912-921.)

Further, Appellants' challenge regarding "high tech" goals is immaterial here. Appellant prevailed on the "small portion" of the OAH Action regarding the timing of the District's provision of a "high tech" device (and thus goals) for E.F., and there does not appear to be any actual purpose in their current argument other

than repeating what the ALJ ultimately found. The District did not appeal that element of the ALJ's ruling, and thus this element of Appellants' current claim is immaterial to the proceeding. In summary, the ALJ was correct to find that Appellants failed to meet their burden of proving that the District's IEP goals were inappropriate, as challenged here. (ER 120.)

## V. ARGUMENT ON NON-IDEA CLAIMS: THE DISTRICT COURT'S GRANTING OF APPELLEE'S MOTION FOR SUMMARY JUDGMENT WAS PROPER.

### A. Non-IDEA Claims Subject To Summary Judgment.

Appellants' underlying federal Complaint had named numerous school administration and staff as defendants. However, these individuals were dismissed via stipulation, and that dismissal was ordered by the district court its May 21, 2014 Order of Dismissal (ECF 11.) Additionally, on June 26, 2015 the district court issued another Order of Dismissal (ECF 42), also based on a stipulation. Following that Order, the Complaint consisted of the following causes of action as against the District, and these were the claims considered on summary judgment:

Second Cause of Action: Violation of Section 504 of the Rehabilitation Act ("Section 504") (ECF 1, Complaint, ¶¶ 195-213);

Third Cause of Action: Violation of the Americans with Disabilities Act ("ADA") (*Id.* ¶¶ 214-23);

Eighth Cause of Action: Violation of the Unruh Civil Rights Act and the California Civil Rights Law (*Id.* ¶¶ 246-50);

Tenth Cause of Action: Breach of Duty to Protect and Supervise Students and Employees (*Id.* ¶¶ 259-68)[9]; and,

Twelfth Cause of Action: Action for Attorney's Fees Under the IDEA and § 1988, against "all Defendants," (*Id.* ¶¶ 277-79)[10].

Appellants requested injunctive and declaratory relief, actual and compensatory damages, and an award of attorneys' fees and costs. (*Id.* ¶¶ 319-34). Finally, Appellants requested "an award of Punitive damages in an amount appropriate to punish or make example of the Defendants who are entrusted with the safety, well-being and instruction [of] children with disabilities in this community." (*Id.* ¶ 335).

In summary, Appellants' Section 504 and ADA claims rightly failed based upon the specific facts plead by Appellants, and additional facts determined by OAH and by the district court from the existing record. The OAH Decision and

---

[9] Appellants initially stipulated to dismissal of COA 10, but then rescinded their own stipulation asserting that their preparation and submission to Defendant's counsel of that stipulation was "inadvertent." (Harbottle MSJ Decl., Exhibit G at SER 104-106, email and stipulation along with proposed order dismissing COA 10; Exhibit H, at SER 117.)

[10] The district court considered Appellants' claim for attorneys' fees separately, in their motion for fees, and granted them a portion of their attorneys' fees for partially prevailing in the OAH Action. (ER 0002-0015.) Neither party appeals that ruling.

the district court's affirmance of that decision had preclusive effect on Appellants' ADA and Section 504 claims. The Ninth Circuit has explicitly held that ordinary principles of issue and claim preclusion apply, "in cases raising both IDEA and Title II [ADA] claims where the IDEA administrative appeals process has functionally adjudicated some or all questions relevant to a Title II claim in a way that precludes relitigation." *K.M. v. Tustin Unified School District/D.H. v. Poway Unified School District*, 725 F.3d 1088, 1101 (9th Cir. 2013).

This principle applies to Section 504 claims even more forcefully. The Ninth Circuit has also held that, "[b]ecause a school district's provision of a FAPE under the IDEA meets Section 504 FAPE requirements, *a claim predicated on finding a violation of the Section 504 FAPE standard will fail if the IDEA FAPE requirement has been met*." *Id.* at 1099; emphasis added. As demonstrated below, Appellants' claims under the ADA and Section 504 were based on a claimed violation of Student's right to a FAPE. To the very limited extent that the factual and legal rulings embodied in the OAH Decision and the district court's affirmance thereof did not preclude Appellants' remaining federal claims, undisputed facts determined via those rulings, as well as undisputed facts before the district court did so. Finally, Appellants' state law claims, COAs 8 and 10, failed because the District is immune from liability under the Eleventh Amendment as to state law claims filed by individuals in federal court. (ER 58-59.)

43

**B.    Legal Standards Governing A Motion For Summary Judgment.**

To grant a motion for summary judgment, the Court must find that, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. § 56(a).   The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986) (emphasis in original).   Further, "[a]s to materiality, the substantive law will identify which facts are material.  Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Id.* at 248.

Additionally,

> . . . there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. . . . If the evidence is merely colorable . . . or is not significantly probative . . . summary judgment may be granted.
>
> *Id.* at 249-250, internal citations omitted.

The uncontroverted facts in this case made summary judgment the appropriate means by which to fully and finally resolve Appellants' non-IDEA

claims. There were simply no disputes regarding genuine issues of material fact, based upon the substantive elements of the law as set forth in Appellants' own allegations.

**C.    The District Was Entitled To Summary Judgment On Appellants' Section 504 And ADA Causes Of Action.**

Appellants asserted claims under both Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and under the ADA, 42 U.S.C. § 12132. (ECF 1, Amended Complaint, ¶¶ 195-223.) Each of these causes of action requires proof that there was *intentional* discrimination as to a disabled individual *and* that the alleged discrimination was due to the claimant's disability. *See*, 29 U.S.C. § 794(a) and 42 U.S.C. § 12132.

Specifically, under Section 504:

No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, *solely* by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance  . . .

(Emphasis added.)

Similarly, Section 12132 of the ADA provides that:

Subject to the provisions of this subchapter, no qualified individual with a disability shall, *by reason of such disability*, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

(Emphasis added.)

Importantly, Appellants asserted liability under both provisions as a result of a claimed denial of FAPE to Student.    Specifically, Appellants expressly allege that:

196.  The Minor contends his rights were violated under §504 of the Rehabilitation Act of 1973 *due to a denial of FAPE under requirements of Section 504 by the Defendants (sic) deliberate indifference.*

(ECF 1, Complaint, ¶196, at 58:4-5; emphasis added.)

Similarly, in connection with their claims under the ADA, Appellants contended as follows:

217.  As there is no significant difference between the substantive standards of the ADA and the Rehabilitation Act, *the claims are therefore analyzed together*.

218.  The *Minor* contends his rights were violated under the ADA *due to the denial of access and benefit of his education and due to the denial of FAPE as such as was based on discrimination due to his disability*.

(*Id.* ¶217-218, at 63:1-6; emphasis added.)

Thus, Appellants understood that both their claims are properly analyzed pursuant to the same standard, and this is consistent with Ninth Circuit precedent. Specifically, the Ninth Circuit recently acknowledged that, "[w]e have observed on occasion that, 'there is no significant difference in the analysis of rights and obligations created by the two Acts.' " *K.M. v. Tustin Unified School District/D.H. v. Poway Unified School District*, 725 F.3d at 1098 (quoting *Vinson v. Thomas*, 288 F.3d 1145, 1152 n. 7 (9th Cir.2002).)[11]

---

[11] *K.M.* articulated a single, narrow distinction between the two areas of law, but that distinction is not relevant here, as Appellants did not allege violation of the applicable provisions of the ADA, and have clearly conceded that their ADA and Section 504 claims should be analyzed together.

Appellants relied upon a claim of a FAPE violation as the basis for both Section 504 and ADA liability. However, this district court's affirmance of the OAH Decision in its entirety eliminated any possible source of Section 504 or ADA liability due to a claimed FAPE violation as against the District, except for the "small portion" of their OAH claims on which the District did not prevail. That "small portion" of Appellants' claims dealt entirely with OAH's determination that the District ought to have formally offered Student an electronic AT device prior to the date upon which it ultimately did so. (Statement of Undisputed Facts for MSJ: SUF 7 [SER 203]; OAH Decision, ER 120.)

Thus, the field of even potentially disputed material facts as to Appellants' remaining federal claims was extremely narrow at this point in the case below, because all elements of Appellants' federal claims except the AT issue had been fully and finally resolved in the District's favor. Based upon Appellants' own allegations under both Section 504 and the ADA, the necessary elements of those claims, and additional undisputed facts, judgment for the District as a matter of law on both the Section 504 and the ADA claims was proper.

The necessary elements of Section 504 are very clear:

To state a Section 504 claim, Plaintiff must allege that: (1) he is an individual with a disability; (2) he is otherwise qualified to receive the benefit; (3) he was denied the benefits of the program *solely* by

reason of his disability; and (4) the program receives federal financial assistance. *Duvall v. County of Kitsap,* 260 F.3d 1124, 1135 (9th Cir.2001).

*J.W. ex rel. J.E.W. v. Fresno Unified Sch. Dist.,* 570 F. Supp. 2d 1212, 1226 (E.D. Cal. 2008) (emphasis added).

Thus, Appellants were required to show that E.F. was discriminated against by the District, and that such discrimination was *solely* a consequence of his disability.

Additionally, the same case held that:

A "public entity can be liable for damages under [Section] 504 if it *intentionally* or with *deliberate indifference* fails to provide meaningful access or reasonable accommodation to disabled persons." *Mark H.,* 513 F.3d at 938.

*Id.*; emphasis added.

Perhaps most importantly in this matter:

To assert discrimination in the education context, "*something more than a mere* failure *to provide the 'free appropriate education' required by [IDEA] must be shown*." *Sellers by Sellers v. Sch. Bd. of*

*City of Manassas,* 141 F.3d 524, 529 (9th Cir.1998), citing *Monahan v. Nebraska,* 687 F.2d 1164, 1170 (8th Cir.1982). . . . "*Appellants who allege a violation of the FAPE requirement contained in [Section] 504 regulations, consequently, may not obtain damages simply by proving that the IDEA FAPE requirements were not met.*" *Mark H.,* 513 F.3d at 933.

*Id.* at 1226-27; emphasis added.

Thus, even the "small portion" of the case on which Appellants prevailed, did not entitle them to damages under the ADA or Section 504. As noted, meeting the IDEA's FAPE standard also meets the Section 504 FAPE standard: "[o]ne means of meeting the substantive portion of §504 is to satisfy the FAPE requirement of IDEA . . . " *T.B. ex rel. Brenneise v. San Diego Unified Sch. Dist.*, 2012 WL 1611021, at *7 (S.D. Cal. May 8, 2012). Therefore, to the extent that Appellants' Section 504 claim is based upon a claimed denial of FAPE under the IDEA, the OAH Decision and the district court's affirmance thereof eliminate such claim as a matter of law as to those elements on which the District prevailed. The only sub-claim surviving the OAH Decision and affirmance is the single finding in the OAH Decision regarding the District's timing in providing an iPad or other such electronic AT device to Student starting in February 2012.

However, under the standard articulated in *J.W.* above, this finding does not amount to a finding of a violation of Section 504. That is, "something more than a mere failure to provide the 'free appropriate education' required by [IDEA] must be shown." *J.W.*, supra, at 1226-27; *see also*, *T.B.*, *supra,* at *7. And, Appellants, "may not obtain damages simply by proving that the IDEA FAPE requirements were not met." *T.B.*, *supra,* at *7.

Appellants must instead have proven intentional discrimination against E.F. as to the narrow AT issue. The Ninth Circuit has expressly adopted the "deliberate indifference" standard for a showing of "intentional discrimination" under both Section 504 and for ADA claims. *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1138 (9th Cir. 2001). In order to establish intentional discrimination in the form of "deliberate indifference," a plaintiff must demonstrate, "both [1] *knowledge* that a *harm to a federally protected right is substantially likely*, and a [2] failure to act upon that the likelihood." *Id.* at 1139 (emphasis added) (citing *City of Canton v. Harris,* 489 U.S. 378, 389 (1988)). Further, "in order to meet the second element of the deliberate indifference test, a failure to act must be a result of conduct that is *more than negligent*, *and involves an element of deliberateness*." *Id*; emphasis added.

Therefore, the only possible avenue for Appellants to have recovered damages under Section 504 or of the ADA would be to prove to a jury *intentional*

*discrimination* in the form of "deliberate indifference" on the part of the District as to the electronic AT issue. But, Appellants' claim of "deliberate indifference" as a potential means of proving intentional discrimination failed as well, on the basis of facts now rendered final by the district court's affirmance of the OAH Decision, and additional undisputed facts.

There is no factual basis upon which Appellants could establish that the District's determination not to offer Student an iPad or other such device until January 2013 was illegal discrimination based on his disability. Rather, it is undisputed that the District acted upon determinations made by the highly qualified District members of Student's IEP team between February 2012, when Parents first disclosed their home use of an iPad, and January 2013 when an iTouch (held appropriate by the ALJ) was introduced into Student's IEP.

For instance, District speech pathologist and behaviorist, Dr. Kathleen Mulligan Murphy, Ph.D., CCC-SLP, BCBA-D testified at hearing as to the AT issue. (SER 830-834, Dr. Murphy's C.V.) The ALJ determined Dr. Murphy to be highly qualified:

Dr. Murphy, who testified at hearing, is a speech pathologist with the District. In 1997 she received her doctorate degree in speech and language science. In addition to her work providing direct speech therapy to children and adults, Dr. Murphy has taught speech at the

university level, has been a researcher in the area of speech pathology, and has conducted investigations in the area of integrating services for the treatment of speech disorders in the classroom. In 2012, Dr. Murphy also obtained a certification as a Board Certified Behavior Analyst at the doctoral level. This required her first to complete education and training in the area of advanced studies of applied behavioral analysis and then to pass a test for the certification. *Dr. Murphy is thus qualified doubly as a speech pathologist and a behaviorist, a unique combination.*

(SUF 8 [SER 203]; OAH Decision, ER 128; emphasis added.)

Dr. Murphy conducted the speech/language portion of Student's "triennial" assessment, which was the only assessment required of the District during the relevant time frame under the IDEA, requiring such evaluations only every three years. 20 U.S.C. § 1414(a)(2)(B). As to Dr. Murphy's assessment and other work, the ALJ held that, "Student presented no documentary evidence or testimony that questioned the validity, propriety, or results of Dr. Murphy's assessments, or contradicted Dr. Murphy's findings, observations and recommendations . . . There was thus no evidence before the district court, or this one, that controverts the appropriateness of Dr. Murphy's assessment or any speech goals she developed for Student in any of his IEPs." (SUF 10 [SER 203]; OAH Decision at ER 132, ¶ 60.)

Dr. Murphy testified directly regarding her views as to Student's potential to utilize an AT device like an iPad or iTouch in February 2012, as follows:

Q:    Okay.  Since there was a discussion on the iPad and [E.F.] was being able to use an iPad, why didn't you propose an AT assessment at that time?

A:    He wasn't demonstrating the rest of the readiness skills at that time.  So typically developing children . . . make that connection.  It isn't until the child is around age three cognitively or developmentally that they are actually beginning to use images for communication purposes.  We were very excited to see [E.F.] make that type of growth, but he wasn't yet at the readiness period to use that alone.

(SUF 11 [SER 203-204]: Murphy Testimony, SER 970:2-12.)

As to the goals she and the IEP team developed to work on E.F's readiness, Dr. Murphy testified that:

So we were still working – all of these goals reflect that building of the foundational skills to getting to that readiness point.  One of the goals or the very first ones we incorporated in here was break time, that he was actually using a visual image for communicative

54

purposes. So he wasn't yet demonstrating that level of readiness. And we did many things to make him ready. So the visuals were not just for communication purpose, but we were also bathing him with the visuals within the environment such as the visual schedule. Part of my responsibility was – included collaborating with the teacher to make those kinds of adjustments and to supplement any of the visual aids for communication purposes across the day.

(SER 970:12-25.)

This rationale was corroborated by Ms. Burns, E.F.'s teacher for much of the relevant period, including the time frame relevant to the AT issue. (SUF 12 [SER 205]; Burns Testimony, SER 856; 865:19-866:14, confirming that she and Dr. Murphy were collaborating closely regarding E.F.'s readiness skills and indicating that, "[E.F.] wasn't ready for communication purposes yet.") It is therefore undisputed that this was E.F.'s IEP team members' rationale for not adding an electronic AT device to Student's IEP in February 2012. It is also undisputed that "soon after" the February 2012 IEP meeting, Ms. Burns, "permitted Student to bring his iPad to school. She began using the iPad as reinforcer for Student when he had reached enough tokens to choose an activity as a reward for completing tasks or behaving appropriately." (SUF 13 [SER 205]; OAH Decision, ER 146, ¶109.)

55

In light of these undisputed facts, there is no basis upon which a finder of fact could determine that Dr. Murphy's or the IEP team's professional judgment regarding Student's ability to utilize an iPad for educational purposes was intentionally discriminatory. To the contrary, these undisputed facts demonstrate that Student could not satisfy either of the required elements of intentional discrimination in the form of "deliberate indifference." It is undisputed that Dr. Murphy was highly qualified to make such determinations. The fact that on balance the ALJ and district court agreed with Student's witness Ms. Cottier's testimony as to the *timing* of E.F's cognitive readiness for use of an iPad does not rise to the level of "deliberate indifference."

Instead, it was merely a difference of professional opinion, which is insufficient as a matter of law to form the basis of an intentional discrimination claim. Indeed, "[e]xperts often disagree on what the special needs of a handicapped child are, and the educational placement of such children is often necessarily an arguable matter." *T.B.*, *supra*, at *7. Moreover, the Court in *T.B.* held, that *"[a] school does not violate the ADA or the Rehabilitation Act when it has a rational explanation for its decision* to accommodate a student's disability even if its proposal fails to comply in every respect with the request." *Id.* at *12 (emphasis added). Further, even if Dr. Murphy's opinion was deemed to be in error, "[e]rrors in professional judgment . . . do not establish deliberate indifference

in the special education context." *Id.* at *8.

There was, therefore, no "knowledge" of a substantial likelihood of harm to a federally protected right," nor any, "failure to act" on the part of the District, as it was providing enormous (and entirely appropriate) support to E.F. (OAH Decision, ER 159, ¶52.) No reasonable finder of fact could conclude, on the basis of these fully adjudicated and undisputed facts, that the considered professional opinion of an indisputably highly qualified speech pathologist and behaviorist (and the IEP team relying upon that opinion) rose to the level of intentional disability discrimination in the form of "deliberate indifference."

Appellants also based their Section 504 claim upon the allegation that the District, "denied [E.F.] access/appropriate instruction to develop functional communication *so as to access and benefit from his education*." (Complaint, at 58, ¶ 200; emphasis added.) However, it is undisputed, as determined by the findings of OAH and this Court, that the District was addressing functional communication with Student, and that he had made meaningful educational progress in all areas, including functional communication, during the relevant time frame.

For instance, the OAH Decision notes that, "Student had met all four of his speech and language goals by the February 29, 2012 IEP." (SUF 14 [SER 205]; OAH Decision, ER 141, ¶103.) Likewise, in January 2013, at Student's next annual IEP, the ALJ found and it is now undisputed, that, "Student met all four of

his speech goals." (SUF 15 [SER 205]; OAH Decision, ER 148, ¶140.) Several of those goals directly addressed Student's functional communication skills. (SUF 15 [SER 205], 882:9-883-16.) Thus, it is undisputed that Student was making progress in speech/language including functional communication during the relevant time frame.

Similarly, the following determination of the ALJ is dispositive of Appellants' claim of discrimination based solely on his disability and applies to the entire time frame under review in this matter:

*All of the goals developed for Student at each of his IEPs* were based on his then present levels of performance, including, where appropriate, his most recent assessments. Each goal had appropriate baselines indicating Student's current abilities in each area. Each goal was measurable. Each goal addressed deficits that Student had and each goal was needed to address those deficits. Each goal was appropriate for Student based on his assessed needs, his skills, his cognitive level, and his expected ability to be able to meet the goal. [District staff] Ms. Ni, Ms. Kent, Ms. Steinman, Dr. Murphy, and Ms. Burns, all persuasively testified that the goals were properly developed, properly written, and were appropriate for Student.

(SUF 16 [SER 206]; OAH Decision, ER 149, ¶145; emphasis added.)

Ultimately, despite his progress and the appropriateness of the program as a whole, the ALJ determined that in February 2012, the District ought to have attempted to use an iPad or equivalent device with Student. The law is very clear that something more than an IDEA FAPE error must be shown in order to show intentional discrimination, and Appellants were unable to do so here.

Appellants conceded below that their Section 504 and ADA claims are to be analyzed together, and their ADA claim fails for the same reasons that their Section 504 claim fails. As the court in *T.B.* stated (and Appellants have acknowledged), "[t]he ADA is substantially similar to the Rehabilitation Act [Section 504], and thus courts analyze these claims together." *T.B., supra,* at *7 (citing *Wong v. Regents of the Univ. of Cal.*, 192 F.3d 807, 816 n. 26 (9th Cir. 1999)); *see also*, Complaint, ECF 1, p. 63:1-3, ¶ 217, with virtually identical language as in *Wong*.

As with their Section 504 claim, Appellants were unable to demonstrate the required unlawful intentional discrimination under the ADA. To reiterate a key holding from *T.B.*,"[a] school does not violate the ADA or the Rehabilitation Act when it has a rational explanation for its decision to accommodate a student's disability even if its proposal fails to comply in every respect with the request."

*T.B., supra,* at *12. Dr. Murphy's qualifications to make professional recommendations are indisputably outstanding, and her explanation via her testimony indisputably rational. It was Dr. Murphy who had most recently and comprehensively assessed Student's speech/language needs, and her assessment *and her results* were found to be entirely appropriate below.

Additionally, specific to their ADA claim, Appellants assert that the District discriminated against Student "based in (sic) their determination that he was Intellectually Disabled." (Complaint, at 62, ¶ 215.) Student challenged this determination before OAH, but it is now undisputed that Student has indeed been determined to be Intellectually Disabled under the IDEA. (SUF 17 [SER 206]; OAH Decision, ER 121, ¶ 3.) This determination was made by E.F.'s IEP team, pursuant to the assessment conducted by District psychologist Ms. Eby Kent. (SUF 18 [SER 206]; OAH Decision, ER 130, ¶50.) As in many areas of the case, the ALJ found that, "Student presented no evidence that Ms. Kent's testing was inappropriate or that her assessment results and recommendations were improper." (SUF 19 [SER 207]; *Id.* at ¶ 51.) Appellants are thus precluded from challenging this dispositive finding of fact at this point in the litigation.

As with the Section 504 claim, differences of professional opinion, cannot, as a matter of law, constitute unlawful discrimination, even in the "small portion" of the case not favorable to the District in the OAH Decision. For example, in

*T.B., supra*, the Court held that as to an issue that the District had lost before OAH, that result did not rise to the level of intentional discrimination:

> While the School District ultimately lost the merits of its arguments under the IDEA about who would supervise T.B.'s G–Tube feedings, the evidence produced by the School District overwhelming refutes any inference that it intended to discriminate against T.B. or to exclude him from being educated with his peers in public school in violation of the ADA or Rehabilitation Act. *A.M. v. N.Y. Dep't of Educ.,* —— F.Supp.2d ——, 2012 WL 120052, at *17 (E.D.N.Y. Jan.17, 2012) (even if student was denied services he was entitled to by law, no reasonable finder of fact would be able to conclude the alleged discrimination was the product of deliberate indifference); *Brantley,* 936 F.Supp. at 656–57 ("any inappropriate decisions, ... were, at most, errors in professional judgment").
>
> *T.B.* at *9, internal footnote omitted.

Taken together, the OAH Decision, the district court's affirmance thereof, and the additional undisputed facts as set forth in the District's summary judgment motion, established that Appellants would have been unable to demonstrate any violation of Section 504 or the ADA, and could not have proven intentional discrimination against E.F. At the very most, Appellants would be able to show

that the ALJ disagreed with Dr. Murphy's considered professional opinion that Student could not benefit from use of an electronic AT device in February 2012. That finding would not amount, as a matter of law, to violation of Section 504 or the ADA on the basis of intentional discrimination. Therefore, judgment on the Section 504 and ADA causes of action in favor of the District on those claims was proper.

## VI.    CONCLUSION

For all of the reasons set forth above, the District respectfully requests that the district court's affirmation of the OAH Decision and its granting of the District's Motion for Summary Judgment be affirmed in their entirety.

DATED:  July 5, 2016                    HARBOTTLE LAW GROUP
                                        S. DANIEL HARBOTTLE

                                By:  /s/ S. Daniel Harbottle
                                     _____
                                     S. DANIEL HARBOTTLE
                                     Attorneys for Defendant
                                     Newport-Mesa Unified School District

# CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation set forth in Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure. This brief uses a proportional typeface and 14-point font, and contains 13,752 words.

DATED: July 5, 2016      HARBOTTLE LAW GROUP
S. DANIEL HARBOTTLE

By: /s/ S. Daniel Harbottle
S. DANIEL HARBOTTLE
Attorneys for Defendant
Newport-Mesa Unified School District

## STATEMENT OF RELATED CASES

There are no related cases pending in this Court.

## CERTIFICATE OF SERVICE

I hereby certify that on July 5, 2016, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.


s/ Stephen Moore
Senior Appellate Paralegal
COUNSEL PRESS, INC.