**Docket No. 15-56452**

*In the*

# United States Court of Appeals

*for the*

# Ninth Circuit

———————————— • ————————————

E.F., a Minor, By and Through His Parents Eric Fulsang and Aneida Fulsang,
ERIC FULSANG and ANEIDA FULSANG,

*Plaintiffs-Appellants,*

v.

NEWPORT MESA UNIFIED SCHOOL DISTRICT,

*Defendant-Appellee.*

———————————————————

*Appeal from a Decision of the United States District Court for the Central District of California,*
*No. 8:14-cv-00455-CJC-RNB · Honorable Cormac J. Carney*

## SUPPLEMENTAL EXCERPTS OF RECORD
## VOLUME IV OF IV – Pages 835 to 1069

S. Daniel Harbottle, Esq.
Sydney Blaauw, Esq.
HARBOTTLE LAW GROUP
18401 Von Karman Avenue, Suite 200
Irvine, California 92612
(949) 428-8780 Telephone
(949) 428-8779 Facsimile
dharbottle@harbottlelaw.com
sblaauw@harbottlelaw.com

*Attorneys for Appellee,*
*Newport Mesa Unified School District*

 

# TABLE OF CONTENTS

| Docket Entry | Description | Page |
|---|---|---|

**VOLUME I OF IV – Pages 1 to 281**

| Docket Entry | Description | Page |
|---|---|---|
| 46 | Declaration of S. Daniel Harbottle in Support of Newport-Mesa Unified School District's Motion for Summary Judgment, Filed July 14, 2015 | 1 |
| | Exhibit A | 5 |
| | Exhibit B | 68 |
| | Exhibit C | 74 |
| | Exhibit D | 83 |
| | Exhibit E | 88 |
| | Exhibit F | 91 |
| | Exhibit G | 97 |
| | Exhibit H | 108 |
| | Exhibit I | 121 |
| | Exhibit J | 133 |
| | Exhibit K | 144 |
| | Exhibit L | 156 |
| | Exhibit M | 169 |
| | Exhibit N | 173 |
| 45 | Newport-Mesa Unified School District's Statement of Uncontroverted Facts and Conclusions of Law in Support of its Motion for Summary Judgment, Filed July 14, 2015 | 201 |
| 13 | Notice of Lodging Administrative Record, Filed August 18, 2014 | |
| | Complaint | 210 |
| | Stipulation Motion to Amend with First Amended Request for Due Process Hearing | 241 |

(CONTINUED IN VOLUME II)

i

**VOLUME II OF IV – Pages 282 to 554**

13    Notice of Lodging Administrative Record,
       Filed August 18, 2014 (CONTINUED FROM VOLUME I)

Student's Prehearing Conference Statement                          282

Hearing Exhibit List                                              292

Student's Exhibit S1 – IEP Dated 2/9/10                           296

Student's Exhibit S2 – IEP Addendum Dated 4/15/10                 329

Student's Exhibit S7 – IEP Addendum Dated 6/21 110               363

Student's Exhibit S9 – IEP Addendum Dated 11 /23/10              399

Student's Exhibit 12 – District's Multidisciplinary Assessment    435

Student's Exhibit S13 – IEP Dated 2/4/ 11                         483

Student's Exhibit S14 – Letter Dated 2/16/11                      517

Student's Exhibit S15 – IEP Addendum Dated 3/8/11                521

(CONTINUED IN VOLUME III)

**VOLUME III OF IV – Pages 555 to 834**

13    Notice of Lodging Administrative Record,
       Filed August 18, 2014 (CONTINUED FROM VOLUME II)

Student's Exhibit Sl7 – IEP Addendum Dated 4/19/11               555

Student's Exhibit Sl8 – Progress Report On Goals                 591

Student's Exhibit S20 – IEP Dated 2/1/12 & 2/29/12               595

Student's Exhibit S23 – Letter Dated 4/ 17/12                    628

Student's Exhibit S25 – Interim Settlement Agreement             633

Student's Exhibit S26 – Augmentative and Alternative             635
Communication Evaluation of Ms. Seldin

Student's Exhibit S27 – IEP dated 1/23/13                        645

Student's Exhibit S29 – Occupational Therapy I Sensory Diet      683

Student's Exhibit S30 – District's Functional Behavioral         686

Assessment Report

Student's Exhibit S31 – District's Independence Facilitator      697
Assistance Evaluation

Student's Exhibit S36 – Kindergarten Report Card                708

District's Exhibit D7 = IEP Addendum dated 5/21/10    709

District's Exhibit Dl2 – Progress Report on Goals    744

District's Exhibit Dl6 – Assessment Plan dated 12/6/l0    748

District's Exhibit D24 – Progress Report on Goals    750

District's Exhibit D28 – Progress Report on Goals    753

District's Exhibit D41 – Email dated 1/29/13    757

District's Exhibit D45 – IEP Addendum dated 5/2/13    759

District's Exhibit D46 – Progress Report on Goals    801

District's Exhibit D47 – AAC training for Student    804

District's Exhibit D48 – Resume of Karrie Anderson    806

District's Exhibit D50 – Resume of Lucinda Bottorf    812

District's Exhibit D51 – Resume of Katherine Bums    814

District's Exhibit D52 – Resume of Tim Chen    815

District's Exhibit D53 – Resume of Maureen B. Cottrell    817

District's Exhibit D55 – Resume of Bonnie C. Hinton    819

District's Exhibit D56 – Resume of Eby I. Kent    826

District's Exhibit D57 – Resume of Daniela Angela Manea    829

District's Exhibit D58 – Resume of Kathleen Mulligan Murphy    830

(CONTINUED IN VOLUME IV)

**VOLUME IV OF IV – Pages 835 to 1069**

13    Notice of Lodging Administrative Record,
Filed August 18, 2014 (CONTINUED FROM VOLUME II)

District's Exhibit D59 – Resume of Jennie Wong Ni    835

District's Exhibit D60 – Resume of Lila Seldin    837

District's Exhibit D61 – Resume of Leah DeNisi    839

Transcript of: Due Process Hearing Before ALJ Darrell Lepkowsky – Witnesses for Student: 1. Eric Fulsang; 2. Katherine Bums    840

Transcript of: Due Process Hearing Before ALJ
Darrell Lepkowsky – Witnesses for Student: 1. Aneida
Fulsang; 2. Elizabeth Hughes ............................................ 887

Transcript of: Due Process Hearing Before ALJ
Darrell Lepkowsky – Witnesses for Student: 1. Cynthia
Cottier; 2. Lila Seldin; 3. Tim Chia Chen ....................... 922

Transcript of: Due Process Hearing Before ALJ
Darrell Lepkowsky – Witnesses for Student: 1. Aneida
Fulsang; 2. Kathleen Mulligan Murphy ............................ 942

Transcript of: Due Process Hearing Before ALJ
Darrell Lepkowsky – Witnesses for Student: 1. Kathleen
Murphy; 2. Leah Steinman-DeNisi; 3. Karrie Anderson;
4. Maureen Cottrell ............................................................ 957

Transcript of: Due Process Hearing Before ALJ
Darrell Lepkowsky – Witnesses for Student: 1. Katherine
Bums – Witnesses for District: 2. Donna Manea; 3. Jennie Ni;
4. Eby Kent; 5. Lucinda Bottorf ...................................... 1028

Transcript of: Due Process Hearing Before ALJ
Darrell Lepkowsky – Witnesses for Student: 1. Aneida
Fulsang; 2. Eric Fulsang – Witnesses for District: 3. Bonnie
Hinton; 4. Maureen Cottrell, 5 . Tammy White ............... 1054

ADMINISTRATIVE RECORD FOR MATTER 2012050785    02/25/2014



## Jennie Wong Ni, MS, OTR/L    tel:

### Education

**Tufts University-Boston School of Occupational Therapy, *Medford, MA***    1998-2000
- M.S. Occupational Therapy
- G.P.A. 3.74

**University of Wisconsin-Madison, *Madison, WI***    1994-1998
- B.S. Honors Psychology and Zoology
- G.P.A. 3.44

### Clinical/Job Experience

**Newport-Mesa Unified School District, *Costa Mesa, CA***    July 2005 – current
- Performed initial, annual, triennial assessments and consultations to determine need for occupational therapy services in the school district. Assessments include: Bruininks-Oseretsky Test of Motor Proficiency, The Beery-Buktenica Test of Visual Motor Integration, Peabody Developmental Motor Scales – 2, Test of Visual Perceptual Skills, Handwriting Without Tears The Print Tool, Wide Range Assessment of Visual Motor Abilities, Sensory Profile, The Sensory Processing Measure, Miller Function and Participation Scales, Test of Handwriting Skills, clinical observations, teacher and parent interviews.
- Caseload included a variety of diagnoses such as autism, sensory integration dysfunction, ADD/ADHD, Down Syndrome, seizure disorder, developmental delay, and learning disorders. Caseload has included children ranging from preschool age through high school.
- Initiated and began running preschool classroom groups to address sensorimotor, fine motor, and social skills needs. Collaborated with the teacher on monthly theme and relating the group to current curriculum.
- Attended IEP meetings for students.
- Supervised Level II Fieldwork occupational therapy students on school-based practice.

**Irvine Therapy Services, *Irvine, CA***    March 2004 – July 2005
- Performed re-assessments for progress updates including the Bruininks-Oseretsky Test of Motor Proficiency, The Beery-Buktenica Test of Visual Motor Integration, Peabody Developmental Motor Scales-2, Test of Visual Perceptual Skills, Motor-Free Visual Perceptual Test, Sensory Profile, Goodenough-Harris Self Drawing, and clinical observations.
- Caseload is primarily children with sensory processing and sensory-motor deficits. Diagnoses include autism, sensory integration dysfunction, ADD/ADHD, visual deficits, and developmental delay.
- Consulted and collaborated with school-based personnel to address sensory-based, fine motor, social skills issues in school.
- Attended IEP meetings as needed.

**Children's Therapy Center, *Las Vegas, NV***    Dec. 2002 – Feb. 2004
- Performed initial evaluations, re-evaluations, progress reports, and treatment for children birth to 18 years.
- Caseload included diagnoses such as cerebral palsy, fetal alcohol syndrome, Down syndrome, autism, sensory integration dysfunction, developmental delay, seizure disorder, hemiplegia, and brachial plexus.
- Utilized sensory integration principles, neurodevelopmental treatment techniques, fine motor and gross motor skills, visual motor skills, activities of daily living skills, strengthening techniques, and kinesiotaping.

**Nevada Early Intervention Services, *Las Vegas, NV***    Sept. 2001 – Feb. 2004
- Performed initial evaluations for children from birth to three years to determine occupational therapy needs.
- Consulted with developmental specialists on home programs for occupational therapy.
- Participated in interdisciplinary monthly meetings to discuss clients and their needs.

**Dayspring Educational and Therapeutic Services, *Lafayette, CO***    Sept. 2000 – Aug. 2001
- Evaluated and treated children from birth to three years in the home and clinic as part of an interdisciplinary early intervention team.
- Participated as a co-leader in a sensory & cognitive play group and a feeding group once a week.
- Created a sensory diet information sheet to give to parents, including activities to do at home.
- Conducted Peabody Developmental Motor Scales 2, clinical observations for writing treatment goals and transition summaries, feeding histories and evaluations.
- Utilized sensory integration principles, neurodevelopmental treatment techniques, and feeding & oral-motor treatment.

{1036561.1 }

**NMUSD 0582**

AR 1266

## Licensure/Professional Development

- NBCOT Certified April 25, 2001
- CPR Certification
- CPI's Nonviolent Crisis Intervention certification
- Completed the following workshops that focused on working with children with Autism
  - Hands-On Sensory Integration Treatment for the Child with Autism:  An Interdisciplinary Approach
  - Received Training in Applied Behavioral Analysis sponsored by Autism Partnership
  - Making Sense-ory Out of Autism
  - Autism and Sensory Processing Disorders
- Attended Integrated Listening Systems training to become an iLs practitioner
- Completed the following workshops that focused on Handwriting for Children
  - Handwriting Without Tears Pre-K, Printing and Cursive Workshop
  - Handwriting Without Tears "Print Tool" Workshop
  - Treating Functional School Difficulties and Neurokinesthetic Approach to Hand Function and Handwriting" presented by Mary Benbow, MS, OTR.
- Completed the following workshops that focused on Sensory Integration and Self Regulation
  - The Sensory Integration Perspective" Course sponsored by the University of Southern California
  - Zones of Regulation
  - Alert Program for Self-Regulation
  - Get Ready to Learn:  Yoga Therapy in the Classroom
  - NDT, SI and Motor Control:  Practical Applications that Achieve Functional Outcomes for Children
- Attended a 5-day continuing education course on "Treatment of the Baby" sponsored by Boehme Workshops.
- Attended a workshop to become certified to use "Threshold Electrical Stimulation (TES)"
- Attended a continuing education course on "Kinesio Taping Fundamentals and Kinesio Taping for Upper and Lower Extremity."
- Attended a week long Rocky Mountain Fragile Infant Feeding Institute that covered topics on feeding for the NICU infant and infants with special feeding concerns.

[1036561.1 ]

NMUSD 0583

AR 1267

836

ADMINISTRATIVE RECORD FOR MATTER 2012050785          02/25/2014                              1268 of 1332



EXHIBIT
D-60
10/24/13

# Lila Seldin

**Objective**          Speech and Language Pathologist

**Qualifications**      My 25 years experience as a speech and language pathologist, my
                        strong past and current educational background and my enthusiasm,
                        dedication and continuing commitment to my students, families, staff and
                        employer qualify me in any educational or clinical setting.

**Education**           California State University, Los Angeles (C.S.U.L.A.)
Jan. '78 to June '81    **Master of Arts in Speech Pathology and Audiology**

                        University of California, Santa Barbara (U.C.S.B.)
Sept. '73 to June '77   **Bachelor of Arts Degree in Speech and Hearing**

June '77 to Dec. '77    **Post Graduate Work in Audiology at C.S.U.L.A.**
                        Eighty-nine clinical hours and classes including graduate classes in
                        pediatric audiology, oral-aural rehabilitation, sign language
                        psychoacoustics, audiologic instrumentation, impedance measurements,
                        and advanced audiologic special tests

**Credentials and
Certifications**
Jan. '2010 to Present   **Assistive Technology Assessment Certificate (High Incidence
                        Disabilities)**
Aug. '84 to Present     **Licensed Speech Pathologist**, Board of Medical Quality Assurance,
                        Speech Pathology and Audiology Examining Committee, #SP5601
Feb. '85 to Present     **Clinical-Rehabilitative Service Credential in Language, Speech and
                        Hearing** for grades, preschool through adult education- Lifetime
                        credential issued by the State of California
Feb. '85 to Present     **Certificate of Clinical Competence (CCC)-** American Speech and
                        Hearing Association
March '99               **Fast ForWord Certification** from the Scientific Learning Corporation
Feb. '99                Certification as a Behavioral Intervention Case Manager (BICM) from
                        Monterey County, SELPA
Aug. '96                Treatment and education of autistic and related communication
                        handicapped children (TEACCH ), one week intensive training

**Employment**          Language, Speech and Hearing Specialist, Monterey County Office of
Aug. '94 to Present     Education- Assistant Director of Special Education; Michel Saleh
                        Responsibilities are assessment and remediation of speech and
                        language disorders in students with diagnoses including autism, autism
                        spectrum disorders, Aspergers Syndrome, Down Syndrome, Cerebral
                        Palsy, hearing impairment, aphasia, apraxia and developmental delays.
                        My speech and language program includes individual and small group
                        therapy sessions, weekly classroom language sessions emphasizing
                        activities of daily living and peer tutoring sessions with general education
                        students. Age ranges include kindergarten through high school.

NMUSD 0584

Specialized techniques utilized include augmentative communication, picture exchange communication, sign language, peer integration, floor time therapy sessions, TEACCH activities, Fast ForWord technology and Intellikeys computer technology. Additionally, I develop and monitor appropriate IEP goals, in-service staff and families to help facilitate communication skills and assist with behavioral management assessment and goals.

**Aug. '93 to Aug. '94**  
Speech and Language Pathologist, NovaCare Corporation  
Responsibilities included assessment and remediation of adults presenting with neurological impairments ranging from expressive and receptive aphasia, traumatic brain injuries, dysphagia treatment and senile dementia and Alzheimer's. Additionally, I in-serviced staff counseled families and started small communication groups with patients in various skilled nursing facilities.

**Sept. '81 to June '93**  
Itinerant Speech and Language Specialist, Los Angeles Unified School District, Program Specialist, Esther Meyers  
Responsibilities included assessment and remediation of speech, language, hearing, fluency and voice disorders in students from preschool through the twelfth grade. I created and developed specialized programs for these students including homework manuals for parents, peer tutoring programs and weekly communication systems involving all parents. Integral parts of this program consisted of in-services to parents and teachers of students, performing the nationally syndicated 'Kids on the Block' plays, and teaching seminars to update speech specialists and special education teachers on current assessments and methodologies interested in hearing impairment or peer integrations activities, and supervising student teachers from colleges for their 'clinical rehabilitation service' credential.

**Feb. '84 to Dec. '84**  
**(Part-time 10 hrs./wk)**  
Speech Pathologist, Community Speech and Hearing Center, Encino, Calif. Director: Howard Gray, PHD.  
Responsibilities included assessment and remediation of speech, language, voice and fluency problems in clients in clinical and home settings. The Clients ranged in ages from infants to geriatrics. Additional focus included counseling of parents and clients and establishing home programs for effective carryover of therapeutic goals.

**Sept. '79 to July '81**  
Special Education Teacher, Center For Communicative Development, Los Angeles. Director: Virginia McKinney  
I was a teacher for deaf and hard-of-hearing adults. Responsibilities included speech and language therapy through total communication, auditory training, monthly reports and contacts with vocational rehabilitation counselors, acquiring hearing aids for these students, teaching daily living skills and written communication skills and on-going evaluations of their communicative development.

**Awards, Trainings**  
**and Organizations**  
May'2010 Newport-Mesa Unified School District Super star Award-June '98  1998 Special Educator of the Year Award – Support Staff, chosen by the Monterey County Special Education local Plan Area Community- Advisory Committee  
Feb. '95  Language Development Specialist Examination –Passed, California Commission on Teacher Credentialing  
Sept. '91 to June '92  Conversational Spanish Courses at Moorpark J.C.  
Sept. '81 to Present  Member of Calif. Speech and Hearing (CSHA)  
Feb. '85 to Present  Member of American Speech and Hearing Assoc.

NMUSD 0585



EXHIBIT
D-61
10/24/13

## Leah DeNisi

---

### EDUCATION

February 2008          Early Childhood Special Education Credential,
                       California State University, Fullerton

December 2003          Graduate: Bachelors of Arts in Communication,
                       Major: Communication
                       San Diego State University, San Diego, CA

### ADDITIONAL QUALIFICATIONS

- CBEST
- Adult, Child and Infant CPR
- Trained in Applied Behavior Analysis (ABA) and discrete trial teaching. District provided 5 day hands on and 2 day didactic by Autism partnership.
- ABA full day in-class 6 week training by Autism partnership.
- Trained in Intensive Behavior Instruction-19 hours.
  Direct 1:1 instruction.
- Social Skills Facilitation training: Teaching Interactions
- PreK Handwriting without tears workshop

### TEACHING AND RELATED EXPERIENCE

2006-Current           Early Childhood Special Education Teacher in
                       a PreK Autism specific Special Day Class,
                       Newport Mesa Unified School District

             •         Establish goals and objectives for the students
             •         Create and instruct curriculum


2004- 2006             Independent Facilitator/Classroom Aid,
                       Capistrano Unified School District

             •         Provide one on one aide on assignments
                       in Behavior Intervention Class and an autism
                       specific PreK class
                       •Conduct Intensive behavior instruction/
                       discrete trial daily

[1036516.1]

**NMUSD 0586**

**AR 1270**

1

## OFFICE OF ADMINISTRATIVE HEARINGS

### SPECIAL EDUCATION DIVISION

### STATE OF CALIFORNIA

In the Matter of:                    )
                                     )
PARENTS ON BEHALF OF                 )    OAH Case No. 2012050785
STUDENT,                             )
                                     )
v.                                   )
                                     )
NEWPORT-MESA UNIFIED                 )
SCHOOL DISTRICT                      )
_____)

                    October 15, 2013

                    Newport-Mesa USD Offices
                    Costa Mesa, CA


        The above-entitled matter came on for hearing
pursuant to notice,

            BEFORE:    DARRELL LEPKOWSKY
                       Administrative Law Judge




Official Transcriber:  Kelli Wells

*Statewide Transcription Services*
*(916)624-4300*

**AR 1361**

840

2

**A P P E A R A N C E S**

On Behalf of Student:

Kathleen M. Loyer, Attorney
Parents

On Behalf of District:

Alefia Mithaiwala, Attorney
Maureen Cottrell, Special Ed Director

AR 1362

841

3

<u>I N D E X</u>

**WITNESSES**                                                          <u>Page</u>

**For Student:**

Eric Fulsang
        Direct Examination by Ms. Loyer                              20
        Cross Examination by Ms. Mithaiwala                          80
        Direct Examination by Ms. Mithaiwala                         98
        Redirect Examination by Ms. Loyer                           117
        Recross Examination by Ms. Mithaiwala                       130
Katherine Burns
        Direct Examination by Ms. Loyer                             145
        Cross Examination by Ms. Mithaiwala                         179
        Direct Examination by Ms. Mithaiwala                        185

**For District:**

None

**Adjournment**                                                     243

**Certification of Transcript**                                     244

AR 1363

842

40

1    our own.  But we had gotten recommendations that he should

2    have more in the neighborhood of about three hours a week of

3    individual.  And we've seen a neurologist up in UCLA.  And

4    also I talked to advocate.

5        Q    Now, you signed this IEP.  Is that correct?

6        A    That is correct.

7        Q    And you accepted the program?

8        A    Yes.  As I recall we -- I think I stopped signing

9    them for a while but then they were saying that they -- that

10   if we didn't agree to it then he would pretty much not get

11   anything.  And I think this whole process here, we're kind

12   of naïve.  We don't understand the system and we're learning

13   as we go.

14       Q    Now.  I'm going to take you over to the signature

15   page, 313.

16       A    Okay.

17       Q    And on the left hand side in the middle of the

18   page where it says informed consent.

19       A    Yes.

20       Q    Okay.  Do you see the initials there where it says

21   I have been advised and given a copy of the special

22   education procedural safeguards?

23       A    Yes.

24       Q    You know what those are?

25       A    Not off top of my head.  Is that the parent's

**AR 1400**

843

41

1   rights form that they hand out

2       Q    You're not allowed to ask me questions.  Sorry.

3       A    Oh, I'm sorry.  I don't recall exactly what that

4   is.  Procedural safeguards.  I think it could be the

5   parent's rights.

6       Q    Are those your initials?

7       A    Yes.  Except on the second line where I wrote no.

8            MS. LOYER:  Okay.  Your Honor, I can't remember if

9   I asked you to enter this.

10           ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  Seventeen,

11  no.

12           MS. LOYER:  Okay.  I'd like you to ask that it be

13  entered, please.

14           ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  Any

15  objection?  This is Student's 17.

16           MS. MITHAIWALA:  No, Your Honor.

17           ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  All right.

18  Student 17 is admitted.

19           MS. LOYER:  Thank you, Your Honor.

20      Q    Okay.  I'm going to take you to Student's Exhibit

21  number 20.  And this is the IEP that was generated on

22  February 1, 2012.  Are you there.

23      A    Yes.

24      Q    Okay.  And if you could just flip back to page

25  354.

**AR 1401**

844

54

1   this.  It's Student 24.

2           ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  Any

3   objection?

4           MS. MITHAIWALA:  Lack of foundation.

5           ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  Ms. Loyer, is

6   Ms. Cottier going to testify to this document?

7           MS. LOYER:  Yes, Your Honor.

8           ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  All right.

9   Why don't we wait for her to admit it into evidence then.

10          MS. LOYER:  Okay.

11          ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  All right.

12  So I'll sustain the objection at this point.

13     Q    Prior to engaging Ms. Cottier to conduct this

14  assessment, did you request, or did the District offer to

15  provide an augmentative communication assessment?

16     A    You mean, prior to this?

17     Q    Prior to this.

18     A    No.  Didn't really know about it.  The assistive

19  technology.

20     Q    Okay.  I want to go back to the IEP now that is

21  tab 27.  Okay.  If you could turn to page 412 in that IEP

22  and second to the bottom it says Parent comments and

23  concerns, if you can take a moment and read that and let me

24  know when you're ready.

25     A    Okay.

*Statewide Transcription Services*
*(916) 624-4300*

**AR 1414**

84

1    "continue" is misleading because we weren't doing it up to

2    this point.

3        Q    I just need you to answer my question.

4        A    Yes, but my understanding of it has --

5        Q    Your understanding of "multimodal communication

6    system," what is your understanding of what that is?

7        A    Well it has multiple modalities and it's a device

8    used for communication.

9        Q    Did Cindy Cottier explain her recommendations to

10   you in person or on the phone?

11       A    We discussed it and -- yes.

12       Q    Okay.  Take a look -- actually don't take a look

13   at anything.  You testified about you had heard that three

14   hours a week of individual speech-and-language therapy is

15   what would be appropriate for ███  Do you recall that

16   testimony?

17       A    Yes.

18       Q    And you testified that you talked to a neurologist

19   and advocate regarding that.  Who were those people?

20       A    Let's see Dr. Shereefi Hanour (phonetic) and then

21   also the advocate that I spoke with over the phone was -- I

22   think it was Gregarian or Gogarian (phonetic) or something

23   like that.  These were years ago.

24       Q    Is Dr. Shereefi Hanour a speech-and-language

25   pathologist?

85

```
 1      A    No, she's a neurologist.
 2      Q    She's a neurologist.  She doesn't have additional
 3 credentials in speech-and-language pathology?
 4      A    I don't recall.
 5      Q    Has she ever worked in a school environment?
 6      A    I don't recall.
 7      Q    Special education environment?
 8      A    I don't know.
 9      Q    How about Mister -- is it Mister -- Gogarian?
10      A    Mr. Gogarian or something like that.
11      Q    Is he a speech-and-language pathologist?
12      A    No, he is not.  He's an advocate for parents.
13      Q    Does he have experience working in a special
14 educational classroom as a teacher?
15      A    I think he maybe does, but I can't say
16 specifically.
17      Q    Did you ask either of those individuals to contact
18 ▮▮▮▮▮ teacher at the time to talk about their philosophy
19 of three hours of individual speech-and-language?
20      A    No, the neurologist I think wrote us a
21 prescription for the speech-and-language therapy and my
22 conversations with the advocate was -- we only spoke once
23 over the phone and then we decided that we wouldn't need the
24 services of an advocate.
25      Q    Okay.  Did your neurologist explain to you the
```

AR 1445

847

98

1    Q    How so?

2    A    Mentioned that there was an inconsistency and that

3  we needed to get some consistency with the PECS.

4    Q    And did you mention that to your home providers?

5    A    Yes.

6    Q    And what did they say?

7    A    There was a lot of coordination going on between

8  the school and them, but they were wanting to try and set up

9  a time to get together with the school and try and

10 coordinate efforts.

11   Q    And what was that?

12   A    I don't recall.

13   Q    Can I switch over to direct at this point, Your

14 Honor?

15        ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  All right.

16                   DIRECT EXAMINATION

17 BY MS. MITHAIWALA:

18   Q    Mr. Fulsang, did you review them at a due process

19 complaint your attorney filed on your behalf?

20   A    Yes.

21   Q    Which staff do you believe are not highly

22 qualified?

23   A    Which staff specifically?

24   Q    Uh-huh.

25   A    I don't think I'm qualified to speak on their

AR 1458

848

124

1   Regional Center, that's where I first found out about legal

2   representation in special education environment.  I also

3   learned about writing letters to request an IEP and things

4   like that.  So we didn't want to hire an attorney right off

5   the be able to, we didn't think that that was necessary, but

6   I would say maybe when ▆▆▆ was maybe four, about then.

7       Q    When you sought assistance or when you retained a

8   counselor?

9       A    When I learned about it.

10      Q    When you learned about it.

11      A    When I retained he was I think after the incident

12  when he got kicked in the head at the school.

13      Q    So do you think it's a fair statement to say that

14  you as a family promoted a collaborative approach?

15      A    Yeah, definitely

16          MS. MITHAIWALA:  Objection, leading.

17          MS. LOYER:  I'm crossing her direct.

18          ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  Okay,

19  overruled.

20      Q    Okay.  And I do have to ask you one question.   Is

21  it true that ▆▆▆ mom handles all the scheduling and

22  bill- paying for all his therapies?

23      A    It is.

24      Q    Okay.  Would it be also fair to say that she's

25  going to make a better witness in that area?

*Statewide Transcription Services*
*(916) 624-4300*

849

**AR 1484**

135

1          MS. MITHAIWALA:  Sure, absolutely.

2          MS. LOYER:  Thank you, Your Honor.

3     Q    Mr. Fulsang, why didn't you request an AT

4  evaluation from the District prior to getting Ms. Cottier's

5  evaluation privately?

6     A    Probably because I'm not an experienced person in

7  special education.

8     Q    So you are not aware that you can request

9  assessments from the District?

10    A    No.

11         MS. MITHAIWALA:  Okay.  I don't have anything

12  further, Your Honor.  Actually wait, sorry.  Just one other

13  question.

14         ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  Okay.

15    Q    You testified, Mr. Fulsang, about the toileting in

16  the home environment?

17    A    Yes.

18    Q    What did Nyansa do with respect to creating a

19  toileting program for you or ▮▮▮▮▮▮

20    A    I think Nyansa tried to develop a toileting

21  regimen.  Merine (phonetic) -- was the name Merine?  Maggie.

22         INTERPRETER:  I'm sorry, could you repeat that

23  last sentence?

24         MR. FULSANG:  Nyansa developed a program for

25  toileting by their program supervisor Maggie, and that was

*Statewide Transcription Services*
*(916) 624-4300*

**AR 1495**

146

1    A    Okay.

2    Q    Thank you.  Now how do you know ███ Fulsang?

3    A    I know ███ Fulsang, he was a student in my

4  classroom beginning in 2011, my kindergarten classroom.

5    Q    Okay.

6    A    And continued in my classroom through 2012 to '13.

7    Q    Okay.  So he was there for two school years?

8    A    Correct.

9    Q    Okay.  And that was at the Mariners Elementary

10 School or --

11   A    No, that was at Eastbluff Elementary.

12   Q    Oh, Eastbluff.  Okay I'm sorry, I'm out of order.

13 Thank you.  Can you describe your classroom there that ███

14 was a part of?

15   A    Okay.  My classroom is in autism, moderate-to-

16 severe classroom, all of the students in there have

17 moderate-to- severe autism.  It's an ABA classroom where we

18 utilize applied behavior analysis strategies throughout the

19 classroom, throughout the school day.  That includes

20 positive behavior reinforcements, each student has you know

21 their own positive behavior reinforcement plan.  It's a very

22 structured classroom, we use a lot of explicit teaching

23 visuals.  Our classroom is made up of myself, the teacher,

24 and I always have additional classroom staff in my

25 classroom.

147

1    Q    Now for the time that ▮▮▮▮ was there how many

2    children were in the classroom?

3    A    The first year we had six children and three

4    adults.  The second year we had seven children and five

5    adults.

6    Q    Okay.  Now how would you describe ▮▮▮▮ and his

7    needs?

8    A    ▮▮▮▮ and his needs, ▮▮▮▮ is a boy who needs

9    positive reinforcement throughout his day.  He requires

10   frequent breaks.  He does well in a smaller environment,

11   smaller teaching environments.  Some of his strengths are

12   that he was able to follow simple classroom instructions, he

13   got used to the routines within the classroom.  He needed

14   support with his communication within the classroom, which

15   was provided.  He was a lovable kid, he definitely showed

16   affection, mainly towards adults.  He was happy.

17   Q    Okay.  I'm going to take you to a couple of

18   documents that are in the books in front of you, and if you

19   could put the white one in front of you, that's the

20   Student's evidence packet and the other one is the

21   District's.  And if I could just explain, we have an

22   interpreter here in case you're wondering why there's some

23   talking going on.

24   A    Okay.  I figured.

25   Q    Okay.  If you could turn to tab 20.  This is the

AR 1507

150

1     too.

2          Q     Did he use it?

3          A     We were in the teaching phase of trying to get him

4     to use it.

5          Q     So, did he -- was it mobile, like if he went out

6     on the playground?

7          A     We kept it inside the classroom.

8          Q     Okay.  Now I'm just going to ask you some random

9     questions that are disconnected, about your classroom.  So

10    did you have a therapy ball in your classroom?

11         A     Yes.

12         Q     Okay.  And did he use it?

13         A     Yes, he would go out in the yard and roll on it.

14         Q     Was that something that he had free access to or

15    did he have to earn it or --

16         A     That was something that was always in the

17    classroom.  When he got his breaks, depending on what he

18    chose for his breaks if he was walking towards a puzzle or

19    something he was able to access it, it would be on his way.

20         Q     Okay.  Was there any scheduled time that he would

21    be put on it?

22         A     We had sensory breaks throughout the day, correct,

23    where we would have students specifically bouncing on the

24    balls, these would facilitate that.  We also had an actual

25    whole group sensory movement opportunities where we would

AR 1510

853

151

1  meet once a day and work on stretching and breathing and

2  squeezing different things like that. That was a daily

3  activity that we did as a whole group.

4      Q    So is everything a whole group or did he have a

5  specific, at this time a specific sensory diet?

6      A    At this time there was not a specific sensory diet

7  that was in place.

8      Q    Okay.

9      A    But with stuff that we were all doing within the

10 classroom.

11     Q    Okay. Now did you do data collection on him when

12 he was in your classroom?

13     A    Yes.

14     Q    Now was that something you did personally or was

15 that delegated to the aides?

16     A    Both, all of us.

17     Q    And how did you determine who did what data

18 collection? How did that work?

19     A    Usually whoever was working with him at the time

20 would collect the data.

21     Q    Okay. And what happened to the data after you

22 collected it?

23     A    After we collected the data we would summarize the

24 data and we would put it into our summative sheets and then

25 it was used for progress reporting and reviewed just to see

*Statewide Transcription Services*
*(916) 624-4300*

**AR 1511**

854

152

1  how they were making progress.  I would review the data

2  weekly just to see where they were at.

3      Q    Okay.  So the data collection that you were doing

4  was just -- was all goal-specific?

5      A    Goal-specific.

6      Q    Okay.  So you weren't collecting behavioral data

7  unless it was directed at behavior roles, is that accurate?

8      A    Correct.  At that time we had specific behavioral

9  goals that we were collecting data on.

10     Q    Okay.  Now when you said we would summarize, who

11 would "we" be?

12     A    My staff and I sat down at the end of the week and

13 we summarize the data weekly.

14     Q    Now did you hold -- I don't know whether this is

15 the right term and if it's, if you don't know what I'm

16 talking about, tell me and I'll see if I can pull another

17 one -- did you hold clinic meetings for him?  You know what

18 that is?

19     A    Clinic meetings.

20     Q    Or staff meetings where everybody comes together

21 with the family and --

22     A    We did not have clinic meetings that were set

23 aside.  The family was free to call an IEP at any time that

24 they wished.  There were times within the last years that I

25 met with the in-home program service provider.

153

1      Q    By "they," you mean your staff, you?

2      A    Myself.

3      Q    Okay.

4      A    My staff and I talk continuously throughout the

5   day.  So if they have questions, readily available to attend

6   to these questions.

7      Q    Okay.  Now, did the subject ever come up about, at

8   this time, the time frame we're in, as to assistive

9   technology devices for him other than PECS?

10     A    I know Kathy Murphy and I, she was a speech-and-

11  language pathologist at that time, we were always talking

12  about readiness to move towards, you know, an eventual

13  higher-tech AAC device.  We were already using PECS and

14  picture-exchange within the classroom, that is something

15  that they had been using in preschool as well.

16     Q    So by "readiness," what do you mean by that?

17     A    I know in preschool he was working on matching

18  object to object.  There are certain levels of readiness

19  where the student needs to be to ensure that they will be

20  successful using an AAC device.  So for instance matching

21  picture to picture, having the picture being able to

22  identify the object, picture to object.

23     Q    Okay.  So at this meeting were you surprised to

24  hear that he was using an iPad at home?

25     A    His mom and I had discussed that he was using that

*Statewide Transcription Services*
*(916) 624-4300*

**AR 1513**

157

1    Q    It's okay.  So if you don't know something just

2  say you don't know and if I'm -- my questions are too

3  convoluted tell me and I'll try to make them better for you,

4  okay.

5    A    The datasheets were provided to me through my --

6  with my autism specialist.

7    Q    And that's Dr. --

8    A    Eliza.

9    Q    Eliza, okay.

10    A    Dr. DelPizzo.

11    Q    Now were you aware of ███████ having any fecal

12  smearing at school?

13    A    We never actually saw the fecal smearing at

14  school.  Mom had told us that there was fecal smearing

15  occurring at home, and we discussed strategies of how they

16  were handling the fecal-smearing at home and we also

17  collaborated with the in-home program, asking what they were

18  doing at home and tried to be as consistent as we could be

19  with the potty routine that they were doing at home.

20    Q    Now if -- I'm going to give you a hypothetical,

21  okay -- if there was an incident of fecal smearing, how

22  would you find that out?  Would that be part of the data

23  collection?  Would it just be one of your aides coming to

24  you?

25    Q    We would -- if they were --

AR 1517

857

158

1      MS. MITHAIWALA:  Objection, hypothetical.  She's
2  not asking about facts that actually occurred.
3      ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  I don't think
4  Ms. Burns has been designated as an expert.
5      MS. LOYER:  Well I'm not asking from an expert,
6  I'm asking from how communication flows from her and her
7  staff.  That's why I gave her a hypothetical because if it
8  didn't happen she can't explain to me, because my thinking
9  in phrasing that question was the teacher may not be the one
10  that would witness it because of the aides' different
11  duties.  And so I am just wondering what the flow of
12  information would be.
13      ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  All right.
14  Well, why don't you just kind of parse that out then?
15      MS. LOYER:  Okay.  So, I don't know how to do that
16  without a hypothetical, you know.  If you had a certain
17  behavior in your classroom and you didn't witness it, how
18  would you find about it?  Is there a better way of asking
19  that?
20      ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  Well go ahead
21  and ask that --
22      MS. LOYER:  Okay, let's try.
23      ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  -- and we'll
24  see where it goes.
25      Q    Okay.  So if you had a certain behavior whether

858

159

1  it's that particular behavior or other behavior and you

2  didn't witness it as the teacher, how does that information

3  flow to you if it's not something that's on a datasheet?

4      A    My staff reports to me throughout the day.  We've

5  got a very tight team in the classroom altogether all day.

6  They know that if anything occurs throughout the day they

7  report to me and I'd communicate it to the parents.

8      Q    Okay.  Now with regards to this report I'm just

9  going to go through a couple aspects of it.  Do you want to

10 take a little bit of time to look at it, I don't know if

11 you've read it recently, I don't want to --

12     A    I looked at it awhile back, but if you have

13 specific pages that you want me to look at we can go into

14 those.

15     Q    Okay.  Let me just ask you a general question.

16 The targeted behaviors that were picked, I think they're

17 listed on page 425 near the bottom, it has the "pushing of

18 the palm," the "tapping fingers" and the "squeezing of

19 another person's wrist," how did you come to picking those

20 three behaviors?

21     A    These were the targeted behaviors that were

22 discussed in the IEP.

23     Q    Okay.  And now, with regards to the "pushing palm

24 to chin," was that disruptive to the learning environment?

25     A    It wasn't necessarily disrupted to the learning

AR 1519

859

160

1   environment because it's usually short-lived.  There was a

2   push and then it was extinguished after that.

3        Q    Okay.  And what about the "tapping"?

4        A    The tapping is more disruptive to the learning

5   environment but he was easily redirected when the tapping

6   did occur.

7        Q    Okay.  And what about the aggression, the

8   "squeezing"?

9        A    Squeezing I wouldn't say that was disruptive to

10  the learning environment.

11       Q    It was or was not?

12       A    It wasn't.

13       Q    It was not, okay.  Thank you.  And with regards to

14  his iTouch that was introduced, can you tell me how that was

15  integrated into his environment?

16       A    We began using it for highly-preferred items.  At

17  snack having him choose which snack item that he would want

18  at that time off of his iTouch.  It was completely modeled,

19  hand-over-hand modeling, a lot of receptive, just verbal

20  language bathing him, and the receptive language of how do

21  you use it.

22       Q    And did it progress from highly-preferred items?

23       A    We kept it with highly-preferred items for a

24  while.  We added in new highly-preferred items to have him

25  be able to choose something that we knew maybe weren't as

AR 1520

860

161

1   highly preferred, and then later we added in more functions

2   and activities to teach him how to navigate through.

3       Q    And how did you feel he was doing on that iPad or

4   iTouch?

5       A    I thought he was doing well.

6       Q    Okay.  I am going to have you go to tab 37 and

7   that is the IEP that was generated on May 2, 2013.

8       A    I'm sorry, tab 37?

9       Q    Tab 37 in the white book, yeah.

10      A    For May 2nd?

11      Q    Yes.

12      A    Okay.

13           ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  This is the

14  one that's tab 45 --

15           MS. LOYER:  Oh, I'm sorry, we're using the other

16  book.

17           ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  -- in

18  District's.

19           MS. LOYER:  So it would be in the black book, tab

20  45.

21           MS. BURNS:  Tab 37 is it?

22           ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  Tab 45 in the

23  book you're looking at now.

24      Q    Okay.  Now, with regards -- I'm going to go back

25  to the iTouch, and this the second paragraph from the bottom

*Statewide Transcription Services*
*(916) 624-4300*

**AR 1521**

861

162

1   it starts with, "Ms. Loyer asked."

2       A    Uh-huh.

3       Q    The second sentence here says, "The team indicated

4   communications support was not always provided under these

5   conditions."  Could you expand on that a little bit about

6   what we were talking about at that?

7       A    I think you were asking if we had the -- if -- I

8   could be wrong but -- if you had it available for certain

9   times of the day and we said that we were teaching him so

10  how to use it so we had it available during the highly-

11  preferred times and we were also -- we had it available at

12  that time, I believe, during circle-time and center-

13  rotations.

14      Q    And how did he do with that at circle-time?  Did

15  he participate?

16      A    He was making progress.  Again, during the non

17  highly-preferred times it was still a lot of hand-over-hand

18  modeling teaching him how to identify object to the picture

19  on the iPad or the iTouch.

20      Q    Uh-huh.  So when you say "object" does that mean

21  for circle-time activities, it was expanded beyond food

22  items at that time?

23      A    "Beyond" -- I'm sorry?

24      Q    Food items?  Preferred food?

25      A    Yes.

163

1    Q    Okay so --

2    A    We were just starting to introduce it.  He was

3  able to identify the food items independently by that point

4  so we were having him move on to other things, and again it

5  was all hand-over-hand modeled just to have him experience

6  it and have interaction with it during the other times of

7  the day.

8    Q    Did you find that he enjoyed using it or did he

9  resist using it, do you have any kind of opinion about that

10  as his teacher?

11    A    Because it was more demanding and it wasn't a

12  highly-preferred time of day it wasn't as enjoyable as it

13  would be during his snack-time.  However when he did

14  receive, for his behavioral support system when he did

15  receive his tokens and it was time for his reinforcement

16  break he was able to use that to choose what break-item he

17  wanted for that time.

18    Q    Now, explain to me how that token thing worked?

19    A    The reinforcement system?

20    Q    Yeah.

21    A    He has a token system which is a token board and

22  he has ten tokens.  Last year I believe he had five and when

23  he was displaying the desired behavior, the targeted

24  behavior, he would received a token as well as verbal praise

25  for that targeted behavior.  It's part of the ABA strategies

AR 1523

863

164

1    that we use in our ABA classroom.

2        Q    Okay.  So did he understand the concept of five

3    tokens?

4        A    Absolutely.

5        Q    So --

6        A    He understood when he got his five tokens and that

7    meant that he got a break.

8        Q    Okay.  So does that translate to him being able to

9    count to five?

10       A    Being able to count to five, I wouldn't say it

11   translated him being able to count to five but because it's

12   a visual and he knows that when that token is on the board

13   and it's covering that piece of Velcro.

14       Q    Okay.

15       A    It's more of a visual thing, he understands when

16   that's full that's when he gets his break.

17       Q    Just so I understand it, it's like a Velcro board

18   and it has five spots for five tokens.

19       A    Uh-huh.

20       Q    And so --

21            ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  You'll have

22   to say yes for the record.

23            MS. BURNS:  Yes, I'm so sorry.

24            ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  Thank you.

25            MS. BURNS:  Yes.

AR 1524

864

179

1    We'll take five minutes if you have to use the restroom or
2    anything --
3              MS. BURNS:  I might go into the restroom.
4              ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  -- wander
5    around, that's fine.  I'm going to take us off the record.
6    Five minutes.
7                        (Off the Record)
8              ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  We are back
9    on the record after a short break in the matter of ▮▮▮
10   Fulsang and Newport-Mesa Unified School District.  Ms.
11   Mithaiwala is going to start her cross examination of Ms.
12   Burns.
13             Ms. Burns, I'll just remind you, you're still
14   under oath.
15             MS. BURNS:  Okay.
16             ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  And you can
17   begin, Ms. Mithaiwala.
18                        CROSS EXAMINATION
19   BY MS. MITHAIWALA:
20        Q    Do you remember your discussion on the witness
21   stand about the use of a iPad for ▮▮▮ and mom talking
22   about that during the IEP meeting?
23        A    Yes.
24        Q    In your opinion is there a difference between use
25   of an iPad for recreational purposes versus communication

180

1  purposes?

2      A    Yes.

3      Q    And what is that difference in your mind?

4      A    When you're using it for a recreational purpose,

5  obviously for a reinforcement it's fine.  They're always

6  going to go towards the fun items within the iPad if it's

7  communication it's used for a different purpose.  So it's

8  more structured, more modeled, it's a different purpose.

9      Q    Is it possible that ▉▉▉ was ready for use of the

10  iPad for recreational purposes prior to his being ready for

11  it to be used for communication purposes?

12     A    No, the navigation was a good thing that he knew

13  how to navigate through it but I would he wasn't ready for

14  communication purposes yet.

15     Q    Take a look at the white binder Exhibit 25.

16     A    Okay.

17     Q    And take a look at page 413.

18         ADMINISTRATIVE LAW JUDGE LEPKOWSKY: You're going

19  to have to tell me instead of saying white binder or I only

20  have --

21         MS. MITHAIWALA:  Student's Exhibit --

22         ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  I only have

23  black binders so, you're going to have to tell me Student's

24  binder or Exhibit.

25         MS. MITHAIWALA:  Student's Exhibit S-25.

183

1   interviewed I think Lila, the speech and language

2   pathologist and I believe she was looking for an AT device

3   was needed and it was prompted by the Parents.

4       Q    Did you have concerns with Dr. Franke's

5   recommendation that the team now needed to do an FBA?

6       A    I think as a team we weren't exactly understanding

7   the assistive behaviors that they were looking for, for the

8   FBA in regards to how it related to the AT device because we

9   were seeing more the taping behaviors, things like that in

10  the classroom.

11      Q    Was ████ having behaviors at that time that in

12  your mind would warrant an FBA?

13      A    No, not at the time.

14      Q    Was Dr. Franke -- you testified earlier that Dr.

15  Franke did not conduct an observation of your classroom, is

16  that correct?

17      A    Not in the classroom, correct.

18      Q    Okay.

19           INTERPRETER:  I'm sorry, the interpreter would

20  like to ask you if you could both speak a little louder.

21           MS. BURNS:  Oh, sure.  Sure, sorry.

22           MS. MITHAIWALA:  Sure, sorry.

23           MS. MITHAIWALA:  Sure, I'll try.  Do you want me

24  to ask that question again?

25           INTERPRETER:  If you don't mind.

184

1    Q    Okay.  Did Dr. Franke do an observation in your

2  classroom prior to recommending an FBA?

3    A    No, she was not inside my classroom.

4    Q    So she wouldn't have had an opportunity to see

5  firsthand whether there were or were not behaviors

6  occurring?

7    A    Correct, firsthand, yeah.

8    Q    Why do you think she then recommended an FBA?

9    A    From reviewing records or speaking to Parents I

10  would assume.

11    Q    And were those records several years old or

12  encompassed several years old or were they?

13    A    The records that she was reviewing, I believe,

14  were assessments from past years, IEPs from past years.

15    Q    If you had seen the need for an FBA for ▆▆▆▆

16  would you have recommended one for him?

17    A    Yes, the school psychologist and I would work as a

18  team and we would have recommended that.

19    Q    Under what circumstances or what types of

20  behaviors do you generally see for students for which you

21  would recommend an FBA?

22    A    If we see there's a significant need in the

23  behavior that's impeding learning in the classroom we aren't

24  seeing progress on goals, there's injury to the self or

25  others that's typically when we look more at an FBA.

**AR 1544**

868

185

1     Q    And none of them was happening with ▆▆▆ at that

2   time?

3     A    No.  No, sorry.

4     Q    You testified earlier about when you started

5   teaching ▆▆▆ and I have it down as 2011/2012, is that

6   right?

7     A    Correct.

8     Q    Were you fully credentialed at that point?

9     A    Yes.

10     MS. MITHAIWALA:  I don't have anything else to

11  cross Your Honor, but I do have some direct.

12     ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  Go ahead.

13                 DIRECT EXAMINATION

14  BY MS. MITHAIWALA:

15     Q    Okay.  Black binder, District's Exhibit 51.  Okay.

16  Katy, have you seen these documents before?

17     A    Yes.

18     Q    And what is it?

19     A    My resume.

20     Q    And what is your current title or position?

21     A    My current title or position is I am an SDC

22  teacher at Eastbluff Elementary and an ABA structured autism

23  classroom for moderate to severe students.

24     Q    Can you describe your educational background?

25     A    I received my bachelor of arts degree in

188

1  training and the District has also offered additional

2  training courses which I have attended.  They offer courses

3  throughout the school year for professional development.

4      Q    You've worked with ████ for two school years, is

5  that right?

6      A    Correct.

7      Q    Can you describe his intellectual functioning?

8      A    His intellectual functioning is very low.  He does

9  make progress but it tends to be slower progress.  He does

10  have the ability to learn but he is intellectually low.

11      Q    Where would you place him along the autism

12  spectrum?

13      A    He would be more severe.

14          ADMINISTRATIVE LAW JUDGE LEPKOWSKY: I'm sorry I

15  didn't understand your answer.

16          MS. BURNS:  More severe.

17          ADMINISTRATIVE LAW JUDGE LEPKOWSKY: Severe.

18          MS. BURNS:  Severe.

19          ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  Thank you.

20      Q    Is that because of his intellectual functioning or

21  because he has more severe autistic behaviors?

22      A    I would say his stimulatory behaviors, his

23  cognitive functioning.

24      Q    How would you describe his ability to retain

25  information?

870

189

1    A    If he has consistent and structured classroom time
2  he is able to maintain, if there are gaps we would see there
3  would be some regression.  He needs that consistent support
4  in order to retain his learning skills.
5    Q    Okay.  We're going to be looking at the District's
6  evidence now so it's going to be primarily the black binder.
7  Can you look at D-26 please?  You testified earlier that you
8  were at this IEP meeting right?
9    A    Yes, right this was the one.
10    Q    You need to look at page 363 to refresh your
11  memory.
12    A    Okay.  Yes.
13        ADMINISTRATIVE LAW JUDGE LEPKOWSKY: You are at D-
14  26 I am sorry?
15        MS. MITHAIWALA:  D-26 just in general I asked her
16  -- if she had been -- if she was at this meeting.
17        ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  Okay, thank
18  you.
19    Q    I'm sorry, Katy yes you were?
20    A    Yes, yes.
21    Q    Okay.
22    A    I was.
23    Q    What was the purpose of this meeting?
24    A    This -- let me double check it, I believe this was
25  the transition meeting from preschool to kindergarten that

190

1  was held at the end of the preschool year.

2      Q     And so what was your role in this meeting?

3      A     I was there to explain our program to the Parents

4  and to the family and the teacher to go over their current

5  goals and where the Student currently was at.

6      Q     Did Parents have any objection on this meeting to

7  him going to your program?

8      A     Not that I recall.

9      Q     Did you describe your classroom and how you go

10 about teaching?

11     A     Yes, that's a routine part of a transition

12 meeting.

13     Q     You've referenced your classroom as an ABA

14 classroom.  Can you talk more about what that means

15 specifically?

16     A     Yes, everybody has a behavior support some kind of

17 system where they work off of.  They all have targeted

18 behaviors that we focus in on.  It's a structured

19 environment, our ratios are smaller than a regular

20 classroom.  We use lots of visuals within our classroom,

21 explicit teaching, we will use lots of positive

22 reinforcements not only are we using their specific token

23 systems but then we also during core group time, we have

24 other items in ways that we provide positive reinforcement

25 during learning activities for all of the students.  It's

191

1    all very differentiated because each student is so different

2    so a lot of modifications for the students for their certain

3    needs.

4        Q    You have mentioned earlier in your testimony that

5    you have bouncy ball in your classroom.

6        A    Yes.

7        Q    What other sensory supports do you have?

8        A    We have a bouncy ball, we have bean bags, we have

9    a green mat, we've got Thera-Bands, weighted vests, weighted

10   blankets, a trampoline.  There's -- well that was there last

11   year, we had a rocking thing which is a plastic rocking

12   course type of thing but it wasn't rocking course.  Lots of

13   squishy balls.

14       Q    What's the green mat that you referred to?

15       A    The green mat is just basically a mat that unfolds

16   where if the kids want to go and lay down.  It just gives

17   them a little bit of soft pressure, we also have I don't

18   know the technical term but it's an OT stock I believe the

19   kids can put it on and it just provides pressure.

20       Q    Take a look at D-44.  Have you seen this before?

21       A    Yes.

22       Q    What is it?

23       A    This is a sensory diet recommendations that that

24   OTs would give for students in the classroom who have

25   sensory needs just gives us some ideas of different things

**AR 1551**

873

192

1   that we can try to help their sensory needs.

2       Q    And how did this particular one for ███ come

3   about?  Why was it prepared?

4       A    This is 2013.  Our OT was in the classroom and she

5   wanted to make sure he had everything documented within the

6   classroom so that we could share it with everybody, make

7   sure that everyone was on the same page utilizing the

8   strategies in the classroom and also so that you know when

9   he does transition to another class that they also are aware

10  of the different sensory activities that will help ███

11  with his sensory needs.

12      Q    Was there anything in this report -- well let me

13  back up -- lay a foundation.  Did you review this report

14  with Tim Chen, the author of it?

15      A    Yes.

16      Q    Was there anything in this report that was new to

17  you as far as used for ███ or something you hadn't

18  previously thought of?

19      A    Actively pumping was something we were working on

20  the swings.  He enjoys swinging but he wasn't actively

21  pumping quiet yet, but other than that everything else we

22  had stuff in the classroom we were human sandwich we did

23  that kind of stuff squishing, squishes.

24      Q    Can you walk us through a typical day -- well

25  foundation -- is there a typical day in your classroom?

193

1    A    Well the way that my day is structured we have --

2  we all go to the restroom first thing in the morning and we

3  take what we call movement break where the students will

4  walk around the black top just to get some movement and then

5  we allow them to go on the playground, access the playground

6  equipment for sensory, monkey bars, we encourage them to do

7  the monkey bars just like climbing just to get what we call

8  to get their wriggles out.  After that we go inside the

9  classroom everybody participates in independently getting

10  their stuff out of their backpack.  Some kids need more

11  support than others but that's part of us working towards

12  independence.  Placing it in the designated area.  After

13  that we run a whole group center, whole group instruction

14  where we do calendar morning activity such as calendar, we

15  sing songs, we focus on the letter of the day that becomes

16  the language arts instructional period and after that we

17  would go into our center rotations, our first center

18  rotation -- and there are three different center rotations

19  that are served in the classroom.  Typically, last year we

20  had four because we had more students and more aides we're

21  able to support that.

22        But we have a fine motor center where we work on

23  fine motor activities, cutting, writing, buttoning things

24  that are more functional, punching whatever that students

25  needs are or their goals, that's usually what we work on.  A

*Statewide Transcription Services*
*(916) 624-4300*

AR 1553

194

1  math center where we work on, quantitative concepts, numbers

2  again, the math skills where the student's needs are.  And

3  then we also have a language arts center where we work on

4  reading skills, letters you know if their needs are lower we

5  will work on different things identifying emotions or

6  whatever -- if there (inaudible) we need to work on that

7  category, things along those lines.

8          And then we do -- we always do a snap before

9  recess which also give us an opportunity to work on language

10  skills, social skills, table manners.  And typically when

11  the speech and language pathologist is there that is the

12  time where she will run snap with our group to really hone

13  in on the language skills, and also share her strategies

14  with us, (inaudible) what we are doing during that time --

15      Q    And how often is that?

16      A    -- good time to collaborate.  Twice a week.

17      Q    So that's not student specific, she just comes to

18  a specific class?

19      A    No, that's just that extra time that she's in the

20  classroom pushing in with us, helping us out sharing her

21  strategies.  The students would then go to recess.  After

22  recess, they come back and we finish our center rotations,

23  so the center rotations are not all in the morning they

24  continue after recess.  And then we do another whole group

25  before lunch which focuses on numbers, math, counting.  We

AR 1554

195

1   do an actual activity which sticks and manipulative and then

2   we also utilize the technology with the smart board, working

3   on colors, shapes, numbers.  And then we go to lunch and

4   recess again.

5          After lunch and recess we come back and we have a

6   quiet time where the kids are able to look at books, work on

7   puzzles, use the computer and then we do progressive

8   movement, which again it's another whole group instruction

9   teaching, calming strategies, teaching squeezing, deep

10  breathing, ways to start teaching kids how to self manage

11  their anxiety and their frustrations.

12         After that we would do a read aloud, we'd also do

13  yoga on certain days; stretching, which is also part of

14  looking for a group imitation, attending, and then we also

15  would have -- after that we would have developmental centers

16  where we play games, we do art projects and these usually

17  are small group centers, each center would have a different

18  thing somebody might have Plato, somebody might have Mr.

19  Potato Head.  And each center is designed to work on

20  specific skills where it's manipulating the Plato or

21  imitating what the person's putting on the Plato.  It also

22  uses a lot of different language skills.  We'd work on art

23  projects, we'd do fine motor and games to work on social

24  skills.

25         And each day is a little bit different Fridays we

*Statewide Transcription Services*
*(916) 624-4300*

**AR 1555**

196

1   work on cooking, Thursdays we have sports where we touch on

2   -- we'd try to look at the games that the kids are playing

3   at recess and teach our kids in a more structured

4   environment how to participate in these games.

5       Q    So after small group centers what happens on a

6   daily basis?

7       A    The afternoon centers?

8       Q    Uh-huh.

9       A    After small group usually it's about 2:30, 2:35 we

10  have a group clean up; everybody takes part in cleaning up

11  the classroom.  And then we hold an afternoon snack and the

12  kids go outside to attend the final recess.  And then we

13  come back at 3:00 o'clock and we pack up again working on

14  independent skills getting our own stuff out of our cubbies,

15  putting them in their backpack, zipping it up, and we go

16  meet the parents.

17          That's a typical day and that doesn't include pull

18  outs, which include library, computers and music and those

19  occur sporadically depending on their grade, they go with

20  their grade level throughout the week on different days.

21      Q    Can you explain how ABA methodology is utilized

22  throughout you just gave us a really good detailed schedule.

23  How do you use -- how was ABA used throughout that schedule?

24      A    Throughout the entire day, we use a lot of visuals

25  within the classroom they have to identify, they have to

AR 1556

878

197

1   match and each student -- all students have to match a color
2   for whatever center that they are going to.  It's very
3   structured and we ring a bell, the students come back to the
4   whole group center before they get their instruction to go
5   to their next center rotation.
6           ABA is constantly used because of our token
7   systems that we are using, the positive reinforcements.
8   Students are continuously receiving social praise as well as
9   whatever their break activity is.  Frequent breaks, explicit
10  teaching throughout every center.
11      Q    I believe, Katy, you said either earlier or more
12  recently something about every student having their own
13  positive behavior intervention plan?
14      A    Correct.
15      Q    And is that individualized?
16      A    It is individualized.  Each student has a specific
17  target behavior that they are working for depending on their
18  need and that's what they get tokens for.  And a lot of the
19  token systems are different depending on student
20  understanding and student need for that behavior that
21  particular behavior.
22      Q    What is ▮▮▮▮ behavior?
23      A    ▮▮▮▮ behavior that we were focusing on last
24  year we were really focusing on the taping because that was
25  what was getting -- the most impeding for his educational

AR 1557

198

1  setting and following directions.

2      Q    So when he --

3      A    So this calm body, calm hands were the

4  instructions that we're using and great listening.

5      Q    So when he refrained from taping he got a token?

6      A    Correct.

7      Q    And when he followed directions he got a token?

8      A    Uh-huh.

9      ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  I am sorry

10 you will have to say yes.

11     MS. BURNS:  Yes, yes sorry.

12     Q    Did I miss any piece of that or is that pretty

13 much how it worked?

14     A    That's pretty much how it was working I am

15 remembering specifically towards the last half of the year.

16 That was really what we were honing on in.  And as we a

17 student has progressed and with that goal we would change

18 what that target behavior is, it's whatever the need is at

19 that time.  And also with ABA, I don't know, it's a lot of

20 modeling, is included with ABA, modeling the behavior,

21 modeling and then pulling back how much support you're

22 providing as they began to pick up whatever the task is that

23 you are teaching.

24     Q    Is that prompt hierarchy?

25     A    Yes, some of that was prompt hierarchy.

199

1     Q    What's your understanding of prompt hierarchy?

2     A    Prompt hierarchy is basically how much prompt -- I

3 guess support you're providing in the beginning.  If you're

4 providing a hand over hand physical support modeling touch

5 green, touch blue in your hand that's high.  By the bottom

6 of prompt hierarchy they're able to do with the one verbal

7 instruction.

8     Q    Do you have systems in place to communicate with

9 parents?

10    A    Yes.

11    Q    What are those?

12    A    I have sent home a daily communication log every

13 day that consists of -- it breaks it down by day into the

14 different portions of the day with a rating skill basically

15 of how their students are doing.  We look at participation,

16 attention, calm and compliant and then there's also a place

17 for notes where we would write notes.

18    Q    And do parents have an opportunity to write back

19 to you?

20    A    On the backside there's section where they can

21 also tell us what is going on at home if there's something

22 different, changes in medication, sleeping patterns.

23    Q    And how often did your communication log go home?

24    A    Daily.

25    Q    And did ███████ parents ever write in it?

*Statewide Transcription Services*
*(916) 624-4300*

214

1    alphabet.

2        Q    And how did you collect data on that?

3        A    A ratio.

4        Q    And why was it appropriate ▮

5        A    These are foundational skills for reading and

6    someday ▮ does have the ability to read simple words to

7    have the foundations of letters, very, very beginning basic

8    skills.

9        Q    Are any of these goals that we just went through

10   designed to improve functional communication?

11       A    Yes, the ones all these with visuals.

12       Q    Can you point to page numbers?  Let's make it

13   easier, if there is a goal that you believe is designed to

14   improve his functional communication, can you tell us the

15   page number for that?

16       A    Communicational skills, those can always --

17            ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  If you want

18   to just give us -- and also give us the page number shown?

19            MS. BURNS:  376 that's part of communicational

20   skill, identifying body parts eventually he should be able

21   to identify on his communication device if something is

22   wrong with his stomach, his head, that was geared towards

23   communicational skills.  Using the restroom, page 378,

24   beginning stages of identifying a party icon, being able to

25   request eventually using that.  That was used towards that.

AR 1574

882

215

1   Attending in general that is just a basic learning skill

2   that would be needed to learn any kind of skills or teaching

3   watching how things are modeled.

4          ADMINISTRATIVE LAW JUDGE LEPKOWSKY:   What page is

5   that.

6          MS. BURNS:   I am sorry.

7          ADMINISTRATIVE LAW JUDGE LEPKOWSKY:   What page?

8          MS. BURNS:   Beginning, 381.

9          ADMINISTRATIVE LAW JUDGE LEPKOWSKY:   Thank you.

10         MS. BURNS:   382 using the visuals for the visual

11  schedule.  Again, identifying those visuals, being able to

12  understand a visual schedule on paper can eventually be

13  transferred to in AAC device identifying different places

14  within his environment.  Identifying an emotion state, 385,

15  again beginning stages of having him be able to communicate

16  how he is feeling, how others are feeling.  Morning,

17  afternoon -- so that is independence.  Waiting.  I would say

18  those are the ones that are mostly geared towards --

19     Q    You said waiting is one.

20     A    I mean waiting was more of a social emotional

21  because he was grabbing from peers, so waiting can be

22  because waiting to ask your turn on the actually AAC device,

23  waiting to request.

24     Q    Did you propose services to support these goals

25  that you proposed?

AR 1575

883

216

1    A    Yes.

2    Q    What were the services you proposed?

3    A    The services I proposed was that he would be

4  include in an ABA specific classroom five days a week 1,860

5  minutes a week and then also proposed some school ESY.

6    Q    Why?

7    A    Which is five days a week.  To maintain learning

8  skills and keep from having his skills regress that he has

9  learned throughout the school year.

10   Q    Did you propose a one to one aide to --

11   A    No.

12   Q    -- as a service?  Why not?

13   A    I did not.  I did not feel he was needing a one to

14 one aide.

15   Q    Why not?

16   A    I felt like he was still making progress towards

17 goals and there wasn't a need for more support at that time.

18   Q    Do you have students in your classroom that do

19 have one to one aides?

20   A    Yes.

21   Q    So, if one was necessary for Student would you

22 advocate for that?

23   A    Yes.

24   Q    Okay.  Take a look at D-33.

25        ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  Did you say

229

1    support these goals?

2        A    Yes.

3        Q    And what was that?

4        A    I proposed that a CCABA classroom 1,860 minutes a

5    week which is five days a week, 31 hours and I also

6    recommended ESY for summer school to maintain skills that

7    were learned throughout the school year.

8        Q    And did you propose a one on one to aide in this

9    IEP?

10       A    No.

11       Q    Why not?

12       A    We do not feel that there was a need for one on

13   one aide at the time due to progress that was being made on

14   the goals.

15            ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  I am sorry

16   what was that last question?

17       Q    Did you propose a one on one aide in this.

18       A    And again this was a team discussion that was

19   decided from the school, sorry, based on his progress in the

20   classroom and on his goals.

21       Q    And Katy, how would you describe his progress in

22   the two years that you have had him?

23       A    He's made progress sometimes it was slow, at times

24   we would see regression especially after longer breaks but

25   overall he made progress on his goals from the time that he

AR 1589

885

230

1    came with to where he is at now.  He's made -- definitely
2    made progress.
3        Q    Can you give us some specific or concrete examples
4    of things he couldn't do when he came to you and now he can
5    do?
6        A    I would say following familiar classroom
7    instructions.  He was able to do following those familiar
8    classroom instructions, his communication got much better as
9    far as using the picture exchange, once we did go to the AT
10   device he was becoming more and more successful with that.
11   His attending increased, he was able to navigate throughout
12   the classroom with a verbal instruction.  Overall he was
13   more motivated when talking to his preschool teacher they
14   had to do a lot of physical prompting just to get him to go
15   to different locations within the classroom.
16       Q    Is there anything that comes to mind that might
17   have impeded his progress or categorized his progress to
18   slow.  What in your mind has made it slow for ▉▉▉
19       A    I think it's --
20       Q    What factors?
21       A    His cognitive levels are low and you know it's --
22   I think lack of motivation at times.
23       Q    How has his attendance been since you've been his
24   teacher?
25       A    Last school year he missed 18 days and the school

1

### OFFICE OF ADMINISTRATIVE HEARINGS

### SPECIAL EDUCATION DIVISION

### STATE OF CALIFORNIA

| | | |
|---|---|---|
| In the Matter of: | ) | |
| | ) | |
| PARENTS ON BEHALF OF | ) | OAH Case No. 2012050785 |
| STUDENT, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| NEWPORT-MESA UNIFIED | ) | |
| SCHOOL DISTRICT | ) | |
| | ) | |

October 16, 2013

Newport-Mesa USD Offices
Costa Mesa, CA


        The above-entitled matter came on for hearing

pursuant to notice,


            BEFORE:    DARRELL LEPKOWSKY
                       Administrative Law Judge




Official Transcriber:  Kelli Wells



*Statewide Transcription Services*
*(916) 624-4300*

AR 1605

2

**A P P E A R A N C E S**

On Behalf of Student:

Kathleen M. Loyer, Attorney
Parents

On Behalf of District:

Alefia Mithaiwala, Attorney
Maureen Cottrell, Special Ed Director

AR 1606

888

3

# I N D E X

**WITNESSES**                                                    **Page**

**For Student:**

Aneida Fulsang
    Direct Examination by Ms. Loyer                    12
Elizabeth Hughes
    Direct Examination by Ms. Loyer                    16
    Cross Examination by Ms. Mithaiwala              134
    Redirect Examination by Ms. Loyer                242
    Recross Examination by Ms. Mithaiwala            244

**For District:**

None

**Adjournment**                                                  247

**Certification of Transcript**                                  248

17

1     Q   Dr. Hughes, I would like you to turn to tab 42 in

2  the white book and if it's easier for you to have it out of

3  the book, it's okay if you can snap it out because that's

4  what I did, I thought it was a little bit cumbersome, and

5  then just let me know when you are ready.

6     A   Sure.  All right.

7     Q   Okay.  Now can you -- I'm sorry.

8          MS. LOYER:  Your Honor, I would like to ask a

9  procedural question before I get there.

10        ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  Sure.

11        MS. LOYER:  Do you want me to have Dr. Hughes go

12  through her resume?

13        ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  Well, do you

14  want to put it into evidence?

15        MS. LOYER:  I want to put it into evidence.

16        ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  Are you going

17  to have an objection?

18        MS. MITHAIWALA:  I am, I haven't received it until

19  this morning.

20        MS. LOYER:  It wasn't listed as an expert, I

21  brought it as a courtesy, Your Honor.

22        ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  I am sorry,

23  Dr. Hughes is not listed as an expert?

24        MS. LOYER:  No.

25        ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  All right.

18

1  We can just go through the resume if that's what you would

2  prefer.

3          MS. MITHAIWALA:  That's fine.

4          ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  All right.

5  Let's go through the resume.

6          MS. LOYER:  Then I will take it back.

7          ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  All right.

8          MS. LOYER:  You don't want it.

9          MS. MITHAIWALA:  I do want it, if we're going

10 through it as she has got it in front of --

11         ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  Well, if it's

12 not into evidence, I don't see how you get to keep it.

13         MS. MITHAIWALA:  If she has got it in front of

14 her, I have a right to take a look at it while you are

15 asking questions.

16         ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  You know, I

17 don't want to argue about this.

18         MS. LOYER:  I don't either.

19         ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  This is not

20 worth arguing about frankly, and we can go through it, she

21 can show a witness a document to refresh her memory.  Yes,

22 if you are doing that, then Ms. Mithaiwala has a right to

23 have it in front of her even if it's just being used to

24 refresh her memory.

25         MS. LOYER:  I don't think I have to refresh Dr.

891

19

1   Hughes' memory.

2          ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  So you would

3   like to take the (inaudible - multiple speakers).

4          MS. LOYER:  No, I will ask her the questions and

5   get a resume.

6          ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  Okay.  Let's

7   just go through this.  Go ahead.

8          MS. LOYER:  Okay.

9      Q    Could you give me a brief description of your

10  training and then your professional experience?

11     A    Sure.  So I received my BA from UCLA, and during

12  my undergraduate education I took classes from Dr. Lovaas on

13  behavior modification.  I also worked for an agency at that

14  time as a direct care therapist providing ABA therapy as an

15  undergraduate student.  I then entered a graduate school

16  program, a doctoral program in clinical psychology at

17  Alliant International University at the California School of

18  Professional Psychology in Los Angeles with an emphasis in

19  children and families.

20          And at that time I also worked for agencies

21  providing behavioral intervention both in home and in

22  school.  In 2007, I became the director of one of those

23  local agencies and was the director of that agency from 2007

24  to 2011, supervising the implementation of interventions

25  provided both in the school and in the home setting.  And

20

1   then in 2011 I became the director of the Institute For

2   Applied Behavior Analysis and their Children and Adolescent

3   Services division, and if you needed any more detail.

4       Q    Well, I will ask you a few more questions.  Can

5   you describe what your duties are as the director of child

6   and adolescent services at the institute?

7       A    Sure.  We oversee roughly 200 individual children

8   and they receive a variety of intensive ABA-based

9   intervention services in the home, in the school and in the

10  community settings.  We provide functional behavior

11  assessment, we also provide psychodiagnostic assessments and

12  I personally at least both oversee all of those services

13  individually and then provide both the testing and

14  supervision of those services myself.  But we have also a

15  large base of managing supervisors.

16      Q    Okay.  And are some of your clients funded through

17  Regional Center and or school districts?

18      A    Yes.

19      Q    Does your agency have MPA status?

20      A    Yes, we do.

21      Q    Now with regards to some of your earlier

22  testimony, you said you worked for other agencies, could

23  you, for autism related disorders, could you name a couple

24  of them for me?

25      A    Sure.  I work for the Center for Autism and

AR 1624

21

1    Related Disorders, CARD, I have also worked for The Conway

2    Agency for children and families with special needs.

3        Q    Okay.  And do you have any publications?

4        A    In the field, yes, I have the most recent

5    publications is the one that's in press on there which is

6    regarding effective interventions for children with

7    challenging behavior with a focus on positive behavior

8    supports and that's going to be published later this month

9    in a journal in the United Kingdom.  Also papers,

10   presentations at international conferences with regard to

11   positive behavior support for children with autism spectrum

12   disorder specifically and children with challenging

13   behavior.

14       Q    Okay.  And can you tell me what applied verbal

15   behavior is?

16       A    Sure.  Applied verbal behavior is a subcategory in

17   applied behavior analysis, it is an intervention that is

18   used to increase verbal behavior which can be speech, it can

19   be vocal speech, it can also be communication via APEX

20   system or it's a communication device, verbal behavior would

21   not require vocal speech, it's any sort of communicative

22   behavior and it uses the principles of applied behavior

23   analysis to increase the communication abilities of an

24   individual.

25       Q    Okay, thank you.  Is there anything else in your

AR 1625

22

1   experience that you would like to share that is relevant to
2   the type of testimony you are providing today?
3        A    Well, with regard to my education and training, I
4   both purposefully and due to good mentorship have developed
5   competencies in both applied behavior analysis and child
6   development because the current field standards involve not
7   only the ability to implement a behavior paradigm
8   intervention, but also to understand the developmental place
9   that an individual is having that a child or an adult in
10  order to effectively create programming that will meet the
11  developmental needs of that individual.
12       Q    Okay, thank you very much.  Okay, now, I'll get
13  back to our Exhibit Number 42, do you have it front of you?
14       A    I do.
15       Q    Okay.  Can you tell me, do you recognize this
16  document?
17       A    I do.
18       Q    And if you could just flip to page P-636 and it's
19  the last page of this report and let me know when you are
20  there.
21       A    Yes.
22       Q    I just want you to authenticate that that is your
23  signature and this is your report.
24       A    That is my signature.
25       Q    Okay.

23

1          MS. LOYER:  For the record, Your Honor, this is a
2  comprehensive functional behavioral assessment report and
3  recommended support plan dated September 17, 2013, and I
4  would like to move it into evidence please.
5          ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  Ms.
6  Mithaiwala?
7          MS. MITHAIWALA:  No objections.
8          ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  All right.
9  Student's 42 is admitted.
10         MS. LOYER:  Thank you.
11     Q    Now, I'm going to be asking you some questions and
12  I'm going to try to kind of focus on the report, so if you
13  could bear with me if I struggle with some of the terms,
14  okay, all right.  Can you tell me what the reason was for
15  the referral of ▓▓▓▓ to you or to ABA for evaluation?
16     A    Yes, we received the referral from ▓▓▓▓ parents
17  and the request was to look at all aspects of ▓▓▓▓
18  current programming due to a variety of contradictory
19  feedback that parents had received from varying providers
20  over the years with regard to what was the best
21  recommendation for ▓▓▓▓ current program as well as what
22  should be the focus of that program.  There was also the
23  concern that there had been many interventions or therapies
24  delivered by different people attempted that had seen little
25  to no progress and that was also part of the driving force

24

1    of this referral.

2        Q    Okay.  Now one of the things, one of the terms

3    that you mentioned, if you could flip to page 592.  You used

4    the term inconsistent responding behaviors, could you define

5    that for us?

6        A    Yes.  And it's actually defined within the report,

7    if you would like me to flip to the page.

8        Q    Okay, sure.

9        A    Okay.  Let me find the page that it's on.  So it's

10   on page P-604 and inconsistent responding behavior consist

11   of four topographies which may happen in conjunction and

12   more rarely in isolations.  What that means is there is four

13   types of behavior that are within this category,

14   inconsistent responding behaviors, they may happen at the

15   same time or they may happen individually.

16           And these four topographies that we separated out

17   this behavior category into are failing to respond, which is

18   when ███ will not respond to something that he has just

19   previously responded to within the same trial set.  Prompt

20   dependence, requiring prompts for skills which have

21   previously been independently demonstrated, incorrect

22   responding, responding incorrectly to a skill that he

23   demonstrated correctly within the same trial set.  And

24   indiscriminate responding which is where ███ will respond

25   with a behavior that is a correct target for a different

AR 1628

25

1  skill as opposed to the skill currently being targeted.  And

2  all of these are commonly seen in children on the autism

3  spectrum.

4      Q    Thank you.  I'm going to take you back now to page

5  592 and can you just give me a general description of the

6  assessment activities?

7      A    Yes.  The assessment was conducted by a team and

8  of that team interviews with school staffs were conducted

9  observations at school and at home, videotaped observations

10 of speech therapy sessions were also done.  We had in-depth

11 interviews with the family and there were a long list of

12 previous records that were reviewed and taken into

13 consideration, I won't list all of them because I don't have

14 the paper.  And then also based on those interviews, items

15 that would be reinforcing to ███ were inventoried and

16 there was also some interaction with the home supervisor the

17 person who designs ███ current home ABA program, excuse

18 me.  And also interactions with ███ by various people who

19 were participating in completing the assessment.

20     Q    And did you interact with the staff at school as

21 well?

22     A    The assessment team did, I did not personally.

23     Q    Okay.  And can you tell me why was it important to

24 include activities across all environments?

25     A    We always, especially when we have a child on the

30

1   to demonstrate skills.

2            And, you know, many children on the autism

3   spectrum are considered not testable by standardized

4   measures because there is this failure to respond

5   consistently.  And, you know, those of us in the field need

6   to be very aware of not falling into a cognitive expectation

7   based on skill presentation.  And so seeing those types of

8   things again consistently not once it was seen because once

9   could be an accident, you know, once is an artifact, we

10  never want to base anything on once.  But to see those

11  throughout different observations was an indicator that his

12  skill level, at least potential skill level is higher than

13  what we may have originally estimated.

14       Q    Now, you also make a statement that he was notably

15  frustrated by the lack of the ability to communicate needs

16  and wants, could you expand on that a little bit?

17       A    Sure.  Despite ███ having a very mild demeanor

18  in that, you know, everybody's personality is different.

19  When his communication attempts were not understood, he did,

20  you know, moan or groan, push back in his seat, you know,

21  shift side to side, make a grimacing face, turn away from

22  the learning experience or interaction that he was having.

23  So those signs though they are mild as far as what we

24  consider to be a problem, those of us experiencing them were

25  not ███ still are communicative behaviors on his part to

39

1       ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  All right.

2   36 for Student is admitted.

3       MS. LOYER:  Thank you.

4   Q   Okay.  I thought it may be easier for you to have

5   it in front of you while you are speaking to it.

6   A   Yeah.  So this is the report card we also received

7   the, I guess, it was sort of the teachers amended version of

8   this that was titled progress report card or progress report

9   that was attached to this when it was delivered.  So on this

10  reporting it says that explanation of marks and it gives you

11  a zero or rather an O as outstanding, and S as satisfactory

12  and N is needs improvement and that's ratings of effort.

13      And then under achievement, we go from four which

14  is 91 to a 100 percent down to one which is limited

15  progress, zero to 59 percent.  So, it's difficult to say how

16  these are graded for ▮▮▮▮ because it says toward grade

17  level standard which he is not meeting.  So that may and

18  that was commented on the report, that may be the reason why

19  there are all ones on here because he is not being graded on

20  grade level standards, so it's almost that it's not

21  relevant.

22      But in that case, if he is not being exposed to

23  grade level standards, then there is no opportunity for him

24  to learn it, I find it odd that he would be graded on

25  something that he had no opportunity to learn.  So the

900

42

1  received it and I'm not sure how it was anywhere else, but

2  when we received it, this was attached to the reporting, the

3  report card for the current reporting period, the one I

4  think we were just referencing in the previous exhibit was

5  actually the previous year.  So this is I believe his

6  current IEP goals as we have read them on the IEP with a

7  corresponding grade number, which since it was attached to

8  the report card, we were wondering if it corresponded to the

9  same grading standard as there was no other grading standard

10  provided.

11          So as an example, there is -- just bear with me as

12  I find what I'm trying to reference.  So on self-regulation

13  just in the effort of saving time we will have just one

14  example, I guess.  "When feeling agitated, ▮▮▮ will use

15  his AAC device to request a calming/coping or sensory

16  strategy, i.e., squeezes, tickles, bouncing, et cetera, in

17  50 percent of charted opportunities in a two-week period."

18  So, the --

19          INTERPRETER:  I'm sorry, the interpreter would

20  like to ask everyone to speak a little loud.

21          MS. HUGHES:  Oh, sorry, yes.

22          ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  Thank you.

23      A   So, the IEP goal that we are referencing is from

24  the area of self-regulation and the goal states, "When

25  feeling agitated, ▮▮▮ will use his AAC device to request a

901

43

1  calming, coping or sensory strategy, i.e., squeezes,

2  tickles, bouncing, et cetera, in 50 percent of charted

3  opportunities in a two-week period."  So the reporting level

4  is a four, which on the previous report card indicated that

5  91 to a 100 percent.  So I'm not sure if that's the grading

6  scale we are looking at.

7       But the progress states that, we are currently in

8  a teaching phase of the school with hand over hand support

9  and modeling.  ████ will chose a sensory strategy during

10 small group time.  When told to chose a particular sensory

11 strategy, he chooses the correct strategy and 60 percent of

12 provided opportunities.  So I think that's probably a very

13 important thing for him to learn, but it's not the goal.  So

14 it's confusing to have a grading system represented for a

15 goal on a skill that is not the goal that's stated and this

16 seems to be almost like a receptive language task.

17       So if they present squeezes and tickles, which I

18 can only imagine they are presenting with PECS because

19 unless they are demonstrating that action from him and

20 saying, chose this strategy and he is choosing "correct one"

21 that remain the one that they have labeled.  So that's a

22 receptive language skill to be able to chose tickles versus

23 bouncing.  And the rationale for that is he is learning what

24 the calming strategies at this time.

25       So again very important to expose him to all of

902

44

1    the calming strategies important that he would have the

2    ability to know what they were and like all of that, there

3    is nothing that I'm saying that that shouldn't be done, it's

4    just not relevant to the goal.  So even if he is selecting

5    the correct strategies 60 percent of opportunities that

6    can't really be compared to what his goal is.

7            The other thing is, I'm not sure how many

8    strategies they are presenting.  One would assume that since

9    ████ has so many difficulties with discriminating, they are

10   only presenting two because presenting any more than two

11   would be much more difficult, but he is demonstrating the

12   ability to do.  So presenting two things and asking a child

13   to pick the correct one with a rate of 60 percent is barely

14   above what you would get in chance.

15           So it would also be necessary to know how many

16   choices they are forwarding him because if you're only being

17   given two when you are getting a 60 percent, it's hard to

18   say whether that's because you are learning something or

19   because of chance.

20   Q     Okay.  Let's move on.  We will get back to report

21   which was number 42.

22           MS. LOYER:  Your Honor, I have a procedural

23   question.

24           ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  Yes.

25           MS. LOYER:  I don't know that I have this.

**AR 1648**

903

45

1       ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  I'm sorry,
2  that you have --
3       MS. LOYER:  That was added to the report card and
4  I don't know --
5       ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  It's not in
6  your District's binder.
7       MS. LOYER:  Well, it's in the District's binder, I
8  mean, I would like to have it entered, but it's not my
9  exhibit and I don't know that I could enter.
10      ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  You can move,
11  it's sitting here in front of me, you can move to enter it
12  in, if you want to.
13      MS. LOYER:  Okay.  Then I would like to move it,
14  yeah, I would.
15      ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  Do you have
16  any objection?
17      MS. MITHAIWALA:  No.
18      ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  All right.
19  District's 46 is admitted.
20      MS. LOYER:  Thank you, Your Honor.
21      ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  You're
22  welcome.
23   Q    Okay.  I'm going to move on to 598.  In paragraph
24  1, you talk about a specific mastery criteria and has some
25  comments about --

**AR 1649**

904

46

1          ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  Ms. Loyer,

2     let's just wait a couple of seconds while the --

3          MS. LOYER:  Oh, I'm sorry.

4          ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  -- whenever

5     the machine is outside and it's down.

6          MS. LOYER:  See this is when my loud talking comes

7     in handy.

8          ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  Okay.  Go on.

9     Q    Okay.  And you talk about the condition of when he

10    attends, can you expand on your comments about that, explain

11    what you wrote here?

12    A    Yes.  So there were several things referenced that

13    we received from the school that gave a scoring of what

14    ███    could do "when he attends."  So it's hard to say

15    exactly what that means.  There was no qualification of

16    what, when he attends is defined as and from all of our

17    observations, he attends less than 50 percent of the time.

18    So if we are saying he can do something less than half the

19    time that doesn't really translate into anything that would

20    be functional for him.

21         There was also no delineation of how scoring was

22    taken, you know, is scoring only being taken when he is in

23    one of these "attentive places" or are they noting within

24    one trial set that the scores that or that the trials that

25    came out is correct or when he was attentive.  It's not a

47

1  criterion referenced score.  So, if we want to take a score,
2  we would take the score overall, not just the score when it
3  seemed like things were going best.
4          Again, one of the hallmark issues with children
5  with autism spectrum disorder is that they do not respond
6  consistently.  And that's one of the hardest issues to work
7  with in any setting when trying to teach a child on the
8  autism spectrum a skill because the skill is only functional
9  for you if you can demonstrate it all the time.  No one ever
10 asks me what my name is and I sometimes answer wrong.
11         We all have skills that we have and we have them
12 at a 100 percent, most of the time we are happy with the kid
13 on autism spectrum getting at 80 percent of the time, but
14 most of us have our very basic skills at close to a 100
15 percent and whether we are attending particularly intently
16 or not.
17     Q    Okay.  Now, you moved into his self-care and
18 domestic skills and specifically his toileting and that goes
19 through 598 to 599, could you also explain or summarize what
20 your report does referring to that?
21     A    Yes.  According to reports, both from the school
22 and from the home ABA program as well as Parent report,
23 █████ was habit trained to eliminate in the toilet for
24 urination regularly.  There was not in accident regularity
25 with that that would be outside of what would be expected up

906

53

1  these particular behaviors as the ones that were impairing

2  his ability to function or access his curriculum.  So that

3  was one consideration.

4      Q    Okay.  With regard to your term, and I know that I

5  have misstated the inconsistent responding, was that it.  Is

6  that something that is a term of art for ABA or is that a

7  well known out in the field ABA term?

8      A    It is used in the field, I don't know whether it

9  is referenced in any textbook, that distinction I could not

10 give you a reference from a text book for that, but

11 noncapitalized inconsistent responding as a general feature

12 of children on the autism spectrum is widely --

13     Q    Okay.  So it is --

14     A    -- published in mostly educational publications

15 because or publications regarding testing.  When we were

16 going through testing training even when I was in graduate

17 school and advanced testing seminar, inconsistent responses

18 were something that we were trained on how to identify in a

19 child so that you could know when a child's testing was not

20 reflective or was not accurate and there is even particular

21 statistical things on standardized tests, various scores

22 that will if they fall within a certain range will imply

23 that there was not consistent enough responding for the test

24 to be graded or scored as a standardized measure.

25     Q    Okay.  Just give me a second.

AR 1657

907

125

1  I've ever seen in a kid who has such limited communication

2  abilities," because generally speaking limited communication

3  abilities are highly correlated with severely challenging

4  behavior.

5       Q    So if he's attending a full-day of school being in

6  elementary school now, how significant a home program do you

7  think --

8       A    Generally speaking when children are attending a

9  full day of school they have 10 to 15 hours a week --

10           MS. MITHAIWALA:  I just want to enter objection.

11  She's speaking like an expert.  She's not talking about

12  ███████ specifically, I don't think --

13           MS. LOYER:  I am asking her about ███████

14  specifically.  She's a service provider.  She's not an

15  expert.

16           ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  The question

17  was with regard to ███████ he's now attending a full day of

18  school, so what should his home program be.

19           MS. MITHAIWALA:  And the response is generally

20  speaking, so --

21           MS. LOYER:  She didn't get to finish.

22           ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  That's not an

23  objection to the question.  It's the objection to the

24  answer, so.

25           MS. LOYER:  Yeah.

AR 1729

908

135

1    assessment team does however.

2         Q    Okay.  Do you have a speech and language

3    credential?

4         A    No.

5         Q    Do you have an AT certificate?

6         A    No.  I'm assuming that you're referring to

7    assistive technology.

8         Q    Yes.

9         A    Yes.

10        Q    Do you have a degree in special education?

11        A    I do not.

12        Q    A degree in any type of teaching?

13        A    None in teaching.

14        Q    I saw on your resume that you have provided expert

15   testimony before.  How many times have you done that?

16        A    Seven.

17        Q    Okay.  And for families or districts or both?

18        A    For families and regional centers.

19        Q    Never for a district?

20        A    Never for a district.

21        Q    And you mentioned earlier that you do trainings

22   for districts, is that right?

23        A    Yes.

24        Q    Okay.  Can you describe the function of IABA?

25             ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  Excuse me,

161

1  currently demonstrating it consistently to the point where

2  it's a functional skill for him?  Not in my opinion.

3      Q    Okay.  So it's not true then that he has a lack of

4  ability?  He has a lack of a consistent ability, would that

5  be fair to say?

6      A    Sure.

7      Q    Do you know what alternative augmentative

8  communication is?

9      A    In a behavioral way, yes, I do, not as a speech

10  pathologist.

11      Q    What is it in a behavioral way?

12      A    Behaviorally we look at AAC devices as an

13  alternative method for children (inaudible) verbal behavior.

14  So with a child who is using vocal speech, we may expect

15  them to speak.  With a child who is using PECS, we would

16  expect them to give a card.  With a child who is using

17  signs, we would expect them to make that appropriate sign.

18  And for a child who's using a device, whatever device it is,

19  we would expect them to use that device and emit that

20  behavior in order to produce the verbal response.

21      Q    Is there another way to look at AAC aside from

22  behaviorally?  It sounded like you were making a

23  distinction.

24      A    Well, it is a language -- it is a language-based

25  device, so it's usually monitored in the speech pathology

*Statewide Transcription Services*
*(916) 624-4300*

AR 1765

910

163

1   sentence out loud please?

2       A       "███████ was discharged from speech therapy within

3   the last year due to lack of progress in those sessions."

4       Q       Where did you get that information from?

5       A       That information was told to us by the Parent with

6   regard to his speech therapy sessions that I believe it was

7   the same speech path as the one we observed.  And the

8   progress wasn't considered significant enough for the

9   recommendation to continue and that's what we were told.

10      Q       Do you know how long -- was her name Adelaide

11  (phonetic), does that sound right?

12      A       I wouldn't --

13      Q       Don't remember.

14      A       -- remember if you said it, so I'd have to look

15  back at the notes.

16      Q       Whoever was delivering the speech and language in

17  the videos, do you know how long she had worked with ███████

18  or at what frequency or rate?

19      A       Again I would have to look back at my notes that I

20  don't have.

21      Q       Do you know if he received speech and language

22  services at school?

23      A       I would have to look back, but I believe that was

24  part of his IEP.  Whether it's delivered by a speech and

25  language pathologist, I'm not sure, but he does have goals

*Statewide Transcription Services*
*(916) 624-4300*

AR 1767

911

164

1    to increase his verbal skills in the school setting.  There

2    is the mention of the use of that AAC device.  So I'm not

3    sure whether that's delivered by speech pathologist or if

4    there is a specialist that's just for assistive technology

5    since it's included.

6        Q    You just said he has goals to increase his use of

7    verbal skills.

8        A    Using that AAC device, yeah, that's the one that I

9    reviewed earlier.

10        Q    And when you say verbal skills, is this in the

11    sense of actually speaking or the sense of what you --

12        A    Verbal behavior.

13        Q    Okay.

14        A    Of any emitting of a communicative behavior

15    whether it's verbal speech or the use of his device or signs

16    or PECS or what have you.

17        Q    Okay.  In your report it says that per Parent

18    report or at least the assumption was per Parent report that

19    ███ was discharged from speech therapy last year due to

20    lack of progress in those sessions.  Do you have an opinion

21    if an agency discharges a student why that might be?

22        A    Well, there is many reasons.  We may discharge a

23    student because we don't have people available to see them,

24    so we may recommend that they go elsewhere for services.  We

25    may discharge a Student when they are participating in a

165

1   competing program that might have philosophies that are
2   counter-indicative.  We may discharge if over the course of
3   our work with that child, we have systematically gone
4   through and tried different things and consulted with
5   different professionals and made sure that we've done our
6   due diligence and we still see that we aren't able to get a
7   result, so we recommend that that family seeks services
8   where perhaps someone has a different kind of competency
9   than we do.
10      Q    Do you think that's what happened with the speech
11  and language, the latter?
12      A    I don't know so.
13      Q    Take a look at 597.  You testified about this page
14  quite a bit, and you expressed some confusion about what was
15  happening with the progress report in correlation to the
16  report card.  Do you recall that testimony?
17      A    Uh-huh.
18      Q    Yeah.  And you also testified that you regularly
19  train school districts and work with I think you said 200
20  students, is that right?
21      A    We have 200 clients in our child and adolescent
22  services roughly.
23      Q    But not in Orange County?
24      A    No, not in --
25      Q    You're talking about other --

AR 1769

913

166

```
 1      A     Everywhere.

 2      Q     Everywhere?

 3      A     Yeah.

 4      Q     Okay.  Well, let me just ask you the question,

 5   have you seen -- besides seeing ▇▇▇▇ grade report, have

 6   you seen multiple students' grade reports before?

 7      A     Yes.

 8      Q     And what do those report cards measure?

 9      A     Well, it depends on how the report card is set up.

10   We have some report cards that are set up to measure those

11   grade level standards and then those end up looking like

12   ▇▇▇▇ report card, when you have a child who is not being

13   taught to grade level standards where everything looks like

14   nothing.  And then there is other report cards that are

15   modified to reflect the particular goals of that child or a

16   modified curriculum if there is a standardized version of

17   that.  So they tend to vary widely.  I'm not sure if that's

18   based on district standards, but vary from district to

19   district.

20      Q     So generally a report card measures I think you

21   said grade level standards.  How about state standards, do

22   they measure those?

23      A     Not being a teacher, I'm not sure, but I would

24   assume that part of the standards that are included are

25   based on the state standards to for curriculum.
```

AR 1770

914

167

1    Q   I don't want you to assume, I want you to think

2  about the report cards that you've seen, what are they

3  measuring?

4    A   They are measuring --

5       MS. LOYER:  I object, she asked and answered the

6  question.  Does she get to keep asking until she gets the

7  answer she wants or --

8       ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  Overruled, I

9  think that was a clarification question.  You can answer the

10  question.

11    A   Can you ask it again?

12    Q   Sure.  Based upon your review of report cards for

13  multiple students, what is being measured?

14    A   There are standards, where they are from I'm not

15  certain, that are being measured and then there are also IEP

16  goal progress that is being measured.

17    Q   And those are all on the report card in your

18  experience?

19    A   On the standardized report card?

20    Q   Uh-huh.

21    A   No, because it's hard to put an individualized

22  thing on a standardized report card.

23    Q   Okay.  So generally a report card in the sense of

24  a general education report card is different than an IEP

25  progress report?

**AR 1771**

915

168

1     A    Generally.

2     Q    Generally, okay.  And what does an IEP progress

3  report measure?

4     A    The progress toward IEP goals.  Sometimes that is

5  used in replacement of other standardized measures in my

6  experience.

7     Q    Okay.  So take a look at that D-46.

8     A    Yes.

9          ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  I'll just

10  note that Mr. Fulsang has joined us.

11     Q    And on page 597 of your report, I see it noted

12  "Progress report 6/21/13."

13     A    Yes.

14     Q    Is the Exhibit at D-46 the right one?

15     A    Yes.

16     Q    Okay.  So when you were reporting on page 597, you

17  were looking at what is Exhibit D-46, correct?

18     A    Parts of it, yes.

19     Q    Okay.  What made you think that these 4s

20  (phonetic) on this report correlate with the report card,

21  which is Exhibit D-36 I believe -- D-37 maybe.  Sorry, S-37,

22  my book is messed up.

23     A    S-37.

24     Q    S-37.  So you're going to look at the white book.

25     A    Oh.

AR 1772

169

1      Q    Sorry.

2      A    Is this the IEP that you're having me reference or

3  --

4           ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  No, S-37.

5           MS. HUGHES:  S-37 is an IEP.

6           MS. MITHAIWALA:  Okay.

7           ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  Then it's S-

8  36.

9           MS. HUGHES:  S-36?

10          ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  Yeah.

11          MS. MITHAIWALA:  It's S-36, I need to mark it down

12  in here.  So the report card is --

13          MS. HUGHES:  So in that --

14          MS. MITHAIWALA:  I'm sorry, just one second.

15          ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  The report

16  card is S-36, the progress report is D-46.

17          MS. MITHAIWALA:  The progress report is D-46,

18  okay.

19     Q    So what made you think that the 4s on District's

20  Exhibit 46 correlated with Student's Exhibit 36?

21     A    Because since they --

22          MS. LOYER:  I object, that's not her testimony,

23  that she thought they correlated.

24          ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  Well, I can't

25  remember --

**AR 1773**

917

170

1          MS. LOYER:  Her testimony was specifically she
2  didn't know.

3          ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  I can't
4  remember what you testified, what your earlier testimony
5  was.  Why don't you ask that question?

6          MS. MITHAIWALA:  Okay.

7      Q    Is it your belief based upon what's written on
8  page 597 of your report that the 4s on this report correlate
9  with the report card on at Exhibit S-36?

10     A    My report even says that we couldn't determine
11 what the criteria was because there isn't any criteria
12 listed on here for grading.  It was given in conjunction
13 with the report card.  So the only reference criteria on
14 that was for the report card.  The other item that goes home
15 with ████ that we did not include as part of the report
16 also lists that same kind of criteria, that daily reports 4
17 is 91 to 100 percent.  So that's the only criteria that
18 we've ever been given.  So we said maybe that's it, but we
19 didn't know since there was no criteria offered.

20     Q    Okay.  So take a look at S-18.  Did you receive a
21 copy of this when you asked for all records with ████
22 name on it?

23     A    This I did not.

24     Q    Did you receive anything that looked like this?

25     A    Anything that looked like this, I don't know.  But

171

1  this particular one, no.

2      Q    So does this form now look familiar to you based

3  upon your review of his records?

4      A    This particular one, I don't remember.  But again

5  we reviewed so many ones, I'm not sure whether this

6  particular page is something that's in our records or not.

7          MS. LOYER:  I'm sorry, I think I'm on the wrong

8  page.  Could you give me your number again?

9          ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  Right now we

10  are on Student's 18, which is entitled "Progress report of

11  annual special education goals or IEP dated 2/4/11," 2011.

12         MS. LOYER:  Okay, I'm sorry, I was looking at

13  District 18.  Thank you.

14     Q    Since you testified that you haven't seen this

15  before, can you take a minute and review the italicized

16  language at the top?

17     A    Yes.

18     Q    Would that code for what the numbers mean make a

19  little bit more sense for what's in D-46 than the report

20  card to you?

21     A    More sense certainly, but again since -- and this

22  one particularly I wish I had a different one for me, but

23  again I don't have my own records, but what I see on number

24  3 is you know, progress has been made, but the goal might

25  not be met.  Instructional strategies might need to be

AR 1775

919

172

1    changed.

2        Q    On number 3 what is the definition?

3        A    That's the grade of number 3, that's what it says.

4    So given that historically -- I know this is for like a 2011

5    IEP, so given historically there were goals that were not

6    met, I would have expected to see more 3s, but again since I

7    don't have the exact things in front of me, I don't want to

8    misquote or make a --

9        Q    Sure.

10       A    -- direct specific statement that's not attached

11   to something.

12       Q    You testified that this whole thing, the report

13   card and the numbers correlating was confusing to you and

14   your staff.  Did you seek clarification with anyone from the

15   school as to what those numbers meant on District 46?

16       A    I would have to check with Dr. Hernandez to see

17   what her notes said about that.

18       Q    Okay.  And if you had gotten such clarification,

19   would that have been reflected in your report?

20       A    If we had gotten clarification, it would have been

21   reflected in the report.

22       Q    Take a look at page 598.  There is a sentence

23   midway through the first paragraph --

24            ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  Let me get

25   back there because I wanted to make --

*Statewide Transcription Services*
*(916) 624-4300*

**AR 1776**

920

173

1    MS. MITHAIWALA:  Sure, it's Exhibit S-42.

2    ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  We're going

3  back to Exhibit 42.  That's your report again.

4    A    Five-nine-eight?

5    Q    Yes.  The first paragraph at the top about three-

6  quarters of the way down, there is a sentence that says

7  "From observations completed in the course of the

8  assessment, ████ was attentive, but on-task less than 50

9  percent of opportunity."  Was that all the observations that

10  we talked about earlier or was it just some?

11    A    That was the coding of the inconsistent

12  responding.  So he's demonstrating inconsistent responding.

13  It's converse to say he's not attentive.  So if he is

14  inconsistently responding in 70 percent of opportunities, he

15  is attentive in roughly 30 percent, which is less than 50

16  percent.

17    Q    Why didn't you just say less than or approximately

18  30 percent?

19    A    Because we wanted to make sure that things were

20  again estimated more appropriately, and 30 percent was based

21  on only our charted data as opposed to other reports or

22  estimates that we received from other people.

23    Q    But you said the 70 percent was not based upon

24  charted data, it was based upon estimated data excluding the

25  home observations?

*Statewide Transcription Services*
*(916) 624-4300*

**AR 1777**

921

1

**OFFICE OF ADMINISTRATIVE HEARINGS**

**SPECIAL EDUCATION DIVISION**

**STATE OF CALIFORNIA**

```
In the Matter of:           )
                            )
PARENTS ON BEHALF OF        )   OAH Case No. 2012050785
STUDENT,                    )
                            )
v.                          )
                            )
NEWPORT-MESA UNIFIED        )
SCHOOL DISTRICT             )
                            )
```

October 17, 2013

Newport-Mesa USD Offices
Costa Mesa, CA


        The above-entitled matter came on for hearing
pursuant to notice,


        BEFORE:   DARRELL LEPKOWSKY
                  Administrative Law Judge




Official Transcriber:  Kelli Wells

*Statewide Transcription Services*
*(916) 624-4300*

AR 1853

922

2

**A P P E A R A N C E S**

On Behalf of Student:

Kathleen M. Loyer, Attorney
Parents

On Behalf of District:

Alefia Mithaiwala, Attorney
Maureen Cottrell, Special Ed Director

AR 1854

923

3

# I N D E X

**WITNESSES**                                                            **Page**

**For Student:**

Cynthia Cottier
    Direct Examination by Ms. Loyer                       10
    Cross Examination by Ms. Mithaiwala                   27
    Redirect Examination by Ms. Loyer                     55
    Recross Examination by Ms. Mithaiwala                 58
Lila Seldin
    Direct Examination by Ms. Loyer                       65
    Cross Examination by Ms. Mithaiwala                   87
    Redirect Examination by Ms. Loyer                    120
    Recross Examination by Ms. Mithaiwala                132
Tim Chia Chen
    Direct Examination by Ms. Loyer                      137
    Cross Examination by Ms. Mithaiwala                  150
    Redirect Examination by Ms. Loyer                    170
    Recross Examination by Ms. Mithaiwala                174

**For District:**

None

**Adjournment**                                                          **178**

**Certification of Transcript**                                          **179**

AR 1855

924

30

```
 1      A    I was given information from the Parents --

 2      Q    Documents or just verbal information?

 3      A    I'm sorry?

 4      Q    Documents or just verbal information?

 5      A    I can't actually remember that without looking

 6 back at my records.

 7      Q    Do you know if you were provided any of his IEPs?

 8      A    I believe I was provided with his IEP but I can't

 9 state that without looking back in my folder, in my record.

10 I believe so, but again, I am under the impression I'm not

11 to looking at other records while I'm speaking unless I'm

12 directed to do so.

13      Q    And that's right.  do you know off the top of your

14 head if that, if the IEP, if you were provided an IEP, was

15 it the most recent one or several from the last couple

16 years?  Or can you not recall?

17      A    I cannot recall that.

18      Q    Okay.  On page 365, Cindy, under "Behavioral

19 Status,"?

20      A    Yes?

21      Q    In the middle of the paragraph there's a sentence

22 that reads, "The examiner asked ████ s father if a sensory

23 diet was utilized, and she was informed it was although he

24 was not familiar with this term."  Can you describe to me

25 what that conversation was?
```

31

1    A    To the best of my knowledge, I can't remember the
2    exact conversation.  I did -- when I was talking with his
3    father I was doing a case history, asking questions, I would
4    ask questions, but I can't answer specifically what the
5    dialog was, I don't remember to be perfectly honest.
6    Q    You testified earlier, and this is a quote from
7    you, you say, "At the time of my evaluation he did not have
8    a sensory diet."  In looking at page 365, the sentence I
9    just directed you to, I'm a little bit confused.  Did he
10   have a sensory diet or did he not?
11   A    It says in my report that he did have a sensory
12   diet.  I misspoke and I said I think -- I thought that
13   because I didn't have any items that were provided to me to
14   be utilized during the evaluation.  Most students who come
15   if they have a sensory diet, they will come to the
16   evaluation with some of those items to utilize during the
17   evaluation.  I did not have any of those items so when I was
18   testifying that's probably what I was thinking of.
19   Q    Did you ask ▮▮▮▮▮ Dad if he had any such items?
20   Did you give him examples of what those things might look
21   like?
22   A    Again, I don't recall the conversations, so I'm
23   not sure if I specifically said do you have items A, B, C or
24   D.  I don't recall that.
25   Q    You had testified a bit that earlier about your

85

```
 1          ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  Are you
 2   confused as to the question?
 3          MS. SELDIN:  She asked if -- let me clarify, how
 4   long does it take to take the iPad Mini?  It depends on the
 5   PO order.  In submitting that.
 6      Q    So how long does it take to submit an order?
 7      A    I would say, my guess is, four to eight weeks.
 8      Q    So is there any reason why the team couldn't use
 9   the iPad that the Parents had already provided in the
10   meantime?
11      A    Is there any reason that the Parents -- I would
12   object the Parents using an iPad for communication, as a
13   dedicated communication device or for entertainment?
14      Q    Well, as a dedicated communication device.  Do you
15   recall the parents saying that they would go and buy the
16   mini iPad?
17      A    I don't.
18      Q    You don't?
19      A    No.
20      Q    Okay.  You know who took the notes at this
21   meeting?
22      A    I can't remember.
23      Q    Okay.  As a speech path, what would be your
24   recommendation as to how to teach functional communication
25   on the iTouch over time?
```

*Statewide Transcription Services*
*(916) 624-4300*

**AR 1937**

86

1   A   In terms of service delivery model?  That's the

2   key.  A service delivery model to be effective for

3   functional augmentative communication, I believe is a

4   collaborative and consultative model in which you push in

5   with the team and use it across people and across settings

6   for a variety of communicative intents such as your basic

7   speech acts, such as "I want to request items, request

8   actions, rejections et cetera."

9   Q   So is it your testimony that no individual

10  training with ▮▮▮ is necessary?

11  A   Collaboratively, yes.  He needs to -- let me

12  clarify that -- if I'm in there with the staff, ▮▮▮ should

13  be there in consultation for customizing it.

14  Q   Now, when you were asked to do your assessment,

15  did you review his files, all his files, or just that one

16  report that you referred to?

17  A   I reviewed his IEPs and his MD, Multi-

18  Disciplinary.

19  Q   Every time you say that, I think of the doctors.

20  Sorry.  In that process, do you have any sense, having

21  worked with so many kids over so many years, what his

22  cognitive ability is?

23  A   I am not a psychologist.  It's not my field of

24  expertise.

25  Q   Does that make a difference when you're teaching

AR 1938

928

91

1      Q    How so?

2      A    Conversations I believe.  And I can't really -- I

3   don't have any information on that one.  I don't have any --

4      Q    Okay.  Are you aware if Parents had previous to

5   obtaining Ms. Cottier's report requested an AAC evaluation

6   from --

7      A    Prior to this --

8      Q    No, prior to Ms. Cottier's report, which is July

9   18th, are you aware if Parents had requested an AAC

10  evaluation from the District?

11     A    Prior to -- say that again, I'm sorry.

12     Q    Prior to July 18, 2013, had Parents, to your

13  knowledge, requested an assistive technology or AAC?

14     A    I don't know.  I wasn't aware of that.

15     Q    If they had, would it have been you to conduct it?

16  Would you have had knowledge that such a request had been

17  made?

18     A    If they asked me specifically or --

19     Q    No, if Parents had requested an evaluation for

20  Alternative Augmentative Communication, would you have known

21  about it necessarily?

22     A    It would have gone through the teacher probably,

23  and then to me, because I'm on campus, actually.

24     Q    But you would have had been -- you would have been

25  told, "Hey, someone's asked for an AAC eval"?

141

1          MS. MITHAIWALA:  Okay.

2          ADMINISTRATIVE LAW JUDGE LEPKOWSKY: -- because I'm

3   going to go through --

4          MS. MITHAIWALA:  I just don't want to miss

5   opportunity.

6          ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  No, I'm going

7   to go through both binders at the end of the hearing.

8          MS. MITHAIWALA:  I was just trying to abide by

9   what you said.

10         ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  And so don't

11  even worry about it.

12         MS. MITHAIWALA:  Okay.

13    Q    Now, I just want you to take a look at it.  And do

14  you recognize the document?

15    A    Yes, I do.

16    Q    Okay, and did you generate all three pages?

17    A    Yes, I did.

18    Q    Okay.  And how did you come to generate this

19  document?

20    A    I observed ▮▮▮▮ in the classroom and I talked to

21  the teachers.

22    Q    Which teachers?

23    A    I'm sorry, teacher Ms. Burns.

24    Q    Okay.  Was there a specific request made for this?

25    A    Yes, the Parents had asked for a sensory diet at

*Statewide Transcription Services*
*(916) 624-4300*

**AR 1993**

930

142

1   her IEP.

2       Q    Now, on the first page, on the bottom right the

3   number is 421, and it says in bold print, "Suggested sensory

4   activities for ███████ and then it goes on to say that he

5   should be engaged in some kind of proprioceptive activity

6   every 20 to 30 minutes.  Can you explain that

7   recommendation?

8       A    So throughout the day, every 20 minutes, he gets

9   some deep pressure.  Proprioception is deep pressure into

10  your muscles and your joints.

11      Q    And can you explain why he needed that

12  specifically?

13      A    To help him self-regulate and we were trying to

14  see if it would help him with some of his behaviors that we

15  saw.

16      Q    Just give me one second.  Now, his services at

17  that time prior to the generation of this report, how often

18  did you see him, do you remember?

19      A    One time a week.

20      Q    Okay.  And what kind of things did you do with him

21  one time a week?

22      A    We were doing fine motor, visual motor.

23      Q    Can you give me an example of what you would be

24  doing fine motor?

25      A    We were working on writing -- prewriting shapes

931

151

1     Q    Tim, you mentioned earlier when Ms. Loyer

2  referenced you to page 421 --

3     A    Uh-huh.

4     Q    -- do you have that in front of you, page 421?

5     A    Yes, I do.

6     Q    Okay.  So the section about every 20 to 30

7  minutes, you said you recommended this to help self-regulate

8  to see if it would help with his behaviors, do you recall

9  that?

10     A    Yes.

11     Q    What behaviors were you referencing?

12     A    The chinning and then the hand finger tapping.

13     Q    And you were asked a question about when you

14  reviewed his records did you or didn't you see a sensory

15  diet, do you recall that?

16     A    Yes.

17     Q    And your answer was no, you did not see one?

18     A    Yes.

19     Q    Were you worried after reviewing his file that he

20  didn't have a sensory diet as an OT?

21     A    No.

22     Q    Why not?

23     A    In our ABA classes or SDC classes, the sensory

24  strategies and sensory activities are embedded into the

25  classroom.  For example, Ms. Burns did stretching and yoga-

932

152

1   type activities throughout her day with the kids.

2       Q    Did you feel a need -- after discovering there was

3   not a specific sensory diet for ████   did you feel a need

4   to create one?

5       A    I -- per Parent request and the reasoning for my

6   creating the diet is because -- to make it more routine.  It

7   would follow him if he were to move to the next classroom or

8   move to another school, it would be -- they would know what

9   was going on, have an idea what we're doing.

10      Q    So from October until -- let me clarify, what was

11  the date of your sensory -- what date or time did you create

12  your sensory diet?

13      A    It was May 2013.

14      Q    Okay.  So between October when you started working

15  with him and May 2013, did you see a need for a written down

16  sensory diet?

17      A    I did not.

18      Q    Why is that?

19      A    Because it was part of what was being taught in

20  the classroom, part of the curriculum.  He was being able to

21  access -- she has a calming corner in her classroom.

22      Q    So in May you created the classroom -- I mean you

23  created the sensory diet you said one, because the Parent

24  requested, and two, because you didn't know where he might

25  go the following school year?

AR 2004

933

153

1    A    Yes, just kind of to give a written idea for the

2  next person that's working with him to know what kind of

3  things we were trying with him.

4    Q    Can you take a look at the black binder and go to

5  Exhibit 52?  That's District's Exhibit 52.  Can you identify

6  this document?

7    A    Yes.

8    Q    What is it?

9    A    It's my resume.

10    Q    And did you prepare it?

11    A    Yes.

12    Q    Can you look at under "Fieldwork experience," the

13  very first bullet point, can you explain what that means?

14    A    Sensory integration pretty much is taking the

15  stimuli in our environment and being able to show him how to

16  be able to process the stimuli in environment, sensory

17  integration.

18    Q    Was this a private firm or private -- or was this

19  part of the Irvine School District?

20    A    It was a private clinic.

21    Q    So you saw children specifically to work with them

22  on sensory integration?

23    A    Yes.

24    Q    So how much of your career as an occupational

25  therapist has been school versus private?

160

1    Q    Why?

2    A    He was making -- he was meeting his goals before

3 with the same amount of time.

4    Q    Do you recall during this IEP meeting if Parents

5 asked you for more OT goals or different OT goals?  Did they

6 agree with these?

7    A    I believe they agreed with the goals.

8    Q    Have you observed ███ in Katy's classroom, Katy

9 Burns' classroom?

10    A    This year or last year or --

11    Q    Last school year.

12    A    Yes.

13    Q    What sensory strategies did she utilize for her

14 students?

15    A    She had a trampoline, she had the therapy balls,

16 also different baskets or -- with like beans and stuff,

17 different things that they could put their hands into.

18    Q    Okay.  Take a look again at D-44.  District's

19 Exhibit 44, it's tab 44, not page number.  What were the

20 things that you did to create a sensory diet for ███

21    A    I observed him, I talked to the teacher.

22    Q    Was one of the basis for creating this diet your

23 own experience with him or was it based upon Katy's -- what

24 was happening in Katy's classroom?

25    A    It was Parent request pretty much.

161

1    Q    Were you utilizing some of these sensory diet

2  strategies you list in here in your group sessions with him

3  last school year?

4    A    We did some stretching.  We did the applying

5  pressure to the top of the head and shoulders and then

6  sometimes we do work with the resistive putty.

7    Q    I'm sorry, the what?

8    A    The resistive putty.

9    Q    Who was meant to implement this sensory diet?

10   A    The teacher.

11   Q    Does ████ need a one-to-one aide to implement it?

12   A    Any adult could do it.

13        MS. MITHAIWALA:  I don't have any further

14  questions.

15        ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  All right.

16  Mr. Chen, I have a couple of questions.  Looking at the same

17  exhibit, which is District's 44 and your recommendation for

18  sensory diet, and you have a lot of things that are

19  recommended here.  If you could go through that list

20  starting with the bullet points that you have under the

21  "Suggested sensory-based activities," can you tell me which

22  of these things that you have seen or observed in the

23  classroom that ████ was in last year?  So if you could look

24  through --

25        MR. CHEN:  Things that they --

936

162

1          ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  That they
2    were implementing in that classroom, and you said Ms. Burns
3    already had --
4          MR. CHEN:  Oh, okay.  Yeah, yeah, okay.
5          ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  -- was doing
6    sensory things in the classroom.  So I want to know the
7    things that you have listed here --
8          MR. CHEN:  Okay.
9          ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  -- which
10   things do you know have you observed exist in her classroom?
11         MR. CHEN:  Okay.  The second one, carrying
12   different things.
13         MS. LOYER:  I'm sorry Your Honor, what page are we
14   on?
15         ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  I'm on page
16   D-496.
17         MS. LOYER:  Okay, thank you.
18         MR. CHEN:  Stretching activities, the circle time
19   activities, and songs with movement.
20         MS. LOYER:  Are we going straight down the list,
21   because I'm not tracking where we're at.
22         ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  We're on the
23   second page.
24         MS. LOYER:  Yeah.
25         ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  Now we've

*Statewide Transcription Services*
*(916) 624-4300*

**AR 2014**

937

163

1  moved to the second page and --

2          MS. LOYER:  Okay, those are subs.  Okay.  I was

3  looking at just the hash marks.

4          ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  Do you see

5  the kind of bullet points, (inaudible - multiple speakers)?

6          MS. LOYER:  Yeah, now I do.  Thank you, Your

7  Honor.

8          ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  Okay.  We're

9  going down that list.

10         MR. CHEN:  The human sandwich, and I think instead

11 of using the putty or clay, they used Play-Doh.

12         ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  All right, so

13 you've mentioned about four things that are on your list of

14 -- you have about 17 things on the list and you've mentioned

15 four that you've actually seen in the class.

16         MR. CHEN:  Yeah.

17         ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  So do you

18 think that there was any disadvantage to ▮▮▮▮ because these

19 other things on your list were not being done in his

20 classroom?

21         MR. CHEN:  It says that they don't have to be --

22 where it says the teacher's role, it says not to make it

23 just to follow this, but to be creative, basically to give

24 him deep pressure, and then the prompt.

25         ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  So from what

*Statewide Transcription Services*
*(916) 624-4300*

**AR 2015**

938

164

1  you observed in Burns' classroom, did she or any of the

2  adults in the classroom have deep pressure exercises with

3  the children or with ███ in particular?

4          MR. CHEN:  Most of the things -- most of the ones

5  that I saw were the two activities, I think I mentioned

6  before was the jumping and then the ball.

7          ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  But you

8  didn't see any deep pressure activities?

9          THE WITNESS:  Those are deep pressure activities.

10          ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  They are deep

11  pressure activities?

12          THE WITNESS:  Yeah.  Like with the ball, it's

13  taking the yoga ball and rolling it on the person --

14          ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  Okay.

15          THE WITNESS: -- or having them bounce on the yoga

16  ball, and then trampoline is just being able to jump on the

17  trampoline.

18          ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  So if these

19  other things weren't being done in the classroom, was there

20  any negative -- anything that was negative for ███ not

21  having these other things in the classroom?

22          THE WITNESS:  It didn't affect him at all if he

23  didn't get all of them?

24          ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  Yeah, it

25  didn't affect him negatively?

*Statewide Transcription Services*
*(916) 624-4300*

**AR 2016**

939

165

```
 1        THE WITNESS:  I don't think he had to have all of
 2   them, but that's just an opportunity to get that same kind
 3   of input in different ways.  As long as he was getting the
 4   input, it would be okay.
 5        ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  From what you
 6   saw of him in the classroom and what you saw of him during
 7   your sessions, do you think he was getting enough sensory
 8   input in his classroom?
 9        THE WITNESS:  I can't tell if it was exactly
10   sensory input because there's other factors that -- there's
11   other behavioral factors that affect them.
12        ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  And what are
13   those?
14        THE WITNESS:  If I did use the behavioral
15   strategies to keep him going -- even if I did all these
16   sensory things without behavior strategies, it wouldn't
17   affect him.
18        ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  So what
19   you're saying -- I'm sorry, you were going to add something?
20        THE WITNESS:  I'm sorry.  Yeah, because in there
21   it says that it's supposed to be used with other strategies.
22   Let me see if I can -- I'm sorry.  So it's the very first
23   paragraph on page 49-96, midway -- the last sentence is
24   "Since behaviors may not stem from sensory strategies alone,
25   sensory-based strategy should be used in conjunction with
```

AR 2017

940

166

1  language and behavior strategies for more optimal outcomes."

2      ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  Okay.  So I

3  guess I'm confused.  Do you think that the lack of sensory -

4  - of a specific sensory diet for ███ exacerbated his other

5  behaviors?

6      THE WITNESS:  Not in my opinion.

7      ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  Now, you said

8  that there -- that although ███ brought his iTouch to your

9  sessions, he didn't use it all that often, right?

10      THE WITNESS:  Yes, ma'am.

11      ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  How was he

12  communicating to you if he wasn't using the iTouch?

13      THE WITNESS:  Mostly through taking my hand if he

14  wanted something, just him -- his physical communication I

15  would say in moving things, so.

16      ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  Did you ever

17  redirect him to the iTouch?

18      THE WITNESS:  I did.  We were just going through

19  that at the beginning.  I think that when we were seeing it

20  -- I want to say -- I don't remember when he got it or when

21  he had it.  I want to say it was towards the end of this --

22  the end of 2012, so a couple of months after school when he

23  was using it more in the beginning (inaudible).

24      MS. MITHAIWALA:  I can't hear you Tim, and I can't

25  see you either because of the notebook.  Can you repeat your

941

1

**OFFICE OF ADMINISTRATIVE HEARINGS**

**SPECIAL EDUCATION DIVISION**

**STATE OF CALIFORNIA**

In the Matter of:                )
                                 )
PARENTS ON BEHALF OF             )   OAH Case No. 2012050785
STUDENT,                         )
                                 )
v.                               )
                                 )
NEWPORT-MESA UNIFIED             )
SCHOOL DISTRICT.                 )
                                 )
_____  )

October 21, 2013

Harper Center
Costa Mesa, California

The above-entitled matter came on for hearing

pursuant to notice,

BEFORE:   DARRELL LEPKOWSKY
          Administrative Law Judge

Official Transcriber:  Kelli Wells

*Statewide Transcription Services*
*(916) 624-4300*

AR 2032

942

2

**A P P E A R A N C E S**

On Behalf of Student:

Kathleen M. Loyer, Attorney
Eric and Aneida Fulsang, Parents

On Behalf of District:

Alefia Mithaiwala, Attorney
Maureen Cottrell, Director of Special Education

AR 2033

943

3

# I N D E X

**WITNESSES**                                                    **Page**

**For Student:**

Aneida Fulsang
    Direct Examination by Ms. Loyer                    8
    Cross Examination by Ms. Mithaiwala               38
    Redirect Examination by Ms. Loyer                 69
    Recross Examination by Ms. Mithaiwala             72
Kathleen Mulligan Murphy
    Direct Examination by Ms. Loyer                   77
    Cross Examination by Ms. Mithaiwala              109

**For District:**

None

**Adjournment**                                                 **181**

**Certification of Transcript**                                 **182**

AR 2034

944

119

1   that's central to developing communication in a social

2   framework.

3        Q    Can you explain --

4        A    So I talked about specific strategies, how we

5   could actually do that as a speech language pathologist and

6   then apply it from the behavioral perspective.

7        Q    Can you explain what the term "joint attention"

8   means?

9        A    Joint attention actually means that a mom and a

10  child are actually both focused on the same possible toy or

11  activity at the same time.  So they are actually sharing a

12  mutual focus of attention.  It could be anything, it could

13  be the red and white circle on the wall but both of the

14  parent and the child or the teacher and the child are both

15  looking and focusing at the same thing at the same time.

16  It's the most wonderful and facilitating context for

17  learning language.  So it could be anything, but both the

18  dual focus of both individuals on the same topic or

19  activity.

20       Q    And how does joint attention play into a student's

21  ability to use a high-tech device in your opinion?

22       A    Joint attention is the foundational skill and it's

23  required really central to all communication.  So it plays

24  in -- the use of technology for AAC comes way down the road.

25  First the child needs to be able -- there are four

AR 2150

945

120

1  competencies that children need really before they are ready
2  for technology or for AAC in that capacity and that is
3  actually that the child has some kind of a linguistic
4  confidence so they understand language, receptive words and
5  they are using not necessarily words but they're actually
6  communicating. And so they have this -- because there's
7  confidency about language itself.

8        But the social piece is where the joint attention
9  comes in. They have to realize -- and it is all based in
10 those early times of joint attention that communication
11 isn't or language in itself isn't in a vacuum, but we
12 actually use it with others in our environment in a very
13 powerful way to make a difference. And so joint attention
14 is the place that a child actually realizes and learns that
15 what they do communicatively can actually have a difference
16 with others in their environment.

17       So to get ready for AAC in technology, a student
18 needs to have that social piece that is based in joint
19 attention, they need to have some kind of a language
20 competency, they need to have cognition to know how it can
21 be used, as well as the actually suaveness or the technical
22 ability to use the device. So joint attention is just one
23 of the four pieces based on social communication at the need
24 for readiness.
25              ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  I'm sorry,

AR 2151

946

121

1   I'm going to take us off a minute so I can get some more

2   water.

3                    (Off the Record)

4          ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  We are back

5   on the record after short break in the matter of ███

6   Fulsang and Newport-Mesa.  You can continue, Ms. Mithaiwala.

7          MS. MITHAIWALA:  Okay.

8      Q    You mentioned four, as you called them,

9   competencies before the Student is ready for high tech

10  assistive technology, correct?

11     A    Yes.

12     Q    Okay.  When ████ came to you in the fall of 2010,

13  which if any of these did he have in place?

14     A    I think ████ had poor joint attention of skills

15  but he was actually starting to use eye gaze to signal needs

16  in that program so that was an emerging ability.  He had

17  very poor linguistic confidence and I think that was also

18  going to be reflected in the cognitive levels but he was

19  unable to identify -- he was unable to match yet 3D objects

20  to the same 3D objects.  So we had to actually back it up so

21  he actually started to realize that a picture could actually

22  represent something else.

23          So he didn't have the basic cognitive skills yet

24  to have that on a regular basis to know that a picture

25  actually represents a real object and then to be able to use

122

1    it linguistically to actually signal his needs.  So he can

2    even really have those yet.  So really all three of those

3    are missing pieces.  And if we speak to language in general,

4    he wasn't yet a strong functional communicator.  So he

5    wasn't effectively meeting his needs in this community.

6        Q    What about the fourth piece?  I think you called

7    that suaveness to use the device?

8        A    We weren't actually assessing that at that place.

9        Q    Why not?

10       A    We know that he had access to computers in the

11   classroom, but it wasn't an important piece.  The others

12   were much more foundational pieces at the beginning.

13            THE INTERPRETER:  Your Honor?

14            ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  Yes.

15            THE INTERPRETER:  Can you please repeat that for -

16   - the mother wanted you to repeat it.

17            ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  Sure.  Could

18   you repeat the last thing you just said?

19            MS. MURPHY:  Sure.

20            THE INTERPRETER:  The fourth --

21            ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  The fourth

22   issue that you were responding to.

23            MS. MURPHY:  The fourth piece was in September of

24   2010, we didn't do it.

25            THE INTERPRETER:  You talk of abilities, something

*Statewide Transcription Services*
*(916)624-4300*

AR 2153

948

123

```
 1   about that.  You were saying you did not have the abilities.

 2        MS. MURPHY:  The four pieces?  At the time -- so

 3   we were looking at four different competencies and readiness

 4   for AAC with technology.  So we're looking at linguistic

 5   competence.  We know affectively that ████ at the time that

 6   he came in was not yet using or understanding language and

 7   using language on a regular basis, that he had a difficulty

 8   understanding words in this environment in that identifying

 9   labels receptively.  And he didn't have the ability even to

10   show us picture cards that would represent objects.

11        We're looking at that to move him to AAC.  So we

12   knew that that would be ultimately the goal.  So he didn't

13   yet again show that a picture of a water bottle.  If I took

14   a 3D picture -- first of all, if I asked him to give me the

15   same in the water bottle, I'm sorry.  She's done an example.

16   That if I ask him to give me the same, he would necessarily

17   from a field of three yet be able to give me the same

18   matching object, a matching of water bottle to another water

19   bottle.  Once we got that on a regular basis, then we

20   actually started assessing his ability to actually match a

21   three-inch color picture to the particular object.

22        So he wasn't actually a two -- typically

23   developing children at age 2 actually develop that

24   representational thought that this could also be represented

25   in a picture.  They're not using it yet communicatively.
```

949

124

1  But they actually understand that knowledge that this could

2  be a picture.  And so he wasn't even at that point yet.  We

3  weren't even using it communicatively and that might also be

4  kind of give you an idea about where he was cognitively.

5      Q    Okay.  You mentioned when in talking through your

6  resume about the seahorse program.  Is that a program ▆▆▆

7  was in?

8      A    Correct.

9      Q    And how many years was he in that program?

10     A    Two years and I think three or four months.  I'm

11 not exactly sure when he started but from the time of his

12 initial assessment I believe he was placed there.  So it'd

13 be February or March.

14     Q    Did you have an opportunity to do a home visit in

15 ▆▆▆ s home?

16     A    I did.

17     Q    And when was that?

18     A    October of 2010.

19     Q    Just that one or were there others?

20     A    Just that one.

21     Q    And why did you do that?

22     A    Both the classroom teacher and I wanted to see

23 what his home program was like.  And to possibly develop

24 collaboration with that program.  We discussed what we were

25 doing or the purpose was to actually discuss how we were

AR 2155

950

130

1   different times.  So we certainly saw regression when he

2   entered the school year.  And then I would say stagnation in

3   continuing to use this particular modality at the time.  It

4   wasn't meaningful for him and he was making a lot of errors.

5   So we had -- and it wasn't really necessarily a stagnation.

6   It was just that it wasn't -- he wasn't demonstrating at

7   this particular time for us a visual discrimination in some

8   of the basics.

9        Q    What do you mean basics?

10       A    In this case, he was actually not discriminating

11  among the picture cards and just placing two on a strip.  So

12  very rote and not communicating in a meaningful basis with

13  the pictures that's described by the goal.

14       Q    Was this happening across the goals that you were

15  working on with him or just one or two?

16       A    No, it was working across the goals.  We were

17  having difficulty meeting all of the goals.  We're making

18  progress but we anticipated that there would be difficulty

19  in reaching them as written.  But he was still making

20  progress but at a much slower rate.  And we saw also

21  somewhat of key deficits or some splintering of skills so

22  that he could do parts of goals but not all of the goals,

23  all of the skills required to meet the goals on time.

24       Q    In general after working with ▮▮▮▮ for two full

25  years, how would you describe his ability to retain

138

1   foundational skills that were missing.

2        He was not yet getting his needs met and because

3   of that these were opportunities for behaviors --

4   maladaptive behaviors, screaming, swiping, eloping.  And so

5   this functional communication system actually was to address

6   those types of needs affectively.

7        Q    Was ███ ready for a high tech AT device at the

8   time of this meeting?

9        A    Absolutely not.

10       Q    Why?

11       A    Because he didn't have the ability yet of

12  representational or symbolic thinking.  He didn't yet have

13  the ability to realize that a photo actually represented an

14  object and to be able to use that communicatively on a

15  regular and consistent basis.

16       Q    In addition to revising your goals, what else did

17  the team do to address ███ slow progression?

18       A    We shared strategies with the family.

19       Q    Such as what?

20       A    Explaining what we were using the classroom.  That

21  seemed to be affective.

22       Q    Did parents have any questions about that or

23  concerns that they articulated?

24       A    I think they were very concerned about the slower

25  rate of progress.

AR 2169

143

1  individual staffs and take a look at what's working and not

2  working and make revisions.  But I know when I am not there,

3  it's also being addressed using the same facilitative

4  strategies that I have identified.

5          So that's what a collaborative model is.  So we

6  are working together really for the same functional outcome

7  for the children.

8      Q    Okay.  Take a look at D-16.  Do you recognize this

9  document?

10     A    Yes.

11     Q    What is it?

12     A    It's an IEP meeting notice.  Oops, D-16, I am

13  sorry.  Wrong page.  It's the assessment plan.

14     Q    And what were the questions that you sought to

15  clarify on your piece of the assessment plan?

16     A    I was assessing under speech and language, what

17  are █████  speech and language abilities as compared to his

18  typically developing aged peers and what are his unique

19  areas of need.

20          I also shared under social/emotional and adoptive

21  behaviors specifically I am looking at social/emotional

22  impacting his progress in the educational setting.

23     Q    I am sorry.  Say that again?  You were looking at

24  what?

25     A    I also shared in the component social/emotional

144

1  and adaptive behavior, and was looking at social and

2  emotional skills in the academic setting along with the

3  psychologist.

4      Q    Did you include a request for IR (phonetic) to

5  have an assisted technology assessment in this assessment

6  plan?

7      A    No.

8      Q    Why not?

9      A    We already were using assistive technology in

10 terms of augmentative --

11     Q    Can you elaborate on that?

12     A    Yes.  So in terms of augmentative communication or

13 alternative communication -- alternative and augmentative

14 communication AAC, we already had a system in place and we

15 were continuing to revise it based on his current levels and

16 his needs.  So we were using a combination of gestures, eye

17 gaze, vocalization and indicating behavior such as the point

18 in the (inaudible) again and using picture systems which are

19 all part of an assistive technology and augmentative plan.

20     Q    Did Parents prior to signing this assessment plan,

21 did they ask for any additional assessments that you are

22 aware of?

23     A    No.

24     Q    Okay.  Take a look at D-18.  Is this the

25 assessment report that you prepared as a result of that

162

```
 1   progress and prior goals with respect to the speech and
 2   language goals in this IEP?
 3        A    Yes.
 4        Q    Did you review those in the IEP meeting?
 5        A    Yes.
 6        Q    Take a look at pages 264 through 268.  Just review
 7   those quickly.  My question is going to be do you, sitting
 8   here today, believe that that was a true and accurate
 9   description of his present levels in progress and prior
10   goals at that time?
11        A    Yes.
12        Q    Based upon what?
13        A    Based on data.
14        Q    What data?
15        A    The data collected in his classroom and then
16   across the functional settings in which these goals were
17   targeted.
18        Q    Okay.  Take a look at page 265.  Was this one of
19   the speech and language goals you proposed?
20        A    Yes.
21        Q    Can you tell me the purpose of this goal for
22   ███████
23        A    Again this was a goal that we were actually trying
24   to broaden and expand his use of visual images or
25   photographs in a communicative fashion.  So he had the
```

177

1  minutes.  Why two times 15?  Why not two times 30 or two

2  times 45, some -- why 15?

3      A     Based on our learning we actually kept it really

4  engaging and we moved fast.  We allowed us to have a lot of

5  repetition and build momentum in a very intense, meaningful

6  way and without having to actually give him a break.  That

7  was away from the contact.  So a lot of times what we do is

8  over a period of time after a child has worked so long we

9  actually give them a break away from the table instruction.

10         And what I was able to actually do is to maintain

11  his focus and interest, really use that as an opportunity to

12  build momentum and learning, keep it fun and engaging.  And

13  what I loved about these short intense sessions as well as

14  just keeping his focus and maintaining that and supporting

15  that for that 15 minutes was it was so flexible.  I didn't

16  have to just do it in the centers.

17         I didn't have to adhere to a rigid flexible [sic]

18  schedule.  I could do that outside of that one specific

19  time.  And that gave me lots and lots of flexibility to take

20  those same goals and then do it maybe in snack tomorrow or

21  library at another time.  I could do it out on the

22  playground.  We could actually move the services a lot more.

23         Again, teaching and facilitating language in a

24  really meaningful setting.  But the most important part is

25  building that behavior in an intense fashion.

*Statewide Transcription Services*
*(916)624-4300*

AR 2208

956

1

## OFFICE OF ADMINISTRATIVE HEARINGS

## SPECIAL EDUCATION DIVISION

## STATE OF CALIFORNIA

```
In the Matter of:          )
                           )
PARENTS ON BEHALF OF       )   OAH Case No. 2012050785
STUDENT,                   )
                           )
v.                         )
                           )
NEWPORT-MESA UNIFIED       )
SCHOOL DISTRICT.           )
                           )
                           )
_____)
```

October 22, 2013

Harper Center
Costa Mesa, California

The above-entitled matter came on for hearing

pursuant to notice,

BEFORE:    DARRELL LEPKOWSKY
           Administrative Law Judge

Official Transcriber:  Kelli Wells

**AR 2214**

957

2

# A P P E A R A N C E S

On Behalf of Student:

Kathleen M. Loyer, Attorney
Eric and Aneida Fulsang, Parents

On Behalf of District:

Alefia Mithaiwala, Attorney
Maureen Cottrell, Director of Special Education

AR 2215

958

3

# I N D E X

**WITNESSES**                                                    **Page**

**For Student:**

Kathleen Murphy
    Cross Examination by Ms. Mithaiwala    6
    Redirect Examination by Ms. Loyer    39
Leah Steinman-DeNisi
    Direct Examination by Ms. Loyer    66
    Cross Examination by Ms. Mithaiwala    88
    Redirect Examination by Ms. Loyer    128
    Recross Examination by Ms. Mithaiwala    134
Karrie Anderson
    Direct Examination by Ms. Loyer    138
    Cross Examination by Ms. Mithaiwala    152
    Redirect Examination by Ms. Loyer    171
Maureen Cottrell
    Direct Examination by Ms. Loyer    176
    Cross Examination by Ms. Mithaiwala    181

**For District:**

None

**Adjournment**    195

**Certification of Transcript**    196

AR 2216

959

10

1        ▮▮▮▮▮▮        And so we were talking about learning language

2    within the naturalistic context in a school environment

3    where language was actually very meaningful and it would be

4    actually services that would be provided in real settings

5    across individuals in meaningful ways.  And an individual --

6    increase in individual doesn't actually or doesn't

7    necessarily get to the heart of the generalization

8    opportunities that are available when services are actually

9    in a collaborative fashion with the staff, we had suggested

10   and explained to Mr. Fulsang.

11        Q    Okay.  Take a look at D-26 please, and turn to

12   page 636 of this document.  Did you attend this IEP meeting?

13        A    I'm sorry, which page?

14        Q    I'm sorry, 363.

15        A    Yes, I did.

16        Q    And what was the purpose of this IEP?

17        A    The purpose of this IEP was his transition to

18   kindergarten.  So we met with the preschool staff and the

19   kindergarten staff -- actually not at this meeting.

20        Q    Did you change your IEP goals at this meeting?

21        A    I did not change my IEP goals?

22        Q    How about your services?

23        A    Yes.

24        Q    What was the change to services?

25        A    The services actually changed to increase to two

11

1  groups for 30 minutes a week and I again reoffered 215

2  minute individuals per week.

3     Q    Let's start with the first change, the increase to

4  group to two times a week.  Why did you propose that?

5     A    It's a different program in kindergarten than

6  preschool.

7     Q    How so?

8     A    I mean in elementary focus there is more -- the

9  curriculum looks very different in kindergarten than in a

10 preschool.  There isn't the same types of access and play

11 that there is -- there is more of an academic focus in

12 kindergarten, less downtime I should say in structured play

13 -- with play per.  So I was actually again looking for just

14 -- anyway, sorry.

15    Q    Was the group services provided in the

16 kindergarten environment meant to be push-in or pull-out?

17    A    Push-in.

18    Q    Was the increase to two times 30 minutes necessary

19 for █████  to receive FAPE in kindergarten?

20    A    Yes.

21    Q    Why then did you decrease the individual services

22 from two times 30 back down to the two times 15?

23    A    Because I thought that was the best setting and

24 type of services for █████  to meet █████  needs.

25    Q    Why?

*Statewide Transcription Services*
*(916) 624-4300*

**AR 2224**

961

12

1    A    Again, a 30 minute individual session was too

2  long.  It didn't offer the flexibility and I preferred and

3  having had worked with him understood that the intensity

4  available in the 15 individual sessions would be sufficient.

5  It would keep him engaged to meet his needs and to reach our

6  goals.

7    Q    Did the Eastbluff kindergarten staff still have

8  the same collaborative model that you had described for

9  preschool?

10    A    Absolutely.  Our occupational therapist and I both

11  pushed into the classroom for services.

12    Q    Okay.  Take a look at D-28 please.

13        ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  I'm sorry, I

14  didn't hear you?  I was writing.

15        MS. MITHAIWALA:  D-28.

16        ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  Thank you.

17    Q    Have you seen this document before, Kathy?

18    A    Yes.

19    Q    Did you prepare the progress for ████ speech

20  and language goals?

21    A    Yes.

22    Q    Can you tell us how he was doing as of November on

23  his speech and language goals?

24    A    He was making progress and we anticipated that he

25  would actually meet his annual goals.

13

1    Q    And how did you know that?

2    A    Based on the data.  All of our goals were based on

3  data.  Or I should say all of our measurements were based on

4  data.

5    Q    Do you have any reason to doubt the accuracy of

6  the information in this progress report?

7    A    No.

8    Q    Okay.  And take a look at Exhibit D-30 and flip to

9  page 405.  Did you attend this IEP meeting?

10   A    One second here.

11   Q    Sure.

12   A    Yes.

13   Q    And what was the purpose of this IEP meeting?

14   A    This IEP was his annual.

15   Q    Did you write present levels of performance and

16  progress on his prior speech and language goals for this

17  IEP?

18   A    Yes.

19   Q    Did you review them in the IEP meeting?

20   A    Yes.

21   Q    Do you have any reason to believe that those

22  present levels that you wrote or the speech and language

23  progress is anything but a true and accurate description of

24  his progress at that time?

25   A    No.

18

1    him from the three-inch, what was an easy reference, to now

2    two-inch.  Our goal was to actually move him to more of a

3    symbolic simple line drawing that's available on Boardmaker,

4    but he was not yet ready.  He wasn't able to demonstrate

5    understanding of those simple line drawings like he did the

6    photo images at that time.

7        Q    Okay.  And how did you measure this goal?

8        A    It was an accuracy goal.  So in this case I would

9    present a picture and ask him to demonstrate that particular

10   action such as lining up, if he did it or didn't do it

11   independently.  It would be marked plus if he did it

12   independently.  A minus -- or with prompting, it would -- I

13   should say if he did not do it or he required prompting, it

14   would be noted as a minus.

15       Q    Okay.  All right, take a look at 391.  And what

16   was the purpose of this goal?

17       A    The purpose of this goal was to actually again

18   expand his ability to understand and follow directions

19   within the environment and relative to people that he saw on

20   a recurring basis every single day.  He had not yet

21   associated a name with a staff that was in his classroom

22   every single day.  Meaning that I could say where's Katie or

23   where's Ms. Burns, but he was not yet connecting her name to

24   the person.  And this was a really important piece for him

25   to acquire so that he could actually successfully complete

AR 2231

964

19

1   receptive directions in the classroom such as "give this to

2   Ms. Burns, line up next Ms. Joe (phonetic)."  Very, very

3   important directions for safety, completing in access to

4   curriculum, participation throughout his school day.

5       Q    And how did you measure this goal?

6       A    Again, it was an accuracy goal and so it was

7   actually a plus or a minus.

8       Q    And can you give us an example of what the prompt

9   would be, if you will, without looking at Student's binder?

10      A    Sure.  Again, we targeted two of his family

11  members and three adult staff members in the class, because

12  obviously we wanted the school to cross settings.  All of

13  our goals were focused on generalization across settings and

14  it was just as important for the family as it was for us for

15  him to recognize and follow these kinds of simple

16  directions.  So in the case when we were actually working

17  with his school individuals, we had three pictures of the

18  individuals and I would actually combine that with the prior

19  goal, the touch.  So touch Ms. Burns.  And he would actually

20  -- he would be expected to actually identify based on the

21  photo.  It should be noted that we didn't have just one

22  single photo of the individuals.  And again we know that

23  nobody looks the same every day, so we had at least three

24  pictures of the staff as well as the family had supplied us

25  lots of pictures of the family.  And so we targeted it that

965

20

1  way, again, focused on the generalization.

2     Q    Did you present it in the same way with family

3  members?

4     A    We did.  We actually presented it mostly on the

5  iPad on the screen, just to again to expose him to the use

6  of the iPad for more than a break.  His family supplied that

7  and so we used that for the instruction.  So it was used,

8  yeah.

9     Q    And that was beginning when?

10    A    That would have been beginning -- oh my gosh.

11  Well, it would have been hopefully -- I'm not exactly sure

12  of the date the family supplied the iPad for this, but

13  that's how -- that's the vehicle they supplied the pictures.

14  Obviously as soon as consent was reached for the goals, we

15  started developing materials for him.

16    Q    Okay.  Take a look at 392.  What was the purpose

17  of this goal, Kathy?

18    A    This again expanded -- all of these are building

19  on prior goals and his skills as we knew him and understood

20  them at that time.  So in this case again we're expanding

21  the use of this visual to prep him for more sophisticated

22  AAC when he was ready.  So in this particular goal we

23  actually had him do for the first time out of seat

24  directions, which are huge.  So we would actually show him a

25  picture of different places in the classroom or different

21

1   items and gave him a very simple instruction such as "put."

2   And I would present him with something like, "Put the paper

3   in the trash can," and we would show him the pictures.  The

4   paper could have been put in any of the pictures that were

5   actually presented, and it could have been paper -- I should

6   explain this that I would give him an item and ask him to

7   put in a location and then again bathe him in this receptive

8   information as well as the visual to support his

9   understanding of when I say trash can, there's a picture of

10  the trash can.  So he would make that connection from --

11  with the visual and my words and then find it somewhere in

12  the classroom.  So we would have things like the trash can,

13  his copy, his backpack, the library, which is a place in the

14  classroom, a break area, and actually have him get out of

15  his seat, take that item and put it in that designated

16  location.  And then the expectation was not for him to

17  return to the seat, but just to visually discriminate -- see

18  the (inaudible) in the picture and complete the simple

19  instruction.

20       Q    How did you measure this one?

21       A    This was actually measured in accuracy too.  So in

22  this case that he actually completed the instruction of

23  getting up out of his seat and going to the specified

24  location in the visual.  And it's was a plus or a minus.  A

25  minus again included a prompt.

AR 2234

967

22

1     Q    At the time you developed these goals did you

2  believe them to be appropriate for ▮▮▮▮

3     A    Absolutely, yes.

4     Q    Sitting here today do you still believe these

5  goals were appropriate at the time?

6     A    Yes, absolutely.

7     Q    Okay.  Take a look at page 373.  Did you propose

8  speech and language services to support these goals?

9     A    I did.

10     Q    What were those?

11     A    I proposed again the two individual 15 minutes a

12  week, two groups of 30 minutes per week and we added an

13  individual consult.

14     Q    Why did you add the consult?

15     A    I added the consult really for -- the most

16  important reason is I actually provided that kind of a

17  consult in the classroom.  ▮▮▮▮ was actually demonstrating

18  improved readiness for technology or for additional AAC and

19  my role was to actually make sure he was actually -- always

20  being able to access the most current types of materials.

21  So I used that time to actually talk with the teacher,

22  develop new materials, expand his repertoire of visuals as

23  so indicated.  And really very importantly this was guided

24  by my consult with Lila Seldin, who is the AT specialist.

25  So I used this time to consult with her based on where he

AR 2235

968

23

1  was to see if there was anything we might be missing or

2  should add to facilitate his readiness for what we

3  anticipated the use of assistive technology to supplement

4  his communication.  So I consulted with both the classroom

5  staff and her on a regular basis.

6      Q    Take a look at page 403 and read the very last

7  paragraph to yourself, the one that starts "SLP Kathy

8  Murphy," just to refresh your memory.

9      A    Okay.

10     Q    Do you recall, Kathy, a discussion during this IEP

11 meeting about the use of the iPad for ████

12     A    At this point, yes, the family did have the access

13 to the iPad, and when we had discussed this means

14 (inaudible) school, this is where obviously the Mother had

15 added this piece of information that he was actually doing

16 some of that, the photos of anybody who he is familiar with

17 an iPhone or an iPad.  They do have that photo bank and that

18 they were using some of those photos in this particular

19 program.  And so he was actually using some of those to

20 discriminate some of the family members at home and to teach

21 that.

22     Q    Is that where the idea to use the iPad for his IEP

23 goal that you pointed out was generated during this

24 conversation or did that develop later?

25     A    The family had some tests reviewed at that time,

AR 2236

969

24

1  so we incorporated it.

2     Q   Okay.  Since there was a discussion on the iPad

3  and ███ was being able to use an iPad, why didn't you

4  propose an AT assessment at that time?

5     A  He wasn't demonstrating the rest of the readiness

6  skills at that time.  So typically developing children -- I

7  know I actually mentioned this earlier -- make that

8  connection.  It isn't until the child is around age three

9  cognitively or developmentally that they are actually

10  beginning to use images for communicative purposes.  We were

11  very excited to see ███ make that type of a growth, but he

12  wasn't yet at the readiness period to use that alone.  So we

13  were still working -- all of these goals reflect that

14  building of the foundational skills to getting to that

15  readiness point.  One of the goals or the very first ones we

16  incorporated in here was break time, that he was actually

17  using a visual image for communicative purposes.  So he

18  wasn't yet demonstrating that level of readiness.  And we

19  did many things to make him ready.  So the visuals were not

20  just in for communication purposes, but we were also bathing

21  him with the visuals within the environment such as the

22  visual schedule.  Part of my responsibility was -- included

23  collaborating with the teacher to make those kinds of

24  adjustments and to supplement any of the visual aids for

25  communication purposes across the day.

AR 2237

970

25

1    Q    During this IEP meeting did the family ask you for

2  an AT assessment?

3    A    No, they did not.

4    Q    Did they tell you they were going to seek a

5  private AT assessment?

6    A    No.

7    Q    Did they tell you after this IEP meeting they were

8  planning to do that?

9    A    No.

10    Q    Did you serve ███████ through the entirety of the

11  2011-2012 school year?

12    A    Yes.

13    Q    At what point did he jump off your caseload?

14    A    At the end of this school year.  I think that was

15  like 6/20 or 6 -- whatever that week is.

16    Q    And I believe you testified that it was because

17  your caseload changed?

18    A    Correct.

19    Q    Can you expand upon that a little bit more?

20    A    I actually was transitioning from that particular

21  setting to a new assignment at Corona del Mar High School

22  and working with middle and high schoolers.

23    Q    How would you describe ███████ progress

24  holistically over the two school years that you spent with

25  him with respect to speech and language and communication?

26

1       A       Well, when we first initially -- when he first
2    initially arrived at the School District, his profile placed
3    him at about a six to nine month level based on the
4    assessment results.
5       Q       Six to nine months as far as communication?
6       A       Communication.  Speech and language abilities at
7    about six to nine month old.  And so he was close to a 36
8    month level at that time.  So there was about a little more
9    than a two year gap.  So when we did the triennial two years
10   later, his speech and language skills again were at a
11   profile lower than expected, but still had made tremendous
12   progress to a 13 month.  So he had made progress, but he was
13   60 months old at the time.  So it was a very slow rate.  I
14   can't necessarily tell you exactly the place where he was
15   when he left my caseload a year later than that, but he
16   continued to make gains.  Based on that trajectory it's a
17   little bit difficult to project, but I would say that
18   because of his use of pictures and all he had moved in that
19   particular year from about a 13 month to probably at about a
20   15-16 month old due to his increase in use of intentional
21   communication at the time, which is he was much more
22   consistently pairing eye gaze with gestures on a regular
23   basis.  He was actually beginning to use pictures for
24   communication, so he was growing at a rate of about three
25   months, two to three months a year.

AR 2239

972

27

1    Q    Do you believe that's commensurate with his

2 cognitive ability?

3    A    Yes.

4    Q    Is there a difference in the way one might

5 approach communication or teaching functional communication

6 from a behavioral perspective versus a language-based

7 perspective given that you have a degree in both?  How do

8 you utilize one degree versus the other degree in your

9 teaching of functional communication or is there a

10 difference?

11    A    There really isn't very much of a difference, and

12 I think my role over the last couple of years having a BCBA

13 and a speech language pathologist it's very clear that

14 there's many more similarities in the way that we teach.

15 Last year I actually taught a class in graduate school at

16 Chapman University and it was a behavioral -- it

17 incorporated many of the behavioral principles in teaching.

18 And we use many, many of those in speech-language pathology

19 and there isn't very much of a difference at all.  The new

20 models of ABA are placing and focusing on developing skills

21 in a naturalistic setting.  We sometimes contrive the

22 opportunity for children to practice and use their speech

23 and language in that environment just like they do learning

24 of other skills.  So there's really almost no difference in

25 how we focus an early intervention approach and a behavioral

AR 2240

973

28

1    approach in language acquisition, best practice.

2        Q    You testified much earlier in your testimony about

3    going on the home visit.  Do you recall that testimony?

4        A    Yes.

5        Q    And seeing -- I think you called it more of a DTT

6    type of teaching style?

7        A    Correct.

8        Q    Is that the type of teaching style the staff uses

9    in the classrooms that --

10       A    No.

11       Q    -- you used to have for Little Seahorse?

12       A    No, they don't.

13       Q    What do they use?

14       A    They use a much more naturalistic approach.  They

15   have materials that are very meaningful.  Their feedback

16   isn't -- first of all, they don't teach in mass trials.

17       Q    What does that mean, teach in mass trials?

18       A    That you might be presenting 20, maybe 30

19   opportunities, boom, boom, boom, right off the bat for a

20   student to actually learn a new skill.  It's much more

21   naturalistic of choosing a lot of materials.  They will be

22   getting natural -- a lot of feedback.  They are keeping it

23   engaging and they are also teaching in a group setting.

24   Language is never learned and communication in isolation.

25   That he is actually learning -- and in a group setting

29

```
 1  what's very cool about it is it can actually be motivating.
 2  You are also using the peer in a small group so that you
 3  might be reinforcing a peer for getting it right.  And
 4  you're able to actually balance in a naturalistic style
 5  learning and many of the other goals at the same time and
 6  using the peers to somewhat reinforce the learning process.
 7  It's a very effective process, but --
 8      Q    Do you know --
 9      A     -- there will be -- oh, well, go ahead.
10      Q    Go ahead.
11      A    No.  I was just going to say learning in the
12  natural environment it's never over.  It's 24x7.  And that's
13  what I love best.  It's very meaningful.  So they might be
14  targeting the goals lining up and going to the bathroom, in
15  the bathroom, eating a snack.  The programs are implemented
16  across the day.
17      Q    Do you recall a conversation -- I believe it was
18  during the 2011 annual IEP meeting, where Parents were
19  expressing that █████ can't learn in a group setting?  Do
20  you recall that conversation in the context of asking for
21  individual speech and language therapy?
22      A    Yes.
23      Q    Did you explain to them why you believed █████
24  could learn in a group setting during that meeting?
25      A    He was learning in a group setting at the time.  I
```

975

30

1   do recall saying that.

2       Q    Okay.  Do you believe ▮▮▮ has apraxia?

3       A    No.

4       Q    Why not?

5       A    There are several hallmarks that we actually see

6   in apraxia and there's a very systematic assessment process.

7   Currently it's estimated that people are diagnosed with

8   apraxia 75 percent or more.  There is an over diagnosis of

9   the label of apraxia.  So I do want that to be known that

10  it's a very frequent, but it's not an accurate diagnosis.

11  He doesn't demonstrate any of the hallmarks that would be

12  indicative of apraxia.

13      Q    And what are those?

14      A    I see no groping.  First of all, he's nonverbal

15  for the most part.  It's rare that you would actually have

16  childhood of apraxia of speech ever diagnosed in a child who

17  was not actually producing speech or attempting to produce

18  speech.  And that's the biggest difference.  You might be

19  nonverbal because you can't produce speech, but that

20  particular individual would actually be trying to produce

21  speech.  He would be vocalizing a lot.  There would be a lot

22  of variability.  Some of the hallmarks for apraxia include

23  inconsistency in consonant productions.  So that means that

24  I might say one word one way.  This time -- like for

25  example, cotton candy I might say it this time.  The next

AR 2243

976

31

```
 1   time it might be totton nanny (phonetic).  So there is a lot
 2   of inconsistency, so the consonants are changing.  We also
 3   see a lot of vowel errors and there are attempts again in
 4   inconsistent pattern and we're going to see changes and
 5   inconsistencies in intonation patterns.  Intonation is that
 6   porosity over the words.  You're going to have a lot of
 7   stressed errors.  But the child is going to be actually
 8   typically trying to produced speech.  So that's all of those
 9   inconsistencies.  Along with that you're going to see a lot
10   of groping because the child is actually trying to place
11   volitionally an articulator in a specific spot.  So, for
12   example, the tongue might -- is supposed to go -- is
13   supposed to be placed behind the alveolar ridge on the top
14   and the child has difficulty placing that.  So they are
15   groping for the correct placement to produce that sound.  So
16   you'll see the groping errors as well.  In an nonverbal
17   child again you're going to see the attempts to communicate,
18   but the child failing.  But they are still going to be
19   communicating.  They will be very resourceful in their use
20   of nonverbal behaviors to support their communicative
21   efforts.  Some other hallmarks that we typically see in the
22   child of apraxia for a nonverbal speaker would be you would
23   see feeding issues.  You would see early drooling.  Those
24   have never been reported by the family.  We didn't see
25   those.  We never saw the groping.  We didn't see the
```

977

32

1   communicative attempts on -- remember we wrote a goal for
2   increasing the rate of communicative attempt in his very
3   first assessment -- I mean after initial, his very first IEP
4   because that was something that wasn't happening on a
5   regular basis.  To actually diagnose childhood apraxia of
6   speech you'll have a full assessment.  So first you'll have
7   a structural functional assessment and then you'll actually
8   follow that up with a motor speech assessment.  It's a very
9   intensive assessment.  And for somebody who is an ethical
10  evaluator, they wouldn't take that lightly.  You're also
11  going to find for the child that's verbal -- I'll also see a
12  significant discrepancy in what they understand, receptive
13  language, versus their expressive language.  He's a
14  nonverbal speaker, so that's not necessarily relative.  But
15  we would find a difference in standard scores.  What we do
16  see however is that we see consistency in both his receptive
17  and expressive language both at his baseline or his initial
18  assessment and also in my report.  Both of those yielded six
19  to 9 months at his initial assessment and 13 months in my
20  assessment.  So we don't even see a gap then.  But I do want
21  to note that you will have that big difference based on
22  actual words produced.
23          MS. MITHAIWALA:  I don't have anything further.
24          ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  Okay.  I just
25  have a couple of questions for you, Ms. Murphy.  First, what

AR 2245

978

33

1   was specifically done on the playground to facilitate

2   ▓▓▓▓▓▓ communication or interaction with the other

3   children?

4           MS. MURPHY:  There's several techniques that we

5   actually use.  One of them is actually keeping him in

6   proximity to peers to create those naturalistic

7   opportunities to actually interact with others and to use

8   the kinds of functional language that we were targeting.  So

9   we actually created an environment that would facilitate a

10  group interaction typically and it's something we carried

11  over into the classroom.

12          We actually put the materials between the children

13  and then had the children on the outside but facing the

14  shared material.  So, for example, it would be like you and

15  me and maybe we were on the playground and we would actually

16  put -- and he was interested in sand, we would actually have

17  all of the sand materials in the middle so that he could

18  actually be in close proximity with the shared materials.

19          We might sometimes withhold a missing material or

20  an item that he needed -- he was possibly -- I'm just using

21  the sandbox because this is an easy example.  Maybe he needs

22  a shovel to finish what he wants.  And so one of us as a

23  staff would actually withhold the shovel to request that he

24  needed the shovel.

25          ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  And let me

34

1  just interject.  How would he do that?  How would ████ in

2  particular, say, request a shovel?

3          MS. MURPHY:  One of the signs that we were

4  targeting was want so that he would actually designate that

5  he wanted maybe all of my materials.  Maybe I had the shovel

6  or another staff would have a shovel.  We would again look

7  for him to look to the aide or the individual that has the

8  shovel, maybe it's another peer, and point.  So again that's

9  an intentional communication.  It's a very rich way of

10  communicating nonverbally.  So the combination of the eye to

11  the object that he wants, and he could be requesting it that

12  way.

13          If he was actually going down the slide, which is

14  a super, super favorite thing of his, we would actually

15  block access so that he would actually keep him at the top

16  of the slide until he actually again modeled the more, which

17  was again a functional sign that we were targeting.  He

18  would actually have to look to us and do the more.  "Boom,

19  you get to go down the side, yeah," and there is a big

20  celebration at the end.

21          So that would be with staff.  Because we did have

22  that reverse inclusion program at the Seahorse, we had

23  typical peers in there to provide that model.  We don't want

24  language always just to come from staff, but it's really

25  important to respond to peers.  So in the classroom how we

35

1   would actually -- I mean again on the playground how we

2   would do that is sometimes those materials would be held by

3   the peers, not just us. Sometimes his friends would

4   actually block access. Maybe if he was on the swing and

5   loved to swing, we had peers push him so that they would

6   actually have to -- each time they would wait -- we would be

7   coaching them, but they would actually -- he would have to

8   sign more and again, "yeeah," you know, the celebration. He

9   was always supported by the staff and then he would actually

10  be pushed.

11       So it wasn't necessarily with his other peers that

12  he was actually -- those interactions were facilitated, but

13  not nearly with the intensity that we used our typical peers

14  to create that peer-to-peer interaction. Because we knew

15  they would be persistent and hang in there and wait for him

16  to respond the way that -- and they would understand what

17  that response was supposed to look like on his part.

18       ADMINISTRATIVE LAW JUDGE LEPKOWSKY: I'm just

19  going to note for the record that we've been joined by our

20  interpreter, Ms. Conceical.

21       I wanted to ask you a little bit about the

22  technology and the iPad and      use of that. I think it

23  was at the February 2012 IEP where there was a discussion by

24  Parents of      iPad use. Did you ever personally work

25  with him when he was using the iPad?

36

1       MS. MURPHY:  I worked with him when we had the

2  photo selection for the family on there.  We were using it

3  at that time.

4       ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  Were you

5  using it at school with him?

6       MS. MURPHY:  Yes, I was only in the school

7  environment with him with that.

8       ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  So he was

9  bringing the iPad to school?

10      MS. MURPHY:  Yes.

11      ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  Did he also

12  have the school provided iTouch at the same time?

13      MS. MURPHY:  No, he did not at that time.

14      ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  Were you

15  working with him at the time the iTouch was introduced?

16      MS. MURPHY:  No, I was not.

17      ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  Okay.  In

18  terms of the iPad use, what exactly did you do with him on

19  using the iPad?

20      MS. MURPHY:  Primarily he used it for

21  reinforcement in the classroom, so he earned time with it on

22  his breaks.  He had particular programs he loved to use.  He

23  was not using it for communicative purposes with us.

24      ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  Did you

25  attempt to use it for communication with him?

38

1   properties and equations.

2         It's just like the iPad with these communication

3   programs.  I actually have to build competency.  I have to

4   get a child to actually use the TI-83 Plus for trigonometry,

5   which is a required tool in high schools today for those

6   upper education math classes.  I actually have to build the

7   trigonometry.  There's so much that goes on before that and

8   it starts at an early age.

9         Again, we were building throughout his whole

10  program.  I wouldn't change a single goal that was written.

11  It was a very systematic the way we were expanding his use.

12  He was not ready for communication.  But we were getting

13  there.  We were making -- continue to make strong progress.

14  After his initial assessment I understood what that rate was

15  or the trajectory rate.  And I'm really excited about the

16  fact that we wrote goals that were appropriate that he

17  continued to make progress.

18        ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  All right.  I

19  think that's all I had.  I'm going to turn it back to you,

20  Ms. Loyer.

21        MS. LOYER:  Could I just have a few minutes to get

22  organized?

23        ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  Sure.  That's

24  all right.

25        MS. LOYER:  Thank you.

*Statewide Transcription Services*
*(916) 624-4300*

58

1     Q    Okay, I'm confused.  But could you explain that

2  what you just said?

3     A    There are no other functional signs taught.

4     Q    Is there any reason for that?

5     A    ████ had a difficulty.  Let me just explain the

6  two differences.  When you're actually teaching a sign,

7  you're expecting a child to actually reference the memory

8  bank or stored memory of what that sign looks like and to

9  reproduce that independently.  ████ was having difficulty

10  in the modality of teaching and communicating through sign.

11  There was a lot of confusion.  The Mother marks that and

12  notes that in some of her comments in IEPs.  So the decision

13  was actually made to support intentional communication, to

14  continue to do that, but to focus on the visual modality so

15  that it was not going to be dependent on him actually

16  retrieving something from stored memory.  But based on his

17  cognitive levels and his communicative competency the

18  decision was made to move to a visual or an AAC aided

19  program.

20     Q    When was that decision made?

21     A    Based on his difficulty.  It wasn't a formal

22  decision.  It was based on practice and clinical experience

23  and what he was actually producing.  We continued to support

24  those signs but he was having a very difficult time

25  independently producing and generalizing sign, and this

AR 2271

984

59

1    seemed much more age appropriate based on his developmental

2    age.

3        Q     So the use of the picture system doesn't require

4    memory?

5        A     No, because you have a fixed set.  It requires

6    memory in a different regard, but it's not closed from his

7    own internal memory.  He has actually produced a closed set

8    of visual pictures and he can use those communicatively.

9        Q     For example, is that what PECS is based on?

10       A     Correct.

11       Q     Got you.  Okay.  When you were working with ████

12   did you observe him to display any specific behaviors that

13   would cause you to think he was frustrated?

14       A     He displayed behaviors.  It's difficult to

15   sometimes tell exactly frustrated.  He didn't like doing

16   academic tests.  He didn't like working.  So he actually

17   would display behaviors that would serve that he doesn't

18   like what he's doing.  So that would be frustration, yes.

19       Q     But how would you know that?  What would he do

20   that --?

21       A     A demand would be placed.  He may swipe the

22   materials.  He may squeal.

23            ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  I'm sorry, he

24   would what?

25            MS. MURPHY:  Squeal or vocalize.  There's a

985

69

1    required a lot of maintenance to retain skills.

2         Q    And how did he communicate in your classroom?

3         A    ███████ had really good eye contact with his

4    familiar staff.  You know, to get his needs met he did a

5    variety of things such as gestures.  If he really wanted

6    something like a snack, he would lead us to that direction.

7    You know, we were also using a picture system, a visual

8    schedule.

9         Q    Now, did he use the picture system to communicate

10   to you or did you use it to communicate to him?

11        A    Both.

12        Q    And how large was his repertoire?

13        A    When he was my student it was very small.

14        Q    And the visual schedule, how does that work?

15        A    In my classroom we had pictures of basically each

16   activity that we were doing and we would reference it

17   throughout the day.

18        Q    And how did he use it?

19        A    We would show him.  We would take him to the

20   picture schedule, show him the picture schedule.

21        Q    Okay.  So I'm going to take you to the big white

22   book --

23        A    Okay.

24        Q    -- and it's tab number 9.  And that's the IEP

25   addendum that was generated in November of 2010.  So just

*Statewide Transcription Services*
*(916) 624-4300*

**AR 2282**

986

70

1   let me know when you're there.

2       A    Yes.

3       Q    Now, this was -- this took place in the fall when

4   he first started in your class, is that correct?

5       A    Correct.

6       Q    And school started sometime in early September?

7       A    Correct.

8       Q    And if you look on that first page -- on the

9   bottom right the page number is by the way.  And this is

10  page 116.

11      A    Okay.

12      Q    On the third paragraph down in the note section.

13           ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  I'm sorry,

14  what page are you on?

15           MS. LOYER:  One-sixteen, Your Honor.

16           ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  All right,

17  continue.

18           MS. LOYER:  Okay.

19      Q    It says in here that Leah explained that much

20  limited progress to many goals seemed to be due to poor

21  motivation in demonstrating independence across skill areas.

22  Can you tell me what you meant by poor motivation?

23      A    Sure.  As I mentioned before it was very prompt

24  dependent.  That was one of the first things that we noticed

25  when he entered our classroom.  And although he was able to

987

71

```
 1   do some of the skills, he didn't want to do them

 2   independently.  So he was -- he would look to staff to help

 3   him through steps, yeah.

 4        Q    So how would you motivate him?

 5        A    Well, we used a very high rate of reinforcement.

 6   He had his token board with him at all times.

 7        Q    Can you explain what the token board was?

 8        A    Sure.  The token board consisted of five spaces

 9   where he could get a token.  So basically after -- and

10   depending on what we were working on at the time, he would

11   be reinforced with a token.  When he got to five tokens he

12   would get a reinforcer of his choice.

13        Q    And how would he ask for that?

14        A    Eye contact, tapping the token board to turn it

15   in.

16        Q    How would he chose the reinforcement of his

17   choice?

18        A    We would give options.

19        Q    How?

20        A    So every week we would do a reinforcement

21   assessment to make sure that the things that we were using

22   for ████ were highly reinforcing to him.  So he would

23   virtually chose the items that would be placed in this bag.

24   So we would chose two of the items, place them in front of

25   him and he would look, point or tap the item.
```

72

1    Q    And he did that successfully?

2    A    Yes.

3    Q    Okay.  So you were using the token system to

4  motivate him, but you felt that he wasn't motivated.  Can

5  you kind of explain that to me?

6    A    Each step would need to be broken down for him.

7  So if we would take that high rate of reinforcement out, he

8  wasn't doing the steps independently.

9    Q    So did you maintain the token system throughout

10  the school year?

11    A    Yes.

12    Q    I just want to flip you to page 151 and I just

13  want you to authenticate your signature on that page, on the

14  upper left hand side.

15    A    Yes.

16    Q    Okay, thank you.  Now, one of the things that's

17  indicated in that note page is that you were proposing new

18  goals.  Is that accurate?

19    A    I believe in the addendum meeting we changed some

20  speech goals and I modified the baseline of a behavior goal

21  to reflect how he was performing in my classroom.

22    Q    Now you also mentioned in that same paragraph that

23  you saw an increase of maladaptive behaviors.  Can you

24  explain that a little bit?

25    A    Yes.  When ███ first entered my classroom we

100

1   regular ESY program you were still noticing regression or
2   stagnation in his goals?

3       A   Uh-huh.

4           ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  Yes?

5           MS. DeNISI:  Yes, correct.

6       Q   Do you have a hypothesis as to why was it -- the
7   goals weren't appropriate to begin with?  Was it something
8   happened over the summer?  Do you have an understanding or a
9   hypothesis?

10      A   You know, I think, that ████ went into a new
11  setting.  It was kind of like he had to -- he had a short
12  period of time that he wasn't doing any services at least
13  through the School District.  So many of those skills have
14  been lost and we had to backtrack quite a bit.  It's my
15  observation that he had a slow rate of learning and even
16  skills that he had seemed to master needed consistent --
17  what's the word I'm looking for?  We needed to still work on
18  them to keep them.

19      Q   Are you aware if he had a home program during this
20  time?

21      A   Yes, I believe he did.

22      Q   Were they working on the same skills?

23      A   We did do an in-home observation and the purpose
24  of that observation was really to make sure that we were on
25  the same page.  So we shared some -- on how we were working

101

```
1   on things and they seemed to be doing things similarly, yes.

2   And we were offered that we would begin communication with

3   them.

4        Q    Were you in communication with them?

5        A    Yes.

6        Q    Okay.  Now take a look at D-14.  I think you

7   testified earlier that you were present at this meeting,

8   right?

9        A    Correct.

10       Q    On page 159, the third paragraph, last sentence

11  that starts "in addition."  Can you read that to yourself

12  please?

13       A    "███  is demonstrating" --

14       Q    No, read it to yourself.

15       A    Oh, I'm sorry.

16       Q    That's okay.  Can you explain what you meant by

17  that?

18       A    Yes.  ████  was very dependent on staff prompting.

19  Although he appeared that he could do some skills, he would

20  always wait for adult prompting.  He wasn't doing many

21  things independently.

22       Q    What do you mean wait for adult prompting?  How

23  did you know that's what he was waiting for?

24       A    Because he would look to us, lean to us, offer out

25  his -- extend his hand to us.  So, for example, if I would
```

*Statewide Transcription Services*
*(916) 624-4300*

AR 2314

991

104

1   your team's discussion about reevaluating?

2        A    Yes, I believe so.

3        Q    Prior to Parents' consent to it, on page 198, did

4   they ask you for additional assessment beyond what was

5   listed?

6        A    I don't recall.

7        Q    Why didn't you include a functional behavioral

8   analysis as part of the assessment?

9        A    In terms of ██████ behavior it was very clear

10  based on just the training that I've had in ABA that many of

11  his behaviors were due to task avoidance.  As I mention

12  before, it wasn't always that ██████ couldn't do something,

13  but was he willing to do it.

14       Q    Do I understand you to say that you didn't -- he

15  didn't need -- you didn't feel the need for an FBA?  I'm not

16  sure I understand what you --

17       A    I felt that I was qualified enough to determine

18  the function of his behavior.

19       Q    And what behaviors were you seeing at the time the

20  assessment plan was prepared?

21       A    Some whining behaviors, task avoidant behaviors.

22       Q    Were you managing those within the context of your

23  classroom?

24       A    Yes.

25       Q    How?

*Statewide Transcription Services*
*(916) 624-4300*

**AR 2317**

992

107

1   in his cognitive area.  He's performing within the 12 to --

2   or 9 to 12 months age level.  It also shows that skills were

3   scattered.  He wasn't necessarily consistent.

4       Q    Did you use the results of this tool, of the HELP

5   to develop IEP goals?

6       A    Yes.

7       Q    Take a look at D-19.  And I believe you already

8   testified that you were there.

9       A    Yes.

10      Q    My question is did you write the present levels of

11  performance and progress on prior goals as they related to

12  your specific goals?

13      A    Yes.

14      Q    Did you review those in the IEP meeting?

15      A    Yes.

16      Q    Do you have any reason to believe that they are

17  not a true and accurate description of his present levels or

18  progress at that time?

19      A    No.

20      Q    Based upon what?

21      A    Based upon observation, my assessment.

22           INTERPRETER:  Your Honor?

23           ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  Yes.

24           INTERPRETER:  Could you ask her to speak slowly

25  because I'm losing her?

AR 2320

993

108

1    ADMINISTRATIVE LAW JUDGE LEPKOWSKY: Oh, sure.

2    MS. MITHAIWALA: Sorry.

3    INTERPRETER: Please.

4    MS. MITHAIWALA: Yeah.

5    ADMINISTRATIVE LAW JUDGE LEPKOWSKY: All right,

6 Ms. Mithaiwala.

7    MS. MITHAIWALA: Yes.

8    ADMINISTRATIVE LAW JUDGE LEPKOWSKY: Thank you.

9  Q  Take a look at 251.  On that page there is a chart

10 that says behavior and the box is checked yes.  Can you tell

11 me why the team decided to check yes?  Page 251.

12  A  Okay.  I'm sorry.  Because his behaviors were

13 affecting his ability to learn, so we put behavior goals in

14 place.

15  Q  Why not a behavior support plan, or for that

16 matter a behavior intervention plan?

17  A  Because it wasn't needed.  We knew the function of

18 his behavior.  I think the point was just to work on that.

19  Q  What do you mean the point was to work on that?

20  A  Based on what we had observed we came up with

21 strategies to work on those behaviors.

22  Q  Take a look at the page before, page 250, under

23 health and medical, the third paragraph that starts "parents

24 indicated."  Can you read that to yourself?

25  A  Uh-huh.

994

109

1     Q    Was this brought up during the IEP meeting?

2     A    Briefly.

3     Q    Why did Parents bring this up and ask you to note

4  it in the section?

5        MS. LOYER:  I object.  There's no testimony that

6  says the Parents asked them to write that in.

7        ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  Right.  I'll

8  sustain that.  You need to lay a foundation.

9     Q    Leah, did you write this or did Parents -- was the

10  information about having an EEG and that the results

11  indicated that he does not have epilepsy or seizures, was

12  that something that you brought up during the IEP meeting or

13  did Parents bring that up?

14     A    Parents brought it up.

15     Q    Why?

16     A    ███  had just been out for a few days.  I think

17  they were letting us know why he had been out of school.

18  And I don't really remember the rest.  I don't know.  I

19  don't recall.

20     Q    Had you brought any concerns with respect to

21  seizures or epilepsy to Parents' attention?  Was that

22  something you were concerned about?

23     A    No.

24     Q    Okay.  Did you propose IEP goals during this IEP

25  meeting?

110

1     A    Yes.

2     Q    Okay.  Taking a look at page 251.  We're going to

3   go through each goal and I want you to tell me what the

4   purpose of the goal was and how you measured it?

5     A    Sure.

6     Q    Okay?  So let's start with the first one.  Was

7   this a goal that you were responsible for?

8     A    Yes.

9     Q    And what was its purpose?

10    A    For him to identify receptively his head and his

11  nose.

12    Q    So how would he do that?  Can you lead us through

13  an example of how you would work on it with ▮▮▮▮▮

14         ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  I'm sorry,

15  what page are you on?

16         MS. DeNISI:  Two-fifty-two.

17         MS. MITHAIWALA:  Two-fifty-two.

18         ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  Two-fifty-

19  two, okay, thank you.

20    A    When we work on these annual goals they are

21  written for a year.  So we do build upon these goals.  We

22  first have to teach him what these body parts are.  So the

23  goal is that we will teach him his head and his nose.  So we

24  show him head and nose -- let's say we start with his head.

25  You know, this is your head.  We show it on a picture.  We

*Statewide Transcription Services*
*(916) 624-4300*

120

```
1        A     Sure.  I'll have to look back.

2        Q     -- or supported that purpose?  You can go through

3   them --

4        A     Sure.

5        Q     -- starting at the beginning and just let us know

6   which ones you think.

7        A     The receptive instruction speech and language

8   goal, where he would follow the instruction give me, touch,

9   show me.  Also the protesting goal, where he would have to

10  shake his head to indicate no.  The matching pictures goal.

11  The action location pictures goal.

12       Q     How about the visual attention goal, does that

13  speak to his ability to communicate at all in your mind?

14       A     It's communicating that he is attending to what

15  you are doing.

16       Q     Did you propose services to support these goals

17  that you proposed during this IEP meeting?

18       A     Yes.

19       Q     What were those services that you proposed?

20       A     A special day class for five hours and fifteen

21  minutes a day as well as extended school year program

22  consisting of four hours a day and an extended August

23  program.  And I believe I offered four days.

24       Q     Why didn't you propose a one-to-one aide to go --

25  in addition to these services for ███████
```

*Statewide Transcription Services*
*(916) 624-4300*

121

```
 1      A     He didn't require a one-to-one aide.

 2      Q     Why not?

 3      A     With the staff that we had in place we were able

 4  to meet all needs.  Once again we were also working on him

 5  being independent.  ████ knew when someone was there to

 6  work specifically with him or to help him and we wanted to

 7  steer him away from that direction.

 8      Q     Do you recall if in this meeting Parents expressed

 9  disagreement with any of your IEP goals?

10      A     I don't believe so, none of my goals, no.

11      Q     Do you recall if they asked you for additional

12  goal areas?

13      A     I don't believe so.

14      Q     Did they express disagreement with your proposed

15  level of services, your recommendation for services?

16      A     No.

17      Q     Take a look at D-24.  Have you seen this document

18  before?

19      A     Yes.

20      Q     Did you prepare the portions relative to the goals

21  that you were collecting data on?

22      A     Yes.

23      Q     How was he doing overall as of this data report in

24  March just about a month after your IEP?

25      A     He was making progress.  And he was still prompt
```

*Statewide Transcription Services*
*(916) 624-4300*

122

```
 1   dependent, but he was making progress.
 2        Q     Do you have any reason to believe that the
 3   information on here is inaccurate?
 4        A     No.
 5        Q     Take a look at D-26.  What was the purpose of this
 6   meeting?
 7        A     This was his kindergarten transition meeting.
 8        Q     And what is a kindergarten transition meeting?
 9        A     When a student is eligible due to their age we
10   meet as a team to transition them into a kindergarten
11   setting.
12        Q     And did you have a discussion about your classroom
13   as opposed to a kindergarten classroom during this meeting?
14   You can use the document to refresh your memory if you need
15   to.
16        A     Can you rephrase the question?
17        Q     Sure.
18        A     Sorry.
19        Q     During this meeting did you sort of compare and
20   contrast the preschool program to the kindergarten program?
21        A     Yes, we did.  We talked about what my structure
22   looked like and we had the teacher also describe her ABA
23   classroom.
24        Q     The teacher, which teacher?
25        A     The special day class teacher that --
```

*Statewide Transcription Services*
*(916) 624-4300*

AR 2335

123

1     Q    For kindergarten?

2     A    Yes.

3     Q    Okay.  Have you seen Kathy's classroom?

4     A    No, I have not seen her classroom.

5     Q    Did Parents express any concerns regarding the

6  transition?  After you both compared and contrasted your

7  program, did they express any concerns about moving him on

8  to kindergarten?

9     A    Not that I recall.  Through the transition process

10  it's very common that teachers are very -- that we keep in

11  good contact.  We invite teachers in to observe.  So I

12  actually had invited the receiving teacher into the

13  classroom two different times to observe the strategies that

14  we were using.  So I think based on that I don't remember

15  there being any major concerns.

16     Q    Okay.

17     MS. MITHAIWALA:  I don't have anything further,

18  Your Honor, right now.

19     ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  All right.  I

20  just have a couple of questions for you, Ms. DeNisi.

21     MS. DeNISI:  Sure.

22     ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  You mentioned

23  earlier in context of the -- like the first IEP that you

24  were involved in with ▮▮▮ that before that ▮▮▮ was not

25  in a school program.  Do you remember saying something like

*Statewide Transcription Services*
*(916) 624-4300*

141

1    on the record after a short break in the matter of ▮▮▮

2    Fulsang and Newport-Mesa.  Ms. Loyer, you can continue.

3        Q    Can you tell me what your recollection is as to

4    when the Parents made that request?

5        A    At the January IEP.

6        Q    Is it typical for the District to conduct

7    assessments when one-on-one aides are assigned, or one-on-

8    one support, let me put it that way?

9        A    I'm not understanding the question.

10       Q    Is it standard practice for the District to

11   require assessments when adding one-on-one dedicated

12   support?

13       A    Yes.

14       Q    Then what's the protocol for that type of

15   assessment?

16       A    We sign an assessment plan and then there's a

17   series of record review observations, data collection,

18   collaborating with staff, gaining parent input, and then a

19   report is generated based on the information.

20       Q    I'm sorry, the last thing was?

21       A    A report is generated based on the information.

22       Q    Okay.  Getting back to your report page -- tab 31,

23   on page 435 you list some information and note that it was

24   taken from the January 2011 evaluation.

25       A    Uh-huh.

**AR 2354**

1001

142

1    Q    Did you interview any of the people that conducted

2  that assessment?

3    A    No.

4    Q    Okay.  Now, on page 436 -- I'm sorry 439, the

5  second paragraph last sentence, it says ▉▉▉▉ program

6  includes close proximity to an adult.  What do you mean by

7  that?

8    A    In the structure of the classroom there's a two-

9  to-one ratio of adults to students and ▉▉▉▉ had close

10 proximity to adult at all time during his program-day.

11   Q    What does close proximity mean?

12   A    Someone within -- there wasn't a defined, like,

13 you know, (inaudible) that was assigned, but there was

14 somebody that was in -- well within reach to be able to

15 ensure safety in.

16   Q    Is that part of the general structure of the

17 program at all times, or was that something that was

18 enforced when you did your assessment?

19   A    For ▉▉▉▉ specifically there is extra set of eyes

20 on him.

21   Q    And why is that?

22   A    There was an incident the year prior where he was

23 injured out on the playground.

24   Q    And that extra set of eyes, can you tell me where

25 that service would be put on an IEP?

AR 2355

1002

143

1    A    It wasn't as part of his programming, it wasn't in

2    IEP.

3    Q    So it was added after the injury, but it was not

4    added as a service?

5    A    Well, it wasn't necessarily added in the sense

6    that he had individual programming, it was a part of the

7    existing program.

8    Q    Now, page 440 in the second paragraph under

9    "Observation data," you indicate that he was observed to go

10    in a stall and use the toilet independently?

11    A    Yes.

12    Q    And this may sound like a dumb question, but I

13    don't know what their bathroom facilities look like so you

14    have to bear with me couple of minutes.  When you observed

15    him going to the stall, was it capable for you to discern

16    whether he actually used the restroom or whether he just

17    went into the stall and came back out?

18    A    I was just able to discern whether he went into

19    the stall and came back out and flushed the toilet.

20    Q    Okay.  So you heard him flush the toilet, but did

21    you actually know that he actually voided in the commode?

22    A    No.  Actually I believe that the teacher Ms. Burns

23    had gone in and flushed the toilet, so she saw void in the

24    toilet.

25    Q    But which is it?

AR 2356

1003

144

1      A    The latter.

2      Q    So he didn't do it independently then?

3      A    The toilet flushing, no, but the voiding, yes.

4      Q    It says here Ms. Burns stood next to the door.

5      A    While he was in the stall.

6      Q    But did not provide any direction or support.

7      A    In terms of him taking down his pants and using

8  the restroom.

9      Q    Were you made aware of any fecal smearing at

10 school?

11     A    No.

12     Q    If there was any fecal smearing would you be made

13 privy to that information?

14     A    I'm not sure.

15     Q    Well, I mean, would you consider that an important

16 piece of information, let me put it that way?

17     A    Yes.

18     Q    Did you observe him using any signs?

19     A    Yes.

20     Q    Can you recall what signs?

21     A    The sign for break.

22     Q    For break?

23     A    Uh-huh.

24     Q    Do you know what that sign is?

25     A    I think it's this or --

AR 2357

1004

145

1        ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  I'm sorry.

2  Okay, just for the record Ms. Anderson is moving her hands

3  apart from each other.

4        MS. ANDERSON:  No.

5        ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  What?  Is

6  that correct?

7        MS. ANDERSON:  Yes, and I'm not an expert in sign

8  language though, but that's -- typically it's paired with a

9  vocal and that's how I understood that it was break.

10    Q    And you also made a statement in the last

11  paragraph on page 441 that -- let's see one, two, third

12  sentence in, first line of last paragraph, "He was able to

13  fully participate in all items that were presented to him

14  when given a choice."  Can you expand on that a little bit?

15    A    I'm sorry, where is that?

16    Q    It's the last paragraph on page 441 where it says

17  "Notes" and then it starts one, two, so third sentence on

18  that first line, it starts "He was able to fully."

19    A    To the best of his ability when he was given a

20  trial he was able to participate in the trial to the best of

21  his ability.

22    Q    And what does that mean, to the best of his

23  ability?

24    A    He was making choices, he was presented with

25  different concepts working on full and empty, I think he was

1005

146

1    working on big and little were the concepts that he was

2    working on.

3        Q    Okay.

4        A    So he was able to make a choice during those.  So

5    that was -- he was able to fully participate in that.

6        Q    Okay.  Let me ask that again because maybe I'm

7    misunderstanding what you're saying here.  You said that he

8    was able to do it to the best of his ability and my question

9    is what do you discern is his ability?

10       A    I'm not understanding what you're asking.

11       Q    Well, in asking the question that he was able to

12   fully participate I asked you to expand on it and you said

13   he's able to participate to the best of his ability and when

14   I asked what do you mean by that you said he could make

15   choices about full and empty and things like that.

16       A    Uh-huh.

17       Q    Now that -- and again I'm saying this so I can

18   make sure I understand.

19       A    Yes.

20       Q    That to me seems like that's a task that he's

21   being asked to do and so not what is the best of his ability

22   mean?

23       A    Uh-huh.

24       Q    Okay.  So if he's asked to discern empty, full,

25   how does his ability play into that?  So I'm not

AR 2359

1006

147

1  understanding what you mean by that.

2      A    I'm saying that he was able to make a choice

3  between the two, between whether the full -- when he was

4  asked touch big, he would touch either big or he would touch

5  the little item, either or, so to the best of his ability

6  (inaudible).  He's still working on obtaining mastery of

7  those goals.  So he doesn't have mastery of those goals, so

8  the best that he could perform on that day he was able to

9  do.

10     Q    Well --

11     A    There was nothing impeding him being able to

12  participate in the task.

13     Q    Well, let me ask it in a different way.  What

14  would be something that would impede him?

15     A    It could be a number of things.  It could be his

16  attention span, it could be that he is distracted, doesn't

17  understand the concept.

18     Q    So are you saying he was able to do this

19  independently or not?

20     A    No.  I'm saying that he was able to fully

21  participate in the activity meaning there was nothing that

22  he was -- that was impeding his ability to do the task that

23  would be outside of his knowledge-base.

24     Q    When you made these observations, this particular

25  one that through this comment, was he in a group setting,

**AR 2360**

1007

148

1  was he one-on-one? I mean, and did it -- or did it vary

2  between group setting and one-on-one?

3      A    Initially in circle time it was with the entire

4  group and then when he went to the center he's with an aide.

5  So he was by himself with one instructional aide.

6      Q    Now on page 442 you indicate that he was solitary

7  in his actions, can you kind of expand on what you mean by

8  that?

9      A    What section are you referencing?

10     Q    Page 442 and "He did not -- " it's the last

11 sentence or second last sentence, "He did not look to

12 interact with his peers."

13     A    Uh-huh.

14     Q    Oh, I'm sorry, on page 443 is where -- maybe wrong

15 page written down, under the observation number 5, second

16 paragraph, third line up in the middle, "██████ was solitary

17 in his actions," this was in observation during recess.

18     A    Meaning that he was not looking to engage socially

19 with peers nor was he responding to any social overtures.

20     Q    Nor was he responding to?

21     A    To social overtures like kids around him playing,

22 he was solitary in what he was doing.

23     Q    And can you define what an independent facilitator

24 is?

25     A    That would be a one-on-one aide or a shared aide

1008

149

1  even, someone who's facilitating the student's activities

2  throughout the day.

3      Q    Do they have any special training?

4      A    Yes.

5      Q    And do you have any knowledge of what that

6  training would be?

7      A    Well, there is various degrees of -- or there is

8  varying levels I guess you could say of the independent

9  facilitators.  You have some who have less training than

10  others.  The ones that typically work with our students on

11  the spectrum, we refer to them as BAIs and they go through a

12  training through the District, as well as training within

13  the classroom with their classroom teacher or the school

14  psychologist would work with them when they were in a

15  general education setting.

16      Q    Now, did you interview the Parents for this?

17      A    There was a formal discussion at the IEP meeting.

18      Q    But when you conducted your assessment, did you

19  interview the Parents?

20      A    Not as part of this report, no.

21      Q    Can you tell me where in the report you have the

22  Parent input?

23      A    The Parent input is not -- there's some input from

24  -- that was extracted from the assessment that was done in

25  2011, but there wasn't any new information that was

1009

150

1    presented by the Parent in this report.  That discussion

2    took place during the IEP meeting.

3        Q    Okay.  I'm going to take you to that IEP meeting

4    notes and it's tab number 27 and the notes start on page

5    413.  And can you show me where on the notes it indicates

6    the Parents' specific input as to the one-on-one aide?

7        A    It doesn't appear that that was captured in the

8    meeting.

9        Q    So do you have any specific recollection as to why

10   they thought he needed an aide?

11       A    There was actually a pretty extensive discussion

12   regarding their concerns for ███████ in terms of an aide.  One

13   of the chief concern was safety as I mentioned before that

14   there was an incident that occurred the year before where he

15   was kicked in the head.  So that was pressing for the

16   family, the concern of safety, and then the secondary

17   concern was whether the family felt that he was making

18   adequate progress or not on his goals.

19       Q    You conduct other types of assessments on students

20   --

21       A    I do.

22       Q    -- in your capacity.

23       A    Yes.

24       Q    And are those other assessments that you conduct

25   typically, typically discussed at IEP meetings or do they

*Statewide Transcription Services*
*(916) 624-4300*

**AR 2363**

1010

151

1    just happen outside of the IEP meeting?

2             MS. MITHAIWALA:  Objection, vague.

3             MS. LOYER:  Okay, let me try again.

4             ADMINISTRATIVE LAW JUDGE LEPKOWSKY:   Okay.

5        Q    When you -- how does it come about?  What's your

6    typical experience as a school psychologist when you're

7    asked to conduct an assessment on a child?  What process is

8    it?

9        A    In terms of meeting with the family, as a student?

10       Q    No, no, in terms of just a general you're going to

11   do one of your assessments and this would be for a child who

12   has an existing IEP.

13       A    Okay.

14       Q    Okay.  So how does that get in front of you, we're

15   going to do an assessment?

16       A    Typically if there is a request for something

17   along those lines, the team would meet and have an addendum

18   IEP and discuss the concerns that the family is presenting,

19   is concerned with, and then the team would move forward at

20   that point based on the concerns and how the team would

21   choose to address those concerns.

22       Q    Okay.  So if you have a meeting like that, is it

23   your practice that you then don't need any input from the

24   parent?

25       A    We did get input from the Parent.

AR 2364

1011

152

1    Q    No, no, I mean subsequent to the meeting.  This is

2  our example of how typical procedure --

3         MS. MITHAIWALA:  Objection, vague as to type of

4  assessment.  Are we talking about an IF (phonetic)

5  assessment or any type of assessment?

6         MS. LOYER:  I'm talking about her assessments,

7  whatever one she conducts that she's qualified to conduct.

8         ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  So is the

9  question whether she contacts parents as part of the

10  assessment process for all of her assessments or for some of

11  them?

12         MS. LOYER:  Yes, thank you, Your Honor.

13    A    Yes, parent input is a part of the assessment

14  process.

15         MS. LOYER:  I don't have any more questions.

16         ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  All right.

17  Ms. Mithaiwala, are you ready or do you need a few minutes?

18         MS. MITHAIWALA:  I'm ready.

19                    CROSS EXAMINATION

20  BY MS. MITHAIWALA:

21    Q    Take a look, Karrie, at the black binder please.

22  And turn to tab D-48 please.  How many years have you been a

23  school psych?

24    A    This is my ninth.

25    Q    And has all of that been in Newport?

*Statewide Transcription Services*
*(916) 624-4300*

AR 2365

1012

153

1       A    Yes.

2       Q    Can you describe your educational background?

3       A    Sure.  I have a bachelor's degree from Cal State

4    Fullerton in human services.

5            ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  I'm sorry,

6    and let me just -- what exhibit was that?

7            MS. MITHAIWALA:  Forty-eight in the District's

8    binder.

9            ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  Thank you.

10   All right, you can go ahead.

11      A    Okay.  I have a bachelor's degree in human

12   services and a minor in sociology and then I also have a

13   master's degree from Azusa Pacific in education with my

14   emphasis being in school psychology, the credential, and

15   then I'm currently receiving my BCBA from Florida Institute.

16      Q    Okay.  In your nine years in working in the

17   District have you worked with autistic students primarily or

18   only?

19      A    I've worked with all different disabilities, but

20   the last eight or seven years I've been on campuses that

21   have special day classes for students with autism and

22   (inaudible) students with autism.

23           MS. CONCEICAL:  Your Honor?

24           ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  Yes.

25           MS. CONCEICAL:  Can you please ask her to slow

AR 2366

1013

154

1   down?

2          ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  Oh, yes.  So

3   could you slow down a little bit for the interpreter?

4          MS. ANDERSON:  Sure.

5          ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  Thank you.

6      Q    When you say you've been on campus with autism, I

7   didn't understand what you said.  Say it one more time,

8   sorry.

9      A    With the campuses that have special day classes

10  for students that have autism.

11     Q    Okay.

12     A    And then students that are fully included as well.

13     Q    And how much of the nine years has been working

14  with elementary-age students?

15     A    Seven.

16     Q    Taking a look in the black binder at D-43, you

17  identified this is your independent facilitator assessment

18  report, is that right?

19     A    Yes.

20     Q    What were your findings or conclusions from this

21  report?

22     A    Do you want me to paraphrase or do you want me to

23  --

24     Q    Paraphrase, yes.

25     A    Sure, okay.  Basically after the extensive

1014

155

1   observations and everything that was conducted as part of
2   this evaluation, it was determined that his current
3   programming is sufficient enough for him to continue to make
4   progress on his goals, access his educational curriculum,
5   and maintain safety at school.
6           Q    And why did you come to this conclusion?
7           A    Based on the fact that his programming is working
8   for him, he's making progress on his goals, he's able to
9   maintain a safe environment at school and he's able to fully
10  access the curriculum at school.
11          Q    Can you describe Katy's classroom as far as the
12  level of support provided to students?  Are students
13  typically worked with one-on-one or in a group setting?
14          A    She typically starts her day in a circle time so
15  you'd have -- and she concludes her day in circle time as
16  well with the large group that kind of congregate on the
17  floor around the Smart Board.  It's very interactive.
18  There's eight kids, this was of last year, there were eight
19  students in the classroom and five adults to go with the
20  students.  So it's a very small ratio of students to
21  teachers in there.  There's lots of visuals around the
22  classroom.  Students when they get broken down into their
23  centers, it's typically done two-to-one, but sometimes it
24  can be a one-on-one just depending on what they're working
25  on.

156

1     Q   And what's in place in Katy's classroom and

2 outside of her classroom, on the playground for example to

3 keep ███ safe that you observed through your observations?

4     A   The aide support and the teacher support.  There's

5 a lot of adults that are constantly moving around and

6 circulating making sure that primarily ███ but all the

7 students are safe in class and out on the playground.

8     Q   Have you conducted several -- can you put a number

9 on how many independent facilitator assessments you've

10 conducted?

11     A   Maybe 20.

12     Q   Has the outcome ever been to recommend a one-on-

13 one aide?

14     A   Yes.

15     Q   And under what circumstances did you find that to

16 be appropriate?

17     A   If the student required additional support being

18 that they had a medical issue or if a student required

19 support because they weren't making progress on their goal

20 or there was some -- they weren't able to access the

21 curriculum on some level and the current supports weren't

22 sufficient enough.

23     Q   Can you give an example of a student not being

24 able to access the curriculum?

25     A   We've had students who maybe have a medical

*Statewide Transcription Services*
*(916) 624-4300*

AR 2369

1016

157

1    disability so they weren't able to physically get over there

2    to the curriculum or to be able to physically manage some of

3    the things within the classroom, so they would have to have

4    support in terms of being able to bring them their supplies

5    or making sure that they're able to access what's going on

6    in the classrooms.

7         Q    Okay.  In providing a one-to-one support for the

8    students that you have recommended a one-to-one aide for, is

9    prompt-dependency a concern for you in making that

10   recommendation?

11        A    Definitely.  Definitely.

12        Q    Why?

13        A    Because that takes away the student's

14   independence, makes a student become dependent on those

15   within his environment or her environment.  It's difficult

16   for students to kind of be weaned off of that level of

17   support.  They become very accustomed to having someone

18   prompt them throughout their day.

19        Q    Have you heard the argument that if an aide is

20   properly ABA-trained and is implementing ABA appropriately

21   that that prompt dependency won't occur, have you heard that

22   argument?

23        A    No.

24        Q    Do you believe that argument?

25        A    No.

AR 2370

1017

158

1    Q    Why not?

2    A    Because if the aide was that stealthy, then there

3  wouldn't be a need for an aide that the student was able to

4  do it independently or with such minimal supports, then the

5  likelihood of the need for the aide would be diminished.

6         MS. LOYER:  If the aide was that what?  I didn't

7  hear.

8         MS. CONCEICAL:  Excuse me, Your Honor, I can't --

9         ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  I'm sorry?

10         MS. CONCEICAL:  I can't comprehend, I can't

11  follow.

12         ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  She's going

13  too fast.

14         MS. CONCEICAL:  Yes.

15         ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  Okay.  So can

16  you try and slow down?

17         MS. ANDERSON: Sorry.

18         MS. LOYER:  I can't follow her either.  It's the

19  background noise.

20         MS. ANDERSON:  Okay.  I'm sorry.

21         MS. LOYER:  We've got lot of background noise in

22  this side of the room.

23         ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  Do you need

24  Ms. Anderson to repeat what she just said?

25         MS. CONCEICAL:  To repeat, yes.  (Off mic).

1018

159

1   ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  All right.

2 The last question was whether or not you agreed with the

3 philosophy that if an ABA aide was properly trained, then

4 the child would not become dependent.

5   MS. ANDERSON:  Uh-huh.

6   ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  So could you

7 do your answer again please?

8   MS. ANDERSON:  Yes, I said that I haven't heard of

9 that argument and then I was asked if I agreed with that

10 based on that statement you just made.  I would say no

11 because if the student didn't require that much support and

12 there was such a minimal amount of support then the student

13 wouldn't require an aide.

14  Q Do you recall an agency called IABA coming to

15 observe in &#9608;&#9608;&#9608;&#9608; classroom?

16  A Yes.

17  Q When was that?

18  A There were two or three dates that were set up,

19 two of which they did come.  The first one was on June 7,

20 and the second one was on June 10.  And then there was a

21 third one that was set up I think for maybe the 11th and

22 there was some internal miscommunication on their part and

23 they were late for the observation and it wasn't able to be

24 completed.

25  Q And what time of the day was the June 7th

1019

160

1   observation?

2       A    That one was from 11:00 to 12:00.

3       Q    And who came to that?

4       A    It was Dr. Hernandez and then she was with a male

5   companion or colleague and I don't recall his name.

6       Q    And how about on June 10th, what time of day?

7       A    That was just Dr. Hernandez.  She was there -- she

8   came about 50 minutes late for the observation.

9       Q    Do you remember about what time it was scheduled

10  for?

11      A    That one was from 9:00 to 10:00.

12      Q    Let's talk about the first observation on June

13  7th.  What was happening in the classroom during the hour

14  that they were in there?

15      A    When they got there, ████ was in a group.  There

16  was two students and one aide in the group.  And then

17  shortly after that they got there, then it was time for his

18  toileting routine and so the aide took ████ to the bathroom

19  for about 20 minutes.  There was a whole process that kind

20  of went on in the bathroom and then when they came back he

21  returned back to the center.

22      Q    Do you recall which center it was?

23      A    I don't.

24      Q    You said the bathroom took about 20 minutes.  Did

25  you and the IABA people, Dr. Hernandez and the other male

*Statewide Transcription Services*
*(916) 624-4300*

1020

161

1    person, go in the bathroom to observe?

2        A   We were on -- like, the door was open, but we were

3    just sort of standing like right kind of in the threshold.

4        Q   Did Dr. Hernandez or her male colleague take any

5    data during that observation?

6        A   No.

7        Q   How do you know that?

8        A   I was standing next to them or sitting next to

9    them the whole time.  There were some notes that were being

10   taken.  It was very -- they had not seen ▮▮▮▮ before and

11   they had no knowledge of ▮▮▮▮  They were asking me a lot

12   of questions about him and kind of his functioning and the

13   programming that he's involved in.  It was kind of more

14   conversational.

15       Q   Did they talk to anybody besides you during that

16   observation?

17       A   Not that I recall.

18       Q   Did anything else stand out to you about that

19   observation that's particularly noteworthy that ▮▮▮▮ do

20   something totally out of the ordinary or was the staff

21   acting in a certain way that wasn't ordinary?

22       A   No, I would it was very typical.

23       Q   Did Dr. Hernandez or the male colleague that was

24   with her comment to you about the instructional strategies

25   being used or if they were appropriate or inappropriate or

1021

162

1    make any -- in their dialogue with you make any observations

2    about what they were saying?

3         A    Not to me, no.

4         Q    Okay.  Now, let's talk about the June 7th -- I

5    mean, June 10th observation.  And that was at a different

6    time-frame you said from 9:00 to 10:00.  What was going on

7    in the classroom then?

8         A    It had been arranged that she would observe a

9    speech lesson, so she observed ███ during speech therapy.

10        Q    So the entire 45 minutes was speech?

11        A    I think there was about 35 minutes of speech.

12        Q    And tell us about how that was happening, was it

13   in the classroom environment, group, individual?

14        A    It was in the classroom environment, the students

15   were broken into centers and ███ was in a center with the

16   speech pathologist.  They were working on the implementation

17   of his AAC device, they were pairing his responding and

18   requesting with the highly preferred reinforcers, food.  He

19   was requesting some crackers, bubbles.  She was trying to do

20   some verbal speech output from him, the letter B she was

21   working on.

22        Q    Did you believe what she was working on was a

23   functional -- or was it functional in any way or was she

24   just asking him to do something and expecting a response?

25        A    No, it was very functional.  He was highly

*Statewide Transcription Services*
*(916) 624-4300*

AR 2375

1022

163

1    motivated by what he was doing.  Edibles are one of his

2    primary reinforcers, and he was very engaged with the

3    bubbles as well.

4        Q    Did you see anything during the observation, that

5    45 minutes, that caused you concern about the speech and

6    language pathologist's ability to use prompt hierarchy?

7        A    No.

8        Q    Do you know what prompt hierarchy is?

9        A    Yes.

10       Q    What is it?

11       A    Just the various levels of prompting a student;

12   full prompting would be like hands-on, that would be the

13   most intrusive physical prompting all the way down to a low-

14   level prompt which would be like a signal or something along

15   those lines.

16       Q    Do you recall what type of prompting levels the

17   speech and language pathologist was using with the AAC

18   device?

19       A    No, I don't.

20       Q    And that observation only lasted the 45 minutes

21   because she was late?

22       A    Yes.

23       Q    And during that observation did Dr. Hernandez take

24   any data?

25       A    Not that I observed.  She was taking notes again,

1023

164

1    I was sitting next to her, and I didn't see any data being

2    collected.

3        Q    What's the difference between taking notes and

4    taking data in your mind?

5        A    In my mind taking notes is kind of it's more

6    transcribing what you're seeing, being able to sort of get

7    on paper some of the more pivotal things that you're seeing

8    versus I think the data that I saw was more like a

9    percentage data.

10        Q    What do you mean the data that you saw?

11        A    In the report that was provided by the company,

12    that was more percentage data, and I didn't see any -- that

13    type of data being taken.

14        Q    Did Dr. Hernandez or the male counterpart on

15    either occasion have a conversation with you specifically

16    about ▮▮▮▮▮ level or approximation of attention asking you

17    to give like a percentage of about how much time he attends?

18        A    No.

19        Q    Did Dr. Hernandez ask anyone else on that June

20    10th observation that question or something similar to that?

21        A    No.

22        Q    Did Dr. Hernandez interact with anybody in that

23    second observation besides you?

24        A    I believe that she had a brief dialogue with the

25    teacher Ms. Burns and I have thought that they were going to

*Statewide Transcription Services*
*(916) 624-4300*

165

1  try and set up a time that they could talk while she wasn't

2  teaching and I don't know that that actually occurred.

3      Q    When you say brief dialogue, about how long was

4  that?

5      A    Like three minutes maybe.

6      Q    Were you able to hear what they were talking

7  about?

8      A    It was primarily discussing if there would be a

9  time that they could get together and talk.

10     Q    And you said that follow-up with Katy didn't

11 happen or you don't know if it happened?

12     A    I don't know if it happened.

13     Q    Okay.

14     A    Yeah.

15     Q    Take a look at D-39 on page 465.  The middle

16 paragraph on that page that starts "Ms. Cottrell," at the

17 very end of that first line your name appears there "Ms.

18 Anderson."  It says "Ms. Anderson asked what the Parents or

19 staff consider the behaviors to be."  Why did you ask that

20 question in this IEP meeting?

21     A    This was in regards to Dr. Franke's recommendation

22 to do an FBA.  The staff was reporting that the behaviors

23 that were observed in the 2011 report were no longer being

24 observed in the classroom and so there was a long and

25 intensive conversation surrounding an FBA.  And I was

AR 2378

1025

166

1  unclear as to what behaviors then we would be addressing in

2  an FBA being that the behaviors that were spoken about in

3  2011 weren't occurring at a rate either high enough that

4  they would be impeding his education or weren't occurring at

5  all.

6       Q   And did you get a response to that?

7       A   Yes.

8       Q   What was the response?

9       A   There were targets that were identified primarily

10 by both Mister and Mrs. Fulsang.  I believe their -- one was

11 aggression, one was the chin pushing and tapping were the

12 chief targets.

13      Q   Did you ask this question because thought you

14 would be conducting the FBA?

15      A   Yes.

16      Q   Or were you asking it just on behalf of the team?

17      A   At the time I felt that I would be conducting the

18 FBA.

19      Q   Why didn't you ultimately conduct the FBA?

20      A   I had been out on medical leave at the time and so

21 when I came back from medical leave we had the two

22 assessment plans that were signed for both the FBA and the

23 IF and I think internally we felt that it would be better if

24 we could split that up because they are both pretty labor-

25 intensive reports and all the things that go into them.

1026

172

1  IEP notes on page 465 where I believe opposing counsel

2  indicated the sentence "Ms. Anderson asked what the Parents

3  or staff consider behaviors to be," is it your testimony

4  that at that meeting the target behaviors were decided as

5  tapping, chin pushing, and aggression, at that meeting?

6      A    Yes.

7      Q    Is that reflected anywhere in these notes?

8           ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  What exhibit

9  are you on please?

10          MS. LOYER:  I'm sorry?

11          ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  What exhibit?

12          MS. LOYER:  It's District Exhibit 39 page 465.

13          ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  Okay.

14     A    I don't see them.

15     Q    Now, with regard to the observation when the IABA

16  staff was there, you mentioned that ▓▓▓ was -- or excuse

17  me, you mentioned that what they observed was kind of

18  typical.  Is it typical for him to spend 20 minutes in the

19  restroom?

20     A    At that time it was, yes.

21     Q    And why was that?

22     A    The group, they were reestablishing his

23  programming for toileting.  He had had some pretty severe

24  setbacks in that area and part of the programming was to

25  make the toilet seem less aversive for him so they were

1027

1

**OFFICE OF ADMINISTRATIVE HEARINGS**

**SPECIAL EDUCATION DIVISION**

**STATE OF CALIFORNIA**

| | | |
|---|---|---|
| In the Matter of: | ) | |
| | ) | |
| PARENTS ON BEHALF OF | ) | OAH Case No. 2012050785 |
| STUDENT, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| NEWPORT-MESA UNIFIED | ) | |
| SCHOOL DISTRICT | ) | |
| | ) | |

October 23, 2013

Newport-Mesa USD Offices
Costa Mesa, CA

      The above-entitled matter came on for hearing
pursuant to notice,

          BEFORE:   DARRELL LEPKOWSKY
                        Administrative Law Judge

Official Transcriber:  Kelli Wells

AR 2410

1028

2

## **A P P E A R A N C E S**

On Behalf of Student:

Kathleen M. Loyer, Attorney
Parents

On Behalf of District:

Alefia Mithaiwala, Attorney
Maureen Cottrell, Special Ed Director

AR 2411

1029

3

## I N D E X

**WITNESSES**                                                          **Page**

**For Student:**

Katherine Burns
    Redirect Examination by Ms. Loyer                                    19
    Recross Examination by Ms. Mithaiwala                                22

**For District:**

Donna Manea
    Direct Examination by Ms. Mithaiwala                                 41
    Cross Examination by Ms. Loyer                                       69
Jennie Ni
    Direct Examination by Ms. Mithaiwala                                 81
    Cross Examination by Ms. Loyer                                      120
    Redirect Examination by Ms. Mithaiwala                             132
Eby Kent
    Direct Examination by Ms. Mithaiwala                               142
    Cross Examination by Ms. Loyer                                     163
Lucinda Bottorf
    Direct Examination by Ms. Mithaiwala                               176
    Cross Examination by Ms. Loyer                                     194

**Adjournment**                                                         201

**Certification of Transcript**                                         202

AR 2412

1030

103

1   service anymore.

2        Q     Why is that?

3        A     Just due to the way the classrooms are set up

4   there are a lot of sensory opportunities in the classroom

5   and the real weakness with ████ was his under reactivity.

6   So we wanted to provide things for him in the classroom that

7   would kind of alert him and wake him up.  So we provided

8   those things in the classroom for him.

9        Q     In the IEP that you testified about, that is at

10  Exhibit 1, it's the 2010 IEP; there were some sensory goals

11  specifically.  And then on page 243 here you say, he doesn't

12  require direct services it's addressed in the curriculum,

13  can you help me understand --

14       A     What that means?

15       Q     What that means and why the change in approach?

16       A     So the sensory processing goals that he had were

17  more geared towards his motor planning, so like the visual

18  attention with him throwing the bean bag was also to address

19  his motor planning.  That area was a strength for him.  He

20  was good at his motor coordination his climbing, those types

21  of things.  And so that area of sensory processing was a

22  strength for him.  But we wanted to move more towards just

23  what he needed in the classroom and those are just

24  strategies that he needs to be able to participate and he

25  will -- and this is ████    He will most likely be like

AR 2512

1031

104

1   this.

2       Q    What do you mean?

3       A    So this is sort of his profile.  His sensory

4   processing isn't going to change.

5       Q    Okay.  And why do you say that?

6       A    So you know, if you would look at a child with

7   autism, usually they do have sensory processing deficits in

8   multiple areas and those will remain.  So you can use

9   strategies to kind of help him in the classroom, which is

10  what we were focusing on.

11      Q    What I understand, you just be saying is that,

12  well, I don't want to put words in your mouth, can you

13  clarify what do you mean by, they won't change?

14      A    Well there is no fix for it, that's just his

15  neurological make up.

16      Q    So what then is the purpose of say for example a

17  sensory diet?

18      A    So sensory diet are strategies that you would use

19  in the classroom.

20      Q    For what?

21      A    To help him attend better or to help him organize.

22      Q    So use of the sensory diet is not going to

23  eliminate his sensory deficits?

24      A    No.

25      Q    Okay.  Take a look at Exhibit D-19.  Actually

1032

105

1    before we go there, a couple of questions about the

2    differences in the OT approach or your approach between when

3    he was here at Harper, in Donna's classroom versus when he

4    moved in the 2010/'11 school year to Lila's classroom at

5    Mariner's.  How did your approach change if at all?

6         A    We definitely did less clinic when he was at

7    Mariner's.  He still received the group, the classroom

8    group, where they came over to the Harper Clinic.  The focus

9    at Mariner's became really participating in the classroom.

10   So his occupational therapy sessions occurred in the

11   classroom, working on the fine motor skills.

12        Q    And why wasn't that the approach when he was here

13   at Harper?

14        A    So at that point, we did have goals that were

15   associated with the clinic.  So those goals were worked on

16   in the clinic.  I also did work in the classroom though with

17   ██████ with regards to fine motor.

18        Q    Is there any research or guidance from -- I think

19   it was National -- NCBOT (phonetic).  Is there any guidance

20   or research that sort of guides the way that you approach

21   pre-school and elementary aged students in the service

22   model?

23        A    So right now, the recommendations are really to be

24   very collaborative with teachers, to work in the classrooms

25   since that's where the students need the skills.

*Statewide Transcription Services*
*(916) 624-4300*

**AR 2514**

1033

106

1    Q    And who has made those recommendations?

2    A    So this is the American Occupational Therapy

3    Association.  So those are the best practices.

4    Q    Okay.  Look at D-19 now.  Have you seen this

5    document before?

6    A    Yes.

7    Q    And what is it?

8    A    So this is ███████ IEP for his 2011 year.

9    Q    Were you still his OT at this point?

10   A    Yes.

11   Q    On page 281, did you attend this meeting?

12   A    Yes.

13   Q    If you could flip to page 270 for me.  Did you

14   write this goal for ███████

15   A    Yes.

16   Q    And what was its purpose?

17   A    It was really to have him participate in the

18   classroom and visually attend while he was doing it.

19   Q    Okay.  Is this the continuation of the goal you

20   have written prior on page 269?

21   A    Yes.

22   Q    So at this time, had he made a lot of progress

23   with respect to the visual attention goal?

24   A    He had not met the goal yet.  So he would usually

25   be attending for three to five seconds at a time when he was

107

1   doing our projects in the classroom.  So we wanted to
2   increase that.
3       Q    Going from three to five seconds to eight seconds
4   seems minimal.  Why did you write it to only eight seconds?
5       A    Well he was just having a hard time attending in
6   general.  So we didn't want to make it not-obtainable.  We
7   wanted to work on it slowly so that it was obtainable for
8   him.
9       Q    And what strategies did you utilize to help him
10  meet this goal?
11      A    We used like his token board, you know, visual
12  prompts.  We made sure that while he was working on projects
13  that his arousal level was good, so he would usually be
14  sitting on a T-Stool.
15      Q    What's a T-Stool?
16      A    So it's just a chair that's made out of wood or
17  something that looks like a "T," so they just sit on it, so
18  they have to balance on it.
19      Q    And what does that have to do with his arousal
20  levels?
21      A    It kind of makes him, just his body more alert
22  because he is having to use his body to sit instead of being
23  more passive.
24      Q    Did parents have any questions or concerns about
25  this goal or any concerns about why you are only increasing

AR 2516

1035

108

1    it to eight seconds?

2        A    Not that I remember.

3        Q    Take a look at the goals on page 271.  Did you

4    write the progress on those goals?

5        A    Yes.

6        Q    Okay.  Do you have reason to believe that what

7    you've written there is inaccurate?

8        A    No.

9        Q    Okay.  Tell me, I know you've addressed it already

10   a little bit but tell me a little bit more about why it says

11   area of need, sensory processing and then it says, goals

12   needed, addressed in curriculum, what is meant by this?

13       A    So we were moving his sensory processing to the

14   classroom because he needed more strategies in the classroom

15   to help him function.  So those were the strategies like the

16   T-Stool, like bouncing on the therapy ball within the

17   classroom, so that we were really working more on the

18   alerting piece in the classroom because that's also where a

19   child is, he's not in the therapy clinic.  Their day occurs

20   in the classroom.  So we want to make sure that that's where

21   he functions and that's where the services are.

22       Q    Why didn't you write a sensory diet for him at

23   this point?

24       A    We had already included these things in the

25   classroom.  So I mean it was just part of his classroom

AR 2517

1036

109

1   routine already.

2       Q    Did you implement occupational or did you

3   recommend OT services to help support the goals you

4   developed in this IEP meeting?

5       A    Yes.

6       Q    Take a look at page 248 to refresh your memory.

7   What were the service recommendations you made?

8       A    So I recommended 30 minute group session and then

9   an individual consult once every month.

10      Q    It appears that these service levels were

11  decreased from the year prior is that accurate?

12      A    Yes.

13      Q    Why?

14      A    So we decreased those goals really just to focus

15  on visual attention and visual attention is worked on in the

16  classroom on -- every day, on a daily basis.  And the

17  consults was really to address that -- the sensory need, so

18  to make sure that there were strategies provided in there

19  for him.

20      Q    Did Parents consent to the OT services you

21  recommended at this IEP meeting?

22      A    Yes.

23      Q    Take look at page -- I am sorry, tab D-30.  Have

24  you seen this document before?

25      A    Yes.

1037

131

1    who were specifically working on sensory integration skills

2    where we need the large equipment.

3           ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  Is there

4    anything about ▆▆▆▆ profile with regard to his particular

5    needs in OT that would merit him going to this clinic?

6           MS. NI:  Not at this point.

7           ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  And why do

8    you say that?

9           MS. NI:  Because due to his profile, his sensory

10   processing needs will not necessarily change.  You can add

11   strategies in there like we've done, like the wiggle cushion

12   or the T-Stool to kind of help him function in the

13   classroom.  But you know, his sensory systems are not going

14   to change neurologically.

15          ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  What type of

16   sensory equipment or sensory manipulatives were in ▆▆▆▆

17   classroom at the time you were giving him services?

18          MS. NI:  So in the classroom they would typically

19   have like a trampoline, a therapy ball, T-Stools, wiggle

20   cushions and then they would have other manipulatives like

21   Theraputty and other sensory things like shaving cream and

22   then, you know, typical things that you would see in the

23   preschool classroom.

24          ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  And were

25   these things all used with every child in the class?

1038

132

```
1            MS. NI:  So they were available to every child.
2    If there were specific needs for an individual child then we
3    would let the teacher know, you know, when to use certain
4    things for a certain child.
5            ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  So in ▮▮▮▮
6    case did you ever have a discussion with his teachers about
7    the use of any of these things you mentioned?
8            MS. NI:  Yes.
9            ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  And what was
10   the nature of that discussion?
11           MS. NI:  So we discussed the use of the T-Stool
12   specifically during centers.
13           ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  And any other
14   things that you mentioned?
15           MS. NI:  And, you know, ▮▮▮▮ enjoyed like therapy
16   ball and the trampoline.  So when they would see that, you
17   know, he needed kind of a break or his alertness level was a
18   little low that they would, you know, use those types of
19   things in the classroom.
20           ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  Right.
21   That's all I have.  Ms. Mithaiwala?
22                    REDIRECT EXAMINATION
23   BY MS. MITHAIWALA:
24       Q    Jennie, you testified a little bit earlier when
25   Ms. Loyer was asking you questions that her question was
```

*Statewide Transcription Services*
*(916) 624-4300*

**AR 2541**

1039

145

```
 1  sometimes we see a different child at school than we do at
 2  home.  So it gives us information across settings.
 3           I did observations both in the classroom as well
 4  as on the playground.  And then I administered standardized
 5  assessments, the ones that I participated in or the ABAS
 6  which is an adaptive functioning assessment.  Our team
 7  filled out the childhood autism rating skill together to
 8  look at the autistic-like characteristics.  We filled out
 9  the developmental assessment of young children based on both
10  observations from our team as well as Parent input.  And the
11  last one that I administered was the Mullen Scales of Early
12  Learning.  Both the Mullen and the DAYC give us information
13  about his cognitive functioning as well as other areas of
14  functioning.
15      Q    Okay.  On page 203, the health and development
16  tool history, can you tell us who prepared that and why?
17      A    The school nurse Denise Ellis prepares that.  It's
18  part of a multi-disciplinary assessment.  We have to rule
19  out that there is not medical information that could be
20  impacting the Student.
21      Q    And you testified that you conducted some
22  observations.  I think you said classroom and recess?
23      A    Yes.
24      Q    How many different observations total did you do?
25      A    I did three observations and I also observed him
```

AR 2554

1040

146

1    in the testing setting, so that would count as four.

2        Q    On page 204, at the bottom of that observation, it

3    says 10/11 ████ was given reinforcement time after earning

4    five tokens.  Can you explain what you saw with respect to

5    reinforcement and use of tokens?  And this was Leah's

6    classroom?

7        A    Yes.

8        Q    Can you explain what you saw with respect to that?

9        A    Sure.  As far as reinforcement goes, ████ had his

10   own token more that he was working off so.  So he would get

11   tokens on his board and token out have a reinforcement time.

12   There was also a lot of verbal reinforcement going on as

13   well as reinforcement with their face -- smiles, thumbs up,

14   those type of things.  But the token board was very concrete

15   way of reinforcing him or choosing to understand.

16       Q    Okay.  I see throughout the observations there is

17   a lot of plusses and minuses in terms of those.  Can you

18   explain what those are?

19       A    Sure.  Whenever a task was given or he was asked

20   to imitate, the plus would indicate that he did what they

21   were asking.  If there was a minus, that indicated that he

22   wasn't compliant with what the request was.  If there was a

23   P and a plus or a negative P and a plus, the P signifies

24   that there was a prompt given.  So if there was only a plus,

25   he did that without any additional prompts.

AR 2555

1041

147

1    Q    And there were two or three observations in the
2  classroom and recess environments.  What did you notice as
3  far his level of compliance with or without prompts or both
4  with prompts and without prompts?
5    A    He was very compliant for imitation.  So if they
6  asked him do this and they modeled it, he did well with that
7  or he did well when there was a visual queue given.  When it
8  was purely auditory request, he usually needed a prompt with
9  that.
10   Q    And what kind of prompting did you see going on in
11 the classroom?
12   A    Gestural, visual as well as some physical.
13   Q    Do you have a recollection of which types of tasks
14 required that more intensive physical prompting?
15   A    It was ones that usually didn't have a visual.  It
16 wasn't an imitation, it was more of show me a body part and
17 he wasn't able to do that.
18   Q    Was he not given a visual a lot in the classroom
19 or were visuals present throughout?
20   A    No.  I think there -- sorry for interrupting.  I
21 think there were visuals given, but there were some tasks
22 that they were trying to get him to that next level on and
23 have him to start showing his skills.
24   Q    You mean start showing his skills without the
25 addition of the visual prompts?

AR 2556

1042

148

1     A    Yes.

2     Q    Okay.  After your observations in the classroom,

3 did you notice any significant behaviors that you thought

4 impeded his learning?

5     A    In one of my observations, he had pinched a child

6 and was able to keep moving.

7     Q    I am sorry, who was keep -- ███ kept moving or

8 the other child?

9     A    He was able to continue with lesson.

10    Q    Okay.

11    A    Another time he did have to be taken to a separate

12 area to calm down and it took him about 20 minutes before he

13 was able to rejoin the group.  He was given many

14 opportunities, but I think those behaviors without

15 reinforcement could impede not staying calm.

16    Q    Take a look at page 206 and 207.  Can you tell me

17 about what information you learned with the Parent

18 interview?  Was it both Parents or just one?

19    A    I believe his Mom.

20    Q    Okay.  What did you learn from Mom?

21    A    I learned -- let me kind of glance over it for a

22 minute.

23    Q    Sure.

24    A    We talked a little bit about the home program.

25 She felt like it was a good place for him right now.  As far

AR 2557

1043

149

1  as self help goes, he was doing a lot of -- the bathroom

2  schedules are getting addressed when there was the

3  opportunity.  I know she has other children at home and she

4  said sometimes it's me and don't give him the opportunity to

5  get dressed himself.  So she thought that had some impact on

6  it.  He was able to eat with a fork, he was able to put his

7  dish by the sink, kind of self-help skills.

8          As far as play, I learned that he was interested

9  in his baby sisters' toys, that he was able to do some

10 simple imitation similar to what we were seeing in the

11 classroom.  Ms. Fulsang had said about eye contact that he

12 gave her good eye contact but didn't always exhibit that

13 with everyone.

14         Sometimes he was under-sensitive to things that

15 might be painful, the hot water running.  He had sensitivity

16 to sounds but he had made progress with that where he would

17 sometimes cover his ears or leave the room before his

18 reaction was much more severe.  He had been a picky eater,

19 but seemed to be getting less picky.

20         About schedules, he had a schedule that he

21 followed in the morning but he didn't overreact if the

22 schedule was interrupted.

23     Q    Okay.  Let's move to page 208.

24     A    Okay.

25     Q    As part of your assessment, I see that you have

**AR 2558**

1044

150

1    listed previous testing results.  Can you tell us about

2    those?

3        A    Sure.  It's testing from 2008 and 2009.  The DAYC

4    was administered twice, both were similar results following

5    the 16-month (inaudible) showing cognitive delay.  The

6    trans-disciplinary play-based assessment, it's just that

7    it's play-based assessment which also showed delays in the

8    cognitive areas of development.

9        Q    Okay.  And moving to your current testing results,

10   can you tell us about the Mullen and what its purpose is?

11       A    Absolutely.  The Mullen is a scale for young

12   children up to the age of 68 to give information about their

13   cognitive functioning.

14       Q    I sorry, you said age 68?

15       A    To age 68 months.

16       Q    Okay.

17       A    Sorry, clarification.  Birth to 68 months.

18       Q    Okay.  And I missed what you said after that

19   because I was focused on the 68.

20       A    Sixty-eight, knock that off.  It's to measure

21   their cognitive functioning.

22       Q    Did you administer the whole test for the Mullen

23   or just did some tests?

24       A    I actually gave all of them in this case, visual

25   receptor, fine motor, receptive language as well as

AR 2559

1045

151

1   expressive language.

2       Q    Okay.  And did you administer the most recent

3   version of the test available at that time?

4       A    Yes.

5       Q    Did you administer the test according to its

6   instruction so that you got accurate results?

7       A    Yes.

8       Q    Did you get a standardized score on this

9   assessment?

10      A    I did.

11      Q    And what was that?

12      A    A standard score of 49.

13      Q    What does that mean?

14      A    A score of 49 on this test fell within the very

15  low range of functioning.

16      Q    Other than a number of 49 and the descriptive

17  category of very low, what did this assessment tell you

18  about ████    and his needs?

19      A    If you look at the individual sub-skills, it will

20  give you information about the age equivalent.  And I think

21  that's more realistic to look at because you can compare

22  that to his chronological age.  So at this time I think he

23  was about 58 months.  So you will see if you look at the age

24  equivalent for the sub-skills, there are significant delays

25  in all areas.

152

1     Q    Is there any reason to believe that this

2  assessment was racially, culturally or sexually

3  discriminatory for ▓▓▓▓▓

4     A    No.

5     Q    Do you have a reason to believe that about any of

6  the assessments you administered?

7     A    No.

8     Q    Okay.  Take a look at page 210, the DAYC.  Can you

9  tell us about the purpose of this assessment?

10    A    Sure.  Again, it gives an idea about the cognitive

11 levels.  It's given from birth to 5 years 11 months.

12    Q    Why did you administer a second cognitive

13 assessment?

14    A    I usually try for all the children I test to give

15 two cognitive assessment so I can get an accurate picture of

16 the way they are functioning.  I also like this one because

17 it gives you some flexibility with administration.  So the

18 manual states that you can get information from a variety of

19 sources as well as through direct observation.

20    Q    Okay.  And did you administer the most recent

21 version of this test at the time?

22    A    Yes.

23    Q    And did you administer it according to the

24 instructions so that you could get a standardized score?

25    A    I administered it with information.  What I

*Statewide Transcription Services*
*(916) 624-4300*

153

1   reported in this is that some of the information that gave

2   us the score was only reported from the Parent, things that

3   we did not see in the classroom.

4        Q    And why is that significant to note?

5        A    Because usually we'll see -- we want to see things

6   across the setting to say that it is an established skill.

7        Q    Okay.  And what did this assessment tell you about

8   ███████

9        A    That there are significant delays in his cognitive

10  ability.

11       Q    Did you find it to be commensurate with the Mullen

12  or different in any respect?

13       A    Very commensurate.  Looking at either the standard

14  score compared to the early learning composite on the Mullen

15  or looking at the age equivalent to the age equivalence on

16  the sub-skills.

17       Q    Looking back at the administration that it appears

18  ACES, administer the DAYC in 2008, it appears that his

19  standard score went down -- I am sorry, not the ACES one but

20  the 2009 administration of the DAYC by Newport-Mesa, it

21  appears that his standard score went down.  Can you explain

22  from an expert school psychologist opinion why you think

23  that might have happened?

24       A    Absolutely.  What did happen is we compare him to

25  his age, same-aged peers.  So, when he was compared in 2009,

AR 2562

1048

154

1  he was compared to other children of his same age. When he

2  is compared currently in this 2011 report, he did require to

3  do more skills. If you look at the RASS scores that we got,

4  in 2009 he got a RASS score of 23 and when I re-administered

5  in 2011, he got a RASS score of 28. So he actually did

6  increase in his skills, he had a higher RASS score. But

7  when we compared him to the natural growth of other

8  children, then we see a discrepancy there.

9      Q    Okay. I can also see that the age equivalency

10  went up though even though the standard score went down in

11  2009 to 2011, age equivalency went up. How does that relate

12  to the standard score going down?

13     A    Well, part of it is because once you hit bottom

14  standard score, it kind of stops and it lumps everything in

15  there. It doesn't further give different months. So you

16  will see that the standard score isn't one number, it's less

17  than 50. So anything under there would have been the 21-

18  month range. Does that make sense?

19     Q    It does.

20     A    Okay.

21     Q    Why is it less than 50? Does the DAYC not have

22  scores under 50 like individual number numerical scores?

23     A    Without looking at the menu I believe once you hit

24  that mark and under, it's all less than 50 for a standard

25  score.

1049

155

1    Q    Okay.  Take a look at page 212.

2    A    Okay.

3    Q    Tells us about the ABAS' purpose.

4    A    The purpose of the ABAS is to get an understanding

5    of ▇▇▇▇▇ adaptive functioning skills.

6    Q    Are these scales or questionnaires or --

7    A    It's a questionnaire and this is actually one that

8    Ms. Fulsang filled out and it looks at a variety of areas.

9    Q    Did you administer the most recent version of this

10   test at the time?

11   A    Yes.

12   Q    And did you administer it according to

13   instructions to get accurate information?

14   A    I had Ms. Fulsang fill it out and then we talked

15   about any things that need to be clarified in our interview.

16   Q    Is that allowed per the testing manual?

17   A    Yes.

18   Q    And what did this assessment tell you about ▇▇▇▇▇

19   A    The assessment indicated that his adaptive skills

20   were significantly below his peers and commensurate with his

21   cognitive level.

22   Q    Looking at page 211, when it was -- the same

23   assessment was administered in 2009 and compared to what it

24   was administered in 2011, what do you see?

25   A    Again, you'll see the same thing that we saw with

AR 2564

1050

156

1  the cognitive, his scores appear to have gone down.  This is

2  because he is compared to same-aged peers and what he should

3  -- the skills he should have acquired over the last few

4  years.  Nevertheless, they both fall in the same

5  classification range of extremely low.

6      Q    Do you know if during his initial assessment if

7  the eligibility category of intellectually disabled was

8  given to ▮▮▮▮ as part of his IEP process?

9      A    It was analyzed, but they said that it needs to be

10  monitored after he had consistent research-based

11  interventions.

12      Q    Were you part of that assessment team?

13      A    The initial one, no.

14      Q    Okay.  And why didn't they just give him the ID

15  diagnosis at that time?

16      A    When we have children come in young that had not

17  necessarily been in our program with constant learning

18  strategies, interventions, reinforcement systems, we really

19  want to be cautious with providing them with that

20  eligibility category because it is a significant one and we

21  want to see how they -- once we get their behaviors under

22  control if there are any, how they are able to learn and if

23  they start to take off in their learning potential.

24      Q    Okay.  On page 235, what is the GARS, what is its

25  purpose?

184

1    A   From a field of thee familiar objects across five

2  total objects, ▮▮▮▮ would be directed to show me what where

3  is and he would need to reach --

4    Q   Can you give us an example of how Melissa

5  implemented this goal with ▮▮▮▮ What was the materials in

6  front of her, what would she do to work on this goal?

7    A   Well, this goal is one that was implemented

8  throughout his day in the classroom by both Melissa as well

9  as his special education teacher, so that as a specific

10  situation came up, for example if we was doing an art

11  activity and there was a paintbrush, paint, a cup for the

12  paint to be poured into, then the teacher would say, you

13  know, get the cup, get the paint, take data, help establish

14  that he is matching those semantic labels.  It was always

15  important to have those objects be real to the activities

16  that were going on in the classroom.

17    Q   And take a look at goal number two on page 16.

18  What was the purpose of this goal?

19    A   At the time, ▮▮▮▮ had learned to use picture

20  symbols to make requests, most often during snack and other

21  eating activities.  Those were preferred activities for him

22  and so he had learned to make requests using these picture

23  icons in those settings.  The goal was to expand his

24  understanding of photos beyond just the specific food items

25  that were preferred so that he would be able to begin to

AR 2593

1052

185

1    make requests of toys, people and actions.

2        Q    And walk us through how this goal would be worked

3    on with ████

4        A    Very similarly to the objects where he has given

5    options of pictures to make choices and make requests of

6    things to do during his day in the classroom when there was

7    a time for him to make a choice, so that he could choose

8    between a puzzle, a book, and let's say a ball for a free

9    time choice activity, then he could use a picture to make

10   that choice.

11       Q    Was the purpose of this goal to be independent

12   with his skill or use prompts?

13       A    The ultimate goal is always for independence.

14       Q    Take a look at page 17.  What was the purpose of

15   this goal?

16       A    The purpose was to start with his baseline where

17   he was able to handle -- hand a single picture, begin to

18   think about combining ideas and combining picture symbols

19   into what foundation we might become a sentence so that he

20   is putting two pictures together for something.  Maybe he is

21   all done with an activity, he was more of something, so that

22   he is starting to learn that two ideas can be combined

23   together symbolically.

24       Q    And why was this important for ████

25       A    Taking his baseline of just making a choice for

*Statewide Transcription Services*
*(916) 624-4300*

AR 2594

1053

1

### OFFICE OF ADMINISTRATIVE HEARINGS

### SPECIAL EDUCATION DIVISION

### STATE OF CALIFORNIA

| | |
|---|---|
| In the Matter of: )<br>)<br>PARENTS ON BEHALF OF )<br>STUDENT, )<br>)<br>v. )<br>)<br>NEWPORT-MESA UNIFIED )<br>SCHOOL DISTRICT )<br>_____ ) | OAH Case No. 2012050785 |

October 24, 2013

Newport-Mesa USD Offices
Costa Mesa, CA

     The above-entitled matter came on for hearing
pursuant to notice,

        BEFORE:   DARRELL LEPKOWSKY
                   Administrative Law Judge

Official Transcriber:  Kelli Wells

AR 2612

1054

2

**A P P E A R A N C E S**

On Behalf of Student:

Kathleen M. Loyer, Attorney
Parents

On Behalf of District:

Alefia Mithaiwala, Attorney
Maureen Cottrell, Special Ed Director

AR 2613

1055

3

# I N D E X

**WITNESSES**           <u>Page</u>

**For Student:**

Aneida Fulsang
    Direct Examination by Ms. Loyer      82
Eric Fulsang
    Direct Examination by Ms. Loyer      85

**For District:**

Bonnie Hinton
    Direct Examination by Ms. Mithaiwala      8
    Cross Examination by Ms. Loyer      54
    Redirect Examination by Ms. Mithaiwala      65
    Recross Examination by Ms. Loyer      67
Maureen Cottrell
    Direct Examination by Ms. Mithaiwala      102
Tammy White
    Direct Examination by Ms. Mithaiwala      127
    Cross Examination by Ms. Loyer      130

**Adjournment**      134

**Certification of Transcript**      135

*Statewide Transcription Services*
*(916)624-4300*

**AR 2614**

1056

9

1    Q    And turn to Exhibit 55, please.

2    A    Okay.

3    Q    Have you seen this document before?

4    A    Yes.

5    Q    What is it?

6    A    It is my résumé.

7    Q    And then did you prepare it?

8    A    I did.

9    Q    Can you tell us about your educational background?

10   A    Sure.  So I have a master's of science from

11   California State, Long Beach, in special education, as well

12   as my Bachelor of Arts from Long Beach in liberal studies.

13   I am also a board-certified behavior analyst and have done

14   the coursework necessary for that.  I have a certificate as

15   well.

16   Q    What is the California II education specialist

17   instruction credential?

18   A    So that is also a teaching credential in the state

19   of California especially for special education.

20   Q    Okay.  Can you tell us what your current position

21   is?

22   A    Yes.  Currently I'm an autism specialist at

23   Newport-Mesa.  And I've been since 2009.

24   Q    And what do you do as an autism specialist?

25   A    My role is to consult with teachers,

10

1    psychologists, instructional assistants, any staff working

2    with children with autism and to really provide consultation

3    and training on ABA methodologies.  I also often am a

4    facilitator in IEPs.  I assist with writing IEP goals as

5    necessary and may also assist with the assessment process of

6    students with autism.

7             INTERPRETER:  Excuse me, (off mic.)

8             ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  Sure --

9             MS. HINTON:  Oh sure.  Sorry.

10            ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  We're

11   translating for Mrs. Fulsang.

12            MS. HINTON:  Sure, of course.  Yeah, sorry.

13            MS. MITHAIWALA:  Do you need her to repeat any of

14   that?

15            INTERPRETER:  After reading the goals in the IEP

16   meeting --

17            MS. HINTON:  So I may participate in writing and

18   developing IEP goals.  I also make may participate in

19   assessments that are done on students with autism throughout

20   the District.

21    Q    What did you do immediately prior to being an

22   autism specialist in Newport?

23    A    Before coming here to Newport I worked in Cyprus

24   School District.  I was a classroom teacher for an autism-

25   specific ABA classroom, grades --- around grades two through

AR 2621

1058

11

1    four.

2         Q    Okay.  And how long did you do that?

3         A    From 2005 to 2009.

4         Q    Okay.  And how about right prior to that?

5         A    Prior to becoming a teacher I worked for the

6    Greater Anaheim SELPA as an in-home behavior therapist.  I

7    will -- I worked in the home providing ABA services and I

8    also provided shadowing or aid services in the schools as

9    well for students with autism.

10        Q    Okay.  At what point in that process did you get

11   your BCBA?

12        A    I received my BCBA a year ago, last September.  So

13   in my role as an autism specialist I started the coursework

14   and received it a year ago.

15        Q    Okay.  On pages 568 through 572 I see quite a few

16   trainings.  Can you tell us about, you know, why you've had

17   so many trainings and is that part of your job description

18   as an autism specialist or -- yeah.

19        A    Okay.  The first section of that -- so I guess 568

20   through the middle of 571 are the trainings that I've

21   attended.  I've attended them throughout the years of my

22   career working as -- a person working with students with

23   autism, not necessarily required by my job, but I've been

24   given the opportunity through my employment to attend these

25   trainings.

12

```
 1          And also as a BCBA we're required to keep up with
 2  the latest research and knowledge in the field of autism and
 3  ABA.  And so these trainings have allowed me to stay
 4  current.  On the following -- pages 571 through 572 are the
 5  trainings I've actually given myself and those were done --
 6  most of them were done here in my appointment with Newport-
 7  Mesa but also prior to coming to Newport-Mesa I conducted a
 8  few trainings as well for staff on autism, behavior, social
 9  skills, a variety of topics.
10      Q    Okay.  I see quite a few of the trainings that
11  you've been to -- by Autism Partnership.  Is there a reason
12  that so much of the training you've had is through Autism
13  Partnership?
14      A    Prior to coming to Newport-Mesa I was in -- I did
15  have a relationship with Autism Partnership through my other
16  District.  We received consultation from their staff in our
17  classrooms.  And so through that consultation I learned of
18  the opportunity to receive training -- further training from
19  them.  Newport-Mesa has a very strong and long relationship
20  with Autism Partnership.
21          And so with the consultant that we work with
22  directly, he -- it keeps us up-to-date with the trainings
23  that Autism Partnership is making available so that we can
24  attend.
25      Q    You mentioned a strong and long partnership with
```

22

1    Q    And what were the components of Dr. DelPizzo's

2    FBA?

3    A    She first identified target behaviors to -- for

4    further assessment.  She then included some data -- had some

5    data-collection procedures in place in order to look closely

6    at those behaviors, when they were occurring, why

7    potentially they were occurring.  Based on that information

8    she hypothesized functions of those target behaviors and

9    then made recommendations to address the functions and

10   alleviate the problem behaviors that were targeted.

11   Q    Are you -- in your training as BCBA or otherwise

12   in your master's degree and whatnot, are you familiar with

13   what an FBA should look like as far, as you know, important

14   components?

15   A    Yes.

16   Q    On page 474, the evaluation format.

17   A    Uh-huh.

18   Q    Can you go through each one of those bullet points

19   and describe what those are and whether, in your mind,

20   that's an important component of an FBA?

21   A    Sure.  So the first component is the teacher

22   interview.  So that would likely look like a set of

23   questions to the person who is experiencing the behavior and

24   seeing the behavior the most often.  And likely she would

25   ask questions about how often it's occurring, under what

23

1    conditions the behavior is occurring.

2         And then probably also get information about his

3    current programming if he is using any reinforcement

4    systems, what he enjoys in terms of reinforcers and what

5    he's willing to work for, what motivates him.  And that

6    would be considered an indirect assessment tool as part of

7    the FBA process.

8         Q    What do you mean "indirect assessment tool"?

9         A    Meaning that it isn't -- it's secondhand

10   information.  It's not based off of direct observation or

11   data, but it's information gathered from the people who are

12   most in contact with the behavior and the student.

13        Q    Okay.  What is the next component?

14        A    Descriptive assessment tools -- when I read that I

15   refer to the data.  And Dr. DelPizzo used ABC data recording

16   for the purpose of this report.  And basically what that --

17        Q    Can you describe what ABC --

18        A    Uh-huh.

19        Q    What is that?

20        A    So ABC data looks at the "A" which is the

21   antecedent or what occurs right before a behavior occurs,

22   the "B" which is the behavior itself, and the "C" which is

23   the consequence or the events that occurred right after the

24   behavior --

25        Q    Okay.

24

1     A    -- took place.  And so by using that tool Dr.

2  DelPizzo was able to draw conclusions about patterns of when

3  and under what conditions the behavior was occurring.

4     Q    Can you show us where in her report that pieces --

5     A    It's in a few places.  It looks like it starts on

6  page 476 and 477.  And that is in relation to the pushing-

7  palm-to-chin behavior.  On page 479 through 480 there's

8  another data chart and that data is in relation to the

9  tapping behavior.  And then on page 481 through 482 there's

10  another data chart and that is in relation to the aggression

11  behavior.

12     Q    Okay.  So I just want to make sure I understand.

13  The descriptive assessment tools is essentially the data

14  collection?

15     A    Yes.

16     Q    Okay.  What is the direct observation piece?

17     A    So direct observation -- you can see listed right

18  below that are dates in which Dr. DelPizzo herself conducted

19  observations of &#9608;&#9608;&#9608; in the school setting.  It looks like

20  she saw him or she mentioned seeing him both in the

21  classroom as well as out on the playground and she would

22  take data on the behaviors themselves and what she was

23  seeing in terms of the conditions under which they were

24  occurring.

25     Q    Okay.  Did Dr. DelPizzo's FBA and your sort of

AR 2635

1063

25

1  after-the-fact look at it, did it include all the necessary

2  components of an FBA?

3      A    Yes.

4      Q    Is there one piece of her assessment that you

5  would say is the most important piece or is -- are they all

6  pretty much equally important?

7      A    I would say that they're all important.  However,

8  the data to me is what is the most validating in terms of

9  whether or not the recommendations and the conclusions drawn

10 were appropriate and accurate.

11     Q    And why is that?

12     A    Data related -- the data is what allowed for her

13 to find patterns and draw conclusions about the functions of

14 the behavior.  A real cornerstone of ABA is that all

15 behaviors have a function.  And in order to target those

16 behaviors and work on reducing those behaviors you must

17 address the function.  And so without this data she would

18 not have been able to appropriately address their functions.

19     Q    Okay.  Take a look at the white binder now,

20 please.

21     A    Okay.

22     Q    And take a look at Tab 42 in that binder as well.

23     A    Okay.

24     Q    Okay.  Have you seen this document before?

25     A    Yes.

26

1      Q     And what is that?

2      A     It is a functional behavior assessment report done

3   by the Institute for Applied Behavior Analysis.

4      Q     And did you have an opportunity to review those

5   when Dr. Williams asked you to look at his recent

6   assessments?

7      A     Yes.

8      Q     Okay.  Looking at it holistically, did you have

9   any concerns about this report that stood out in your mind?

10     A     I feel what stood out -- there are a few things

11  that did stand out in terms of concerns or confusion.  One

12  would be the lack of data that's referenced in the report.

13  There doesn't appear to be any specific data that was

14  collected for the purpose of the assessment.  And if it was

15  collected it's not referenced clearly in the report.

16          Secondly, I would say the target behavior that was

17  selected for an FBA didn't appear to me to be appropriate

18  for this level of assessment.  I also had a difficult time

19  synthesizing some of the information due to just the lack of

20  general organizational fluidity.  There wasn't a real linear

21  progression throughout the report, and it was difficult for

22  me to discern the different components of an FBA and where

23  they were in the report.

24          I would say along those same lines I had also had

25  some difficulty and confusion throughout the report as to

AR 2637

1065

27

1 whether they were referencing the home environment or the

2 school environment.  It seemed to me that both environments

3 were assessed, but it was unclear in the report when they

4 were discussing which environment.

5     Q    Okay.  I want to talk more about the second one

6 that you mentioned, the target behavior not being

7 appropriate.

8     A    Okay.

9     Q    What did you understand the target behavior to be

10 in this FBA?

11     A    The target behavior in the FBA was titled

12 "Inconsistent Responding."  In looking at the description of

13 that behavior throughout the report my kind of takeaway

14 message was that they were referring to inattention.

15     Q    Okay.  And why is inattention an inappropriate

16 thing to look at in an FBA?

17     A    Well, inattention is really a common

18 characteristic of all students with autism.  It's definitely

19 a problem behavior that is worked through in ABA

20 programming.  It's -- typically an FBA is reserved for more

21 interfering, more uncharacteristic type of behaviors that

22 require some really intensive assessment and

23 recommendations.

24         Inattention, to me, can really be addressed

25 through the course of general ABA strategies such as

28

1  reinforcement, consequence procedures, and prompting and
2  also through IEP goals.
3      Q   Okay.  I'm trying to get down what you said --
4  inattention can be addressed through ABA what?
5      A      -- methodologies such as reinforcement
6  strategies, consequence strategies, and also just addressed
7  through the IEP goals.
8      Q   Okay.  Okay.  And speaking about the -- your
9  second -- or sorry, your fourth point, confusion regarding
10 home and school environments, why was it necessary, in your
11 mind, for there to be the distinction?
12     A   I think that when -- in order to really synthesize
13 the information and understand where these recommendations
14 were -- should be in place, where some of the concerns come
15 from, it needed to be made more clear to me as a reader the
16 specifics of those concerns.  And by not including the
17 environment in which they were observed, I didn't feel it
18 was specific enough for me to synthesize the information.
19     Q   Okay.  Did you review the recommendations portion
20 of the IABA FBA?
21     A   Yes.  Yes.
22     Q   And were there -- can you describe what those
23 recommendations were, or to use your words, synthesize what
24 those recommendations were in -- after reading the report?
25 What was your -- I think you said takeaway message -- what

AR 2639

127

1   Here, bring a chair.  And what we're going to do -- Ms.

2   White, what we're going to do is Ms. Mithaiwala is going to

3   ask you some questions on behalf of the District.

4           An attorney named Kathleen Loyer represents ███

5   and his family.  If she has questions, she'll ask them of

6   you at that point.  Then I'll ask some questions if there's

7   anything they haven't covered that I feel need to be

8   clarified.  And then the attorneys have another opportunity

9   for questioning, okay?

10          MS. WHITE:  Okay.

11          ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  If you don't

12  understand the question or you can't hear us, just be sure

13  to let us know.  All right?

14          MS. WHITE:  Okay.

15          ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  Okay.  Thank

16  you.  Go ahead, Ms. Mithaiwala.

17                    DIRECT EXAMINATION

18  BY MS. MITHAIWALA:

19      Q    Hi, Tammy.  It's Alefia.  Thanks for coming or

20  being willing to do this.

21      A    Sure.

22      Q    Do you recall, Tammy, being present at an IEP

23  meeting for ███ Fulsang on January 23, 2013?

24      A    Yes, I do.

25      Q    Do you recall during that meeting Mr. Fulsang

128

1   saying something to the effect of he didn't believe the

2   private speech and language therapy that the family had

3   provided to the Student was effective or had paid off?

4       A    Yes, I recall a conversation about the speech

5   therapy.

6       Q    Can you explain the context in which that comment

7   by Mr. Fulsang was made, as you recall it?

8       A    Yeah.  Well, I recall that we had had a lengthy

9   conversation about really looking toward using the

10  technology -- the device to provide ▉ a more effective

11  mode of communication.  And within the context of that

12  conversation there was some discussion about whether the

13  speech therapy would continue to focus on verbal

14  communication or just focus on ▉ developing more

15  confidence using the -- just the assistive technology

16  device.

17          And there was a lengthy conversation about that

18  because I think Mrs. Fulsang was concerned about -- you

19  know, well, she was having questions about not continuing to

20  focus on verbal communication.  And within the context of

21  that conversation it was agreed that the focus on verbal

22  communication had not really paid off for ▉ in the way

23  that they had hoped.

24          And that was the context with which Mr. Fulsang

25  had said that.  And that the family was, you know, trying to

AR 2739

1069

## CERTIFICATE OF SERVICE

I hereby certify that on July 5, 2016, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

s/ Stephen Moore
Senior Appellate Paralegal
COUNSEL PRESS, INC.