**Docket No. 15-56452**

*In the*

# United States Court of Appeals

*for the*

# Ninth Circuit

———— • ————

E.F., a Minor, By and Through His Parents Eric Fulsang and Aneida Fulsang,
ERIC FULSANG and ANEIDA FULSANG,

*Plaintiffs-Appellants,*

v.

NEWPORT MESA UNIFIED SCHOOL DISTRICT,

*Defendant-Appellee.*

———————————————

*Appeal from a Decision of the United States District Court for the Central District of California,
No. 8:14-cv-00455-CJC-RNB · Honorable Cormac J. Carney*

# SUPPLEMENTAL EXCERPTS OF RECORD
## VOLUME I OF IV – Pages 1 to 281

S. DANIEL HARBOTTLE, ESQ.
SYDNEY BLAAUW, ESQ.
HARBOTTLE LAW GROUP
18401 Von Karman Avenue, Suite 200
Irvine, California 92612
(949) 428-8780 Telephone
(949) 428-8779 Facsimile
dharbottle@harbottlelaw.com
sblaauw@harbottlelaw.com

*Attorneys for Appellee,
Newport Mesa Unified School District*



COUNSEL PRESS · (800) 3-APPEAL

PRINTED ON RECYCLED PAPER 

# TABLE OF CONTENTS

Docket Entry | Description | Page

## VOLUME I OF IV – Pages 1 to 281

46 | Declaration of S. Daniel Harbottle in Support of Newport-Mesa Unified School District's Motion for Summary Judgment, Filed July 14, 2015 | 1

Exhibit A — 5
Exhibit B — 68
Exhibit C — 74
Exhibit D — 83
Exhibit E — 88
Exhibit F — 91
Exhibit G — 97
Exhibit H — 108
Exhibit I — 121
Exhibit J — 133
Exhibit K — 144
Exhibit L — 156
Exhibit M — 169
Exhibit N — 173

45 | Newport-Mesa Unified School District's Statement of Uncontroverted Facts and Conclusions of Law in Support of its Motion for Summary Judgment, Filed July 14, 2015 | 201

13 | Notice of Lodging Administrative Record, Filed August 18, 2014 |

Complaint — 210

Stipulation Motion to Amend with First Amended Request for Due Process Hearing — 241

(CONTINUED IN VOLUME II)

i

**VOLUME II OF IV – Pages 282 to 554**

13      Notice of Lodging Administrative Record,
        Filed August 18, 2014 (CONTINUED FROM VOLUME I)

          Student's Prehearing Conference Statement                          282

          Hearing Exhibit List                                               292

          Student's Exhibit S1 – IEP Dated 2/9/10                            296

          Student's Exhibit S2 – IEP Addendum Dated 4/15/10                  329

          Student's Exhibit S7 – IEP Addendum Dated 6/21 110                 363

          Student's Exhibit S9 – IEP Addendum Dated 11 /23/10                399

          Student's Exhibit 12 – District's Multidisciplinary Assessment     435

          Student's Exhibit S13 – IEP Dated 2/4/ 11                          483

          Student's Exhibit S14 – Letter Dated 2/16/11                       517

          Student's Exhibit S15 – IEP Addendum Dated 3/8/11                  521

        (CONTINUED IN VOLUME III)

**VOLUME III OF IV – Pages 555 to 834**

13      Notice of Lodging Administrative Record,
        Filed August 18, 2014 (CONTINUED FROM VOLUME II)

          Student's Exhibit Sl7 – IEP Addendum Dated 4/19/11                 555

          Student's Exhibit Sl8 – Progress Report On Goals                   591

          Student's Exhibit S20 – IEP Dated 2/1/12 & 2/29/12                 595

          Student's Exhibit S23 – Letter Dated 4/ 17/12                      628

          Student's Exhibit S25 – Interim Settlement Agreement               633

          Student's Exhibit S26 – Augmentative and Alternative               635
          Communication Evaluation of Ms. Seldin

          Student's Exhibit S27 – IEP dated 1/23/13                          645

          Student's Exhibit S29 – Occupational Therapy I Sensory Diet        683

          Student's Exhibit S30 – District's Functional Behavioral           686

          Assessment Report

          Student's Exhibit S31 – District's Independence Facilitator        697
          Assistance Evaluation

          Student's Exhibit S36 – Kindergarten Report Card                   708

District's Exhibit D7 = IEP Addendum dated 5/21/10 .......... 709

District's Exhibit Dl2 – Progress Report on Goals .......... 744

District's Exhibit Dl6 – Assessment Plan dated 12/6/l0 .......... 748

District's Exhibit D24 – Progress Report on Goals .......... 750

District's Exhibit D28 – Progress Report on Goals .......... 753

District's Exhibit D41 – Email dated 1/29/13 .......... 757

District's Exhibit D45 – IEP Addendum dated 5/2/13 .......... 759

District's Exhibit D46 – Progress Report on Goals .......... 801

District's Exhibit D47 – AAC training for Student .......... 804

District's Exhibit D48 – Resume of Karrie Anderson .......... 806

District's Exhibit D50 – Resume of Lucinda Bottorf .......... 812

District's Exhibit D51 – Resume of Katherine Bums .......... 814

District's Exhibit D52 – Resume of Tim Chen .......... 815

District's Exhibit D53 – Resume of Maureen B. Cottrell .......... 817

District's Exhibit D55 – Resume of Bonnie C. Hinton .......... 819

District's Exhibit D56 – Resume of Eby I. Kent .......... 826

District's Exhibit D57 – Resume of Daniela Angela Manea .......... 829

District's Exhibit D58 – Resume of Kathleen Mulligan Murphy .......... 830

(CONTINUED IN VOLUME IV)

**VOLUME IV OF IV – Pages 835 to 1069**

13    Notice of Lodging Administrative Record,
      Filed August 18, 2014 (CONTINUED FROM VOLUME II)

District's Exhibit D59 – Resume of Jennie Wong Ni .......... 835

District's Exhibit D60 – Resume of Lila Seldin .......... 837

District's Exhibit D61 – Resume of Leah DeNisi .......... 839

Transcript of: Due Process Hearing Before ALJ
Darrell Lepkowsky – Witnesses for Student: 1. Eric Fulsang;
2. Katherine Bums .......... 840

iii

Transcript of: Due Process Hearing Before ALJ
Darrell Lepkowsky – Witnesses for Student: 1. Aneida
Fulsang; 2. Elizabeth Hughes                                    887

Transcript of: Due Process Hearing Before ALJ
Darrell Lepkowsky – Witnesses for Student: 1. Cynthia
Cottier; 2. Lila Seldin; 3. Tim Chia Chen                       922

Transcript of: Due Process Hearing Before ALJ
Darrell Lepkowsky – Witnesses for Student: 1. Aneida
Fulsang; 2. Kathleen Mulligan Murphy                            942

Transcript of: Due Process Hearing Before ALJ
Darrell Lepkowsky – Witnesses for Student: 1. Kathleen
Murphy; 2. Leah Steinman-DeNisi;  3. Karrie Anderson;
4. Maureen Cottrell                                             957

Transcript of: Due Process Hearing Before ALJ
Darrell Lepkowsky – Witnesses for Student: 1. Katherine
Bums – Witnesses for District: 2. Donna Manea; 3. Jennie Ni;
4. Eby Kent; 5. Lucinda Bottorf                                 1028

Transcript of: Due Process Hearing Before ALJ
Darrell Lepkowsky – Witnesses for Student: 1. Aneida
Fulsang;  2. Eric Fulsang – Witnesses for District: 3. Bonnie
Hinton; 4. Maureen Cottrell,  5 . Tammy White                  1054

1  HARBOTTLE LAW GROUP
   S. Daniel Harbottle (State Bar No. 156442)
2  *dharbottle@harbottlelaw.com*
   18401 Von Karman Avenue, Suite 200
3  Irvine, California 92612
   Telephone:  949.428.8780
4  Facsimile:  949.428.8779

5  Attorneys for Defendant
   Newport-Mesa Unified School District
6

7

8             **UNITED STATES DISTRICT COURT**

9             **CENTRAL DISTRICT OF CALIFORNIA**

10

| | |
|---|---|
| 11  E.F., a minor by and through his parents Eric Fulsang, Eric Fulsang and Aneida Fulsang for themselves,<br><br>13            Plaintiff,<br><br>14       v.<br><br>15  Newport-Mesa Unified School District, Does 1-9,<br><br>16            Defendant. | Case No.: SACV 14-00455-CJC (RNBx)<br><br>**DECLARATION OF S. DANIEL HARBOTTLE IN SUPPORT OF NEWPORT-MESA UNIFIED SCHOOL DISTRICT'S MOTION FOR SUMMARY JUDGMENT**<br><br>**[Filed Concurrently With (1) Notice of Motion and Motion for Summary Judgment, (2) Statement of Uncontroverted Facts and Conclusions of Law, (3) Memorandum of Points and Authorities, and (4) Proposed Judgment]**<br><br>Action Filed: Mar. 24, 2014<br><br>Judge:          Hon. Cormac J. Carney<br>Motion Hearing:   August 24, 2015<br>Time:              10:00 a.m.<br>Location:          Court Room 9B |

24

25

26

27

28

HARBOTTLE LAW GROUP
Attorneys at Law
{1056635.1 }

**1**

1

## DECLARATION OF S. DANIEL HARBOTTLE

2

3      I, S. Daniel Harbottle, declare as follows:

4

5      1.      I am an attorney with, and owner/direct of, Harbottle Law Group,

6    counsel of record for Defendant Newport-Mesa Unified School District in this

7    action. I am a member in good standing of the State Bar of California and have

8    been admitted to practice before this Court. I make this Declaration in support of

9    Defendant's Motion for Summary Judgment. I have personal knowledge of the facts

10   set forth in this Declaration, except where noted to be on information and belief,

11   and, if called as a witness, could and would testify competently to such facts under

12   oath.

13      2.      Attached as Exhibit A is a true and correct copy of the OAH Decision

14   in this matter that was made a part of the Administrative Record ("AR") in this

15   matter, and the OAH Decision bears the AR numbering assigned by OAH and the

16   Parties. The OAH Decision determined that the District prevailed on all but a

17   "small portion" of the issues heard and decided.

18      3.      Attached as Exhibit B, are true and correct copies the relevant pages of

19   the OAH testimony of Dr. Kathleen Mulligan Murphy.

20      4.      Attached as Exhibit C, are true and correct copies of the relevant pages

21   of the OAH testimony of Ms. Burns, E.F.'s teacher.

22      5.      At all relevant times, the District website, or other equally accessible

23   mechanism, has made the requisite Tort Claim form available to potential claimants.

24      6.      Plaintiffs have acknowledged that they never filed a formal Tort Claim

25   using the form provided by the District regarding matters alleged in their pending

26   Complaint.

27      7.      Attached as Exhibit D, is a true and correct copy of my meet and confer

28   letter dated, April 1, 2015 to Plaintiffs' counsel regarding dismissal of various

HARBOTTLE LAW GROUP
Attorneys at Law

{1056635.1 }

-2-

**2**

1   causes of action, including Plaintiffs' state law claims.

2         8.    Attached as Exhibit E, is a true and correct copy of my meet and confer

3   letter dated, April 10, 2015 to Plaintiffs' counsel regarding dismissal of various

4   causes of action, including Plaintiffs' state law claims.

5         9.    Attached as Exhibit F, is a true and correct copy of my meet and confer

6   letter dated, May 8, 2015 to Plaintiffs' counsel regarding dismissal of various causes

7   of action, including Plaintiffs' state law claims.

8       10.    Attached as Exhibit G, is a true and correct copy of my meet and confer

9   letter dated, June 4, 2015 to Plaintiffs' counsel regarding dismissal of various causes

10   of action, including Plaintiffs' state law claims, which encloses Plaintiffs' counsel's

11   own stipulation to dismiss their Tenth Cause of Action.

12       11.    Attached as Exhibit H, is a true and correct copy of Plaintiffs' counsel's

13   meet and confer letter/memo dated June 19, 2015, in which Plaintiffs' counsel

14   revokes their own prior proposed stipulation to dismiss their Tenth Cause of Action.

15       12.    Attached as Exhibit I, is a true and correct copy of Plaintiffs' Rule

16   26(a)(1) Initial Disclosure Statement.

17       13.    Attached as Exhibit J is a true and correct copy of Plaintiffs' Rule

18   26(a)(1) Supplemental Disclosure Statement.

19       14.    Attached as Exhibit K is a true and correct copy of the District's First

20   Request for Production of Documents/Things.

21       15.    Attached as Exhibit L is a true and correct copy of Plaintiffs' initial

22   Response to the District's First Request for Production of Documents/Things.

23       16.    Attached as Exhibit M is a true and correct copy of Plaintiffs'

24   Supplemental Response to the District's First Request for Production of

25   Documents/Things.

26       17.    Attached as Exhibit N is a true and correct copy of Plaintiffs' additional

27   Response to the District's First Request for Production of Documents/Things.

28       18.    Other than a pre-filing version of Student's counsel's fee invoice

HARBOTTLE LAW GROUP
Attorneys at Law

{1056635.1 }

-3-

DECLARATION OF S. DANIEL HARBOTTLE

1  provided during settlement discussions, and despite several rounds of meeting and

2  conferring regarding their Initial Disclosures and discovery responses, Plaintiffs

3  have not provided any attorney fee invoice either in their Initial Disclosure,

4  Supplemental Disclosure or in response to the District's First Request for Production

5  of Documents/Things.

6          Executed on July 14, 2015, at Irvine, California.

7          I declare under penalty of perjury under the laws of the United States of

8  America that the foregoing is true and correct.

9

10                                              */s/ S. Daniel Harbottle*
                                                  S. Daniel Harbottle
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

HARBOTTLE LAW GROUP
Attorneys at Law

{1056635.1 }

-4-

DECLARATION OF S. DANIEL HARBOTTLE

# Exhibit A

ADMINISTRATIVE RECORD FOR MATTER 2012050785          02/25/2014                      1271 of 1332

BEFORE THE
OFFICE OF ADMINISTRATIVE HEARINGS
STATE OF CALIFORNIA

In the Matter of:

PARENTS ON BEHALF OF STUDENT,          OAH Case No. 2012050785

v.

NEWPORT-MESA UNIFIED SCHOOL
DISTRICT.

## DECISION

Parents on behalf of Student (collectively referred to here as Student) filed a due process hearing request (complaint) with the Office of Administrative Hearings (OAH), State of California, on May 17, 2012, naming the Newport-Mesa Unified School District (District). On May 9, 2013, the parties filed a stipulated motion to amend Student's complaint. On May 9, 2013, OAH granted the motion to amend and granted for good cause the parties' motion to continue the hearing to specific dates they requested.

Administrative Law Judge (ALJ) Darrell Lepkowsky heard this matter in Costa Mesa, California, on October 15-17, and 21-24, 2013.

Kathleen M. Loyer, Attorney at Law, represented Student and his parents. Student's mother and father were present for every day of the hearing. Student was present for one afternoon.

Alefia Mithaiwala, Attorney at Law, represented the District. Maureen Cottrell, the District's Director of Special Education, attended the hearing every day on behalf of the District.

One of two interpreters was present every day of the hearing to interpret from English to Brazilian Portuguese and Brazilian Portuguese to English for Mother.

**Exhibit A Page 0005**
**AR 1271**

6

The ALJ granted a continuance for the parties to file written closing briefs and the record remained open until November 18, 2013. Upon timely receipt of the written closing briefs, the ALJ closed the record and the matter was submitted for decision.[1]

## ISSUES[2]

[1] On December 9, 2013, the District filed a motion to strike a portion of Student's brief because it cited to an article that the ALJ had declined to admit into evidence. The District simultaneously filed a motion for sanctions against Student. Student filed an opposition to the motions on December 13, 2013. The District filed a reply on December 16, 2013. Because the article was not admitted into evidence, the District's motion to strike is granted.

The District's motion for sanctions is denied. The District has failed to show that Student's action in referencing the article was for the sole purpose of harassing the District or delaying the procedures in this case.

[2] Student's amended complaint included an additional issue: whether the District denied Student a FAPE by failing to include Parents in developing the District's 2013 functional behavior assessment, sensory diet development, and evaluation to determine Student's need for an in-class aide. However, Student did not include this issue in his pre-hearing conference statement. The issue was not discussed at the prehearing conference held on October 11, 2013, and the ALJ did not include the issue in her prehearing conference order issued on October 11, 2013. On October 14, 2013, Student filed two motions to correct the prehearing conference order. Both motions addressed only requests to include additional IEP meetings that had been referenced in Student's amended complaint as issues for hearing. Neither motion referenced any issue involving lack of parent involvement in the District's 2013 assessments. The ALJ amended her prehearing conference order, and, at the beginning of the hearing, clarified all the IEP dates at issue in this case. Student at no time clarified that he still intended to raise separate allegations concerning Parents' alleged lack of involvement in the assessment process. For these reasons, this Decision does not address as a separate issue whether the District failed to include Parents in the development of its 2013 assessments.

Additionally, although Student sought to include his April 15, 2010 IEP addendum as an issue for hearing, that IEP was not referenced in his original or amended complaints, which specifically define the issues as occurring on or after May 16, 2010. Nor did Student allege any issues regarding his April 15, 2010 IEP in his prehearing conference statement. Additionally, the April 15, 2010 IEP is outside of the applicable statute of limitations in this case. Both federal and state laws contain a two year statute of limitations for special education administrative actions. (20 U.S.C. § 1415(b)(6)(B); 34 C.F.R. § 300.507(a)(2)(2006); Ed. Code, § 56505, subd. (l).) Special education law does not recognize the doctrine of continuing violations as an exception to the two year statute of limitations. (*J.L. v. Ambridge Area School Dist.* (W.D.Pa. 2008) 622 F.Supp.2d 257, 268-

2

ADMINISTRATIVE RECORD FOR MATTER 2012050765          02/25/2014                              1273 of 1332

1.      Since May 16, 2010, did the District deprive Student of a free appropriate public education (FAPE) when it failed to appropriately assess Student in all areas of suspected disability, specifically in the areas of cognitive ability, functional communications, assistive technology, social integration, and behavioral analysis?

2.      Did the District fail to provide Student a FAPE at the individualized education program (IEP) meetings of May 21, 2010; June 21, 2010; November 23, 2010; February 4, 2011, March 8, 2011, April 19, 2011, February 29, 2012, January 23, 2013, and May 2, 2013, by:

a.      Failing to address all of Student's unique needs;

b.      Failing to adopt appropriate goals; and

c.      Failing to provide appropriate placement and services in the areas of behavioral support, speech and language, parental training, occupational therapy, and assistive technology?

3.      Since May 16, 2010, did the District deprive Student of a FAPE when it failed to have "highly qualified" staff to assess and provide services to Student in the areas of behavior intervention, inclusion, assistive technology, and individual aide support?

4.      Did the District fail to conduct an appropriate Functional Behavior Analysis (FBA) and Sensory Diet Development Evaluation in May 2013 to determine Student's need for aide assistance, which resulted in the IEP team adopting a less than adequate Behavior Support Plan, Behavior Intervention Plan, and inappropriate aide support?

## SUMMARY OF DECISION

Student in this case is a child with autism who also suffers cognitive and communication delays. As of the hearing in this matter, Student was mostly non-verbal. He communicates through a picture exchange communication system, signs, gestures, his eyes, and pulling people toward what he wants. Student recently has started learning to use a small electronic tablet called an iTouch to communicate.

The crux of this case is whether Student's acknowledged slow progress is due to his disabilities that do not permit him to progress at a more rapid rate, or due to failures by the District to adequately assess Student and address all of Student's unique needs. Student contends that the District has failed timely to assess him in all areas of suspected disability

---

269; 71 Fed.Reg. 46697 (Aug. 13, 2006).) This Decision will therefore not address the merits of any IEP developed before May 17, 2010.

3

8

and that those assessments[3] that were finally done were either improperly developed or failed to address all of Student's deficits. Student also contends that the IEP's at issue in this case, which cover approximately three years, failed to contain appropriate goals, provide him with an appropriate placement, or offer him the intensive related services Student needs in order to benefit from his education. Student believes that his progress would have been more significant had the District not failed in these areas.

The District responds that it timely and appropriately assessed Student in all areas of suspected disability. The District acknowledges that Student demonstrates significant challenges which have resulted in him only being capable of making very slow progress. The District argues that Student's progress is the result of his inherent deficits and that his capacity to progress was not hampered by lack of appropriate assessments, placement, or services. The District contends that all IEP's it offered Student were reasonably calculated to provide Student with meaningful educational benefit based on the information known to it at the time. Therefore, the District provided Student with a FAPE at all times relevant to this case.

This Decision finds that Student has failed to meet his burden of proof that the goals, placement, and most services in his IEP's were legally inadequate. This Decision also finds that Student has failed to show that the District's assessments were improper or that District staff was not appropriately trained to provide him with instruction or services. This Decision further finds that the District did not fail to appropriately assess or address Student's needs in the area of functional behavior. However, this Decision does finds that Student has demonstrated by a preponderance of the evidence that the District should have assessed him earlier than spring 2013 in the area of assistive technology[4] and should have provided him with an electronic assistive technology device and assistive technology services approximately a year before it first did so. Therefore, this Decision orders certain remedies, described below, to compensate Student for this.

## FACTUAL FINDINGS

*Jurisdiction and Background Information*

1.    Student is a little boy who is presently seven-and-a-half years old. He has attended school within the District since preschool. Student and his parents live within the boundaries of the District. He is a loving and sweet child who presently qualifies for special

---

[3] The term "assessment" is used in California law. Federal law uses the term "evaluation." The parties use the terms interchangeably. This Decision does likewise.

[4] The terms "augmentative communication" and "assistive technology" were used interchangeably by the parties. The terms are also used interchangeably in this Decision.

4

education and related services under the eligibility categories of autistic-like behaviors, speech and language impairment, and intellectual disability.

2.      Student is mostly non-verbal. He can presently only vocalize a few sounds that do not amount to words or parts of words. Until recently, Student communicated primarily through a picture exchange system; a few hand signs, which are not necessarily recognized from a formal system of sign language; through gestures and eye contact; and through guiding someone by hand to what Student wants or needs. Since late 2011 or early 2012, Student has been learning to use an electronic tablet. He first began using an iPad at home. Later, he used it at school as a positive reinforcer for completing required tasks. In mid-2013, the District implemented with Student the use of a smaller electronic tablet called an iTouch as an assistive technology device for augmentative communication. As discussed below, Student has slowly begun to use this device for functional communication.

3.      Student also has been diagnosed with an intellectual disability. Student's cognitive deficits, combined with his autism, and his challenges in communication, have gravely impacted Student's ability to progress academically. Student either cannot retain information or does not find retention of information to be meaningful to him. This has resulted in Student's inability to repeat correctly tasks and responses, sometimes from week to week, sometimes from day to day, and sometimes even within the same instructional time frame. Student has only made a month to a few months of progress each school year.

4.      Yet, Student is aware of his surroundings and the people around him. He is generally compliant and often responds not only to his name, but also to specific directives to do things or to move to other activities. He does not leave the instructional setting or run away even if he does not prefer a task. Student can sit for upwards of 15 minutes at a time. In spite of his communication issues, Student does not presently have aggressive behaviors that impair his functioning. He enjoys playing with toys and with his iPad. Although Student can become frustrated and lose his calm, he does not engage in behaviors that are harmful to him or others or that impedes the ability of his peers to access their education.

5.      Student has received in-home applied behavioral analysis (ABA) therapy from private providers since age two. Student has consistently received at least 10 hours of services a week. The therapy was funded initially by the local Regional Center. Student has had two or three different private providers. A non-public agency, called ACES, provided therapy for several years. In June 2012, the Regional Center ceased funding the therapy, directing instead that Parents use their medical insurance as the funding source. Parents' insurance company has funded Student's therapy since then, but Parents are required to pay significant co-pays and deductibles. The present non-public agency serving Student is Nyansa. None of the people who have provided or now provide in-home services to Student testified at the hearing in this matter. There is no evidence about the progress Student may have made in the programs or where he had his greatest deficits or challenges.

6.      The District developed its first IEP for Student in February 2009, just before Student turned three-years-old. At the time, Student's eligibility for special education was

5

under the category of autistic-like characteristics. Student's developmental level at the time was in the six to nine month range.

7.      The statutory period covering this case begins on or about May 17, 2010, two years prior to the date Student filed his original complaint. Student's operative IEP at the time was dated February 9, 2010. Student was ending his first year of preschool at the District's Harper Preschool. This IEP included placement in a special day class with an embedded ABA focus. The class lasted five hours and 15 minutes a day. Student also received two, 30-minute group based speech and language therapy sessions per week, one, 45-minute group occupational therapy session a week, and one, 30-minute session per week of individual occupational therapy. Student was also offered two sessions of extended school year instruction.

8.      The February 9, 2010 IEP included several goals. These consisted of two goals in the area of academic readiness; two goals for self-help to address Student's toileting issues; three behavior goals; two goals to address Student's social/emotional needs; four speech and language goals; two fine motor goals; and two sensory processing goals. Each goal described Student's progress toward his prior goals, determined Student's present levels of performance, and Student's need for the goal. Each goal is measurable. Each goal addressed Student's known needs at the time.

*May 21, 2010 IEP*

9.      On May 21, 2010, the District convened an IEP meeting at Parents' request to discuss Student's speech and occupational therapy needs. Parents believed Student required more individual therapy and more coordination between the school and the in-home ABA providers then funded by the Regional Center. In addition to Father, the IEP team participants were Maureen Cottrell, who was then the Principal at Harper Preschool and is now the District's Director of Special Education; occupational therapist Jennie Ni; speech and language pathologists Lucinda Bottorf and Melissa Wiley; and Student's special education teacher Donna Manea.

10.     Ms. Ni testified at the hearing. As of the hearing, she had worked with Student for over three years. She was involved in many of his prior IEP's. Ms. Ni has a master's degree in occupational therapy, has national board certification, and has been working in her profession for over 12 years. She worked first for private agencies before joining the District. She has worked with school districts since 2005. Up to 70 percent of her work is with children on the autism spectrum. Ms. Ni has worked with preschool-aged and elementary school-aged children her entire career.

11.     Based upon Parents' concerns that Student was not progressing in his occupational therapy goals, Ms. Ni made several suggestions to the IEP team. She suggested modifying Student's pre-writing goal to include different materials to use in helping him write letters because the initial goal was proving too difficult for him. She also agreed with Parents that it would be beneficial to increase Student's occupational therapy. The team

6

ultimately added an additional 10 minutes a week of therapy, for a total of 40 minutes. Because of Student's short attention span, Ms. Ni suggested breaking the therapy into two, 20-minute sessions. Ms. Ni did not believe that more than 10 minutes additional therapy was warranted because focus on fine motor skills was embedded in Student's preschool program. The IEP team, including Parents, agreed to these modifications.

12.   Parents were disappointed by Student's failure to develop verbal communication skills. Their main concern was, and consistently has been, that Student learns to speak. To address Parents' concerns, the IEP team reviewed Student's speech goals and discussed the foundational skills that underlie speech. Ms. Wiley and Ms. Bottorf, the speech therapists at the meeting, discussed that the goal was to establish communicative intent for Student. Ms. Bottorf testified at the hearing. She informed that Ms. Wiley suggested changing one of Student's 30-minute group speech therapy sessions to two, 15-minute individual sessions per week. The shorter sessions were to address Student's short attention span. The individualized sessions were to see if Student would show greater progress working in a one-on-one setting. The therapists believed that additional sessions were not warranted because Student's speech goals were targeted throughout his day in his special day class. Additionally, the classroom was designed to be a language-rich environment to address the needs of the entire class, all of whom were on the autism spectrum.

13.   The District team members did not consider any augmentative communication devices at this time because Student already was using gestures, pointing, and picture symbols. The District believed that Student was not yet demonstrating the foundational skills necessary to use higher level technology to communicate.

14.   Other than his parents, the only non-District witnesses who testified on Student's behalf were Dr. Elizabeth Hughes and Cynthia Cottier. Dr. Hughes is a psychologist who was part of a team that conducted an independent educational evaluation of Student, funded by his parents, in the area of functional behavior. Dr. Hughes does not have training or experience as an occupational therapist or speech pathologist. Her team's report briefly addressed speech and occupational issues but only in a cursory fashion. Nor did Dr. Hughes's testimony at hearing specifically address any of the District's offers of speech or occupational therapy in the IEP's at issue in this case. Dr. Hughes therefore offered no evidence to support Student's contention that goals and services the District offered Student in speech or occupational therapy during the years at issue in this case were inappropriate or inadequate.

15.   Ms. Cottier is a speech and language pathologist who has a master's degree in speech pathology as well as a second master's degree in special education. She has practiced as a speech pathologist since 1980. She initially worked for a public school district as a speech pathologist and as the coordinator of an assistive technology program. Since 1993, Ms. Cottier has been in private practice and heads a non-public agency. Her private practice focuses on augmentative communication and assistive technology for special education students. Ms. Cottier testified at hearing on behalf of Student. Based on her experience,

7

Exhibit A Page 0011
AR 1277

**12**

training, and clear and unequivocal answers to questions at hearing, Ms. Cottier was a persuasive witness.

16.     However, Ms. Cottier only administered an augmentative communication evaluation to Student. She was not asked to administer any standardized speech assessments to him. She did not review any of Student's prior speech assessments. Although Ms. Cottier has significant expertise in the area of speech pathology, during the hearing, Student did not ask her to address any of Student's speech goals or the type and/or frequency of speech therapy the District provided to him over the last three years.

17.     Student therefore provided no evidence to contradict the testimony of Ms. Ni and Ms. Bottorf that the District modification of occupational therapy and speech therapy services to Student at the May 21, 2010 IEP meeting were sufficient to meet his needs based on the information known to the District at the time. Student provided no evidence to contradict the testimony of all District witnesses that the goals and services provided for Student in each IEP at issue in this case were appropriate and met Student's needs.

18.     Donna Manea was Student's preschool teacher during the 2009-2010 school year when Student attended the Harper Preschool. Her classroom was a moderate to severe special day class. Ms. Manea has a master's degree in education. She is credentialed to teach autistic children. Prior to becoming a teacher, she was an ABA therapist for a different school district. After being hired by the District, Ms. Manea received an eight-week training from a non-public ABA agency under contract with the District. Her training included how to take data; classroom management, parent communication, lesson planning, and specifically how to teach autistic children. It is the same training the District provides to its entire staff who work with autistic children. All staff also receives on-going training in ABA methodology, social skills, and behavior strategies.

19.     Ms. Manea was concerned that Student was not retaining information. She and the other District IEP team members also were concerned that Student had difficulty transitioning back to school after breaks. He also was demonstrating an unwillingness to join in group lessons. Ms. Manea and the other District IEP team members therefore recommended increasing Student's attendance in the August extended school year program from two to four days a week. The District believed that Student would show less regression if he had the additional time in school during the summer. Parents agreed to the modifications in this IEP.

*June 21, 2010 IEP Meeting*

20.     The District presented an addendum IEP to Parents on June 21, 2010 for the purpose of indicating that Student's school location was going to change for the 2010-2011 school year. The Harper Preschool was closing and the students there were being assigned to other school sites. Student was assigned to the Mariner's Elementary School. Parents

**Exhibit A Page 0012**
**AR 1278**

ADMINISTRATIVE RECORD FOR MATTER 2012050785          02/25/2014                                    1279 of 1332

requested that the District assign him to teacher Leah Steinman's[5] class. Ms. Steinman had
run a volunteer sports league for special needs children in which Student participated,
although Ms. Steinman had not been his direct coach. Parents had heard that she was an
excellent teacher who worked well with children on the autism spectrum. The District
agreed to their request. Student began his second year of preschool at Mariner's in early
September 2010 in Ms. Steinman's class.

*Ms. Steinman's Classroom*

21.    Ms. Steinman has taught preschool for about eight years. Before becoming a
teacher, she was an independence facilitator and worked in an autism-specific preschool and
kindergarten classroom. She received full training in ABA principles through the non-public
agency with which the District contracts. After approximately two months of direct training,
the agency observed her for many weeks as she taught a class. An agency trainer would take
notes and help her with modifications to the curriculum and with data collection. The agency
would model strategies and Ms. Steinman would model them back. Her training included
how to develop goals and behavior support plans as well as how to determine the function of
behavior. The aides assigned to Ms. Steinman's classroom received the same training from
the non-public agency as did she.

22.    One of the District's ABA programs for autistic preschool children is called
the Little Seahorse program. The District developed the program in 2006 to improve
services for preschool children on the autism spectrum. The teaching and support staff were
all trained in positive behavioral strategies. Regular collaboration between teachers, aides,
and related service providers was an integral part of the program. The purpose of the
program was to maximize outcomes for children with autism by using research-based
practices, focusing on a rich social curriculum and focusing on academic readiness. The
program was also designed to maximize success in communication for the students, no
matter the modality of communication the student was at or chose to use. Play was an
important element of the program. By teaching the children to play together, the program
hoped to prepare the children for a successful transition to kindergarten.

23.    Ms. Steinman's classroom was run similarly to the other preschool classes that
were part of the program. The school day lasted five hours and 15 minutes. There were
generally eight special education students in the classroom. Three typically developing
children were part of a reverse inclusion program; they attended Ms. Steinman's class three
days a week, four hours a day. In addition to Ms. Steinman, two adult aides trained in ABA
were assigned to the classroom. Ms. Steinman collaborated with Ms. Manea, Student's
previous teacher, before Student began the 2010-2011 school year so that she would know
his particular needs and habits and learn how to best address them in her classroom.

24.    Ms. Steinman and speech pathologist Dr. Kathleen Murphy conducted an in-
home observation of Student early in the school year to make certain the District and private

---

[5] Ms. Steinman's last name is now DeNisi.

9

ADMINISTRATIVE RECORD FOR MATTER 2012050785          02/25/2014                    1280 of 1332

ABA providers were working consistently with Student. They did not observe Student using any verbal language. His work with his ABA provider was based on discrete trial training. It was not focused on functional language. Dr. Murphy and Ms. Steinman shared strategies and expectations for Student with the in-home providers.

25.    The schedule in Ms. Steinman's class was dependent on the individual needs of the students each year. However, the school day generally consisted of circle time and center rotations to address each child's goals in the areas of fine motor, sensory needs, art, games, academics, and gross motor skills. The day included time spent teaching the children self-help skills and included exploratory activities and a snack time. Throughout the day, an occupational therapist and a speech therapist came into the class to consult with Ms. Steinman and provide services.

26.    The classroom also integrated significant visual supports for the students. There was a daily schedule posted. General interest visuals, such as a picture of the bathroom and one for snacks, were placed throughout the classroom. Other visuals were developed that were specific to meet the needs of a particular child. Ms. Steinman had specialized visuals for Student as well. For example, since toileting was a significant area of need for him, she had broken down the bathroom routine through the use of four pictures showing a urinal, a sink, a paper dispenser, and a trash can.

27.    Sensory supports were also embedded in Ms. Steinman's classroom. She worked in conjunction with an occupational therapist to create a sensory rich program throughout the school day. The classroom included a sensory table, a sensory ball, spinning devices, and stress balls. There was also an outside obstacle course that was used each day.

28.    Ms. Steinman's classroom also included a "break tent." The majority of the special needs students were on a token economy board system, which was used as positive reinforcement. For example, if a child completed a task, he or she would get a token. Once the child had earned five tokens, the child could use the tokens to choose an activity to do in the break tent.

29.    Student was generally happy in Ms. Steinman's class. He did well in the structured environment of the classroom. However, Student was very prompt-dependent. Student did not want to work independently. Rather, he would look to staff to help him through each step of the skill or activity on which he was working. To motivate Student, Ms. Steinman used the token board with him. Once he earned his five tokens, Student would be able to choose the reward of his choice. Every week, Ms. Steinman or one of her aides would do a reinforcement assessment to see if Student was still responding to the same reinforcers.

30.    Student had a slow rate of learning and required a lot of maintenance to retain skills. Student communicated using eye contact with staff as well as gestures and signs. The signs were not based on American Sign Language. Rather, they were idiosyncratic to Student. The signs Student has used throughout the time frame of this case have never been

10

Exhibit A Page 0014
AR 1280

**15**

ADMINISTRATIVE RECORD FOR MATTER 2012050785          02/25/2014                                    1281 of 1332

based on American Sign Language. Therefore, only people familiar with Student could really understand the signs. If Student really wanted something at school, he would take an adult by the hand and lead them to what he wanted. Student also used a picture exchange system to communicate, although the repertoire of pictures that he understood was fairly small. His repertoire of pictures never expanded in great detail. He did not use the picture exchange system to any extent across environments. Student's communication was therefore a mix of modalities.

*November 23, 2010 IEP Meeting*

31.     The District noted progress on Student's goals every three months during the school year. Progress on Student's 16 goals from his February 2010 IEP was updated on November 17, 2010. As of that date, Student had met his goal for making eye contact with a communication partner and his goal for using loop scissors. Student was making consistent progress and was anticipated to meet his goals in completing puzzles, hand washing, responding to his name, throwing and swinging (to address visual attention and motor planning), and in imitating motor actions. Student had either regressed or failed to make much progress in his goals addressing his toileting routine, using calming strategies, looking at a speaker when his name was called, handing peers objects when directed to do so, understanding familiar objects in a field of three, increasing his use of picture symbols to communicate, combining two picture symbols to make requests, communicating by initiating acts, and tracing lines and circles.

32.     Student's most significant regression was in his use of picture symbols. In March 2010, Student had met his goal of using picture symbols to identify seven toys, three people, and three action words. By November 17, 2010, Student had lost his ability to meet this goal. Student was only using picture symbols to identify favorite objects when presented with choices. The picture exchange system was not proving very functional for Student.

33.     The District convened an IEP meeting on November 23, 2010, in order to address Student's lack of progress and regression on many of his goals. The IEP team participants were Parents, Ms. Steinman, Ms. Ni, and Dr. Murphy.

34.     Ms. Steinman explained that Student had been engaging in avoidance behaviors, such as screaming and collapsing on the floor, when demands were made of him. However, she had lately noted a decrease in the frequency and duration of the behaviors. Because Student had not demonstrated any relative progress in his calming strategies, Ms. Steinman proposed a revision to the goal.

35.     Parents discussed behaviors Student engaged in at home that concerned them, such as the fact Student sometimes would tear paper into small pieces or tear leaves apart on bushes. Although the District did not observe these habits at school, District staff made suggestions to Parents on how to address the behaviors at home. In particular, the District recommended adding routines even to Student's non-structured time. District staff also discussed strategies that Parents could implement at home to address Student's goals. The

11

**Exhibit A Page 0015**
**AR 1281**

**16**

intent was to teach Student how to implement his goals across environments outside of school.

36.     Ms. Ni reviewed Student's progress on his occupational therapy goals. Student had met his goal of learning to cut with loop scissors and cutting with scissors had become a preferred activity for him. However, Student was having difficulty meeting his tracing goal. Ms. Ni noted that Student had difficulty attending to tasks, which was interfering with his progress on many of his goals. Parents acknowledged that Student did not seek to do fine motor drawing tasks at home in spite of the availability of writing tools. Ms. Ni therefore recommended deleting his writing goal because it had become apparent the goal was too advanced for him. She proposed replacing it with a goal targeting visual attention to art projects in order to work more on the foundational skill of visual attention. Ms. Ni noted that in spite of Student's failure to progress on some of his goals, he had made significant gains with motor planning and motor imitation skills.

37.     Dr. Murphy then reviewed Student's progress on his speech goals. Dr. Murphy, who testified at hearing, is a speech pathologist with the District. In 1997 she received her doctorate degree in speech and language science. In addition to her work providing direct speech therapy to children and adults, Dr. Murphy has taught speech at the university level, has been a researcher in in the area of speech pathology, and has conducted investigations in the area of integrating services for the treatment of speech disorders in the classroom. In 2012, Dr. Murphy also obtained a certification as a Board Certified Behavior Analyst at the doctoral level. This required her to first complete education and training in the area of advanced studies of applied behavioral analysis and then to pass a test for the certification. Dr. Murphy is thus qualified doubly as a speech pathologist and a behaviorist, a unique combination.

38.     Dr. Murphy was also a facilitator for the District's Little Seahorse program in 2008 and 2009. She worked with District autism specialist Dr. Elizabeth DelPizzo, with preschool teachers Donna Manea and Leah Steinman, with other related service providers, as well as with Ms. Cottrell, who was the coordinator for the program. Dr. Murphy provided direct speech services to Student from September 2010 to June 2012.

39.     Dr. Murphy reviewed Student's limited progress on two of his speech goals and his lack of progress on the other two. She expressed concern that Student was not demonstrating strong foundational skills that were necessary to make continued progress on the goals. Dr. Murphy proposed deleting the goals targeting the use of the picture exchange system. She proposed replacing those with two others. The first would target the functional and consistent use of five communication gestures for the concepts of "more," "want," "eat," "my turn," and pointing. The second goal would target the use and matching of two-dimensional photographs and three-dimensional objects. Dr. Murphy did not believe that Student was ready for any type of electronic assistive technology because he really did not understand the basic concepts of language.

12

Exhibit A Page 0016
AR 1282

**17**

ADMINISTRATIVE RECORD FOR MATTER 2012050785          02/25/2014                                        1283 of 1332

40.     Parents agreed to all District suggestions for deleting and modifying Student's goals.

41.     Due to Student's limited progress, the District team members also recommended conducting an early triennial assessment of Student before his next annual IEP meeting in February 2011. Parents agreed to the assessment.

*District's February 4, 2011 Multidisciplinary Triennial Assessment*

42.     The District conducted Student's early triennial assessment over seven days in January 2011. The assessment team consisted of school psychologist Eby Kent; special education teacher Ms. Steinman; speech pathologist Dr. Murphy; school nurse Denise Ellis; and occupational therapist Ms. Ni, who was assisted by an occupational therapy student. The assessment report is dated February 4, 2011. The assessment covered the areas of psycho-educational, cognition, behavior, speech, and occupational therapy. The assessment was thorough and followed all mandatory assessment procedures. The resulting assessment report, which is almost 50 pages long, is equally detailed and comprehensive.

43.     The assessment team followed best practice assessment procedures. The assessors reviewed Student's school records, including IEP's and prior assessments. They reviewed his health and developmental records and history. Ms. Kent interviewed Mother and the school nurse interviewed both parents. Ms. Kent interviewed Student's present teacher, Ms. Steinman. Ms. Kent observed Student in class and on the playground. Ms. Steinman conducted a formal observation of Student in her own class as well. Ms. Ni also completed a clinical observation of Student.

44.     Eby Kent testified at the hearing. She has a master's degree in psychology and specific training in applied behavioral analysis. She has worked with the District as a school psychologist since 2006. Ms. Kent conducted the cognitive and adaptive behavior portion of Student's triennial assessment. Ms. Kent observed Student when she tested him. He transitioned easily to the testing room with her. Ms. Kent used Student's token board during the assessment. Student responded well to physical and tangible reinforcers but displayed inconsistent eye contact with Ms. Kent and with the testing materials. Student attempted all tasks, but did not always understand the tasks presented. He was compliant and responded to directives. Ms. Kent also observed Student at school. She first observed him in Ms. Steinman's classroom. Ms. Kent noted that the class was extremely well-structured. The staff used verbal and tangible reinforcements and class expectations were clear and understood by the students.

45.     Student had his own token board and appeared to understand its purpose and use. He was compliant when asked to imitate something or when a visual cue was given. Student generally needed a visual, gestural, or physical prompt for auditory requests, although Ms. Kent observed staff trying to get Student to show a skill without the prompting. At one point, Student became frustrated and had to be taken to a separate area of the classroom to calm down.

13

**Exhibit A Page 0017**
**AR 1283**

**18**

46.     Ms. Kent also observed Student during recess. Student was able to maneuver easily around playground equipment. He could climb stairs, hang from bars, dropped easily to the ground, and was able to balance. Student appeared to enjoy playing but did not show any interest in the children playing near him. When Student became fixated on some wood chips, an adult easily re-directed him to something else. Student transitioned fairly easily from playing when recess was over.

47.     Ms. Kent used two testing instruments to assess Student's cognition. Student's standard score on the first was 49, which is in the very low range of functioning. Student's visual and receptive language skills were in the range of a 16 to 17-month-old child. His expressive language skills were at the five month range. On the fine motor subtests, Student's highest score was in the range for a 26-month-old child. Student's scores indicated significant delays in all areas tested. Ms. Kent administered a second cognitive test to get an accurate picture of Student's cognitive functioning. His overall standard score on the second test was less than 50, commensurate with his score on the first test. Student's standard scores on both cognitive assessments were lower than the scores he received when last assessed in 2009.

48.     Ms. Kent assessed Student's adaptive behavior skills using a rating scale questionnaire completed by Mother. Like his scores on the cognitive assessments, Student's scores for adaptive behavior were all in the extremely low range and had decreased from his 2009 assessment. Ms. Kent was not surprised that the cognition and adaptive behavior scores were so similar because it indicated that Student's adaptive skills were commensurate with his cognition.

49.     The objective of the last assessment tool Ms. Kent used was to determine the extent of Student's autism. The test was based on observations and input from Parents and Student's teacher. Student's overall score of 46 indicated to Ms. Kent that Student demonstrated severe symptoms of autism spectrum disorder.

50.     Student's 2009 assessment had not made a final recommendation for finding Student to be intellectually disabled. The assessors had indicated that Student's development needed to be monitored. Ms. Kent explained that when a child is young and has not been exposed to formal teaching, professionals do not want to make hasty decisions about whether the child is intellectually disabled. They want first to see the results of educational interventions. In Student's case, the results of Ms. Kent's assessment indicated that Student not only demonstrated severe autistic-like behaviors, but that he also was intellectually disabled. The assessments indicated significant deficits in all areas of cognitive and adaptive functioning.

51.     Student presented no evidence that Ms. Kent's testing was inappropriate or that her assessment results and recommendations were improper. Dr. Hughes did not address Ms. Kent's assessment or any portion of the multidisciplinary triennial assessment during her testimony. Dr. Hughes did not conduct any cognitive or adaptive behavior assessments of

14

ADMINISTRATIVE RECORD FOR MATTER 2012050785        02/25/2014                    1265 of 1332

Student. Student has not obtained any assessment results that contradict Ms. Kent's assessment or call into question the validity of her results.

52.    Ms. Steinman tested Student's pre-academic readiness. She used an assessment appropriately used with both typically developing children and children who are exhibiting developmental delays. The assessment addressed cognition, language, gross motor, fine motor, social abilities, and self-help abilities. The results of Ms. Steinman's assessment indicated that while Student had emerging skills and abilities in the 27 to 36 month range, the majority of Student's abilities and skills were in the nine to 24 month range. Student's scores were lowest in areas of cognition and receptive language, with some low scores in social interaction and play. The results of Ms. Steinman's testing were similar to the results Ms. Kent obtained on her assessments.

53.    Dr. Murphy completed the speech and language portion of Student's triennial assessment to determine Student's current levels of language functioning. She administered, or attempted to administer, both formal and informal tests. During Dr. Murphy's testing, Student was cooperative. He attempted all tasks, although he needed prompting or modeling to do so. Student was more attentive when the tests included concrete objects and familiar reinforcers.

54.    Dr. Murphy first assessed Student's speech and articulation. She was not able to use formal tests because Student had limited speech. Her testing was therefore informal, based on her observations of Student. Student only produced a limited range of sounds, generally single consonants or vowels. The only consonant-vowel sounds he made consistently were "mo" and "ma," although Student would often string the latter sounds together ("ma-ma-ma-ma"). Dr. Murphy was unable to assess Student's voice and fluency because of his lack of verbalization.

55.    Dr. Murphy used another assessment tool to measure Student's communicative competence by looking at his eye gaze, gestures, words, sounds, understanding, and play. The test uses preferred activities and fun trials to elicit a response. Using this test, Dr. Murphy conducted 12 trials with Student. He appropriately looked to the adult and either vocalized or gestured with a reach, by pointing, giving an object to the adult, or other acceptable indicating behaviors in seven of the 12 trials. Early communicative behaviors have three primary goals: behavior regulation, social interaction, and joint attention. Dr. Murphy found that Student only used communication for the purpose of regulating the behavior of others to obtain preferred items. Student sustained eye gaze, engaged in play activities, expressed delight in some of the activities, and produced a high rate of communicative behaviors with accompanying gaze to his communication partner when presented with crackers, his preferred treat. Student reached for the jar of crackers, used a hand sign indicating he wanted "more" and vocalized the "ma-ma-ma-ma" sound.

56.    Student was beginning to use some symbolic augmentative communication through the use of photographic images. Student was beginning to be able to search through a few photographs and recognize preferred items. However, at the time, Student still was not

15

consistent in being able to distinguish preferred and non-preferred items or identify
photographs for juice or water.

57.     Dr. Murphy used a test to assess Student's play skills. During this test,
Student engaged in purposeful exploration of toys provided to him and also attempted to
discover how the toys operated. Student did not consistently engage in more advanced play
activities such as pretending to drink from a cup or trying to find hidden toys. Student's
results on this test indicated that his play skills were at the level of a child aged 13 to 17
months.

58.     Dr. Murphy also assessed Student's expressive and receptive language skills.
The test permits the use of clinical observation, reports, and/or elicitation of responses to
determine the child's specific early language skills. This language test is composed of two
subtests: one addresses auditory comprehension. The other addresses expressive
communication. Student's standard scores on both subtests placed him in the first percentile
of language abilities for a child his age. Student's age equivalency was that of a typically
developing child aged approximately one year and one month old. Student's test results
indicated that he had severely delayed language skills.

59.     Based on the totality of her testing, Dr. Murphy concluded that Student's
overall communication abilities were that of a child aged 12 to 15 months. She concluded
that Student used functional communication such as eye gaze, signs, gestures, vocalizations,
and other indicating behaviors (such as pointing) to direct others to meet his needs. Student
rarely demonstrated communicative behaviors for purposes other than getting others to meet
his needs. Student did not communicate for things such as socializing with peers. He was
particularly successful in requesting choices and indicating his preferred items, and was
beginning to be able to match photographs with objects.

60.     Student presented no documentary evidence or testimony at hearing that
questioned the validity, propriety, or results of Dr. Murphy's assessments, or contradicted
Dr. Murphy's findings, observations, and recommendations. Student's parents privately
funded speech therapy for Student for a year and a half by a speech pathologist named
Natalie Neal. However, Ms. Neal did not testify at this hearing and no formal assessment
from her was offered as evidence. Although Ms. Cottier did testify at the hearing about her
augmentative communication assessment, Student never questioned her about Dr. Murphy's
speech assessment or any speech goals developed for Student by the District in any of its
IEP's. There is thus no evidence that controverts the appropriateness of Dr. Murphy's
assessment or any speech goals she developed for Student in any of his IEP's.

61.     Jennie Ni administered an occupational therapy assessment to Student as part
of his triennial. Ms. Ni observed Student and spoke with his teacher as part of her
assessment process. Student was able to participate in both gross motor and fine motor
activities at school. However, he could be inconsistent if he was having a bad day. If so, he
might cry and resist participating even in preferred activities such as using the swings or the
obstacle course. Although Student's level of alertness had improved since starting preschool,

16

**21**

he continued sometimes to demonstrate a lowered level of alertness. To address this, his teacher offered him alerting activities throughout the school day, such as jumping on a trampoline and using playground equipment.

62.     Student did not have gross motor needs. He was able to access all the equipment in the occupational therapy room and on the playground, and was able to maneuver through the classroom. Student's parents agreed that one of his strengths was his ability to use playground equipment.

63.     Since Student did not demonstrate any gross motor needs, Ms. Ni administered only the fine motor subtests of the assessments she used. One included tasks for cutting, building, lacing, grasping, and copying. This test, in conjunction with observations of Student, established his present level of fine motor skill development. Student had a difficult time with visual motor integration skills on the test. In general, his visual attention for tasks was short. Student sometimes did not understand a task or the directions for it. His overall grasping score was poor, but in class, Student had the hand skills to participate in most of the preschool fine motor activities. His visual attention in class for fine motor tasks was four to five seconds. Student could trace letters, but only with prompts. Student's scores on the fine motor assessments indicated that his fine motor skills were at the level of a child aged 20 to 28 months.

64.     Sensory processing refers to the handling of sensory information through vestibular (pertaining to balance and spatial orientation), proprioceptive (perception of things around you), tactile, auditory, visual, olfactory (pertaining to smell), or gustatory (pertaining to taste) means.[6] Ms. Ni assessed Student's sensory processing by having his teacher, Ms. Steinman complete a sensorimotor questionnaire that is designed to obtain information about how the teacher views a child's sensory processing in the classroom. Ms. Ni also observed Student in the occupational therapy clinic room. The test indicated that Student's sensory processing in the areas of self-regulation, touch, and over-reactive processing of movement, were in the normal range. Student participated appropriately in those areas at school.

65.     However, Student scored at-risk in the area of under-reactive sensory processing of movement. Student preferred fast-moving, spinning equipment, and seemed less dizzy than other children after spinning. Student especially liked movements such as bouncing, using a rocking chair, being turned in a swivel chair, and being upside down. Student also scored at risk in the area of motor planning and coordination. Student did not always use two hands for tasks that required it; he had difficulty dressing himself; he had difficulty with large muscle activities such as jumping on two feet; he ate in a sloppy manner; and did not spontaneously choose activities involving the use of tools.

66.     Ms. Steinman and Parents completed another rating scale that measures social participation; vision; hearing; touch; body awareness; balance and motion; and planning and

---

[6] Definitions found at www.dictionary.com

17

Exhibit A Page 0021
AR 1287

**22**

ideas. Student had more difficulty in the classroom than he did at home. Ms. Steinman's
scores indicated Student had definite dysfunction in all areas other than body awareness,
where Ms. Steinman's score indicated only some problems. Parents' scores indicated
definite dysfunction only in the areas of touch, and planning and ideas.

67.     Based upon the results of all these assessments, Ms. Ni found that Student was
functioning below age level in his visual-motor skills. However, he demonstrated good hand
strength and manipulation skills and thus was able to satisfactorily participate in fine motor
activities in the classroom. Student continued to have difficulty maintaining an optimal
arousal level in class, which was demonstrated by his low level of alertness at school.

68.     Student presented no evidence to dispute the validity, appropriateness, or
accuracy of Ms. Ni's assessment. The only occupational therapists who testified at the
hearing were Ms. Ni and, as discussed below, another District occupational therapist named
Tim Chia Chen, who did a sensory diet profile of Student in 2013. Both Ms. Ni and Mr.
Chen testified to the appropriateness and validity of their respective reports of Student. Dr.
Hughes did not review or testify about any of the District's occupational therapy assessments
and, in any case, is not an occupational therapist and has no training in the field. Ms. Cottier
mentioned Student's possible sensory needs, but she is a speech pathologist and is not trained
as an occupational therapist. There is no evidence in the record that indicates that Ms. Ni's
testing did not accurately assess Student or did not accurately reflect Student's present
abilities and needs in the area of occupational therapy.

69.     Ms. Kent, Ms. Steinman, Dr. Murphy, and Ms. Ni all opined at hearing that
the assessments they administered were thorough, were administered in Student's primary
language, and used appropriate multiple assessment tools that were validated to produce
accurate, relevant, and reliable results. All four assessors stated that the assessment tools
they used were not racially, culturally, or sexually discriminatory. They all indicated that
each standardized or normed assessment was administered pursuant to the publisher's
instructions, and they were respectively qualified to administer them. All four assessors used
assessment tools that were nationally recognized, were appropriate for Student's age and
cognitive levels, and which elicited scores that were an accurate and reliable measure of
Student's abilities at the time he was tested. Student presented absolutely no evidence that
contracted the testimony of Ms. Kent, Ms. Steinman, Dr. Murphy, or Ms. Ni, as to the
validity of their respective assessment processes or the reliability of their results.

70.     Based on the results of the entire battery of assessments administered to
Student, the recommendation of the multidisciplinary assessment team was that Student was
eligible for special education and related services under the categories of intellectual
disability and speech and language impairment, in addition to his then current eligibility
under autistic-like characteristics. Student presented no evidence that contradicted these
findings.

18

ADMINISTRATIVE RECORD FOR MATTER 2012050785          02/25/2014          1289 of 1332

*February 4, 2011 IEP Meeting*

71.     Student's IEP team met on February 4, 2011, for his annual IEP meeting and
to review the District's triennial assessment. Parents, Ms. Steinman, Ms. Kent, Dr. Murphy,
Ms. Ni and an occupational therapy student, and a District administrator were the IEP team
members who attended the meeting. Those team members who had assessed Student
discussed the results of their testing. The team then discussed Student's progress on his
goals from the prior year. Based upon the results of the assessment and Student's progress or
lack of progress on current goals, the IEP team developed new, yearly goals for him.

72.     Student had met his readiness goal in the area of putting together three-piece
puzzles. The team therefore developed two new readiness goals. One goal was for Student
to be able to identify parts of his body when requested by pointing or touching the body part.
The second goal addressed motor imitation. The goal required Student to imitate four out of
six two-step, non-verbal actions without prompts.

73.     Student had two previous self-help goals. He had met the goal for learning a
hand washing routine. He had progressed toward meeting a goal for using a toilet for
urination. In response, the team developed two new goals that also addressed toileting. The
goals broke down toileting into two separate acts: one upon entering the bathroom and one
upon getting ready to leave. Based upon Student's needs, the team developed an additional
self-help goal to use utensils to eat instead of using his hands.

74.     Student met his behavior goals in safety awareness and responding to his
name. Student had only met 20 percent of his goal in calming strategies, but he had
significantly reduced the duration and severity of his screaming and whining behaviors.
Although Student was not compliant when he was engaging in the behaviors, he was not
aggressive toward staff or his peers. To address his continuing behavioral needs, the IEP
team developed two new behavior goals. The first goal sought to decrease the amount of
time necessary for Student to comply with directives, such as to sit down. The second goal
addressed Student's need to stay with the group of other students when transitioning from
one activity to another.

75.     Student's February 2010 IEP had contained two social/emotional goals.
Student had met the goal addressing eye contact with whoever was communicating with him.
He was progressing on his goal to hand objects to a peer when verbally requested to do so.
The IEP team developed two new goals to address Student's continuing social/emotional
needs. The first goal was in functional play. It required Student to use a toy or item of play
for its intended purpose. The second goal addressed Student's unwillingness to stay in a
group. It required him to stay in the group, such as at circle time, for at least four minutes.

76.     Student had had four speech goals. He had made 50 to 66 percent progress on
his goals in the areas of functional communication, matching objects to photographs of the
objects, and rate of communication. Student had only made 10 percent progress on his goal
in receptive vocabulary. In response, the IEP team re-evaluated the goals based on Dr.

19

**24**

Murphy's speech assessment and Student's lack of progress. The team developed four
different speech goals for Student. The aim of the first goal was for Student to identify
himself doing different actions, such as eating, using photographs of him engaging in the
action. The second goal was for matching objects to photographs of the objects. It was
similar to Student's prior goal, but increased the amount of objects Student would be
expected to match. The aim of the third speech goal was for Student to learn how to shake
his head "no" if he did not want something. The fourth goal addressed following
instructions. The IEP team still did not believe that Student was ready to try electronic
assistive technology because Student was still having difficulty with receptive and expressive
language concepts.

77.     Student had met his fine motor goal of using loop scissors. He was
progressing toward his goal of visually paying attention to tasks. Student was only able to
visually attend to his fine motor tasks, such as drawing lines, for three to five seconds. The
IEP team re-wrote this goal, with the aim of Student being able to be visually focused for
eight seconds at a time.

78.     Student had met his goal of motor planning in the area of sensory processing.
He had almost met his goal in visual attention, a goal related to his fine motor goals.
Because Student had basically met the goals, and because Student's sensory processing
needs were met within his preschool curriculum, the IEP team did not develop any new
sensory processing goals for Student.

79.     The team then discussed Student's occupational therapy needs. Parents
expressed concern that 15- minute sessions of occupational therapy was too little for Student
to make progress. The District IEP team members explained that because Student had such a
short attention span, longer therapy sessions were not productive. Ultimately, the District
team members acceded to Parents' concerns and offered one, 30-minute small group session
of occupational therapy per week. Ms. Ni suggested adding a 30-minute per month
consultation between the occupational therapist and Student's teacher as a component of
Student's occupational therapy services rather than direct individual services. She felt the
consultation would help ensure that Student's alertness in the classroom was at an
appropriate level and would allow an ongoing opportunity for the occupational therapist to
share ideas with other members of Student's team. Ms. Ni felt this would be more beneficial
to Student than direct individual services. Parents agreed to the proposed occupational
therapy goals and services.

80.     Based upon her assessment of Student, including the input from Parents,
Student's teacher, and the other assessors, Dr. Murphy recommended that Student receive
two, 15-minute individual speech therapy sessions a week and one, 30-minute session of
speech therapy in a small group.

81.     Although Parents ultimately consented to this IEP, including the speech
therapy services and goals, they indicated on the IEP document that they did not believe one
hour a week of speech therapy was sufficient or that the speech goals were adequate. They

20

were concerned that Student was not making progress in his communication skills. They were concerned that the window of opportunity for learning functional communication - in particular verbal speech - was going to close on Student and he would be unable to learn to communicate in the real world.

82.   Parents requested that the District triple the amount of speech therapy to three hours a week. However, Parents did not give a concrete reason why they believed three hours specifically was what Student required to make progress in communicating. Neither parent has training or experience in speech therapy. Student presented no evidence that a speech pathologist or other speech professional specifically recommended three hours a week.

83.   Dr. Murphy disagreed that it would be beneficial for Student to receive three hours a week of services. She believed that the collaborative model used in the Little Seahorse program provided embedded speech services to Student throughout his school day in a functional environment. The school staff were targeting Student's goals to generalize his skills across different people and across different settings. Pulling a child out of class for services did not help to generalize skills. Additionally, Student's short addition span was not conducive to large amounts of pull-out services. During the short 15-minute speech sessions, the therapists were able to keep Student engaged and did not have to give him a break. Student presented no evidence to contradict Dr. Murphy's opinion that the speech therapy services and goals she recommended met Student's needs.

84.   Student was scheduled to transition to kindergarten after the 2010-2011 school year ended in June 2011. Parents did not want Student placed in a general education kindergarten. The IEP team, including Parents, agreed that Student would continue his preschool placement in Ms. Steinman's special day class, with its reverse mainstream component, until the end of the school year. The team agreed to convene another meeting before the end of the school year to address Student's transition to kindergarten.

*March 8, 2011 IEP Meeting*

85.   The District sent a letter to Parents on February 16, 2011, detailing the specifics of its IEP offer and reiterating why it did not adopt Parents' request for three hours a week of individual speech therapy or additional speech goals. However, the District representative who wrote the letter inadvertently stated that the District's offer of individual speech services was two, 30-minute sessions a week rather than that the two, 15-minute individual sessions written on the IEP document.

86.   On March 8, 2011, the District convened an addendum IEP meeting to again discuss Parents' request for additional speech therapy and speech goals. The District staff explained in more detail how Ms. Steinman's classroom was a language-rich environment that embedded language and communication skills into the everyday curriculum. Dr. Murphy explained how she collaborated daily with Ms. Steinman and the rest of the Little Seahorse staff and service providers to address the language needs of Student and his peers.

21

At the hearing, Dr. Murphy explained that embedding language in the class day was best practice for creating a naturalistic setting to learn language and to generalize language across environments.

87.     Dr. Murphy did not believe that Student required more than an hour a week of pull-out speech services. However, because the letter from the District representative had stated the District was offering two, 30-minute individual speech therapy sessions, the District honored the offer and agreed to increase Student's speech services. Parents still believed Student required three hours of speech therapy a week. For reasons never explained during this IEP meeting and never explained at hearing, Parents did not agree to the District's offer to increase Student's individual therapy to two, 30-minute sessions a week. Their reticence was illogical; although the District did not adopt Parents' requested increase to three hours a week of services, any increase should have been of benefit to Student if Parents were correct that the original amount of therapy offered by the District was inadequate.

*April 19, 2011 Kindergarten Transition IEP Meeting*

88.     Student's IEP team met on April 19, 2011, to plan his transition to kindergarten in September 2011. Present at this meeting were Parents; Ms. Steinman; special education teacher Katherine Burns; Dr. Murphy; a general education teacher; a school psychologist; and a District administrative representative.

89.     All team members agreed that Student should be placed in an ABA special day class kindergarten program. The District kindergarten program is six hours and 50 minutes a day, a bit over an hour and a half longer than its preschool program. Ms. Burns, the kindergarten teacher at Eastbluff Elementary School, taught one of the kindergarten classes. Ms. Burns has a bachelor's degree in psychology. She obtained an Education Specialist credential in 2010. Ms. Burns received training in ABA through a non-public agency prior to being hired by the District. Once hired by the District, Ms. Burns received the intensive ABA training provided by the District through its contract with a non-public agency to all staff working with autistic children. Ms. Burns was initially hired by the District as an ABA facilitator who provided direct services to autistic children in the classroom. She became a special education teacher for the District in 2009.

90.     Ms. Burns described her classroom and the curriculum she used to the IEP team. Student was in her classroom for kindergarten during the 2011-2012 school year and for first grade during the 2012-2013 school year. There were six children in her class Student's first year with her. In addition to Ms. Burns, there was adult support from two aides. The second year, there were seven or eight children in her class and five adults, including Ms. Burns.

91.     Ms. Burns's classroom was based on ABA methodology. She and her support staff targeted behaviors of the children that were interfering with their learning. There were visuals throughout the classroom. She developed a positive reinforcement system, based on a token economy, which was individualized for each child. The classroom was a structured

22

Exhibit A Page 0026
AR 1292

ADMINISTRATIVE RECORD FOR MATTER 2012050785          02/25/2014                          1293 of 1332

environment. At the beginning of the day, the children were taken to the restroom. They
then had a movement break by running around the playground to address sensory needs and
"get the wiggles out" and prepare them for the school day. Ms. Burns reviewed the calendar
for the day right after class started. She then had the children sing some songs. After the
singing, Ms. Burns gave basic instruction in English language arts. The children then moved
through rotations at three centers. There was a center for working on fine motor skills such
as cutting, another for working on math skills, and another to work on pre-reading skills such
as learning letters.

92.    The children had a snack time before recess. The speech pathologist ran the
snack break twice a week as an opportunity to address language skills. After recess, the
children returned to do center rotations. After the rotations, Ms. Burns worked with the class
as a group. She worked on skills such as colors, shapes, and numbers. The children then
went to lunch and recess. After recess, they had some quiet time where they could look at
books, work on puzzles, or work on the computers. When quiet time was over, Ms. Burns
worked on teaching calming strategies with the children as a group. The children then went
to a developmental center in the classroom where they worked in small groups on different
activities each day. Those activities included fine motor art projects, games for social skills,
and basic cooking principles. The activity changed daily. The children then cleaned up, had
an afternoon snack and recess, and prepared to go home.

93.    Ms. Burns used visuals throughout the classroom. The children had to match
pictures of colors to the center rotations to which they were going. The children were taught
to follow a schedule. Each child had an individualized token economy system that addressed
the child's individual behavior needs. Sensory needs were also specifically addressed in Ms.
Burns's classroom. In addition to the outdoor playground activities available to the students
such as swings, her classroom had bouncy balls, therabands, weighted vests and weighted
blankets, a trampoline, an implement resembling a rocking horse, squishy balls, a mat to lie
on for soft pressure, and occupational therapy pressure socks.

94.    The IEP team also discussed how much speech therapy was appropriate for
Student. Although the kindergarten ABA program had similarities with the Little Seahorse
preschool program in that it was based on the use of ABA in a naturalistic environment, there
were some differences in the program. Kindergarten had more focus on academics than on
play. There was less unstructured time in the classroom. For these reasons, Dr. Murphy
recommended increasing Student's group speech therapy sessions from one, 30-minute
session a week to two, 30-minute sessions a week. Dr. Murphy recommended that Student
have two, 15-minute individual sessions a week, as she had originally recommended at
Student's February 4, 2011 IEP meeting. Group therapy was more of more benefit to
Student because he had such a need to learn to acknowledge and relate to his peers.

95.    The IEP team retained Student's amount, duration, and frequency of
occupational therapy. No one on the team suggested deleting, adding, or modifying
Student's goals. The IEP team recommended Ms. Burns's class for Student. Parents did not
object to Student's placement there.

23

96.     The District IEP team members also recommended that Student attend
extended school year classes for four weeks during the month of July 2011, five days a week,
for four hours a day. The team offered occupational therapy and speech therapy during the
regular extended school year as well. The team further recommended Student attend the
supplemental ABA extended school year program for two weeks in August 2011, for two
days a week. The District team members believed that Student's low rate of retention and
high rate of regression warranted these two extended school year sessions. This program is
designed for preschool-aged children. Student ultimately did not attend either of the
extended school year sessions because his family travelled out of the country for the entire
summer of 2011.

97.     Although Parents still disputed the level of speech and language and
occupational therapy services, they consented to this transition IEP.

*February 29, 2012 IEP Meeting*

98.     Student's IEP team met on February 29, 2012, for his annual IEP meeting. In
addition to Parents, the team members consisted of Ms. Burns, Dr. Murphy, a general
education teacher, an occupational therapist, and a District administrative representative.

99.     Parents indicated to the team that Student seemed to understand what they said
to him. They saw his primary challenges as being the need to be potty-trained and his
inability to communicate. Student still did not have a functional communication system.
The IEP team noted that Student did best in a small instructional environment. He
understood a behavior token system and responded well to it. Student would independently
enter the classroom and begin to work on a puzzle. If he was attending to tasks, he was able
to match pictures of items that were the same.

100.    Ms. Burns reviewed Student's progress on his goals and the team developed
new goals for him. Student had met his readiness goal of motor imitation. He had
progressed on his goal of identifying body parts. The team developed a more advanced goal
addressing Student's ability to identify body parts. The new goal required Student to match
body parts through pictures, starting with pictures of his own body parts. Student had had
three self-help goals. He had met his two bathroom goals and progressed 55 percent on his
goal to use utensils for eating. The team developed a more advanced goal to address
Student's bathroom needs. The purpose of the goal was to have Student independently
request to use the bathroom.

101.    Student had met his two behavior goals of following instructions without
exhibiting maladaptive behaviors and transitioning from locations without leaving the group.
The team developed three new, more advanced behavior goals for Student. The objective of
the first goal was for Student to attend to an activity for two minutes. The second goal
required Student to independently navigate throughout his school day using a visual

24

**Exhibit A Page 0028**
**AR 1294**

**29**

schedule. The objective of the third behavior goal was for Student to imitate three non-verbal actions.

102.    Student had met his social/emotional goal of remaining in a group for a minimum of four minutes. He had progressed toward meeting his goal of using toys for their intended purpose. Student's IEP team developed three new social/emotional goals for him. The first was for Student to learn to identify emotional states of people, such as sadness, in a photograph. The second goal focused on Student learning to independently complete his morning school arrival and afternoon school departure routines. The third goal focused on teaching Student not to grab food from his peers.

103.    Student had met all four of his speech and language goals by the February 29, 2012 IEP meeting. His IEP team therefore developed four new goals for him. The objective of the first goal was for Student to learn to use a picture card to indicate the beginning of the time to take a break to go play. The objective of the second goal was for Student to perform a particular action, such as lining up, when he was shown a picture card at the same time a verbal directive was given to him. The third goal focused on Student learning to identify photographs of familiar adult staff and family members. The fourth goal focused on teaching Student to complete out-of-seat directives, such as putting away objects, when shown a picture card of the action requested. However, although Student met his goals, his use of the picture exchange system was not extending across environments. Additionally, Student's communication continued to be a mixture of modalities. He still primarily used gestures, eye gaze, and idiosyncratic signs outside of the classroom.

104.    At this meeting, Parents indicated to the District for the first time that Student had learned to use an iPad and was using it for entertainment purposes at home. They also indicated that they had placed an application on the iPad that supported identifying people's names and faces. Parents indicated that Student could navigate independently through the iPad. As a goal for the next year, Parents wanted the District to use the iPad to teach Student to read and write. Although it was now aware that Student was responding positively to the use of an electronic device, the District did not discuss whether Student's use of the iPad might suggest he was ready to use some sort of electronic device for the purpose of developing a more functional means of communicating. The District did not suggest assessing Student in the area of assistive technology.

105.    The four speech goals indicated that Student would address the goals through the use either of "PECS" (picture exchange communication system or picture cards) or "AAC" (alternative augmentative communication). Dr. Murphy testified that the "AAC" referred to Student's iPad. However, the use of the iPad is not specifically identified in any of the four goals or anywhere on this IEP document. There is no reference to what type of alternative communication Student would be using with the goals if he was not using the picture cards. There is no indication that the IEP team specifically discussed having Student use the iPad for educational purposes or how he would learn to do that. There is no reference to training Student to use the iPad for communication purposes at school. Neither Dr. Murphy nor any other District IEP team member suggested assessing Student in the area of

25

ADMINISTRATIVE RECORD FOR MATTER 2012050785       02/26/2014                        1296 of 1332

augmentative communication to determine if the iPad or any other electronic device would help him increase his ability to communicate. Augmentative communication does not only refer to communication through electronic devices. Picture cards and sign language are types of augmentative communication tools.

106.    Student had met his fine motor goal. His IEP team developed two new fine motor goals for him. The objective of the first was for Student to copy lines and circles. The second goal focused on teaching Student to use scissors with more accuracy.

107.    Student's IEP team also developed academic goals for him for the first time. The team developed a goal to have Student identify numbers one to five. The team also developed a goal for Student to identify letters "A" through "E."

108.    The District offered Student direct occupational therapy services and speech therapy services similar to those in his previous IEP. However, the District also proposed adding 30 minutes a month of formal speech consultation between the speech pathologist and classroom staff to discuss Student's progress and the development of new in-class communication strategies. The District also offered Student extended school year class for four weeks, along with speech and language and occupational therapy services during the summer. Although Parents continued to advocate for more speech and language services, they consented to this IEP.

109.    Soon after this meeting, Ms. Burns permitted Student to bring his iPad to school. She began using the iPad as a reinforcer for Student when he had reached enough tokens to choose an activity as a reward for completing tasks or behaving appropriately. The iPad was a preferred activity for Student. He would play with it in the break tent in his classroom. Student was able to navigate the iPad at least for purposes of play. There is no evidence that Ms. Burns or any of Student's service providers utilized the iPad with Student to work on any of his goals or for purposes of communication.

*Private Speech Therapy Services and the Independent Augmentative Communication Evaluation by Cynthia Cottier*

110.    Parents were concerned about what they saw as Student's slow progress in learning communication skills. They wanted Student to learn to speak. Parents therefore contracted with a speech pathologist named Natalie Neal for private speech therapy sessions for Student. Ms. Neal provided two or three sessions a week to Student, generally for 60 minutes a session. She charged $125.00 an hour. Ms. Neal began providing therapy to Student in March 2011. She ceased providing services in August 2012.

111.    Student did not call Ms. Neal as a witness at hearing. There is no evidence therefore about what type of instruction she used. There is no evidence about how Student responded to the therapy or what type of progress he made.

26

Exhibit A Page 0030
AR 1296

ADMINISTRATIVE RECORD FOR MATTER 2012050785          02/25/2014                    1297 of 1332

112. However, there is evidence in the record of this case that Ms. Neal discharged
Student as a client in August 2012 because he was not making any progress and that her
services therefore were not beneficial. At Student's annual IEP meeting on January 23,
2013, Father informed the IEP team that the private speech services obtained by Parents that
focused on verbal language did not "pay off." Father told the team that Parents had
discontinued the services with Ms. Neal. Parents also informed Dr. Hughes that Student was
discharged from private speech therapy due to lack of progress. Dr. Hughes referenced this
fact in her FBA report. Father tried to downplay this fact at the hearing. But the evidence is
persuasive that after almost a year and a half of private individual speech services for two to
three hours a week, Student made such little progress in learning how to speak or
communicate better that his private therapist discharged him because she was unable to help .
Instead, she suggested that Parents obtain an augmentative communication assessment for
Student.

113. Ms. Cottier assessed Student on July 18, 2012. Her assessment lasted 90
minutes. The purpose of her assessment was to determine if Student's current means of
communication was appropriate, if modifications or adaptations were appropriate, or if any
augmentative communication system should be implemented. Ms. Cottier did not conduct
any observations of Student at school as part of her assessment.

114. Student was able to participate during the entire 90 minute assessment. Ms.
Cottier did notice sensory seeking behaviors in Student, such as his habit of repeatedly
tapping things with his hands or fingers. He also wanted deep pressure stimuli like hugs.
Ms. Cottier was used to such behaviors and was able to manage them with behavior
intervention techniques such as verbal and gestural prompts for Student to stop tapping.
Father, who was present during the assessment, informed Ms. Cottier that a sensory diet was
used with Student.

115. Student indicated an intent to communicate throughout the assessment. He
would tap Ms. Cottier to gain her attention. He used non-standardized signs and gestures.
He would nod his head "yes" or "no." Student also occasionally was able to use the picture
exchange system icons that used both photographs and picture representations that Ms.
Cottier had in her office. Student was essentially non-verbal and could only produce some
simple sound vocalizations. He was able to follow simple directions and was motivated to
do so. Student's receptive language abilities were higher than his expressive language
abilities.

116. Since Ms. Cottier was aware that Student was familiar with using a picture
exchange system, she utilized picture and photograph icons first with Student. Although
Student recognized some symbols and pictures, he did not want to use them and often
selected an incorrect picture. Student demonstrated the least visual attention and poorest
accuracy when using the picture system than of any other communication method Ms.
Cottier presented during her assessment. The use of the picture exchange system appeared to
be too much of an effort for Student.

27

117. Ms. Cottier then tried using voice output devices with Student. Although he responded somewhat to the device that had a digitized voice output and backlit display screen, Student was not able to navigate between the dynamic displays of the device without becoming frustrated and losing interest. In any case, at hearing Ms. Cottier explained that these type of devices are exceedingly more expensive than new electronic devices such as tablets.

118. Ms. Cottier then presented an iPad to Student. The applications for the iPad also run on iPhones and on the iTouch, which is just a bit larger than the iPhone. Ms. Cottier opted to use the iPad with Student rather than the much smaller and more portable iTouch because Student did not demonstrate the sustained visual attention she though necessary to successfully use it. Ms. Cottier believed that the increased visual scanning demands would increase Student's frustration and therefore decrease the likelihood he would be successful using it. Also, Student had already been successful using an iPad for entertainment purposes.

119. Student demonstrated he was able to navigate the iPad independently for favorite activities. It was easy for him to use the touch display system of the device. Student at first only wanted to use the iPad to play games and kept pressing the home button to access the games rather than trying to use the communication programs Ms. Cottier was presenting. She finally covered the home button so that he could not access it. Student then began to utilize the iPad communication applications. He was able to make appropriate selections in a consistent fashion. Student's visual discrimination and discrete choice making abilities were very high using the iPad. They were lowest using the picture exchange system.

120. Student was highly motivated to use the iPad. Ms. Cottier explained that the motivation and desire to use a communication mode is as important as the effort to use it. Student was not using the picture exchange system effectively and his other means of communicating by gestures and idiosyncratic signs was equally limited.

121. Ms. Cottier recommended that Student be provided with a separate iPad for communication and educational purposes to distinguish it from the iPad he used for entertainment. She recommended that he have three to four individual speech therapy sessions a week for 20 to 30 minutes each to focus on teaching him to effectively use the iPad. At hearing, Ms. Cottier clarified that her recommendation was for the total amount of individual speech therapy Student required, not for individual therapy in addition to the individual therapy he was already receiving through his IEP. Ms. Cottier also recommended that Student's parents and his staff at school receive one to two hours of training on the iPad with the functions that would be used with Student.

122. Ms. Cottier was not surprised at Student's ability to use the iPad to communicate. She has assessed non-verbal children as young as three and four-years-old who have become adept at using such a device. She advocates starting children as early as possible with an electronic device so that they can develop communication skills that will cross environments. The earlier it is used, the more the child sees the device as a legitimate

28

Exhibit A Page 0032
AR 1298

**33**

form of his or her own communication. For Student, no other communication method had
proven to be reliable. He was not verbal. He was not using the picture symbols much. The
signs he used were all adaptive and therefore would not be understood even by people who
knew sign language. Additionally, a device such as an iPad was easily taken into the
community where people were familiar with it. It therefore could be used across
environments.

      123.   The District argued that Ms. Cottier's assessment was not reliable for several
reasons. First, Ms. Cottier had not done any classroom observations of Student. However,
as discussed below, Lila Seldin, the District speech pathologist who later assessed Student,
did no observations of Student either and relied fully on reports from staff as to Student's
classroom communication, as did Ms. Cottier. The District also questioned Ms. Cottier's
finding that a picture communications system was not appropriate with Student because she
used picture icons instead of the photographs used in Student's class. However, Ms. Cottier
testified she used both icons and photographs during her assessment, although they were not
the same ones Student was using in his classroom. Additionally, Ms. Seldin found, based on
her conversations with staff working with Student, that he had limited success using any type
of picture exchange system, other than for requesting food.

      124.   The District's criticisms of Ms. Cottier's assessment are therefore not well-
taken because the only real difference between her recommendations and those of Ms. Seldin
was that she recommended the larger iPad instead of the smaller, more portable iTouch. As
discussed below, because Student proved he was able to use the iTouch, in that regard, Ms.
Seldin's recommendation proved to be appropriate and workable with Student.

      125.   Ms. Cottier's assessment confirmed what the District should have realized
after Parents informed Student's IEP team that Student was using an iPad successfully:
Student showed an interest in electronic devices and was able to use one. Had the District
assessed Student after his February 29, 2012 IEP meeting, it would have found, as did Ms.
Cottier and as later did Ms. Seldin, that the use of an electronic device was an appropriate
means of functional communication for Student that would enable him to benefit from his
education where the picture exchange system had not. After Ms. Seldin recommended the
use of an iTouch for Student, the District temporarily offered him speech services
commensurate with Ms. Cottier's recommendations so that Student would learn to use the
device for communication. As Ms. Cottier pointed out, developing Student's use of the
iTouch would substitute for the speech services he previously received that focused on trying
to teach him to speak. Student is therefore entitled to compensatory speech services based on
the District's delay in assessing him in the area of assistive technology.

*District's Augmentative and Alternative Communication Consultation Report*

      126.   After the District received Ms. Cottier's report, it decided to administer its
own augmentative communication assessment to Student. The test was administered by
District speech and language pathologist Lila Seldin, who reviewed Ms. Cottier's report in
preparation for her own assessment.

Exhibit A Page 0033
AR 1299

127.  Ms. Seldin's education and experience are very similar to that of Ms. Cottier. Ms. Seldin also has a master's degree in speech pathology and also has approximately 30 years of experience in her profession. Ms. Seldin is also certified in assistive technology. Like Ms. Cottier, she was a knowledgeable witness who evidenced a sound expertise in her profession.

128.  Ms. Seldin noted that Student communicated through vocalizations, eye gaze, proximity, gestures, walking an adult to what he wanted, sign language and some picture and photograph cards. She noted that Student's symbolic communication, such as using pictures for things like foods and indicating he wanted more of something, was emerging.

129.  Like Ms. Cottier, Ms. Seldin assessed Student using a variety of communication modes. She used an iTouch, employing two different programs; an iPad; and sign language. Those portions of Ms. Seldin's assessment addressing Student's use of a picture exchange system and a portable photo board were based entirely on staff reports of Student's use of those communication systems. Staff working with Student reported that he used the picture exchange systems with limited success across settings. He was more successful using it when requesting food. Ms. Seldin did not specifically observe Student in his classroom or on the playground.

130.  Staff told Ms. Seldin that Student was able to imitate a few sign language words. The signs were approximations and were not easily understood by a communication partner unfamiliar with Student. Ms. Seldin did not recommend that sign language be used as Student's only means of communication. However, she found that it should be used to support Student's communication when augmentative communication was not available.

131.  Student was very successful during Ms. Seldin's assessment using the iTouch loaded with a program called Proloquo2go. He was able to activate buttons when the device was set to very large button size. He was able to independently request items 47 percent of the time. Student was able to scroll through four to six or seven photographs to make choices. He was able to navigate from an "eat" to "play" folder on the iTouch to the specific items for requests 10 times when given gestural prompts. Student was more independent when requesting food items.

132.  Ms. Seldin found that the iTouch with the Proloquo2go program would meet Student's communication needs, including the use of pictures for communication, with auditory feedback. She found that the iTouch would provide Student with an easily portable communication system that could be available to him in the classroom and across other settings. Ms. Seldin also assessed Student using an iPad. Staff had reported to her that Student used the iPad at home for entertainment and at school as a reinforcer. They had reported that Student resisted using it for dedicated communication. While using the iPad with Ms. Seldin, Student kept tapping on it, something he had not done when using the iTouch.

30

133.  Ms. Seldin recommended that Student continue to use multiple means of communication, including picture cards and signs, with staff modeling the pictures in the classroom to reinforce them. She also recommended that Student have a four to six week trial using the iTouch to support his communication needs. Use of the iTouch would ensure Student's ability to communicate across environments, particularly into the community. Ms. Seldin described exactly how the pictures on the iTouch should be set up and how it should be customized for Student. She emphasized that the device should only be used for communication and never for entertainment purposes. Ms. Seldin recommended that since Student required modeling from an adult to navigate between pages and to activate the sentence bar, staff would need to be trained on the iTouch. Finally, if the trial was successful, Ms. Seldin recommended that Student have access to the iTouch for all communication purposes. Ms. Seldin did not recommend the iPad because of Student's use of it for entertainment, because of the sensory issues he had with it shown by his tapping, and because the iTouch was easier to transport.

134.  The District implemented the trial of the iTouch after Student's annual IEP meeting on January 23, 2013. The trial was successful. Although the iTouch has a much smaller screen than the iPad, Student has been able to use it successfully. He has learned to navigate through several pages to find different folders. Dr. Hughes acknowledged Student's successful use of the iPad in her September 2013 FBA report.

*Parties' Interim Settlement Agreement and January 23, 2013 IEP Meeting*

135.  Student filed his original complaint in this case on May 17, 2012. On November 29, 2012, the parties entered into an interim settlement agreement in which the District agreed to contract with Dr. Lauren Franke to do a review of Student's records and make recommendations based on the review. Although the agreement permitted Dr. Franke to conduct observations of Student at her discretion, she chose not to. Dr. Franke did not write a report about her findings and recommendations concerning Student. Neither Student nor the District called Dr. Franke as a witness at the hearing.

136.  Student's IEP team met on January 23, 2013, for his annual review and to discuss Dr. Franke's findings. In addition to Parents and their attorney, the IEP members included Ms. Cottrell, Ms. Seldin, Ms. Burns, Mr. Chen, two other District administrative representatives, another speech and language pathologist, District school psychologist Karrie Anderson, a general education teacher, an attorney for the District, and Dr. Franke. This is the only IEP meeting Dr. Franke attended.

137.  Based on her review of Student's records, Dr. Franke informed the IEP team that a functional analysis assessment of Student should have been done and that assistive technology should have been used with Student. She disagreed that there were any pre-requisites to the use of assistive technology with him, agreeing with Dr. Cottier's findings that assistive technology was appropriate for Student. Ms. Seldin reviewed her assessment. Dr. Franke and the IEP team discussed the need for adults to model several times any device used with Student before offering it to him.

31

ADMINISTRATIVE RECORD FOR MATTER 2012050785          02/28/2014                    1302 of 1332

138. The team then reviewed Student's progress on his goals. Student had met his readiness goal in body parts and no longer needed a goal in that area. Student had not met his bathroom goal and continued to need assistance in toileting. Student had met his behavior goals of attending and daily routines and had partially met his motor imitation goal. The team developed three new behavior goals for Student: one to follow choral instructions, such as "line up;" one in self-regulation; and one in stimulatory reduction, the purpose of which was to decrease Student's stimulatory habit of tapping.

139. Student had met his social/emotional goals in the areas of learning to identify emotions and being able to complete his morning and afternoon routines. He had partially met his goal of waiting and not taking food from other students. The IEP team developed three new goals in this area. The purpose of the first goal was teaching Student to make simple choices of preferred items using some sort of augmentative communication. The second goal was for Student to identify his written name. The third goal was to teach Student to match pictures of his peers to the actual child.

140. Student had met all four of his speech goals. His IEP team therefore developed four new goals. The first was focused on having Student use augmentative communication to indicate when he was "all done" with an activity. The second goal was for Student to use augmentative communication to indicate that he did not want a non-preferred activity or object. The third goal was to teach Student to request items or things he wanted to do. The fourth goal was similar to the third, except that the purpose was for Student to use augmentative communication when requesting items or activities.

141. Student had met his fine motor goal in using scissors and was progressing toward his goal in copying shapes. His IEP team developed two new fine motor goals for him. One goal was for Student to learn to trace the letters of his name. The second goal was for Student to develop more advanced skills with scissors.

142. In academics, Student was progressing toward his math goal. His IEP team developed a new goal in identifying concepts of quantifying, such as full versus empty. Student was progressing in his letter identification goal. The IEP team developed two new language arts goals for him. The objective of one goal was for Student to match a sentence describing an action to a picture of the action. The objective of the second goal was to teach Student to separate pictures of familiar items into categories.

143. The form used by the District to review and describe a student's present levels of performance on goals and to describe new goals, is a model of clarity. The form indicates the student's area of need. It identifies the prior goal by name, describes what the object of the goal was, whether the goal had been met, and, if not, the percentage of progress made on the goal. The form has a space for indicating the student's strengths and needs. It has a space to indicate if a goal in the area is needed. The form then includes an area to describe the student's baseline performance in the area, a space to describe the new annual goal, along

32

with benchmarks and objectives as necessary, how the goal will be evaluated, and the persons responsible for implementing the goal.

144.    In this case, the forms for Student's goals used in every one of his IEP's contained all information necessary to describe Student's present abilities, his need for each of the goals, a description of the goals' objectives, how the goal would be evaluated, and who would be responsible for implementing the goal.

145.    All of the goals developed for Student at each of his IEP's were based on his then present levels of performance, including, where appropriate, his most recent assessments. Each goal had appropriate baselines indicating Student's current abilities in each area. Each goal was measurable. Each goal addressed deficits that Student had and each goal was needed to address those deficits. Each goal was appropriate for Student based on his assessed needs, his skills, his cognitive level, and his expected ability to be able to meet the goal. Ms. Ni, Ms. Kent, Ms. Steinman, Dr. Murphy, and Ms. Burns, all persuasively testified that the goals were properly developed, properly written, and were appropriate for Student.

146.    In their testimony at hearing, Parents did not specifically address why any of the goals in Student's IEP's were inappropriate or failed to be clear or measurable. There is no indication in the IEP notes that Parents requested goals that the District refused to consider or adopt and Parents never testified at hearing that such was the case. Other than Parents, Student presented the testimony of only two non-District witnesses: Ms. Cottier and Dr. Hughes. Neither witness was asked to review the goals in Student's IEP's. Their assessment reports do not reference Student's goals. At hearing, neither witness was asked to critique the goals or offered any testimony questioning the validity, appropriateness, or format of the goals. Student therefore presented no documentary or testimonial evidence that disputed the appropriateness or validity of any of the goals contained in the IEP's at issue in this case.

147.    Based upon input from Dr. Franke, Parents, and the District IEP team members, the team decided to administer two additional assessments to Student: an FBA and an assessment to determine if Student needed a one-on-one aide (also known as an "independence facilitator" at the District). The team also determined that a District occupational therapist would review Student's need for a sensory diet. The IEP team, including Parents, agreed that Student would begin use of the iTouch. The District agreed to provide training to Student's staff and Parents. The District also agreed to invite Student's in-home ABA providers to the training.

148.    The IEP team also discussed the frequency of Student's speech services. The District offered Student one, 30 minute per week group session; one, 30-minute per week individual session; and one, 30-minute per week individual consultation session. In response to a request from Student's attorney, the District agreed to provide Student with three additional 20-minute individual sessions a week on a short-term basis to address the introduction to Student of the iTouch. The District also offered 30 minutes per week of

33

assistive technology consultation in Student's classroom on a short-term basis. Ms. Seldin would also be available as needed for training on the iTouch and support for Student and his team. The IEP team agreed that Ms. Seldin would provide four hours of training on the iTouch to staff supporting Student in the classroom.

*Request for a One-on-One Aide*

*Injury on February 1, 2012*

149.    On two separate occasions, Parents have formally requested the District to assign a one-on-one aide to Student. The first time was in early 2012. On February 1, 2012, Student had an accident at school while on the playground. When the adult playground supervisor who normally was in charge of watching out for Student and one other child briefly turned away from him, Student walked into the path of a child on a swing. The other child crashed into Student. Student received cuts and scrapes, some non-permanent teeth became loose, and Student suffered some type of concussion that caused him to have small seizures for about two weeks. However, in spite of these injuries, Student returned to school the day after the injury.

150.    Student did not suffer any permanent injury from the accident. However, Parents reacted, as would most parents, by being concerned about Student's continued safety at school. Although they did not broach the incident at Student's February 29, 2012 IEP meeting, they wrote to the District on April 5, 2012, requesting that the District provide a one-on-one aide to Student during class and on the playground.

151.    Ms. Cottrell responded on behalf of the District by letter dated April 17, 2012. Among other things, she addressed Parents' request for the aide. She noted that Student had met most of his prior goals and was continuing to make educational progress. Ms. Cottrell also noted that there was a very high ratio of adults to children in Student's class. At the time, Ms. Burns's class had one adult for every two children. The District did not believe that an aide was necessary to address Student's needs.

152.    After the accident, school staff discussed strategies to keep Student safe on the playground. Ms. Burns initially moved Student to a different playground for recess that did not have swings. She returned Student to his original playground when he indicated he wanted to go back. However, to keep him safe, the District assigned an adult to specifically watch Student on the playground and ensure that no further accidents happened. Other than a few cuts and scrapes, Student had never been injured at school before this incident. Between the time he was injured in February 2012, and the hearing in this matter, Student did not suffer any injuries other than a few scratches attributable to interaction with other children. The District attempted to obtain Student's medical records from Parents to determine if Student had suffered any long-term effects of the accident, but Parents declined to provide the records or access to Student's doctor. For these reasons, the District did not believe Student required a dedicated aide. Student's doctor did not testify at the hearing.

34

**Exhibit A Page 0038**
**AR 1304**

*Ms. Anderson's Independence Facilitator Assessment*

153.   The second time Parents formally requested an aide for Student was when they asked the District to conduct an assessment to see if an aide was warranted. The District asked Karrie Anderson to perform the assessment. Ms. Anderson has been a District school psychologist since 2005. She has a master's degree in school psychology. She is presently working on her certification as a Board Certified Behavioral Analyst. Ms. Anderson helped facilitate the programming in Ms. Burns's classroom during the 2012-2013 school year.

154.   Ms. Anderson observed Student six times over a three-week period in April 2013. She observed him in class, during recess and in physical education. Some of the observations were while Student received small group instructions. During other observations he received individual instruction.

155.   Student was in first grade at the time. As with kindergarten, Ms. Burns was his teacher. There were then eight children in his class. In addition to Ms. Burns, there were two classroom aides and two aides assigned to specific children whose IEP's required one-on-one assistance. Ms. Anderson noted that the class was an autism-specific ABA classroom that had a highly structured environment where a daily schedule was posted and followed. The staff used visual and auditory cues to aid communication and learning. There was a high rate of reinforcement used in the class as a whole and with individual children. Student's positive behaviors were reinforced consistently. Student was always in close proximity to an adult.

156.   Student participated appropriately in the classroom activities. He responded to positive reinforcement. He was able to easily transition to new activities. He was able to complete puzzles. Overall, Student was compliant and followed directions most of the time. When he was in one of the center rotation activities, he would visually check in with the aide. During one activity, he calmly waited his turn. Student also was able to use his iTouch to select what he wanted to eat during a break. Student demonstrated interest during lessons. He did not require more than two prompts to follow directions. He was calm at all times observed. Staff reinforced him verbally and with his token board for staying calm and engaging in activities.

157.   On the playground, Student was always in the company of an adult. Student played safely on the swings, pushed by the aide, and played safely and independently on playground equipment. Student did not interact with the aide or the other children but seemed aware of them as he would walk around other children to access equipment. During Ms. Anderson's observation of Student in his physical education class, Student participated in kicking a soccer ball back and forth. He smiled while kicking it and took initiative to kick it. Student was aware of his environment because he watched others, moved around other children when they were in his way, and responded to noises.

158.   Based upon her observations of Student's behavior in class and on the playground, in the context of the structured classroom he attended and the high adult to

35

Exhibit A Page 0039
AR 1305

**40**

student ratio, Ms. Anderson determined that Student did not require a one-on-one aide in order to access his education or to be safe on the playground.

159. Other than Parents, the only witness who testified that Student required an aide, either in 2012 or at the time of the hearing, was Dr. Elizabeth Hughes, the psychologist who headed the private assessment team that conducted an FBA for Student in September 2013. Dr. Hughes has a doctorate degree in clinical psychology. She studied under ABA expert Dr. Ivar Lovaas. Dr. Hughes has written several articles and given several trainings on positive behavior practices. Her experience has been primarily in the supervision of programs providing behavior intervention services to children. Since 2011, she has been the Director of the Institute for Applied Behavior Analysis (IABA), a non-public agency.

160. Dr. Hughes found that Student was not progressing sufficiently in class and that an aide would assist him to focus and pay more attention to tasks. Dr. Hughes also believed that the one incident of Student being injured when he walked in front of a child on a swing was sufficient indication that Student was unaware of his surroundings and needed to have a dedicated staff person watching his every movement on the playground.

161. Dr. Hughes's recommendation for a one-on-one aide is not persuasive. As discussed below, IABA staff made recommendations based on one in-class observation of Student in which no data was taken. Contrary to IABA's conclusions, Student was generally making good progress in school, as evidenced by the testimony of his teachers and Ms. Anderson. He had consistently met most of his goals and had made progress on those he had not met. He was able to access the instruction in the classroom. Ms. Anderson conducted three in-class observations of Student. He functioned appropriately during all three. He was not overly inattentive. When he was, staff was able to re-direct him. Dr. Hughes too lightly disregarded the progress Student was making in class, the progress he made on most of his goals over the last two years, and the fact that all District assessments and IEP's reference the fact that Student was too prompt-dependent in the first place.

162. Student's teacher at the time, Ms. Burns, was in the best position to determine if Student needed an in-class aide because she was with him every day. Ms. Burns noted that Student was making progress on his goals, that there was already a ratio of one adult for every two students in her class, and that Student needed to become more independent rather than more prompt-dependent. Student's IEP goals consistently focused on making him more independent. There were children in Ms. Burns's class who did have a one-on-one aide. She has recommended dedicated aides in the past when appropriate. If Ms. Burns had believed that Student also required one, she would have recommended it.

163. With regard to the issue of Student's safety on the playground, which had prompted Parents' request for the aide in April 2012, the District persuasively demonstrated that it quickly and appropriately responded to Student's injury. A staff person had been assigned to watch Student at all times. Student had not suffered another injury. Dr. Hughes's reliance on one incident, which occurred a year and a half before her assessment, to make a determination that Student required an aide is therefore not persuasive.

36

ADMINISTRATIVE RECORD FOR MATTER 2012050785          02/25/2014                              1307 of 1332

*Sensory Diet Recommendations*

164.   Based upon Parents' request that the District review Student's need for a
sensory diet, District occupational therapist Tim Chen spoke with Ms. Burns to determine
Student's sensory needs. Mr. Chen has a master's degree in occupational therapy. He has
worked as an occupational therapist for the District since 2008.

165.   A sensory diet is a way of facilitating a child's self-regulation skills using
sensory activities incorporated into the child's daily activities. A child's behaviors may not
be based solely on sensory issues, however. Sensory strategies often must be used with
language and behavioral strategies.

166.   Mr. Chen suggested that Student engage in some type of heavy work every 20
to 30 minutes. "Heavy work" refers to activities that provide resistance against gravity. This
type of activity is calming to people who have sensory needs. Mr. Chen found that Student
might also need a "sensory break" after long periods of sitting or concentration. Student
required the breaks before he engaged in negative or inappropriate behaviors, not as a
response to it. Mr. Chen suggested a variety of activities for Student, along with a suggested
schedule of when Student should engage in one of the activities.

167.   However, Mr. Chen was not concerned that Student had not had a specific
written sensory diet previously because sensory strategies were fully embedded in the
curriculum of the District's ABA autism specific classrooms. Mr. Chen was familiar with
Ms. Burns's classroom. There was a trampoline in the classroom as well as therapy balls,
baskets of manipulatives, and other things, like baskets of beans, into which the children
could put their hands. The classroom also had a calming corner. There was an obstacle
course available to the children. The class also had items like weighted vests to apply light
pressure to a child who needed it. Ms. Burns started each day with physical activity to help
regulate the children and prepare them for the school day. The class day had several recess
breaks to allow the children to engage in physical activity as well. Although Student had not
had a written sensory diet prior to the one Mr. Chen prepared, Student presented no
persuasive evidence that his sensory needs were not met in his classroom.

*District's Functional Behavior Assessment*

168.   The District conducted an FBA at Parents' request. The assessment was done
by Ms. Burns and Dr. Elizabeth DelPizzo, a District autism specialist. Dr. DelPizzo did not
testify at the hearing.

169.   Based on IEP team discussions at the January 23, 2013 IEP meeting, the FBA
focused on three of Student's behaviors at school: pushing his palm or someone else's palm
to his chin; tapping his fingers for three or four counts; and squeezing and/or twisting another
person's wrist or hand in a way that might be considered aggressive.

37

**Exhibit A Page 0041**
**AR 1307**

**42**

170.   Ms. Burns provided information concerning the onset of each of the behaviors. The assessors also took data to determine what the antecedents or triggers were for each behavior, and the frequency and duration of the behaviors. The data also addressed the severity of the behaviors, when and if staff addressed the behavior, and Student's response to any interventions by staff. Finally, the assessors used the data they obtained to determine if any of the three behaviors was interfering with the ability of Student or his peers to access their education, or was causing physical harm to Student or to others.

171.   The data indicated that none of the behaviors had any marked impact on Student's education or that of his fellow students. If Student pushed his chin to his palm, staff would re-direct him and Student would comply. Student did not suffer any physical injury from the behavior.

172.   Student's tapping behavior occurred most often when he had some type of hard object to manipulate or when he was walking near a hard surface. The data indicated that the behavior did not interfere with Student's ability to learn and did not interfere with social interactions. When staff noticed Student engaging in the behavior, Student was prompted to stop it. Student received tokens when he did not engage in tapping.

173.   Student's manner of grabbing or twisting another person's hand or wrist occurred when he was asked to do something he did not want to do or when he was in close proximity to an adult. The behavior was never directed at another child. The assessors believed that this behavior was the result of Student's frustrations with not being able to understand what others were trying to tell him or direct him to do. The assessors believed that it was Student's frustration at not being able to communicate that caused the behavior. In any case, the behavior was not interfering with Student's ability to access his education, was not affecting his peers, and was not causing injury to him or to the adults in the classroom.

174.   The assessors determined that the three behaviors were triggered when Student was waiting to do something, was presented with instructional demands, or needed to communicate. Overall, the purpose of the behaviors was to escape or avoid tasks or demands, for self-stimulation, or because of frustrations with communication. The assessors recommended that the District continue to emphasize teaching Student functional communication with the iTouch, with verbal directions, and with his picture cards, which would ease his frustrations with not being able to communicate effectively. They recommended that the District continue to assess the type of reinforcers that were effective with Student and continue to expand Student's play skills. The assessors further recommended that the District continue to teach Student calming strategies and continue to use the token system to teach him not to engage in the aggressive behaviors. Finally, the assessors recommended that the District continue to offer Student verbal guidance and redirection.

175.   None of the three targeted behaviors were interfering with Student's progress toward his goals, were interfering with the education of his peers, or were physically harming

38

Exhibit A Page 0042
AR 1308

**43**

Student or anyone else in his classroom. All of the many recommendations that the assessors had to address the behaviors were already being implemented for Student. The assessors therefore did not recommend that the District develop a behavior support plan or behavior intervention plan for Student.

### May 2, 2013 IEP Meeting

176.    Student's IEP team met on May 2, 2013, to review the results of the District's assessments. The District assessors informed Parents at this meeting that the results of the assessments indicated Student did not require a one-on-one aide or a behavior support plan. The IEP team agreed that the sensory diet would be formally implemented as part of Student's IEP.

177.    By the time of this meeting, Student had been using the iTouch for approximately three months. He was using it in school and at home with appropriate prompting. Student was functionally using the iTouch. Importantly, Student was responding to questions about personal needs and wants, and to location questions about where he was. The District had provided training on using, programming, and customizing Student's iTouch to Ms. Burns, Father, Student's in-home ABA supervisor, the speech therapist, and Mother. Ms. Seldin had also provided weekly assistive technology consultations in Student's classroom with Student, Ms. Burns, and the speech therapist. Although the consultation was supposed to have ended in March, 2013, the District had continued to provide it weekly through mid-April. At this IEP meeting, the District agreed to provide 30-minute monthly assistive technology consultations through the reminder of the time covered by Student's January 23, 2013 IEP.

### Functional Analysis Assessment by IABA

178.    Parents were not satisfied with the District's FBA. They therefore privately funded an FBA through the IABA, of which Dr. Hughes is the present Director. For unknown reasons, IABA assigned eight people to be part of the team conducting this assessment. Three of the eight had doctorate degrees and three had master's degrees. IABA conducted its assessment between May 30 and September 17, 2013. The IABA assessors reviewed Student's records, did observations of Student at school and at in his ABA program at home, reviewed video recordings of Student's ABA sessions and prior speech private speech sessions, and interviewed Student's family, his ABA provider, and his staff at school.

179.    The IABA assessment focused on what the report called "inconsistent responding behaviors." These consisted of Student doing the following: failing to respond to stimuli to which he had previously responded; requiring prompts for skills which he had previously demonstrated independently; responding incorrectly to a skill that Student had demonstrated correctly within the same trial set or learning session; and responding with a behavior that was the target response for a previously targeted skill, rather than the skill currently being targeted. IABA concluded that it was these behaviors that were interfering with Student's ability to access his education. IABA concluded that neither the District staff

39

ADMINISTRATIVE RECORD FOR MATTER 2012050786          02/25/2014                                    1310 of 1332

nor Student's in-home ABA providers were correctly responding to or addressing Student's behaviors. IABA additionally concluded that neither the District staff nor Student's in-home ABA providers were correctly practicing ABA principles with Student. IABA concluded that this was another reason why Student was failing to progress.

180.    There are many flaws in the IABA report. It is almost impossible to determine from the report whether observations relate to the home or to the school environment. For example, the report states that Student did not always have access to his augmentative communication device (referring to the iTouch). The report fails to state whether this was at home, in school, or both. This is a consistent problem throughout the report. There is no specific description of Student's behaviors in his classroom. There is no indication of the specific data collected either in the home or at school. Significantly, the IABA report does not discuss the many advances that Student had made throughout the years on meeting the majority of his goals and progressing substantially on the few he did not meet.

181.    Bonnie Hinton is an autism specialist for the District. She has a master's degree in special education, a special education teaching credential, and is a Board Certified Behavior Analyst. She testified at hearing as an expert for the District. Ms. Hinton explained that what IABA termed "inconsistent responding behavior" was just a description of Student's inattentive behavior. Inattention is part of the inherent component of autism and can be addressed through prompting, IEP goals, reinforcement, and consequence strategies. All of these had been used with Student.

182.    IABA made several recommendations to address the concerns it had about Student's education. All of them were already being addressed in one manner or another in Student's school program. Prompt hierarchies were being implemented in his class. The District had not written a specific goal for this because it was an inherent part of the teaching strategy used in the classroom. The District also included collaboration between the staff members working with Student because it was an inherent part of the District's autism specific classroom programs and was implemented on a daily basis. Collaboration between specific service providers and Student's teachers were part of the related services offered to Student in most of his IEP's. Student's latest IEP specified collaboration between the assistive technology specialist and Student's team at school. Likewise, the District had incorporated the concept of relevant and functional stimuli into goals for Student. For example, one of his earlier goals had been to identify body parts. The District had also developed functional goals addressing, inter alia, Student's daily routines, his toileting, his ability to identify people and objects, his ability to make choices, and his need for pre-academic skills such as tracing letters.

183.    IABA recommended that Student have full access to his iTouch. The District had developed goals using the device, had provided therapy sessions for Student to learn to use it, and had provided training to his teacher and staff, his parents, and his in-home providers. The District had confirmed at Student's May 2, 2013 IEP meeting that Student was using the iTouch throughout his school day.

40

Exhibit A Page 0044
AR 1310

184.    The District was addressing Student's need to access his peers by developing
goals for him to learn what emotions are and to identify his peers. The District was also
already providing visual supports in Student's classroom through visual schedules, the token
boards, and picture cards used as aids to represent different parts of Student's school day.

185.    Ms. Hinton's opinion that IABA's assessment failed to define issues not
already being addressed by the District was therefore ultimately more persuasive than Dr.
Hughes's criticism of the District's program. IABA's failure to follow best practice data
collection criteria, its failure to identify whether its observations referred to Student's home
program or to his school program, its failure to recognize the gains Student had made on his
goals through the years, and its failure to acknowledge the emphasis placed by the District on
addressing Student's inattention at school through programming, services and goals, all
weakened its finding that the District was not addressing Student's needs at school.

## LEGAL CONCLUSIONS

*Introduction – Legal Framework under the IDEA[7]*

1.    This hearing was held under the Individuals with Disabilities Education Act
(IDEA), its regulations, and California statutes and regulations intended to implement it. (20
U.S.C. § 1400 et. seq.; 34 C.F.R. § 300.1 (2006) et seq.;[8] Ed. Code, § 56000, et seq.; Cal.
Code. Regs., tit. 5, § 3000 et seq.) The main purposes of the IDEA are: (1) to ensure that all
children with disabilities have available to them a FAPE that emphasizes special education
and related services designed to meet their unique needs and prepare them for employment
and independent living, and (2) to ensure that the rights of children with disabilities and their
parents are protected. (20 U.S.C. § 1400(d)(1); See Ed. Code, § 56000, subd. (a).)

2.    A FAPE means special education and related services that are available to an
eligible child at no charge to the parent or guardian, meet state educational standards, and
conform to the child's IEP. (20 U.S.C. § 1401(9); 34 C.F.R. § 300.17; Cal. Code Regs., tit.
5, § 3001, subd. (p).) "Special education" is instruction specially designed to meet the
unique needs of a child with a disability. (20 U.S.C. § 1401(29); 34 C.F.R. § 300.39; Ed.
Code, § 56031.) "Related services" are transportation and other developmental, corrective
and supportive services that are required to assist the child in benefiting from special
education. (20 U.S.C. § 1401(26); 34 C.F.R. § 300.34; Ed. Code, § 56363, subd. (a) [In
California, related services are also called designated instruction and services].) In general,
an IEP is a written statement for each child with a disability that is developed under the
IDEA's procedures with the participation of parents and school personnel that describes the

---

[7] Unless otherwise indicated, the legal citations in the introduction are incorporated by
reference into the analysis of each issue decided below.

[8] All references to the Code of Federal Regulations are to the 2006 edition.

41

Exhibit A Page 0045
AR 1311

**46**

ADMINISTRATIVE RECORD FOR MATTER 2012050786          02/26/2014          1312 of 1332

child's needs, academic and functional goals related to those needs, and a statement of the special education, related services, and program modifications and accommodations that will be provided for the child to advance in attaining the goals, make progress in the general education curriculum, and participate in education with disabled and non-disabled peers. (20 U.S.C. §§ 1401(14), 1414(d); Ed. Code, § 56032.)

3.    In *Board of Education of the Hendrick Hudson Central School Dist. v. Rowley* (1982) 458 U.S. 176, 201 [102 S.Ct. 3034, 73 L.Ed.2d 690] ("*Rowley*"), the Supreme Court held that "the 'basic floor of opportunity' provided by the [IDEA] consists of access to specialized instruction and related services which are individually designed to provide educational benefit to" a child with special needs. *Rowley* expressly rejected an interpretation of the IDEA that would require a school district to "maximize the potential" of each special needs child "commensurate with the opportunity provided" to typically developing peers. (*Id.* at p. 200.) Instead, *Rowley* interpreted the FAPE requirement of the IDEA as being met when a child receives access to an education that is reasonably calculated to "confer some educational benefit" upon the child. (*Id.* at pp. 200, 203-204.) The Ninth Circuit Court of Appeals has held that despite legislative changes to special education laws since *Rowley*, Congress has not changed the definition of a FAPE articulated by the Supreme Court in that case. (*J.L. v. Mercer Island School Dist.* (9th Cir. 2010) 592 F.3d 938, 950 [In enacting the IDEA 1997, Congress was presumed to be aware of the *Rowley* standard and could have expressly changed it if it desired to do so.].) Although sometimes described in Ninth Circuit cases as "educational benefit," "some educational benefit," or "meaningful educational benefit," all of these phrases mean the *Rowley* standard, which should be applied to determine whether an individual child was provided a FAPE. (*Id.* at p. 950, fn. 10.)

4.    The IDEA affords parents and local educational agencies the procedural protection of an impartial due process hearing with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a FAPE to the child. (20 U.S.C. § 1415(b)(6); 34 C.F.R. 300.511; Ed. Code, §§ 56501, 56502, 56505; Cal. Code Regs., tit. 5, § 3082.) The party requesting the hearing is limited to the issues alleged in the complaint, unless the other party consents. (20 U.S.C. § 1415(f)(3)(B); Ed. Code, § 56505, subd. (i).) Subject to limited exceptions, a request for a due process hearing must be filed within two years from the date the party initiating the request knew or had reason to know of the facts underlying the basis for the request. (20 U.S.C. § 1415(f)(3)(C), (D).) At the hearing, the party filing the complaint has the burden of persuasion by a preponderance of the evidence. (*Schaffer v. Weast* (2005) 546 U.S. 56-62 [126 S.Ct. 528, 163 L.Ed.2d 387]; see 20 U.S.C. § 1415(i)(2)(C)(iii) [standard of review for IDEA administrative hearing decision is preponderance of the evidence].)

*Issues 1 and 4: Failure to Appropriately Assess Student in All Areas of Suspected Disability since May 16, 2010*

5.    Student makes two contentions regarding the District's duty to assess him. First, he contends that the District assessments were not appropriate. Second, he contends that the District failed to timely assess him in all areas of suspected need. Student contends

Exhibit A Page 0046
AR 1312

that the District should have assessed him earlier than it did in the areas of assistive technology and functional behavior. He further contends that when the District finally administered the assessments, they were not appropriate. Finally, Student contends that the District has not appropriately assessed his sensory processing needs.

6.      The District contends that all assessments it administered meet applicable legal standards. It also contends that its assessments were timely and that it assessed all of Student's suspected areas of need.

7.      As stated above in Legal Conclusion 2 "related services" are developmental, corrective, and supportive services as may be required to assist the child in benefiting from special education, and include OT, PT, health and nursing services, assistive technology and speech and language pathology. A FAPE means special education and related services that are available to the child at no charge to the parent or guardian, meet state educational standards, and conform to the child's IEP. The basic floor of opportunity provided by the IDEA consists of access to specialized instruction and related services which are individually designed to provide educational benefit to a child with special needs.

8.      A state or local educational agency must conduct a full and individual initial assessment before the initial provision of special education and related services to a child with a disability. (20 U.S.C. § 1414 (a); 34 C.F.R. § 300.301; Ed. Code, § 56320). After a child has been deemed eligible for special education, reassessments must be performed if warranted by the child's educational or related service's needs. (20 U.S.C. § 1414 (a)(2)(A)(i); 34 C.F.R. § 300.303(a)(1); Ed. Code, § 56381, subd. (a)(1)). However, absent an agreement to the contrary between a school district and a student's parents, reassessments must not occur more than once a year, or more than three years apart. (20 U.S.C. § 1414 (a)(2)(B); 34 C.F.R.§ 300.303(b); Ed. Code, § 56381, subd. (a)(2).)

9.      A local educational agency must assess a special education student in all areas of suspected disability, including if appropriate, health and development, vision, hearing, motor abilities, language function, general intelligence, academic performance, communicative status, self-help, orientation and mobility skills, career and vocational abilities and interests, and social/emotional status. (20 U.S.C. § 1414(b)(3)(B); 34 C.F.R. § 300.304 (c)(4); Ed. Code, § 56320, subd. (f).) A local educational agency must use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information. (20 U.S.C. § 1414(b)(2)(A)). No single measure or assessment shall be the sole criterion for determining whether a child is a child with a disability. (20 U.S.C. § 1414(b)(2)(B); 34 C.F.R. § 300.304(b)(2); Ed. Code, § 56320, subd. (e)). Assessments must be sufficiently comprehensive to identify all of the child's special education and related service needs, whether or not commonly linked to the disability category of the child. (34 C.F.R. § 300.304 (c)(6).) The local educational agency must use technically sound testing instruments that demonstrate the effect that cognitive, behavioral, physical, and developmental factors have on the functioning of the student. (20 U.S.C. § 1414(b)(2)(C); 34 C.F.R. § 300.304 (b)(3).) The IEP team must consider the assessments in determining the child's educational program. (34 C.F.R. § 300.324(a)(1)(iii)).

43

**Exhibit A Page 0047**
**AR 1313**

**48**

10. The District administered an early triennial multidisciplinary assessment to Student in January and February 2011. The District assessed Student in the areas of cognition, academic achievement and ability, speech and language, and occupational therapy. In November and December 2012, the District administered an assistive technology assessment to Student. Each of the assessors used a variety of assessment tools that were appropriate for the purpose of each assessment, and correctly administered them. All of the assessors were very experienced in conducting assessments, and qualified to conduct them. The assessments were not discriminatory in any way, and were administered in English, Student's primary language. Student presented no evidence that the assessments did not meet all legal requirements.

11. Student presented the testimony of Dr. Hughes and Ms. Cottier, two experienced professionals who would have been qualified to critique the District's assessments, Dr. Hughes in the area of psycho-educational and Ms. Cottier in the area of speech and assistive technology. Yet, neither of these witnesses were questioned about the District assessments that they were respectively qualified to address. Student has failed to meet his burden of proof that any section of the District's triennial assessment was inappropriate or that Ms. Seldin's assistive technology assessment was inappropriate.

12. Student alleged that the District failed to assess him in the area of social integration. However, Student failed to provide any evidence whatsoever that a specific assessment in this area should have been administered or that the District's triennial assessment did not address that area of need. The triennial assessment specifically assessed Student's social/emotional development. No one at hearing testified that the assessment was not appropriate or that it failed to address Student's social or emotional needs. Student has failed to meet his burden of proof in this regard.

13. In May 2013, the District administered an assessment to determine whether Student required the assistance of a one-on-one aide, known in the District as an independence facilitator. As discussed below, Dr. Hughes disputes the District's findings that Student does not require an aide. However, she did not address the appropriateness of the assessment administered by Ms. Anderson. Student has therefore failed to prove that the District's independence facilitator assessment was not done appropriately.

*District's FBA*

14. The District conducted an FBA of Student in May 2013. Student contends the assessment was flawed because it did not identify the behaviors that were impeding his ability to progress in his education. Student also asserts that the District should have done a formal behavior assessment of him earlier than it did. The District contends that the FBA was appropriate. It also contends that since none of Student's behaviors were interfering with his access to his education, there was no reason to have assessed Student's behaviors before it did.

44

15.     When a child's behavior impedes the child's learning or that of others, the IEP team must consider strategies and supports, including positive behavioral interventions, to address that behavior. (20 U.S.C. § 1414(d)(3)(B)(i); 34 C.F.R. § 300.324(a)(2)(i), (b); Ed. Code, § 56341.1, subd. (b)(1).) Federal law does not contain a specific definition of "behavioral intervention" and does not impose any specific requirements for how to conduct or implement a behavior assessment or behavior intervention plan. (*Alex R. v. Forrestville Valley Community Unit School Dist., # 221* (7th Cir. 2004) 375 F.3d 603, 615.) In California, a behavior intervention is "the systematic implementation of procedures that result in lasting positive changes in the individual's behavior." (Cal. Code Regs., tit. 5, § 3001, subd. (d).) It includes the design, evaluation, implementation, and modification of the student's individual or group instruction or environment, including behavioral instruction, to produce significant improvement in the student's behavior through skill acquisition and the reduction of problematic behavior. (*Ibid.*)

16.     Student's teachers during the time period covered by this case were Ms. Manea, Ms. Steinman, and Ms. Burns. None of them believed that Student had any behaviors that were interfering with his learning or that of his classmates that they were not addressing in their classrooms as part of Student's curriculum and as part of their classroom management. Each of their classrooms was autism-specific, used ABA methodology, and was designed to meet the needs of children on the autism spectrum. Inattention is often inherent in children with autism. The District autism-specific classrooms were all designed to address inattention in children and respond to and address the behavior needs of all children in the class. Ms. Manea, Ms. Steinman, Ms. Burns, and their staff, successfully did that with Student. They did not believe that an FBA was therefore needed for Student.

17.     The District conducted the FBA in May 2013 based upon the recommendation of Dr. Franke, who reviewed Student's records as part of a settlement agreement between the parties. It is unknown why she believed an FBA was necessary because she did not write a report and did not testify at the hearing.

18.     Ms. Burns and Dr. DelPizzo conducted the District's FBA. They focused on the three possible behaviors that might have been interfering with Student's progress: his pressing of his chin to the palm of his hand or the palm of adults; his self-stimulatory tapping behavior; and his habit of grabbing the wrist or hand of adults and twisting them. The District's FBA determined that none of these behaviors was interfering with the access of Student or other children to their education. Nor were the behaviors injuring Student or anyone else in the classroom.

19.     Dr. Hughes was highly critical of the District's FBA. She believed that Student's behaviors were, in fact, impeding his progress. The difficulty, according to Dr. Hughes, was that the District did not focus on the behaviors that were actually affecting Student at school. She felt that Student's "inconsistent responding behaviors" were the root of his failure to progress.

45

20.    Dr. Hughes's opinion on this matter is not persuasive. First, Dr. Franke was the impetus behind the District's decision to conduct its FBA. She was present during the discussions and part of the team that made the decision about what the FBA would address. It is unlikely that Dr. Franke, who had reviewed Student's records, and was part of the in-depth discussion of Student's possible behavior challenges, would not have voiced her opinion that the District's focus for the FBA was misguided. There is no evidence that Dr. Franke did so.

21.    Dr. Hughes's criticism of the District's FBA is unpersuasive also because the behaviors she described as inhibiting Student's education were basically inattention. All of those behaviors were being addressed in Student's classroom as part of his curriculum and through his many goals. Additionally, the District had already developed goals for, and was already implementing them in, Student's ABA focused classroom the majority of the strategies Dr. Hughes recommended in the IABA's report.

22.    The final point undermining the persuasiveness of IABA's critique of the District's FBA was its opinion that Student had never received appropriate ABA therapy and that he required more intensive ABA services than what he was then receiving. The evidence contradicts IABA's criticism of the District's program, which IABA based on a mere hour and a half observation. Ms. Burns, Ms. Steinman, and Ms. Hinton all testified to the intense ABA training they received from an outside agency, as does all District staff working with autistic children. IABA's opinion that Student had failed to receive adequate ABA intervention is not plausible because it indicts not only the District, but the three private non-public agencies that have provided ABA services to Student for over five years, as well as the non-public agency that provides intensive training in ABA procedures to District staff.

23.    The District's FBA was appropriate as was its finding that Student did not engage in behaviors which interfered with his education or the education of others. Student has therefore failed to prove by a preponderance of the evidence that the District's FBA should have been done earlier or that the FBA was inappropriate.

*Independence Facilitator Assessment / District's FBA*

24.    Student also contends that the District's FBA was inappropriate because it failed to determine that Student required the services of a one-on-one aide, also called an independence facilitator by the District. The District contends that it properly determined that Student did not require a dedicated aide.

25.    As discussed above, the District focused on three behaviors that might have been interfering with Student's progress at school. As determined above, the District's FBA was appropriately administered. It correctly found that the behaviors were not interfering with the ability of Student or his peers to access their education. It correctly found that the behaviors were not harmful to Student or others in his classroom. Since the behaviors were appropriately addressed by Student's teacher and her staff, there was no need to assign a one-on-one aide to Student.

46

**Exhibit A Page 0050**
AR 1316

**51**

26.     At Parents' request, the District also conducted a separate assessment to
determine if Student required a one-on-one aide. This assessment was completed by school
psychologist Karrie Anderson. Parents believed that Student required the aide because he
had been injured at school on February 1, 2012, when he walked in front of child on a swing.
Student suffered some type of concussion that caused him to have slight seizures for a week.
He suffered some cuts and bruises, and some of his non-permanent teeth became loose.
Student returned to school the day after the incident. He did not suffer any long-term injuries
from the accident.

27.     Ms. Anderson reviewed Student's records and conducted six observations of
Student. She determined from her observations that Student was sufficiently supported in
class and on the playground and therefore did not need the services of a one-on-one aide.

28.     Although Dr. Hughes was of the opinion that Student required the aide, she
did not address the appropriateness of the District's independence facilitator assessment.
Student presented no evidence that the manner in which Ms. Anderson conducted her
assessment was improper or that there were other methods she should have used as part of
the assessment. Student has therefore failed to meet his burden that the District's FBA or
independence facilitator assessment were procedurally flawed with regard to the issue of
whether Student needed a dedicated aide. The substantive issue of whether Student required
an aide will be addressed below.

### Sensory Diet Evaluation

29.     Student contends that the District did not conduct a proper sensory diet
development evaluation in May 2013 to determine Student's need for aide assistance.
Student contends that this resulted in Student's IEP team adopting less than adequate
behavior support plans for Student and providing him with inappropriate aide support. The
District contends that its sensory diet evaluation was appropriate.

30.     It is unclear why Student connects the sensory diet evaluation to Student's
need for an aide. The purpose of the evaluation was to determine if Student required a
sensory diet, and, if so, what would comprise it and how would it be implemented. As
discussed above, the District did a separate assessment to determine if Student required an
aide.

31.     To the extent that Student is contending that the District's sensory diet
evaluation was not properly conducted, Student has failed to provide any evidence to support
his position. Mr. Chen, the District occupational therapist who completed the evaluation, has
the appropriate training and experience to make the recommendations he did concerning
Student's sensory needs. He spoke with Ms. Burns and determined Student's needs based on
her description of Student's sensory seeking behaviors. Student presented no evidence that
the recommendations Mr. Chen made were inappropriate for Student or would fail to benefit
him.

47

32.     To the extent that Student is arguing that the District should have formally assessed Student's sensory needs, Student has also failed to prove his contention. Mr. Chen and Ms. Ni testified that Student was appropriately assessed. Ms. Ni used comprehensive and appropriate occupational therapy assessment tools when she tested Student as part of his triennial in early 2011. Mr. Chen addressed all of Student's sensory needs in his report. The only witness at hearing who criticized to any extent the District's treatment of Student's sensory needs was Dr. Hughes. But Dr. Hughes is a psychologist and not an occupational therapist. Although there are some psychological tests that address sensory processing issues, Dr. Hughes did not administer any such assessments to Student. In any case, sensory integration and sensory diets are issues properly addressed by an occupational therapist, not a psychologist. Student has therefore failed to meet his burden of proof that the District should have formally assessed his sensory needs.

*Assistive Technology / Functional Communication Assessment*

33.     Student contends that the District should have conducted an assessment to determine if he required assistive technology in order to benefit from his education long before Ms. Seldin assessed Student in November, 2012. The District contends that Student did not demonstrate the communication abilities necessary to benefit from assistive technology before the date it assessed him.

34.     A school district is required to provide any assistive technology device that is needed to provide a FAPE to a child with a disability. (20 U.S.C. § 1412(a)(12)(B)(i); 34 C.F.R. § 300.105; Ed. Code, § 56341.1, subd. (b)(5).) An IEP team must consider whether a child requires assistive technology devices or services. (20 U.S.C. § 1414(d)(3)(B)(v); 34 C.F.R. § 300.324 (a)(2)(v); Ed. Code, § 56341.1, subd. (b)(5).) An assistive technology device is any item that is used to increase, maintain, or improve the functional capabilities of a child with a disability. (20 U.S.C. § 1401(1); Ed. Code, § 56020.5.)

35.     In this case, Student met his burden of proof that the District should have been assessed his assistive technology needs before it did. First, Dr. Cottier persuasively testified that the earlier a child is provided with assistive technology, the earlier he or she will be able to use it for purposes of communication. Dr. Cottier generally assesses children when they are three or four-years-old. Their lack of present communication capabilities does not impact the ability of young children with communication deficits to successfully be able to use different types of assistive technology, particularly electronic devices. Dr. Franke concurred that there were no prerequisites for conducting an assistive technology assessment.

36.     The most compelling evidence Student presented is the fact that he began to use an iPad successfully by the time of his February 29, 2012 IEP meeting, albeit for entertainment purposes. The use of the iPad was such a reinforcer for him that the District permitted Student to bring it to school and allowed him to use it as a reward for completing tasks and engaging in appropriate behaviors. Given Student's interest in using the iPad and

48

**Exhibit A Page 0052**
AR 1318

**53**

ADMINISTRATIVE RECORD FOR MATTER 2012060785          02/25/2014                    1319 of 1332

his success with it, the District should have at least assessed Student right after discovering his ability to use the iPad.

37.    The District argues that it was already providing assistive technology to Student through the use of a picture exchange system, which is a form of assistive technology, and that it was not required to maximize Student's communication abilities or potential. The District is correct. For example, in the case of *R.P.* v. *Alamo Heights Ind. School Dist.* (5th Cir. 2012) 703 F.3d 801, 814 (*Alamo Heights*), the court found that the school district did not violate a student's right to a FAPE by not providing her with a voice output device. Instead, the District used a picture exchange system with her. However, the facts in *Alamo Heights* are distinguishable from Student's case. There, the student was independently using the picture exchange system to successfully communicate across environments. She was steadily increasing her communication abilities using it. In this case, Student had very limited success using any type of picture exchange system. This fact was substantiated by Ms. Cottier, Student's teachers, and Ms. Seldin when she assessed Student. Student's use of signs was not functional because they were idiosyncratic to him and therefore could not be understood by people not familiar with him. Student's other means of communication, such as eye gaze and pointing, were also not functional means of communication. Student has thus met his burden of proof that the District should have administered an assistive technology assessment to him no later than subsequent to his February 29, 2012 IEP meeting.

38.    However, the inquiry does not end with this finding. A failure to assess a child in a suspected area of need is a procedural violation. A procedural violation constitutes a denial of FAPE only if it impeded the child's right to a FAPE, significantly impeded the parents' opportunity to participate in the decision making process regarding the provision of a FAPE to their child, or caused a deprivation of educational benefits. (20 U.S.C. § 1415(f)(3)(E); 34 C.F.R. § 300.513(a)(2); Ed. Code, § 56505, subd. (f)(2); see also, *W.G. v. Board of Trustees of Target Range School Dist.* (9th Cir. 1992) 960 F.2d 1479, 1483-1484.) The decision of a due process hearing officer shall be made on substantive grounds based on a determination of whether the child received a FAPE. (20 U.S.C. § 1415(f)(3)(E); Ed. Code, § 56505, subd.(f)(1).) The hearing officer "shall not base a decision solely on nonsubstantive procedural errors, unless the hearing officer finds that the nonsubstantive procedural errors resulted in the loss of an educational opportunity to the pupil or interfered with the opportunity of the parent or guardian to participate in the formulation process of the individualized education program." (Ed. Code, § 56505, subd. (j).) In matters alleging a procedural violation, a due process hearing officer may find that a child did not receive a FAPE only if the procedural violation did any of the following: impeded the right of the child to a FAPE; significantly impeded the opportunity of the parents to participate in the decision-making process regarding the provision of a FAPE to the child ; or caused a deprivation of educational benefits. (20 U.S.C. § 1415 (f)(3)(E); Ed. Code, § 56505, subds. (f)(2).)

39.    Here, Student has persuasively demonstrated that he was deprived of an educational benefit by the District's failure to timely assess him for assistive technology. Ms. Seldin's assessment confirmed Ms. Cottier's findings that Student did not use a picture

49

**Exhibit A Page 0053**
**AR 1319**

exchange system consistently or reliably. The evidence shows that Student's lack of functional communication was underscoring his inattention and frustration in class. When finally provided with an iTouch sometime after his January 23, 2013 IEP meeting, Student adapted to it rapidly. Although Ms. Cottier had been concerned that the iTouch was too small for Student and was too difficult for him to use because he was required to navigate through different pages on the device to access what he needed to communicate, her concerns were unfounded. As of the Student's May 2, 2013 IEP meeting, Student was learning to use the iTouch and was using it across environments to communicate. Where his communication with the picture exchange system had been extremely limited, Student's communication abilities with the iTouch expanded consistently. There is no evidence in the record that Student would not have been able to advance as well with the iTouch had he been assessed the year before and provided with the device at that time. As discussed below in Legal Conclusions 68 through 71, Student has persuasively demonstrated that he required some type of electronic assistive technology device in order to develop functional communication. The failure to assess him in assistive technology was a procedural violation that resulted in a substantive denial of FAPE to Student.

*Issue 2. Failure to Provide Student with a FAPE since May 16, 2010*

40.     Student contends that the District did not provide him with a FAPE because it failed to adopt appropriate goals for him, failed to address all of Student's unique needs, and failed to provide appropriate placement and services in the areas of behavioral support, speech and language, parental training, occupational therapy, and assistive technology.

*Lack of Appropriate Goals*

41.     Student contends that the District failed to develop appropriate goals for him in the IEP's at issue in this case. The District contends that its goals were all designed to meet Student's unique needs.

42.     Federal and state special education law require generally that the IEP developed for a child with special needs contain the present levels of the child's educational performance and measurable annual goals, including benchmarks or short-term objectives, related to the child's needs. (20 U.S.C. § 1414 (d)(1)(A)(ii); Ed. Code, § 56345, subd. (a).) The purpose of goals and measurable objectives is to permit the IEP team to determine whether the pupil is making progress in an area of need. (Ed. Code, § 56345.) In developing the IEP, the IEP team shall consider the strengths of the child, the concerns of the parents for enhancing the education of their child, the results of the initial evaluation or most recent evaluation of the child and the academic, functional, and developmental needs of the child. (20 U.S.C. § 1414(d)(3)(A).) The IEP team also must consider special factors, such as whether the child needs assistive technology devices and services. (20 U.S.C. § 1414(d)(3)(B); 34 C.F.R. § 300.324(a)(2); Ed. Code, § 56341.1, subd. (b).) For each area in which a special education student has an identified need, the IEP team must develop measurable annual goals that are based upon the child's present levels of academic

50

Exhibit A Page 0054
AR 1320

**55**

achievement and functional performance, and which the child has a reasonable chance of attaining within a year.  (Ed. Code, § 56344.)

43.    There is no one test for measuring the adequacy of educational benefits conferred under an IEP.  (*Rowley, supra*, 458 U.S. at pp. 202, 203, fn. 25.)  A student may derive educational benefit under *Rowley* if some of his goals and objectives are not fully met, or if he makes no progress toward some of them, as long as he makes progress toward others. A student's failure to perform at grade level is not necessarily indicative of a denial of a FAPE, as long as the student is making progress commensurate with his abilities. (*Walczak v. Florida Union Free School Dist.* (2d Cir. 1998) 142 F.3d 119; *E.S. v. Indep.  School Dist., No. 196* (8th Cir. 1998) 135 F.3d 566, 569; *In re Conklin* (4th Cir. 1991) 946 F.2d 306, 313; *M.H. v. Monroe-Woodbury Central School Dist.* (S.D.N.Y. March 20, 2006, No. 04-CV-3029-CLB) 2006 WL 728483, p. 4; *Houston Indep. School Dist.  v. Caius R.* (S.D.Tex. March 23, 1998, No. H-97-1641) 30 IDELR 578; *El Paso Indep. School Dist.  v. Robert W.* (W.D.Tex. 1995) 898  F.Supp. 442, 449-450.)  A child's academic progress must be viewed in light of the limitations imposed by his or her disability and must be gauged in relation to the child's potential.  (*Mrs. B. v. Milford Board of Education* (2d Cir. 1997) 103 F.3d 1114, 1121.)  The issue is whether the IEP was appropriately designed and implemented and is reasonably calculated to provide a student with a meaningful benefit.  (*Rowley, supra*, 458 U.S. at p. 192; *Adams, supra*, 195 F.3d at p. 149; *J.W. v. Fresno Unified School Dist.* (9th Cir. 2010) 626 F.3d 431, 461.)

44.    Student's contentions that the District's goals were inadequate is simply not supported by the record.  In each of Student's IEP's, the District reviewed his present levels of performance and determined whether Student had met his prior goals.  If Student had not met the goal, the District staff reviewed Student's progress and in-class performance to determine why the goal had not been met.  The District then either revised the goal or developed additional goals to address the area in which Student was not progressing.  The goals each had specific baselines, the objectives of the goals were clearly defined, and the goals were measurable.  The IEP documents indicated how the goals would be evaluated, and indicated who would be responsible for implementing the goals.

45.    In every IEP at issue in this case, the District developed goals to meet Student's unique needs at the time.  As he matured and met his goal, the District devised goals in new areas.  For example, in its last IEP, the District developed specific goals for Student in the areas of mathematics and language arts, areas that had not been addressed when Student was in preschool or kindergarten.

46.    Student failed to elicit testimony from any witness that his goals were improper or that additional goals should have been developed for him.  Neither Ms. Cottier nor Dr. Hughes addressed the adequacy of Student's goals.  The only basis for Student's argument that the goals were improper is the fact that he did not meet all of them.  As stated above, where Student failed to meet his goals, the District evaluated the cause and revised the goal or developed new ones to meet Student's needs.  In any case, Student's emphasis on his failure to meet his goals is misplaced.  For the majority of the IEP periods, Student met

51

**Exhibit A Page 0055**
**AR 1321**

the majority of his goals. Even where he did not meet a goal, Student demonstrated progress on it. Student has therefore failed to meet his burden that the District did not develop adequate goals.

*Failure to Address Student's Unique Needs / Failure to Provide Appropriate Placement and Services*

*Behavioral Support and Services*

47.     Student contends that the District failed to provide appropriate placement and services in the areas of behavioral support, speech and language, occupational therapy, assistive technology, and parent training. Student also contends that he needs a one-on-one aide to address his behaviors in the classroom and to ensure his safety on the playground. The District contends that it appropriately and adequately met all of Student's unique needs in the areas at issue.

48.     The basis for Student's contention that he has not received a FAPE is that he has made little or no educational progress. Student is a child who is very impacted by his autism. He has only made a few months of progress at school each year. However, his slow rate of progress does not by itself prove that his progress has been "de minimus" or that the District has denied him a FAPE. Student's rate of progress is limited by his disabilities. Where a child has significant deficits such as Student's, the law accepts that the child's progress in school may be slow, and that he may need to repeat certain goals. (*R.P. v. Prescott Unified School Dist.* (9th Cir. 2011) 631 F.3d 1117, 1122-1123; *K.S. v. Fremont Unified School Dist.* (N.D.Cal. 2009) 679 F.Supp.2d 1046, 1057-1058 (*Fremont*).) A child's academic progress must be viewed in light of the limitations imposed by his or her disability and must be gauged in relation to the child's potential. (*Mrs. B. v. Milford Board of Education* (2d Cir. 1997) 103 F.3d 1114, 1121.) In considering the substance of an educational plan, "(T)he test is whether the IEP, *taken in its entirety*, is reasonably calculated to enable the particular child to garner educational benefits." (*Lessard v. Wilton-Lyndeborough Cooperative School Dist.* (1st Cir. 2008) 518 F.3d 18, 30 (italics added) (*Lessard*); see also *T.Y. v. New York City Dept. of Educ.* (2nd Cir. 2009) 584 F.3d 412, 419 [judging the "IEP as a whole"].)

49.     In California, related services are called designated instructional services (DIS). (Ed. Code, § 56363.) DIS includes speech and language services and other services as may be required to assist the child in benefiting from special education. (20 U.S.C. § 1401(26)(A); Ed. Code, § 56363, subd. (a); *Irving Independent School Dist. v. Tatro* (1984) 468 U.S. 883, 891 [104 S.Ct. 3371, 82 L.Ed.2d. 664]; *Union School Dist. v. Smith*, (9th Cir. 1994) 15 F.3d 1519, 1527.) DIS services shall be provided "when the instruction and services are necessary for the pupil to benefit educationally from his or her instructional program." (Ed. Code, § 56363, subd. (a).)

50.     Student contends that the District failed to provide him with sufficient behavioral support. To the extent that Student's contention addresses behavioral supports at

52

**Exhibit A Page 0056**
AR 1322

school, the allegation has already been discussed extensively throughout the Factual Findings and Legal Conclusions and will not be reiterated here. Legal Conclusions 15 through 28 are incorporated herein by reference. Student has failed to prove by a preponderance of the evidence that the District failed to address his behavioral needs at school or to provide him with adequate behavioral support.

51.     Student also contends that the District should have provided him with ABA therapy outside of the classroom. The District contends that the program it provided in its autism-specific classrooms was sufficient to meet Student's needs.

52.     Student's argument is not persuasive for several reasons. First, the District has demonstrated that the preschool, kindergarten, and elementary school programs Student attended were sufficiently designed to meet his needs. Each classroom was modeled on ABA principles, which were embedded in the curriculum. The classrooms had highly structured curriculum. The teaching and support staff were all trained in positive behavioral strategies. Regular collaboration between teachers, aides, and related service providers was an integral part of the programs. The purpose of the programs was to maximize outcomes for children with autism by using research-based practices, focusing on a rich social curriculum and focusing on academic readiness. The programs were also designed to maximize success in communication for the students, no matter the modality of communication the student was at or chose to use. Center rotations were used to address the children's goals in the areas of fine motor, sensory needs, art, games, academics, and gross motor skills. The school day included time spent teaching the children self-help skills and included exploratory activities and a snack time. Throughout the day, an occupational therapist and a speech therapist came into the class to consult with the teachers and provide services.

53.     The classrooms also integrated significant visual supports for the students. There was a daily schedule posted. General interest visuals, such as a picture of the bathroom and one for snacks, were placed throughout the classroom. Other visuals were developed that were specific to meet the needs of a particular child. For example, Ms. Steinman had specialized visuals for designed to help him with his toileting needs.

54.     Sensory supports were also embedded in the classrooms. The classroom teachers worked in conjunction with an occupational therapist to create a sensory rich program throughout the school day. The classrooms included items such as a sensory table, a sensory ball, spinning devices, weighted vests, and stress balls.

55.     Each child's behavior needs were addressed through positive reinforcers that were appropriate for that child.

56.     In Student's case, the District identified his needs and developed behavior-based goals to address those needs. During preschool, Student received over 25 hours a week of ABA based instruction at school. In kindergarten and first grade, that increased to

53

Exhibit A Page 0057
AR 1323

over 30 hours a week. There is no compelling evidence that this was not a sufficient amount of ABA based instruction to meet Student's needs.

57.     Student's contention that the District should have provided him with in-home ABA also is unpersuasive because Student has failed to prove that additional ABA therapy has been or would be necessary in order for him to benefit from his education. To the contrary, the evidence shows that despite 10 hours a week of in-home ABA therapy by at least two different private non-public agencies, Student's progress at school continued at the same slow but steady pace. Student provided no evidence that an increase in his in-home ABA would have any significant impact on his rate of progress in his education.

58.     Student has therefore failed to demonstrate by a preponderance of the evidence that the District denied him a FAPE by not providing him with in-home ABA therapy.

*Speech Therapy*

59.     Student contends that the amount of speech therapy provided in his IEP's was not sufficient. He believes that he required at least three hours a week of direct services in order to make strides in his ability to communicate. The District responds that the amount of speech services it provided was sufficient to implement Student's speech goals.

60.     Speech services in relation to assistive technology is discussed separately below.

61.     There are two key flaws in Student's argument. First, he provided absolutely no evidence at hearing to support the contention that he requires three hours a week of services. It is unclear from where Student determined he needs that level of service. Other than Dr. Murphy, the only speech pathologist to assess Student was Ms. Cottier. Her recommendation was for three to four sessions of individual speech therapy a week, for 20 to 30 minutes a session. She did not recommend three hours a week of services. Student's private provider, Natalie Neal, did not testify at hearing. Student therefore has not presented any evidence that supports his contention that the District's provision of speech services in any of his IEP's was inadequate. District speech pathologist Dr. Murphy testified extensively to the basis for each speech goal developed by the District and for each level of services offered. Student provided no evidence that contradicted Dr. Murphy's testimony.

62.     The second flaw in Student's argument is that there is no evidence that three hours a week of services would have even been of any benefit to him. To the contrary, the evidence shows that Student did not make advances in communication even though his parents privately funded two to three hours a week of speech therapy for a year and a half. Student's failure to progress in functional communication was the reason Ms. Neal discharged him as a client. Her services were not assisting Student. Father admitted this to Student's IEP team and to Dr. Hughes.

54

Exhibit A Page 0058
AR 1324

ADMINISTRATIVE RECORD FOR MATTER 2012050785          02/25/2014                          1325 of 1332

63.    Student has not met his burden of proof that the District's provision of speech services failed to meet his needs.

*Occupational Therapy*

64.    Student contends that the District failed to meet his fine motor and sensory needs. The District responds that the goals and services it provided through Student's IEP's met his occupational therapy needs.

65.    Legal Conclusions 29 through 32 are incorporated herein by reference. This Decision has already found that the District appropriately addressed Student's sensory needs in his classroom. That discussion will not be repeated here.

66.    Other than the brief reference by IABA in its assessment report that Student has sensory needs, Student failed to present any evidence in support of his contention that the occupational goals and services provided by the District were inadequate. IABA did not administer an occupational therapy assessment to Student. It only observed Student at school for a short amount of time. Dr. Hughes did not reference Student's occupational therapy goals or the extent of his occupational therapy services during her testimony. Although Ms. Cottier's report noted that Student had sensory needs, she also noted that Father confirmed Student was receiving a sensory diet. Ms. Cottier did not observe Student at school. She was not asked about his occupational therapy goals or services during her testimony. In any case, Ms. Cottier is a speech pathologist and not an occupational therapist. She does not have specific training or expertise in occupational therapy.

67.    Occupational therapist Jennie Ni testified extensively at the hearing regarding the basis for each occupational therapy goal the District developed for Student. She addressed how she reviewed his progress on goals and how she modified his goals when appropriate. Ms. Ni testified that she initially focused on Student's visual attention issues. As Student's skills developed, she increased the level of skill needed to meet each goal. Although Student argues that his occupational goals and services were not sufficient, he presented no evidence to support his contentions. Student therefore failed to meet his burden of persuasion that the District failed to address his occupational therapy needs.

*Assistive Technology*

68.    Student contends that the District timely failed to provide him with access to assistive technology and the services he needed in order to support his use of the technology. The District asserts that it was already providing Student with assistive technology through the use of a picture exchange system. It further contends that Student did not require more advance technology in order to communicate functionally or to progress in his speech goals.

69.    Legal Conclusions 33 through 39 are incorporated herein by reference.

70.    This Decision has already found that the District should have assessed Student upon learning at his February 29, 2012 IEP meeting that he was successfully using an iPad.

55

Exhibit A Page 0059
AR 1325

60

Student has shown by a preponderance of the evidence that had he been assessed at that time, the District would have recommended the use of the iTouch as assistive technology to enable Student to develop a functional means of communication. The iTouch and the services to support its use are related services that Student required to benefit from his education. The purpose behind the IDEA is, inter alia, to prepare children with disabilities for further education, employment, and, significantly, for independent living. (20 U.S.C. § 1400(d)(1)(A).) Student has persuasively shown that the picture exchange system did not provide him with functional communication. While Student had made progress on his speech goals, because the District did not assess Student in assistive technology until November 2012, and did not provide Student with assistive technology services, Student's progress in functional communication was delayed. In order to have any expectation of independence in the future, Student requires a mode of functional communication. Until the District introduced the use of the iTouch, with speech therapy sessions to support Student's use of it, Student's communication was an amalgamation of modalities. He used gazes, pointing, leading someone by the hand, a few unintelligible sounds, and a few picture symbols, to communicate. He was not engaging in functional communication that would serve him across environments. The lack of functional communication deprived Student of an educational benefit, resulting in a substantive violation of FAPE.

71.     Ms. Seldin agreed with the conclusions of Dr. Franke and Ms. Cottier that Student should be provided with an electronic assistive technology device in order to develop functional communication. The District adopted her recommendations at Student's January 23, 2013 IEP meeting. In order to implement the use of the iTouch, which was the device Ms. Seldin recommended, the District offered to temporarily provide Student with three, 20-minute sessions of individual speech therapy for the sole purpose of working with Student on how to use the iTouch to communicate. This was the level of service recommended by Ms. Cottier. The District ultimately provided this level of individual services for several months. Had the District assessed Student the prior year, he would have received the services a year earlier. Student is therefore entitled to compensatory education for the District's delay in providing him access to a functional communication modality.

### One-on-One Aide

72.     Student contends that the District should have assigned him a dedicated aide in the classroom to address his behavioral needs and an aide on the playground because of safety concerns. The District responds that Student did not require an aide because it provided Student with sufficient adult support in class and on the playground.

73.     Legal Conclusions 24 through 28 are incorporated herein by reference.

74.     Parents first requested an aide for Student after he was injured on the playground when he walked in front of a child on a swing. Although Student was injured, his injuries were not permanent. Student returned to school the day after the incident. The District appropriately responded to Parents' concerns for Student's safety by first moving Student to another playground that did not have swings. After returning Student to his

56

Exhibit A Page 0060
AR 1326

original playground, the District assigned an adult to watch Student on the playground. Student has not had any similar accidents since this happened on February 1, 2012. Parents, however, continued to be concerned that Student's inattention would result in another accident.

75.     Student also believed he needed a dedicated aide in the classroom to help him focus and to work on being more consistent in his responses. However, the evidence from Student's teacher, Ms. Burns, and District autism specialist Bonnie Hinton, supports the conclusion that Student's needs were being met in the classroom. The first year Student was in Ms. Burns's class, there was a ratio of two adults for each child in the class. The second year, there were five adults for the eight students in the class. There was no evidence that this very high adult to student ratio did not meet Student's needs.

76.     Dr. Hughes agreed with Parents that an aide was a necessity to help Student stay safe on the playground and access his curriculum in class. However, her recommendation for a one-on-one aide is not persuasive. She did not personally observe Student in class; the observations of Student referenced in her agency's FBA assessment report were done by other assessors. The IABA report is extremely unclear as to whether specified observed behaviors occurred in school or in Student's home. IABA staff observed Student's classroom only once and took no data on what they observed. The results of one observation, where the most significant commentary is that Student was whiney and non-compliant, does not support a finding that a District should have assigned a dedicated aide to a child in a class that already had a ratio of less than two children per adult.

77.     Student's contention that he required a dedicated aide on the playground is equally unpersuasive. Although Student experienced mild seizures after the accident, they lasted for a very short time. Although the District specifically requested medical confirmation of any adverse effects Student suffered from the accident, Parents declined to provide any supporting medical records. Student did not call his doctor to testify at the hearing. Parents declined to give consent for the District to speak with Student's doctor. Since the accident, Student has not had any seizures or demonstrated any ongoing injury. There have been no further accidents at school. Student has suffered nothing more than minor scratches and scrapes since then. Ms. Anderson observed Student on the playground twice in April 2013. Student played appropriately, responded to noise, was aware of his surroundings and people around him, and had an adult watching him at all times. The testimony of District witnesses that Student does not require a dedicated one-on-one aide on the playground because it has placed appropriate adult supervision there to ensure Student's safety, is therefore more compelling that the testimony of Dr. Hughes.

78.     Student has therefore not met his burden of proof that he requires a one-on-one aide in order to benefit from his education.

57

Exhibit A Page 0061
AR 1327

*Parent Training*

79.     Student contends that the District failed to provide his parents with sufficient training to support the generalization across environments of what he was being taught at school. However, the evidence demonstrates that the District was responsive to Parents, discussed with them the methods they were using at school, and made suggestions to Parents of what they could do at home to assist Student. The District specifically developed training sessions with Parents, as well as with Student's in-home ABA provider, in how to use, program, and customize the iTouch that Student was utilizing for communication. Student has failed to meet his burden of proof on this issue.

*Issue 3: Failure to Provide Highly Qualified Staff to Assess Student and Provide Services in the Areas of Behavior Intervention, Inclusion, Assistive Technology, and Individual Aide Support*

80.     Student contends that his District teachers and staff were not qualified to instruct him or provide him with appropriate related services. The District contends that all of its staff is highly trained and effective in meeting the needs of autistic children.

81.     To the extent Student contends that his teachers and service providers did not meet the "highly qualified" requirements of the No Child Left Behind Act , that issue is not the proper subject of a due process hearing. (34 C.F.R. §§ 300.18(f), 300.156(e).) To the extent that Student contends that he was denied a FAPE because his teachers or services providers were either not trained to meet his needs or were ineffective in meeting his needs, Student has failed to meet his burden of proof on that issue.

82.     With regard to the qualifications of a one-on-one aide, as discussed above, Student has not demonstrated that he required a dedicated aide. Since no such aide was assigned to Student, there is no basis for arguing that this nonexistent person is not qualified.

83.     Student did not address the issue of inclusion at all during the hearing. There was no discussion, no testimony, and no documentary evidence addressing the issue of whether Student was or was not provided with appropriate opportunities for inclusion or whether District staff had the proper training to know when or how to provide inclusion opportunities for Student. Student therefore has not prevailed on this issue.

84.     Student's contention that District staff was not sufficiently trained to provide him with assistive technology is meritless. Student presented absolutely no evidence that Ms. Seldin does not have the training or experience to provide assistive technology services to Student or to effectively train him or others in the use of the technology. The only witness to testify at the hearing with the expertise to have opined regarding Ms. Seldin's qualifications was Ms. Cottier. Student did not ask Ms. Cottier to review Ms. Seldin's assessment and did not question Ms. Cottier at hearing about any of the assistive technology services Student received pursuant to Ms. Seldin's assessment. Ms. Seldin has a master's degree in speech pathology. She has 30 years of experience in the field. She is separately

58

certified in assistive technology. The evidence definitively indicates that Ms. Seldin has more than sufficient experience and training to meet Student's assistive technology needs. Student's contentions to the contrary have no support in the record.

85.     Student also contends that his teachers and other support staff were not qualified or trained to address his behavioral needs. The evidence is to the contrary. All District teachers and staff working in the District's autism-specific classrooms receive in-depth training in ABA methodology and best practices. The District contracts with a non-public agency to provide initial and on-going training for staff. The initial training is for approximately eight weeks. The training includes data collection, ABA methodologies, social skills, behavior strategies, prompt hierarchies, and discrete trial training. After a staff member receives the training, either a trainer from the non-public agency or a trained District autism specialist observes and critiques the staff member in the classroom. Each of Student's three teachers received education in teaching special needs children. Each either had previous experience teaching autistic children or had experience as an ABA aide prior to receiving a teaching degree.

86.     To the extent that Student is arguing that his teachers and classroom staff were not effective in providing behavioral intervention, there is no compelling evidence to support that position. The only basis for Student's condemnation of District staff is the IABA report which determined that District staff were not using proper ABA principles in the classroom. The IABA conclusion is not persuasive for a variety of reasons. First, it was based on one short observation of Student's classroom. Second, the training given to District staff contradicts the criticism in the report. Finally, the persuasiveness of the IABA findings is undermined by the fact that IABA also criticized the teaching methods of Student's in-home ABA provider. The IABA report is an indictment of the District staff's abilities, of the abilities of the non-public agency with which it contracts, and of all the non-public agencies which have provided ABA home services to Student over more than five years. IABA's conclusions therefore just do not ring true.

87.     Student's teachers all testified to the methods they used in class to address Student's needs as a child on autism spectrum. They testified to the methodologies used, to the way they manage their classroom, to the schedules they follow, and to the goals they implemented for Student. All were non-evasive in their testimony. All presented as dedicated teachers who felt a calling to teach special needs children. Student has therefore failed to meet his burden of persuasion that District staff did not have sufficient training to meet his needs at school.

*Remedy for the District's Delay in Providing Student with Assistive Technology*

88.     School districts may be ordered to provide compensatory education or additional services to a pupil who has been denied a FAPE. (*Student W. v. Puyallup School Dist.* (9th Cir.1994) 31 F.3d 1489, 1496. (*Puyallup*) These are equitable remedies that courts may employ to craft "appropriate relief" for a party. An award of compensatory education need not provide a "day-for-day compensation." (*Id.* at p. 1497.) An award to

59

**Exhibit A Page 0063**
**AR 1329**

compensate for past violations must rely on an individualized assessment, just as an IEP focuses on the individual student's needs. (*Reid ex rel. Reid v. District of Columbia* (D.D.C. Cir. 2005) 401 F.3d 516, 524.) The award must be "reasonably calculated to provide the educational benefits that likely would have accrued from special education services the school district should have supplied in the first place." (*Ibid.*)

89.     Once a significant denial of a FAPE has been established, it is a rare case in which an award of compensatory education is not appropriate. (*Puyallup, supra,* 31 F.3d at p. 1497.) The court is given broad discretion in fashioning a remedy, as long as the relief is appropriate in light of the purpose of special education law. (*Burlington, supra,* 471 U.S. at p. 369.) The authority to order such relief extends to hearing officers. (*Forest Grove School Dist. v. T.A.* (2009) 557 U.S. 230, [129 S.Ct. 2484, 2494, fn. 11, 174 L.Ed.2d 168].)

90.     Here, Student has demonstrated that he should have been provided with assistive technology and corresponding speech services to support his use of the technology almost a year before the District implemented its use. However, Student failed to present specific evidence in support of his request for additional speech therapy sessions as compensatory education. The one witness of Student's who had the expertise to give an opinion on the amount of compensatory speech sessions warranted by the District's delay in providing him with assistive technology services, was Ms. Cottier. Student did not, however, ask her any questions related to compensatory education. The question therefore is how to devise a remedy given Student's failure to provide a concrete basis for one. The ALJ has reviewed the testimony of the witnesses and the documentary evidence presented at hearing. Had the District assessed timely Student's assistive technology needs, the services it offered to him in January 2013, would have been offered the year before. Student was deprived of goals, therapy, and the iTouch itself for almost an entire school year. The ALJ has considered Ms. Cottier's recommendation of a minimum of three, 20-minute individual speech therapy sessions a week to support the use of an electronic device, and the District's actual provision of services in Student's January 23, 2013 and May 2, 2013 IEP's. Applying the equitable principles discussed in Legal Conclusion 88, the ALJ finds it reasonable and equitable for the District to be ordered to provide Student with 20 sessions of individual compensatory assistive technology therapy sessions to specifically address Student's functional communication needs. The sessions will be provided to Student in 20 minute increments during Student's school day. The District will provide no more than one compensatory session a week in addition to whatever speech therapy and/or assistive technology therapy sessions being provided pursuant to Student's IEP. The District shall have 12 months from the date of this decision to provide Student with the compensatory services ordered here.

91.     Since Student failed to prevail on any other issue he raised at this hearing, the many other requests he made for remedies are not warranted.

60

**Exhibit A Page 0064**
**AR 1330**

**65**

ADMINISTRATIVE RECORD FOR MATTER 2012050785          02/26/2014                          1331 of 1332

## ORDER

1.    The District shall provide Student with 20 sessions of individual assistive technology services to assist him in using the iTouch for purposes of functional communication. These sessions shall be in addition to any speech and/or assistive technology services provided by Student's IEP's. The District shall provide the 20 sessions of compensatory services in 20 minute increments during Student's school day. The District shall not provide more than one compensatory session per week of school. The District shall provide the hours over a time period not exceeding 12 months from the date of this decision.

2.    All other relief requested by Student is denied.

## PREVAILING PARTY

The decision in a special education administrative due process proceeding must indicate the extent to which each party prevailed on issues heard and decided. (Ed. Code, § 56507, subd. (d).) Here, Student partially prevailed on a small portion of Issues 1 and 2. The District prevailed on all other issues heard.

## RIGHT TO APPEAL

The parties in this case have the right to appeal this Decision by bringing a civil action in a court of competent jurisdiction. (20 U.S.C. § 1415(i)(2)(A); 34 C.F.R. § 300.516(a); Ed. Code, § 56505, subd. (k).) An appeal or civil action must be brought within 90 days of the receipt of this Decision. (20 U.S.C. § 1415(i)(2)(B); 34 C.F.R. § 300.516(b); Ed. Code, § 56505, subd. (k).)

DATED: December 26, 2013

DARRELL LEPKOWSKY
Administrative Law Judge
Office of Administrative Hearings

61

**Exhibit A Page 0065**
AR 1331

ADMINISTRATIVE RECORD FOR MATTER 2012050785        02/25/2014                    1332 of 1332

## DECLARATION OF SERVICE

**OAH No.: 2012050785**

I, Parvati Ryan, declare as follows: I am over 18 years of age and am not a party to this action. I am employed by the Office of Administrative Hearings. My business address is 2349 Gateway Oaks Drive, Suite 200, Sacramento, CA 95833. On December 26, 2013, I served a copy of the following document(s) in the action entitled above:

## DECISION

to each of the person(s) named below at the addresses listed after each name by the following method(s):

Erik & Aneida Fulsang
5016 River Avenue
Newport Beach, CA 92663

Kathleen M. Loyer
Law Offices of Kathleen M. Loyer, Inc.
940 Calle Amanecer, Suite L
San Clemente, CA 92673
*CC via fax*

S. Daniel Harbottle
Harbottle Law Group
18401 Von Karman Avenue, Suite 200
Irvine, CA 92612
*CC via fax*

$\boxtimes$ **Overnight Delivery.** I enclosed the above-described document(s) in a sealed envelope or package addressed to the person(s) at the address(es) listed above, and placed the envelope or package with overnight delivery by an overnight delivery carrier at our office's regularly utilized drop box or at a location regularly utilized for collection and overnight delivery by an authorized overnight delivery courier for our office.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. This declaration was executed at Sacramento, California on December 26, 2013.

/s/
Parvati Ryan, Declarant

**Exhibit A Page 0066**
**AR 1332**

**67**

# Exhibit B

68

1

### OFFICE OF ADMINISTRATIVE HEARINGS

### SPECIAL EDUCATION DIVISION

### STATE OF CALIFORNIA

| | | |
|---|---|---|
| In the Matter of: | ) | |
| | ) | |
| PARENTS ON BEHALF OF | ) | OAH Case No. 2012050785 |
| STUDENT, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| NEWPORT-MESA UNIFIED | ) | |
| SCHOOL DISTRICT. | ) | |
| | ) | |
| | ) | |


October 21, 2013

Harper Center
Costa Mesa, California


       The above-entitled matter came on for hearing
pursuant to notice,


       BEFORE:   DARRELL LEPKOWSKY
                 Administrative Law Judge


Official Transcriber: Kelli Wells


*Statewide Transcription Services*
*(916) 624-4300*

**Exhibit B Page 0067**
**AR 2032**

2

## A P P E A R A N C E S

On Behalf of Student:

Kathleen M. Loyer, Attorney
Eric and Aneida Fulsang, Parents


On Behalf of District:

Alefia Mithaiwala, Attorney
Maureen Cottrell, Director of Special Education

*Statewide Transcription Services*
*(916) 624-4300*

**Exhibit B Page 0068**
AR 2033

3

I N D E X

WITNESSES                                                    Page

For Student:

Aneida Fulsang
       Direct Examination by Ms. Loyer                          8
       Cross Examination by Ms. Mithaiwala                      38
       Redirect Examination by Ms. Loyer                        69
       Recross Examination by Ms. Mithaiwala                    72
Kathleen Mulligan Murphy
       Direct Examination by Ms. Loyer                          77
       Cross Examination by Ms. Mithaiwala                     109

For District:

None

Adjournment                                                   181

Certification of Transcript                                   182

Statewide Transcription Services
(916) 624-4300

Exhibit B Page 0069
AR 2034

77

1   the attorneys might have an objection to a question.  You

2   know, an attorney will ask a question, the other attorney

3   might object to it.  If you do hear somebody objecting,

4   don't answer the question at that point.  I'll rule on the

5   objection and then I'll tell you whether to answer it or

6   I'll tell the attorney to ask another question.  All right?

7   There's plenty of water there in case you want some.

8           MS. MURPHY:  I may go through that.

9           ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  And before

10  Ms. Loyer starts, if could state and spell your full name

11  for the record.

12          MS. MURPHY:  Kathleen Mulligan Murphy.  Kathleen

13  K-A-T-H-L-E-E-N, Mulligan M-U-L-L-I-G-A-N, Murphy M-U-R-P-H-

14  Y.

15          ADMINISTRATIVE LAW JUDGE LEPKOWSKY: Thank you.

16  Ms. Loyer?

17                   DIRECT EXAMINATION

18  BY MS. LOYER:

19      Q    Okay.  Thank you for being here today.  Can you

20  tell me what your position is with the District please?

21      A    A speech language pathologist.

22      Q    And how long have you been with the District?

23      A    Eight years.

24      Q    As a speech and language path?

25      A    Correct.

*Statewide Transcription Services*
*(916)624-4300*

**Exhibit B Page 0070**
**AR 2108**

24

1   so we incorporated it.

2        Q    Okay.  Since there was a discussion on the iPad

3   and          was being able to use an iPad, why didn't you

4   propose an AT assessment at that time?

5        A    He wasn't demonstrating the rest of the readiness

6   skills at that time.  So typically developing children -- I

7   know I actually mentioned this earlier -- make that

8   connection.  It isn't until the child is around age three

9   cognitively or developmentally that they are actually

10  beginning to use images for communicative purposes.  We were

11  very excited to see        make that type of a growth, but he

12  wasn't yet at the readiness period to use that alone.  So we

13  were still working -- all of these goals reflect that

14  building of the foundational skills to getting to that

15  readiness point.  One of the goals or the very first ones we

16  incorporated in here was break time, that he was actually

17  using a visual image for communicative purposes.  So he

18  wasn't yet demonstrating that level of readiness.  And we

19  did many things to make him ready.  So the visuals were not

20  just in for communication purposes, but we were also bathing

21  him with the visuals within the environment such as the

22  visual schedule.  Part of my responsibility was -- included

23  collaborating with the teacher to make those kinds of

24  adjustments and to supplement any of the visual aids for

25  communication purposes across the day.

*Statewide Transcription Services*
*(916) 624-4300*

# Exhibit C

1

### OFFICE OF ADMINISTRATIVE HEARINGS

### SPECIAL EDUCATION DIVISION

### STATE OF CALIFORNIA

In the Matter of:          )
                           )
PARENTS ON BEHALF OF       )   OAH Case No. 2012050785
STUDENT,                   )
                           )
v.                         )
                           )
NEWPORT-MESA UNIFIED       )
SCHOOL DISTRICT            )
_____)

                    October 15, 2013

                    Newport-Mesa USD Offices
                    Costa Mesa, CA


        The above-entitled matter came on for hearing

pursuant to notice,

            BEFORE:    DARRELL LEPKOWSKY
                       Administrative Law Judge




Official Transcriber:  Kelli Wells



Statewide Transcription Services
(916)624-4300

**Exhibit C Page 0072**
AR 1361

2

**A P P E A R A N C E S**

On Behalf of Student:

Kathleen M. Loyer, Attorney
Parents

On Behalf of District:

Alefia Mithaiwala, Attorney
Maureen Cottrell, Special Ed Director

*Statewide Transcription Services*
*(916)624-4300*

**Exhibit C Page 0073**
AR 1362

3

### I N D E X

WITNESSES                                                    Page

For Student:

Eric Fulsang
        Direct Examination by Ms. Loyer                        20
        Cross Examination by Ms. Mithaiwala                    80
        Direct Examination by Ms. Mithaiwala                   98
        Redirect Examination by Ms. Loyer                     117
        Recross Examination by Ms. Mithaiwala                 130
Katherine Burns
        Direct Examination by Ms. Loyer                       145
        Cross Examination by Ms. Mithaiwala                   179
        Direct Examination by Ms. Mithaiwala                  185

For District:

None

Adjournment                                                  243

Certification of Transcript                                  244

*Statewide Transcription Services*
*(916)624-4300*

**Exhibit C Page 0074**
AR 1363

153

1     Q   By "they," you mean your staff, you?

2     A   Myself.

3     Q   Okay.

4     A   My staff and I talk continuously throughout the

5 day.  So if they have questions, readily available to attend

6 to these questions.

7     Q   Okay.  Now, did the subject ever come up about, at

8 this time, the time frame we're in, as to assistive

9 technology devices for him other than PECS?

10    A   I know Kathy Murphy and I, she was a speech-and-

11 language pathologist at that time, we were always talking

12 about readiness to move towards, you know, an eventual

13 higher-tech AAC device.  We were already using PECS and

14 picture-exchange within the classroom, that is something

15 that they had been using in preschool as well.

16    Q   So by "readiness," what do you mean by that?

17    A   I know in preschool he was working on matching

18 object to object.  There are certain levels of readiness

19 where the student needs to be to ensure that they will be

20 successful using an AAC device.  So for instance matching

21 picture to picture, having the picture being able to

22 identify the object, picture to object.

23    Q   Okay.  So at this meeting were you surprised to

24 hear that he was using an iPad at home?

25    A   His mom and I had discussed that he was using that

*Statewide Transcription Services*
*(916) 624-4300*

**Exhibit C Page 0075**
**AR 1513**

179

```
1    We'll take five minutes if you have to use the restroom or
2    anything --
3              MS. BURNS:  I might go into the restroom.
4              ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  -- wander
5    around, that's fine.  I'm going to take us off the record.
6    Five minutes.
7                        (Off the Record)
8              ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  We are back
9    on the record after a short break in the matter of ████
10   Fulsang and Newport-Mesa Unified School District.  Ms.
11   Mithaiwala is going to start her cross examination of Ms.
12   Burns.
13             Ms. Burns, I'll just remind you, you're still
14   under oath.
15             MS. BURNS:  Okay.
16             ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  And you can
17   begin, Ms. Mithaiwala.
18                      CROSS EXAMINATION
19   BY MS. MITHAIWALA:
20        Q    Do you remember your discussion on the witness
21   stand about the use of a iPad for ████ and mom talking
22   about that during the IEP meeting?
23        A    Yes.
24        Q    In your opinion is there a difference between use
25   of an iPad for recreational purposes versus communication
```

*Statewide Transcription Services*
*(916) 624-4300*

**Exhibit C Page 0076**
**AR 1539**

79

180

1  purposes?

2      A    Yes.

3      Q    And what is that difference in your mind?

4      A    When you're using it for a recreational purpose,

5  obviously for a reinforcement it's fine.  They're always

6  going to go towards the fun items within the iPad if it's

7  communication it's used for a different purpose.  So it's

8  more structured, more modeled, it's a different purpose.

9      Q    Is it possible that          was ready for use of the

10 iPad for recreational purposes prior to his being ready for

11 it to be used for communication purposes?

12     A    No, the navigation was a good thing that he knew

13 how to navigate through it but I would he wasn't ready for

14 communication purposes yet.

15     Q    Take a look at the white binder Exhibit 25.

16     A    Okay.

17     Q    And take a look at page 413.

18          ADMINISTRATIVE LAW JUDGE LEPKOWSKY: You're going

19 to have to tell me instead of saying white binder or I only

20 have --

21          MS. MITHAIWALA:  Student's Exhibit --

22          ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  I only have

23 black binders so, you're going to have to tell me Student's

24 binder or Exhibit.

25          MS. MITHAIWALA:  Student's Exhibit S-25.

*Statewide Transcription Services*
*(916) 624-4300*

**Exhibit C Page 0077**
**AR 1540**

214

1    alphabet.

2         Q     And how did you collect data on that?

3         A     A ratio.

4         Q     And why was it appropriate

5         A     These are foundational skills for reading and

6    someday            does have the ability to read simple words to

7    have the foundations of letters, very, very beginning basic

8    skills.

9         Q     Are any of these goals that we just went through

10   designed to improve functional communication?

11        A     Yes, the ones all these with visuals.

12        Q     Can you point to page numbers?  Let's make it

13   easier, if there is a goal that you believe is designed to

14   improve his functional communication, can you tell us the

15   page number for that?

16        A     Communicational skills, those can always --

17             ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  If you want

18   to just give us -- and also give us the page number shown?

19             MS. BURNS:  376 that's part of communicational

20   skill, identifying body parts eventually he should be able

21   to identify on his communication device if something is

22   wrong with his stomach, his head, that was geared towards

23   communicational skills.  Using the restroom, page 378,

24   beginning stages of identifying a party icon, being able to

25   request eventually using that.  That was used towards that.

*Statewide Transcription Services*
*(916) 624-4300*

**Exhibit C Page 0078**
**AR 1574**

215

1   Attending in general that is just a basic learning skill

2   that would be needed to learn any kind of skills or teaching

3   watching how things are modeled.

4           ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  What page is

5   that.

6           MS. BURNS:  I am sorry.

7           ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  What page?

8           MS. BURNS:  Beginning, 381.

9           ADMINISTRATIVE LAW JUDGE LEPKOWSKY:  Thank you.

10          MS. BURNS:  382 using the visuals for the visual

11  schedule.  Again, identifying those visuals, being able to

12  understand a visual schedule on paper can eventually be

13  transferred to in AAC device identifying different places

14  within his environment.  Identifying an emotion state, 385,

15  again beginning stages of having him be able to communicate

16  how he is feeling, how others are feeling.  Morning,

17  afternoon -- so that is independence.  Waiting.  I would say

18  those are the ones that are mostly geared towards --

19      Q    You said waiting is one.

20      A    I mean waiting was more of a social emotional

21  because he was grabbing from peers, so waiting can be

22  because waiting to ask your turn on the actually AAC device,

23  waiting to request.

24      Q    Did you propose services to support these goals

25  that you proposed?

*Statewide Transcription Services*
*(916) 624-4300*

**Exhibit C Page 0079**
**AR 1575**

# Exhibit D

 **HARBOTTLE**
L A W  G R O U P

S. Daniel Harbottle, JD, PhD
HLG Irvine
18401 Von Karman Avenue
Suite 200
Irvine, California 92612
Tel: 949.428.8780
Fax: 949.428.8779
dharbottle@harbottlelaw.com
www.harbottlelaw.com

HLG San Jose
2033 Gateway Place
5th Floor
San Jose, California 95110
Tel: 408.961.8711
Fax: 949.428.8779

April 1, 2015

**VIA FACSIMILE ONLY**

Kathleen M. Loyer
Law Offices of Kathleen M. Loyer, Inc.
940 Calle Amanecer, Suite L
San Clemente, CA 92673-6218

Robert Stanford Brown, APC
714 W Olympic Blvd Suite 450
Los Angeles, CA 90015

Re: ▮▮▮▮▮▮▮▮ *v. Newport-Mesa Unified School District*
Case No: SACV14-00455-CJC (RBNx)

Dear Ms. Loyer and Mr. Brown:

I am writing to initiate the meet and confer process pursuant to Local Rule 7-3, regarding a motion the District contemplates filing in response to the pending federal complaint in this matter, Case No: SACV 14-00455-CJC (RBNx), the "Federal Action." Specifically, I believe a Federal Rule 12(c) Motion as to certain allegations requiring exhaustion of administrative remedies, as well as Causes of Action ("COA") 3, 4, 5, 6, 7, 8,10, and 11 has merit, and would be granted. However, I also believe that we should be able to resolve this matter through the meet and confer process and avoid involving the Court.

1. Motion to Dismiss/Strike allegations regarding IEP-related matters post-dating those addressed and adjudicated in Office of Administrative Hearings ("OAH") Case No. 2012050785, ("OAH Action");

   a. Rationale: As you are aware, the OAH Action addresses a series of IEPs, ending with the May 2, 2013 IEP. (OAH Decision, Exhibit A to Complaint, at 3.) However, the Complaint in the Federal Action contains allegations as to events (and at least one IEP) that post-date the May 2, 2013 IEP, and these allegations are incorporated into all Causes of Action thereafter. (Complaint, at 44 of 93, beginning with Paragraph 143, including events in January 2014 and an IEP on February 26, 2014.) Such allegations must initially be submitted to OAH as a means of exhausting your clients' administrative

1104N04.2 1

**Exhibit D Page 0080**

**84**

April 1, 2015
Page 2

> remedies as to these matters, and consequently must be dismissed or stricken
> from the Federal Action.

2. Motion to Dismiss Cause of Action 3;

   a. Rationale:   Certain allegations in the Federal Action assert violations of
   federal law regarding which your clients failed to exhaust administrative
   remedies.  Specifically, the Federal Action alleges violation of the Americans
   with Disabilities Act ("ADA"), but we believe that your OAH Action did not
   appropriately exhaust administrative remedies with respect to any such claims.
   Therefore, all allegations of violation of the ADA must be dismissed for
   failure to exhaust administrative remedies.  20 U.S.C. §1415(l).

3. Motion to dismiss Causes of Action 4, 5, 6, and 7;

   Rationale:

   a. COAs 4, 5, 6, and 7 all plead violations of 42 U.S.C. §1983.  COA 4 alleges a
   §1983 violation "Against All Defendants"; COA 5 alleges a §1983 violation
   "Against Individual Defendants"; and COA 6 alleges a §1983 violation
   "Against the Defendants."

   b. As you know, the Court dismissed all of the individual defendants in its May
   21, 2014, Order Dismissing Federal Claim (Ninth Cause of Action) and
   Defendants in Their Official Capacity.  Accordingly, the only remaining
   defendants in this case are the District and "Does 1-9."  In COA 5, you
   specifically limit the claim to "Individual Defendants," so COA 5 must
   therefore be dismissed on this ground.

   c. In California, school districts have Eleventh Amendment immunity from
   §1983 claims.  *Belanger v. Madera Unified Sch. Dist.*, 963 F.2d 248, 250-55
   (9th Cir. 1992) (determining that a California school district is a state agency
   for purposes of the Eleventh Amendment).   This authority clearly supports
   dismissal of COAs 4 and 6.

   d. In COA 7, you attempt to plead a *Monell*[1] claim "Against All Defendants."
   Even if the District were deemed to be a municipality subject to direct suit
   under §1983 via a *Monell* claim, which is it not pursuant to *Belanger,* such a
   claim would lie only if the action that is alleged to be unconstitutional is the

---

[1] *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690-91, 98 S. Ct. 2018, 2036, 56 L. Ed. 2d 611
(1978).

{1047004.2 }

**Exhibit D Page 0081**

85

April 1, 2015
Page 3

implementation or execution of an officially adopted or promulgated policy, or a longstanding custom or practice with the force of law (the *Monell* standard). Your Complaint includes only bare conclusory language related to a District policy or custom. This conclusory allegation is insufficient under the pleading standards articulated by the Supreme Court in *Twombly*[2] and *Iqbal*.[3] Furthermore, in order to properly plead this claim, you would need to allege a §1983 violation and then identify the policy, practice, or custom that has been implemented by the District that caused the violation, which you have failed to do. Accordingly, I believe the Court would grant a Rule 12(c) motion as to COA 7.

e. Additionally, it has been recently held by the Ninth Circuit that §1983 claims against a California school district were frivolous, including claims for both money damages and for injunctive relief, and sanctions were upheld against counsel for the plaintiffs for pursuing such claims. *C.W. v. Capistrano Unified School District*, --- F.3d ---, 2015 WL 859545, March 2, 2015. We believe that your claims under §1983 are likewise frivolous, especially in light of the fact that you failed to meet your obligation pursuant to Local Rule 26 in your Initial Disclosures and your Amended Initial Disclosures with respect to your damages claims. I previously reminded you of these points on October 6, 2014, but you have failed to remedy them. Thus, we do not believe that you have a good faith basis to pursue any damages claims against the District, including but not limited to claims pursuant to §1983.

4. Motion to Dismiss Causes of Action 8, 10 and 11;

Rationale:

a. Your COA 8 is for alleged violation of the Unruh Civil Rights Act and the California Civil Rights Law. In COA 10 you plead a claim for breach of duty to protect and supervise E.F. and employees, and in COA 11 you plead a claim for intentional and/or negligent infliction of emotional distress. These allegations are subject to the California Tort Claims Action, and your Complaint does not allege compliance with the Tort Claims Act requirement that a claim be submitted within six months of the date of accrual, and it is now too late to cure that defect. Govt. Code §911.2.

---

[2] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, 127 S. Ct. 1955, 1965, 167 L. Ed. 2d 929 (2007).
[3] *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009).

{1047004.2 }

**Exhibit D Page 0082**

April 1, 2015
Page 4

           b.  Additionally, the District has immunity under the Eleventh Amendment from state law claims brought in federal district court. Accordingly, I believe the Court would grant a Rule 12(c) Motion as to these claims.

This proposed Motion will require resolution by the Court if we are not able to resolve it via the meet-and-confer process. I propose one of the following dates and times for our conference:

April 3, 2015 between 10-11 a.m.

April 6, 2015 between 9-11 a.m.

April 7, 2015 between 1- 4 p.m.

Please provide your availability on one of these dates/times to conduct the requisite meet and confer conference, or provide alternative dates and times.

Respectfully,

S. Daniel Harbottle

SDH/jn

cc:    Ann Huntington
        Maureen Cottrell

[1047004.2]

**Exhibit D Page 0083**

87

# Exhibit E



HARBOTTLE
LAW GROUP

S. Daniel Harbottle, JD, PhD
HLG Irvine
18401 Von Karman Avenue
Suite 200
Irvine, California 92612
Tel: 949.428.8780
Fax: 949.428.8779
dharbottle@harbottlelaw.com
www.harbottlelaw.com

HLG San Jose
2033 Gateway Place
5th Floor
San Jose, California 95110
Tel: 408.961.8711
Fax: 949.428.8779

April 10, 2015

VIA FACSIMILE ONLY

Kathleen M. Loyer
Law Offices of Kathleen M. Loyer, Inc.
940 Calle Amanecer, Suite L
San Clemente, CA  92673-6218

Robert Stanford Brown, APC
714 W Olympic Blvd Suite 450
Los Angeles, CA 90015

Re:                      v. *Newport-Mesa Unified School District*
     Case No: SACV 14-00455-CJC (RBNx)

Dear Ms. Loyer and Mr. Brown:

    I am writing in follow up to the meet and confer discussion we conducted on Thursday, April 9, 2015, regarding both a proposed discovery motion and a proposed motion to dismiss contemplated by the District, in the pending federal matter between our respective clients. Case No: SACV 14-00455-CJC (RBNx), the "Federal Action." Specifically, we discussed a Federal Rule 12(c) Motion as to certain allegations requiring exhaustion of administrative remedies, as well as Causes of Action ("COA") 3, 4, 5, 6, 7, 8,10, and 11 pending in the Federal Action. It is my understanding that we agreed as follows:

1.  Your clients, through your offices, will dismiss COAs 4-7, each involving Section 1983 claims, on the grounds specified in my letter dated April 1, 2015. This dismissal will be accomplished through a stipulation to be prepared by your offices consistent with our prior stipulation in which your clients dismissed all individual defendants and COA 9;

2.  Your offices will research and determine whether a Govt. Tort Claim was filed against the District as would be required in order to maintain COAs 8, 10, and 11, and if you confirm (as I believe) that no Tort Claim was filed, you will include these COAs in the above-noted stipulation to dismiss claims;

3.  Your offices will research our position that COA 3, alleging violation of the Americans with Disabilities Act ("ADA"), required exhaustion of administrative remedies, and that your clients did not exhaust those remedies, and if you determine that we are correct, you will also include COA in the above-noted stipulation to dismiss claims;

4.  Your offices will research our position that allegations post-dating the May 2, 2013 IEP require exhaustion, and must also be dismissed or stricken from the Complaint. Specifically,

{10530686.1 }

**Exhibit E Page 0084**

April 10, 2015
Page 2

as pointed out in my prior letter, the OAH Action addresses a series of IEPs, ending with the May 2, 2013 IEP. (OAH Decision, Exhibit A to Complaint, at 3.) However, the Complaint in the Federal Action contains allegations as to events (and at least one IEP) that post-date the May 2, 2013 IEP, and these allegations are incorporated into all Causes of Action thereafter. (Complaint, at 44 of 93, beginning with Paragraph 143, including events in January 2014 and an IEP on February 26, 2014.) Such allegations must initially be submitted to OAH as a means of exhausting your clients' administrative remedies as to these matters, and consequently must be dismissed or stricken from the Federal Action.

    a.  If your research results in agreement with our position, you will also dismiss/strike all such allegations from the Federal Action;

5. As to the pending dispute regarding discovery, you agreed with the position set forth in my letter dated March 30, 2015, and have agreed as follows:

    a.  By close of business, April 20, 2015, you will provide updates written responses to all challenged document responses, and will update your document production with any and all additional documents that are in your possession in response to the pending requests;

    b.  Given the delay entailed in obtaining final, sufficient responses, you will agree to an extension of the discovery cut-off so that the District is not prejudiced in seeking any discovery it requires in defense of your clients' claims.

If this letter in any manner fails to accurately reflect your understanding of our agreements, please immediately, and in no event later than close of business, Monday, April 13, 2015, inform me in writing as to any such differences of understanding. Thank you for your anticipated cooperation in this process.

Respectfully,

S. Daniel Harbottle

SDH/jn

cc:   Ann Huntington
      Maureen Cottrell

{4053n86 1.1}

**Exhibit E Page 0085**

# Exhibit F

 HARBOTTLE
LAW GROUP

**S. Daniel Harbottle, JD, PhD**
**HLG Irvine**
18401 Von Karman Avenue
Suite 200
Irvine, California 92612
Tel: 949.428.8780
Fax: 949.428.8779
dharbottle@harbottlelaw.com
www.harbottlelaw.com

**HLG San Jose**
2033 Gateway Place
5th Floor
San Jose, California 95110
Tel: 408.961.8711
Fax: 949.428.8779

May 8, 2015

<u>VIA FACSIMILE ONLY</u>

Kathleen M. Loyer
Law Offices of Kathleen M. Loyer, Inc.
940 Calle Amanecer, Suite L
San Clemente, CA  92673-6218

Robert Stanford Brown, APC
714 W Olympic Blvd Suite 450
Los Angeles, CA 90015

Re:              *. Newport-Mesa Unified School District*
        Case No: SACV14-00455-CJC (RBNx)

Dear Ms. Loyer and Mr. Brown:

       I am writing in follow up to the meet and confer discussion we conducted on Thursday, April 30, 2015, regarding the proposed motion to dismiss contemplated by the District, in the pending federal matter between our respective clients. Case No: SACV 14-00455-CJC (RBNx), the "Federal Action." Specifically, we discussed a Federal Rule 12(c) Motion as to certain allegations requiring exhaustion of administrative remedies, as well as Causes of Action ("COA") 3 and 8.

       As to COA 3, alleging violation the Americans with Disabilities Act ("ADA"), Ms. Loyer indicated that the failure to allege violation of the ADA in the underlying due process action was a "clerical error," and that in the vast majority of her due process filings, allegations regarding the ADA are included. In our view, exclusion of the ADA in the underlying due process filing in this case is most likely to be viewed as a voluntary decision, and more importantly, its absence was reasonably interpreted by the District as evidence of lack of intent to pursue an ADA claim. The District relied upon that apparent lack of intent, and it would contravene the purpose of the exhaustion requirement to permit the matter to go forward under the ADA in these circumstances. However, I would appreciate seeing any case authority that supports your position on both the claim that a "clerical error" can excuse a failure to include a statutory claim, as well as the exhaustion of administrative remedies issue, and will keep an open mind about this element of the case, and review any such case authority objectively.

{1054462.1}

**Exhibit F Page 0086**

May 8, 2015
Page 2

As to COA 8, alleging violation of the Unruh Civil Rights Act/California Civil Rights
Act, we agreed in previous discussions, and again on April 30, 2015, that this COA is subject to
the California Government Tort Claims Act. We further agreed that if your clients failed to
submit a Tort Claim, then this COA would be without basis and would be dismissed. During
our discussion, Ms. Loyer pointed out a passage in the Amended Due Process Request which she
purports to be the "tort claim." That section reads, ". . . Petitioners are hereby providing the
District notice of their demands and intent to file a lawsuit for this and issues related to ▮▮▮
injuries at school." (Amended Due Process Complaint, p. 39, lines 20-21.)

In our view, based on the Government Tort Claims Act itself, this language does not
constitute a claim.  First, Government Code Section 910.4 provides that, "The board shall
provide forms specifying the information to be contained in claims against the state or a judicial
branch entity.  *The person presenting a claim shall use the form in order that his or her claim is
deemed in conformity with Sections 910 and 910.2.*"  (Emphasis added.)  The District website
contains an easily locatable page (see attached) that directs potential claimants to the appropriate
person from whom to obtain the requisite form.  Plainly, the language in the Amended Due
Process Complaint upon which you rely as constituting your Tort Claim, is not on the required
form, and does not therefore constitute a tort claim.

However, even if a court were to excuse use of the necessary form, the Amended Due
Process Complaint does not contain the required information.  Specifically, Section 910(a) of the
Government Code sets forth the requirements for a valid Tort Claim:

(a) The name and post office address of the claimant; (b) The post office
address to which the person presenting the claim desires notices to be sent;
(c) The date, place and other circumstances of the occurrence or
transaction which gave rise to the claim asserted; (d) A general description
of the indebtedness, obligation, injury, damage or loss incurred so far as it
may be known at the time of presentation of the claim; (e) The name or
names of the public employee or employees causing the injury, damage, or
loss, if known; (f) The amount claimed if it totals less than ten thousand
dollars ($10,000) as of the date of presentation of the claim, including the
estimated amount of any prospective injury, damage, or loss, insofar as it
may be known at the time of the presentation of the claim, together with
the basis of computation of the amount claimed. If the amount claimed
exceeds ten thousand dollars ($10,000), no dollar amount shall be included
in the claim. However, it shall indicate whether the claim would be a
limited civil case." (Cal. Gov't Code §910.)

In our view, even if, as you asserted during our discussion, subsections (a)-(c) are
incorporated elsewhere in the Amended Complaint, they are not set forth as required, but spread

{1034462.1}

**Exhibit F Page 0087**

May 8, 2015
Page 3

throughout the multi-page document without any clear intent to have that information constitute part of a Tort Claim. Moreover, subsections (d)-(f) are missing entirely, most pointedly the requirements of subsection (f).

Additionally, and of equal importance, unless I am missing it in the voluminous pending Complaint, your clients did not plead compliance with the Government Tort Claims Act in the Federal Action, as is also required by law. *State v. Superior Court (Bodde)*, 32 Cal. 4th 1234, 1243, 90 P.3d 116, 122 (2004) (citing extensive history of Torts Claims Act and its purpose, and stating, "[in light of this overwhelming case law and history, we conclude that a *plaintiff must allege facts demonstrating or excusing compliance with the claim presentation requirement*. Otherwise, his complaint is subject to a general demurrer for failure to state facts sufficient to constitute a cause of action."; emphasis added).

Compliance with the claims statutes is mandatory. *Farrell v. County of Placer,* 23 Cal.2d 624, 630, 145 P.2d 570 (1944). Failure to file a claim is fatal to the cause of action. *Johnson v. City of Oakland,* 188 Cal.App.2d 181, 183, 10 Cal.Rptr. 409 (1961). "[F]ailure to allege facts demonstrating or excusing compliance with the claim presentation requirement subjects a claim against a public entity to a demurrer [or dismissal] for failure to state a cause of action." *State v. Superior Court,* 32 Cal.4th 1234, 13 Cal.Rptr.3d 534, 538, 90 P.3d 116 (2004). A "plaintiff must allege facts demonstrating or excusing compliance with the claim presentation requirement." *State v. Superior Court,* 32 Cal.4th at 1243, 13 Cal.Rptr.3d at 534, 90 P.3d 116. "Accordingly, submission of a claim within [six months] is a condition precedent to a tort action against either the employee or the public entity." *Williams v. Horvath,* 16 Cal.3d 834, 838,129 Cal.Rptr. 453 (1976).")

The District, in its Answer, placed your clients on explicit notice of its intent to rely upon their failure to comply with, and to plead such compliance with, the Tort Claims Act. (Answer, Nineteenth Affirmative Defense, p. 56, line 16-19.) The District's Answer was filed nearly a full year ago, on May 21, 2014, such that your clients have had this full year to investigate and address this deficit in their Complaint.

Finally, it is now too late to seek leave to file a late Tort Claim. A petition for leave to submit a late claim must be filed within a reasonable time, and in no event more than one year from the accrual of the cause of action. Cal Gov't Code Section 911.4(b). The pending Complaint in the Federal Action was filed more than a year ago, on March 24, 2014, so there is no possibility that a Tort Claim could be submitted at this time as to any allegations pending in that Complaint.

We therefore ask that you reconsider your position regarding COA 8, and agree to dismiss it along with COA 10 and 11 which you have already agreed to dismiss.

{1054462.1}

**Exhibit F Page 0088**

May 8, 2015
Page 4

     As to the remaining subjects of our meet and confer of April 30, 2015, I will write under separate cover to further elucidate our position.

     Thank you for your anticipated cooperation in this process.

Respectfully,

S. Daniel Harbottle

SDH/jn

cc:    Ann Huntington
       Maureen Cottrell

{1054462.1 }

**Exhibit F Page 0089**

skip

Search                    [Go]

- Home
- About Us
- Board
- Calendars
- Programs
- Espanol
- Jobs
- Staff

Facts At A Glance How to Contact Us 2014/15 K-12 Priorities Harbor Council Parent Teacher Association
Board of Education
School Calendars and Student Holidays Test Schedule 2014-2015
Educational Program Resources and Information
Bienvenidos
Employment Opportunities With N-MUSD Administration Open Positions Certificated Open Positions
Resource Page for Employees

# N-MUSD Claims Process

If you are alleging District liability due to a negligent act or omission on the part of the District or its employees that contributed to the injury (loss, etc.), please request a claim form by contacting:

Adriana Jones, Property & Liability
Newport-Mesa Unified School District
2985 Bear Street, Building A
Costa Mesa, CA 92626
Phone: 714-424-5072
Fax: 714-424-5015
Email: ajones@nmusd.us

Upon receipt of the Claim for Damages, a file will be established and your claim will begin the claims review process. Please be advised, this process can take some time and may require handling by our third party administrator. It is imperative that you complete the claim form in its entirety, including specific information as outlined. Attach a copy of backup documentation, including two (2) estimates to repair or replace. Return the signed and completed claim form and backup document as instructed.

Staff Login     Select Language ▼

**Exhibit F Page 0090**

96

# Exhibit G

97

 **HARBOTTLE**
LAW GROUP

S. Daniel Harbottle, JD, PhD
HLG Irvine
18401 Von Karman Avenue
Suite 200
Irvine, California 92612
Tel: 949.428.8780
Fax: 949.428.8779
dharbottle@harbottlelaw.com
www.harbottlelaw.com

HLG San Jose
2033 Gateway Place
5th Floor
San Jose, California 95110
Tel: 408.961.8711
Fax: 949.428.8779

June 4, 2015

VIA FACSIMILE ONLY

Kathleen M. Loyer
Law Offices of Kathleen M. Loyer, Inc.
940 Calle Amanecer, Suite L
San Clemente, CA 92673-6218

Robert Stanford Brown, APC
714 W Olympic Blvd Suite 450
Los Angeles, CA 90015

Re: ███████ v. Newport-Mesa Unified School District
Case No: SACV14-00455-CJC (RBNx)

Dear Ms. Loyer and Mr. Brown:

I am writing in follow up to the various meet and confer discussions we have conducted regarding a proposed motion to dismiss contemplated by the District, in the pending federal matter between our respective clients. Case No: SACV 14-00455-CJC (RBNx), the "Federal Action." Specifically, we discussed a Federal Rule 12(c) Motion as to certain allegations requiring exhaustion of administrative remedies, as well as Causes of Action ("COA") 3, 8 and 10. I wrote to you on May 8, 2015, regarding COAs 3 and 8. In this letter, I address our position that factual allegations regarding post-May 2013 IEPs, and other allegations not adjudicated by the Office of Administrative Hearings ("OAH"), are subject to the exhaustion of administrative remedies, which has not been fulfilled as to these allegations. I also reiterate the points made during our most recent conversation on these points, and substantiate our position with legal authority.

*The Exhaustion Requirement*

In OAH Case No. 2012050785, (the "OAH Action") OAH addresses a series of IEPs, ending with the May 2, 2013 IEP. (OAH Decision, Exhibit A to Complaint, at 3.) However, your Complaint in the Federal Action contains allegations as to events (and at least one IEP) that post-date the May 2, 2013 IEP, and these allegations are incorporated into all Causes of Action thereafter. (Complaint, at 44 of 93, beginning with Paragraph 143, including events in January 2014 and an IEP on February 26, 2014.) We have continued our research, and confirmed that such allegations must initially be submitted to OAH as a means of exhausting your clients'

June 4, 2015
Page 2

administrative remedies as to these matters, and consequently must be dismissed or stricken from the Federal Action. Additionally, as discussed several times, we contend that the law will not permit what your clients are seeking in remedies. Specifically, you have confirmed numerous times that the remedy your clients seek is essentially a mandatory injunction (though you have also sometimes phrased it in terms of "damages") requiring the District to fund ▇▇▇▇ private educational program until his 22nd birthday, over ten years from now. You estimate these costs to be approximately $5,000,000.00, though have not detailed how this figure was derived.

We have asserted several times, both in writing and orally during our various discussions, that the post-May 2013 allegations (especially regarding IEPs not adjudicated by OAH) are subject to the exhaustion requirement. I have argued that these allegations require exhaustion because they could potentially yield relief that might be available to your clients under the IDEA. The law on this seems to us to be definitive. For example, in *Payne v. Peninsula School District*, 653 F.3d 863, 877, *overruled on other grounds*, in *Albino v. Baca*, 747 F.3d 1162, the Ninth Circuit held that,

> If the measure of a plaintiff's damages is the *cost of counseling, tutoring, or private schooling—relief available under the IDEA—then the IDEA requires exhaustion*. In such a case, the plaintiffs are seeking the same relief, even if they are willing to accept cash in lieu of services in kind. (Emphasis added.)

It is beyond dispute, following our numerous discussions, and your production of documents, that you are indeed seeking, "damages" in the form of "counseling, tutoring or private schooling" and thus your current allegations all fall within the parameters set forth in *Payne* and require exhaustion. Some of your allegations have been exhausted, such as those regarding the IEPs adjudicated under the IDEA by OAH. Others, such as the post-May 2013 IEPs have not been so adjudicated, and thus have not been exhausted. On the same basis that the post-May 2013 IEP allegations need be exhausted, so do any and all future allegations that could be potentially remedied under the IDEA. As I have stated numerous times, the distinction you are making between "damages" and other remedies, as set forth clearly in *Payne*, is not meaningful under the IDEA, which permits school districts to make annual offers of FAPE to each of its students, and thus requires administrative exhaustion of each of those annual offers.

Additionally, you have argued that these post-May 2013 allegations are asserted as part of your pleading in order to establish a policy or pattern of practice, and thus they do not require exhaustion. While there is some colorable authority on this point, it is clear under controlling law that in this case your clients must exhaust their administrative remedies. Specifically, in *Hoeft v. Tuscon Unified School District*, 967 F.2d 1298, 1303 (9th Cir. 1992), the Ninth Circuit stated that, "[t]he policies underlying the IDEA's administrative procedures reflect both general principles of administrative law and the educational philosophy of the IDEA. The exhaustion doctrine embodies the notion that 'agencies, not the courts, ought to have primary responsibility

{1053049.1}

**Exhibit G Page 0092**

June 4, 2015
Page 3

for the programs that Congress has charged them to administer.'" *quoting*, *McCarthy v. Madigan*, 503 U.S. 140, 112 S.Ct. 1081, 1086, 117 L.Ed.2d 291 (1992).

However, in apparent consistency with your position, *Hoeft* also holds that exhaustion is not required in some circumstances, and that, "[t]hese include complaints that: (2) *an agency has adopted a policy or pursued a practice of general applicability that is contrary to the law . . . "* at 1304-1305; emphasis in original.

But, the apparent consistency with your argument is truly only apparent because *Hoeft* ultimately held that the plaintiffs there, situated very like your clients here, were required to exhaust their "policy" claims nonetheless. This is because, according to *Hoeft*, "[s]tructuring a complaint as a challenge to policies, rather than as a challenge to an individualized education program formulated pursuant to these policies, however, *does not suffice to establish entitlement to a waiver of the IDEA's exhaustion requirement. Plaintiffs must demonstrate in addition that the underlying purposes of exhaustion would not be furthered by enforcing the requirement.*" (Emphasis added.)

Here, there is no argument available to you, or at least you have not provided any such argument to me during our various discussions, that the purposes underlying the exhaustion requirement would not be furthered in this case. As I have understood your position thus far, you contend that merely alleging a policy, pattern or practice excuses the exhaustion requirement, and I have contended that it does not do so. We can agree that it may in some circumstances, but I request that you place your position clearly in writing so that we may consider it before filing a motion to dismiss on this basis. Specifically, please identify those portions of your pending complaint in the Federal Action in which you plead facts sufficient to demonstrate that, "the underlying purposes of exhaustion would not be furthered by enforcing the requirement."

Finally, you have submitted a Statement of Interest of the United States of America in connection with a Massachusetts case, adjudicated under the ADA. This Statement requires little analysis because (1) we are challenging allegations in the Federal Action that were without dispute not adjudicated by OAH; and, (2) given the equally undisputed fact that you are seeking "damages" in the form of "counseling, tutoring or private schooling" all of which are potentially available under the IDEA, and thus require exhaustion.

*Non-Statutory Cause of Action 10*

Your offices previously agreed to dismiss COA 10, alleging breach of duty to protect and supervise students and employees. For ease of reference, please see the stipulation and proposed order submitted to me directly by Mr. Brown, with the representation that your offices were in agreement to dismiss COA 10. However, despite this agreement and your own drafted

{1055049.1 }

**Exhibit G Page 0093**

June 4, 2015
Page 4

stipulation to this effect, you have changed your position and seem now to claim that the
reference to various Education and Government Code provisions automatically makes COA 10 a
"statutory" claim. This is false in our view. Indeed, one of the cases you submitted for my
review on May 28, 2015, *D.K. v. Solano County Office of Education* holds precisely to the
contrary. Specifically, I quote a fairly large bit here as it goes straight to the point:

> In California, all government tort liability is dependent on the existence of an
> authorizing statute. Cal. Gov.Code § 815; *Lopez v. S. Cal. Rapid Transit Dist.,* 40
> Cal.3d 780, 785 n. 2, 221 Cal.Rptr. 840, 710 P.2d 907 (1985); *Morris v. State of
> California,* 89 Cal.App.3d 962, 964, 153 Cal.Rptr. 117 (Cal.App.2d Dist.1979).
> To state a cause of action, every fact essential to the existence of statutory liability
> must be pleaded with particularity, including the existence of a statutory duty.
> *Susman v. Los Angeles,* 269 Cal.App.2d 803, 808, 75 Cal.Rptr. 240 (Cal.App.2d
> Dist.1969); *Lopez,* 40 Cal.3d 780, 795, 221 Cal.Rptr. 840, 710 P.2d 907. "The
> facts showing the existence of the claimed duty must be alleged." Since the duty
> of a governmental agency can only be created by statute, the statute claimed to
> establish the duty must be identified. *Searcy v. Hemet Unified Sch. Dist.,* 177
> Cal.App.3d 792, 802, 223 Cal.Rptr. 206 (Cal.App.4th Dist.1986).
>
> In the instant case, Plaintiffs reference several statutes in order to establish such a
> duty. First, Plaintiffs state that Cal. Educ.Code § 56000 et. seq. establishes that
> Defendants had a duty to provide education pursuant thereto. (TAC ¶ 138.)
> However, nothing in this statute provides that a school district has a duty to
> supervise.
>
> Plaintiffs further point to Cal. Gov.Code § 815.6 and California Penal Code §
> 11166 to assert that Defendants are mandatory reporters of knowledge of child
> abuse. Cal. Gov.Code § 815.6 states that "[w]here a public entity is under a
> mandatory duty ..., the public entity is liable for an injury of that kind proximately
> caused by its failure to discharge the duty...." However, this statute still does not
> establish the duty to supervise, it only states that if there is such a mandatory duty,
> the public entity is liable for injuries proximately caused by a breach of that duty.

*D.K.* at 1198.

In our view, your COA 10 is essentially equivalent to this form of allegation (though the
substance differs) and that COA must be dismissed as such allegations were dismissed in *D.K.*
Under *D.K.*, "every fact essential to the existence of statutory liability must be pleaded with
particularity, including the existence of a statutory duty," and our reading of COA 10 is that it is
not sufficiently plead to establish a statutory duty.

{11055049.1 }

**Exhibit G Page 0094**

June 4, 2015
Page 5

You also submitted for our review, *Sydnor v. Fairfax County, Va.* from the Fourth Circuit. However, as you noted during our discussion, this case involves an entirely different area of law, and an EEOC complaint. This distinction is meaningful because a quick reading of the case demonstrates that the exhaustion requirement there (related facts) is different from that under the IDEA, which focuses on remedies. Even if the standards were the same, the facts underlying the allegations that we are claiming require exhaustion are, in fact, different from those that have been exhausted. Thus, under either scenario the *Sydnor* case does not support your position.

I reiterate that your office had previously agreed, in writing and in fact proposed a stipulation, to dismiss COA 10, and there is no legitimate basis for your rejecting your own prior agreement in this respect. We believe that the Court would be highly dismayed that it was forced to adjudicate a motion regarding a cause of action dismissal of which had previously been agreed upon by the plaintiff.

*Tort Claim Dispute Re COA 8*

Your offices continue to contend that your clients' due process complaint actually satisfies the Tort Claims Act, despite the specifics of my letter of May 8, 2015 in which I clarify the statutory requirements, and case authority interpreting those requirements. I note that you have not provided a written response to my May 8th letter, but you have now submitted two cases and a Dept. of Justice opinion which you assert support your position as to this dispute. I have reviewed this material and conclude that it does not support your position. Specifically, you submit *D.K.*, discussed above for this point, but even a casual reading of that case demonstrates that it is perfectly distinguishable. There, the plaintiffs had undeniably submitted Tort Claims, the defendant agency has undeniably been on notice of the claims, and had explicitly denied them. Here, by stark contrast, you have asserted that a couple of sentences in a multi-page due process complaint nowhere marked in any manner as purporting to constitute a Tort Claim, constitutes such a Claim nonetheless. There is no legitimate comparison between the facts in *D.K.* and those here. I will not reiterate the points made in my May 8, 2015 letter, but ask that you carefully consider the merits of moving forward with COA 8 under these circumstances.

In closing, I note that I have undertaken substantial efforts to make clear our position on these points, and I have not received any written response to any of the various letters I have written and analysis I have provided. We are coming quite close to the point at which we will have to make the proposed motion if we cannot come to a resolution. Please provide your written response to these points by close of business Monday, June 8, 2015, so that we can have a clear understanding of the parameters of a motion if one needs to be made. We do reserve our rights to recover our reasonable attorneys' fees in connection with such motion if it is required.

{1055049.1}

**Exhibit G Page 0095**

June 4, 2015
Page 6

Thank you for your anticipated cooperation in this process.

Respectfully,

S. Daniel Harbottle

cc:    Ann Huntington
       Maureen Cottrell

{1055049.1}

**Exhibit G Page 0096**

**Dan Harbottle**

| | |
|---|---|
| From: | Robert Brown <rstanfordbrown@gmail.com> |
| Sent: | Monday, April 27, 2015 4:31 PM |
| To: | Dan Harbottle |
| Cc: | Kathleen Loyer |
| Subject: | Stipulation |
| Attachments: | Revised NMUSC Proposed Stipulation [4-27-15] (2).DOC; Revised NMUSC Proposed Stipulation PROPOSED ORDER [4-24-15] (2).pdf |

Hello Dan,

Here is the Stipulation that Kathy and I are willing to sign.  As you will see, we made some revisions.  I am also attaching the Proposed Order.

Also, please submit some dates regarding moving the discovery cut-off or trial date.

Thank you.

Robert

1

**Exhibit G Page 0097**



HARBOTTLE LAW GROUP
S. Daniel Harbottle (State Bar No. 156442)
*dharbottle@harbottlelaw.com*
18401 Von Karman Avenue, Suite 200
Irvine, California 92612
Telephone:  949.428.8780
Facsimile:  949.428.8779

Attorneys for Defendant
Newport-Mesa Unified School District

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| E.F., a minor by and through his parents Eric Fulsang, Eric Fulsang and Aneida Fulsang for themselves,<br><br>        Plaintiffs,<br><br>   v.<br><br>Newport-Mesa Unified School District, Does 1-9,<br><br>        Defendants. | Case No.: SACV 14-00455-CJC (RNBx)<br><br>**JOINT STIPULATION TO DISMISS CAUSES OF ACTION 4, 5, 6, 7, 10, AND 11 with Proposed Order**<br><br>Action Filed: Mar. 24, 2014<br>Judge:  Hon. Cormac J. Carney |

TO THE COURT, ALL INTERESTED PARTIES, AND TO THEIR COUNSEL OF RECORD:

    Plaintiffs, E.F., Aneida Fulsang, and Eric Fulsang ("Plaintiffs") and Defendants, Newport-Mesa Unified School District ("District"), through their respective attorneys of record, stipulate and agree as follows:

    1. The following claims of Plaintiffs will be dismissed without prejudice, with each side to bear their own costs and attorneys' fees:

        • Causes of Action 10 and 11, each of which alleged non-statutory

-1-

HARBOTTLE LAW GROUP
Attorneys at Law

**Exhibit G Page 0098**

105

1     claims; and

2     • Causes of Action 4, 5, 6, and 7, each of which alleged Section 1983

3         claims.

4

5         The Parties respectfully request that the Court enter an Order consistent with

6     this stipulation.

7

8     DATED:                    LAW OFFICES OF KATHLEEN M. LOYER, INC.

9                               KATHLEEN M. LOYER

10                                     /s/ Kathleen M. Loyer
                        By: _____
11                          Kathleen M. Loyer
                            Attorneys for Plaintiff
12                          E.F., Eric Fulsang, Aneida Fulsang

13    DATED:                    ROBERT STANFORD BROWN, APC

14                                     /S/ Robert S. Brown
15                      By: _____
                            Robert S. Brown
16                          Attorneys for Plaintiff
                            E.F., Eric Fulsang, Aneida Fulsang
17

18

19    DATED:                    HARBOTTLE LAW GROUP

20                              S. DANIEL HARBOTTLE

21

22                      By: _____
                            S. DANIEL HARBOTTLE
23                          Attorneys for Defendant
                            Newport-Mesa Unified School District
24

25

26

27

28

1

2

3

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

4

5

6

E.F., a minor by and through his
parents Eric Fulsang, Eric Fulsang
and Aneida Fulsang for themselves,

Case No.: SACV 14-00455-CJC
(RNBx)

7

Plaintiffs,

**PROPOSED ORDER**

8

9

v.

**Granting Parties Joint Stipulation to
Dismiss Causes of Action 4, 5, 6, 7, 10,
and 11**

10

11

Newport-Mesa Unified School
District, Does 1-9,

Action Filed:  Mar. 24, 2014
Judge:  Hon. Cormac J. Carney

12

Defendants.

13

14

15

16

17

18

19

    Plaintiffs, E.F., Aneida Fulsang, and Eric Fulsang and Defendant,
Newport-Mesa Unified School District, through their respective attorneys of
record have stipulated and agreed the following claims of Plaintiffs will be
dismissed without prejudice, with each side to bear their own costs and
attorneys' fees: Causes of Action 4, 5, 6, 7, 10 and 11.

    It is so ordered.

20

21

22

By: _____     Date:_____
        Hon. Judge Cormac J. Carney

23

24

25

26

HARBOTTLE LAW GROUP
Attorneys at Law

-1-

# Exhibit H

108

# LAW OFFICES OF **KATHLEEN M. LOYER**, INC.

940 Calle Amanecer, Suite #L, San Clemente CA 92673
Phone: 949-369-1082 • Facsimile: 949-366-6836 • E-Mail: kmloyer@education-law.com

*A Professional Corporation*

## MEMO

**To:** S. Daniel Harbottle
Via Fax 949-428-8779 and E-mail dharbottle@harbottlelaw.com

**Re:** E.F., et al v. Newport Mesa USD, et al
Federal District Court, Case No.: SACV 14-00455
Your Letter dated June 5, 2015

**cc:** Robert S. Brown

We are writing in response to your letter sent on June 4, 2015, regarding the various meet and confer discussions that have taken place regarding your contemplated FRCP 12(c) Motion for Judgement on the pleadings.

We feel a motion for both causes of action ("COA"), 3 and 8, would fail as it would be inappropriate at this time. As you know, the analysis under FRCP 12(c) is substantially identical to that under FRCP 12(b)(6). *Chavez v. United States*, 683 F.3d 1102, 1108 (9th Cir.2012). Under FRCP 12(c), judgment on the pleadings is granted when, accepting all factual allegations as true, there is no issue of material fact in dispute, and the moving party is entitled to judgment as a matter of law. *Id.* Complaints are examined to see if they contain sufficient factual matter to state a facially plausible claim for relief. *Id.* In considering the motion, *"the trial court is required to view the facts presented in the pleadings and the inferences to be drawn therefrom in the light most favorable to the nonmoving party."* *Roost v. Reynolds* (In re Reynolds), 189 B.R. 199, 200 (1995) (quoting 5A Wright & Miller, Federal Practice and Procedure, pp. 518–519 (1990)). *In re Grover*, No. ADV 13-6013-TMR, 2013 WL 5934631, at *1 (Bankr. D. Or. Oct. 31, 2013). It is our position there are still material facts in dispute in the case. However, if the court is to decide in the alternative that there are no material facts in dispute, it is our position that when viewing the factual allegations and inferences that can be made from them in the light

1 of 11
June 19, 2015
Memo to Harbottle

**Exhibit H Page 0101**

most favorable our clients, i.e., the nonmoving parties, the court would find we have plead sufficient facts to defeat any of your defenses.

The court in *F.B. v. Sch. of Arts & Enter.*, No. CV 14-1878 DMG, 2014 WL 7525484 (C.D. Cal. Aug. 1, 2014), recognized the decision of *Albino v. Baca Albino v. Baca*, 747 F.3d 1162. It is important to note, however, in *Albino,* the court states that a motion to dismiss based upon a failure to exhaust should be treated as an affirmative defense, which the defendant must prove. *Albino*, at 1168–71. Because it is an affirmative defense, it is your client's burden to prove. As such, we feel at this time we need not defend our pleading until challenged through an official proceeding. We will discuss this further infra.

That being said, we would like to address the additional issues detailed in your June 4, 2015 letter as you have listed them.

1. **Our statement of facts subsequent to May 2, 2013 (Complaint p.44, "Cp44", your letter p.1 "Lp1"):**

We understand you feel strongly about striking these facts. However, as we have stated repeatedly, these facts are presented in support of the claims made, including our contention as to the severe emotional distress experienced by E.F., given the hostile school environment he endured and the ongoing pattern of practices of the District. We would like to make it clear we have neither accepted the post May 2013 IEP, nor have we challenged it. It follows then, there is no exhaustion requirement at this time. My clients did provide written notice of intent to provide services privately, so as to preserve their right to seek reimbursement for such in the future. We are aware of the two year statute of limitations. As discussed *ad nauseum*, it is our position inclusion of facts related to the post May 2013 IEP within the complaint is appropriate, as we are required to provide facts to support our contentions. And it is our intent to support these contentions via testimony and documentary evidence at trial.

**Exhibit H Page 0102**

2. **Remedies - Regarding the stated damages demand of $5M – Lp2**

The $5M amount addresses compensatory and punitive damages. As discussed, we are seeking compensation for the harm caused our client while attending NMUSD schools during the statutory time period as stated in paragraphs 212, 221, 248, 256, 267, 270, 276, 328, and 329. We have exhausted available administrative remedies. See OAH Decision, Case #201205078. We understand because of our discussion as to the mathematics used to come to this figure, you have somehow come to the conclusion that such an award would somehow interfere with the District's ability to meet the requirements of the IDEA as to "annual offers of FAPE". We simply do not see the logic in your analysis. An award of compensatory and punitive damages would in no way impede your client's ability to meet its affirmative duties. Also, please keep in mind, as to the appeal portion of the complaint, we are seeking reimbursements for all educationally related services that were previously denied by the hearing officer.

Further, as we have not put the post May 2013 IEP at issue as to IDEA claims, any remedy available to under the IDEA has been exhausted given the full evidentiary administrative hearing that took place. When the court rules on the appeal portion of the case, and my clients prevail, the court may order the specific educational services we have requested. However, as you know, there is very little chance that the decision on the appeal would result in services so expansive so as to remedy the harm caused our client. Rather, as you have indicated, when finding a failure to provide FAPE, the remedies available are only compensatory services to address the areas of failure and only in an amount and nature determined by the presiding judge. Students do not receive "hour for hour" compensatory remedies, nor do they receive any remedy beyond compensatory services (and/or reimbursement for services deemed compensatory). There is no cause of action under the IDEA for harm caused to a child, no money

**Exhibit H Page 0103**

damages. There is only the restoration or establishment of FAPE and compensatory
services. Families must look to the further protections of §504, the ADA, §1983, and/or
viable tort claims, as applicable.

The Restatement (Second) of Torts §§903, 905 cmt. a (1979) indicates
compensatory damages that may be awarded without proof of pecuniary loss included
compensation for emotional distress. §905 further indicates:

> "there is no rule of certainty with reference to the amount of recovery permitted
> for any type of emotional distress; the only limit is such an amount as a
> reasonable person could possible estimate as fair compensation…§910 ("One
> injured by the tort of another is entitled to recover damages from the other for all
> harm, past present, and prospective, legally caused by the tort. *Robb v. Bethel
> School District No. 403*, 308 F3d 1047,1055-56 (2002).

> "If they were to prevail in their tort action, plaintiffs would have the right to
> seek damages not only for present and future harms (i.e., a presently damaged
> self-esteem and the future costs of therapy needed to repair it), but for the pain
> experienced in the past due to defendants' treatment…As the weight of the
> caselaw makes clear, damages for past emotional distress are not available
> under the IDEA, and so requirement exhaustion with respect to such damages is
> to require a futile act" *Id. quoting W.B. v. Matula, 67 F.3d 484, 496 (3d
> Cir.1995)…see also Port v. Bd. Of Trustees Manhattan Beach USD, 3001
> WL31246678 at \*4, 2002 LEXIS 2099, at \*13 (9th Cir.2002)*

**3. Exhaustion – Lp2-3**

**American with Disabilities Act Amendments Act of 2008 – "ADA"**

The American with Disabilities Act Amendments Act of 2008 "the ADA" regulations,
28 CFR 35.172(b), permit complainants to file an action at any time. Exhaustion is not a

requirement. We are not seeking any remedies in our §504 claims that are available under IDEA.

Again, the facts related post May 2013 are not included to remedy any supposed FAPE claims under the IDEA. Instead, facts related to this IEP meeting, (and verifiable by both witness and documentary evidence) are provided to support our client's claims under the ADA and/or §504/ That is, to show a "*policy or pattern of practice*" of discrimination against E.F. because of his disabilities. Also, the issue of the District's policy or pattern of practice was exhausted via the due process hearing when Plaintiffs challenged the establishment of the "naturalistic environment" placement policies and their application to E.F. The administrative hearing procedure proved futile. Returning to it at this juncture would be inappropriate, at best.

Your contention that inclusion of the post-May 2013 allegations "*could potentially yield relief that might be available to [our] clients under the IDEA,*" is unsupported. It is your theory of our case, not the claim we have made. It we are at impasse, it would appear the court must decide. Through our own research of the decision of *Payne v. Peninsula School District*, 653 F.3d 863, 877, overruled on other ground in *Albino v. Baca*, 747 F.3d 1162, we do understand your indication that the courts do apply this reasoning. However, we feel it is important to draw your attention to additional language within the opinion. In discussing the exhaustion requirements and a court's analysis of a plaintiff's claim, the court stated,

> [W]hether a plaintiff *could* have sought relief available under the IDEA is irrelevant—what matters is whether the plaintiff actually sought relief available under the IDEA. In other words, when determining whether the IDEA requires a plaintiff to exhaust, courts should start by looking at a complaint's prayer for relief and

**Exhibit H Page 0105**

determine whether the relief sought is also available under the
IDEA. If it is not, then it is likely that § 1415(l ) does not require
exhaustion in that case. *Payne,* 653 F.3d at 875.

Again, the remedies sought under the ADA are not available under IDEA. The facts
as to the post-May 2013 IEP meeting will be used to prove those remedies available
under the ADA, as stated in the complaint, not those available under the IDEA. (Cp89-
93, Para 328-331 and 333-339). Just as in *F.B. v. Sch. of Arts & Enter.,* No. CV 14-1878
DMG, 2014 WL 7525484 (C.D. Cal. Aug. 1, 2014) the complaint (and damages sought)
do not specify how the damages are to be calculated by the court, therefore, any
speculation on your, or the court's, part would be inappropriate. (Cp89-93 para 329-331,
333-336) See *Payne,* 653 F.3d at 875

It is our position that, just as the court in *F.B.* could not *"conclude on the face of the
Complaint that F.B.'s ADA claim—which alleges discrimination vel non on the basis of
her disability—seeks relief available under the IDEA,"* the court here could not conclude
that our ADA claim seeks relief available under the IDEA. *Id.* at 7.

We disagree with your contention that *"[i]t is beyond dispute...that [we] are seeking,
"damages" in the form of "counseling, tutoring or private schooling."* It is our position
that we are seeking damages in the form of money in order to make our clients whole
and punish the district for their violations of the ADA (and §504).

Your interpretation of our position is flawed. As previously explained, the use of the
cost of services beyond any remedy available under the IDEA, was employed to
establish a basis for the amount requested, as it is our contention that the harm caused
E.F. by the District's failures/violations is irreparable with lifelong impact.

As stated above, we detail the post-May 2013 IEP factual allegations to establish
"a *policy or pattern of practice*" of discrimination, not a violation of IDEA. As stated, your

**Exhibit H Page 0106**

114

presentation as to the decision of *Hoeft v. Tuscon Unified School District*, 967 F.2d 1298 (9th Cir. 1992) is inapplicable. *Hoeft*, a class action case, involved allegations the defendant district had "*formal, written policies and informal, de facto policies concerning extended school year services which operate to deny children with disabilities an appropriate, individually tailored education, in violation of the...*[IDEA]." *Id.* In the present case, the ADA claims were not made separately from the IDEA claims. The post-May 2013 facts support our ADA claim and, as stated above, ADA claims do not have any administrative prerequisites. However, the *Hoeft* court did find "The IDEA's exhaustion requirement is not absolute...for there are situations in which exhaustion serves no useful purpose. Courts universally recognize that parents need not exhause the procedures set forth in 20 U.S.C. §1415 where resort to the administrative process would be either futile or inadequate. *Hoeft* at 1303, (internal cites omitted).

To further clarify our position regarding your belief exhaustion is required for allegations involving "*policy*" claims, it is our position the policies, pattern or practice alleged, is regarding our ADA claim and not open to a remedy under the IDEA appeal. Your contentions as to these claims and the caselaw you cite appear to encompass IDEA claims. It is true that within our pending complaint there is an appeal of the administrative decision on the IDEA claims. However, as discussed on multiple occasions and, as you have acknowledged, there is also an ADA claim at issue. Again, as previously discussed and further explained herein, as well as considering the caselaw you have cited involving decisions you claim to be precedent, we maintain our contention, when properly considered, there is no requirement under the ADA, nor further requirement under the IDEA for exhaustion as to the facts of our case and the claims before the court.

**Exhibit H Page 0107**

115

As we have also discussed, in line with the Department of Justice's position, it is our contention that your contention that our ADA claim (COA 3) will fail because exhaustion has not occurred is completely unsupported.

In its amicus brief ("the Brief"), submitted on August 27, 2014 by the Attorney General of the United States, Eric H. Holder, stated the Justice Department submitted the brief so as to "*clarify the proper interpretation of the ADA….*" *Statement of Interest of the United States of America,* at p2, *S.S. v. City of Springfield, Mass.,* Civil Action No. 3:14-cv-30116-MGM (D.C. Mass. 2014). The first issue addressed was whether Title II of the ADA includes any administrative prerequisites for filing suit in federal court. The Brief explains that both the ADA and IDEA are similar in providing protection to disabled individuals, but vary in their "*purpose or scope and impose distinct obligations school districts in furtherance of their respective statutory mandates." Id.* It is further stated that the IDEA makes it clear that an IDEA claim does not "*restrict rights and remedies that are independently available through sources of law*." . As Mr. Holder states, "*Title II of the ADA includes* **no administrative perquisites** *for filing suit in federal court….*" (Brief p.3, Emphasis added.) It is important to note the Department of Justice has been directed by Congress to issue Title II's regulations. *Olmstead v. L.C. ex rel. Zimring,* 527 U.S. 581, 583, 119 S. Ct. 2176, 2178, 144 L. Ed. 2d 540 (1999). "*An agency's interpretation of its own regulation is controlling unless plainly erroneous or inconsistent with the regulation.*" *Brief* p.7

As to our use of the Brief to support our contention, we ask that you reconsider your dismissal of its relevance, given our complete disagreement as to your characterization of the remedies we seek. The Justice Department's interpretation in the form of an amicus brief, should not diminish the deference that it should receive. *Brief* p.11. The

**Exhibit H Page 0108**

Brief supports the contention that, given the fact a full evidentiary, administrative hearing was conducted, any argument that further exhaustion is required would certainly fail.

**4.   Non-Statutory Cause of Action 10 - duty to supervise/protect – Lp3**

We apologize that you feel that it had already been agreed upon that we would dismiss COA 10. Despite what may have been inadvertently portrayed, both myself and Mr. Brown continued to discuss this issue after the draft stipulation was typed. And, after further discussion and research, we found we were not in agreement to dismiss our COA 10. Mr. Brown may have drafted the stipulation document. However it was just that, a draft. The draft was not finalized, signed by all attorneys, nor filed.

You are correct that our position is that various Education and Government Code provisions create a statutory duty. Here, Government Code §815.2 applies, in that it indicates public entities are liable for injury caused by employees. However, there seems to be some misunderstanding based on your view of how we believe the decision of *D.K. v. Solano County Office of Education* is applicable. Specifically, regarding the quoted material in your June 4, 2015 letter, we believe the facts of our case, applied to that analysis, will show a statutory duty. In *D.K.*, the plaintiff claimed that Cal. Educ. Code § 56000 et. Seq. established a duty to supervise. In Cal. Educ. Code § 56000 et. seq. there is no mention of "*supervision*" or such a requirement that may be inferred from the language. Our position is that, although there is no direct statement of the creation of a duty to protect and supervise in Cal. Educ. Code §§ 2260-32262, 44807, and 44808, these sections read together with Cal.Gov.Code §815.2 create a statutory duty to protect and supervise that is assumed by the court in caselaw. Further, it is our contention that Lopez v. S. Cal. Rapid Transit Dist., 40 Cal.3d 780 does not stand for the proposition that plaintiff must plead with particularity in all instances. Rather, the *Lopez* court put forth the proposition that plaintiffs are not required to plead with specificity prior to

**Exhibit H Page 0109**

discovery. See *C.A. v. William S. Hart UHSD*, 53 Cal.4[th] 861, 872 (2002), where the court held that such a rule would be impractical and inconsistent with the legislative intent in enacting the statute.

We are prepared to argue such before the court so as to allow a ruling on the issue. Again, we do apologize for any confusion on this.

5.  **Tort Claim Dispute Re COA 8 – Lp5**

We appreciate the extensive information you have provided through your May 8th letter. However, we continue to maintain we have met the requirements of notice for our Tort Claims as we feel the language contained in both our original RFDP and our Stipulated First Amended RFDP provide sufficient notice.  As far back as 1961, California courts have held that "substantial compliance is all that is required...when a notice contains the information necessary" *Johnson v. City of Oakland*, 188 Cal.App.2d, 181,183. The Court also found "It must also be noted that California courts have taken a liberal view of claims statutes where a reasonable attempt has been made to comply with the law in good faith." Id. (Internal cites omitted.)  As I had expressed, there is an explicit statement in our RFDP filings. The District's subsequent behavior provides support to our contention that the District was well aware of these claims and its potential liability. Several meetings were held where all of these issues were discussed.

The District has more than sufficient time, information and opportunity to fully investigate and settle this claim before suit was brought. State v. Superior Court (Bodde), 32 Cal.4[th] 1234,1244 (2004).  Settlement discussions took place over the 18 months this case was litigated, discussions where the District's requirement for a full waiver of all causes of actions was stated as a condition of final settlement, indicating its clear understanding of its exposure.

**Exhibit H Page 0110**

We respect you have a different opinion, but continue to feel strongly enough in our position that we believe a judge would agree that notice requirements for our tort claims were substantially met. Further, your claim that the District had a form for provided notice under the Government Tort Claims Act, and their form was readily available to anyone visiting their website does not appear to be credible for the applicable time period. We have considered your position. However, we continue to feel it is viable for us to move forward with our position, for the court's consideration.

We respectfully request consideration of our broaden analysis of the applicable laws and caselaw, full consideration of Attorney General Holder's amicus brief, as well as the entirety of the facts presented, as we feel such will bring better understanding of our position. We do hope it assists in a better understanding of our positions. We also hope consideration of this information will result in a decision that avoids any unnecessary motions and their related costs.

If you have any further questions or concerns, please feel free to contact my office. We will do our utmost best in providing you with a speedy response and/or arrange for an additional teleconference so as to meet and confer prior to any contemplated filings.

Yours truly,

/s/

Kathleen M. Loyer
Attorney at Law

and

/s/
Robert S. Brown
Attorney at Law


cc: Fulsang

**Exhibit H Page 0111**

# LAW OFFICES OF KATHLEEN M. LOYER

### 940 CALLE AMANECER, SUITE L • SAN CLEMENTE, CA 92673
#### Phone: 949-369-1082    Fax 949-366-6836
##### E-mail: kmloyer@education-law.com

## FACSIMILE COVER SHEET

## CONFIDENTIAL

| | |
|---|---|
| TO: | FROM: |
| Harbottle Law Group | KM Loyer |
| Attn: Daniel Harbottle, Esq. | |
| (949)428-8779 - Harbottle Law Group | |

| | |
|---|---|
| FAX NUMBER: | DATE: |
| See above | June 19, 2015 |
| RE: | TOTAL NO. OF PAGES INCLUDING COVER: |
| E. F. v. Newport-Mesa USD | 12 |
| Case No. SACV14-00455 | |

PLEASE CALL 949-369-1082 IMMEDIATELY IF YOU DO NOT RECEIVE ALL PAGES. THIS TRANSMITTAL CONTAINS CONFIDENTIAL INFORMATION INTENDED FOR THE ADDRESSEE ONLY. PLEASE NOTE THAT ANY USE OF THIS INFORMATION IF YOU ARE NOT THE INTENDED RECIPIENT IS PROHIBITED. IF YOU HAVE RECEIVED THIS TRANSMITTAL IN ERROR, PLEASE NOTIFY THIS OFFICE.

ANY INADVERTENT OR ERROR IN TRANSMITTING THIS DOCUMENT DOES NOT CONSTITUTE A WAIVER OR ATTORNEY CLIENT PRIVILEGE

NOTES/COMMENTS:

Please see attached correspondence, response to your Letter dated June 4, 2015.

**Exhibit H Page 0112**

120

# Exhibit I

121

1 | **KATHLEEN M. LOYER, SBN 188741**
**LAW OFFICES OF KATHLEEN M. LOYER, INC.**
2 | **940 Amanecer, Suite L, San Clemente, CA 92673**
**Phone: 949-369-1082, Fax: 949-366-6836,**
3 | **E-mail: kmloyer@education-law.com; atty@education-law.com**

4 | **ROBERT BROWN, SBN#187845**
**714 W. Olympic Blvd., Suite #450**
5 | **Los Angeles, Ca 90015**
**Phone: 213-745-6300,  Fax: 213-261-3906,**
6 | **Email: rstanfordbrown@earthlink.net**

7 | **Attorneys for the:      Appellants/Plaintiffs**

**UNITED STATES DISTRICT COURT**

8 | CENTRAL DISTRICT OF CALIFORNIA

E.F. a minor, by and through his parents)
9 | Eric Fulsang and Aneida Fulsang, Eric   )   CASE NO. 8:14-CV-00455 CJC-RNB
Fulsang and Aneida Fulsang for              )
10 | themselves                                            )   **PLAINTIFFS' RULE 26 (a)(1)**
                                                                )   **INITIAL DISCLOSURE**
11 |     Appellants/Plaintiffs                       )   **STATEMENT**
    v.                                                        )
12 |                                                             )
Newport Mesa Unified School District;)
13 | Does 1-9                                              )
                         Appellee/Defendant)
14 | _____)

**PLAINTIFFS'  INITIAL DISCLOSURES**

15 | Plaintiffs E.F, ERIC FULSANG and ANEIDA FULSANG ("Plaintiffs")

16 | makesthe following initial disclosures pursuant to Federal Rules of Civil

17 | Procedure 26(a)(1).  Plaintiffs' initial disclosures are made subject to and

expressly reserving the right to supplement this Disclosure Statement if and when
18 |
additional witnesses and/or documents become available, and upon further

19 | investigation and discovery.

20 | / / /
/ / /
21 |                                                   I

**Exhibit I Page 0113**

122

**I.    Witnesses**

Pursuant to Federal Rule of Civil Procedure 26(a)(1)(A), Plaintiffs provide the name and, if known, the address and telephone number of each individual likely to have discoverable information that Plaintiffs may use to support her claims (excluding impeachment evidence), identifying the subjects of the information, that are as such known at this time:

1. Plaintiff Eric Fulsang.  Mr. Fulsang may be contacted through his attorneys.  [Information regarding E.F.'s development (or lack therof) before and after being a student of Newport Mesa Unified School District; E.F.'s communications with Newport Mesa Unified School District personnel regarding E.F.'s education; the mental, emotional and financial effect of Newport Mesa Unified District's action and omissions regarding E.F., on him and his family.]

2. Plaintiff Aneida Fulsang.  Mrs. Fulsang may be contacted through her attorneys.  [Information regarding E.F.'s development (or lack therof) before and after being a student of Newport Mesa Unified School District; E.F.'s communications with Newport Mesa Unified School District personnel regarding E.F.'s education; the mental, emotional and financial effect of Newport Mesa Unified District's action and omissions regarding E.F., on her and her family.]

3. Dr. Elizabeth Hughes, 5777 West Century Blvd., #675, Los Angeles, CA 90045 (310) 649-0499.  [E.F.'s educational needs and development.]

4. Dr. Robert Patterson, 2030 East Fourth Street, #122A, Santa Ana, CA 92705 (714) 541-5326.  [E.F.'s cognitive ability and development.]

5. Dr. Cindy Cottier, 960 E. Green Street,  Ste. 203, Pasadena, CA 91106  (626) 351-5402.  [E.F.'s augmentative communication skills and development and E.F.'s speech therapy.]

2

**Exhibit I Page 0114**

6.      Alefia Mithawaiwala, 18401 Van Karman Ave., Ste. 200, Irvine, CA 92612  (949) 428-8780.  [Ms. Mithawaiwala's participation at E.F.'s IEP meeting in February of 2014.]

7.      Natalie Neal, M.A. CCC-SLP, 3300 Irvine Ave., Ste. 111, Newport Beach, CA 92660 (714) 396-8685.  [E.F.'s speech and language skills and development.]

8.      Cheryl Beck, NMUSD Administrator.  She can be reached through opposing counsel.  [E.F.'s assessment(s), E.F.'s unique needs, and educational recommendations.]

9.      Maureen Cottrell, NMUSD Administrator.  She can be reached through opposing counsel.  [E.F.'s assessment(s), E.F.'s unique needs, and educational recommendations.]

10.      Pam Coughlin, NMUSD Administrator.  She can be reached through opposing counsel.  [E.F.'s assessment(s), E.F.'s unique needs, and educational recommendations.]

11.      Denise Ellis, NMUSD Nurse.  She can be reached through opposing counsel.  [E.F.'s assessment(s), E.F.'s unique needs, and educational recommendations.]

12.      Scott Huffman, NMUSD Program Specialist.  He can be reached through opposing counsel.  [E.F.'s assessment(s), E.F.'s unique needs, and educational recommendations.]

13.      Linda Natzmer, NMUSD Nurse.  She can be reached through opposing counsel.  [E.F.'s assessment(s), E.F.'s unique needs, and educational recommendations.]

14.      Bethany Allen, General Ed. Teacher.  She can be reached through opposing counsel.  [E.F.'s assessment(s), E.F.'s unique needs, and educational recommendations.]

3

Exhibit I Page 0115

124

15. Kristy Becker, NMUSD School Psychologist. She can be reached through opposing counsel. [E.F.'s assessement(s), E.F.'s unique needs, and educational recommendations.]

16. Katherine Burns, NMUSD Special Ed. Teacher. She can be reached through opposing counsel. [E.F.'s assessement(s), E.F.'s unique needs, and educational recommendations.]

17. Donna Manea, NMUSD Special Ed. Teacher. She can be reached through opposing counsel. [E.F.'s assessement(s), E.F.'s unique needs, and educational recommendations.]

18. Leah Steinman, NMUSD Special Ed. Teacher. She can be reached through opposing counsel. [E.F.'s assessement(s), E.F.'s unique needs, and educational recommendations.]

19. Alexandra Sweany, NMUSD Occupational Therapist. She can be reached through opposing counsel. [evaluation of E.F.'s health condition, E.F.'s unique needs, and educational recommendations.]

20. Brooke Beverage, NMUSD Occupational Therapist. She can be reached through opposing counsel. [evaluation of E.F.'s heathl condition, E.F.'s assessement(s), E.F.'s unique needs, and educational recommendations.]

21. Tim Chen, NMUSD Occupational Therapist. He can be reached through opposing counsel. [evaluation of E.F.'s health condition, E.F.'s unique needs, and educational recommendations.]

22. Lucinda Bottrof, NMUSD Speech and Language Pathologist. She can be reached through opposing counsel. [E.F.'s assessement(s), E.F.'s unique needs, and educational recommendations.]

23. Caitlin Johnson, NMUSD Speech and Language Pathologist. She can be reached through opposing counsel. [E.F.'s assessement(s), E.F.'s unique needs, and educational recommendations.]

4

**Exhibit I Page 0116**

125

24.    Jennie Ni, Occupational Therapist.  She can be reached through opposing counsel.  [evaluation of E.F.'s health condition, E.F.'s unique needs, and educational recommendations.]

25.    Kathy Murphy, NMUSD Speech and Language Pathologist. She can be reached through opposing counsel.  [E.F.'s assessement(s), E.F.'s unique needs, and educational recommendations.]

26.    Heather Mans, NMUSD General Ed. Teacher.  She can be reached through opposing counsel.  [E.F.'s assessement(s), E.F.'s unique needs, and educational recommendations.]

27.    Juliet Hilde, NMUSD General Ed. Teacher.  She can be reached through opposing counsel.  [E.F.'s assessement(s), E.F.'s unique needs, and educational recommendations.]

28.    Eby Kent, NMUSD Psychologist. NMUSD Special Ed. Teacher.  She can be reached through opposing counsel.  [E.F.'s assessement(s), E.F.'s unique needs, and educational recommendations.]

29.    Lila Seldin, NMUSD Assistive Techonolgy Specialist.  She can be reached through opposing counsel.  [E.F.'s assessement(s), E.F.'s unique needs, and educational recommendations.]

30.    Melissa Wiley, NMUSD Speech and Language Pathologist. She can be reached through opposing counsel.  [E.F.'s assessement(s), E.F.'s unique needs, and educational recommendations.]

31.    Dr. Lauren Franke, Speech and Language Pathologist. She can be reached through opposing counsel.  [E.F.'s assessement(s), E.F.'s unique needs, and educational recommendations.]

32.    Karrie Anderson, NMUSD Psychologist.  She can be reached through opposing counsel.  [E.F.'s assessement(s), E.F.'s unique needs, and educational recommendations.]

5

**Exhibit I Page 0117**

33.   Eliza Del Pizzo, Autism Specialist.  She can be reached through opposing counsel.  [E.F.'s assessement(s), E.F.'s unique needs, and educational recommendations.]

34.   Without conceding the admissibility of the document(s), all witnesses identified in Defendant Newport Mesa Unified School Districts Rule 26(a)(1) Initial Disclosure Statement;

35.   Without conceding the admissibility of the document(s), all witnesses identified in any report of the Yuba City Fire Department regarding Plaintiff's Incident; and,

36.   Any other witness that may be determined to be relevant, as set forth in documents or otherwise.

Discovery and investigation are ongoing so additional witnesses may be identified.

## II.   Documents

Pursuant to Federal Rule of Civil Procedure 26(a)(1)(B), Plaintiff provides a description by category and location of all documents, data compilations, and tangible things that are in the possession, custody, or control of Plaintiff and that Plaintiff may use to support her claims, unless solely for impeachment:

1.   NMUSD Annual IEP, dated February 9, 2010;

2.   NMUSD  IEP Progress Report, dated March 8, 2010;

3.   NMUSD Addendum IEP, dated April 15, 2010;

4.   Letter from Fulsangs requesting IEP meeting, dated April 15, 2010;

5.   Letter from Fulsangs, dated June 2, 2010;

6.   NMUSD IEP Progress Report, dated June 10, 2010;

7.   NMUSD Addendum IEP, dated June 21, 2010;

8.   NMUSD Progress Report, dated November 17, 2010;

9.   NMUSD Addendum IEP, dated November 23, 2010;

6

Exhibit I Page 0118

127

10. NMUSD Assessment Plan, dated December 6, 2010;

11. NMUSD Triennial Report Student Health Information, dated January 26, 2011;

12. NMUSD IEP Annual, dated February 4, 2011;

13. NMUSD Multidisciplinary Assessment, dated February 4, 2011;

14. Letter from NMUSD, dated February 16, 2011;

15. NMUSD IEP Addendum, dated March 8, 2011;

16. NMUSD IEP Progress Report, dated March 10, 2011;

17. NMUSD IEP Addendum, dated April 19, 2011;

18. NMUSD IEP Progress Report, dated June 24, 2011;

19. NMUSD IEP Progress Report, dated November 14, 2011;

20. NMUSD IEP Annual, dated February 1, 2012 and February 29, 2012;

21. NMUSD IEP Progress Report, dated March 12, 2012;

22. Letter from Fulsangs, dated April 5, 2012;

23. Letter from District, dated April 17, 2012;

24. Augumentative Communication Evaluation by Cottier, dated July 18, 2012;

25. Augumentaive and Alternative Communication Consultation Report, dated November 27, 2012 and December 6, 2012;

26. NMUSD IEP Annual, dated January 23, 2013;

27. NMUSD IEP Addendum, dated January 23, 2013;

27. NMUSD Assessment Plan, dated January 24, 2013;

28. NMUSD Sensory Diet Report, dated May of 2013;

29. NMUSD Fuctional Behavioral Assessment Report, dated April 30, 2013;

30. NMUSD Evaluation, dated May 2, 2013;

7

**Exhibit I Page 0119**

1    31.    Fulsang's receipts, invoices, and cancelled checks for services
2 rendered to E.F.;
     32.    NMUSD IEP, dated May 2, 2013;
3    33.    Comprehensive Functional Behavioral Assement Report and
4 Recommended Support Plan, dated September 17, 2013.
5    34.    Progress Report, dated June 21, 2013;
     35.    Progress Report of Annaul Special Education Goals for IEP, dated
6 February 4, 2011;
7    36.    Report Cards/Progress Reports;
8    37.    Occupational Therapy Progress Reports; and,
     38.    Speech Therapy Data Logs.
9       Discovery and investigation are ongoing so additional documents may be
10 identified.

11 **III.   Damages**
        Plaintiff seeks economic and non-economic damages in an amount to be
12 determined.
13 / / /
14 / / /
   / / /
15 / / /
16 / / /
17 / / /
   / / /
18 / / /
19 / / /
20 / / /
   / / /
21

8

**Exhibit I Page 0120**

129

**IV.    Insurance**

1

2          Plaintiff is not presently aware if any Defendant has insurance that covers
its misconduct.

3    Dated: September 26, 2014              ROBERT STANFORD BROWN, APC

4

5                                    By:        /S/ Robert S. Brown
                                          Robert S. Brown
                                          Attorneys for Plaintiff E.F., ERIC
6                                          FULSANG, ANEIDA FULSANG

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21                                        9

**Exhibit I Page 0121**

130

1

PROOF OF SERVICE

*E.F. v. Newport Mesa Unified School District*
*LASC Case No.:* 8:14-CV-00455 CJC-RNB

2

3      I am employed in the County of Los Angeles, State of California. I am over the age of
18 and not a party to the within action; my business address is 714 West Olympic Blvd., Ste
450, Los Angeles, CA 90015.

4      On September 26, 2014 I served the foregoing document(s) described as **PLAINTIFFS'
RULE 26 (a)(1) INITIAL DISCLOSURE STATEMENT** on all interested parties in this
action at the addresses listed below, as follows:

5

Adam Y. Siegel, Esq.
David Z. Feingold, Esq.
6      **Jackson Lewis P.C.**
725 South Figueroa Street, Suite 2500
7      Los Angeles, CA 90017
Telephone: (213) 689-0404

8

()      FOR COLLECTION.  By placing a true copy (copies) thereof enclosed in a
9      sealed envelope(s), addressed as above, and by placing said sealed envelope(s) for collection
and mailing on that date following ordinary business practices. I am "readily familiar" with the
10     business' practice for collection and processing of correspondence for mailing the U.S. Postal
Service. Under that practice, it would be deposited with the U.S. Postal Service on that same
day with postage thereon fully prepaid at Los Angeles, California, in the ordinary course of
11     business.

()      OVERNIGHT DELIVERY (DROP-OFF).  By placing a true copy(ies) thereof
12     enclosed in a sealed envelope(s) or package(s) as designated by [Overnight Express] or [Federal
Express], addressed as above, and depositing said envelope(s) or package(s), with delivery fees
13     provided for, in a box regularly maintained by [Overnight Express] or [Federal Express] at 3701
Wilshire Boulevard, Los Angeles, California 90010.

14     (X)      VIA E-MAIL.  By transmitting a true copy(ies) thereof to each of the
designated counsel on the service list to their facsimile numbers as listed herein.

15     ()      PERSONAL DELIVERY.  I caused to be served by messenger for personal
delivery that same day the foregoing documents in a sealed envelope to the above persons at
16     the address(es) listed above.

I declare under penalty under the laws of the State of California that the above is true
17     and correct. Executed on September 26, 2014 in Los Angeles County, California.

18

/S/ Robert S. Brown
19     _____

Robert S. Brown
20

21                                          10

Exhibit I Page 0122

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

ii

**Exhibit I Page 0123**

# Exhibit J

1 | **KATHLEEN M. LOYER, SBN 188741**
**LAW OFFICES OF KATHLEEN M. LOYER, INC.**
2 | **940 Amanecer, Suite L, San Clemente, CA 92673**
**Phone: 949-369-1082, Fax: 949-366-6836,**
3 | **E-mail: kmloyer@education-law.com; atty@education-law.com**

4 | **ROBERT BROWN, SBN#187845**
**714 W. Olympic Blvd., Suite #450**
5 | **Los Angeles, Ca 90015**
**Phone: 213-745-6300, Fax: 213-261-3906,**
6 | **Email: rstanfordbrown@earthlink.net**

7 | **Attorneys for the:**     **Appellants/Plaintiffs**
**UNITED STATES DISTRICT COURT**
8 | CENTRAL DISTRICT OF CALIFORNIA

E.F. a minor, by and through his parents )
9 | Eric Fulsang and Aneida Fulsang, Eric )   CASE NO. 8:14-CV-00455 CJC-RNB
Fulsang and Aneida Fulsang for )
10 | themselves                     )   **PLAINTIFFS' RULE 26 (a)(1)**
)   **SUPPLEMENTAL DISCLOSURE**
11 |       Appellants/Plaintiffs    )   **STATEMENT**
v.                               )
12 |                                    )
Newport Mesa Unified School District; )
13 | Does 1-9                       )
           Appellee/Defendant )
14 | _____)

**PLAINTIFFS' SUPPLEMENTAL DISCLOSURES**

15 | Plaintiffs E.F, ERIC FULSANG and ANEIDA FULSANG ("Plaintiffs") make the

16 | following supplemental disclosures pursuant to Federal Rules of Civil Procedure

17 | 26(a)(1). Plaintiffs' supplemental disclosures are made subject to and expressly

reserving the right to supplement this Disclosure Statement if and when additional
18 |
witnesses and/or documents become available, and upon further investigation and

19 | discovery.

20 | ///

/// |
21 |

                                1

1 | **I.      Witnesses**

2 | Pursuant to Federal Rule of Civil Procedure 26(a)(1)(A), Plaintiffs provide
the name and, if known, the address and telephone number of each individual

3 | likely to have discoverable information that Plaintiffs may use to support her

4 | claims (excluding impeachment evidence), identifying the subjects of the

5 | information, that are as such known at this time:

6 | 1. Plaintiff Eric Fulsang.  Mr. Fulsang may be contacted through his
attorneys.  [Information regarding E.F.'s development (or lack therof) before and

7 | after being a student of Newport Mesa Unified School District; E.F.'s

8 | communications with Newport Mesa Unified School District personnel regarding
E.F.'s education; the mental, emotional and financial effect of Newport Mesa

9 | Unified District's action and omissions regarding E.F., on him and his family.]

10 | 2.      Plaintiff Aneida Fulsang.  Mrs. Fulsang may be contacted through

11 | her attorneys.  [Information regarding E.F.'s development (or lack therof) before
and after being a student of Newport Mesa Unified School District; E.F.'s

12 | communications with Newport Mesa Unified School District personnel regarding

13 | E.F.'s education; the mental, emotional and financial effect of Newport Mesa

14 | Unified District's action and omissions regarding E.F., on her and her family.]

15 | 3.      Dr. Elizabeth Hughes, 5777 West Century Blvd., #675, Los Angeles,
CA 90045 (310) 649-0499.  [E.F.'s educational needs and development.]

16 | 4.      Dr. Robert Patterson, 2030 East Fourth Street, #122A, Santa Ana,

17 | CA 92705 (714) 541-5326.  [E.F.'s cognitive ability and development.]

18 | 5.      Dr. Cindy Cottier, 960 E. Green Street, Ste. 203, Pasadena, CA
91106  (626) 351-5402.  [E.F.'s augmentative communication skills and

19 | development and E.F.'s speech therapy.]

20 |

21 | 2

**Exhibit J Page 0125**

6.      Alefia Mithawaiwala, 18401 Van Karman Ave., Ste. 200, Irvine, CA 92612 (949) 428-8780. [Ms. Mithawaiwala's participation at E.F.'s IEP meeting in February of 2014.]

7.      Natalie Neal, M.A. CCC-SLP, 3300 Irvine Ave., Ste. 111, Newport Beach, CA 92660 (714) 396-8685. [E.F.'s speech and language skills and development.]

8.      Cheryl Beck, NMUSD Administrator.  She can be reached through opposing counsel. [E.F.'s assessment(s), E.F.'s unique needs, and educational recommendations.]

9.      Maureen Cottrell, NMUSD Administrator.  She can be reached through opposing counsel. [E.F.'s assessment(s), E.F.'s unique needs, and educational recommendations.]

10.     Pam Coughlin, NMUSD Administrator.  She can be reached through opposing counsel. [E.F.'s assessment(s), E.F.'s unique needs, and educational recommendations.]

11.     Denise Ellis, NMUSD Nurse.  She can be reached through opposing counsel. [E.F.'s assessment(s), E.F.'s unique needs, and educational recommendations.]

12.     Scott Huffman, NMUSD Program Specialist.  He can be reached through opposing counsel. [E.F.'s assessment(s), E.F.'s unique needs, and educational recommendations.]

13.     Linda Natzmer, NMUSD Nurse.  She can be reached through opposing counsel. [E.F.'s assessment(s), E.F.'s unique needs, and educational recommendations.]

14.     Bethany Allen, General Ed. Teacher.  She can be reached through opposing counsel. [E.F.'s assessment(s), E.F.'s unique needs, and educational recommendations.]

3

1    15.    Kristy Becker, NMUSD School Psychologist. She can be reached

2  through opposing counsel. [E.F.'s assessement(s), E.F.'s unique needs, and

   educational recommendations.]

3
     16.    Katherine Burns, NMUSD Special Ed. Teacher. She can be reached

4  through opposing counsel. [E.F.'s assessement(s), E.F.'s unique needs, and

5  educational recommendations.]

     17.    Donna Manea, NMUSD Special Ed. Teacher. She can be reached
6
   through opposing counsel. [E.F.'s assessement(s), E.F.'s unique needs, and

7  educational recommendations.]

8    18.    Leah Steinman, NMUSD Special Ed. Teacher. She can be reached

   through opposing counsel. [E.F.'s assessement(s), E.F.'s unique needs, and
9
   educational recommendations.]

10   19.    Alexandra Sweany, NMUSD Occupational Therapist. She can be

11 reached through opposing counsel. [evaluation of E.F.'s health condition, E.F.'s

   unique needs, and educational recommendations.]

12
     20.    Brooke Beverage, NMUSD Occupational Therapist. She can be

13 reached through opposing counsel. [evaluation of E.F.'s heathl condition, E.F.'s

14 assessement(s), E.F.'s unique needs, and educational recommendations.]

     21.    Tim Chen, NMUSD Occupational Therapist. He can be reached
15
   through opposing counsel. [evaluation of E.F.'s health condition, E.F.'s unique

16 needs, and educational recommendations.]

17   22.    Lucinda Bottrof, NMUSD Speech and Language Pathologist. She

   can be reached through opposing counsel. [E.F.'s assessement(s), E.F.'s unique
18
   needs, and educational recommendations.]

19   23.    Caitlin Johnson, NMUSD Speech and Language Pathologist. She can

20 be reached through opposing counsel. [E.F.'s assessement(s), E.F.'s unique

   needs, and educational recommendations.]

21                                    4

**Exhibit J Page 0127**

1      24.    Jennie Ni, Occupational Therapist. She can be reached through

2  opposing counsel. [evaluation of E.F.'s health condition, E.F.'s unique needs,

   and educational recommendations.]

3      25.    Kathy Murphy, NMUSD Speech and Language Pathologist. She can

4  be reached through opposing counsel. [E.F.'s assessment(s), E.F.'s unique

5  needs, and educational recommendations.]

6      26.    Heather Mans, NMUSD General Ed. Teacher. She can be reached

7  through opposing counsel. [E.F.'s assessment(s), E.F.'s unique needs, and

   educational recommendations.]

8      27.    Juliet Hilde, NMUSD General Ed. Teacher. She can be reached

9  through opposing counsel. [E.F.'s assessment(s), E.F.'s unique needs, and

   educational recommendations.]

10      28.    Eby Kent, NMUSD Psychologist. NMUSD Special Ed. Teacher. She

11  can be reached through opposing counsel. [E.F.'s assessment(s), E.F.'s unique

   needs, and educational recommendations.]

12      29.    Lila Seldin, NMUSD Assistive Techonolgy Specialist. She can be

13  reached through opposing counsel. [E.F.'s assessment(s), E.F.'s unique needs,

14  and educational recommendations.]

15      30.    Melissa Wiley, NMUSD Speech and Language Pathologist. She can

16  be reached through opposing counsel. [E.F.'s assessment(s), E.F.'s unique

   needs, and educational recommendations.]

17      31.    Dr. Lauren Franke, Speech and Language Pathologist. She can be

18  reached through opposing counsel. [E.F.'s assessment(s), E.F.'s unique needs,

   and educational recommendations.]

19      32.    Karrie Anderson, NMUSD Psychologist. She can be reached

20  through opposing counsel. [E.F.'s assessment(s), E.F.'s unique needs, and

   educational recommendations.]

21

5

**Exhibit J Page 0128**

1    33.    Eliza Del Pizzo, Autism Specialist.  She can be reached through

2  opposing counsel.  [E.F.'s assessement(s), E.F.'s unique needs, and educational

   recommendations.]

3
     34.    Dr. Sarah Scheflen, 530 Wilshire Blvd., Ste. 204, Santa Monica, CA

4  90401 (877) 477-5764 [E.F.'s Prompt Speech Therapy]

5    35.    Aviva Moss, MS, CCC-SLP, 530 Wilshire Blvd., Ste. 204, Santa

   Monica, CA 90401 (877) 477-5764 [E.F.'s Prompt Speech Therapy]

6
     36.    Maggie McCrow, MA, BCBA 801 N. Park Center Drive, Ste. 100,

7  Santa Ana, CA 92705  (559) 707-7937 [Applied Behavioral Analysis for E.F.]

8    37.    Without conceding the admissibility of the document(s), all witnesses

   identified in Defendant Newport Mesa Unified School Districts Rule 26(a)(1)

9  Initial Disclosure Statement;

10   38.    Any other witness that may be determined to be relevant, as set forth

11 in documents, through the discovery process or otherwise.

     Discovery and investigation are ongoing so additional witnesses may be

12 identified.

13 **II.     Documents**

14   Pursuant to Federal Rule of Civil Procedure 26(a)(1)(B), Plaintiff provides

   a description by category and location of all documents, data compilations, and

15 tangible things that are in the possession, custody, or control of Plaintiff and that

16 Plaintiff may use to support her claims, unless solely for impeachment:

17   1.    NMUSD Annual IEP, dated February 9, 2010;

     2.    NMUSD  IEP Progress Report, dated March 8, 2010;

18   3.    NMUSD Addendum IEP, dated April 15, 2010;

19   4.    Letter from Fulsangs requesting IEP meeting, dated April 15, 2010;

20   5.    Letter from Fulsangs, dated June 2, 2010;

     6.    NMUSD IEP Progress Report, dated June 10, 2010;

21                               6

**Exhibit J Page 0129**

7.    NMUSD Addendum IEP, dated June 21, 2010;

8.    NMUSD Progress Report, dated November 17, 2010;

9.    NMUSD Addendum IEP, dated November 23, 2010;

10.   NMUSD Assessment Plan, dated December 6, 2010;

11.   NMUSD Triennial Report Student Health Information, dated January 26, 2011;

12.   NMUSD IEP Annual, dated February 4, 2011;

13.   NMUSD Multidisciplinary Assessment, dated February 4, 2011;

14.   Letter from NMUSD, dated February 16, 2011;

15.   NMUSD IEP Addendum, dated March 8, 2011;

16.   NMUSD  IEP Progress Report, dated March 10, 2011;

17.   NMUSD IEP Addendum, dated April 19, 2011;

18.   NMUSD  IEP Progress Report, dated June 24, 2011;

19.   NMUSD IEP Progress Report, dated November 14, 2011;

20.   NMUSD IEP Annual, dated February 1, 2012 and February 29, 2012;

21.   NMUSD IEP Progress Report, dated March 12, 2012;

22.   Letter from Fulsangs, dated April 5, 2012;

23.   Letter from District, dated April 17, 2012;

24.   Augumentative Communication Evaluation by Cottier, dated July 18, 2012;

25.   Augumentaive and Alternative Communication Consultation Report, dated November 27, 2012 and December 6, 2012;

26.   NMUSD IEP Annual, dated January 23, 2013;

27.   NMUSD IEP Addendum, dated January 23, 2013;

27.   NMUSD Assessment Plan, dated January 24, 2013;

28.   NMUSD Sensory Diet Report, dated May of 2013;

7

**Exhibit J Page 0130**

1    29.    NMUSD Fuctional Behavioral Assessment Report, dated April 30,
2  2013;

3    30.    NMUSD Evaluation, dated May 2, 2013;

     31.    Fulsang's receipts, invoices, and cancelled checks for services
4  rendered to E.F.;

5    32.    NMUSD IEP, dated May 2, 2013;

     33.    Comprehensive Functional Behavioral Assement Report and
6  Recommended Support Plan, dated September 17, 2013.

7    34.    Progress Report, dated June 21, 2013;

     35.    Progress Report of Annaul Special Education Goals for IEP, dated
8  February 4, 2011;

9    36.    Report Cards/Progress Reports;

10   37.    Occupational Therapy Progress Reports; and,

     38.    Speech Therapy Data Logs.
11
     39.    Progress Report for E.F., dated October 10, 2014
12
     40.    Speech and Language Progress Report for E.F. dated October 19,
13 2014.

14     Discovery and investigation are ongoing so additional documents may be
   identified.
15
**III.    Damages**

16     Plaintiff seeks economic and non-economic damages in the amount of

17 $5,000,000.

   ///
18
   ///
19 ///

   ///
20
   ///
21
                                    8

1  IV.  **Insurance**

2        Plaintiff is not presently aware if any Defendant has insurance that covers

   its misconduct.

3

   Dated: November 5, 2014                ROBERT STANFORD BROWN, APC

4

5                                    By: 

                                         Robert S. Brown
6                                        Attorney for Plaintiff E.F., ERIC
                                         FULSANG, ANEIDA FULSANG

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21                                   9

**Exhibit J Page 0132**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

### PROOF OF SERVICE
*E.F. v. Newport Mesa Unified School District*
*LASC Case No.:* 8:14-CV-00455 CJC-RNB

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is 714 West Olympic Blvd., Ste 450, Los Angeles, CA 90015.

On November 5, 2014, I served the foregoing document(s) described as **PLAINTIFFS' RULE 26 (a)(1) SUPPLEMANTAL DISCLOSURE STATEMENT** on all interested parties in this action at the addresses listed below, as follows:

S. Daniel Harbottle, Esq.
**Harbottle Law Group**
18401 Von Karman Ave., Ste. 200
Irvine, CA 92612
Telephone: (949) 428-8780
Facsimile: (949) 428-8779

(X) FOR COLLECTION. By placing a true copy (copies) thereof enclosed in a sealed envelope(s), addressed as above, and by placing said sealed envelope(s) for collection and mailing on that date following ordinary business practices. I am "readily familiar" with the business' practice for collection and processing of correspondence for mailing the U.S. Postal Service. Under that practice, it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at Los Angeles, California, in the ordinary course of business.

( ) OVERNIGHT DELIVERY (DROP-OFF). By placing a true copy(ies) thereof enclosed in a sealed envelope(s) or package(s) as designated by [Overnight Express] or [Federal Express], addressed as above, and depositing said envelope(s) or package(s), with delivery fees provided for, in a box regularly maintained by [Overnight Express] or [Federal Express] at 3701 Wilshire Boulevard, Los Angeles, California 90010.

(X) VIA E-MAIL. By transmitting a true copy(ies) thereof to each of the designated counsel on the service list to their facsimile numbers as listed herein.

( ) PERSONAL DELIVERY. I caused to be served by messenger for personal delivery that same day the foregoing documents in a sealed envelope to the above persons at the address(es) listed above.

I declare under penalty under the laws of the State of California that the above is true and correct. Executed on November 5, 2014 in Los Angeles County, California.

Robert S. Brown

10

**Exhibit J Page 0133**

# Exhibit K

144

1    HARBOTTLE LAW GROUP
     S. Daniel Harbottle (State Bar No. 156442)
2    *dharbottle@harbottlelaw.com*
     18401 Von Karman Avenue, Suite 200
3    Irvine, California 92612
     Telephone: 949.428.8780
4    Facsimile: 949.428.8779

5    Attorneys for Defendant
     Newport-Mesa Unified School District
6

7

8                    **UNITED STATES DISTRICT COURT**

9                    **CENTRAL DISTRICT OF CALIFORNIA**

10

11   E.F., a minor by and through his parents          Case No.: SACV 14-00455-CJC
     Eric Fulsang and Aneida Fulsang, Eric            (RNBx)
12   Fulsang and Aneida Fulsang for
     themselves,                                      **NEWPORT-MESA UNIFIED
13                                                     SCHOOL DISTRICT'S FIRST
              Plaintiffs,                              REQUEST FOR PRODUCTION
14                                                     OF DOCUMENTS/THINGS**
         v.
15                                                     Action Filed: Mar. 24, 2014
     Newport-Mesa Unified School District,
16   Does 1-9,                                        Judge: Hon. Cormac J. Carney

17            Defendants.

18

19

20   PROPOUNDING PARTY:        Newport-Mesa Unified School District

21   RESPONDING PARTY:         E.F., a minor by and through his parents Eric

22                             Fulsang and Aneida Fulsang

23   SET NO.:           ONE

24   **TO PLAINTIFFS AND THEIR ATTORNEYS OF RECORD:**

25        Pursuant to Federal Rule of Civil Procedure 34, Defendant Newport-Mesa

26   Unified School District ("District") hereby requests that Plaintiff E.F., by and

27   through his parents Eric Fulsang and Aneida Fulsang, responds to this Request for

28   Production and produce and permit inspection and copying of the documents that

                                        -1-

1  are responsive to any of the following numbered requests within 30 days of the date

2  of service of this request, in accordance with the definitions and instructions below.

3  **I.    Definitions**

4      The following definitions apply throughout this request for identification and

5  production, unless the context clearly indicates otherwise:

6  A.    "Document" means any written, recorded, or graphic material of any kind,

7  whether prepared by you or by any other person, that is in the possession or custody

8  of, subject to the control of, or within the knowledge of E.F. or Plaintiffs' counsel, or

9  any consultants or experts retained by E.F. or Plaintiffs' counsel.  The term

10  document is a broadly inclusive term referring to any and all written or other graphic

11  material, however produced or reproduced, of every kind and description, and to

12  everything upon which sounds, words, symbols or pictures are recorded or depicted

13  by magnetic or electrical impulse, photography, or otherwise.  The term document

14  includes, but is not limited to the following:

15      1.    Letters, facsimiles, memoranda, interoffice correspondence, e-mails,

16      and other forms of correspondence and written communication;

17      2.    Agreements, contracts, policies, reports, records, journals, papers,

18      statements, files and their contents, file folders, file covers, file jackets, and

19      notes;

20      4.    Calendars, desk calendars, appointment books, schedules, logs,

21      telephone messages, diaries, time sheets, minutes of meetings, and transcripts;

22      5.    Financial statements, checks, invoices, and accounting records and

23      books;

24      6.    Pleadings, deposition transcripts, trial transcripts, interrogatories,

25      answers to interrogatories, affidavits, declarations, papers filed or lodged with

26      courts, and papers filed with or sent to administrative agencies.

27      7.    Tape recordings, sound reproductions, objects, photographs, motion

28      pictures, microfilm, computer data stored on magnetic tape, computer

-2-

HARBOTTLE LAW GROUP
Attorneys at Law

{1050442.1 }

NEWPORT-MESA UNIFIED SCHOOL DISTRICT'S FIRST REQUEST FOR
PRODUCTION OF DOCUMENTS/THINGS    **Exhibit K Page 0135**

1         printouts, data processing cards or tapes, and computer disks or diskettes.

2         Without limitation on the term "control" as used above, a document is deemed

3 to be in your control if you have the right to secure the document or a copy thereof

4 from another person.

5 B.    "Including" means including, but not limited to.

6 C.    "Person" means any natural person, corporation, company, partnership, joint

7 venture, firm, association, proprietorship, agency, board, authority, commission,

8 office or other business or legal entity, whether private or governmental.

9 D.    "You" or "your" means E.F.

10 E.    "Parents" means Eric Fulsang and/or Aneida Fulsang.

11         The singular form of a noun or pronoun shall be considered to include within

12 its meaning the plural form of the noun or pronoun, and vice versa; and the past

13 tense shall include the present tense where the clear meaning is not distorted. The

14 term "or" shall mean "and" and vice versa, as necessary to bring within the scope of

15 the following document requests all information or documents that would be

16 excluded absent this definition.

17 **II.**   **INSTRUCTIONS**

18 A.    This request requires you produce all documents responsive to any of the

19 following numbered requests that are in your possession or control, or subject to

20 your control, wherever they may be located. The documents that you must identify

21 and produce include not only documents that you presently possess, but also

22 documents that are in the possession or control of your attorneys, representatives,

23 expert witnesses, or anyone else acting on your behalf.

24 B.    You are requested to produce all documents that are responsive to any of the

25 following numbered requests for inspection and photocopying at the law offices of

26 Harbottle Law Group, 18401 Von Karman Avenue, Suite 200, Irvine, California, at

27 10:00 a.m. on the thirtieth day following the date of service of this request (or the

28 next business day if that day falls on a Saturday, Sunday, or court holiday).

-3-

HARBOTTLE LAW GROUP
Attorneys at Law

{1050442.1 }

NEWPORT-MESA UNIFIED SCHOOL DISTRICT'S FIRST REQUEST FOR
PRODUCTION OF DOCUMENTS/THINGS   **Exhibit K Page 0136**

**147**

1   C.     If you prefer, you may produce all documents that are responsive to any of the

2   following numbered requests by delivering copies of all such documents to the law

3   offices of Harbottle Law Group, 18401 Von Karman Avenue, Suite 200, Irvine,

4   California, at 10:00 a.m. on the thirtieth day following the date of service of this

5   request (or the next business day if that day falls on a Saturday, Sunday, or court

6   holiday).

7   D.     All documents that are responsive to any of the following numbered requests

8   shall be produced in full, without abridgement, abbreviation, or expurgation of any

9   sort. If any such documents cannot be produced in full, produce the writing to the

10  extent possible and indicate in your written response what portion of the document

11  is not produced and why it could not be produced.

12  E.     Only one copy need be produced of documents that are responsive to more

13  than one paragraph or are identical except for the person to whom it is addressed if

14  you indicate the persons or group of persons to whom such documents were

15  distributed. Documents that in their original condition were stapled, clipped, or

16  otherwise fastened together shall be produced in such form. Please place the

17  documents called for by each paragraph in a separate file folder or other enclosure

18  marked with E.F.'s name and the paragraph to which such documents respond, and

19  if any document is responsive to more than one request, indicate each request to

20  which it responds.

21  F.     You are required to produce not only the original or an exact copy of the

22  original of all documents responsive to any of the following numbered requests, but

23  also copies of such documents which bear any notes or markings not found on the

24  originals and all preliminary, intermediate, final, and revised drafts of such

25  documents.

26  G.     The District does not request production of any documents in the

27  administrative record. Instead, indicate in your written response which documents

28  in the administrative record are responsive to each numbered request, including

-4-

HARBOTTLE LAW GROUP
Attorneys at Law

{1050442.1 }

NEWPORT-MESA UNIFIED SCHOOL DISTRICT'S FIRST REQUEST FOR
PRODUCTION OF DOCUMENTS/THINGS   **Exhibit K Page 0137**

**148**

1    citations to the document's Bates-numbering.

2    H.    It is not intended that this request require production of any documents that

3    are privileged.  If you are not producing any writing responsive to any of the

4    numbered requests below on the basis of a claimed privilege, *or for any other*

5    *reason*, state the following information:

6          1.    Describe the document with specificity;

7          2.    Identify the privilege claimed or the other reason why the document is

8          not produced;

9          3.    State the names and capacities of all persons who participated in the

10         preparation of the document; and

11         4.    State the names and capacities of all persons to whom the document

12         was circulated or its contents communicated.

13   I.    Pursuant to Fed.R.Civ.P. 26(e), you are under a duty to timely supplement

14   any response to this request for production for which you learn that the response is

15   in some material respect incomplete or incorrect and if the additional or corrective

16   information has not otherwise been made known to us during the discovery process

17   or in writing.

18   J.    For any document responsive to these document requests that is known to

19   have been destroyed or lost, or is otherwise unavailable, identify each such

20   document by author, addressee, date, number of pages, and subject matter; and

21   explain in detail the events leading to the destruction or loss, or the reason for the

22   unavailability of such document, including the location of such document when last

23   in your possession, custody, or control, and the date and manner of its disposition.

24   K.    Each document that is written in whole or in part in any language other than

25   English, or that contains any marginal notations in such a language, must be

26   accompanied by a certified verbatim English language translation as well as all

27   existing English language versions of all such documents and notations.

28   ///

HARBOTTLE LAW GROUP
Attorneys at Law

{1050442.1 }

-5-

**149**

III.  **DOCUMENTS DEMANDED**

1.  All documents that you contend support each allegation in your Complaint, including:

    A.  All documents that you contend support your allegation that the District denied E.F. the opportunity to participate in or benefit from an aid, benefit, service, right, advantage, or opportunity that was afforded to non-disabled students.

    B.  All documents that you contend support your allegation that the District intentionally discriminated against or acted with deliberate indifference towards E.F.

    C.  All documents that you contend support your allegation that the District discriminated against E.F. based on a determination that he was intellectually disabled.

    D.  All documents that you contend support your allegation that the District has failed to implement clear and adequate procedures to ensure that all disabled children within its jurisdiction receive appropriate special education and related services.

    E.  All documents that you contend support your allegation that E.F. was arbitrarily denied appropriate special education and related services by the District.

    F.  All documents that you contend support your allegation that the District's policies and practices have resulted in a pervasive, substantial, and systematic inability and/or refusal to provide FAPE, including identification of those alleged policies and practices.

    G.  All documents that you contend support your allegation that the District "promulgated, created, maintained, ratified, permitted, and encouraged a services of polices, customs, and practices with authorized the systematic denial of appropriate identification, placement, and services

-6-

HARBOTTLE LAW GROUP
Attorneys at Law
{1050442.1 }
NEWPORT-MESA UNIFIED SCHOOL DISTRICT'S FIRST REQUEST FOR
PRODUCTION OF DOCUMENTS/THINGS   **Exhibit K Page 0139**

**150**

1    to children with disabilities," including identification of those alleged

2    policies, customs, and practices.

3   H.   All documents that you contend support your allegation that the District

4    has "de facto customs and practices of denying services and condoning

5    individual educational staff members to support and recommend denial

6    of various services," including identification of those alleged de facto

7    customs and practices.

8   I.   All documents that you contend support your allegation that the District

9    showed a conscious disregard for E.F.'s lack of educational progress.

10   J.   All documents that you contend support your allegation that the District

11    showed a conscious disregard for E.F.'s safety at school.

12   K.   All documents that you contend support your allegations that your

13    Parents' rights under the IDEA were violated.

14   L.   All documents that you contend support your allegations that your

15    Parents' rights under Section 504 were violated.

16   M.   All documents that you contend support your allegation that District

17    staff obstructed the provision of services, diverted decisions to a

18    District administrator, "did nothing to assure Student's safety on

19    campus," and obstructed all attempts by Parents to ensure that E.F.'s

20    unique needs were met.

21   N.   All documents that you contend support your allegation that E.F. was

22    injured on more than one occasion due to the District's failure to

23    supervise, including your allegations of visible physical injuries, head

24    injuries, concussions, loose teeth, and seizures.

25   O.   All documents that you contend support your allegation that E.F. was

26    "lost" or "misplaced" at school.

27   P.   All documents that you contend support your allegation that the District

28    had a reckless disregard for E.F.'s well-being.

-7-

HARBOTTLE LAW GROUP
Attorneys at Law
;1050442.1 ;
NEWPORT-MESA UNIFIED SCHOOL DISTRICT'S FIRST REQUEST FOR
PRODUCTION OF DOCUMENTS/THINGS   **Exhibit K Page 0140**

151

1      Q.    All documents that you contend support your allegation that District

2              staff has engaged in extreme, outrageous, and/or intentional behavior

3              that caused E.F. extreme emotional distress.

4      R.    All documents that you contend support your request for attorneys'

5              fees.

6      Designate to which particular allegation each document produced applies.  To

7  the extent that you intended any of the above allegations from your Complaint to

8  extend beyond the period of May 17, 2010, to May 17, 2012, and into the period of

9  May 17, 2012, to March 24, 2014, produce all documents related to both time

10  periods.

11  2.    All documents that you contend support your allegation that you exhausted

12         your Section 504 and ADA claims with regard to the time period from

13         May 17, 2012, to March 24, 2014.

14  3.    All documents that you contend support your claimed damages, from May 17,

15         2010, to March 24, 2014.

16  4.    All documents that you contend support your claim for physical, mental, or

17         emotional injuries, from May 17, 2010, to March 24, 2014, including:

18      A.    All documents that you contend support your allegation that E.F. "has

19              suffered and continues to suffer humiliation, emotional distress, loss of

20              educational opportunity, lack of academic progress, [and] academic and

21              social emotional regression."

22      B.    All documents that you contend support your allegation that the

23              "Plaintiffs have suffered and continue to suffer humiliation, emotional

24              distress, anxiety, [and] physical decline."

25      C.    All documents that you contend support your allegation that the

26              "Plaintiffs have suffered extreme and severe mental anguish and pain."

27      D.    All documents that you contend support your allegation that E.F.

28              sustained physical and social emotional injury at school, including

-8-



1          visible physical injuries, head injuries, concussions, loose teeth, and

2          seizures.

3     E.    All documents that you contend support your allegation that E.F. has

4          "constant anxiety and fear of school."

5     F.    All documents that you contend support your allegation that E.F. has

6          need for additional therapeutic intervention.

7     G.    All documents that you contend support your allegation that E.F.'s

8          parents and private therapists have been providing "therapeutic

9          intervention."

10    H.    All documents that you contend support your allegation that E.F. has

11          suffered extreme emotional distress.

12   5.    All written or recorded statements of any party and/or non-party witnesses as

13       to the extent of injuries and damages to Plaintiffs.

14   6.    All documents related to any private services received by E.F. during the

15       relevant time period, including bills, reports, and/or progress information.

16   7.    All documents you intend to introduce as evidence at the trial in this action.

17   8.    Any documents that support or dispute the substance of the evidence you

18       intend to offer at the trial in this action.

19   9.    All documents signed by any Plaintiff that refer to any aspects of E.F.'s

20       educational program.

21   10.   All documents given to any Plaintiff, shown to any Plaintiff, or made

22       available for review by any Plaintiff that relate to or refer to any aspects of

23       E.F.'s educational program.

24   11.   All documents regarding or referring to any discussions between any Plaintiff

25       and any District employee that relate to or refer to any aspects of E.F.'s

26       educational program.

27   ///

28   ///

-9-

HARBOTTLE LAW GROUP
Attorneys at Law

{1050442.1 }

NEWPORT-MESA UNIFIED SCHOOL DISTRICT'S FIRST REQUEST FOR
PRODUCTION OF DOCUMENTS/THINGS    **Exhibit K Page 0142**

**153**

1    12.    For each expert witness you expect will testify at trial or any hearing related

2           to this case, please produce a copy of their curriculum vitae and a complete

3           copy of his/her file related to this case.

4

5  DATED:  January 8, 2015         HARBOTTLE LAW GROUP

6                                S. DANIEL HARBOTTLE

7                        By:   _/s/_____

8                            S. DANIEL HARBOTTLE

                           Attorneys for Defendant

9                            Newport-Mesa Unified School District

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

HARBOTTLE LAW GROUP
Attorneys at Law

{1050442.1 }

-10-

NEWPORT-MESA UNIFIED SCHOOL DISTRICT'S FIRST REQUEST FOR
PRODUCTION OF DOCUMENTS/THINGS

**Exhibit K Page 0143**

154

POS-020

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*: | FOR COURT USE ONLY |
|---|---|
| S. Daniel Harbottle                         156442<br>Harbottle  Law Group<br>18401 Von Karman Avenue, Suite 200<br>Irvine, CA 92612<br><br>TELEPHONE NO: 949.428.8780<br>E-MAIL ADDRESS *(Optional)*:                    FAX NO.*(Optional)*: 949.428.8779<br>ATTORNEY FOR *(Name)*: Defendants Newport-Mesa Unified School District | |

UNITED STATES DISTRICT COURT CENTRAL DISTRICT OF CALIFORNIA

| PETITIONER/PLAINTIFF: E.F., a minor by an through his parents Eric Fulsang and<br>Aneida Fulsang, Eric Fulsang and Aneida Fulsang for<br>themselves<br><br>RESPONDENT/DEFENDANT: Newport -Mesa Unified School District | |
|---|---|

| PROOF OF PERSONAL SERVICE—CIVIL | CASE NUMBER:<br>SACV-14-00455-CJC (RNBx) |
|---|---|

*(Do not use this Proof of Service to show service of a Summons and Complaint.)*

1.  I am over 18 years of age and **not a party to this action.**

2.  I served the following **documents** *(specify):* NEWPORT- MESA UNIFIED SCHOOL DISTRICT'S FIRST REQUEST FOR PRODCUTION OF DOCUMENTS/THINGS, ERIC FULSANG, ANEIDA FULSANG, E.F., A MINOR AND THROUGH HIS PARENTS ERIC FULSANG AND ANEIDA FULSANG

☐ The documents are listed in the *Attachment to Proof of Personal Service—Civil (Documents Served)* (form POS-020(D)).

3.  I personally served the following **persons** at the address, date, and time stated:

   a.  Name: Kathleen M. Loyer, Law offices of Kathleen M. Loyer, Inc. by serving Debbie Banuelos, Office Manager
   b.  Address: 940 Calle Amanecer, Suite L, San Clemente, CA 92673
   c.  Date: 1/8/2015
   d.  Time: 1:40 p.m.

☐ The persons are listed in the *Attachment to Proof of Personal Service — Civil (Persons Served)* (form POS-020(P)).

3a. Witness fees: (check one)
   ☐ were offered or demanded and paid.  Amount $ __
   ☐ were not demanded or paid.

3b. ☒ Fee for service:.......................................  $ _95.00_

4.  I am
   a.  ☐ not a registered California process server.       c.  ☐ an employee or independent contractor of a
   b.  ☒ a registered California process server.               registered California process server.
                                                          d.  ☐ exempt from registration under Business & Professions
                                                              Code section 22350(b).

5.  My name, address, telephone number, and, if applicable, county of registration and number are *(specify):*
   Laurie Evans                                    Orange County 1622
   The MCS Group, Inc.
   555 N. Parkcenter Drive, Suite 200
   Santa Ana, CA 92705
   (714) 647-0478

6.  ☒ I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

7.  ☐ I am a California sheriff or marshal and certify that the foregoing is true and correct.

Date: January 16, 2015

Laurie Evans
(TYPE OR PRINT NAME OF PERSON WHO SERVED THE PAPERS)                    (SIGNATURE OF PERSON WHO SERVED THE PAPERS)

American LegalNet, Inc.
www.USCourtForms.com

Form Approved for Optional Use
Judicial Council of California
POS-020 [NEW JANUARY 1,2005]            **PROOF OF PERSONAL SERVICE—CIVIL**            Code of Civil Procedure, § 1011
www.courtinfo.ca.gov

**Exhibit K Page 0144**

# Exhibit L

1 | KATHLEEN M. LOYER, SBN 188741
LAW OFFICES OF KATHLEEN M. LOYER, INC.
2 | 940 Amanecer, Suite L, San Clemente, CA 92673
Phone: 949-369-1082, Fax: 949-366-6836, E-mail: kmloyer@education-law.com

3 | ROBERT BROWN, SBN#187845
714 W. Olympic Blvd., Suite #450
4 | Los Angeles, Ca 90015
Phone: 213-745-6300, Fax: 213-261-3906, Email: rstanfordbrown@earthlink.net
5 | Attorneys for the:   Appellants/Plaintiffs

6 | **UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

7

8 | E.F. a minor, by and through his parents )
Eric Fulsang and Aneida Fulsang, Eric  )   CASE NO. 8:14-CV-00455-CJC-RNB
Fulsang and Aneida Fulsang for         )
9 | themselves                            )
                                       )
10 |     Appellants/Plaintiffs            )   **PLAINTIFF E.F., A MINOR BY AND
                                       )   THROUGH HIS PARENTS ERIC
     v.                               )   FULSANG AND ANEIDA FULSANG
11 |                                    )   RESPONSE TO NEWPORT-MESA
Newport Mesa Unified School            )   UNIFIED SCHOOL DISTRICT'S
12 | District; Does 1-9                   )   FIRST REQUEST FOR PRODUCTION
                                       )   OF DOCUMENTS/THINGS**
13 |     Appellees/Defendants            )
                                       )
14

15 | PROPOUNDING PARTY:          Newport-Mesa Unified School District

16 | RESPONDING PARTY:           E.F., a minor by and through his parents

17 |                             Eric Fulsang and Aneida Fulsang

18 |     COMES NOW the Plaintiff, E.F. ("Plaintiff"), by and through his attorney,

19 | submits   the   follow   response   to   First   Request   for   Production   of

20 | Documents/Things, Set 1:

21 |              E.F., et al v. NMUSD, et al  Case #8:14-CV-00455-CJC-RNB
              PLAITIFF E.F., RESPONSE TO NMUSD's 1st REQUEST FOR PRODUCTION
                                  1 of 12

**Exhibit L Page 0145**

157

1     Plaintiff has not fully completed discovery in this action and has not

2   completed preparation for trial.  All of the information contained herein is based

3   upon such information and documents which are presently available to or

4   specifically known to responding party and disclose only those contentions which

5   presently occur to such responding party.

6     It is anticipated that further discovery, legal research and legal analysis will

7   supply additional facts, add meaning to known facts, as well as establish entirely

8   new factual conclusions and legal conclusions, all of which may lead to

9   substantial additions to, changes in, and variations from contentions contained

10   herein set forth.  The answers contained here are made in good faith effort to

11   supply as much factual information and as much specification of legal contentions

12   as is presently known and should in no way be to the prejudice of the plaintiff in

13   relation to further discovery, research or analysis.

14   **#1 DOCUMENTS DEMANDED**

15   1.   All documents that you contend support each allegation in your Complaint,

16        including:

17        A.   All documents that you contend support your allegation that the

18             District denied E.F. the opportunity to participate in or benefit from

19             an aid, benefit, service, right, advantage, or opportunity that was

20             afforded to non-disabled students.

21                    E.F., et al v. NMUSD, et al  Case #8:14-CV-00455-CJC-RNB
                 PLAITIFF E.F., RESPONSE TO NMUSD's 1st REQUEST FOR PRODUCTION
                                      2 of 12

**Exhibit L Page 0146**

1        **ANSWER**: All IEP's - AR S1, S2, S7, S9, S13, S15, S17, S20, S27,

2        D7, D45, All Evaluation Reports – AR S12, S24, S26, S29, S30, S31,

3        S42, 2009 Assessment report, Letters – AR S14, S23, Progress

4        reports, Data Sheets/Logs, and Audio of 2/26/14 IEP meeting.

5    B.    All documents that you contend support your allegation that the

6        District intentionally discriminated against or acted with deliberate

7        indifference towards E.F.

8        **ANSWER**: All IEP's - AR S1, S2, S7, S9, S13, S15, S17, S20, S27,

9        D7, D45, All Evaluation Reports – AR S12, S24, S26, S29, S30, S31,

10       S42, 2009 Assessment report, Letters – AR S14, S23, Progress

11       reports, Data Sheets/Logs, and Audio of 2/26/14 IEP meeting.

12   C.    All documents that you contend support your allegations that the

13       District discriminated against E.F. based on a determination that he

14       was intellectually disabled.

15       **ANSWER**: All IEP's - AR S1, S2, S7, S9, S13, S15, S17, S20, S27,

16       D7, D45, All Evaluation Reports – AR S12, S24, S26, S29, S30, S31,

17       S42, 2009 Assessment report, Letters – AR S14, S23, Progress

18       reports, Data Sheets/Logs, Protocols and Audio of 2/26/14 IEP

19       meeting.

20

21               E.F., et al v. NMUSD, et al  Case #8:14-CV-00455-CJC-RNB
             PLAITIFF E.F., RESPONSE TO NMUSD's 1st REQUEST FOR PRODUCTION
                               3 of 12

**Exhibit L Page 0147**

D.  All documents that you contend support your allegation that the
District has failed to implement clear and adequate procedures to
ensure that all disabled children within its jurisdiction receive
appropriate special education and related services.

**ANSWER**: All IEP's - AR S1, S2, S7, S9, S13, S15, S17, S20, S27,
D7, D45, All Evaluation Reports – AR S12, S24, S26, S29, S30, S31,
S42, 2009 Assessment report, Letters – AR S14, S23, Progress
reports, Data Sheets/Logs, and Audio of 2/26/14 IEP meeting.

E.  All documents that you contend support your allegation that E.F. was
arbitrarily denied appropriate special education and related services
by the District.

**ANSWER**: All IEP's - AR S1, S2, S7, S9, S13, S15, S17, S20, S27,
D7, D45, All Evaluation Reports – AR S12, S24, S26, S29, S30, S31,
S42, 2009 Assessment report, Letters – AR S14, S23, Progress
reports, Data Sheets/Logs, and Audio of 2/26/14 IEP meeting.

F.  All documents that you contend support your allegation that the
District's policies and practices have resulted in a pervasive,
substantial, and systematic inability and/or refusal to provide FAPE,
including identification of these alleged policies and practices.

E.F., et al v. NMUSD, et al  Case #8:14-CV-00455-CJC-RNB
PLAITIFF E.F., RESPONSE TO NMUSD's 1st REQUEST FOR PRODUCTION
4 of 12

**Exhibit L Page 0148**

| | | |
|---|---|---|
| 1 | | **ANSWER**: All IEP's - AR S1, S2, S7, S9, S13, S15, S17, S20, S27, |
| 2 | | D7, D45, All Evaluation Reports – AR S12, S24, S26, S29, S30, S31, |
| 3 | | S42, 2009 Assessment report, Letters – AR S14, S23, Progress |
| 4 | | reports, Data Sheets/Logs, and Audio of 2/26/14 IEP meeting. |
| 5 | G. | All documents that you contend support your allegations that the |
| 6 | | District "promulgated, created, maintained, ratified, permitted, and |
| 7 | | encouraged a services of policies, customs, and practices with |
| 8 | | authorized the systematic denial of appropriate identification, |
| 9 | | placement, and services to children with disabilities, " including |
| 10 | | identification of those alleged policies, customs, and practices. |
| 11 | | **ANSWER**: All IEP's - AR S1, S2, S7, S9, S13, S15, S17, S20, S27, |
| 12 | | D7, D45, All Evaluation Reports – AR S12, S24, S26, S29, S30, S31, |
| 13 | | S42, 2009 Assessment report, Letters – AR S14, S23, Progress |
| 14 | | reports, Data Sheets/Logs, and Audio of 2/26/14 IEP meeting. |
| 15 | H. | All documents that you contend support your allegations that the |
| 16 | | District has "de facto customs and practices of denying services and |
| 17 | | condoning individual educational staff members to support and |
| 18 | | recommend denial of various services, " including identification of |
| 19 | | those alleged de facto customs and practices. |
| 20 | | |
| 21 | | E.F., et al v. NMUSD, et al  Case #8:14-CV-00455-CJC-RNB<br>PLAITIFF E.F., RESPONSE TO NMUSD's 1st REQUEST FOR PRODUCTION<br>5 of 12 |

**Exhibit L Page 0149**

1      **ANSWER**: All IEP's - AR S1, S2, S7, S9, S13, S15, S17, S20, S27,

2      D7, D45, All Evaluation Reports – AR S12, S24, S26, S29, S30, S31,

3      S42, 2009 Assessment report, Letters – AR S14, S23, Progress

4      reports, Data Sheets/Logs, and Audio of 2/26/14 IEP meeting.

5      I.    All documents that you contend support your allegation that the

6            District showed a conscious disregard for E.F.'s lack of educational

7            progress.

8      **ANSWER:** All IEP's - AR S1, S2, S7, S9, S13, S15, S17, S20, S27,

9      D7, D45, All Evaluation Reports – AR S12, S24, S26, S29, S30, S31,

10     S42, 2009 Assessment report, Letters – AR S14, S23, Progress

11     reports, Data Sheets/Logs, and Audio of 2/26/14 IEP meeting.

12     J.    All documents that you contend support your allegations that the

13           District showed a conscious disregard for E.F.'s safety at school.

14     **ANSWER:** IEP - AR S12, Letter - AR S22, Reports – AR S29, S30,

15     S42

16     K.    All documents that you contend support your allegations that your

17           Parents' rights under the IDEA were violated.

18     **ANSWER:** Reports AR S29, S30, S42

19     L.    All documents that you contend support your allegations that your

20           Parents' rights under Section 504 were violated.

21     E.F., et al v. NMUSD, et al  Case #8:14-CV-00455-CJC-RNB
       PLAITIFF E.F., RESPONSE TO NMUSD's 1st REQUEST FOR PRODUCTION
       6 of 12

**Exhibit L Page 0150**

162

1        **ANSWER:** All IEP's - AR S1, S2, S7, S9, S13, S15, S17, S20, S27,

2        D7, D45, All Evaluation Reports – AR S12, S24, S26, S29, S30, S31,

3        S42, 2009 Assessment report, Letters – AR S14, S23, Progress

4        reports, Data Sheets/Logs, and Audio of 2/26/14 IEP meeting.

5    M.    All documents that you contend support your allegation that District

6        staff obstructed the provision of services, diverted decisions to a

7        District administrator, "did nothing to assure Student's safety on

8        campus," and obstructed all attempts by Parents to ensure that E.F.'s

9        unique needs were met.

10       **ANSWER:** All IEP's - AR S1, S2, S7, S9, S13, S15, S17, S20, S27,

11      D7, D45, All Evaluation Reports – AR S12, S24, S26, S29, S30, S31,

12      S42, 2009 Assessment report, Letters – AR S14, S23, Progress

13      reports, Data Sheets/Logs, and Audio of 2/26/14 IEP meeting.

14   N.    All documents that you contend support your allegation that E.F. was

15      injured on more than one occasion due to the District's failure to

16      supervise, including your allegations of visible physical injuries, head

17      injuries, concussions, loose teeth, and seizures.

18      **ANSWER:** TBD

19   O.    All documents that you contend support your allegation that E.F. was

20      "lost" or "misplaced" at school.

21      E.F., et al v. NMUSD, et al  Case #8:14-CV-00455-CJC-RNB
          PLAITIFF E.F., RESPONSE TO NMUSD's 1st REQUEST FOR PRODUCTION
                 7 of 12

**Exhibit L Page 0151**

163

1     **ANSWER:** TBD

2     P.   All documents that you contend support your allegation that the

3       District had a reckless disregard for E.F.'s well-being.

4     **ANSWER:** TBD

5     Q.   All documents that you contend support your allegation that District

6       staff has engaged in extreme, outrageous, and/or intentional behavior

7       that caused E.F. extreme emotional distress.

8     **ANSWER:** TBD

9     R.   All documents that you contend support your request for attorneys'

10       fees.

11     **ANSWER:** AR Tab# 67

12 2.  All documents that you contend support your allegation that you exhausted

13   your Section 504 and ADA claims with regards to the time period from

14   May 17, 2012, to March 24, 2014.

15 **ANSWER:** AR Tab #1, #27

16 3.  All documents that you contend support your claimed damages, from May

17   17, 2010, to March 24, 2014.

18 **ANSWER:** All IEP's, Reports and Letters - AR S1, S2, S7, S9, S13, S15,

19   S17, S20, S27, D7, D45, S12, S24, S26, S29, S30, S31, S42, S14, S23, and

20   2009 Assessment Report

21     E.F., et al v. NMUSD, et al  Case #8:14-CV-00455-CJC-RNB
PLAITIFF E.F., RESPONSE TO NMUSD's 1st REQUEST FOR PRODUCTION
8 of 12

**Exhibit L Page 0152**

164

4.   All documents that you contend support your claim from physical, mental, or emotional injuries, from May 17, 2010, to March 24, 2014, including:

A.   All documents that you contend support your allegation that E.F. "has suffered and continues to suffer humiliation, emotional distress, loss of educational opportunity, lack of academic progress, [and] academic and social emotional regression."

**ANSWER**: TBD

B.   All documents that you contend support your allegation that the "Plaintiffs have suffered and continues to suffer humiliation, emotional distress, anxiety, [and] physical decline."

**ANSWER:** TBD

C.   All documents that you contend support your allegation that the "Plaintiffs have suffered extreme and severe mental anguish and pain."

**ANSWER:** TBD

D.   All documents that you contend support your allegation that E.F. sustained physical and social emotional injury at school, including visible physical injuries, head injuries concussions, loose teeth, and seizures.

**ANSWER:** TBD

Exhibit L Page 0153

1    E.    All documents that you contend support your allegation that E.F. has

2           "constant anxiety and fear of school."

3         **ANSWER:** TBD

4    F.    All documents that you contend support your allegation that E.F. has

5           need for additional therapeutic intervention.

6         **ANSWER:** S24, S42

7    G.    All documents that you contend support your allegation that E.F.'s

8           parents and private therapists have been providing "therapeutic

9           intervention."

10         **ANSWER:** S44, S24, S42

11    H.    All documents that you contend support your allegation that E.F. has

12           suffered extreme emotional distress.

13         **ANSWER:** TBD

14  5.    All written or recorded statements of any party and/or non-party witnesses

15    as to the extent of injuries and damages to Plaintiffs.

16    **ANSWER:** TBD

17  6.    All documents related to any private services received by E.F. during the

18    relevant time period, including bills, reports, and/or progress information.

19    **ANSWER:** S24, S44, S42

20  7.    All documents you intend to introduce as evidence at the trial in this action.

21

**Exhibit L Page 0154**

1   **ANSWER:** As it stands now, we do not know which exhibits we are going

2   to be using for trial.  However we will file an exhibit list consistent with the

3   courts order.

4   8.   Any documents that support or dispute the substance of the evidence you

5   intend to offer at the trial in this action.

6   **ANSWER:** As it stands now, we do not know which exhibits we are going

7   to be using for trial.  However we will file an exhibit list consistent with the

8   courts order.

9   9.   All documents signed by any Plaintiff that refer to any aspects of E.F.'s

10   educational program.

11   **ANSWER:** All IEP's - AR S1, S2, S7, S9, S13, S15, S17, S20, S27, D7,

12   D45

13   10.   All documents given to any Plaintiff, shown to any Plaintiff, or made

14   available for review by any Plaintiff that relate to or refer to any aspects of

15   E.F.'s educational program.

16   **ANSWER:** Object, overbroad, without waiving any objection.

17   11.   All documents regarding or referring to any discussions between any

18   Plaintiff and any District employee that relate to or refer to any aspects of

19   E.F.'s educational program.

20   **ANSWER:** Administrative Record in Entirety and Protocols

21   E.F., et al v. NMUSD, et al  Case #8:14-CV-00455-CJC-RNB
PLAITIFF E.F., RESPONSE TO NMUSD's 1st REQUEST FOR PRODUCTION
11 of 12

**Exhibit L Page 0155**

1   12.   For each expert witness you expect will testify at trial or any hearing related

2         to this case, please produce a copy of their curriculum vitae and a complete

3         copy of his/her file related to this case.

4         **ANSWER**: We have not designated any experts as yet; however, we will

5         designate experts per Rule 26.

6

7   Respectfully submitted by:

8

9   Dated: February 24, 2015                **ROBERT STANFORD BROWN, APC**

10                                          By_____/S/_____
                                            Robert S. Brown, Esq
11                                          Attorney for Plaintiffs, E.F, Aneida
                                            Fulsang, Eric Fulsang
12

13  Dated: February 24, 2015                **LAW OFFICES OF KATHLEEN M.
                                            LOYER, INC.**
14
                                            By_____/S/_____
15                                          Kathleen M. Loyer, Esq.
                                            Attorney for Plaintiffs, E.F, Aneida
16                                          Fulsang, Eric Fulsang

17

18

19

20

21              E.F., et al v. NMUSD, et al  Case #8:14-CV-00455-CJC-RNB
                PLAITIFF E.F., RESPONSE TO NMUSD's 1st REQUEST FOR PRODUCTION
                                     12 of 12

**Exhibit L Page 0156**

168

# Exhibit M

1 | **KATHLEEN M. LOYER, SBN 188741**
LAW OFFICES OF KATHLEEN M. LOYER, INC.
2 | 940 Amanecer, Suite L, San Clemente, CA 92673
Phone: 949-369-1082, Fax: 949-366-6836, E-mail: kmloyer@education-law.com

3 | **ROBERT BROWN, SBN#187845**
714 W. Olympic Blvd., Suite #450
4 | Los Angeles, Ca 90015
Phone: 213-745-6300, Fax: 213-261-3906, Email: rstanfordbrown@earthlink.net
5 | **Attorneys for the:        Appellants/Plaintiffs**

6 | ### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

7 |

8 | E.F. a minor, by and through his parents )
Eric Fulsang and Aneida Fulsang, Eric  )   CASE NO. 8:14-CV-00455-CJC-RNB
Fulsang and Aneida Fulsang for           )
9 | themselves                                         )
                                                          )
10 |      Appellants/Plaintiffs                  )   **PLAINTIFF E.F., A MINOR BY AND**
                                                          )   **THROUGH HIS PARENTS ERIC**
        v.                                             )   **FULSANG AND ANEIDA FULSANG**
11 |                                                      )   **SUPPLEMENTAL RESPONSE TO**
Newport Mesa Unified School           )   **NEWPORT-MESA  UNIFIED**
12 | District; Does 1-9                            )   **SCHOOL DISTRICT'S FIRST**
                                                          )   **REQUEST FOR PRODUCTION OF**
13 |      Appellees/Defendants             )   **DOCUMENTS/THINGS**
                                                          )

14 | _____

15 |
PROPOUNDING PARTY:            Newport-Mesa Unified School District
16 |
RESPONDING PARTY:              E.F., a minor by and through his parents
17 |
                                                  Eric Fulsang and Aneida Fulsang
18 |
COMES NOW the Plaintiff, E.F. ("Plaintiff"), by and through his attorney,
19 |
submits the following Supplemental response to First Request for Production of
20 |
Documents/Things, Set 1:
21 | E.F., et al v. NMUSD, et al  Case #8:14-CV-00455-CJC-RNB
PLAITIFF E.F., SUPPLEMENTAL RESPONSE TO NMUSD's 1st REQUEST FOR PRODUCTION
**1 of 3**

**Exhibit M Page 0157**

1       Plaintiff has not fully completed discovery in this action and has not

2 completed preparation for trial.  All of the information contained herein is based

3 upon such information and documents which are presently available to or

4 specifically known to responding party and disclose only those contentions which

5 presently occur to such responding party.

6       It is anticipated that further discovery, legal research and legal analysis will

7 supply additional facts, add meaning to known facts, as well as establish entirely

8 new factual conclusions and legal conclusions, all of which may lead to

9 substantial additions to, changes in, and variations from contentions contained

10 herein set forth.  The answers contained here are made in good faith effort to

11 supply as much factual information and as much specification of legal contentions

12 as is presently known and should in no way be to the prejudice of the plaintiff in

13 relation to further discovery, research or analysis.

14       The documents attached address the following demands: #1 B, C, E, H, I;

15 #3; #4 A, F, G; #6; #8; #10.  These documents include bate stamp pages P566

16 through P659.

17 //

18 //

19 //

20

21                E.F., et al v. NMUSD, et al  Case #8:14-CV-00455-CJC-RNB
PLAITIFF E.F., SUPPLEMENTAL RESPONSE TO NMUSD's 1st REQUEST FOR PRODUCTION
2 of 3

**Exhibit M Page 0158**

1    Respectfully submitted by:

2

3    Dated: March 18, 2015             **ROBERT STANFORD BROWN, APC**

4                                By_____/S/_____

                                Robert S. Brown, Esq

5                                 Attorney for Plaintiffs, E.F, Aneida

                                Fulsang, Eric Fulsang

6

7    Dated: March 18, 2015             **LAW OFFICES OF KATHLEEN M.**

                                **LOYER, INC.**

8

                                By_____/S/_____

9                                 Kathleen M. Loyer, Esq.

                                Attorney for Plaintiffs, E.F, Aneida

10                                Fulsang, Eric Fulsang

11

12

13

14

15

16

17

18

19

20

21

# Exhibit N

1  | **KATHLEEN M. LOYER, SBN 188741**
   LAW OFFICES OF KATHLEEN M. LOYER, INC.
2  | 940 Amanecer, Suite L, San Clemente, CA 92673
   Phone: 949-369-1082, Fax: 949-366-6836, E-mail: kmloyer@education-law.com

3  | **ROBERT BROWN, SBN#187845**
   714 W. Olympic Blvd., Suite #450
4  | Los Angeles, Ca 90015
   Phone: 213-745-6300, Fax: 213-261-3906 , Email: rstanfordbrown@earthlink.net
5  | **Attorneys for the:     Appellants/Plaintiffs**

6  | ## UNITED STATES DISTRICT COURT
   ## CENTRAL DISTRICT OF CALIFORNIA

7  |
8  | E.F. a minor, by and through his parents )
   Eric Fulsang and Aneida Fulsang, Eric  )  CASE NO. 8:14-CV-00455-CJC-RNB
   Fulsang and Aneida Fulsang for          )
9  | themselves                              )
                                            )
10 |     Appellants/Plaintiffs              )  **PLAITIFF E.F., ERIC FULSANG AND**
                                            )  **ANEIDA FULSANG'S RESPONSE TO**
   |  v.                                    )  **NEWPORT-MESA UNIFIED SCHOOL**
11 |                                        )  **DISTRICT'S FIRST REQUEST FOR**
   | Newport Mesa Unified School            )  **PRODUCTION OF**
12 | District; Does 1-9                     )  **DOCUMENTS/THINGS**
                                            )
13 |        Appellees/Defendants            )
   | _____       )

14 |

15 | PROPOUNDING PARTY:        Newport-Mesa Unified School District

16 | RESPONDING PARTY:         E.F., Eric and Aneida Fulsang

17 | SET NO:                   ONE

18 | //

19 | //

20 | //

21 |

**Exhibit N Page 0160**

**DOCUMENTS DEMANDED**

1. All documents that you contend support each allegation in your Complaint, including:

    A.    All documents that you contend support your allegation that the District denied E.F. the opportunity to participate in or benefit from an aid, benefit, service, right, advantage, or opportunity that was afforded to non-disabled students.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 1A:**

Plaintiffs contend that the following documents supports each of their claims against Defendant—specifically, the IDEA, Section 504 and ADA allegations:

    1.    Pre-School Multidisciplinary Evaluation, dated February 12, 2009;

    2.    Progress Reports of Annual Special Education Goals for IEPs between May 5, 2009 and March 12, 2012;

    3.    NMUSD Annual IEP, dated February 9, 2010;

    4.    NMUSD  IEP Progress Report, dated March 8, 2010;

    5.    NMUSD Addendum IEP, dated April 15, 2010;

    6.    Letter from Fulsangs requesting IEP meeting, dated April 15, 2010;

    7.    Letter from Fulsangs, dated June 2, 2010;

    8.    NMUSD IEP Progress Report, dated June 10, 2010;

    9.    NMUSD Addendum IEP, dated June 21, 2010;

    10.    NMUSD Progress Report, dated November 17, 2010;

    11.    NMUSD Addendum IEP, dated November 23, 2010;

    12.    NMUSD Assessment Plan, dated December 6, 2010;

    13.    NMUSD Triennial Report Student Health Information, dated January 26, 2011;

    14.    NMUSD IEP Annual, dated February 4, 2011;

15. NMUSD Multidisciplinary Assessment, dated February 4, 2011;

16. Letter from NMUSD, dated February 16, 2011;

17. NMUSD IEP Addendum, dated March 8, 2011;

18. NMUSD  IEP Progress Report, dated March 10, 2011;

19. NMUSD IEP Addendum, dated April 19, 2011;

20. NMUSD  IEP Progress Report, dated June 24, 2011;

21. NMUSD IEP Progress Report, dated November 14, 2011;

22. NMUSD IEP Annual, dated February 1, 2012 and February 29, 2012;

23. NMUSD IEP Progress Report, dated March 12, 2012;

24. Letter from Fulsangs, dated April 5, 2012;

25. Letter from District, dated April 17, 2012;

26. Augumentative Communication Evaluation by Cottier, dated July 18, 2012;

27. Augumentaive and Alternative Communication Consultation Report, dated November 27, 2012 and December 6, 2012;

28. NMUSD IEP Annual, dated January 23, 2013;

29. NMUSD IEP Addendum, dated January 23, 2013;

30. NMUSD Assessment Plan, dated January 24, 2013;

31. NMUSD Sensory Diet Report, dated May of 2013;

32. NMUSD Fuctional Behavioral Assessment Report, dated April 30, 2013;

33. NMUSD Evaluation, dated May 2, 2013;

34. Fulsang's receipts, invoices, and cancelled checks for services rendered to E.F.;

35. NMUSD IEP, dated May 2, 2013;

36. Comprehensive Functional Behavioral Assement Report and Recommended Support Plan, dated September 17, 2013.

E.F., et al v. NMUSD, et al  Case #8:14-CV-00455-CJC-RNB
PLAITIFFS' RESPONSE TO NMUSD's 1st REQUEST FOR PRODUCTION
3  of  27

Exhibit N Page 0162

1       37.    Progress Report, dated June 21, 2013;

2       38.    Progress Report of Annaul Special Education Goals for IEP, dated
February 4, 2011;

3       39.    Report Cards/Progress Reports;

4       40.    Occupational Therapy Progress Reports;

5       41.    Speech Therapy Data Logs;

       42.    Progress Report for E.F., dated October 10, 2014;

6       43.    Speech and Language Progress Report for E.F. dated October 19,

7  2014;

8       44.    F.F.'s Occupational Therapy Data Logs;

       45.    E.F.'s IPOD touch training and consultation (February 4, 2013 –

9  April 1, 2013);

10       46.    Communication Equipment Loan Contract;

11       47.    Data Summary Sheets (February 8, 13 – May 3, 2013);

       48.    Behavioral Daily/Weekly Data Sheets (February 4, 2013 – May 3,

12  2013);

13       49.    Task Analysis Data Sheets (April 9, 2013 – April 30, 2013);

14       50.    Direct Observation Data Sheets of E.F.'s Behavior (April 9, 2013 –
April 24, 2013);

15       51.    Desired Results Developmental Profile Access documents from

16  2009-2011;

17       52.    Child Observation Data Recording Form I (Birth to 3 Years), dated
February 3, 2009;

18       53.    AEPS Family Report I, dated January 22, 2009;

19       54.    Peabody Developmental Motor Scales, dated February 9, 2009;

       55.    Rosetti Infant Toddler Language Scale (January 23, 2009);

20       56.    Parent/Primary Caregiver Form, dated December 5, 2008;

21

Exhibit N Page 0163

57.  Behavior Assessment System for Children, 2nd Edition (December 8, 2008);

58.  Developmental Assessment of Young Children (DAYC) Cognitive Subtest Scoring Form, dated January 21, 2009;

59.  Childhood Autism Rating Scale, dated February 9, 2009;

60.  The Beery-Buktanica Developmental Test of Visual Motor Integration (Beery VM I), dated February 9, 2009;

61.  Sensory Profile Caregiver Questionnaire, dated February 13, 2009

62.  Developmental Assessment of Young Children (DAYC), January 19, 2011;

63.  HELP Strands by Stephanie Parks Warshaw, cated January 27-28, 2011;

64.  Adoptive Behavior Assessment System II (ABAS II) Parent/Primary Caregiver Form, dated January 3, 2011;

65.  Peabody Developmental Motor Scales (PDMS-2), January, 7, 2011;

66.  Pre-school Language Scale, 4th Edition, January 27, 2011;

67.  Sensory Processing Measure-Preschool (SPM-P), by Leah Steinman, January 14, 2011;

68.  SPM-P, January 16, 2011;

69.  Pre-school Functonal Educational Checklist;

70.  Sensorimotor History Questionnaire for Pre-schoolers, January 7, 2011;

71.  Mullen Scales of Early Learning;

72.  IPAD Receipt, May 27, 2011

73.  Invoices from Schaflen Speech-Language Pathology for services rendered to E.F.;

74.  Invoices from Natalie Neal for services rendered to E.F.;

Exhibit N Page 0164

1      75.    Invoices from Augumentative Communication Therapies (ACT) for

2 services rendered to E.F.;

3      76.    Invoices from IABA Child & Adolescent Services for services
rendered to E.F.;

4      77.    Choc Pediatric Subspecialty Faculty Autism Diagnosis for E.F.,

5 dated January 9, 2011;

6      78.    Dr. Pantea Sharifi's Autism Diagnosis for E.F., dated February 22,
2011;

7      79.    ACT Progress Report, dated October 10, 2014

8      80.    Speech and Laguage Progress Report, dated October 20, 2014;

      81.    Kids Institute for Development & Advancement (KIDA)

9 Occupational Therapy Assessment, dated October 24, 2014;

10      82.    Nyansa letter, dated January 27, 2015; and,

11      83.    E.F.s IEP, dated May 5, 2009.

      84.    Video recordings of E.F.

12      85.    Audio-taped IEP meeting occurring on or about February 26, 2014.

13      Upon diligent search and inquiry, Plaintiffs have previously produced items

14 #1-83 to Defendant.  Plaintiffs will produce items 84-85 to Defendant. Plaintiffs

15 are not currently aware of any other responsive documents. Plaintiffs'
investigation is on-going.  If any other responsive documents are obtained,

16 Plaintiffs will produce them to Defendant as required under FRCP 26(e).

17

18      B.    All documents that you contend support your allegation that the
District intentionally discriminated against or acted with deliberate

19           indifference towards E.F.

20

21        E.F., et al v. NMUSD, et al  Case #8:14-CV-00455-CJC-RNB
           PLAITIFFS' RESPONSE TO NMUSD's 1st REQUEST FOR PRODUCTION
                      6 of 27

**Exhibit N Page 0165**

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 1B:**

  Upon diligent search and inquiry, Plaintiffs have produced the following documents to support its IDEA, Section 504 and ADA claims: all of the IEPs and IEP Addendums regarding E.F. that were prepared by Defendant or on its behalf; all assessments and progress reports regarding E.F. that were prepared by Defendant or on its behalf; the letter from Fulsangs, dated April 5, 2012; the letter from the District, dated February 16, 2011, the letter from the District dated April 17, 2012; the Augmentative Communication Evaluation, dated July 18, 2012; Augmentative and Alternative Coomunication Consultation Report, dated November 27, 2012 and December 6, 2012; and the audio-taped recording of an IEP meeting for E.F. which occurred on or about February 26, 2014.  Plaintiffs are not currently aware of any other responsive documents.  However, Plaintiffs' investigation is on-going.  If any other responsive documents are obtained, Plaintiff will produce them to Defendant as required under FRCP 26(e).

   C. All documents that you contend support your allegations that the District discriminated against E.F. based on a determination that he was intellectually disabled.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 1C:**

  Upon diligent search and inquiry, Plaintiffs have produced the following documents to support its IDEA, Section 504 and ADA claims: all of the IEPs and IEP Addendums regarding E.F. that were prepared by Defendant or on its behalf; all assessments and progress reports regarding E.F. that were prepared by Defendant or on its behalf; the letter from Fulsangs, dated April 5, 2012; the letter from the District, dated February 16, 2011, the letter from the District dated April 17, 2012; the Augmentative Communication Evaluation, dated July 18, 2012; Augmentative and Alternative Coomunication Consultation Report, dated

**Exhibit N Page 0166**

November 27, 2012 and December 6, 2012; and the audio-taped recording of an IEP meeting for E.F. which occurred on or about February 26, 2014. Plaintiffs are not currently aware of any other responsive documents. However, Plaintiffs' investigation is on-going. If any other responsive documents are obtained, Plaintiff will produce them to Defendant as required under FRCP 26(e).

D. All documents that you contend support your allegation that the District has failed to implement clear and adequate procedures to ensure that all disabled children within its jurisdiction receive appropriate special education and related services.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 1D**

After diligent search and inquiry, Plaintiffs have no documents responsive to this Request. Plaintiffs' investigation is on-going. If Plaintiffs obtain any responsive document, Plaintiffs will produce them to Defendant as required under FRCP 26(e).

E. All documents that you contend support your allegation that E.F. was arbitrarily denied appropriate special education and related services by the District.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 1E:**

Upon diligent search and inquiry, Plaintiffs have produced the following documents to support its IDEA, Section 504 and ADA claims: all of the IEPs and IEP Addendums regarding E.F. that were prepared by Defendant or on its behalf; all assessments and progress reports regarding E.F. that were prepared by Defendant or on its behalf; the letter from Fulsangs, dated April 5, 2012; the letter from the District, dated February 16, 2011, the letter from the District dated April 17, 2012; the Augmentative Communication Evaluation, dated July 18, 2012;

**Exhibit N Page 0167**

1  Augmentative and Alternative Coomunication Consultation Report, dated

2  November 27, 2012 and December 6, 2012; and the audio-taped recording of an

3  IEP meeting for E.F. which occurred on or about February 26, 2014.  Plaintiffs are

   not currently aware of any other responsive documents.  However, Plaintiffs'

4  investigation is on-going.  If any other responsive documents are obtained,

5  Plaintiff will produce them to Defendant as required under FRCP 26(e).

6

   F.     All documents that you contend support your allegation that the
7
          District's policies and practices have resulted in a pervasive,
8
          substantial, and systematic inability and/or refusal to provide FAPE,

9          including identification of these alleged policies and practices.

   **RESPONSE TO REQUEST FOR PRODUCTION NO. 1F**
10
        After diligent search and inquiry, Plaintiffs have no documents responsive
11
   to this Request.  Plaintiffs' investigation is on-going.  If Plaintiffs obtain any

12  responsive document, Plaintiff will produce them to Defendant as required under

   FRCP 26(e).
13

14  G.     All documents that you contend support your allegations that the

          District "promulgated, created, maintained, ratified, permitted, and
15
          encouraged a services of policies, customs, and practices with
16
          authorized the systematic denial of appropriate identification,

17          placement, and services to children with disabilities, " including

          identification of those alleged policies, customs, and practices.
18
   **RESPONSE TO REQUEST FOR PRODUCTION NO. 1G**
19
        After diligent search and inquiry, Plaintiffs have no documents responsive
20
   to this Request.  Plaintiffs' investigation is on-going.  If Plaintiffs obtain any

21

**Exhibit N Page 0168**

1   responsive document, Plaintiffs will produce them to Defendant as required under
2   FRCP 26(e).

3       H.    All documents that you contend support your allegations that the
4             District has "de facto customs and practices  of denying services and
5             condoning individual educational staff members to support and
6             recommend denial of various services, " including identification of
              those alleged de facto customs and practices.
7   **RESPONSE TO REQUEST FOR PRODUCTION NO. 1H**
8       After diligent search and inquiry, Plaintiffs have no documents responsive
    to this Request.  Plaintiffs' investigation is on-going.  If Plaintiffs obtain any
9   responsive document, Plaintiffs will produce them to Defendant as required under
10  FRCP 26(e).

11      I.    All documents that you contend support your allegation that the
12            District showed a conscious disregard for E.F.'s lack of educational
13            progress.
14  **RESPONSE TO REQUEST FOR PRODUCTION NO. 1I**
15      Upon diligent search and inquiry, Plaintiffs have produced the following
    documents to support its IDEA, Section 504 and ADA claims: all of the IEPs and
16  IEP Addendums regarding E.F. that were prepared by Defendant or on its behalf;
17  all assessments and progress reports regarding E.F. that were prepared by
18  Defendant or on its behalf; the letter from Fulsangs, dated April 5, 2012; the letter
    from the District, dated February 16, 2011, the letter from the District dated April
19  17, 2012; the Augmentative Communication Evaluation, dated July 18, 2012;
20  Augmentative and Alternative Coomunication Consultation Report, dated
    November 27, 2012 and December 6, 2012; and the audio-taped recording of an
21  

**Exhibit N Page 0169**

IEP meeting for E.F. which occurred on or about February 26, 2014.  Plaintiffs are not currently aware of any other responsive documents.  However, Plaintiffs' investigation is on-going.  If any other responsive documents are obtained, Plaintiff will produce them to Defendant as required under FRCP 26(e).

      J.    All documents that you contend support your allegations that the District showed a conscious disregard for E.F.'s safety at school.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 1J**

Upon diligent search and inquiry, Plaintiffs have produced the following documents to support its IDEA, Section 504 and ADA claims: the letter from Fulsangs, dated April 5, 2012 and the letter from the District dated April 17, 2012; and, Defendant's Head Injury Information Sheet re E.F., dated February 1, 2012. Plaintiffs are not currently aware of any other responsive documents.  However, Plaintiffs' investigation is on-going.  If any other responsive documents are obtained, Plaintiff will produce them to Defendant as required under FRCP 26(e).

      K.    All documents that you contend support your allegations that your Parents' rights under the IDEA were violated.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 1K**

Upon diligent search and inquiry, Plaintiffs have produced the documents set forth in Response to Request for Production No. 1A to support its IDEA, Section 504 and ADA claims.  Plaintiffs incorporate the response to Request for Production 1A into this Response. Plaintiffs are not currently aware of any other responsive documents.  Plaintiff's investigation are on-going.  If any other responsive documents are obtained, Plaintiffs will produce them to Defendant as required under FRCP 26(e).

**Exhibit N Page 0170**

1

2      L.    All documents that you contend support your allegations that your

Parents' rights under Section 504 were violated.

3

**RESPONSE TO REQUEST FOR PRODUCTION NO. 1L**

4      Upon diligent search and inquiry, Plaintiffs have produced the documents

5 set forth in Response to Request for Production No. 1A to support its IDEA,

Section 504 and ADA claims.  Plaintiffs incorporate the response to Request for

6 Production 1A into this Response. Plaintiffs are not currently aware of any other

7 responsive documents.  Plaintiffs' investigation is on-going.  If any other

8 responsive documents are obtained, Plaintiffs will produce them to Defendant as

required under FRCP 26(e).

9

10      M.    All documents that you contend support your allegation that District

11              staff obstructed the provision of services, diverted decisions to a

District administrator, "did nothing to assure Student's safety on

12              campus," and obstructed all attempts by Parents to ensure that E.F.'s

13              unique needs were met.

14

**RESPONSE TO REQUEST FOR PRODUCTION NO. 1M**

      Upon diligent search and inquiry, Plaintiffs have produced the following

15 documents to support its IDEA, Section 504 and ADA claims: all of the IEPs and

16 IEP Addendums regarding E.F. that were prepared by Defendant or on its behalf;

17 all assessments and progress reports regarding E.F. that were prepared by

Defendant or on its behalf; the letter from Fulsangs, dated April 5, 2012; the letter

18 from the District, dated February 16, 2011, the letter from the District dated April

19 17, 2012; the Augmentative Communication Evaluation, dated July 18, 2012;

20 Augmentative and Alternative Coomunication Consultation Report, dated

November 27, 2012 and December 6, 2012; and the audio-taped recording of an

21

E.F., et al v. NMUSD, et al  Case #8:14-CV-00455-CJC-RNB
PLAITIFFS' RESPONSE TO NMUSD's 1st REQUEST FOR PRODUCTION
**12 of 27**

**Exhibit N Page 0171**

1 IEP meeting for E.F. which occurred on or about February 26, 2014.  Plaintiffs are

2 not currently aware of any other responsive documents.  However, Plaintiffs'

3 investigation is on-going.  If any other responsive documents are obtained,
Plaintiff will produce them to Defendant as required under FRCP 26(e).

4

5     N.    All documents that you contend support your allegation that E.F. was

6     injured on more than one occasion due to the District's failure to
supervise, including your allegations of visible physical injuries, head

7     injuries, concussions, loose teeth, and seizures.

8 **RESPONSE TO REQUEST FOR PRODUCTION NO. 1N**

9     Upon diligent search and inquiry, Plaintiffs have produced the following
documents to support its IDEA, Section 504 and ADA claims: the letter from

10 Fulsangs, dated April 5, 2012 and the letter from the District dated April 17, 2012;

11 and, Defendant's Head Injury Information Sheet re E.F., dated February 1, 2012.

12 Plaintiffs are not currently aware of any other responsive documents.  However,
Plaintiffs' investigation is on-going.  If any other responsive documents are

13 obtained, Plaintiff will produce them to Defendant as required under FRCP 26(e).

14

15     O.    All documents that you contend support your allegation that E.F. was
"lost" or "misplaced" at school.

16 **RESPONSE TO REQUEST FOR PRODUCTION NO. 1O**

17     Upon diligent search and inquiry, Plaintiffs have produced the following
documents to support its IDEA, Section 504 and ADA claims: the letter from

18 Fulsangs, dated April 5, 2012 and the letter from the District dated April 17, 2012;

19 Plaintiffs are not currently aware of any other responsive documents.  However,

20 Plaintiffs' investigation is on-going.  If any other responsive documents are
obtained, Plaintiff will produce them to Defendant as required under FRCP 26(e).

21

E.F., et al v. NMUSD, et al  Case #8:14-CV-00455-CJC-RNB
PLAITIFFS' RESPONSE TO NMUSD's 1st REQUEST FOR PRODUCTION
13 of 27

**Exhibit N Page 0172**

186

P.    All documents that you contend support your allegation that the
District had a reckless disregard for E.F.'s well-being.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 1P**

Upon diligent search and inquiry, Plaintiffs have produced the following
documents to support its IDEA, Section 504 and ADA claims: all of the IEPs and
IEP Addendums regarding E.F. that were prepared by Defendant or on its behalf;
all assessments and progress reports regarding E.F. that were prepared by
Defendant or on its behalf; the letter from Fulsangs, dated April 5, 2012; the letter
from the District, dated February 16, 2011, the letter from the District dated April
17, 2012; the Augmentative Communication Evaluation, dated July 18, 2012;
Augmentative and Alternative Coomunication Consultation Report, dated
November 27, 2012 and December 6, 2012; and the audio-taped recording of an
IEP meeting for E.F. which occurred on or about February 26, 2014.  Plaintiffs are
not currently aware of any other responsive documents.  However, Plaintiffs'
investigation is on-going.  If any other responsive documents are obtained,
Plaintiff will produce them to Defendant as required under FRCP 26(e).

Q.    All documents that you contend support your allegation that District
staff has engaged in extreme, outrageous, and/or intentional behavior
that caused E.F. extreme emotional distress.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 1Q**

Upon diligent search and inquiry, Plaintiffs have produced the following
documents to support its IDEA, Section 504 and ADA claims: all of the IEPs and
IEP Addendums regarding E.F. that were prepared by Defendant or on its behalf;
all assessments and progress reports regarding E.F. that were prepared by

**Exhibit N Page 0173**

1  Defendant or on its behalf; the letter from Fulsangs, dated April 5, 2012; the letter

2  from the District, dated February 16, 2011, the letter from the District dated April

3  17, 2012; the Augmentative Communication Evaluation, dated July 18, 2012;
   Augmentative and Alternative Coomunication Consultation Report, dated

4  November 27, 2012 and December 6, 2012; and the audio-taped recording of an

5  IEP meeting for E.F. which occurred on or about February 26, 2014.  Plaintiffs are

6  not currently aware of any other responsive documents.  However, Plaintiffs'
   investigation is on-going.  If any other responsive documents are obtained,

7  Plaintiff will produce them to Defendant as required under FRCP 26(e).

8
          R.    All documents that you contend support your request for attorneys'
9                fees.

10 **RESPONSE TO REQUEST FOR PRODUCTION NO. 1R**

11        Upon diligent search and inquiry, Plaintiffs have produced the following
   documents: pleadings, correspondence, OAH appeals and discovery documents.
12 Plaintiffs believe that they are entitled to attorney's fees if they prevail at the trial

13 of this matter.

14
          Designate to which particular allegation each document produced applies.
15 To the extent that you intended any of the above allegations from your Complaint

16 to extend beyond the period of May 17, 2010, to May 17, 2012 and into the period

17 of May 17, 2012, to March 24, 2014, produce all documents related to both time
   periods.
18

19

20

21

Exhibit N Page 0174

2.      All documents that you contend support your allegation that you exhausted your Section 504 and ADA claims with regards to the time period from May 17, 2012, to March 24, 2014.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 2**

Upon diligent search and inquiry, Plaintiffs have produced the following documents: pleadings, correspondence, Administrative Record, OAH appeals and discovery documents. Plaintiffs are not currently aware of any other responsive documents. However, Plaintiffs' investigation is on-going. If any other responsive documents are obtained, Plaintiff will produce them to Defendant as required under FRCP 26(e).

3.      All documents that you contend support your claimed damages, from May 17, 2010, to March 24, 2014.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 3**

Upon diligent search and inquiry, Plaintiffs have produced the following documents to support its IDEA, Section 504 and ADA claims: all of the IEPs and IEP Addendums regarding E.F. that were prepared by Defendant or on its behalf; all assessments and progress reports regarding E.F. that were prepared by Defendant or on its behalf; the letter from Fulsangs, dated April 5, 2012; the letter from the District, dated February 16, 2011, the letter from the District dated April 17, 2012; the Augmentative Communication Evaluation, dated July 18, 2012; Augmentative and Alternative Coomunication Consultation Report, dated November 27, 2012 and December 6, 2012; and the audio-taped recording of an IEP meeting for E.F. which occurred on or about February 26, 2014. Plaintiffs are not currently aware of any other responsive documents. However, Plaintiffs' investigation is on-going. If any other responsive documents are obtained, Plaintiff will produce them to Defendant as required under FRCP 26(e).

**Exhibit N Page 0175**

4.   All documents that you contend support your claim from physical, mental, or emotional injuries, from May 17, 2010, to March 24, 2014, including:

    A.   All documents that you contend support your allegation that E.F. "has suffered and continues to suffer humiliation, emotional distress, loss of educational opportunity, lack of academic progress, [and] academic and social emotional regression."

**RESPONSE TO REQUEST FOR PRODUCTION NO. 4A**

After diligent search and inquiry, Plaintiffs have produced the following documents in support of its allegations under the IDEA, Section 504, and the ADA: all of the IEPs and IEP Addendums regarding E.F. that were prepared by Defendant or on its behalf; all assessments and progress reports regarding E.F. that were prepared by Defendant or on its behalf; Defendant's Head Injury Information Sheet re E.F., dated February 1, 2012; the letter from Fulsangs, dated April 5, 2012; the letter from the District, dated February 16, 2011, the letter from the District dated April 17, 2012; the Augmentative Communication Evaluation, dated July 18, 2012; Augmentative and Alternative Coomunication Consultation Report, dated November 27, 2012 and December 6, 2012; and the audio-taped recording of an IEP meeting for E.F. which occurred on or about February 26, 2014. Plaintiffs would also include all of the remaining documents set forth in Response to Request for Production of Document 1A. Plaintiffs are not currently aware of any other responsive documents. However, Plaintiffs' investigation is on-going. If any other responsive documents are obtained, Plaintiffs will produce them to Defendant as required under FRCP 26(e).

**Exhibit N Page 0176**

1     B.     All documents that you contend support your allegation that the
"Plaintiffs have suffered and continues to suffer humiliation,
emotional distress, anxiety, [and] physical decline."

**RESPONSE TO REQUEST FOR PRODUCTION NO. 4B**

After diligent search and inquiry, Plaintiffs have produced the following documents in support of its allegations under the IDEA, Section 504, and the ADA: all of the IEPs and IEP Addendums regarding E.F. that were prepared by Defendant or on its behalf; all assessments and progress reports regarding E.F. that were prepared by Defendant or on its behalf; Defendant's Head Injury Information Sheet re E.F., dated February 1, 2012; the letter from Fulsangs, dated April 5, 2012; the letter from the District, dated February 16, 2011, the letter from the District dated April 17, 2012; the Augmentative Communication Evaluation, dated July 18, 2012; Augmentative and Alternative Coomunication Consultation Report, dated November 27, 2012 and December 6, 2012; and the audio-taped recording of an IEP meeting for E.F. which occurred on or about February 26, 2014. Plaintiffs would also include all of the remaining documents set forth in Response to Request for Production of Document 1A. Plaintiffs are not currently aware of any other responsive documents. However, Plaintiffs' investigation is on-going. If any other responsive documents are obtained, Plaintiffs will produce them to Defendant as required under FRCP 26(e).

Regarding Plaintiffs Eric and Aneida Fulsang, Plaintiffs have no documents responsive to this Request. Plaintiff's investigation is on-going. If Plaintiffs obtain any responsive document, Plaintiff will produce them to Defendant as required under FRCP 26(e).

E.F., et al v. NMUSD, et al  Case #8:14-CV-00455-CJC-RNB
PLAITIFFS' RESPONSE TO NMUSD's 1st REQUEST FOR PRODUCTION
18 of 27

Exhibit N Page 0177

191

C.    All documents that you contend support your allegation that the "Plaintiffs have suffered extreme and severe mental anguish and pain."

**RESPONSE TO REQUEST FOR PRODUCTION NO. 4C**

        After diligent search and inquiry, Plaintiffs have produced the following documents in support of its allegations under the IDEA, Section 504, and the ADA: all of the IEPs and IEP Addendums regarding E.F. that were prepared by Defendant or on its behalf; all assessments and progress reports regarding E.F. that were prepared by Defendant or on its behalf; Defendant's Head Injury Information Sheet re E.F., dated February 1, 2012; the letter from Fulsangs, dated April 5, 2012; the letter from the District, dated February 16, 2011, the letter from the District dated April 17, 2012; the Augmentative Communication Evaluation, dated July 18, 2012;  Augmentative and Alternative Coomunication Consultation Report, dated November 27, 2012 and December 6, 2012; and the audio-taped recording of an IEP meeting for E.F. which occurred on or about February 26, 2014.  Plaintiffs would also include all of the remaining documents set forth in Response to Request for Production of Document 1A. Plaintiffs are not currently aware of any other responsive documents.  However, Plaintiffs' investigation is on-going.  If any other responsive documents are obtained, Plaintiffs will produce them to Defendant as required under FRCP 26(e).

        Regarding Plaintiffs Eric and Aneida Fulsang, Plaintiffs have no documents responsive to this Request.  Plaintiff's investigation is on-going.  If Plaintiffs obtain any responsive document, Plaintiff will produce them to Defendant as required under FRCP 26(e).

D.    All documents that you contend support your allegation that E.F. sustained physical and social emotional injury at school, including

**Exhibit N Page 0178**

visible physical injuries, head injuries, concussions, loose teeth, and seizures.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 4D**

After diligent search and inquiry, Plaintiffs have produced the following documents in support of its allegations under the IDEA, Section 504, and the ADA: the letter from Fulsangs, dated April 5, 2012 and the letter from the District dated April 17, 2012; and, Defendant's Head Injury Information Sheet re E.F., dated February 1, 2012. Plaintiffs are not currently aware of any other responsive documents. However, Plaintiffs' investigation is on-going. If any other responsive documents are obtained, Plaintiff will produce them to Defendant as required under FRCP 26(e).

E.  All documents that you contend support your allegation that E.F. has "constant anxiety and fear of school."

**RESPONSE TO REQUEST FOR PRODUCTION NO. 4E**

After diligent search and inquiry, Plaintiffs have no documents responsive to this Request. Plaintiffs' investigation is on-going. If Plaintiffs obtain any responsive document, Plaintiffs will produce them to Defendant as required under FRCP 26(e).

F.  All documents that you contend support your allegation that E.F. has need for additional therapeutic intervention.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 4F**

After diligent search and inquiry, Plaintiffs have produced the following documents in support of its allegations under the IDEA, Section 504, and the ADA: all of the IEPs and IEP Addendums regarding E.F. that were prepared by Defendant or on its behalf; all assessments and progress reports regarding E.F. that were prepared by Defendant or on its behalf; Defendant's Head Injury

Exhibit N Page 0179

1  Information Sheet re E.F., dated February 1, 2012; the letter from Fulsangs, dated

2  April 5, 2012; the letter from the District, dated February 16, 2011, the letter from

3  the District dated April 17, 2012; the Augmentative Communication Evaluation,
   dated July 18, 2012;  Augmentative and Alternative Coomunication Consultation

4  Report, dated November 27, 2012 and December 6, 2012; and the audio-taped

5  recording of an IEP meeting for E.F. which occurred on or about February 26,

6  2014. Plaintiffs would also include all of the remaining documents set forth in
   Response to Request for Production of Document 1A.  Plaintiff is not currently

7  aware of any other responsive documents.  However, Plaintiffs' investigation is

8  on-going.  If any other responsive documents are obtained, Plaintiffs will produce
   them to Defendant as required under FRCP 26(e).

9

10       G.     All documents that you contend support your allegation that E.F.'s
                parents and private therapists have been providing "therapeutic
11              intervention."

12 **RESPONSE TO REQUEST FOR PRODUCTION NO. 4G**

13       Plaintiffs contend that the following documents supports each of their

14 allegations against Defendant—specifically, the IDEA, Section 504 and ADA
   allegations: Progress Report for E.F., dated October 10, 2014; Speech and

15 Language Progress Report for E.F. dated October 19, 2014; E.F.'s IPOD touch

16 training and consultation (February 4, 2013 – April 1, 2013); Invoices from

17 Schaflen Speech-Language Pathology for services rendered to E.F.; Invoices from
   Natalie Neal for services rendered to E.F.; Invoices from Augumentative

18 Communication Therapies (ACT) for services rendered to E.F.; Invoices from

19 IABA Child & Adolescent Services for services rendered to E.F.; ACT Progress

20 Report, dated October 10, 2014; Speech and Language Progress Report, dated
   October 20, 2014; Kids Institute for Development & Advancement (KIDA)

21

**Exhibit N Page 0180**

194

1  Occupational Therapy Assessment, dated October 24, 2014; Nyansa letter, dated

2  January 27, 2015; Video recordings of E.F; and, Audio-taped IEP meeting

3  occurring on or about February 26, 2014. Plaintiffs are not currently aware of any

   other responsive documents.  However, Plaintiffs' investigation is on-going.  If

4  any other responsive documents are obtained, Plaintiffs will produce them to

5  Defendant as required under FRCP 26(e).

6       H.    All documents that you contend support your allegation that E.F. has

7             suffered extreme emotional distress.

8  **RESPONSE TO REQUEST FOR PRODUCTION NO. 4H**

        Upon diligent search and inquiry, Plaintiffs have produced the documents

9  set forth in Response to Request for Production No. 1A.  Plaintiffs incorporate the

10 response to Request for Production 1A into this Response. Plaintiffs are not

11 currently aware of any other responsive documents.  Plaintiffs' investigation is on-

   going.  If any other responsive documents are obtained, Plaintiffs will produce

12 them to Defendant as required under FRCP 26(e).

13

14 5.    All written or recorded statements of any party and/or non-party witnesses

          as to the extent of injuries and damages to Plaintiffs.

15 **RESPONSE TO REQUEST FOR PRODUCTION NO. 5**

16       Upon diligent search and inquiry, Plaintiffs are informed and believes that

17 the testimony of witnesses at the OAH hearing would constitute testimony as to

   the extent of Plaintiffs' injuries and damages.  Plaintiffs will not produce these

18 documents because they are contained within the Administrative Record and are

19 within Defendant's possession, custody and control.

20

21              E.F., et al v. NMUSD, et al  Case #8:14-CV-00455-CJC-RNB
         PLAITIFFS' RESPONSE TO NMUSD's 1st REQUEST FOR PRODUCTION
                                22  of  27

**Exhibit N Page 0181**

6.    All documents related to any private services received by E.F. during the relevant time period, including bills, reports, and/or progress information.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 6**

After diligent search and inquiry, Plaintiffs have produced following responsive documents which support Plaintiffs' IDEA, Section 504 and ADA claims: Augumentative Communication Evaluation by Cottier, dated July 18, 2012; Augumentaive and Alternative Communication Consultation Report, dated November 27, 2012 and December 6, 2012; Progress Report for E.F., dated October 10, 2014; Speech and Language Progress Report for E.F. dated October 19, 2014; E.F.'s IPOD touch training and consultation (February 4, 2013 – April 1, 2013); Invoices from Schaflen Speech-Language Pathology for services rendered to E.F.; Invoices from Natalie Neal for services rendered to E.F.; Invoices from Augumentative Communication Therapies (ACT) for services rendered to E.F.; Invoices from IABA Child & Adolescent Services for services rendered to E.F.; ACT Progress Report, dated October 10, 2014; Speech and Language Progress Report, dated October 20, 2014; Kids Institute for Development & Advancement (KIDA) Occupational Therapy Assessment, dated October 24, 2014; Nyansa letter, dated January 27, 2015; Video recordings of E.F; and, Audio-taped IEP meeting occurring on or about February 26, 2014. Plaintiffs expect to receive additional reports and/or invoices related to services rendered to E.F. As these reports and invoices are submitted to Plaintiffs, they will be produced to Defendant. Plaintiffs are not currently aware of any other responsive documents. However, Plaintiffs' investigation is on-going. If any other responsive documents are obtained, Plaintiffs will produce them to Defendant as required under FRCP 26(e).

7.    All documents you intend to introduce as evidence at the trial in this action.

**Exhibit N Page 0182**

**RESPONSE TO REQUEST FOR REQUEST FOR PRODUCTION NO. 7**

After diligent search and inquiry, Plaintiffs have produced following responsive documents which support Plaintiffs' IDEA, Section 504 and ADA claims: Plaintiffs have produced the documents set forth in Response to Request for Production No. 1A.  Plaintiffs incorporate the response to Request for Production 1A into this Response.  Plaintiffs have not decided exactly which documents that it will introduce as evidence at trial.  However, all pertinent documents that Plaintiffs might introduce at trial will be listed on Plaintiffs' Exhibit List per the Federal Rules of Civil Procedure and the Central District Local Rules.  Plaintiffs are not currently aware of any other responsive documents.  Plaintiffs' investigation is on-going.  If any other responsive documents are obtained, Plaintiffs will produce them to Defendant as required under FRCP 26(e).

8.   Any documents that support or dispute the substance of the evidence you intend to offer at the trial in this action.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 8**

After diligent search and inquiry, Plaintiffs have produced following responsive documents which support Plaintiffs' IDEA, Section 504 and ADA claims:  Plaintiffs have produced the documents set forth in Response to Request for Production No. 1A.  Plaintiffs incorporate the response to Request for Production 1A into this Response.  Plaintiffs have not decided exactly which documents that it will introduce as evidence at trial.  However, all pertinent documents that Plaintiffs might introduce at trial will be listed on Plaintiff's exhibit list per Federal Rules of Civil Procedure and the Central District Local Rules.  Plaintiffs are not currently aware of any other responsive documents.

**Exhibit N Page 0183**

1  Plaintiffs' investigation is on-going.  If any other responsive documents are
2  obtained, Plaintiffs will produce them to Defendant as required under FRCP 26(e).

3  9.    All documents signed by any Plaintiff that refer to any aspects of E.F.'s
4        educational program.

5  **RESPONSE TO REQUEST FOR PRODUCTION NO. 9**

6        After diligent search and inquiry, Plaintiffs have produced following
   responsive documents which support Plaintiffs' IDEA, Section 504 and ADA
7  claims:  IEPs for E.F., prepared for E.F.;  AEPS Family Report I, dated January
8  22, 2009; Parent/Primary Caregiver Form, dated December 5, 2008; Behavior
   Assessment System for Classroom, 2nd Edition (BASC-2), dated December 8,
9  2008; Developmental Assessment of Young Children (DAYC) Cognitive Subtest
10 Scoring Form, dated January 21, 2009, Sensory Profile Caregiver Questionnaire,
11 dated February 13, 2009, Adaptive Behavior Assessment System II (ABAS II)
   Parent/Primary Caregiver Form, dated January 3, 2011; Sensory Processing
12 Measure—Preschool (SPM-P), dated January 16, 2011; and,  cancelled checks
13 regarding services to E.F. Plaintiffs are not currently aware of any other
14 responsive documents.  Plaintiffs' investigation is on-going.  If any other
   responsive documents are obtained, Plaintiffs will produce them to Defendant as
15 required under FRCP 26(e).

16

17 10.   All documents given to any Plaintiff, shown to any Plaintiff, or made
         available for review by any Plaintiff that relate to or refer to any aspects of
18       E.F.'s educational program.

19 **RESPONSE TO REQUEST FOR PRODUCTION NO. 10**

20       Upon diligent search and inquiry, Plaintiffs have produced the documents
   set forth in Response to Request for Production No. 1A to support its IDEA,
21
                     E.F., et al v. NMUSD, et al  Case #8:14-CV-00455-CJC-RNB
              PLAITIFFS' RESPONSE TO NMUSD's 1st REQUEST FOR PRODUCTION
                                    25  of  27

**Exhibit N Page 0184**

1 Section 504 and ADA claims.  Plaintiffs incorporate the response to Request for
2 Production 1A into this Response. Plaintiffs are not currently aware of any other
3 responsive documents.  Plaintiffs' investigation are on-going.  If any other
4 responsive documents are obtained, Plaintiffs will produce them to Defendant as
required under FRCP 26(e).

5

6

7

8

9 11.    All documents regarding or referring to any discussions between any
10        Plaintiff and any District employee that relate to or refer to any aspects of
11        E.F.'s educational program.

12 **RESPONSE TO REQUEST FOR PRODUCTION NO. 11**

13        Upon diligent search and inquiry, Plaintiffs have produced the documents
14 set forth in Response to Request for Production No. 1A to support its IDEA,
15 Section 504 and ADA claims.  Plaintiffs incorporate the response to Request for
Production 1A into this Response. Plaintiffs are not currently aware of any other
16 responsive documents.  Plaintiffs' investigation is on-going.  If any other
17 responsive documents are obtained, Plaintiffs will produce them to Defendant as
required under FRCP 26(e).
18

19 12.    For each expert witness you expect will testify at trial or any hearing related
20        to this case, please produce a copy of their curriculum vitae and a complete
        copy of his/her file related to this case.
21                    E.F., et al v. NMUSD, et al  Case #8:14-CV-00455-CJC-RNB
                    PLAITIFFS' RESPONSE TO NMUSD's 1st REQUEST FOR PRODUCTION
                                      26  of  27

1   **RESPONSE TO REQUEST FOR PRODUCTION NO. 12**

2       At this time, it has not been decided who will ultimately testify as an expert

    on Plaintiff's behalf.  However, that decision will be reflected in Plaintiff's Rule
3
    26(a)(2) Disclosure Statement and disclosed to Defendant once that Disclosure
4   Statement is due.

5
    Dated: April 20, 2015                    **ROBERT STANFORD BROWN, APC**
6
                                        By_____/s/_____
7
                                            Robert S. Brown, Esq
                                            Attorney for Plaintiffs, E.F, Aneida
8                                           Fulsang, Eric Fulsang

9   Dated:                                **LAW OFFICES OF KATHLEEN M.**
                                          **LOYER, INC.**
10                                        By_____
                                            Kathleen M. Loyer, Esq.
11                                          Attorney for Plaintiffs, E.F, Aneida
                                            Fulsang, Eric Fulsang
12

13

14

15

16

17

18

19

20

21                  E.F., et al v. NMUSD, et al  Case #8:14-CV-00455-CJC-RNB
                PLAINTIFFS' RESPONSE TO NMUSD's 1st REQUEST FOR PRODUCTION
                                    **27 of 27**

                                                    **Exhibit N Page 0186**

1  HARBOTTLE LAW GROUP
   S. Daniel Harbottle (State Bar No. 156442)
2  *dharbottle@harbottlelaw.com*
   18401 Von Karman Avenue, Suite 200
3  Irvine, California 92612
   Telephone: 949.428.8780
4  Facsimile: 949.428.8779

5  Attorneys for Defendant
   Newport-Mesa Unified School District
6

7

8            **UNITED STATES DISTRICT COURT**

9            **CENTRAL DISTRICT OF CALIFORNIA**

10

11  E.F., a minor by and through his parents        Case No.: SACV 14-00455-CJC
    Eric Fulsang, Eric Fulsang and Aneida          (RNBx)
12  Fulsang for themselves,
                                                    **NEWPORT-MESA UNIFIED**
13              Plaintiffs,                         **SCHOOL DISTRICT'S**
                                                    **STATEMENT OF**
14       v.                                         **UNCONTROVERTED FACTS**
                                                    **AND CONCLUSIONS OF LAW IN**
15  Newport-Mesa Unified School District,          **SUPPORT OF ITS MOTION FOR**
    Does 1-9,                                       **SUMMARY JUDGMENT**
16
                Defendants.                         **[Filed Concurrently With (1) Notice**
17                                                  **of Motion and Motion for Summary**
                                                    **Judgment, (2) Memorandum of**
18                                                  **Points and Authorities, (3)**
                                                    **Declaration of S. Daniel Harbottle,**
19                                                  **and (4) Proposed Judgment]**

20                                                  Action Filed: Mar. 24, 2014

21                                                  Judge:        Hon. Cormac J. Carney
                                                    Motion Hearing:   August 24, 2015
22                                                  Time:             10:00 a.m.
                                                    Location:         Court Room 9B
23

24

25

26

27

28

HARBOTTLE LAW GROUP
Attorneys at Law

{1056631.1 }

-1-

NEWPORT-MESA UNIFIED SCHOOL DISTRICT'S STATEMENT OF
UNCONTROVERTED FACTS AND CONCLUIONS OF LAW

201

## I.    STATEMENT OF UNCONTROVERTED FACTS.

The uncontroverted facts are as follows:

| UNCONTROVERTED FACTS | SUPPORT |
|---|---|
| 1. E.F. is young boy who has resided within the limits of the District during all relevant time periods. | Amended Complaint ¶ 3, Dkt. 1, "Complaint." |
| 2. E.F. is eligible for special education and related services pursuant to the Individuals with Disabilities Education Act ("IDEA") under the categories of Autism, Speech and Language impairment, and Intellectual Disability, and is essentially nonverbal. | Complaint, ¶¶ 27, 29. |
| 3. Plaintiffs' operative complaint with OAH was their Amended Request for Due Process filed on May 8, 2013. | Complaint, ¶¶ 66, 84; AR 198-238 is Amended Due Process Request. |
| 4. In October 2013, an OAH Administrative Law Judge ("ALJ") held a due process hearing over seven (7) full days, and, in December 2013, the ALJ issued a decision in the matter. | Complaint ¶¶ 103, 107; Harbottle Decl., ¶2, Exhibit A, OAH Decision AR 1271-1332. |
| 5. The ALJ's decision found for the District on all but a "small portion" of Plaintiffs' claims. Specifically, the ALJ concluded that the District should have provided electronic AT such as an iTouch device sooner than it did. | Harbottle Decl., ¶2, Exhibit A, OAH Decision, AR 1274. |
| 6. On June 22, 2015, oral argument on the IDEA appeal occurred, and on June 23, 2015, the Court issued its order affirming the OAH | Dkt. 39. |

HARBOTTLE LAW GROUP
Attorneys at Law

{1056631.1 }

| | |
|---|---|
| Decision in its entirety. | |
| 7. The "small portion" of Plaintiffs' claims on which the District did not prevail dealt entirely with OAH's determination that the District ought to have formally offered Student an electronic AT device prior to the date upon which it ultimately did so. | Harbottle Decl., ¶2, Exhibit A, OAH Decision, AR 1274. |
| 8. The ALJ determined District speech pathologist/behaviorist Dr. Kathleen Mulligan Murphy to be highly qualified. | Harbottle Decl., ¶2, Exhibit A, OAH Decision, AR 1282. |
| 9. Dr. Murphy conducted a speech/language assessment of E.F. and served as a member of his IEP team during the relevant time frame. | Harbottle Decl., ¶2, Exhibit A, OAH Decision, AR 1285-1286, ¶¶ 53-59. |
| 10. As to Dr. Murphy's assessment, and her work with Student, the ALJ held that, "Student presented no documentary evidence or testimony at hearing that questioned the validity, propriety, or results of Dr. Murphy's assessments, or contradicted Dr. Murphy's findings, observations or recommendations." Accordingly, "[t]here is thus no evidence that controverts the appropriateness of Dr. Murphy's assessment or any speech goals she developed for Student in any of his IEPs." | Harbottle Decl., ¶2; Exhibit A; OAH Decision at 1286, ¶ 60. |
| 11. Dr. Murphy testified directly regarding her views as to Student's potential to utilize an AT | Harbottle Decl., ¶3, Exhibit B, Murphy |

HARBOTTLE LAW GROUP
Attorneys at Law

{1056631.1 }

| | |
|---|---|
| device like an iPad or iTouch in February 2012, as follows: | Testimony, AR 2237:2-15; 12-25. |
| Q: Okay. Since there was a discussion on the iPad and [E.F.] was being able to use an iPad, why didn't you propose an AT assessment at that time? | |
| A: He wasn't demonstrating the rest of the readiness skills at that time. So typically developing children . . . make that connection. It isn't until the child is around age three cognitively or developmentally that they are actually beginning to use images for communication purposes. We were very excited to see [E.F.] make that type of growth, but he wasn't yet at the readiness period to use that alone. So we were still working – all of these goals reflect that building of the foundational skills to getting to that readiness point. | |
| As to the goals she and the IEP team developed to work on E.F's readiness, Dr. Murphy testified that: | |
| So we were still working – all of these goals reflect that building of the foundational skills to getting to that readiness point. One of the goals or the very first ones we incorporated in here was break time, that he was actually using a visual image for communicative purposes. So he wasn't yet demonstrating that level of readiness. And we did many things to make him ready. So the visuals were not just for communication purpose, but we were also bathing him with the visuals within | |

-4-

HARBOTTLE LAW GROUP
Attorneys at Law

{1056631.1 }

NEWPORT-MESA UNIFIED SCHOOL DISTRICT'S STATEMENT OF
UNCONTROVERTED FACTS AND CONCLUIONS OF LAW

204

| | |
|---|---|
| the environment such as the visual schedule. Part of my responsibility was — included collaborating with the teacher to make those kinds of adjustments and to supplement any of the visual aids for communication purposes across the day. | |
| 12. This rationale was corroborated by Ms. Burns, E.F.'s teacher for much of the relevant period, including the time frame relevant to the AT issue. | Harbottle Decl., ¶4, Exhibit C; Burns Testimony, AR 1513; 1539:19-1540:14. |
| 13. "Soon after" the February 2012 IEP meeting, Student's teacher, Ms. Burns, "permitted Student to bring his iPad to school. She began using the iPad as reinforcer for Student when he had reached enough tokens to choose an activity as a reward for completing tasks or behaving appropriately." | Harbottle Decl., ¶2; Exhibit A; OAH Decision, AR 1296, ¶109. |
| 14. OAH determined that, "Student had met all four of his speech and language goals by the February 29, 2012 IEP." | Harbottle Decl., ¶2; Exhibit A; OAH Decision, AR 1295, ¶103. |
| 15. In January 2013, at Student's next annual IEP, the ALJ found that, "Student met all four of his speech goals."   Also, several of those goals directly addressed Student's functional communication skills. | Harbottle Decl., ¶2; Exhibit A; OAH Decision, AR 1302, ¶140; Harbottle Decl., ¶4, Exhibit C, Testimony of Ms. Burns, AR |

HARBOTTLE LAW GROUP
Attorneys at Law

{1056631.1 }

-5-

NEWPORT-MESA UNIFIED SCHOOL DISTRICT'S STATEMENT OF
UNCONTROVERTED FACTS AND CONCLUIONS OF LAW

205

| | |
|---|---|
| | 1574:9-1575-16. |
| 16. The ALJ held that, "All of the goals developed for Student at each of his IEP's were based on his then present levels of performance, including, where appropriate, his most recent assessments.   Each goal had appropriate baselines indicating Student's current abilities in each area.  Each goal was measurable.  Each goal addressed deficits that Student had and each goal was needed to address those deficits.    Each goal was appropriate for Student based on his assessed needs, his skills, his cognitive level, and his expected ability to be able to meet the goal. [District staff] Ms. Ni, Ms. Kent, Ms. Steinman, Dr. Murphy, and Ms. Burns, all persuasively testified that the goals were properly developed, properly written, and were appropriate for Student." | Harbottle Decl., ¶2; Exhibit A; OAH Decision, AR 1303, ¶145. |
| 17. Student has been determined to be Intellectually Disabled pursuant to the IDEA. | Harbottle Decl., ¶2; Exhibit A; OAH Decision, AR 1275, ¶ 3. |
| 18. The determination of Student's Intellectual Disability was made by E.F.'s IEP team, pursuant to the assessment conducted by District psychologist Ms. Eby Kent. | Harbottle Decl., ¶2; Exhibit A; OAH Decision, AR 1284, ¶ 50. |

HARBOTTLE LAW GROUP
Attorneys at Law

{1056631.1 }

NEWPORT-MESA UNIFIED SCHOOL DISTRICT'S STATEMENT OF
UNCONTROVERTED FACTS AND CONCLUIONS OF LAW

| | |
|---|---|
| 19. The ALJ found that, "Student presented no evidence that Ms. Kent's testing was inappropriate or that her assessment results and recommendations were improper." | Harbottle Decl., ¶2; Exhibit A; OAH Decision, AR 1284, ¶ 51. |
| 20. The District website at all relevant times has contained an easily locatable page, or equivalent mechanism, that directs potential claimants to the appropriate person from whom to obtain the requisite form. | Harbottle Decl., ¶5, Ex. F at 0090. |
| 21. Plaintiffs have acknowledged that they never submitted a formal Tort Claim using the form provided by the District for such claims. | Harbottle Decl., ¶6. |
| 22. Plaintiffs did not plead compliance with the Government Tort Claims Act, as is also required by law. | Complaint *passim* |
| 23. The District, in its Answer, placed Plaintiffs on explicit notice of its intent to rely upon their failure to comply with, and to plead such compliance with, the Tort Claims Act. | Dkt. 10; Answer, Nineteenth Affirmative Defense, p. 56, line 16-19.) |
| 24. On September 30, 2014, Plaintiffs provided their Initial Disclosures to the District. | Harbottle Decl., ¶12, Exhibit I.) |
| 25. On November 5, 2014, Plaintiffs submitted to the District their Supplemental Disclosure Statement. | Harbottle Decl., ¶13, Exhibit J.) |
| 26. In both their original and supplemental Disclosures, Plaintiffs provide a listing of documents upon which they intend to rely in | Harbottle Decl., ¶¶12-13, Exhibit I at 0118-120, and Exhibit J at 0129- |

HARBOTTLE LAW GROUP
Attorneys at Law

{1056631.1 }

NEWPORT-MESA UNIFIED SCHOOL DISTRICT'S STATEMENT OF
UNCONTROVERTED FACTS AND CONCLUIONS OF LAW

| | |
|---|---|
| establishing their claims in this case. They do not list attorneys' fees invoice(s) in either of these Disclosures, nor have they supplied any such documents in their Disclosures since the filing of the Complaint. | 0131.) |
| 27. On January 27, 2015, the District served its First Request For Production of Documents, expressly seeking, in Request 1(R): "All documents that you contend support your request for attorneys' fees." | Harbottle Decl. ¶14, Exhibit K, at 0141:4-5. |
| 28. Plaintiffs first responded by simply referring to the OAH Decision, and later responded by indicating that they had produced "pleadings, correspondence, OAH appeals and discovery documents." Plaintiffs have not provided a fee invoice in support of their claim for fees in connection with the discovery process, but only during pre-filing settlement discussions. | Harbottle Decl. ¶¶16-18, Exhibit L at 0152:11 and Exhibit N at 0174:11-13. |

## II.   CONCLUSIONS OF LAW.

The District's conclusions of law in support of its Motion for Summary Judgment are as follows:

1. The OAH Decision and this Court's affirmance thereof have preclusive effect on Plaintiffs' factual allegations to the extent they apply in this action.

2. The District did not discriminate against Plaintiffs, or any of them, under either Section 504 or the ADA, on the basis of Plaintiff E.F.'s.

3. The District is immune from liability under the Eleventh Amendment to the United States Constitution as to Causes of Action Eight and Ten.

-8-

HARBOTTLE LAW GROUP
Attorneys at Law
{1056631.1 }
NEWPORT-MESA UNIFIED SCHOOL DISTRICT'S STATEMENT OF
UNCONTROVERTED FACTS AND CONCLUIONS OF LAW

208

1      4. Plaintiffs failed to file a valid Tort Claim against the District or any of its

2         employees, failed to plead compliance with the Tort Claims Act, and it is now

3         too late to seek leave to file a late Tort Claim; therefore, Plaintiffs' Causes of

4         Action Eight And Ten are time-barred.

5      5. Plaintiffs are not entitled to recovery of any attorneys' fees against any

6         Defendant for failure to comply with Initial Disclosure requirements, and with

7         valid discovery requests.

8      6. Judgment should be entered in the District's favor as to all remaining causes

9         of action.

10  DATED:  July 14, 2015         HARBOTTLE LAW GROUP
                                            S. DANIEL HARBOTTLE

11

12                                   By:  _/s/_____

13                                           S. DANIEL HARBOTTLE
                                        Attorneys for Defendant

14                                           Newport-Mesa Unified School District

15

16

17

18

19

20

21

22

23

24

25

26

27

28

HARBOTTLE LAW GROUP
Attorneys at Law

{1056631.1 }      NEWPORT-MESA UNIFIED SCHOOL DISTRICT'S STATEMENT OF
               UNCONTROVERTED FACTS AND CONCLUIONS OF LAW

MAY. 17. 2012  9:49AM    LAW OFFICES OF K.M. LOYER                    NO. 3236   P. 1

ADMINISTRATIVE RECORD FOR MATTER 2012050785        02/25/2014                    1 of 1332

# LAW OFFICES OF KATHLEEN M. LOYER

### 940 Calle Amanecer, Suite L • San Clemente, CA 92673
#### Phone: 949-369-1082
#### Fax949-366-6836
#### E-mail: kmloyer@education-law.com

## FACSIMILE COVER SHEET & PROOF OF SERVICE

# CONFIDENTIAL

| | |
|---|---|
| TO:<br>OAH<br>(916) 376-6319<br><br>Newport-Mesa Unified School District<br>(949)515-6760 | FROM:<br>I am employed in the County of Orange, State of California; I am over the age of 18. May 17, 2012 , I served the foregoing document described as Request for Due Process, Notice of Representation, and Notice of Intent, to the interested parties in this action by FACSIMILE TRANSMISSION: The facsimile machine n, Executed on May 17, 2012 at Orange County, California, See mailing/facsimile list to the left.<br><br>By: _Kathleen M. Loyer_ KMLoyer |
| FAX NUMBER:<br>See Above | DATE:<br>May 17, 2012 |
| RE:<br>▇ Fulsang v. Newport Mesa USD<br>OAH# UNASSIGNED<br>Request for Due Process | TOTAL NO. OF PAGES INCLUDING COVER:<br><br>31 |

PLEASE CALL 949-369-1082 IMMEDIATELY IF YOU DO NOT RECEIVE ALL PAGES. THIS TRANSMITTAL CONTAINS CONFIDENTIAL INFORMATION INTENDED FOR THE ADDRESSEE ONLY. PLEASE NOTE THAT ANY USE OF THIS INFORMATION IF YOU ARE NOT THE INTENDED RECIPIENT IS PROHIBITED. IF YOU HAVE RECEIVED THIS TRANSMITTAL IN ERROR, PLEASE NOTIFY THIS OFFICE.

ANY INADVERTENT OR ERROR IN TRANSMITTING THIS DOCUMENT DOES NOT CONSTITUTE A WAIVER OF ATTORNEY-CLIENT PRIVILEGE.

NOTES/COMMENTS:

**SEE ATTACHED:**

**RFDP**

ADMINISTRATIVE RECORD FOR MATTER 2012050785          02/25/2014                    2 of 1332

1

**KATHLEEN M. LOYER #188741**

2  LAW OFFICES OF KATHLEEN M. LOYER, INC.
A PROFESSIONAL CORPORATION

3  940 Calle Amanecer, Suite L
San Clemente, CA 92673

4  Phone: 949-369-1082  Fax: 949-366-6836
E-mail: kmloyer@education-law.com

5
Attorney for the:  Petitioner

6            **BEFORE THE CALIFORNIA DEPARTMENT OF EDUCATION**
                **Superintendent of Public Instruction And the**
7  **OFFICE OF ADMINISTRATIVE HEARINGS –ATTN: SPECIAL EDUCATION DIV.**
        **(916) 263-0880    (916) 263-0890/376-6319 FAX**

8

9        ████ **Fulsang by and through his**            **Case # unassigned**
        **parents Eric and Aneida Fulsang for**        **REQUEST FOR DUE PROCESS HEARING**
10       **themselves and behalf of their**
        **minor sons**                                  **NOTICE OF REPRESENTATION**
11
                              **Petitioners**           **NOTICE OF INTENT**
12  **v.**

13  **Newport Mesa  Unified School**
    **District**
14                              **Respondent**

     **STUDENT INFORMATION:**
15   NAME, First and Last            ████ Fulsang
     ADDRESS                         6016 River Avenue
16                                   Newport Beach, CA 92663
     DATE OF BIRTH                   3/14/06
17   GRADE LEVEL                     K
     SCHOOL OF ATTENDANCE            East Bluff Elementary
     DISTRICT OF RESIDENCE           Newport Mesa USD
18   Interpreter Requested           No
     Will participate in MEDIATION   Yes
19   Non English Speaking            No
     Person of Color                 No
20   **PARENT INFORMATION**
     NAME, First and Last            Eric & Aneida Fulsang
21   ADDRESS                         Same as student

22   **PARTIES TO BE NAMED:**
     DISTRICT OF RESIDENCE           Newport Mesa USD
23   ADDITIONAL PARTIES              None at this time

24   **REQUESTING PARTY**
     PARENT REPRESENTATIVE NAME:     Kathleen M. Loyer, Attorney at Law
25   Contact Information             SEE ABOVE

26                              -1 of 30
                            Fulsang v. NMUSD
27                     Request for Due Process Hearing

28

                                                            **AR 0002**

                              211

ADMINISTRATIVE RECORD FOR MATTER 2012050785          02/25/2014                    3 of 1332

1

2
### NOTICE OF REPRESENTATION

    Please take notice that attorney KATHLEEN M. LOYER, whose office is located at

3
940 Calle Amanecer, Suite L, San Clemente, California 92673, will be representing the

4
above named minor for all matters related to his education. This address should be

5
included in the list of parties to be noticed for all educationally related matters.   See

6
attached consent to represent and signed release of information form.

7
### STANDING NOTICE OF INTENT TO AUDIO TAPE ALL IEP TEAM MEETINGS

    PLEASE BE ADVISED THAT PARENTS WILL BE AUDIO TAPING ALL IEP

8
MEETINGS.  THIS DOCUMENT SHOULD BE PLACED IN STUDENTS FILE TO SERVE

9
AS STANDING NOTICE OF SUCH.

10
### REQUEST FOR DUE PROCESS

11
**On behalf of my client I would like to request a due process hearing.**

12
    20 USC §1415 (emphasis added) states:

13
The procedures required by this section shall include the following:

14
An opportunity for any party to present a complaint--

15
(A) with respect to any matter relating to the identification, evaluation, or **educational placement of the child,** or the **provision of a free appropriate public education to such child;** and

16

17
(B) which sets forth an **alleged violation** that occurred not more than 2 years before the date the parent or public agency knew or should have known about the alleged action that forms the basis of the complaint, or, if the State has an explicit time limitation for presenting such a complaint under this subchapter, in such time as the State law allows...

18

19
    Petitioner was at all times relevant herein, a resident within the jurisdictional limits of

20
the named school District as indicated.  Minor Student is a "child with a disability" as

21
defined in 20 U.S.C. Section 1401(3)[A]), currently under the category of autism who, by

22
reason thereof, needs special education and related services.

23
    Special education due process hearing procedures extend to the parent of a special

24
education student, the student, and the public educational agency involved in decisions

25
regarding the student. California Education Code §56501(a). "Public education agency" is

26
defined as a district, special education local planning area (SELPA), a county office of

27

28

AR 0003

1  education, or any other public agency providing special education or related services.

2  California Education Code §56500.)   Respondent School District was at all times herein

3  mentioned a  public school district organized and existing under and by virtue of the laws

4  of the State of California, doing business within the State of California.  District is a "local

5  education agencies" within the meaning of 20 U.S.C. Section 1401(19)(A); and was  the

6  LEA responsible for providing educational services to the Petitioner and is therefore a

7  proper party in this matter.

8     There is a present and actual controversy among the parties to this action regarding

9  the Respondents' **failure to provide a free and appropriate public education** as

10 defined in 20 U.S.C 1401(9). Specific issues in dispute will be more fully defined infra.

11                              **INTRODUCTION**

12     "...[A] child's entitlement to special education should not depend upon the vigilance

13 of the parents (who may not be sufficiently sophisticated to comprehend the problem) nor

14 be abridged because the district's behavior did not rise to the level of slothfulness or bad

15 faith. Rather, it is the responsibility of the child's teachers, therapists, and administrators-

16 and of the multidisciplinary team that annually evaluates the student's progress-to

17 ascertain the child's educational needs, respond to deficiencies, and place him or her

18 accordingly." [1] Any failure on the part of a disabled student's parents or those responsible

19 to object to his placement does not deprive him of the right to an appropriate education

20 under the Individuals with Disabilities Education Act (IDEA) and [does] not bar claim for

21 compensatory education.[2]  The right to compensatory education accrues when the school

22 knows or should know that its IEP is not providing an appropriate education.[3]  IDEA's

23 central goal is that disabled students receive an appropriate education, not merely an

24 appropriate IEP. Therefore, a disabled student's right to compensatory education accrues

25 [1] *M.C. v. Central Reg'l Sch. Dist.*, 81 F.3d 389, 393 (3rd Cir.1996) at 397.
[2] Individuals with Disabilities Education Act, § 612(2)(B), 20 U.S.C.A. § 1412(2)(B). *Ridgewood Board of Ed. v. N.E.*, 172 F.3rd 238 at 250.
[3] *See M.C.*, 81 F.3d at 396.

26                        -3 of 30
                    Fulsang v. NMUSD
                Request for Due Process Hearing

AR 0004

213

1  when the school knows or should know that the student is receiving an inappropriate

2  education.[4]  An award of compensatory education does not require a finding of bad faith

3  or egregious circumstances.[5]  Courts have held that a school district that "knows or

4  should know that a child has an inappropriate IEP or is not receiving more than a de

5  minimis educational benefit must correct the situation. [6]

6      Here, the District has failed to provide appropriate placement and support services

7  and failed to ensure a safe, least restrictive educational environment.

8      The 2004 Reauthorization of the IDEA requires the provision of high-quality,

9  intensive pre-service preparation and professional development for all personnel who

10  work with children with disabilities in order to ensure that such personnel have the skills

11  and knowledge necessary to improve the academic achievement and functional

12  performance of children with disabilities, including the use of scientifically based

13  instructional practices, to the maximum extent possible.

14  Autism: "According to two studies conducted in the mid-1980s, 3.3 of every 10,000

15  children suffer from autism. (FN3. Centers for Disease Control and Prevention, Vaccine

16  Fact Sheets, (2000), available at http://www.cdc.gov/od/nvpo/fs_tableVII_doc2.htm.)

17  Autism is a developmental disorder of neurobiological origin that "generally has lifelong

18  effects on how children learn to be social beings, to take care of themselves, and to

19  participate in the community." National Research Council, Educating Children With

20  Autism 9 (Catherine Lord & James P. McGee, eds., National Academy Press 2001).

21  (FN4. Also available at http://www.nap.edu/books/0309072697/html.)

22      The disorder is present from birth, or very early in development, and affects the

23  child's ability to communicate ideas and feelings, to use imagination, and to establish

24  relationships with others. Id. No single behavior is characteristic of autism, and no single

---

[4] Id. at 395.
[5] Id, citing  M.C., 81 F.3d at 397
[6]  766 F.Supp. at 863". See also Taylor v. Honig, 910 F.3d 627, 629-33 (9th Cir. 1990) where residential placement was
upheld for an "intellectually able" student with behavioral problems. Id. at 633) and Union School District v. Smith, 15 F.3d
at 1526-27, where the 9th Circuit upheld the student's placement at an out-of district, private clinic which focused on
"increased cooperation and interaction with peers", rather than academics.
-4 of 30
Fulsang v. NMUSD
Request for Due Process Hearing

1 known cause is responsible for its onset. *Id.* Perhaps most distressingly, currently there is

2 no cure. Id.

3    Although autism manifests itself in different ways, its symptoms in children are often

4 measurable by eighteen months of age. Id. at 20. The main characteristics that

5 differentiate autism from other developmental disorders include "*behavioral deficits in eye*

6 *contact, orienting to one's name, joint attention behaviors (e.g., pointing, showing),*

7 *pretend play, imitation, nonverbal communication, and language development.*" Id.

8 According to the National Academy of Sciences, "[*w*]*ith adequate time and training, the*

9 *diagnosis of autism can be made reliably in two-year-olds by professionals experienced in*

10 *the diagnostic assessment of young children*" with autistic disorders. Id. at 3. **Early**

11 **diagnosis is crucial because education (of children as well as of parents and**

12 **teachers) is the primary form of treatment, and the earlier it starts, the better.** Id. at

13 9. Education covers a wide range "*of skills or knowledge-including not only academic*

14 *learning, but also socialization, adaptive skills, language and communication, and*

15 *reduction of behavior problems-to assist a child to develop independence and personal*

16 *responsibility.*" Id. (Emphasis added.)

17    Without early identification and diagnosis, children suffering from autism will not be

18 equipped with the skills necessary to benefit from educational services. *Id.* at 170. A

19 report by the National Research Council analyzed ten educational intervention models for

20 children with autistic disorders. All ten programs emphasized "the importance of starting

21 intervention when children are at the earliest possible ages." *Id.* at 120. **These studies**

22 **showed that intensive early intervention "makes a clinically significant difference**

23 **for many children."** *Id.* at 137. All of the models presented "positive and remarkably

24 similar findings, which included better-than-expected gains in IQ scores, language,

25 autistic symptoms, future school placements, and several measures of social behavior."

26 *Id.* Further, "at least two retrospective studies have found less restrictive placement

27 outcomes for children who began intervention at earlier rather than later ages." *Id.* at 120.

28 Thus, **the available research strongly suggests that intensive early intervention can**

-5 of 30
Fulsang v. NMUSD
Request for Due Process Hearing

AR 0006

Case: 15-56452, 07/05/2016, ID: 10039501, DktEntry: 21-4, Page 221 of 286
MAY. 17. 2012  9:50AM    LAW OFFICES OF K. M. LOYER                    NO. 3236   P. 7

ADMINISTRATIVE RECORD FOR MATTER 2012050785        02/25/2014                    7 of 1332

1  make a critical difference to children with autistic disorders. *Id.* at 132."[7] (Emphasis
2  added.)

3       The 2004 Reauthorization of the IDEA requires the educational agencies to provide
4  staff and services that will ensure improvement of the academic achievement and
5  functional performance of children with disabilities.  The term `individualized education
6  program' or `IEP' means a written statement for each child with a disability that is
7  developed, reviewed, and revised in accordance to the IDEA.  Here, as will be detailed
8  below, the District has failed to provide the level of intensive, early intervention services
   appropriate to meet ▇▇▇ unique needs.  The IEPs developed failed to adhere to a
9  standard of care established by published research.  The goals developed fail to follow
10 the hierarchy of language development.

11                          **STATEMENT OF FACTS**

12      Petitioner, ▇▇▇ is an otherwise identified, 6.2 year old, student who receives
13 special education services under the category of Autism.  Portuguese, English & Spanish
14 are spoken in the home.  Parent first expressed concern when ▇▇ was nine months old
15 as they noted head banging, repetitive behaviors, delayed speech and limited eye
16 contact.

17      When he was 2.3 years old, ▇▇ was made eligible for services by the Regional
   Center of Orange County (RCOC) in June 2008, under the category of Developmental
18 Delay.  He had been referred to RCOC due to concerns regarding delays in speech and
19 social behavior development.  An assessment was conducted by the Interagency
20 Assessment Center.  The report generated at the time indicated "▇▇ *presents with*
21 *limited speech, weakness in joint attention, play, imitation, social interactions, as well as*
22 *the presentation of atypical behaviors.*"  The team also indicated ▇▇ "*did not yet*
23 *consistently imitate or use words to communicate…exhibits significant receptive,*
24 *expressive and pragmatic (social–interactive) language delays relative to his*

25 _____
   [7] Amanda J. ex rel. Annette J. v. Clark County School Dist. 267 F.3d 877 at 882, C.A.9 (Nev.),2001
26                          -6 of 30
                        **Fulsang v. NMUSD**
27                 **Request for Due Process Hearing**

28

1  chronological age..." Additional areas of concern included inconsistent eye contact, lack

2  of speech, limited attention & compliance, delayed fine & gross motor, and delayed self

3  help skills. The RCOC provided 10 hours/week in home ABA services, S&L services, OT

4  and parent training.  A progress report generated by ACES in December 2008 indicated

5  ▆▆▆ "...presents with significant deficits across all domains. He presents with a 50%

6  delay or greater in the communication, social-emotional, and cognitive domains...." It

7  was recommended that he receive significantly increased number of direct service hours.

8  Parents funded assessment in May 2008 by Newport Audiology indicated S&L delay, normal bilateral inner ear function; possibility of mild hearing loss.

9  ▆▆▆ was assessed by the Newport Mesa USD in January 2009. Parents expressed

10  concerns regarding language deficits, eye contact, over-sensitivity to pain, tactile

11  sensitivity, repetitive play and "plopping'. The report generated at the time noted ▆▆▆

12  displayed self-stimulatory behaviors, did not respond to or initiate/maintain interaction with

13  peers, delayed fine motor skills, clinically significant scores in the area of social skills, at

14  risk scores in the areas of atypicality, withdrawal, daily living skills and functional

15  communication. The report notes he was beginning to use signs and some picture

16  symbols to communicate (sign: all done, more). ▆▆▆ scored in the moderate Autism

17  range on the CARS, with several sub scores in the severe range.  The report notes

18  "significant deficits" in social orientation and reciprocity as well as delays in expressive

19  and receptive language, and preservative and rigid behaviors. The report indicated ▆▆▆

20  did meet the eligibility criteria for autistic-like behaviors and S&L impaired.  An IEP team

   meeting was convened. Team recommended

21  SDC preschool (ABA Seahorse), 5 days/week/315min.,
   OT 2xwk45min (1xgroup & 1xindividual)
22  S&L 2xwk30min(group)

23  It appears the team neither considered nor recommended intensive 1:1 ABA

24  therapy, home/clinic based ABA, clinic based OT services, nor Autism Specialist,

   Behaviorist or Inclusion specialist consultation or services. .

25

26  -7 of 30
   Fulsang v. NMUSD
27  Request for Due Process Hearing

28

AR 0008

A health plan was included to address ▉ mouthing of non-food items. Meeting notes indicate, in part, OT observed "*some low tone behaviors...concern with sitting....age appropriate grasp...low arousal can affect his educational performance...*" Special Education teacher reported on pre-academic/readiness skills and noted relative strengths in object permanence, beginning preliterary skills, matching shapes and needs in matcher, motor imitation, safety awareness, response to name, cause & effect play and visual regard. Goals were developed in as follows:

| Goal Area | PLP | Goal |
|---|---|---|
| **Readiness** 1Motor Imitation | Can independently imitate Head Touch , Clapping with prompt, 4/5 | Will imitate 3 familiar non-verbal actions w/o prompts |
| 2. Matching | Can match bird picture in field of 4 | Will mat 6 2-dimentional common object pictures in field of 4 @ 80% |
| **Self Help** 3. Toileting | Does not demo awareness of soiled pants/diapers | Will participate in toileting routine in ed setting 4/5 opps |
| **Behavior** 4. Response to name | Responded to name 27-30% during assessment | Will respond when named is called by pausing his activity and looking to the speaker  4/5x |
| 5. Safety Awareness | Inappropriately climbs on furniture | Will orient toward the speakers ace when commanded to stop, no, or other relevant instruction w/o prompting |
| **Social Emotional** 6. Cause & Effect | Was observed to play appropriately with a cause & effect toy given verb & phys prompting, did not use toys as intended | Will increase his repertoire of independent play to include 6 different cause & effect toys |
| 7. Visual Regard | Fleeting eye contact | Will look at his communication partner when showing or requesting an object during structured activities lasting more than 5 min, 4/5 opps |
| **S&L** 8. Following Directions | Can follow simple, routine directions at home w/ verbal & visual prompts. Cannot follow simple directions outside fully supported, structured activities | Will follow 4/5 routine, single step verbal commands after no more than 2 presentations during educational activities' |
| 9. Receptive vocabulary | Reaches for desired objects & will touch preferred pictures in books,  Does not point or reach for obj or pictures when named | Will demonstrate understanding of 10 objects labels by pointing to pictures or handing objects after "Show me..... 80% |
| 10. Gestures | Reaches for things he wants, physically prompts  being picked up, pulls people to things, takes objects to adults, does not point or use gestures to signal interest, needs, wants | Will increase use of communicative gestures to include 2 movements/signals and use them at least 3x per educational session |
| 11. Expressive Vocabulary | Does not yet use any specific words or signs to name, request or call attention | Will use speech, signs or picture icons to label or request 8/10 objects or actions during structured activities |

| 12. Requesting | | Will use word, sign or gesture to request more of something, indicate all done |
| **Fine Motor** 13. Prewriting | Required multiple attempts & demos and some physical assist to imitate vertical/horizontal strokes | Will imitate vertical & horizontal strokes 4/5 opps |
| 14. Pincer Grasp | Used raking motion to grasp small pellets | Will use a refined pincer grasp when picking up 20 pinto bras, individual off a table 4/5 opps |
| **Sensory Processing** 15. Arousal | Demonstrated signs of increased arousal after playing on therapy ball during ABA session | Will increase number of signs of increased arousal when provided with gross motor activities 4/5 |

The IEP indicates ▮ would spend 38% (120 minutes) of his day within regular education (page 21). However, the document indicates participation is limited to lunch & recess. No accommodations or modifications are noted. No goals were developed to address tactile sensitivities. It seems the District failed to consider, offer, or provide a program with the level of intensity recommended for children diagnosed on the autism spectrum. Parents consented to the IEP

## START OF STATUTE OF LIMITATIONS:

An annual IEP team meeting was held on February 9, 2010. (It should be noted this is the IEP in effect as to the statute of limitations.) IEP document generated at the time indicates ▮ met 7 of his 15 goals:

| Goal | | Progress Report |
|---|---|---|
| **Readiness** | 1. Motor Imitation | Met |
| | 2. Matching | Progressing – 48% |
| **Self Help** | 3. Toileting | Progressing – 44% |
| **Behavior** | 4. Response to name | Progressing – 44% |
| | 5. Safety Awareness | Progressing – 65% |
| **Soc Emotional** | 6. Cause & Effect | Met |
| | 7. Visual Regard | Progressing – 43% |
| **S&L** | 8. Following Directions | Met |
| | 9. Receptive vocabulary | Progressing – 20% |
| | 10. Gestures | Met |
| | 11. Expressive Vocabulary | Met |
| | 12. Requesting | Progressing – 50% |
| **Fine Motor** | 13. Prewriting | Progressing – 30% |
| | 14. Pincer Grasp | Met |
| **Sensory Processing** | 15. Arousal | Met |

The Service plan offered was unchanged despite lack of substantial progress on goals. Plan included:

SDC (ABA Preschool Class 5days/wk315min/day

-9 of 30
Fulsang v. NMUSD
Request for Due Process Hearing

**AR 0010**

with mainstreaming 30min/day and Tues and Thursdays 3hrs 45mins.
S&L 2x30min/wk small group
OT  1x45min/wk large group,  OT  1x30min/wk individual

It appears the District did not subscribe to the available research, which strongly

suggests that intensive early intervention can make a critical difference to children with

autistic disorders.  The service plan offered was far from "intensive".   New goals were

developed as follows:

| Goal Area | PLP | Goal | Issues |
|---|---|---|---|
| **Readiness**<br><br>1.Sorting by size | Can sort by primary color, cannot sort by size. | Will  sort  20  items  or objects that are different sizes 80% | |
| 2.Puzzle | Can complete 6 piece board puzzle, connect two piece together w/ gesture & prompts | Will demonstrate understanding of completing 5, 3 piece interconnected puzzles, 80% | Fails to establish measurable baseline as to the stated goal and level of prompting |
| **Self Help**<br><br>3. Hand washing | Will walk over to the sink and wait for someone to point to the soap to get him started. Needs gestural prompting to complete entire routine | Will participate in a hand washing routine in his educational setting 4/5 | PLP fails to establish level of prompting, Goals states what he already does. Should be directed at reducing prompting and/or independence |
| 4. Toileting Routine | Beginning to understand bathroom routine.  Will walk into bathroom and stand by urinal. Needs physical prompting to pull pants up and down. At 44% accuracy. | Will participate in toileting routine  in  educational setting, | PLP fails to establish level of prompting, does not support stated progress of 44%.  Goals states what he already does, rather than reducing prompting and/or independence |
| **Behavior**<br><br>5. Calming Strategy | Will calm down when an adult takes him for a walk outside the classroom. Unable to calm self down when adult asks him to | Will use calming strategy and stop cyring when he is asked to calm down during a tantrum 80% | Fails to identify & deal with underlying behavior & antecedent to. Requires skill few adults possess |
| 6. Safety Awareness | Will look in the direction of the speaker 65% when asked to stop or when one says no with gesture prompts | Will stop and gaze l the direction of the speaker when name is called and is instructed to stop 80% | Goal address attn to speaker, not safety awareness |
| 7. Response to name | Responds to name 48%, has difficult time looking at his communication partner while engaged with toy/activity | Will  respond  when  his name is called by pausing activity and looking to the speaker    when    the speaker is within 3 steps 4/5 | Goal addresses two skills, but does not establish both baselines, i.e., responding to name, looking at speaker |

-10 of 30
Fulsang v. NMUSD
Request for Due Process Hearing

**AR 0011**

220

MAY. 17. 2012  9:51AM    LAW OFFICES OF K.M. LOYER              NO. 3236   P. 12

ADMINISTRATIVE RECORD FOR MATTER 2012050785       02/25/2014            12 of 1332

| | | | |
|---|---|---|---|
| **Social Emotional**<br>8. Visual Regard | When prompted to look by the adult pausing and physically turning his body, he will look his (sic) communication parting in the eye 50% | Will make eye contact w/communication partner when showing/requesting an object/picture during structured activities lasting 5 minutes 4/5 | PLP fails to establish level of prompting required |
| 9. Peer Interaction | Will look in the direction of a peer when they are making loud noises | Will hand a peer an object given one verbal instruction 80% of the time | Fails to state level of peer interaction in quantitative terms. |
| S&L<br>9. Receptive vocabulary | Demonstrates understanding of "slinky" from a field of 3 when asked to identify | Will demonstrate understanding of 5 familiar objects from field of 3, 80% | Previous goal required identification of 10 objects at 80%, i.e. 8 objects progress was reported at 20%, i.e. 2 objects. Which appears to indicate the PLP is inaccurate. It would be helpful if goal included language regarding presentation, repetition of stimulus so as to establish level of prompting required to get any response, as it is unclear as to whether this is a behavioral issue or a language issue. |
| 10. Expressive Pictures | Uses up to 10 picture symbols during snack and lunch activities to request food items. | Will increase his use of picture symbols to include 7 toys, 3 people and 3 action words. | Baseline is vague as to number of symbols, prompting, etc. |
| 11. Expressive Phrases | Hands single pictured objects to adult to request desired food items | Will combine two pictures on a sentence strip to request preferred items 6x during an activity. | |
| 12. Rate of Communication | Uses a rate of communication of 1 act every 2 minutes to request snack and lunch items. He is not maintaining this rate across activities. | Will increase his rate of communication across school day activities by maintaining a rate of initiating 1 act per 2 minutes | PLP does not establish baseline as to initiation and number of exchanges. |
| **Fine Motor**<br>13. Prewriting | Is able to imitate a vertical line with about 40% accuracy. Able to imitate a horizontal line with about 20% accuracy | Will be able to trace a vertical line, horizontal line and circle on the line w/verbal prompts 4/5 trials | As to PLP, it is unclear as to what "imitate" means in terms of drawing lines. |

-11 of 30
Fulsang v. NMUSD
Request for Due Process Hearing

**221**

AR 0012

| 14. Scissors | Is able to hold loop scissors on his own and with guidance to hold the paper and is able to snip one time | Will be able to use loop scissors to make 5 continuous cuts across paper independently | PLP fails to establish level of support "guidance" infers |
|---|---|---|---|
| **Sensory Processing** <br><br> 15. Motor Planning | Does not consistently imitate simple motor actions. Just beginning to imitate rolling play dough. Has difficult time imitating actions that relate to his own body | Will be able to imitate 5 novel one step motor actions given one demonstration and verbal prompting | |
| 16. Visual Attention | Does not always look when throwing at a target does not always throw his beanbag at the right time while swinging on a swing. Accuracy ranges from 30-50% | Will be able to throw a beanbag into a target while swinging on a swing independently with 80% accuracy | PLP does not establish visual attention baseline |

The IEP document indicates 38% mainstreaming (exposure to typical peers). However, school attendance is noted as 315min/day (1575 min per week) with 30min/day (150 min) and 3 hrs 45 min 1xwk (375 min) mainstreaming per week, which is approximately 23%. Assistive technology was not considered. Once again, it appears the team neither considered nor recommended intensive 1:1 ABA therapy, home/clinic based ABA, clinic based OT services, nor Autism Specialist, Behaviorist or Inclusion specialist consultation or services. Parent consented to the IEP. An IEP addendum was generated on April 15, 2010, whereby the "size" goal was deleted from the plan as having been met. Parent consented to this change.

In a letter dated May 5, 2010, parents requested the IEP team convene again to discuss OT and S&L goals and services. The IEP team met again on May 21, 2010. However, no new documents were generated except for a signature page. The team met again on June 21, 2010, whereby a 34 page document was generated. The only addition to the previous document, however, was an addendum page (#1) that indicated ▮▮▮▮ *"program and services will not be provided at Harper Preschool next year. The program and services will be provided at Mariner's Elementary effective 9/7/10 and continue*

*through the annual review."*  No rationale is provided for the change.  OT & S&L goals and services remained the same, despite parents stated concerns  Parent's consented.

The team convened again on November 23, 2010 to *"review progress during the previous reporting period, discuss concerns and review proposed changes and/or new goals".*  Notes indicate teacher advised ' ▮ *has made limited progress with most current goals..."* and *"...explained much of limited progress to many goals seems to be due to poor motivation in demonstrating independence across skill areas....* ▮ *requires much adult support and prompting to perform tasks across domains...An increased rate of maladaptive behaviors are frequently observed when demands are placed, even during routine and or preferred activities.  These include high shrill screaming, swiping and collapsing of body posture..* ▮ *is demonstrating difficulty in retaining skills across data collection period without high levels of instructional adult support".*  Parents noted continuing concerns that ▮ toileting success was dependent on adult initiated schedule; ▮ was demonstrating increased sensory seeking behaviors and increased destructive behaviors.  OT recommended deleting the pre-writing goal (tracing lines) and expressed concerns regarding attending (i.e., "it takes much effort and support for him to attend before participating in task").  OT recommended additional visual attention goal.  Sensory integration deficits again were not addressed

Notes also indicated *"Due to limited progress, additional concerns, and questions regarding levels of functioning, the IEP classroom team is recommending a full re-evaluation to be completed by site team prior to June 2011, parents were in agreement; an assessment plan should be sent home in early December."*  There was no rationale as to why the plan was not developed at the meeting, nor why the assessment was to be delayed given the current decline/lack of progress in ▮ educational, social and emotional function.  No changes were made to ▮ service plan.

The following changes were made to his goals:

ADMINISTRATIVE RECORD FOR MATTER 2012050785          02/25/2014                    15 of 1332

| Goal Area | PLP | Goal | Issues |
|---|---|---|---|
| **Readiness**<br>1. Sorting by size | **DELETED** | | Determined met. |
| **Behavior**<br><br>5. Calming Strategy | Will calm down when an adult takes him for a walk outside the classroom.  Unable to calm self down when adult asks him to **11/23 Screaming behaviors occur throughout the day (average 2-3x every 30 minutes. During of behavior (high shrill screaming, collapsing body and swiping) to be as short as 2-3min, as long as 10min.  Frequency increases during toileting, snack, circle time and transitions  Seems to be no predictable antecedent. Has been observed  having screaming behaviors during reinforcement.  He is unable to imitate calming strategies** | **Will imitate take deep breaths during structured seting 50% of the time across 3 days of data collection** | Fails to identify and deal with underlying behavior and antecedent to behavior.  Requires skill few adults possess.<br>Fails to properly analyze behavior |
| 9. Peer Interaction | Will look in the direction of a peer when they are making loud noises. **XCVZX** | Will hand a peer an object given one verbal instruction 80% of the time | Fails to state level of peer interaction in quantitative terms. |
| 10. Expressive Pictures | **DELETED** | | Notes indicated goals were deleted b/c of lack of foundational skills and progress |
| 11. Expressive Phrases | **DELETED** | | Same as above. |
| 13.  Prewriting | **DELETED** | | Notes indicated goal deleted b/c of attending issues. |
| **NEW GOAL**<br><br>17 Visual Attention to Projects | Currently is able to attend to his paper for painting and coloring activities for 3 to 5 seconds at a time | Will demo improved visual attention and appropriate use of materials to be able to independently participate in a painting and/or coloring art project for 6 secs  3/5 | |

ADMINISTRATIVE RECORD FOR MATTER 2012050785        02/25/2014                    16 of 1332

| NEW GOAL | Now using sign to communicate needs, but demos confusion & displays several communicative gestures to signal needs and preferences. Able to use several signs after adult model, but not combing communicative gestures independently and successfully. Targeted set: point, more want, no, all done, eating/food. | During familiar semi structured setting, following one presentation of expected communicative behaviors, will independently combine two communicative gestures from set of five targets, to request or indicate choices in 3/5 opps | Fails to list signs ▮ is able to use |
|---|---|---|---|
| 18, Functional Communication | | | |
| NEW GOAL | Is inconsistent in ability to find object to match w/photo | Will independently match real object w/photo of item using 3 foods and 3 toys, 4/5 | Fails to establish measure-able baseline |
| 19. Matching picture/objects | | | |

An assessment plan was developed by the District outside the IEP team, presented to parent and signed on December 31, 2010. ▮ was now 4.10 years old and in a Preschool SDC class at Mariners Elementary School. His teacher, Ms. Leah Steinman provided an "*extremely structured*" classroom with "*reinforcements given consistently.*"

The following information was provided in the subsequent assessment report, dated January 2011. The School Nurse, Denise Ellis, inaccurately reported that the 2008 Newport Audiology report was "sufficient to rule out hearing loss". She also described difficulty in obtaining hearing screening results due to ▮ rejection of headphones and "*inability to comprehend the rationale for the testing*".

Parent interview indicated their concerns as:

Speech/Verbal Communication, Potty Training, Joining in Activities (peer interaction) and self-care skills. They shared that "*communication difficulty makes ▮ frustrated*". The report indicates "▮ *currently receives parent funded services through ACES 4 times per week for 2 hours per day...*", thereby establishing the District's knowledge of the supplementary parent funded services.

ON the Hawaii Early Learning Profile was administered by Leah Steinman to assess ▮ cognitive abilities.

He achieved the following scores:

-16 of 30
Fulsang v. NMUSD
Request for Due Process Hearing

MAY. 17. 2012  9:52AM    LAW OFFICES OF K. M. LOYER                    NO. 3236   P. 17

ADMINISTRATIVE RECORD FOR MATTER 2012050785        02/25/2014                    17 of 1332

| Area | Age Equivalency in Months |
|------|---------------------------|
| Development of Symbolic Play 1 item | 9 – 15 |
| Spatial Relationships:  1 item each | 12 -18  and 30-36 |
| Concepts  - 1 item each | 14-15 and 19-27 |
| Problem solving means to end | 13-15 |
| Cause & effect 1 item each | 12-15 and 18-22 |
| Language Receptive One<br>   Word meaning<br>   Body Parts | <br>9-12<br>No solid skills |
| Social Emotional 1 item each | 15-16 and 19-24 |
| Expression of Emotion/Feelings 1 ea. | 15-16 and 19-24 |
| Learning Rules/Expectations 2 items | 12-15 |
| 1 of  three items | 12-15, 24-30, 30-36 |
| Social Interaction/Play<br>   2 items<br>   1 item | <br>6-10<br>12-15 and 24-30 |
| Independent feeding | 29.5-31.5 |
| Toileting  2 items<br>       1 item | 18-24<br>24-36 |
| Pre-writing | 24-30 |
| Block Construction | 18-22 |

The assessor concluded the following unique needs were identified, behavior (transition, compliance), Social Emotional (functional play), Readiness (body parts, imitation skills) and Self Help (utensil use, toileting).  It was also noted that ▮▮▮ "...*required maximum reinforcement to remain calm during circle time...broke out in spontaneous screaming while the book Brown Bear was being read... required maximum prompting from staff to transition during center rotations...required specific individual instruction to join into activities...*"

S&L language assessment by Kathy Murphy, indicated "***formal testing was not possible due to*** ▮▮▮ ***limited speech and verbal behaviors***". (Emphasis added.)  Ms. Murphy concluded ▮▮▮ "...*demonstrates significant delays in speech, social development and language skills... Results...suggest that his general communication profile is similar to a typically-developing young child between 12-15 months...uses functional communication including eye gaze with signs, gestures, vocalizations, and other indicating behaviors to direct others effectively in meeting his needs....rarely demonstrates communicative behaviors for purposes other than behavioral regulation of others and is particularly*

-16 of 30
Fulsang v. NMUSD
Request for Due Process Hearing

AR 0017

ADMINISTRATIVE RECORD FOR MATTER 2012050785  ·       02/25/2014                          18 of 1332

1  *successful in requesting choices and indicating preferred items...beginning to demonstrate*

2  *improved skills when matching photos with objects...with familiar, functional objects...verbal*

3  *behaviors continue to be restricted in range, but he is using other vocal dimensions (pitch,*

4  *rate, volume, nasality) to augment his communicative attempts about his emotional state.."*

5      District OTs, Jennie Ni and Student Brooke Beverage, conducted fine motor and

6  sensory processing assessment. Ms. Beverage indicated "........***due to*** ▉▉▉ ***behavior,***

7  ***standardized testing could not be completed....*** ▉▉▉ *appears to demonstrate*

8  *difficulties in the areas of vestibular and proprioceptive processing...* ▉▉▉ *demonstrated*

9  *very low arousal level...poor sensory registration and/or modulation..."* (Emphasis added.)

  She concluded ▉▉▉ was *"...currently functioning below age level in his visual motor*

10  *skills...continues to have difficulty maintaining an optimal arousal level for learning in the*

11  *classroom...It would be beneficial for* ▉▉▉ *to participate in activities that increase his*

12  *alertness level as part of his daily runtime..."* She also indicated deficits in motor planning,

13  body awareness, grading his force, auditory processing, social participation.   A sensory

14  diet was not provided.

15      The CARS2 was administered by the school psychologist, Eby Kent, who indicated

16  ▉▉▉ IQ was well below average and his verbal skills were significantly delayed and ▉▉▉

  scored in the "*severe symptoms of Autism*" severity group.

17      The reported concluded ▉▉▉ now met the criteria for eligibility under the categories

18  of Autism, S&L impairment, and Intellectual Disability (MR).   MR, mental retardation, was

19  added, despite the minimal assessment conducted to support this conclusion.  The report

20  did not address augmentative communication, nor did it address ▉▉▉ frustration level.

21      An IEP team meeting was convened on February 4, 2011. The Service plan offered

22  was  reduced despite lack of substantial progress on goals, it included:

23          SDC (ABA Seahorse) Preschool Class 5days/wk315min/day
              with mainstreaming Tues and Thursdays for 4 hrs 10min

24          S&L 2x15min/wk individual, 1x30min/wk small group
        OT  1x30min/wk small group; (individual services were dropped)

25          OT  1x30min/mon consult

26                      **-17 of 30**
                  **Fulsang v. NMUSD**

27                  **Request for Due Process Hearing**

28

ADMINISTRATIVE RECORD FOR MATTER 2012050785        02/25/2014                    19 of 1332

1      Yet again, the team neither considered nor recommended intensive 1:1 ABA

2  therapy, home/clinic based ABA, clinic based OT services, nor Autism Specialist,

3  Behaviorist or Inclusion specialist consultation or services. OT and S&L services were

4  reduced rather than intensified.  The District did not assess for, consider, nor provided any

5  assistive technology despite ████ lack of functional communication.   A behavioral

6  analysis was not considered or provided despite increase behavioral difficulties. He was not

7  considered for nor provided 1:1 services from an appropriately trained and supervised

8  independent facilitator.   Progress on goals were reported as follows:

| Goal | Progress Report |
|---|---|
| 2.Puzzle | Met |
| 3. Hand washing | Met |
| 4. Tolleting Routine | Progressing 50% |
| 5. Calming Strategy | Progressing 20% |
| 6. Safety Awareness | Met |
| 7. Response to name | Met |
| 8. Visual Regard | Met |
| 9. Peer Interaction | Progressing 60% |
| 9. Receptive vocabulary | Progressing 10% |
| 12. Rate of Communication | Progressing 66% |
| 14. Scissors | Met |
| 15. Motor Planning | Met |
| 16. Visual Attention | Progressing 90% |
| 17. Visual Attention/Projects | Progressing 50% |
| 18. Functional Communication | Progressing 50% |
| 19. Matching Pictures | Progressing 65% |

The following new goals were developed:

| Goal Area | PLP | Goal | Issues |
|---|---|---|---|
| Readiness<br><br>1.Body Parts | Able to imitate touching different body parts, but is not able to independently ID | Will receptively ID (by pointing/touching) 2 body parts (head/nose) on self after verbal instruction 4/5 | |
| 2. Motor Imitation | 1:1 imitates non-verbal actions 75% of time. Large Group imitates novel non-verbal actions 50%. Not currently imitating 2 step non-verb actions | Will imitate 4/6 2 step non verbal actions w/o prompts, 80% | PLP and Goal are poorly written in that measurable baseline is not established for 2 step actions 1:1, large group, level of prompting |
| Self Help<br><br>3. Bathroom 1 | Able to walk into bathroom and stand by urinal. Requires physical prompts to pull pants up/down all the way | Will pull pants all the way down after approaching urinal during 4/5 opps | Fails to establish level of prompting required |

-18 of 30
Fulsang v. NMUSD
Request for Due Process Hearing

AR 0019

228

MAY. 17. 2012  9:53AM    LAW OFFICES OF K. M. LOYER                    NO. 3236    P. 20

ADMINISTRATIVE RECORD FOR MATTER 2012050785          02/25/2014                    20 of 1332

| | | | |
|---|---|---|---|
| 4. Bathroom 2 | | Wait until after full urination to pull pants up | same |
| 5. Utensil Use | Uses hands to eat food, plays with food, smears on table and clothes. Requires maximum prompting to use fork | Will independently eat at least 50% of snack/lunch using utensil, when appropriate, 4/5 opps | Goal vague and immeasurable as stated. |
| **Behavior**<br><br>6. Compliance | With prompting takes average of 20 seconds to attempt to follow known instructions. Will look to staff and reach out for physical prompting | Will increase rate of compliance by following known instructions (standup, sit down) within 5 seconds w/o maladaptive behaviors, 4/5 opps | PLP talks about level of time to "attempt" compliance and not actual compliance level. PLP fails to detail maladaptive behaviors |
| 7. Transitioning | We have been working with stopping at word "freeze". Pauses 60% of the time, but will not orient to speaker w/o prompting. Requires adult prompt to stay with group and transition | Will transition locations w/o eloping from group. 80% | PLP does not establish level of elopement. Nor does provide analysis, nor replacement behavior for difficulty with transition. |
| **Social Emotional**<br><br>8. Functional Play | When presented w/ new item has been observed to hold up and stare at them rather than use functionally for intended purpose. "After items are more familiar and steps are performed, is able to imitate some 2 step play) | Will use functional play item within classroom theme for its intended purpose 4/5 opps. | PLP fails to identify true PLP ("after items are familiar and steps are performed..." |
| 9. Group | If a staff member is not close by has been observed to elope from groups of peers throughout day | Will remain in group with peers for 4 min at 80% | PLP does not establish level of elopement. Nor does provide analysis, nor replacement behavior for difficulty with transition. |
| **Speech & Lang**<br><br>10. Action-Location Pictures | Not demonstrating a working functional communication system to signal needs (bathroom, hunger, tired) "This goal is to target an emerging use of photo cards to introduce appropriate actions in context" | "When presented with 3 photos of familiar daily actions in different settings, will ID and match accurately picture of self in given functional space...when presented these options in vivo with ave of 50% accuracy.." | Goals is poorly written, immeasurable. PLP is vague and fails to target specific area. Appears to abandon signing as functional communication |

AR 0020

ADMINISTRATIVE RECORD FOR MATTER 2012050785          02/25/2014                    21 of 1332

| | | | |
|---|---|---|---|
| 11. Matching Pictures & objects | "This goal has initially been addressed on a limited basis. ▇ is able to match & choose photo pictures of preferred foods with consistency…and is becoming more tolerant when he makes an incorrect choice. He is less successful with toys but can find a preferred ball and car | Will independently match a set of 10 identified real objects familiar to classroom environment with a photo of that item from a field of 3 w/ 60% accuracy. | Again, fails to establish a measurable baseline. |
| 12. Protesting | " is able to consistently imitate an adult model shaking head, but not observed to signal this intent independently and typically swipes items he does not office the table (sic)." | During semi structured routine of meals, in classroom will respond independently with the protesting behavior shaking his head "no" to indicate that he does not want a non-preferred food/drink item after it is visually presented and he is asked "do you want xxxx" with an average of 50% | PLP does not establish measurable baseline, goal is poorly written. |
| 13. Receptive instructions | Following adult model and/or prompts is able to complete these simple commands as modeled. He is most successful win "give me XXX" when the hand is extended, but is not discriminating or completing directions w/o prompts | During semi-structured tasks, will discriminate amount two targeted verbal instructions and follow the given direction with ave of 50% accuracy (give me xxx, touch xxx) | PLP does not establish measurable baseline , # of prompts, goal is poorly written. |
| Fine Motor<br><br>14. Visual Attention | Is able to visually attend to his paper for 3-5 seconds during art projects | Will demonstrate improved visual attention and appropriate use of materials to be able to participate in a painting or coloring art project for 8 seconds independently 3/5 | |

The District appears to, in essence, recycle ▇ goals, while reducing services.

The classroom placement is described as an "ABA" class, yet a behavioral analysis had not

been done. ▇ was now found to be mentally retarded, without appropriate assessment

or services being conducted/provided.    Notes generated at the February 4, 2011, meeting

AR 0021

230

1  indicate parent expressed concerns regarding the reduction of direct OT service, fear of

2  ███ being mainstreamed without proper support. They further requested 3 hours/week

3  direct speech and language services and inquired as to how they could facilitate such. They

4  also expressed that they did not feel the level of services offered were appropriate to meet

5  ███ needs, not enough time allotted for OT services. Parents consented to the IEP

6  indicating they disagreed with level of S&L services and limitation of additional goals (goal

7  areas).

8         Parents were advised "*the team would forward this information to the Harbor Zone*

9  *coordinator to address the parents (sic) concerns regarding the level of Speech and*

10  *Language services offered. The zone coordinator will contact the parents in a timely*

11  *manner.*" A letter was generated by Zone Coordinate, Scott Huffman, on February 16,

12  2011. whereby the District indicated "it has offered an appropriate program" and advised

13  the parent of their intent to refuse parents' requests. (per 34 CFR 300.503)

14         Another IEP team meeting was convened on March 8, 2011, where the team

15  reported ███ was making progress on all goals. An addendum was generated whereby

16  S&L services were increased to 2x30min/direct through June 2011 (group, 1x30min/wk

17  remained the same). No other changes were noted.

18         The IEP team convened again on April 10, 2011 regarding ███ transition to

19  Kindergarten. The Addendum generated at the time indicated the team was recommending

20  the ABA SDC Kindergarten at Eastbluff Elementary School:

                SDC 4x390min and 1x300 per wk (ABA Kindergarten)
                S&L 2x15min/wk Individual
                      2x30min/wk small group
                OT 1x30min/wk small group within the SDC setting for fine motor
                      1x30min/mon consultation

21         Parents again expressed concerns regarding the need for more speech therapy

22  services, as well as the need to focus on independent life skills and functional

23  communication for ███ They consented to the IEP and indicated "*No*" to the question

24  "*Did the school district facilitate parent involvement as a means of improving services for*

25  *your child?*" It does not appear the District generated another notice of intent (503) letter

Case: 15-56452, 07/05/2016, ID: 10039501, DktEntry: 21-4, Page 237 of 286
MAY. 17. 2012  9:54AM    LAW OFFICES OF K.M. LOYER                    NO. 3236   P. 23

ADMINISTRATIVE RECORD FOR MATTER 2012050785       02/25/2014                23 of 1332

1  in response to parents repeated request for more services. Progress reports generated on
2  6/24/11 and 11/14/11 indicated progress level toward all goals appeared the goals would
3  be met. Parents continued to privately provide additional services.

4  The IEP team met without the parents on February 1, 2012. One sentence on the
5  notes page indicated the team discussed goals and that another meeting would be
6  scheduled. Part two of the meeting took place on February 29, 2012. Parents, Kadi Burns
7  classroom teacher, Alexandra Sweany, OT and Kathy Murphy, SLP were present. Cheryl
   Beck Principal and gen ed teacher, Juliet Hilde joined the meeting "*midway*".    Parents
8  advised team that they had provided ■ an iPad that he can independently navigate.
9  Parents currently contend that, to date, ■ use of the iPad is not encouraged,
10 supported by District staff.

11 Parent concerns/priorities were noted as they would like ■ to meet his goals in
12 the area of potty training w/o prompts, use of ipad to teach ■ to read/write. They
13 indicated ■ likes to use his iPad, The team listed ■ strengths & preferences as
14 understanding the behavior token system and "*seems to respond to it...when attending*
15 *can match pictures of items that are the same...will independently come into the classroom*
16 *and begin working on a puzzle..*" Notes indicate parents should try using *Underarmor "for*
   *helping with sensory needs* ■ *might have..*"  District did not otherwise address ■
17 sensory deficits.

18 He following progress on goals was reported:

| Goal Area | Progress |
|---|---|
| 1. Body Parts | Progressing 60% |
| 2. Motor Imitation | Met |
| 3. Bathroom 1 | Met |
| 4. Bathroom 2 | Met |
| 5. Utensil Use | Progressing 55% |
| 6. Compliance | Met |
| 7. Transitioning | Met |
| 8. Functional Play | Progressing 50% |
| 9. Group | Met |
| 10. Action- Location Pictures | Met |
| 11. Matching Pictures & objects | Met |
| 12. Protesting | Met |
| 13. Receptive instructions | Met |
| 14. Visual Attention | Met |

-22 of 30
Fulsang v. NMUSD
Request for Due Process Hearing

ADMINISTRATIVE RECORD FOR MATTER 2012050785          02/25/2014                          24 of 1332

The educational records provided indicate the following goals were developed for the February 1, 2012 meeting.

| Goal Area | PLP | Goal | Issues |
|---|---|---|---|
| **Readiness**<br><br>1. Body Parts | Re: Touching head & Nose, Will touch nose but when asked touch head will touch nose | Will match body parts, head nose stomach, (beg w/pics of his then pics of different) w/80% accuracy | Previous goal not met, now been changed limiting to 3 body parts. |
| **Self Help**<br><br>2. Bathroom | Does not independently request restroom | Using visual aide, will req to use restroom thru out school day, 50% | Fails to establish level of prompting required |
| **Behavior**<br><br>3. Attending | Attends to an activity less than a minute before disengaging | Will attend to activity being presented for 2 consecutive minutes | Fails to provide specific PLP, last year was 3-5 secs |
| | 4. Daily Routines | Able to match pictures to locations in the classroom, is not yet able to use visual schedule at school to fully navigate day | Will independently navigate through his day using a visual schedule | Does not establish level of ability, compliance in daily routines |
| | 5. Motor Imitation | During small group instruction will imitate two non verbal actions (nva). During circle time with an instruction to imitate three nva, will do first then stop | During large group instruction will imitate 3 consecutive movements w/ 80%. | PLP is small group based, goal is large group. |
| **Social Emotional**<br><br>6. Emotions | During small group is unable to identify emotions | When presented with a picture of emotional state, will match the emotional state with the corresp picture 80%` | Goal poorly written. Fails to establish how the emotional state will be represented (so as to allow "matching") |
| 7.   Morning  –  Afternoon Routine | When prompted, will unzip backpack in AM but will not follow thru with the rest of am unpacking routine. PM requires hand over hand support to pack up | Will independently complete the morning and afternoon routine of unpacking and packing backpack at 80% | Requires minimal progress and appears more a self help/motoring issue |
| 8. Waiting | When there is a preferred food near will grab the food & put it in mouth w/o waiting Food is usually a peer's | During snack/lunch when highly preferred food is present will wait with calm ready hands 80% | Fails to establish measurable baseline. Unclear as to nature "waiting" deficit – only food related? |
| **Speech & Lang**<br><br>9. Break Time | Not currently using any visual support to indicate break time and is typically directed with gestural support to designated location or desired object | During semi-structured learning times after being told by staff you can take a break will independently present a specific break card (PECS/AAC) to signal the beg of break | Appears redundant to the daily routine goal. |

| | | | |
|---|---|---|---|
| 10. Action in Locations | Is just beginning to demonstrate knowledge of common tasks at 60% to be completed in three given areas within class setting when presented the picture of him performing the expected task in the locations | During structured learning in which simple phrase is paired with five familiar daily actions, using PECS/AAC & high levels of reinforcement will move to noted location and perform action in picture, at 60% | Goals is poorly written, immeasurable. PLP is vague and fails to target specific area. Appears to abandon signing as functional communication |
| 11. Names and Faces | Does not presently demonstrate understanding of familiar staff names unless he is provided maximal prompting and support | During structured learning where 3 pic (PECS/AAC) are presented in filed & Hi levels of reinforcement are provide, will ID a minimum of three familiar adult staff and two family members w/60% ave when asked to "Touch" | PLP doesn't indicate whether ▮ can ID family member, unclear if he has the concept |
| 12. Out of Seat Directions | Is now able to put away his placemat after snack and throw paper in the trash when given pointing/gestural prompts and presented with visual 50% Not able to complete other common & familiar out of seat directions without maximal support | During structured learning w/high reinforcement and he is provided visual through PEC/AAC one of four familiar locations to place the object, will complete the given targeted direction with an average of 50% Put item in XXX) | Fails to establish specific level of prompting required |
| **Fine Motor** <br> 13. Scissor Skills | Able to snip with scissors and cut across a paper, does not cut within ¼ " of line. At 25% w/prompting and redirection | Will cut across 6" line (1/2" think) at ¼" at 60% | Fails to establish level of prompting required for 25% accuracy. |
| **Math** <br> 14. Receptively ID number | Has begun matching #'s 1-10 during small group instruction. He is not yet displaying ability to receptively ID #'s | During small group instruction will receptively ID number 1-5 w/60% accuracy. | |
| **Language Arts** <br> 15. Letter ID | When attending, can match letters of the alphabet independently | During small group instruction, will receptively ID A,B.C,D and # at 80% | |

The IEP indicates 21% of ▮ day would be within general ed.  No rationale was given as to why ▮ exposure to typical peers was reduced.  Parents consented to the IEP on February 29, 2012.

AR 0025

234

1    Parents are concerned for ▉ safety at school. This concern heightened when

2 he received a head injury at school after having walked in front of the swings on the

3 playground. The injury resulted in a seizure. Parents also report they have been called to

4 pick ▉ up from school due to his crying and wanting to leave. When they arrived he

5 was still crying and had scratches that no one could explain. It appears the staff had lost

6 track of him during recess.

7    In their letter of April 5, 2012, parents requested an individual one on one, full time

aide for ▉ Parents received a formal written notice from the District dated April 27,

8 2012 indicating its notice of refused action. (per 34 CFR §300.503)

9    Given ▉ unique needs and what appears to be an inability to provide

10 appropriate support and supervision under the current IEP to keep ▉ safe, along with

11 the District's refusal to provide appropriate support services and its ongoing failure to

12 provide FAPE and the resulting loss of educational opportunity, Petitioner's are now

13 requesting a due process hearing.

14                    ## ISSUE STATEMENTS WITH RELATED FACTS

15                    ### AND
                    ### PROPOSED RESOLUTIONS KNOWN AT THIS TIME

16    Petitioner reserves the right to amend issues upon discovery of unknown facts

17 through receipt of educational and/or public records received from Respondents and

18 other sources.

19    20 USC §1415 (b)(7)(A)(ii) states in pertinent parts that complaints under this
     section shall include (emphasis added):

20    **(III)** a description of the nature of the problem of the child relating to such
     proposed initiation or change, including facts relating to such problem; and

21

22    **(IV)** a proposed resolution of the problem **to the extent known and available to
     the party at the time.**

23    :

24

25

26                                    -25 of 30
                                    **Fulsang v. NMUSD**
27                                  **Request for Due Process Hearing**

28

**FOR THE ENTIRE SOL and all IEPs developed within the SOL, as detailed supra:**

**Issue #1**

As detailed supra, Petitioner contends that the District violated IDEA, Section 504 of the Rehabilitation Act of 1973, the civil rights act under 42 U.S.C. §1983 and denied FAPE under both IDEA and §504 and related special education state and federal laws, which resulted in a loss of educational opportunity, when it failed to provide appropriate assessments in all areas of identified/suspected need, to include but not be limited to cognitive ability, functional communication, need for assistive technology and social integration and behavioral analysis.

**Proposed Resolutions to the extent known and available at this time, reserving right to revise as appropriate:**

An order

1.  Whereby the District must fund a full battery of Independent Educational evaluations (IEEs)   to include, but not be limited to academic achievement, cognitive functioning, social emotional functioning, auditory processing (including Audiological evaluation), speech and language assessment, functional communication assessment, assistive technology assessment to include augmentative communication, etc.

2.  Whereby, once IEEs are completed, the District must convene a full IEP team meeting to include all private assessors where a comprehensive IEP with appropriate DIS services should be developed and compensatory services awarded as per recommendations of the private assessors.

**ISSUE #2**

As detailed supra, Petitioner contends that the District violated IDEA, Section 504 of the Rehabilitation Act of 1973, the civil rights act under 42 U.S.C. §1983 and denied

-26 of 30
Fulsang v. NMUSD
Request for Due Process Hearing

236

AR 0027

FAPE under both IDEA and §504 and related special education state and federal laws, causing a loss of educational opportunity when it :

   1. Failed develop a comprehensive, appropriate IEP, to address all of ▮▮▮▮ identified unique needs (including but not limited to communication, social emotional behavior, self help skills, sensory integration)

   2. Failed to meet the requirements of the IDEA in that the goals written were not comprehensive, were cursory, consistently failed to establish baselines to allow for meaningful measurement of progress thereby permitting a misleading showing of educational progress.

   3. Failed to provide appropriate placement and support services in the Least Restrictive Environment (LRE).

   4. Failed to provide appropriate behavioral support services/interventions (including but not limited to behavioral analysis, clinic based ABA services, ABA home program to assure success and consistency across environments, direct ABA services and 1:1 trained aide support throughout his school day to address social, emotional and academic needs)

   5. Failed to provide sufficient levels of S&L services

   6. Failed to provide parent training

   7. Failed to provide appropriate levels of Occupational Therapy to address sensory needs and fine motor,

   8. Failed to provide appropriate assistive technology assessment, services and equipment

   9. Failed to provide highly qualified staff to assess, develop and implement appropriate IEP to include, but not be limited to, accommodations across environments (including but not limited to behaviorist, inclusion

specialist, assistive technology consult, aide support, social skills facilitation, etc)

10. Failed to provide appropriate level of support services including the provision trained ABA/academic instructional aide, DIS services in the areas to include, but not be limited to functional communication, meaningful social skills interventions and behavioral support services as discussed supra.

11. An order whereby parents are fully reimbursed for out of pocket costs related to all educationally related services/expenses according to proof, for entire statute of limitations.

12. An order whereby the District must provide compensatory services in the form of  clinic based and home based ABA services to include regular staff meetings, supervision, parent training, individual and group social skills training frequency and duration TBD

13. An order of an award of compensatory services (TBD) in the areas of S&L therapy, OT, and direct ABA services by the private service provider of the parent' choice.

14. An order whereby District must fund a private Augmentative Communication assessment to include participation at the IEP team meeting and consultation as to appropriate equipment, training and goal development to assure instruction sufficient to follow hierarchy of language development.

15. A finding that the Petitioners prevailed on all issues presented

16. Any other award as deemed appropriate by the ALJ

**Issue #3**

As detailed supra, Petitioner contends that the District violated IDEA, Section 504 of the Rehabilitation Act of 1973, the civil rights act under 42 U.S.C. §1983 and denied FAPE under both IDEA and §504 and related special education state and federal

-28 of 30
Fulsang v. NMUSD
Request for Due Process Hearing

AR 0029

Case: 15-56452, 07/05/2016, ID: 10039501, DktEntry: 21-4, Page 244 of 286
MAY. 17. 2012  9:55AM    LAW OFFICES OF K.M. LOYER                    NO. 3236    P. 30

ADMINISTRATIVE RECORD FOR MATTER 2012050785          02/25/2014                    30 of 1332

1   laws, causing a loss of educational opportunity when it failed to provide highly

2   qualified staff to assess, provide services and implement appropriate

3   accommodations across environments (including but not limited to behaviorist,

4   inclusion specialist, assistive technology, individual aide support, etc)

5

6   **Proposed Resolution Known at this Time:**

7   A finding that the District violated procedural safeguards of the IDEA when it failed

    to provide highly trained staff to assess for and provide appropriate service to

8   address all of ■ known/suspected deficits necessary to improve his academic

9   achievement and functional performance, as described supra.  An order for private

10  assessments, compensatory services and reimbursement as described supra

11                                 **SUMMARY**

12              **ISSUE STATEMENTS & PROPOSED RESOLUTIONS**

13  It is Petitioner's contention that the Respondents violated IDEA, Section 504 of the

14  Rehabilitation Act of 1973, the civil rights act under 42 U.S.C. §1983 and denied FAPE by

15  their various failures to assess and/or address all of Petitioner's unique needs.  He further

16  contends that these failures/violations resulted in a loss of educational opportunity.  The

17  District has violated proscribed procedures and has failed to develop an IEP that provides

18  Petitioner with an appropriate education.

19  Petitioner is cognoscente of the fact that California has not created a combined system

20  for hearing IDEA and § 504 matters.   However, Petitioners have not been properly notified

21  as to their rights under §504 and is not aware of any fair hearing or due process procedures

22  as established by the District to address violations and assure their rights are properly

23  vindicated.   To that end Petitioners are hereby providing the District notice of their demands

24  and intent to file a lawsuit for this and issues related to ■ injuries at school. Notice is

25

26                              -29 of 30
                             Fulsang v. NMUSD
27                      Request for Due Process Hearing

28

1  provided here to provide for exhaustion of administrative remedies and to promote
2  comprehensive alternative dispute resolution.

3      While Petitioners acknowledge the OAH's customary practice to dismiss such claims
4  due to jurisdictional issues, Petitioners' hereby declare that it is their intent to do all that is
5  necessary to exhaust all such claims, including presenting evidence regarding the impact of
6  §504 and §1983 violations on themselves.    As can be easily demonstrated, there is
7  significant overlap between the IDEA and §504 claims in this case, such violations give rise
8  to §1983 claims. Petitioner will do all things possible to create an ample record with respect
9  to such claims.

10     Proposed Resolutions include IEEs as described supra; a request for compensatory
11  services TBD; development of a comprehensive IEP to include all appropriate DIS
12  services (including but not limited to 1:1 trained aide support) and reimbursement for
13  educationally related services.

14     Petitioner reserves the right to amend his request and add any issues that arise
15  during the course of their good faith attempt to resolve the above stated issues, and any
16  issues that are unknown at this time and add any and all such further relief as may be
    deemed appropriate by the ALJ.
17

18  Respectfully Submitted by:
19

20
21  Kathleen M. Loyer, Attorney for Petitioners          DATE:____5 16 12_____
22

23

24

25

26                          -30 of 30
                        Fulsang v. NMUSD
27                  Request for Due Process Hearing

28

MAY. 8. 2013 5:45PM    LAW OFFICES OF K.M. LOYER                    NO. 3515  P. 1

ADMINISTRATIVE RECORD FOR MATTER 2012050785     02/25/2014                198 of 1332

# LAW OFFICES OF KATHLEEN M. LOYER
### 940 Calle Amanecer, Suite L • San Clemente, CA 92673
Phone: 949-369-1082
Fax949-366-6836
E-mail: kmloyer@education-law.com

# FACSIMILE COVER SHEET

## CONFIDENTIAL

TO:
OAH
(916)376-6319

Harbottle Law Group
Attn: Dan Harbottle, Esq.
(714)371-4485

FROM:
I am employed in the County of Orange, State of California; I am over the age of 18. On May 8, 2013, I served the foregoing document described as Stipulated Motion to Amend filed concurrently with 1st Amended Request for Due Process Hearing , to the interested parties in this action by FACSIMILE TRANSMISSION. The facsimile machine I used complied with Rule 2003.3, and the machine reported no error. Pursuant to Rule 2008(e)(3), I caused the machine to print a record of the transmission, Executed on May 8, 2013 at Orange County, California. See mailing/facsimile list to the left.

By: _____          D. Banuelos

FAX NUMBER:
See Above

DATE:
May 8, 2013

RE:
E. FULSANG V. NEWPORT-MESA
UNIFIED SCHOOL DISTRICT
OAH CASE NO. 2012050785

TOTAL NO. OF PAGES INCLUDING COVER:
41

PLEASE CALL 949-369-1082 IMMEDIATELY IF YOU DO NOT RECEIVE ALL PAGES. THIS TRANSMITTAL CONTAINS CONFIDENTIAL INFORMATION INTENDED FOR THE ADDRESSEE ONLY. PLEASE NOTE THAT ANY USE OF THIS INFORMATION IF YOU ARE NOT THE INTENDED RECIPIENT IS PROHIBITED. IF YOU HAVE RECEIVED THIS TRANSMITTAL IN ERROR, PLEASE NOTIFY THIS OFFICE.

NOTES/COMMENTS:

**PLEASE SEE ATTACHED:**

Stipulated Motion to Amend filed concurrently with 1st Amended Request for Due Process Hearing

AR 0198

ADMINISTRATIVE RECORD FOR MATTER 2012050785         02/25/2014                    199 of 1332

1

2   KATHLEEN M. LOYER #188741
    LAW OFFICES OF KATHLEEN M. LOYER, INC.
3   A PROFESSIONAL CORPORATION
    940 Calle Amanecer, Suite L San Clemente, CA 92673
    Phone: 949-369-1082    Fax: 949-366-6836
4
                   STIPULATED MOTION TO AMEND RFDP
5
        Please be advised that Petitioners made an oral motion to amend their RFDP at the
6
    Pre Hearing Conference held on May 6, 2023. Respondent consented to the amendment
7
    and confirmed that there would be no opposition a change in the hearing dates. The
8
    parties agreed good cause did exist, as the Amendment would serve both judicial and
9
    fiscal economy in that it would include issues related to assessments and IEPs developed
10  subsequent to the original filing. If resolution is not otherwise achieved, failure to amend
11  would result in a need for two hearings where the same controversies, witnesses and
12  exhibits would be involved.     The most recent IEP was developed on May 2, 2013.
    Mediation was also scheduled and held on May 2, 2013. Part two of that mediation is
13
    currently scheduled for May 10, 2013, at 1:00PM.
14
        The Parties hereby submit their stipulated motion to amend with Petitioners' First
15
    Amended Request for Due Process and do so as a stipulated motion to amend. The
16  RFDP was first filed on May 9, 2012, which continues to secure May 9, 2010 as the start of
17  the applicable statute of limitations. It is further requested that the OAH set the
18  following mutually agreeable new dates for the due process hearing: July 23,24, 25,
19  and 26 (if required) 2013, the PHC on July 10, 2013 and PHS due July 3, 2013.
20  It is so stipulated:

21  Date: May 8, 2013
    By _____ and      _____
22  Kathleen M. Loyer                      Dan Harbottle
    Attorney for Petitioners               Attorney for Newport Mesa Unified School District
23
    Attorney Affidavit: I declare under the penalty of perjury that the foregoing is a true and
24  correct representation of the facts, as I know and understand them,

25  By _____            Kathleen M. Loyer, Attorney at Law
26                          1 of 30
                      Fulsang v. NMUSD
                   Stipulated Motion to Amend
27            1ˢᵗ Amended Request for Due Process Hearing

28

ADMINISTRATIVE RECORD FOR MATTER 2012050785          02/25/2014                      200 of 1332

1

2    **KATHLEEN M. LOYER #188741**
     **LAW OFFICES OF KATHLEEN M. LOYER, INC.**
3          A PROFESSIONAL CORPORATION
           940 Calle Amanecer, Suite L
           San Clemente, CA 92673
4    Phone: 949-369-1082 Fax: 949-366-6836
          E-mail: kmloyer@education-law.com
5    Attorney for the: Petitioner

6                    **BEFORE THE CALIFORNIA DEPARTMENT OF EDUCATION**
                          **Superintendent of Public Instruction And the**
7    **OFFICE OF ADMINISTRATIVE HEARINGS -ATTN: SPECIAL EDUCATION DIV.**
                   **(916) 263-0880    (916) 263-0890/376-6319 FAX**

8
                                                       Case # 2012050785 filed May 9, 2012
9      ▆▆▆ **Fulsang by and through his**            **1st AMENDED REQUEST FOR DUE**
       **parents Eric and Aneida Fulsang for**        **PROCESS HEARING**
10     **themselves and behalf of their minor**
       **sons**                                        Request for:
11                              **Petitioners**
                                                        Hearing dates: July 23,24, 25 and 26, 2013
       v.
12     **Newport Mesa Unified School**                 PHC: July 10, 2013,
       **District**
13                              **Respondent**          PHS due July 3, 2013.

14   | STUDENT INFORMATION: | |
     | NAME, First and Last | ▆▆▆ Fulsang |
15   | ADDRESS | 5016 River Avenue |
     |  | Newport Beach, CA 92663 |
16   | DATE OF BIRTH | 3/14/08 |
     | GRADE LEVEL | 1st |
17   | SCHOOL OF ATTENDANCE | East Bluff Elementary |
     | DISTRICT OF RESIDENCE | Newport Mesa USD |
18   | Interpreter | YES - BRAZILIAN |
     | Requested | PORTUGUESE |
19   | Will participate in MEDIATION | Yes |
     | Non English Speaking | No |
20   | Person of Color | No |
     | PARENT INFORMATION | |
21   | NAME, First and Last | Eric & Aneida Fulsang |
     | ADDRESS | Same as student |
22
     | PARTIES TO BE NAMED: | |
23   | DISTRICT OF RESIDENCE | Newport Mesa USD |
     | ADDITIONAL PARTIES | None at this time |
24
     | REQUESTING PARTY | |
25   | PARENT REPRESENTATIVE NAME: | Kathleen M. Loyer, Attorney at Law |
     | Contact Information | SEE ABOVE |

26                                    2 of 40
                                Fulsang v. NMUSD
27                            Stipulated Motion to Amend
                      1st Amended Request for Due Process Hearing

28

## NOTICE OF REPRESENTATION

Please take notice that attorney KATHLEEN M. LOYER, whose office is located at 940 Calle Amanecer, Suite L, San Clemente, California 92673, will be representing the above named minor for all matters related to his education. This address should be included in the list of parties to be noticed for all educationally related matters. See attached consent to represent and signed release of information form.

## STANDING NOTICE OF INTENT TO AUDIO TAPE ALL IEP TEAM MEETINGS

PLEASE BE ADVISED THAT PARENTS WILL BE AUDIO TAPING ALL IEP MEETINGS. THIS DOCUMENT SHOULD BE PLACED IN STUDENTS FILE TO SERVE AS STANDING NOTICE OF SUCH.

## REQUEST FOR DUE PROCESS

**On behalf of my client I would like to request a due process hearing.**

20 USC §1415 (emphasis added) states:

The procedures required by this section shall include the following:

An opportunity for any party to present a complaint--

(A) with respect to any matter relating to the identification, evaluation, or **educational placement of the child, or** the **provision of a free appropriate public education to such child; and**

(B) which sets forth an **alleged violation** that occurred not more than 2 years before the date the parent or public agency knew or should have known about the alleged action that forms the basis of the complaint, or, if the State has an explicit time limitation for presenting such a complaint under this subchapter, in such time as the State law allows...

Petitioner was at all times relevant herein, a resident within the jurisdictional limits of the named school District as indicated. Minor Student is a "child with a disability" as defined in 20 U.S.C. Section 1401(3)[A]), currently under the category of autism who, by reason thereof, needs special education and related services.

Special education due process hearing procedures extend to the parent of a special education student, the student, and the public educational agency involved in decisions regarding the student. California Education Code §56501(a). "Public education agency" is

1

2    defined as a district, special education local planning area (SELPA), a county office of

3    education, or any other public agency providing special education or related services.

4    California Education Code §56500.)   Respondent School District was at all times herein

5    mentioned a  public school district organized and existing under and by virtue of the laws

6    of the State of California, doing business within the State of California.  District is a "local

7    education agency" within the meaning of 20 U.S.C. Section 1401(19)(A); and was  the

8    LEA responsible for providing educational services to the Petitioner and is therefore a

9    proper party in this matter.

10        There is a present and actual controversy among the parties to this action regarding

11   the Respondents' **failure to provide a free and appropriate public education** as

12   defined in 20 U.S.C 1401(9). Specific issues in dispute will be more fully defined infra.

### INTRODUCTION

13        *"...[A] child's entitlement to special education should not depend upon the vigilance*

14   *of the parents (who may not be sufficiently sophisticated to comprehend the problem) nor*

15   *be abridged because the district's behavior did not rise to the level of slothfulness or bad*

16   *faith. Rather, it is the responsibility of the child's teachers, therapists, and administrators-*

17   *and of the multidisciplinary team that annually evaluates the student's progress-to*

18   *ascertain the child's educational needs, respond to deficiencies, and place him or her*

19   *accordingly."* [1] Any failure on the part of a disabled student's parents or those responsible

20   to object to his placement does not deprive him of the right to an appropriate education

21   under the Individuals with Disabilities Education Act (IDEA) and [does] not bar claim for

22   compensatory education.[2]  The right to compensatory education accrues when the school

23   knows or should know that its IEP is not providing an appropriate education.[3]   IDEA's

24   central goal is that disabled students receive an appropriate education, not merely an

25   ------------------------------

[1] *M.C. v. Central Reg'l Sch. Dist.,* 81 F.3d 389, 393 (3rd Cir.1996) at 397.

26   [2] Individuals with Disabilities Education Act, § 612(2)(B), 20 U.S.C.A. § 1412(2)(B). *Ridgewood Board of Ed. v. N.E.,* 172 F.3rd 238 at 250.

27                        4 of 40
                    Fulsang v. NMUSD
                 Stipulated Motion to Amend
        1st Amended Request for Due Process Hearing

28

MAY. 8. 2013 5:46PM    LAW OFFICES OF K.M. LOYER                    NO. 3515   P. 6

ADMINISTRATIVE RECORD FOR MATTER 2012050785        02/25/2014                    203 of 1332

1

2   appropriate IEP. Therefore, a disabled student's right to compensatory education accrues

3   when the school knows or should know that the student is receiving an inappropriate

4   education.[4] An award of compensatory education does not require a finding of bad faith

5   or egregious circumstances.[5] Courts have held that a school district that "knows or

6   should know that a child has an inappropriate IEP or is not receiving more than a de

    minimis educational benefit must correct the situation. [6]

7       Here, the District has failed to provide appropriate placement and support services

8   and failed to ensure a safe, least restrictive educational environment.

9       The 2004 Reauthorization of the IDEA requires the provision of high-quality,

10  intensive pre-service preparation and professional development for all personnel who

11  work with children with disabilities in order to ensure that such personnel have the skills

12  and knowledge necessary to improve the academic achievement and functional

13  performance of children with disabilities, including the use of scientifically based

    instructional practices, to the maximum extent possible.

14  Autism: "According to two studies conducted in the mid-1980s, 3.3 of every 10,000

15  children suffer from autism. (FN3. Centers for Disease Control and Prevention, Vaccine

16  Fact Sheets, (2000), available at http://www.cdc.gov/od/nvpo/fs_tableVII_doc2.htm.)

17  Autism is a developmental disorder of neurobiological origin that "generally has lifelong

18  effects on how children learn to be social beings, to take care of themselves, and to

19  participate in the community." National Research Council, Educating Children With

20  Autism 9 (Catherine Lord & James P. McGee, eds., National Academy Press 2001).

    (FN4. Also available at http://www.nap.edu/books/0309072697/html.)

21

22

23  [3] See M.C., 81 F.3d at 396.
    [4] Id. at 396.
24  [5] Id, citing M.C., 81 F.3d at 397
    [6] 766 F.Supp. at 863". See also Taylor v. Honig, 910 F.3d 627, 629-33 (9th Cir. 1990) where residential placement was
25  upheld for an "intellectually able" student with behavioral problems. Id. at 633) and Union School District v. Smith, 15 F.3d
    at 1526-27, where the 9th Circuit upheld the student's placement at an out-of district, private clinic which focused on
26  "increased cooperation and interaction with peers", rather than academics.
                            5 of 40
                      Fulsang v. NMUSD
27                  Stipulated Motion to Amend
            1st Amended Request for Due Process Hearing

28

AR 0203

246

The disorder is present from birth, or very early in development, and affects the child's ability to communicate ideas and feelings, to use imagination, and to establish relationships with others. *Id.* No single behavior is characteristic of autism, and no single known cause is responsible for its onset. *Id.* Perhaps most distressingly, currently there is no cure. Id.

Although autism manifests itself in different ways, its symptoms in children are often measurable by eighteen months of age. *Id. at 20.* The main characteristics that differentiate autism from other developmental disorders include "*behavioral deficits in eye contact, orienting to one's name, joint attention behaviors (e.g., pointing, showing), pretend play, imitation, nonverbal communication, and language development.*" Id. According to the National Academy of Sciences, "[w]ith adequate time and training, the diagnosis of autism can be made reliably in two-year-olds by professionals experienced in the diagnostic assessment of young children" with autistic disorders. *Id. at 3.* Early diagnosis is crucial because education (of children as well as of parents and teachers) is the primary form of treatment, and the earlier it starts, the better. *Id. at 9.* Education covers a wide range "*of skills or knowledge-including not only academic learning, but also socialization, adaptive skills, language and communication, and reduction of behavior problems-to assist a child to develop independence and personal responsibility.*" Id.

Without early identification and diagnosis, children suffering from autism will not be equipped with the skills necessary to benefit from educational services. *Id. at 170.* A report by the National Research Council analyzed ten educational intervention models for children with autistic disorders. All ten programs emphasized "the importance of starting intervention when children are at the earliest possible ages." *Id. at 120.* These studies showed that intensive early intervention "makes a clinically significant difference for many children." *Id. at 137.* All of the models presented "positive and remarkably similar findings, which included better-than-expected gains in IQ scores, language, autistic symptoms, future school placements, and several measures of social behavior." *Id.* Further, "at least

ADMINISTRATIVE RECORD FOR MATTER 2012050785          02/25/2014                    205 of 1332

1   two retrospective studies have found less restrictive placement outcomes for children who
2   began intervention at earlier rather than later ages." *Id.* at 120. Thus, the available
3   research strongly suggests that intensive early intervention can make a critical difference
4   to children with autistic disorders. *Id.* at 132."[7]

5       The 2004 Reauthorization of the IDEA requires the educational agencies to provide
6   staff and services that will ensure improvement of the academic achievement and
7   functional performance of children with disabilities. The term 'individualized education
8   program' or 'IEP' means a written statement for each child with a disability that is
9   developed, reviewed, and revised in accordance to the IDEA. Here, as will be detailed
10  below, the District has failed to provide the level of intensive, early intervention services
11  appropriate to meet ▇▇▇ unique needs. The IEPs developed failed to adhere to a
12  standard of care established by published research. The goals developed fail to follow
    the hierarchy of language development.

13                                    **STATEMENT OF FACTS**

14      Petitioner, ▇▇▇ is an otherwise identified, 7.2 year old, student who receives
15  special education services under the category of Autism. Portuguese, English & Spanish
16  are spoken in the home. Parent first expressed concern when ▇▇▇ was nine months old
17  as they noted head banging, repetitive behaviors, delayed speech and limited eye
18  contact.

19      When he was 2.3 years old, ▇▇▇ was made eligible for services by the Regional
20  Center of Orange County (RCOC) in June 2008, under the category of Developmental
21  Delay. He had been referred to RCOC due to concerns regarding delays in speech and
22  social behavior development. An assessment was conducted by the Interagency
23  Assessment Center. The report generated at the time indicated ▇▇▇ *presents with*
    *limited speech, weakness in joint attention, play, imitation, social interactions, as well as*

24

25  ─────────────────────
    [7] Amanda J. ex rel. Annette J. v. Clark County School Dist. 287 F.3d 877 at 882, C.A.9 (Nev.),2001
26
27                                    7 of 40
                                   Fulsang v. NMUSD
                              Stipulated Motion to Amend
                        1st Amended Request for Due Process Hearing
28

AR 0205

the presentation of atypical behaviors." The team also indicated ▉ "did not yet consistently imitate or use words to communicate...exhibits significant receptive, expressive and pragmatic (social–interactive) language delays relative to his chronological age..." Additional areas of concern included inconsistent eye contact, lack of speech, limited attention & compliance, delayed fine & gross motor, and delayed self help skills. The RCOC provided 10 hours/week in home ABA services, S&L services, OT and parent training. A progress report generated by ACES in December 2008 indicated ▉ "...presents with significant deficits across all domains. He presents with a 50% delay or greater in the communication, social-emotional, and cognitive domains...." It was recommended that he receive significantly increased number of direct service hours. Parents funded assessment in May 2008 by Newport Audiology indicated S&L delay, normal bilateral inner ear function; possibility of mild hearing loss.

▉ was assessed by the Newport Mesa USD in January 2009. Parents expressed concerns regarding language deficits, eye contact, over-sensitivity to pain, tactile sensitivity, repetitive play and "plopping". The report generated at the time noted ▉ displayed self-stimulatory behaviors, did not respond to or initiate/maintain interaction with peers, delayed fine motor skills, clinically significant scores in the area of social skills, at risk scores in the areas of atypicality, withdrawal, daily living skills and functional communication. The report notes he was beginning to use signs and some picture symbols to communicate (sign: all done, more). ▉ scored in the moderate Autism range on the CARS, with several sub scores in the severe range. The report notes "significant deficits" in social orientation and reciprocity as well as delays in expressive and receptive language, and preservative and rigid behaviors. The report indicated ▉ did meet the eligibility criteria for autistic-like behaviors and S&L impaired. An IEP team meeting was convened. Team recommended

     SDC preschool (ABA Seahorse), 5 days/week/315min.,
     OT 2xwk45min (1xgroup & 1xindividual)
     S&L 2xwk30min(group)

It appears the team neither considered nor recommended intensive 1:1 ABA therapy, home/clinic based ABA, clinic based OT services, nor Autism Specialist, Behaviorist or Inclusion specialist consultation or services. .

A health plan was included to address ▮ mouthing of non-food items. Meeting notes indicate, in part, OT observed "*some low tone behaviors...concern with sitting....age appropriate grasp...low arousal can affect his educational performance...*" Special Education teacher reported on pre-academic/readiness skills and noted relative strengths in object permanence, beginning preliterary skills, matching shapes and needs in matcher, motor imitation, safety awareness, response to name, cause & effect play and visual regard. Goals were developed as follows:

| Goal Area | PLP | Goal |
|---|---|---|
| Readiness #1 Motor Imitation Met 2/10 | Can independently imitate Head Touch , Clapping with prompt, 4/5 | Will imitate 3 familiar non-verbal actions w/o prompts |
| #2 Matching Prog 48% 2/10 | Can match bird picture in field of 4 | Will match 6 2-dimentional common object pictures in field of 4 @ 80% |
| Self Help #3 Toileting Prog 44% 2/10 | Does not demo awareness of soiled pants/diapers | Will participate in toileting routine in ed setting 4/5 opps |
| Behavior #4 Response to name Prog 44% 2/10 | Responded to name 27-30% during assessment | Will respond when named is called by pausing his activity and looking to the speaker  4/5x |
| #5 Safety Awareness Prog 65% 2/10 | Inappropriately climbs on furniture | Will orient toward the speakers face when commanded to stop, no, or other relevant instruction w/o prompting |
| Soc/Emotional #6 Cause & Effect Met 2/10 | Was observed to play appropriately with a cause & effect toy given verb & phys prompting, did not use toys as intended | Will increase his repertoire of independent play to include 6 different cause & effect toys |
| #7 Visual Regard Prog 44% 2/10 | Fleeting eye contact | Will look at his communication partner when showing or requesting an object during structured activities lasting more than 5 min, 4/5 opps |
| S&L #8 Following Directions Met | Can follow simple, routine directions at home w/ verbal & visual prompts. Cannot follow simple directions outside fully supported, structured activities | Will follow 4/5 routine, single step verbal commands after no more than 2 presentations during educational activities' |
| #9 Receptive vocabulary Prog 20% 2/10 | Reaches for desired objects & will touch preferred pictures in books, Does not point or reach for obj or pictures when named | Will demonstrate understanding of 10 objects labels by pointing to pictures or handing objects after "Show me..... 80% |

9 of 40
Fulsang v. NMUSD
Stipulated Motion to Amend
1st Amended Request for Due Process Hearing

AR 0207

250

MAY. 8. 2013 5:47PM    LAW OFFICES OF K.M. LOYER              NO. 3515   P. 11

ADMINISTRATIVE RECORD FOR MATTER 2012050785     02/25/2014          208 of 1332

| #10 Gestures<br>Met 2/10 | Reaches for things he wants, physically prompts being picked up, pulls people to things, takes objects to adults, does not point or use gestures to signal interest, needs, wants | Will increase use of communicative gestures to include 2 movements/signals and use them at least 3x per educational session |
|---|---|---|
| #11 Expressive Vocabulary<br>Met 2/10 | Does not yet use any specific words or signs to name, request or call attention | Will use speech, signs or picture icons to label or request 8/10 objects or actions during structured activities |
| #12 Requesting<br>Prog 50% 2/10 | NO PLP NOTED | Will use word, sign or gesture to request more of something, indicate all done |
| Fine Motor<br>#13 Prewriting<br>Prog 30% 2/10 | Required multiple attempts & demos and some physical assist to imitate vertical/horizontal strokes | Will imitate vertical & horizontal strokes 4/5 opps |
| #14 Pincer Grasp<br>Met 2/10 | Used raking motion to grasp small pellets | Will use a refined pincer grasp when picking up 20 pinto beans, individual off a table 4/5 opps |
| Sensory Processing<br>#15 Arousal<br>Met 2/10 | Demonstrated signs of increased arousal after playing on therapy ball during ABA session | Will increase number of signs of increased arousal when provided with gross motor activities 4/5 |

The IEP indicates ▇▇▇ would spend 38% (120 minutes) of his day within regular education (page 21). However, the document indicates participation is limited to lunch & recess. No accommodations or modifications are noted. No goals were developed to address tactile sensitivities. It seems the District failed to consider, offer, or provide a program with the level of intensity recommended for children diagnosed on the autism spectrum. Parents consented to the IEP

## START OF STATUTE OF LIMITATIONS:

An annual IEP team meeting was held on February 9, 2010. (It should be noted this is the IEP in effect as to the statute of limitations.) IEP document generated at the time indicates ▇▇▇ met 7 of his 15 goals:

| | Goal | Progress Report |
|---|---|---|
| Readiness | 1. Motor Imitation | Met |
| | 2. Matching | Progressing – 48% |
| Self Help | 3. Toileting | Progressing – 44% |
| Behavior | 4. Response to name | Progressing – 44% |
| | 5. Safety Awareness | Progressing – 65% |

10 of 40
Fulsang v. NMUSD
Stipulated Motion to Amend
1st Amended Request for Due Process Hearing

AR 0208

MAY. 8. 2013 5:47PM    LAW OFFICES OF K. M. LOYER                    NO. 3515   P. 12

ADMINISTRATIVE RECORD FOR MATTER 2012050785      02/25/2014                  209 of 1332

| Soc Emotional | 6. Cause & Effect | Met |
| | 7. Visual Regard | Progressing – 43% |
| S&L | 8. Following Directions | Met |
| | 9. Receptive vocabulary | Progressing – 20% |
| | 10. Gestures | Met |
| | 11. Expressive Vocabulary | Met |
| | 12. Requesting | Progressing – 50% |
| Fine Motor | 13. Prewriting | Progressing – 30% |
| | 14. Pincer Grasp | Met |
| Sensory Processing | 15. Arousal | Met |

The Service plan offered was unchanged despite lack of substantial progress on goals. Plan included:

SDC    (ABA Preschool Class 5days/wk315min/day
          with mainstreaming 30min/day and Tues and Thursdays 3hrs 45mins.
S&L    2x30min/wk small group
OT      1x45min/wk large group,
OT  1x30min/wk individual

It appears the District did not subscribe to the available research, which strongly suggests that intensive early intervention can make a critical difference to children with autistic disorders. The service plan offered was far from "intensive". New goals were developed as follows:

| Goal Area | PLP | Goal | Issues |
|---|---|---|---|
| Readiness<br>#1 Sorting by size<br>Met 11/10 | Can sort by primary color, cannot sort by size. | Will sort 20 items or objects that are different sizes 80% | |
| #2 Puzzle<br><br>Met 2/11 | Can complete 6 piece board puzzle, connect two piece together w/ gesture & prompts | Will demonstrate understanding of completing 5, 3 piece interconnected puzzles, 80% | Fails to establish measurable baseline as to the stated goal and level of prompting |
| Self Help<br><br>#3 Hand washing<br><br>Met 2/11 | Will walk over to the sink and wait for someone to point to the soap to get him started. Needs gestural prompting to complete entire routine. | Will participate in a hand washing routine in his educational setting 4/5 | PLP fails to establish level of prompting, Goals states what he already does. Should be directed at reducing prompting and/or independence |
| #4<br>Toileting Routine<br><br>Prog 50% 2/11 | Beginning to understand bathroom routine. Will walk into bathroom and stand by urinal. Needs physical prompting to pull pants up and down. At 44% accuracy. | Will participate in toileting routine in educational setting, | PLP fails to establish level of prompting, does not support stated progress of 44%. Goals states what he already does, rather than reducing prompting and/or independence |

11 of 40
Fulsang v. NMUSD
Stipulated Motion to Amend
1ˢᵗ Amended Request for Due Process Hearing

AR 0209

MAY. 8. 2013 5:48PM    LAW OFFICES OF K.M. LOYER                    NO. 3515    P. 13

| Behavior #5 Calming Strategy<br><br>Not met<br>Revised 2/11 | Will calm down when an adult takes him for a walk outside the classroom. Unable to calm self down when adult asks him to | Will use calming strategy and stop crying when he is asked to calm down during a tantrum 80% | Fails to identify & deal with underlying behavior & antecedent to. Requires skill few adults possess |
|---|---|---|---|
| #6 Safety Awareness<br><br>Met 2/11 | Will look in the direction of the speaker 65% when asked to stop or when one says no with gesture prompts | Will stop and gaze in the direction of the speaker when name is called and is instructed to stop 80%` | Goal address attn to speaker, not safety awareness |
| #7 Response to name<br><br>Met 2/11 | Responds to name 48%, has difficult time looking at his communication partner while engaged with toy/activity | Will respond when his name is called by pausing activity and looking to the speaker when the speaker is within 3 steps 4/5 | Goal addresses two skills, but does not establish both baselines, i.e., responding to name, looking at speaker |
| Social Emotional<br><br>#8 Visual Regard<br><br>Met 2/11 | When prompted to look by the adult pausing and physically turning his body, he will look his communication parting(sic) in the eye 50% | Will make eye contact w/communication partner when showing/requesting an object/picture during structured activities lasting 5 minutes 4/5 | PLP fails to establish level of prompting required |
| #9 Peer Interaction<br><br>Prog 60% 2/11 | Will look in the direction of a peer when they are making loud noises | Will hand a peer an object given one verbal instruction 80% of the time | Fails to state level of peer interaction in quantitative terms. |
| S&L #9 Receptive vocabulary<br><br>DELETED 2/11<br>Poor motivation | Demonstrates understanding of "slinky" from a field of 3 when asked to identify | Will demonstrate understanding of 5 familiar objects from field of 3, 80% | Previous goal required identification of 10 objects at 80%, i.e. 8 objects progress was reported at 20%, i.e. 2 objects. Which appears to indicate the PLP is inaccurate. It would be helpful if goal included language regarding presentation, repetition of stimulus so as to establish level of prompting required to get any response, as it is unclear as to whether this is a behavioral issue or a language issue. |

MAY. 8.2013 5:48PM    LAW OFFICES OF K.M. LOYER                     NO.3515   P. 14

| | | | |
|---|---|---|---|
| #10 Expressive Pictures DELETED 2/11 Poor Motivation | Uses up to 10 picture symbols during snack and lunch activities to request food items. | Will increase his use of picture symbols to include 7 toys, 3 people and 3 action words. | Baseline is vague as to number of symbols, prompting, etc. |
| #11 Expressive Phrases DELETED 2/11 Poor Motivation | Hands single pictured objects to adult to request desired food items | Will combine two pictures on a sentence strip to request preferred items 6x during an activity. | |
| #12 Rate of Communication DELETED 2/11 Poor Motivation | Uses a rate of communication of 1 act every 2 minutes to request snack and lunch items. He is not maintaining this rate across activities. | Will increase his rate of communication across school day activities by maintaining a rate of initiating 1 act per 2 minutes | PLP does not establish baseline as to initiation and number of exchanges. |
| **Fine Motor** #13 Prewriting DELETED 2/11 "Much effort and support required for him to attend.." | Is able to imitate a vertical line with about 40% accuracy. Able to imitate a horizontal line with about 20% accuracy | Will be able to trace a vertical line, horizontal line and circle on the line w/verbal prompts 4/5 trials | As to PLP, It is unclear as to what "*imitate*" means in terms of drawing lines. |
| #13 Scissors Met 2/11 | Is able to hold loop scissors on his own and with guidance to hold the paper and is able to snip one time | Will be able to use loop scissors to make 5 continuous cuts across paper independently | PLP fails to establish level of support "*guidance*" infers |
| **Sensory Processing** #15 Motor Planning Met 2/11 | Does not consistently imitate simple motor actions. Just beginning to imitate rolling play dough. Has difficult time imitating actions that relate to his own body | Will be able to imitate 5 novel one step motor actions given one demonstration and verbal prompting | PLP and Goal fail to establish current/desired rate of verbal prompting |
| #16 Visual Attention Met 90% 2/11 | Does not always look when throwing at a target does not always throw his beanbag at the right time while swinging on a swing. Accuracy ranges from 30-50% | Will be able to throw a beanbag into a target while swinging on a swing independently with 80% accuracy | PLP does not establish visual attention baseline |

The IEP document indicates 38% mainstreaming (exposure to typical peers). However, school attendance is noted as 315min/day (1575 min per week) with 30min/day (150 min) and 3 hrs 45 min 1xwk (375 min) mainstreaming per week, which is approximately 23%. Assistive technology was not considered. Once again, it appears the team neither considered nor recommended intensive 1:1 ABA therapy, home/clinic based

1

2  ABA, clinic based OT services, nor Autism Specialist, Behaviorist or Inclusion specialist

   consultation or services. Parent consented to the IEP. An IEP addendum was generated
3
   on April 15, 2010, whereby the *"size"* goal was deleted from the plan as having been met.
4
   Parent consented to this change.
5
             In a letter dated May 5, 2010, parents requested the IEP team convene again to
6
   discuss OT and S&L goals and services. The IEP team met again on May 21, 2010.
7
   However, no new documents were generated except for a signature page. The team met
8
   again on June 21, 2010, whereby a 34 page document was generated. The only addition
9
   to the previous document, however, was an addendum page (#1) that indicated ███████
10
   *"program and services will not be provided at Harper Preschool next year. The program*
   *and services will be provided at Mariner's Elementary effective 9/7/10 and continue*
11
   *through the annual review."*   No rationale is provided for the change. OT & S&L goals
12
   and services remained the same, despite parents stated concerns. Parent's consented.
13
             The team convened again on November 23, 2010 to *"review progress during the*
14
   *previous reporting period, discuss concerns and review proposed changes and/or new*
15
   *goals"*.   Notes indicate teacher advised "████ *has made limited progress with most*
16
   *current goals..."* and *"...explained much of limited progress to many goals seems to be*
17
   *due to **poor motivation** in demonstrating independence across skill areas....*████████
   *requires much adult support and prompting to perform tasks across domains...An*
18
   *increased rate of maladaptive behaviors are frequently observed when demands are*
19
   *placed, even during routine and or preferred activities.   These include high shrill*
20
   *screaming, swiping and collapsing of body posture...Ejner is demonstrating difficulty in*
21
   *retaining skills across data collection period without high levels of instructional adult*
22
   *support"*. (Emphasis added.)   Parents noted continuing concerns that ████ toileting
23
   success was dependent on adult initiated schedule; ████ was demonstrating increased
24
   sensory seeking behaviors and increased destructive behaviors.   OT recommended
25
   deleting the pre-writing goal (tracing lines) and expressed concerns regarding attending
26
                                14 of 40
                          Fulsang v. NMUSD
27                       Stipulated Motion to Amend
                 1st Amended Request for Due Process Hearing
28

                                                                              AR 0212

1

2 (i.e., *"it takes much effort and support for him to attend before participating in

3 task"*).  OT recommended additional visual attention goal.   Sensory integration deficits

again were not addressed

4       Notes also indicated *"Due to limited progress, additional concerns, and questions

5 regarding levels of functioning, the IEP classroom team is recommending a full re-

6 evaluation to be completed by site team prior to June 2011, parents were in agreement;

7 an assessment plan should be sent home in early December."* There was no rationale as

8 to why the plan was not developed at the meeting, nor why the assessment was to be

9 delayed given the current decline/lack of progress in ▮▮▮▮ educational, social and

10 emotional function.  No changes were made to ▮▮▮▮ service plan.

11      The following changes were made to his goals:

| Goal Area | PLP | Goal | Issues |
|---|---|---|---|
| Readiness<br>1.Sorting by size | DELETED | | Determined met. |
| Behavior<br><br>#5 Calming Strategy<br><br>Prog 20% 2/11 | Will calm down when an adult takes him for a walk outside the classroom.  Unable to calm self down when adult asks him to 11/23 Screaming behaviors occur throughout the day (average 2-3x every 30 minutes. Duration of behavior (high shrill screaming, collapsing body and swiping) to be as short as 2-3min, as long as 10min. Frequency increases during toileting, snack, circle time and transitions  Seems to be no predictable antecedent. Has been observed having screaming behaviors during reinforcement. He is unable to imitate calming strategies | **Will imitate take deep breaths during structured setting 50% of the time across 3 days of data collection** | Fails to identify and deal with underlying behavior and antecedent to behavior.  Requires skill few adults possess.<br>Fails to properly analyze behavior |
| #9 Peer Interaction<br><br>Prog 80% 2/11 | Will look in the direction of a peer when they are making loud noises. | Will hand a peer an object given one verbal instruction 80% of the time | Fails to state level of peer interaction in quantitative terms. |
| #10 Expressive Pictures | DELETED | | Notes indicated goals were deleted b/c of lack of foundational skills and progress |

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

AR 0213

| 11. Expressive Phrases | DELETED | | Same as above. |
|---|---|---|---|
| 13. Prewriting | DELETED | | Notes indicated goal deleted b/c of attending issues. |
| **NEW GOAL**<br><br>#17 Visual Attention to Projects<br><br>Prog 50% 2/11 | Currently is able to attend to his paper for painting and coloring activities for 3 to 5 seconds at a time | Will demo improved visual attention and appropriate use of materials to be able to independently participate in a painting and/or coloring art project for 6 secs 3/5 | |
| **NEW GOAL**<br><br>18, Functional Communication<br><br>Prog 50% 2/11 | Now using sign to communicate needs, but demos confusion & displays several communicative gestures to signal needs and preferences. Able to use several signs after adult model, but not combining communicative gestures independently and successfully. Targeted set: point, more want, no, all done, eating/food. | During familiar semi structured setting, following one presentation of expected communicative behaviors, will independently combine two communicative gestures from set of five targets, to request or indicate choices in 3/5 opps | Fails to list signs ▓ is able to use |
| **NEW GOAL**<br><br>#19 Matching picture/objects<br><br>Prog 65% 2/11 | Is inconsistent in ability to find object to match w/photo | Will independently match real object w/photo of item using 3 foods and 3 toys, 4/5 | Fails to establish measure-able baseline |

An assessment plan was developed by the District outside the IEP team, presented to parent and signed on December 31, 2010. ▓ was now 4.10 years old and in a Preschool SDC class at Mariners Elementary School. His teacher, Ms. Leah Steinman provided an "*extremely structured*" classroom with "*reinforcements given consistently.*"

The following information was provided in the subsequent assessment report, dated January 2011. The School Nurse, Denise Ellis, inaccurately reported that the 2008 Newport Audiology report was "*sufficient to rule out hearing loss*". She also described difficulty in obtaining hearing screening results due to ▓ rejection of headphones and "*inability to comprehend the rationale for the testing*". Parent interview indicated their concerns as:

ADMINISTRATIVE RECORD FOR MATTER 2012050785          02/25/2014                                215 of 1332

Speech/Verbal Communication, Potty Training, Joining in Activities (peer interaction) and self-care skills.

They shared that *"communication difficulty makes ▇ frustrated"*. The report indicates *"▇ currently receives parent funded services through ACES 4 times per week for 2 hours per day..."*, thereby establishing the District's knowledge of the supplementary parent funded services.

The <u>Hawaii Early Learning Profile</u>[6] was administered by Leah Steinman to assess ▇ cognitive abilities. He achieved the following scores:

| Area | Age Equivalency in Months |
|---|---|
| Development of Symbolic Play 1 item | 9 – 15 |
| Spatial Relationships: 1 item each | 12 -18 and 30-36 |
| Concepts - 1 item each | 14-15 and 19-27 |
| Problem solving means to end | 13-15 |
| Cause & effect 1 item each | 12-15 and 18-22 |
| Language Receptive One<br>  Word meaning<br>  Body Parts | <br>9-12<br>No solid skills |
| Social Emotional 1 item each | 15-16 and 19-24 |
| Expression of Emotion/Feelings 1 ea. | 15-16 and 19-24 |
| Learning Rules/Expectations 2 items | 12-15 |
| 1 of three items | 12-15, 24-30, 30-36 |
| Social Interaction/Play<br>  2 items<br>  1 item | <br>6-10<br>12-15 and 24-30 |
| Independent feeding | 29.5-31.5 |
| Toileting  2 items<br>  1 item | 18-24<br>24-36 |
| Pre-writing | 24-30 |
| Block Construction | 18-22 |

The assessor concluded the following unique needs were identified, behavior (transition, compliance), Social Emotional (functional play), Readiness (body parts, imitation skills) and Self Help (utensil use, toileting). It was also noted that ▇ *"...required*

---

[6] Skills within each strand are developmentally sequenced. Each strand includes HELP skills which focus upon a specific underlying key concept and are hierarchical in nature (i.e., one skill leads to or builds the foundation for the next skill). It is not normed, nor are its reliability and validity rated. Washington State Guide to Assessment in Early Childhood.

AR 0215

ADMINISTRATIVE RECORD FOR MATTER 2012050785          02/25/2014                    216 of 1332

maximum reinforcement to remain calm during circle time...broke out in spontaneous screaming while the book Brown Bear was being read... required maximum prompting from staff to transition during center rotations...required specific individual instruction to join into activities..."

S&L language assessment by Kathy Murphy, indicated "*formal testing was not possible due to* ▮▮▮ *limited speech and verbal behaviors*". (Emphasis added.) Ms. Murphy concluded ▮▮▮ "...demonstrates significant delays in speech, social development and language skills... Results...suggest that his general communication profile is similar to a typically-developing young child between 12-15 months...uses functional communication including eye gaze with signs, gestures, vocalizations, and other indicating behaviors to direct others effectively in meeting his needs....rarely demonstrates communicative behaviors for purposes other than behavioral regulation of others and is particularly successful in requesting choices and indicating preferred items...beginning to demonstrate improved skills when matching photos with objects...with familiar, functional objects...verbal behaviors continue to be restricted in range, but he is using other vocal dimensions (pitch, rate, volume, nasality) to augment his communicative attempts about his emotional state.."

District OTs, Jennie Ni and Student Brooke Beverage, conducted fine motor and sensory processing assessment. Ms. Beverage indicated "......*due to* ▮▮▮ *'s behavior, standardized testing could not be completed....* ▮▮▮ appears to demonstrate difficulties in the areas of vestibular and proprioceptive processing...▮▮▮ demonstrated very low arousal level...poor sensory registration and/or modulation..." (Emphasis added.) She concluded ▮▮▮ was "...currently functioning below age level in his visual motor skills...continues to have difficulty maintaining an optimal arousal level for learning in the classroom...It would be beneficial for ▮▮▮ to participate in activities that increase his alertness level as part of his daily runtime..." She also indicated deficits in motor planning, body awareness, grading his force, auditory processing, social participation.   A sensory diet was not provided.

maximum reinforcement to remain calm during circle time...broke out in spontaneous screaming while the book Brown Bear was being read... required maximum prompting from staff to transition during center rotations...required specific individual instruction to join into activities..."

S&L language assessment by Kathy Murphy, indicated "*formal testing was not possible due to* ▇▇▇ *limited speech and verbal behaviors*". (Emphasis added.) Ms. Murphy concluded ▇▇▇ "...demonstrates significant delays in speech, social development and language skills... Results...suggest that his general communication profile is similar to a typically-developing young child between 12-15 months...uses functional communication including eye gaze with signs, gestures, vocalizations, and other indicating behaviors to direct others effectively in meeting his needs....rarely demonstrates communicative behaviors for purposes other than behavioral regulation of others and is particularly successful in requesting choices and indicating preferred items...beginning to demonstrate improved skills when matching photos with objects...with familiar, functional objects...verbal behaviors continue to be restricted in range, but he is using other vocal dimensions (pitch, rate, volume, nasality) to augment his communicative attempts about his emotional state.."

District OTs, Jennie Ni and Student Brooke Beverage, conducted fine motor and sensory processing assessment. Ms. Beverage indicated "......*due to* ▇▇▇*'s behavior, standardized testing could not be completed....* ▇▇▇ appears to demonstrate difficulties in the areas of vestibular and proprioceptive processing..▇▇▇ demonstrated very low arousal level...poor sensory registration and/or modulation..." (Emphasis added.) She concluded ▇▇▇ was "...currently functioning below age level in his visual motor skills...continues to have difficulty maintaining an optimal arousal level for learning in the classroom...It would be beneficial for ▇▇▇ to participate in activities that increase his alertness level as part of his daily runtime..." She also indicated deficits in motor planning, body awareness, grading his force, auditory processing, social participation.  A sensory diet was not provided.

AR 0217

MAY. 8. 2013 5:49PM    LAW OFFICES OF K.M. LOYER    NO. 3515    P. 21

| 16. Visual Attention | Progressing 90% |
|---|---|
| 17. Visual Attention/Projects | Progressing 50% |
| 18. Functional Communication | Progressing 50% |
| 19. Matching Pictures | Progressing 65% |

The following new goals were developed:

| Goal Area | PLP | Goal | Issues |
|---|---|---|---|
| **Readiness**<br><br>#1 Body Parts<br><br>Prog. 60% 2/12 | Able to imitate touching different body parts, but is not able to independently ID | Will receptively ID (by pointing/touching) 2 body parts (head/nose) on self after verbal instruction 4/5 | Goal rather limited requiring only 2 body parts to be ID'd in a year's time. |
| #2 Motor Imitation<br><br>Met 2/12 | 1:1 imitates non-verbal actions 75% of time. Large Group imitates novel non-verbal actions 50%. Not currently imitating 2 step non-verb actions | Will imitate 4/6 2 step non verbal actions w/o prompts, 80% | PLP and Goal are poorly written in that measurable baseline is not established for 2 step actions 1:1, large group, level of prompting |
| **Self Help**<br><br>#3 Bathroom 1<br><br>Met 2/12 | Able to walk into bathroom and stand by urinal. Requires physical prompts to pull pants up/down all the way | Will pull pants all the way down after approaching urinal during 4/5 opportunities | Fails to establish level of prompting required. Does not address sensory integration deficit aspects of toilet training |
| #4 Bathroom 2<br>Met 2/12 | | Wait until after full urination to pull pants up | same |
| #5 Utensil Use<br><br>Progressing 55% 2/12 | Uses hands to eat food, plays with food, smears on table and clothes. Requires maximum prompting to use fork | Will independently eat at least 50% of snack/lunch using utensil, when appropriate, 4/5 opportunities | Goal vague and immeasurable as stated. |
| **Behavior**<br><br>#6 Compliance<br><br>Met 2/12 | With prompting takes average of 20 seconds to attempt to follow known instructions. Will look to staff and reach out for physical prompting | Will increase rate of compliance by following known instructions (standup, sit down) within 5 seconds w/o maladaptive behaviors, 4/5 opportunities | PLP talks about level of time to "attempt" compliance and not actual compliance level. PLP fails to detail maladaptive behaviors |
| #7 Transitioning<br><br>Met 2/12 | We have been working with stopping at word "freeze". Pauses 60% of the time, but will not orient to speaker w/o prompting. Requires adult prompt to stay with group and transition | Will transition locations w/o eloping from group. 80% | PLP does not establish level of elopement. Nor does provide analysis, nor replacement behavior for difficulty with transition. |

AR 0218

MAY. 8. 2013 5:49PM    LAW OFFICES OF K.M. LOYER              NO. 3515  P. 22

| Social Emotional #8 Functional Play Progressing 50% 2/12 | When presented w/ new item has been observed to hold up and stare at them rather than use functionally for intended purpose. After items are more familiar and steps are performed, is able to imitate some 2 step play) | Will use functional play item within classroom theme for its intended purpose 4/5 opportunities | PLP fails to identify true PLP ("*after items are familiar and steps are performed...*" |
|---|---|---|---|
| #9 Group Met 2/12 | If a staff member is not close by has been observed to elope from groups of peers throughout day | Will remain in group with peers for 4 min at 80% | PLP does not establish level of elopement, nor amount of time b/f elopement attempt. Nor does provide analysis, nor replacement behavior for difficulty with transition. |
| Speech & Lang #10 Action-Location Pictures Met 2/12 | Not demonstrating a working functional communication system to signal needs (bathroom, hunger, tired) "This goal is to target an emerging use of photo cards to introduce appropriate actions in context" | When presented with 3 photos of familiar daily actions in different settings, will ID and match accurately picture of self in given functional space...when presented these options in vivo with average of 50% accuracy | Goal is poorly written and immeasurable. PLP is vague and fails to target specific area. Appears to abandon signing as functional communication |
| #11 Matching Pictures & objects Met 2/12 | This goal has initially been addressed on a limited basis. ▉ is able to match & choose photo pictures of preferred foods with consistency...and is becoming more tolerant when he makes an incorrect choice. He is less successful with toys but can find a preferred ball and car | Will independently match a set of 10 identified real objects familiar to classroom environment with a photo of that item from a field of 3 w/ 60% accuracy. | Again, fails to establish a measurable baseline. |
| #12 Protesting Met 2/12 | Is able to consistently imitate an adult model shaking head, but not observed to signal this intent independently and typically swipes items he does not office the table (sic)." | During semi structured routine of meals, in classroom will respond independently with the protesting behavior shaking his head "*no*" to indicate that he does not want a non-preferred food/drink item after it is visually presented and he is asked "*do you want xxxx*" with an average of 50% | PLP does not establish measurable baseline, goal is poorly written. |

AR 0219

ADMINISTRATIVE RECORD FOR MATTER 2012050785      02/25/2014                      220 of 1332

| #13 Receptive Instructions<br><br>Met 2/12 | Following adult model and/or prompts is able to complete these simple commands as modeled. He is most successful with "give me XXX" when the hand is extended, but is not discriminating or completing directions w/o prompts | During semi-structured tasks, will discriminate amount two targeted verbal instructions and follow the given direction with average of 50% accuracy (give me xxx, touch xxx) | PLP does not establish measurable baseline, number of prompts, goal is poorly written. Does not define "semi structured" |
|---|---|---|---|
| **Fine Motor**<br><br>#14 Visual Attention<br><br>Met 2/12 | Is able to visually attend to his paper for 3-5 seconds during art projects | Will demonstrate improved visual attention and appropriate use of materials to be able to participate in a painting or coloring art project for 8 seconds independently 3/5 | A three second gain is a poor improvement in one year's time, establishing a goal that allows a show of progress with very little staff effort |

The District appears to, in essence, recycle ▮▮▮ goals, while reducing services. The classroom placement is described as an "*ABA*" class, yet a behavioral analysis had not been done, nor has a behaviorist been included in his services. ▮▮▮ now found to be mentally retarded, without appropriate assessment or services being conducted/provided. Notes generated at the February 4, 2011, meeting indicate parent expressed concerns regarding the reduction of direct OT service, fear of ▮▮▮ being mainstreamed without proper support. They further **requested 3 hours/week direct speech and language services** and inquired as to how they could facilitate such. They also expressed that they did not feel the level of services offered were appropriate to meet ▮▮▮ needs, **not enough time allotted for OT services. Parents consented to the IEP indicating they disagreed with level of S&L services and limitation of additional goals (goal areas).**

Parents were advised "*the team would forward this information to the Harbor Zone coordinator to address the parents (sic) concerns regarding the level of Speech and Language services offered. The zone coordinator will contact the parents in a timely manner.*" A letter was generated by Zone Coordinate, Scott Huffman, on February 16, 2011. whereby the District indicated "*it has offered an appropriate program*" and advised the parent of their intent to refuse parents' requests. (per 34 CFR 300.503)

**AR 0220**

1

2    Another IEP team meeting was convened on March 8, 2011, where the team

3    reported ███ was making progress on all goals. An addendum was generated whereby

S&L services were increased to 2x30min/direct through June 2011 (group, 1x30min/wk

4    remained the same). No other changes were noted.

5    The IEP team convened again on April 10, 2011 regarding ███ transition to

6    Kindergarten. The Addendum generated at the time indicated the team was recommending

7    the ABA SDC Kindergarten at Eastbluff Elementary School:

8            SDC 4x390min and 1x300 per wk (ABA Kindergarten)
             S&L 2x15min/wk individual
9                2x30min/wk small group
             OT 1x30min/wk small group within the SDC setting for fine motor
10                1x30min/mon consultation

11   Parents again expressed concerns regarding the need for more speech therapy

12   services, as well as the need to focus on independent life skills and functional

     communication for ███ They consented to the IEP and indicated "*No*" to the question

13   "*Did the school district facilitate parent involvement as a means of improving services for

14   your child?*" **It does not appear the District generated another notice of intent (503)**

15   **letter in response to parents repeated request for more services, which violates**

16   **mandated procedures.** Progress reports generated on 6/24/11 and 11/14/11 indicated

17   progress level toward all goals appeared the goals would be met. Parents continued to

18   privately provide additional services.

19   The IEP team met without the parents on February 1, 2012. One sentence on the

20   notes page indicated the team discussed goals and that another meeting would be

     scheduled. Part two of the meeting took place on February 29, 2012. Parents, Kadi Burns

21   classroom teacher, Alexandra Sweany, OT and Kathy Murphy, SLP were present. Cheryl

22   Beck Principal and gen ed teacher, Juliet Hilde joined the meeting "*midway*". Parents

23   advised team that they had provided ███ an iPad that he can independently navigate.

24   Parents contend that, to date, District staff did not encouraged nor support ███ use of

25

26                          23 of 40
                          Fulsang v. NMUSD
27                     Stipulated Motion to Amend
                1st Amended Request for Due Process Hearing

28

AR 0221

the iPad technology until a private assessment was provided in Fall of 2012 and reviewed by the IEP team in January 2013.

Parent concerns/priorities were noted as wanting ▮▮▮▮ to meet his goals in the area of potty training w/o prompts, use of iPad to teach ▮▮▮▮ to read/write. They indicated ▮▮▮▮ likes to use his iPad. The team listed ▮▮▮▮ strengths & preferences as understanding the behavior token system and *"seems to respond to it...when attending can match pictures of items that are the same...will independently come into the classroom and begin working on a puzzle.."* Notes indicate parents should try using *Underarmor "for helping with sensory needs* ▮▮▮▮ *might have..."* **District did not otherwise address** ▮▮▮▮ **sensory deficits and did not provide the recommended support at school.**

The following progress on goals was reported:

| Goal Area | Progress |
|---|---|
| 1.Body Parts | Progressing 60% |
| 2. Motor Imitation | Met |
| 3. Bathroom 1 | Met |
| 4. Bathroom 2 | Met |
| 5. Utensil Use | Progressing 55% |
| 6. Compliance | Met |
| 7. Transitioning | Met |
| 8. Functional Play | Progressing 50% |
| 9. Group | Met |
| 10. Action- Location Pictures | Met |
| 11. Matching Pictures & objects | Met |
| 12. Protesting | Met |
| 13. Receptive instructions | Met |
| 14. Visual Attention | Met |

The educational records provided indicate the following goals were developed for the February 1, 2012 meeting.

| Goal Area | PLP | Goal | Issues |
|---|---|---|---|
| **Readiness**<br>#1 Body Parts<br><br>Met 1/13 | Re: Touching head & Nose, Will touch nose but when asked touch head will touch nose | Will match body parts, head nose stomach, (beg w/pics of his then pics of different) w/80% accuracy | Previous goal not met, now being changed limiting to 3 body parts. |
| **Self Help**<br>#2 Bathroom<br><br>Not met | Does not independently request restroom | Using visual aide, will req to use restroom thru out school day, 50% | Fails to establish level of prompting required |

AR 0222

ADMINISTRATIVE RECORD FOR MATTER 2012050785        02/25/2014                      223 of 1332

| | | | |
|---|---|---|---|
| **Behavior**<br><br>#3 Attending<br>Met 1/13 | Attends to an activity less than a minute before disengaging | Will attend to activity being presented for 2 consecutive minutes | Fails to provide specific PLP, last year was 3-5 secs |
| #4 Daily Routines<br><br>Met 1/13 | Able to match pictures to locations in the classroom, is not yet able to use visual schedule at school to fully navigate day | Will independently navigate through his day using a visual schedule | Does not establish level of ability, compliance in daily routines |
| #5 Motor Imitation<br><br>NOT MET 1/13 | During small group instruction will imitate two non verbal actions (nva). During circle time with an instruction to imitate three nva, will do first then stop | During large group instruction will imitate 3 consecutive movements w/ 80%. | |
| **Social Emotional**<br><br>#6 Emotions<br><br>Met 1/13 | During small group is unable to identify emotions | When presented with a picture of emotional state, will match the emotional state with the correspond picture 80%` | Goal poorly written. Fails to establish how the emotional state will be represented (so as to allow "*matching*") |
| #7 Morning – Afternoon Routine<br><br>Met 1/13 | When prompted, will unzip backpack in AM but will not follow thru with the rest of am unpacking routine. PM requires hand over hand support to pack up | Will independently complete the morning and afternoon routine of unpacking and packing backpack at 80% | Requires minimal progress and appears more a self help/motoring issue |
| #8 Waiting<br><br>NOT MET 1/13 | When there is a preferred food near will grab the food & put it in mouth w/o waiting<br>Food is usually a peer's | During snack/lunch when highly preferred food is present will wait with calm ready hands 80% | Fails to establish measurable baseline. Unclear as to nature "*waiting*" deficit – only food related? |
| **Speech & Lang**<br><br>#9 Break Time<br><br>Met 1/13 | Not currently using any visual support to indicate break time and is typically directed with gestural support to designated location or desired object | During semi-structured learning times after being told by staff you can take a break will independently present a specific break card (PECS/AAC) to signal the beginning of break | Appears redundant to the daily routine goal. |
| 10. Action in Locations | Is just beginning to demonstrate knowledge of common tasks at 80% to be completed in three given areas within | During structured learning in which simple phrase is paired with five familiar daily actions, using PECS/AAC & high levels | Goal is poorly written, immeasurable. PLP is vague and fails to target specific area. Appears to abandon |

AR 0223

MAY. 8. 2013 5:50PM    LAW OFFICES OF K.M. LOYER                    NO. 3515   P. 27

ADMINISTRATIVE RECORD FOR MATTER 2012050785          02/25/2014                    224 of 1332

| | | | |
|---|---|---|---|
| Met within Classroom Only 1/13 | class setting when presented with the picture of him performing the expected task in the locations | of reinforcement will move to noted location and perform action in picture, at 60% | signing as functional communication. |
| #11 Names and Faces  Not met 1/12 | Does not presently demonstrate understanding of familiar staff names unless he is provided maximal prompting and support | During structured learning where 3 pic (PECS/AAC) are presented in file & Hi levels of reinforcement are provided, will ID a minimum of three familiar adult staff and two family members w/60% average when asked to "Touch" | PLP doesn't indicate whether ▮ can ID family member, unclear if he has the concept. Goal does not define "*high levels of reinforcement*" |
| #12 Out of Seat Directions  Met in SDC classroom only 1/13 | Is now able to put away his placemat after snack and throw paper in the trash when given pointing/gestural prompts and presented with visual 50% Not able to complete other common & familiar out of seat directions without max support | During structured learning w/high reinforcement and he is provided visual through PEC/AAC of one of four familiar locations to place the object, will complete the given targeted direction with an average of 50% Put item in XXX) | PLP fails to establish specific level of prompting required, despite staff indicating data is kept on such. Goals is rambling and fails to indicate level of reinforcement to be used |
| Fine Motor  #13 Scissor Skills Met | Able to snip with scissors and cut across a paper, does not cut within ¼ " of line. At 25% w/prompting and redirection | Will cut across 6" line (1/2" think) at ¼" at 60% | Fails to establish level of prompting required for 25% accuracy. |
| Math  #14 Receptively ID number | Has begun matching #'s 1-10 during small group instruction. He is not yet displaying ability to receptively ID #'s | During small group instruction will receptively ID number 1-5 w/60% accuracy. | PLP fails to establish measurable level of accuracy. |
| Language Arts  #15 Letter ID | When attending, can match letters of the alphabet independently | During small group instruction, will receptively ID A,B.C,D and # at 80% | |

The IEP indicates 21% of ▮ day would be within general ed. No rationale was given as to why ▮ exposure to typical peers was reduced. Parents consented to the IEP on February 29, 2012.

**Parents are concerned for** ▮ **safety at school.** This concern heightened when he received a **head injury at school** after having walked in front of the swings on the

AR 0224

1
2    playground. The injury resulted in seizures and headaches that continued to occur over a
3    ten day period and required oversight by a physician. ███ doctor concluded the seizures
     were caused by the head injury. Parents also report they have been called to pick ███ up
4    from school due to his crying and wanting to leave. When they arrived he was still crying
5    and had scratches that no one could explain. It appeared the staff had lost track of him
6    during recess.

7            In their letter of April 5, 2012, due to the injuries that occurred at school and the
8    regression that ███ was exhibiting, parents requested an individual one on one, full time
     aide for ███ Parents received a formal written notice from the District dated April 27,
9    2012, indicating its notice of refused action. (per 34 CFR §300.503). District continues to
10   deny parent request for 1:1 aide support.

11           Given ███ unique needs and what appears to be an inability to provide
12   appropriate support and supervision to keep ███ safe, along with the District's refusal to
13   provide appropriate DIS services and its ongoing failure to provide FAPE along with the
14   resulting loss of educational opportunity and progress, Petitioners filed a request for due
15   process hearing on May 12, 2012. As parents felt ███ lack of any meaningful, consistent
16   modality or support for the development of ███ functional communication, parents
17   arranged for and provided the District a copy of a private assessment by Cynthia Cottier,
18   MA. M.Ed., C.C.C., SLP, an augmentative communication specialist. (July 2012). Ms.
     Cottier recommended development of a multi-modality communication system including the
19   use of a voice output augmentative communication device. She also recommended ███
20   use of the iPad and various software, development of a sensory diet and *"intensive
21   intervention will be necessary for* ███ *to develop his ability to use his system"*  To date
22   the District has refused to provide any level of *"intensive intervention"*.

23           Negotiations ensued and an interim agreement was achieved in November 2012
24   whereby an IEE was to occur by Dr. Lauren Franke, PhD, SL P.  The District convened an
25
26                              27 of 40
                             Fulsang v. NMUSD
27                        Stipulated Motion to Amend
                    1st Amended Request for Due Process Hearing
28

1  IEP team meeting on January 13, 2013, whereby Dr. Franke could present her findings.

2  Despite parent request, to date, no written report was provided.

3       Dr. Franke recommended an FBA be performed and opined it should have been

4  done two years ago. Notes reflect parents agreed to the FBA and consented to it being

5  done immediately. Dr. Franke also recommended that a sensory processing assessment

6  also be done. Meeting notes indicate she also recommended that assistive technology

7  should be utilized to assist ▮ in the development of functional communication. Notes

8  further reflect the District AT specialist, Ms. Lila Seldin, provided a consult, indicating she

9  recommended an iTouch for ▮ She stated the iTouch "*is programmed and used by the

   staff*". Parents expressed concerns as to the small size of the iTouch. Notes further
10
   indicate "*The team discussed how the tool would be used by (sic) as a communicative
11
   device by adults in order to emphasize and continually use the device with* ▮*.*" Dr.
12
   Franke emphasized "*the importance of modeling by each in* ▮ *environment, and*
13
   *without that modeling, she noted growth can be less than expected...*" stressing the
14
   ..."*device should be used multiple times by the adult and then offered to the student for his*
15  *use.*" ▮ toileting issues were discussed, as he has regressed in this area. It was

16  agreed that the school nurse would develop an Individual Health Care Plan an attached to

17  the IEP. To date parents have not received this. Mr. Chen, District OT, opined that ▮

18  did not require individual OT services. A sensory diet was not provided. Ms. Johnson,

19  SLP, indicated ▮ met his S&L goals "*in the classroom setting*". Notes reflect parents

20  requested an increase in S&L services as per Ms. Cottier's recommendations (i.e.,

21  30min/4xwk to address functional communication) to assure "*intensive*" instruction, and

22  that they consented to all recommended assessments and use of the AC device.

23       The following goals were presented at the January 23, 2013 meeting:

24

25

26                        28 of 40
                      Fulsang v. NMUSD
27                  Stipulated Motion to Amend
            1st Amended Request for Due Process Hearing
28

MAY. 8. 2013 5:51PM    LAW OFFICES OF K.M. LOYER                    NO. 3515    P. 30

| Goal Area | PLP | Goal | Issue |
|---|---|---|---|
| **Behavior**<br><br>**Goal #1**<br><br>**Choral Instructions**<br><br>**Page 8** | When the class is given familiar choral instructions (line up, go to circle time, wash hands, etc.), ▮ will respond to the instruction 26% of opportunities provided. | During classroom activities, ▮ will follow familiar choral classroom instructions (line up, find snack, clean up, etc.) in 80% of charted opportunities across two weeks of data collection. | |
| **Behavior**<br><br>**Goal #2**<br><br>**Self-Regulation**<br><br>**Page 9** | Currently ▮ is not able to request calming or sensory strategies. He will grab adults hands to press on his jaw or chin when he needs input. He will also cry and/or whine when needing sensory input. When prompted with the ASL sign for break, he will walk away from the activity and take a break. ▮ enjoys tickles on his arms, squeezes and bounces on the big ball for sensory breaks. Currently he has been observed requesting a break 0% of opportunities provided. | When feeling agitated, ▮ use his AAC device to request a calming/coping or sensory strategy (i.e. squeezes, tickles, bouncing, etc.) in 50% of charted opportunities in a two week period. | District has not conducted a FBA and therefore, may or may not fully understand ▮ communicative intent. If the assumption is correct, his actions are actually requests for a break and baseline data is incorrect at 0%.<br><br>Notes indicate Dr. Franke expressed concerns with the implementation of use of an AAC device for self-regulation goal when he makes attempts to vocalize his needs. Team did not however, change the goal |
| **Behavior**<br><br>**Goal #3**<br><br>**Stimulatory Reduction**<br><br>**Page 10** | During a center rotation, when objects are present on the table, ▮ will work at the table without tapping the table or objects for an average of 2 minutes. | During table top activities, when objects are presented, Ejner will sit for an average of 8 consecutive minutes with calm hands, not tapping the table or objects across two weeks of data collection. | Parents have stated that ▮ tapping seems to provide a level of self-soothing. Extinguishing the behavior without proper analysis of its function may or may not be appropriate. |
| **Soc/Emotional**<br><br>**Goal #1**<br><br>**Choices**<br><br>**Page 12** | Ejner can make simple choices pictures of preferred items from a book or a strip using only the picture to make the request. He has shown success in receptive labeling preferred items in the classroom. When | When given a field of four choices, ▮ will select his preferred choice on an AAC device in 80% of charted opportunities across two weeks of data collection. | |

**AR 0227**

MAY. 8. 2013 5:51PM    LAW OFFICES OF K.M. LOYER                         NO. 3515    P. 31

| | | | |
|---|---|---|---|
| | presented with an AAC device during consultation, ███ was able to choose a preferred item 64% of opportunities provided. | | |
| **Soc/Emotional**<br><br>**Goal #2**<br><br>**Name Identification**<br><br>**Page 13** | When presented with a group of names, ███ correctly identify his own name 26% of opportunities provided. | When given three names, ███ will receptively identify his written name in a field of four in 80% of charted opportunities across two weeks of data collection. | |
| **Soc/Emotional**<br><br>**Goal #3**<br><br>**Peer Matching**<br><br>**Page 14** | Currently ███ does not show awareness of who his peers are. When asked to find a peer or point to a specific peer's picture, ███ will respond correctly 15% of opportunities provided. | ███ will match a picture of his peer, to the actual peer 60% of charted opportunities across two weeks of data collection. | |
| **Speech and Language**<br><br>**Goal #1**<br><br>**Cessation**<br><br>**Page 16** | ███ is able to imitate "*all done*" as a sign language approximation. He also independently demonstrated cessation using AAC pictures in 22% of provided opportunities. | When presented with communication opportunities within the classroom, B███ will use AAC to demonstrate cessation ("all done") in 50% of provided opportunities across 2 data collection sessions. | |
| **Speech and Language**<br><br>**Goal #2**<br><br>**Rejection**<br><br>**Page 17** | ███ currently indicates rejection using physical gestures (shaking his head, pushing items away). He is not yet using AAC pictures to indicate rejection (0% of provided opportunities). | When presented with a non-preferred activity or object within the classroom, ███ will use AAC to demonstrate the intent of rejection ("I don't want it") in 50% of provided opportunities across 2 data collection sessions. | |
| **Speech and Language**<br><br>**Goal #3**<br><br>**Requesting Actions** | To request actions, ███ is able to imitate the sign for "help" and will grab an adults hand and place it under his chin for sensory input. With the AAC device, ███ requested | When presented with communication opportunities in various classroom settings, (e.g. snack, calendar time, language group, etc.), ███ will demonstrate | Again, PLP is unclear as to the communicative intent of placing an adult's hand under his chin. It may or may not be for sensory input. Goal requires ███ to |

AR 0228

MAY. 8. 2013 5:51PM    LAW OFFICES OF K.M. LOYER         NO. 3515   P. 32

| | | | |
|---|---|---|---|
| **Page 18** | action in 0% of provided opportunities. | the intent of requesting an action (help, swing, jump, sensory input) in 50% of provided opportunities across 2 data collection sessions. | make a choice that he may not fully understand. PLP does not establish whether he is able to identify the need for a "sensory" break, given the minimal OT intervention that he has rec'd. |
| **Speech and Language**<br><br>**Goal #4**<br><br>**Requesting Objects**<br><br>**Page 19** | Currently, ▇▇ is able to request preferred objects (puzzles and edibles) using AAC. He request food in 81% and puzzles in 47% of provided opportunities (average of 64%). He also points to desired objects and uses signs for "candy" and "crackers". | When presented with communication opportunities in various classroom settings (e.g. snack, calendar time, language group, etc.), ▇▇ will demonstrate the communicate intent of requesting an object using AAC in at least 2 different activities in 80% of provided opportunities across 2 data collection sessions. | It appears ▇▇ has achieved the 80% goal mark in at least one area (food). And has demonstrated communicative intent. Goal should be more specific in targeting |
| **Fine Motor**<br><br>**Goal #1**<br><br>**Pre-writing tracing**<br><br>**Page 21** | ▇▇ demonstrates the ability to imitate a vertical, horizontal line and open ended circle, he is able to use a dot mark to fill in the dots for a letter that is approximately 6 inches. | To demonstrate improved visual motor integration skills, ▇▇ will trace the letters of his first name (approximately 8 in. letters), in 70% of opportunities, over 2 consecutive weeks of charted opportunities, across 2 staff members. | Goals seems minimal in that ▇▇ has demonstrated tracing skill with six in letters. It would seem 8 inch letters would be less of a challenge and farther away from typical writing skills. |
| **Fine Motor**<br><br>**Goal #2**<br><br>**Scissors skills**<br><br>**Page 22** | ▇▇ demonstrates the ability to cut on a ½ in. wide line that is 6 in. long staying within ¼ in. from the given boundaries. | To demonstrate improved visual motor coordination and motor planning skills, ▇▇ will cut across a 10 inch line (¼ inch thick), deviating no more than ¼ inch from the boundaries of the lines, in 70% of opportunities, over 2 consecutive weeks of charted opportunities, across 2 staff members. | |

AR 0229

MAY. 8. 2013 5:51PM    LAW OFFICES OF K.M. LOYER                    NO. 3515   P. 33

ADMINISTRATIVE RECORD FOR MATTER 2012050785      02/25/2014                    230 of 1332

| Mathematics Goal #1 Quantitative Concepts Page 23 | When presented with a quantitative, ▇ will receptively identify quantitative concepts (big/little, full/empty) 17% of charted opportunities. | ▇ will receptively identify quantitative concepts of big/little, empty/full in 50% of opportunities provided across two weeks of data collection. | |
|---|---|---|---|
| Language Arts Goal #1 Agent/Action Page 24 | When presented with a field of four agent action picture cards, ▇ will match the similar picture card 12% of provided opportunities. | When presented with a picture of an agent action activity, out of a field of 4, ▇ will receptively match the action noun sentences to a similar action noun picture in 60% of opportunities provided across two weeks of data collection. | |
| Language Arts Goal #2 Categories Page 25 | When presented with quantitative concepts, ▇ will correctly identify 27% of opportunities provided. | When given pictures of familiar items, (school supplies, clothing, animals, food, etc.) in a field of 4, ▇ will separate them into the correct category in 80% of opportunities provided across two weeks of data collection. | |

Parents did not receive a copy of the IEP document at the meeting. IEP team meeting notes indicated parents consented to implementation of the proposed goals with the understanding that they would be provided a full copy of the IEP with the meeting notes for review and would provide additional input. Parents requested Dr. Franke be involved in the FBA understanding that she would not be the once collecting data. Parents were assured she would be involved in analyzing the data. Parents requested copies of all data collected on ▇▇. Two months later a packet of blank data sheets was provided.

The Service plan offered included:

    SDC 1x1860 per wk thru 1/2014
    S&L 3x20min/wk individual **thru 2/2013**
        2x30min/wk 1 small group and 1 individual thru 1/2014
        1x30min/wk consult
    OT 1x30min/wk small group within the SDC
    AT consult 1x30 min/wk thru 3/2013 (4 hours of training)

1

2       Despite receiving parental consent as documented in the January 2013 IEP the FBA

3   was not conducted until April 2013.  District representative presented the parents with an

4   assessment plan on or about March 27, 2013 and indicated the need for the signature.

5   The Assessment Plan had been back dated to January 2013.  Parents signed the

6   document with notation citing the IEP meeting notes and indicating consent and this plan

    was not provided until March.

7       An IEP team meeting was convened on May 2, 2013, to review the District's FBA,

8   Sensory Diet and what the District called an *"Evaluation to Determine Need for Special

9   Circumstance Assistance Independence Facilitator Assistance"*.  The FBA was conducted

10  by District autism specialist, Eliza DelPizzo, PhD.  Dr. DelPizzo did not collect data nor

11  conduct formal observations of ███  Dr. Franke was not contacted until after the report

    was written on April 29 2013. Dr. DelPizzo indicated no BSP or BIP was needed.  District

12  OT Provided a *"Sensory Diet"* and indicated a sensory break should be provided every 20-

13  30minutes.   School Psychologist, Karrie Anderson, determined no aide support was

14  needed.  Parent input was not elicited for any of these reports.  The reports were not sent

15  to the parents until the evening prior to the May 2nd meeting.

16      The District presented two additional goals:

17

| Goal Area | PLP | Goal | Issue |
|---|---|---|---|
| Self Help/Domestic Goal #1 Toileting Page 9 | Currently ███ is physically prompted to sign toilet before entering the bathroom. | During bathroom breaks and opportunities, ███ will use AAC Device to identify where he is at (bathroom) with 60% accuracy across two weeks of data collection. | |
| Behavior Goal #1 Aggression Page 11 | Currently ███ shows aggressive behaviors an average of 2 times per day, consisting of grabbing the arm or wrist of a nearby adult and squeezing. These behaviors are sometimes paired with crying and/or whining. | When showing beginning signs of escalation, ███ will use language (signs, AAC, gestures) or calming strategies with no more than one physical prompt, in 60% of given opportunities across two weeks of data collection. | As noted above, Dr. Franke expressed concerns with the implementation of use of an AAC device for self-regulation goals |

1

2

The Service plan offered included:

SDC 1x1860 per wk  thru 1/2014
    2x30min/wk 1 small group and 1 individual thru 1/2014
    1x30min/wk consult
OT 1x30min/wk small group within the SDC
AT consult 1x30 min/mon

3

4

5

Parents again requested that a 1:1 ABA trained aide be added to the service plan so as to

6

provide the recommended intensive training and facilitation of ▇▇▇ functional

7

communication, behavioral intervention and facilitation of social interaction with peers.

8

ABA. They also requested behavioral intervention services to include clinic based

9

services, consult and direct services from a trained, qualified behaviorist, clinic meetings

10

and supervision. All requests were denied. Notes reflect parents were directed to address

11

these requests at the upcoming mediation rather than at the IEP team meeting. Parents

12

protesting indicating they preferred to have the Team discuss these matters during the IEP

13

team meeting. This request was also denied.

14

    Due to the District's continued denial of FAPE and ongoing failure to properly

15

assess for and provide a comprehensive IEP to include placement and services, they are

16

now requesting a due process hearing and submitting this amended request to include the

17

IEPs offered subsequent to their original filing in May 2012.

18

19
## ISSUE STATEMENTS WITH RELATED FACTS
### AND
### PROPOSED RESOLUTIONS KNOWN AT THIS TIME

20

21

    Petitioner reserves the right to amend issues upon discovery of unknown facts

22

through receipt of educational and/or public records received from Respondents and

23

other sources.

24

20 USC §1415 (b)(7)(A)(ii) states in pertinent parts that complaints under this
section shall include (emphasis added):

25

**(III)** a description of the nature of the problem of the child relating to such
proposed initiation or change, including facts relating to such problem; and

26

27

34 of 40<br>Fulsang v. NMUSD<br>Stipulated Motion to Amend<br>1st Amended Request for Due Process Hearing

28

AR 0232

1

2    **(IV)** a proposed resolution of the problem **to the extent known and available to the party at the time.**

3

4    <u>Regarding all Assessments and IEPs generated from May 2010 to present, as fully</u>

5    <u>detailed above:</u>

6    <u>Issue #1</u>

7    As detailed supra, Petitioner contends that the District violated IDEA, Section 504 of the

     Rehabilitation Act of 1973, the civil rights act under 42 U.S.C. §1983 and denied FAPE

8    under both IDEA and §504 and related special education state and federal laws, which

9    resulted in a loss of educational opportunity, when it failed to provide <u>appropriate</u>

10   assessments in all areas of identified/suspected need, to include but not be limited to

11   cognitive ability, functional communication, sensory integration, fine motor, need for

12   assistive technology and/or augmentative communication and social integration/social

13   skills and appropriate behavioral analysis.

14        The District recent attempt at producing a FBA failed to provide appropriate analysis

15   of targeted behavior and failed to result in a behavioral intervention or behavioral support

16   plan. Prior to the May 2013 assessment, the District had not conducted an FBA, despite

     ███ severe behavioral issues and lack of functional communication. The District also

17   failed to assess in the area of assistive technology until parent provided a private

18   assessment in July 2012.

19   <u>Proposed Resolutions to the extent known and available at this time, reserving right</u>

20   <u>to revise as appropriate:</u>

21   An order

22        1. Whereby the District must fund a full battery of Independent Educational

           evaluations (IEEs)  to include, but not be limited to academic

23         achievement, cognitive functioning, social emotional functioning, auditory

24         processing (including Audiological evaluation), speech and language

25

26                        35 of 40
                       Fulsang v. NMUSD
27                  Stipulated Motion to Amend
          1st Amended Request for Due Process Hearing

28

ADMINISTRATIVE RECORD FOR MATTER 2012050785      02/25/2014                        234 of 1332

assessment, functional communication assessment, assistive technology assessment to include augmentative communication, etc.

2. Whereby, once IEEs are completed, the District must convene a full IEP team meeting to include all private assessors where a comprehensive IEP with appropriate DIS services should be developed and compensatory services awarded as per recommendations of the private assessors.

## ISSUE #2

As detailed supra, Petitioner contends that the District violated IDEA, Section 504 of the Rehabilitation Act of 1973, the civil rights act under 42 U.S.C. §1983 and denied FAPE under both IDEA and §504 and related special education state and federal laws, causing a loss of educational opportunity when it :

1. Failed develop a comprehensive, appropriate IEP, to address all of ▮▮▮ identified unique needs including but not limited to communication, social emotional behavior, self-help skills, sensory integration, toileting.

2. Failed to meet the requirements of the IDEA in that the goals written were not comprehensive, were cursory, consistently failed to establish baselines to allow for meaningful measurement of progress thereby permitting a misleading showing of educational progress.

3. Failed to provide appropriate placement and support services in the Least Restrictive Environment (LRE).

4. Failed to provide appropriate behavioral support services/interventions (including but not limited to behavioral analysis, clinic based ABA services, ABA home program to assure success and consistency across environments, direct ABA services, clinic meetings, supervision, and 1:1

AR 0234

trained aide support throughout his school day to address all social, emotional, communication and academic needs).

5. Failed to provide sufficient levels of S&L services.

6. Failed to provide parent training.

7. Failed to provide appropriate levels of Occupational Therapy to address sensory needs and fine motor deficits.

8. Failed to provide appropriate assistive technology assessment, services and equipment.

9. Failed to provide highly qualified staff to assess, develop and implement appropriate IEP to include, but not be limited to, accommodations across environments (including but not limited to behaviorist, inclusion specialist, assistive technology consult, aide support, social skills facilitation, etc).

10. Failed to provide appropriate level of support services including the provision trained ABA/academic instructional aide, DIS services in the areas to include, but not be limited to functional communication, meaningful social skills interventions and behavioral support services as discussed supra.

11. An order whereby parents are fully reimbursed for out of pocket costs related to all educationally related services/expenses according to proof, for entire statute of limitations.

12. An order whereby the District must provide compensatory services in the form of clinic based and home based ABA services to include regular staff meetings, supervision, parent training, individual and group social skills training frequency and duration TBD

1

2      13. An order of an award of compensatory services (TBD) in the areas of

3          S&L therapy, OT, and direct ABA services by the private service provider

           of the parent' choice.

4      14. An order whereby District must reimburse parent for the private

5          Augmentative Communication assessment and consultation at IEP team

6          meeting as to appropriate equipment, training and goal development to

7          assure instruction sufficient to follow hierarchy of language development.

8      15. A finding that the Petitioners prevailed on all issues presented

9      16. Any other award as deemed appropriate by the ALJ

10     **Issue #3**

11     As detailed supra, Petitioner contends that the District violated IDEA, Section 504 of

       the Rehabilitation Act of 1973, the civil rights act under 42 U.S.C. §1983 and denied

12     FAPE under both IDEA and §504 and related special education state and federal

13     laws, causing a loss of educational opportunity when it failed to provide highly

14     qualified staff to assess, provide services and implement appropriate

15     accommodations across environments (including but not limited to behaviorist,

16     inclusion specialist, assistive technology, individual aide support, etc)

17

18     **Proposed Resolution Known at this Time:**

19     A finding that the District violated procedural safeguards of the IDEA when it failed

       to provide highly trained staff to assess for and provide appropriate service to

20     address all of ▇▇▇▇ known/suspected deficits necessary to improve his academic

21     achievement and functional performance, as described supra. An order for private

22     assessments, compensatory services and reimbursement as described supra

23     **Issue #4**

24     As detailed supra, Petitioner contends that the District violated IDEA, Section 504 of

25     the Rehabilitation Act of 1973, the civil rights act under 42 U.S.C. §1983 and denied

26                                    38 of 40
                                   Fulsang v. NMUSD
27                              Stipulated Motion to Amend
                        1st Amended Request for Due Process Hearing

28

AR 0236

1   FAPE under both IDEA and §504 and related special education state and federal

2   laws, causing a loss of educational opportunity when it failed to include parents in

3   the May 2013 FBA, Sensory Diet Development and Evaluation to Determine Need

4   for Special Circumstance Assistance Independence Facilitator Assistance.

5   Failure to include parents in these evaluations caused a loss of educational

6   opportunity when these assessments resulted in a less than adequate service plan,

7   the failure to develop a BSP, BIP and failure to provide appropriate aide support.

8   ## SUMMARY

9   ## ISSUE STATEMENTS & PROPOSED RESOLUTIONS

10   It is Petitioner's contention that the Respondents violated IDEA, Section 504 of the

11   Rehabilitation Act of 1973, the civil rights act under 42 U.S.C. §1983 and denied FAPE by

12   their various failures to assess and/or address all of Petitioner's unique needs. He further

13   contends that these failures/violations resulted in a loss of educational opportunity. The

14   District has violated proscribed procedures and has failed to develop an IEP that provides

15   Petitioner with an appropriate education.

16   Petitioner is cognoscente of the fact that California has not created a combined

17   system for hearing IDEA and § 504 matters.   However, Petitioners have not been

18   properly notified as to their rights under §504 and is not aware of any fair hearing or due

19   process procedures as established by the District to address violations and assure their

20   rights are properly vindicated.   To that end Petitioners are hereby providing the District

21   notice of their demands and intent to file a lawsuit for this and issues related to █████

22   injuries at school. Notice is provided here to provide for exhaustion of administrative

23   remedies and to promote comprehensive alternative dispute resolution.

24   While Petitioners acknowledge the OAH's customary practice to dismiss such claims

25   due to jurisdictional issues, Petitioners' hereby declare that it is their intent to do all that is

26   necessary to exhaust all such claims, including presenting evidence regarding the impact

27   
28

39 of 40
Fulsang v. NMUSD
Stipulated Motion to Amend
1st Amended Request for Due Process Hearing

of §504 and §1983 violations on themselves.  As can be easily demonstrated, there is significant overlap between the IDEA and §504 claims in this case, such violations give rise to §1983 claims.  Petitioner will do all things possible to create an ample record with respect to such claims.

Proposed Resolutions include IEEs as described supra; a request for compensatory services TBD; development of a comprehensive IEP to include all appropriate DIS services (including but not limited to 1:1 trained aide support) and reimbursement for educationally related services.

Petitioner reserves the right to amend his request and add any issues that arise during the course of their good faith attempt to resolve the above stated issues, and any issues that are unknown at this time and add any and all such further relief as may be deemed appropriate by the ALJ.


Respectfully Submitted by:



Kathleen M. Loyer, Attorney for Petitioners        DATE:_____May 8, 2013_____

40 of 40
Fulsang v. NMUSD
Stipulated Motion to Amend
1st Amended Request for Due Process Hearing

AR 0238